UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - X

UNITED STATES OF AMERICA,       : 20-CR-549(AMD)
                                :
                                :
                                :
        -against-               : United States Courthouse
                                : Brooklyn, New York
                                :
                                :
CORY MARTIN,                    : Tuesday, February 27, 2024
                                : 9:30 a.m.
            Defendant.          :
                                :
                                :
- - - - - - - - - - - - - - X

TRANSCRIPT OF CRIMINAL CAUSE FOR TRIAL
BEFORE THE HONORABLE ANN M. DONNELLY
UNITED STATES DISTRICT COURT JUDGE

A P P E A R A N C E S:

For the Government:    BREON S. PEACE UNITED STATES ATTORNEY
                       EASTERN DISTRICT OF NEW YORK
                         271 Cadman Plaza East
                         Brooklyn, New York 11201
                       BY:EMILY J. DEAN
                          TANYA HAJJAR
                          ANDRES PALACIO
                          Assistants United States Attorney

For the Defendant:     LAW OFFICE OF ANTHONY CECUTTI
                         217 Broadway - Suite 707
                         New York, New York 10007
                       BY:ANTHONY CECUTTI, ESQ.

                       THE LAW FIRM OF KESTINE M. THIELE
                         305 Broadway - Suite 700
                         New York, New York 10007

Court Reporter:        LINDA A. MARINO, OFFICIAL COURT REPORTER
                       225 Cadman Plaza East/Brooklyn, NY 11201
                       lindacsr@aol.com
Proceedings recorded by mechanical stenography, transcript
produced by Computer-Aided Transcription.

1      (In open court; Jury not present.)

2      THE COURTROOM DEPUTY:  All rise.

3      THE COURT:  Everybody can sit down.

4      All right, everybody.  So I did receive everybody's

5  submissions on the question of the proposed experts.  I'm

6  still thinking about it.  I have it say, it did occur to me

7  yesterday when the K9 detective was testifying on

8  cross-examination that you brought out stuff that wasn't

9  brought out on direct, and now it seems like you want to

10 impeach him on the stuff that you brought out when he was

11 essentially your witness.

12     I'm still thinking about it.  I'll give you my

13 ruling a little later this morning.

14     All right.  Are we ready to go?

15     MS. DEAN:  Yes, Your Honor.

16     THE COURT:  Let's get our jury.

17     The other thing is I think what we're going to do is

18 because we're working a little bit later, and Mr. Cecutti

19 wants to make that sentencing, I think we might make the lunch

20 hour for 3:00 o'clock.  I know that's crazy.  But I'll give

21 them a couple of other breaks in between.  But I think that'll

22 enable you to do what you have to do, and we'll just take the

23 longer break then.

24     Donna is going to make sure that nobody is too upset

25 about that.

1          MS. HAJJAR:  Your Honor, could we just clarify when

2     the breaks --

3          THE COURT:  I'm sorry, I can't hear you.

4          MS. HAJJAR:  Can we just clarify the breaks --

5          THE COURT:  Like 3:00, 2:45.

6          MS. HAJJAR:  I'm sorry, earlier than that, because

7     we have some witnesses that we intended to prep around the

8     lunch hour.  I'm just wondering if there was there's a way

9     that we could quickly meet with them.

10         THE COURT:  I'll probably give them a break around

11    12:15.  Is 15 minutes enough?

12         We'll figure it out.  If it has to be a little bit

13    longer, it's fine.

14         MS. HAJJAR:  Okay.  And just so Your Honor knows, I

15    think the second witness today is testifying with a Turkish

16    interpreter.

17         THE COURT:  Okay.

18         (Pause in the proceedings.)

19         THE COURTROOM DEPUTY:  All rise.

20         (Jury enters the courtroom.)

21         THE COURTROOM DEPUTY:  You may be seated.

22         THE COURT:  All right, everybody.  We're ready to

23    continue.

24         Are you ready to call your next witness?

25         MR. PALACIO:  Yes, Your Honor.  The Government calls

1   Jordan Allar.

2           (The witness takes the stand.)

3           THE COURTROOM DEPUTY:  Raise your right hand for me,

4   please.

5           (The witness was sworn and/or affirmed in by the

6   courtroom deputy.)

7           THE WITNESS:  I do.

8           THE COURTROOM DEPUTY:  State your name, for the

9   record.

10          THE WITNESS:  Jordan Allar.

11          THE COURT:  All right.  I want to make sure

12  everybody can hear you, so we've got the microphone in a good

13  spot.  But it's important that the jurors hear you and that

14  the people at both tables.  Don't speak too quickly.  Our

15  court reporter takes down everything that you say, and it

16  makes his job hard if you speak too fast.

17          If there's a question you want to have repeated or

18  clarified just let me know, all right.

19          THE WITNESS:  Thank you.

20          THE COURT:  All right.  Go ahead.

21          MR. PALACIO:  Thank you, Your Honor.

22
            (Continued on the following page.)
23

24

25

1   **JORDAN ALLAR**,

2                   called by the Government, having been

3                   first duly sworn, was examined and testified

4                   as follows:

5   DIRECT EXAMINATION

6   BY MR. PALACIO:

7   Q    Ms. Allar, can you tell us who you work for?

8   A    I work for Capital One Bank.

9   Q    In what capacity?

10  A    I'm a bank fraud law enforcement investigator.

11  Q    Where is your office located?

12  A    Our headquarters is in Richmond, Virginia.

13  Q    How long have you worked for Capitol One?

14  A    Seven years.

15  Q    Can you tell us what some of your duties and

16  responsibilities are as a law enforcement bank fraud

17  investigator?

18  A    Yes.  I pull fraud data or account data, I assist law

19  enforcement, and then I also respond to subpoena request.

20  Q    In that role, are you a custodian of Capital One records?

21  A    Yes.

22  Q    Ms. Allar, did there came a point when Capitol One

23  produced bank records for a checking account belonging to

24  someone named Brandy Keshawnn Odom pursuant to a subpoena?

25  A    Yes.

1    MR. PALACIO:  With the Court's permission, if we

2  could show the witness only what's marked as Government's

3  Exhibit 123-1 to 123-7, and I have hard copies for the witness

4  to look at.

5           May I approach, Your Honor?

6           THE COURT:  Sure.

7  Q    Ms. Allar, if you could take a look at those records, and

8  once you do, look up, and I have some questions for you.

9  A    Okay.

10 Q    Ms. Allar, do you recognize those records?

11 A    I do.

12 Q    What do you recognize them to be?

13 A    These records are a declaration of business records and

14 then an account opening signature card, as well as, bank

15 statements.

16 Q    And what is the name of the account holder?

17 A    The account holder is Brandy K. Odom.

18 Q    And what type of bank account is this for?

19 A    It is an essential checking account.

20 Q    And can you just tell us what an essential checking

21 account is?

22 A    Yes.  It is a checking account that is open at a bank

23 branch location.

24 Q    What is the account number associated with those records?

25 A    The account number associated is 3027359093.

1    Q    All right.

2              MR. PALACIO:  If at this time, we could show the

3    witness what's marked as 123-8, for identification only.

4    Q    Ms. Allar, can you tell us what this is?  It should be on

5    your screen.

6    A    Yes.  This is a page showing the debit card information

7    attached to the checking account.

8    Q    And what is the number of the debit card on this record?

9    A    It is 5147592102516969.

10   Q    And is that debit regard number associated with the Odom

11   checking account number that you just gave us?

12   A    Yes.

13             MR. PALACIO:  If we could show the witness what is

14   marked as 123-9 for identification.

15   Q    Ms. Allar, do you recognize this?

16   A    Yes.

17   Q    What is this?

18   A    This is a list of transactions associated with the debit

19   card ending in 6969.

20   Q    Is this a spreadsheet with those transactions?

21   A    Yes.

22   Q    And are these transactions associated with that same Odom

23   account number?

24   A    Yes.

25             MR. PALACIO:  If we could show the witness what is

1    marked as 123-10 for identification.

2              And I'm sorry, just turn back quickly to 123-9.

3    Q    For what month are these transactions?

4    A    These are for February of 2018.

5    Q    All right.

6              MR. PALACIO:  Turn to 123-10.

7    Q    And can you tell us what this record is?

8    A    Yes.  This is also a record of transactions on the debit

9    card associated with the account.

10   Q    With the Odom account?

11   A    Yes.

12   Q    And for what time period?

13   A    If you could please scroll over.

14             These are for March of 2018.

15   Q    All right.  Ms. Allar, I'd like to show you what's marked

16   as Government Exhibit 125 for identification.

17             Do you see that?

18   A    Yes.

19   Q    Can you tell us what those records are?

20   A    These are still images from a Capital One ATM.

21   Q    And are these still images associated with unauthorized

22   transactions on the Odom account in February of 2018?

23   A    Yes, they are.

24             MR. PALACIO:  Can we show the witness what is marked

25   as Government's Exhibit 126 for identification.

1  A    These are also still images from a Capital One ATM

2  associated with the transactions on the account.

3  Q    For what month and year?

4        MR. PALACIO:  If we could please scroll down.

5  A    These are for March of 2018.

6        MR. PALACIO:  And finally, if we could show the

7  witness Government's Exhibit 127 for identification.

8  Q    Do you recognize Government's Exhibit 127 for

9  identification?

10 A    Yes, I do.

11 Q    What is this?

12 A    This is an ATM video from March of 2018.

13 Q    Is it from March 12th of 2018?

14 A    Yes.

15 Q    And is this a video taken from a Capital One ATM?

16 A    Yes, it is.

17 Q    Ms. Allar, were all of these records that we've been

18 discussing made in the regular course of Capital One's

19 business?

20 A    They are.

21 Q    And is it Capital One's regular course of business to

22 keep or maintain these records?

23 A    Yes.

24 Q    Were these records generated at or near the time of the

25 transactions or events reflected in those records?

1   A    Yes.

2   Q    Does Capital One have a business duty to report

3   truthfully and accurately?

4   A    We do.

5   Q    And are you a custodian of all of these records?

6   A    Yes.

7            MR. PALACIO:  Your Honor, offering into evidence,

8   Government's Exhibit 123-1 to 123-10, Government's

9   Exhibit 125, 126, and 127 into evidence?

10           THE COURT:  Any objection?

11           MR. CECUTTI:  No objection.

12           THE COURT:  All right.  Those are in evidence.

13           You can publish.

14           (Government Exhibits 123-1 to 123-10, 125, 126, and

15   127, were received in evidence.)

16           (Exhibit published.)

17  Q    All right.  Ms. Allar, did you have an opportunity to

18  review all of these records before testifying today?

19  A    Yes.

20  Q    All right.

21           MR. PALACIO:  If we could begin with Government's

22  Exhibit 123-2.

23  Q    And first of all, can you tell us what a signature card

24  is?

25  A    Yes.  A signature card is a document produced when an

1    account is opened stating the account holder, the account

2    number, their personal information, as well as their

3    signature.

4          MR. PALACIO:  Mr. Rader, if we could focus in on the

5    top portion of this document.

6    Q    Again, can you tell us what type of account this is?

7    A    Yes.  This is an essential checking account.

8    Q    And who's listed as the account holder of this account?

9    A    Brandy K. Odom.

10   Q    Can you tell us when this account was opened?

11   A    Yes.  It was opened February 12th, 2016.

12   Q    And is this a signature card --

13   A    Yes.

14   Q    -- for the Odom checking account ending in 093?

15   A    Yes.

16   Q    Do you see that account number?

17   A    I do.

18   Q    Where is that?

19   A    It is in the upper left-hand corner.  It starts with 302.

20   Q    And do you see the purported signature of Brandy Odom?

21   A    I do.

22   Q    Where is that?

23   A    It is in the middle of the page underneath the line

24   stating, "signature."

25         MR. PALACIO:  Your Honor, with the Court's

1    permission, may I just retrieve the exhibit?

2            THE COURT:  Yes.

3            (Counsel approaches the witness.)

4    Q    Ms. Allar, I'd like to turn now to Government

5    Exhibit 123-3.

6            Now, this may be a little basic, but can you explain

7    the difference between a credit and a debit when it comes to a

8    bank account?

9    A    Yes.  So a credit is an account or monetary value going

10   into the account, and a debit is a monetary value going out of

11   the account.

12   Q    We're looking at Government's Exhibit 123-3.

13           Do you see the name and address of the account

14   holder?

15   A    Yes.

16   Q    Can you read that out to us, please?

17   A    Yes.  Brandy K. Odom, 249-45 148th Road in Rosedale, New

18   York, 11422.

19   Q    And what is this document that we're looking at?

20   A    This is a bank statement from December 8th, 2017, through

21   January 8th, 2018.

22   Q    And do you see the account number?

23   A    Yes.

24   Q    Where do you see that?

25   A    It is in the middle of the page.  It is in bold, titled,

1   essential checking.

2   Q    And again, this is for the 093 checking account?

3   A    Yes.

4   Q    All right.

5        MR. PALACIO:  Mr. Rader, if we could scroll down,

6   please.

7        And if we could expand the bottom portion.

8   Q    Ms. Allar, do you see a transaction on -- do you see that

9   on your screen?

10  A    Yes, I do.

11  Q    Do you see a transaction on December 8th in the amount of

12  $160.21?

13  A    Yes.

14  Q    What type of transaction was that?

15  A    That is a debit from the account.

16  Q    And what was the entity that debited that sum?

17  A    Verizon.

18  Q    Do you see a number next to that at the top it says,

19  debit card, and then there's a number below?

20  A    Yes.

21  Q    What is that number?

22  A    That number is the last four of the debit card associated

23  with the transaction.

24  Q    Is that 6969?

25  A    Yes.

1    Q    Do you see a transaction on December 13th?

2    A    Yes.

3    Q    Can you tell us what the sum of that transaction was,

4    what type of a transaction it was, and the entity?

5    A    That was a $61.65 credit into the account from BC media

6    group.

7                  MR. PALACIO:  Can we go to the next page.

8                  Actually, Page three.

9    Q    Do you see a transaction on December 19th?

10   A    I do.

11   Q    Can you tell us what that transaction was?

12   A    That is a $203.15 credit from multimedia LLC.

13   Q    Do you see a transaction on December 26th for $21.38?

14   A    Yes.

15   Q    What type of transaction was that?

16   A    That is a debit from AM national life New York.

17   Q    In other words, this money was withdrawn from the

18   account?

19   A    Yes.

20   Q    On January 3rd, do you see a transaction for $394.30?

21   A    Can you please scroll down.  Thank you.

22               What was the dollar amount?

23   Q    It was 39430?

24   A    Yes, I do.

25   Q    What type of transaction was that?

1   A    That was a credit into the account from multimedia LLC.

2   Q    Also on January 3rd, do you see a transaction for $66.97?

3   A    Yes.

4   Q    What type of transaction was that?

5   A    That was a credit into the account from BC media group.

6   Q    Now, I'm sorry, what are the letters that you see before

7   that?

8   A    ACH.

9   Q    Do you know what ACH is?

10  A    Yes.  That is an electronic transfer into the account.

11  Q    And are these -- did you see that for the other ones from

12  multimedia, as well, the ACH?

13  A    Yes.

14  Q    Mr. Rader, if we could show the witness Government's

15  Exhibit 123-4 what time period is this bank statement for?

16  A    January 9th, 2018 through February 7th, 2018.

17  Q    On January 9th -- scrolling down to the bottom -- do you

18  see a transaction for $225.20?

19  A    Yes.

20  Q    What was that?

21  A    That is a debit card purchase at Verizon.

22  Q    On January 18th, do you see a transaction for $273.45?

23  A    Yes.

24  Q    What was that?

25  A    That is an ACH deposit from 1628 multimedia.

1   Q    And do you see on January 18th, as well a transaction for

2   130.36?

3   A    Yes.

4   Q    What was that?

5   A    That is an ACH deposit for BC Media Group.

6        MR. PALACIO:   Turn to Page 3.

7   Q    On January 19th, do you see a transaction for $273?

8   A    Yes.

9   Q    What type of transaction was that?

10  A    That is an ACH withdrawal debit from the account from Con

11  Ed of New York.

12  Q    So in other words, this amount was automatically

13  withdrawn by Con Ed?

14  A    Yes.

15  Q    And on January 23rd, can you tell us what transaction you

16  see there?

17  A    Yes.   There is a $21.38 debit from the account from AM

18  National Life New York.

19  Q    Can you tell us what transaction you see on January 31st?

20  A    Yes.   An $80.49 credit into the account from BC Media

21  Group.

22  Q    And down towards the bottom, can you tell us what

23  transaction you see on February 5th?

24  A    Yes.   A $171.80 credit into the account from 1628 Multi

25  Media.

1  Q    Ms. Allar, I'd like to show you Government's

2  Exhibit 123-5.

3            Is this also a bank statement?

4  A    It is.

5  Q    For what time period?

6  A    February 8th, 2018, through March 7th, 2018.

7  Q    And again, is this for the Odom checking account?

8  A    Yes.

9  Q    All right.

10            MR. PALACIO:  If we could scroll to the bottom.

11  Q    On February 12th, do you see a transaction for $205?

12  A    Yes.

13  Q    What type of transaction was that?

14  A    That is an ATM cash deposit into the account.

15  Q    I'm sorry, a transaction for $250?

16  A    Oh, apologies.  That is a debit from the account for Con

17  Ed of New York.

18  Q    And can you tell us what transaction we see on

19  February 14th?

20  A    Yes.  That is a $180.50 debit from the account from

21  Verizon.

22            MR. PALACIO:  Can we turn to Page 3.

23  Q    On February 21st, do you see a transaction for $69.29?

24  A    Yes.

25  Q    What type of transaction was that?

1   A   That is a debit from the account.

2   Q   From what entity?

3   A   Verizon.

4   Q   On February 22nd, do you see a transaction for $21.38?

5   A   Yes.

6   Q   What type of transaction was that?

7   A   That is a debit.

8   Q   From what entity?

9   A   AM National Life New York.

10          MR. PALACIO:  And if we could turn to Page 4.

11  Q   On March 7th, do you see a transaction for $280?

12  A   Yes.

13  Q   What was that?

14  A   That is a debit.

15  Q   From what entity?

16  A   Con Ed of New York.

17          MR. PALACIO:  If we could show the witness what's in

18  evidence as 123-6.

19  Q   Ms. Allar, again, is this a bank statement?

20  A   Yes.

21  Q   For what time period?

22  A   March 8th, 2018, through April 6th, 2018.

23  Q   Scrolling down to the bottom.

24          On March 19th, do you see a transaction for $70.07?

25  A   Yes.

1    Q     What was that?

2    A     It is a debit from Verizon.

3    Q     Okay.

4          MR. PALACIO:  Turn to Page 3.

5    Q     Can you tell us what transaction we see on March 22nd?

6    A     Yes.  That is a $184 withdrawal.  It was a debit card

7    purchase at Verizon.

8    Q     And on March 23rd, can you tell us what transaction we

9    see?

10   A     Yes.  That is a $21.38 debit from AM National Life New

11   York.

12         MR. PALACIO:  And finally, if we could show the

13   witness what's in evidence as 123-7.

14   Q     Ms. Allar, can you give us the time period for this bank

15   statement?

16   A     April 7th, 2018, through May 7th, 2018.

17   Q     Can you tell us what transaction we see on April 24th?

18   A     It is a $21.38 debit from AM National Life New York.

19   Q     Is this the same recurring debit from AM National Life

20   New York?

21   A     Yes.

22   Q     Ms. Allar, did there came a point when Capital One

23   investigated unauthorized transactions on the Brandy Odom

24   Capital One debit card between February 28th and March 2018?

25   A     Yes.

1          MR. PALACIO:  If we could show the witness 123-8.
2    And if we could just expand it as much as possible.
3    Q    Ms. Allar, do you sea a number highlighted in the top
4    left-hand corner?
5    A    Yes.
6    Q    What is that number?
7    A    That is the debit card number.
8    Q    Is that the debit card number associated with the Brandy
9    K. Odom checking account ending in 093?
10   A    Yes.
11   Q    And the debit card number, is that what you told us
12   earlier, the number ending in 6969?
13   A    Yes.
14   Q    Is that number the number that would actually appear on
15   the debit card itself?
16   A    Yes.
17   Q    And on this document, do we see the bank account number
18   associated with that debit card?
19   A    Yes.
20   Q    Where do we see that?
21   A    In the lower left-hand corner, it is highlighted.
22   Q    And again, that ends in 093?
23   A    Yes.
24   Q    Is this the same checking account number for the bank
25   statements that we just reviewed?

1    A    Yes.

2    Q    Ms. Allar, does Capital One have cameras at its ATM

3    machines?

4    A    We do.

5    Q    And did Capital One produce stills from certain Capital

6    One ATMs and a video from one of those ATMs in connection with

7    this investigation?

8    A    Yes.

9         MR. PALACIO:  Mr. Rader, if we could show the

10   witness what's marked as Government's Exhibit 123-9.

11        (Exhibit published.)

12   Q    Ms. Allar, now that we have this document in front of us

13   as a group, can you tell us what this is again?

14   A    This is a spreadsheet of transactions associated with

15   debit card ending in 6969.

16   Q    Okay.  I want to run through some of these columns so can

17   you let us know what they mean.

18        Beginning with column A, what is the information

19   that we see there?

20   A    That is the debit card associated with the account.  It

21   is tokenized just for data purposes within our systems.

22   Q    What does that mean?

23   A    The first six numbers listed are the same as the actual

24   debit card and the last four are the same.  The intermediate

25   is scrambled just for data purposes.

1   Q    And again, that's the number that would appear on the

2   debit card itself?

3   A    It is.

4           MR. PALACIO:  If we could scroll over -- right

5   there.

6   Q    On column O, can you tell us what information we see

7   there?

8   A    Column O shows -- it just shows the card holder, if the

9   card was present or not.

10  Q    What does that mean?

11  A    If the card was physically in the hand of the person

12  utilizing it or if it was a virtual purchase.

13  Q    So if you purchased something online, that would be

14  listed as an N here?

15  A    Correct.

16  Q    But if you withdraw money or deposit money, we would see

17  a Y; is that fair?

18  A    Yes.

19  Q    Can you tell us what information we see in column Q?

20  A    Column Q is the transaction timestamp of when it

21  occurred.

22  Q    And which transactions -- what date range of transactions

23  did Capital One investigate?

24  A    Listed here is from February 12th, 2018, through

25  February 16th, 2018.

1    Q    And what time zone are these records in?

2    A    These records are one hour past Eastern Standard Time.

3    Q    So in other words, to get to eastern time, we would need

4    to subtract an hour from what's listed here?

5    A    Correct.

6    Q    In locations for some of these dates we see double

7    entries.

8         Can you tell us what that means?

9    A    Yes.  So for some of these, there is double entries due

10   to a balance inquiry on the account prior to an actual

11   transaction that occurred.

12   Q    So in other words, if a person goes and withdraws money

13   and also selects the option to verify the balance, there would

14   be two entries?

15   A    Correct.

16        MR. PALACIO:  Could we scroll over to column R.

17   Q    What is the information we see here?

18   A    Column R shows the debit card information.

19   Q    And again, that's just the same number we saw earlier?

20   A    Yes.

21        MR. PALACIO:  If we could scroll over to column AF.

22   Q    Can you tell us what information we see there?

23   A    Yes.  Column AF lists the city that the transaction

24   occurred in.

25   Q    And do you see the state?

1    A    Yes.  It is in column AJ.

2    Q    What's in column AH?

3    A    AH lists the merchant that the transaction occurred at.

4    Q    So when we see Capital One, what does that mean?

5    A    That states that it was completed at a Capital One ATM or

6    Capital One location.

7    Q    So for example, an ATM withdrawal or deposit?

8    A    Yes.

9              MR. PALACIO:  Can we scroll over to column BA.

10   Q    What information do we see there?

11   A    That, in addition, shows that BA was a Capital One ATM.

12   Q    And column BD, what does that mean?

13   A    BD lists the physical number associated with the ATM.

14   Q    Is that a unique identifier for a Capital One ATM?

15   A    It is.

16   Q    And can you tell us what we see in column BI?

17   A    BI lists the dollar amount associated with the

18   transaction.

19   Q    And we see a zero; what does that mean?

20   A    That indicates a balance inquiry.

21   Q    And in column BL, can you tell us what information we see

22   there?

23   A    BL lists the transaction date and time.  Again, one hour

24   past Eastern Standard Time.

25   Q    Okay.  And what do the rows in yellow generally show?

1  A    The rows in yellow generally show Capital One's

2  indication of a potentially fraudulent transaction.

3  Q    And what do the rows in white generally show?

4  A    Those indicate also potentially fraudulent transactions,

5  but we would not have video footage or any sort of still

6  images.

7  Q    So for example, if someone made a transaction online, you

8  wouldn't have an image of that; is that fair?

9  A    Correct.

10  Q    So now let's talk about the unauthorized transactions

11  investigated by Capital One which took place at Capital One

12  facilities in February of 2018.

13        MR. PALACIO:  If we could look at column BL.

14  Q    Do you see a transaction at 1241?

15  A    Yes.

16  Q    And just referring -- just scrolling over to column BI,

17  can you give us a transaction amount for that?

18  A    Yes.  Zero dollars.

19  Q    And the one below that.

20  A    $205.

21        MR. PALACIO:  Now, if we could show the witness --

22  just scroll back to Government's Exhibit 123-5 on Page 1.

23  Towards the bottom.

24  Q    You said that transaction was for $205.

25        Do you see that here?

 1  A    Yes, I do.

 2  Q    What type of transaction was that?

 3  A    That is an ATM cash deposit into the account.

 4  Q    Did Capital One retain a still photo from the ATM where

 5  that transaction took place?

 6  A    Yes.

 7             MR. PALACIO:  I'd like to show you Government's

 8  Exhibit 125, Page 1.  And if we could just enlarge that,

 9  please.

10  Q    Do you see some information at the bottom of this

11  photograph?

12  A    Yes.

13  Q    Can you tell us what that information is?

14  A    Yes.  That is the timestamp and location indicator

15  associated with the ATM.

16  Q    Can you give us the location indicator?

17  A    Rosedale, New York.

18  Q    And I see a number next to that.

19             What is that number?

20  A    That is the branch unique identifier location.

21  Q    Can you give us that number?

22  A    46605.

23  Q    And what is the timestamp of this photo?

24  A    February 12th, 2018 at 11:40:53 a.m. Eastern Standard

25  Time.

1  Q    So this would be one hour before what's listed on the

2  spreadsheet we just saw?

3  A    Correct.

4           MR. PALACIO:  If we could turn back to Government

5  Exhibit 123-9.

6  Q    And again on column BL, do you see a transaction at -- on

7  February 13th, 2018?

8  A    Yes.

9  Q    What was the dollar amount for that transaction on column

10 BI?

11 A    On February 13th, there is a 0-dollar transaction, as

12 well as a $566 transaction.

13 Q    So again, like the previous one, does that mean there was

14 an ATM transaction, as well as a balance inquiry?

15 A    Yes.

16           MR. PALACIO:  If we could show the witness 123-5,

17 Page 1.

18 Q    Do you see that $566 transaction?

19 A    Yes.

20 Q    What type of transaction was that?

21 A    That is an ATM check deposit.

22 Q    And did Capital One retain a still photo from the ATM

23 where that transaction took place?

24 A    Yes.

25 Q    Ms. Allar, I'd like to show you Government Exhibit 125,

1    Page 2.

2              Can you tell us what we see here?

3    A    That is an ATM still image.

4    Q    What ATM did that take place at?

5    A    It is at a location in Rosedale, New York.

6    Q    Is that the same ATM that we saw on February 12th?

7    A    Yes.

8    Q    And what's the date and timestamp for that transaction?

9    A    February 13, 2018, at 2:25:49 p.m. Eastern Standard Time.

10             MR. PALACIO:  And if we could just scroll to the

11   bottom so we could take a look at that.

12   Q    What's the timestamp there?

13   A    That is 2/13/2018 at 2:28:20 p.m. Eastern Standard Time.

14   Q    So is it fair to say that this is from the same

15   transaction?

16   A    Yes.

17             MR. PALACIO:  Mr. Rader, if we could just scroll to

18   the top.

19             If you could enlarge that, please.

20             And if we could pull up Government's Exhibit 998

21   next to that, please.  You can go up.

22             Sorry it's Page 2 of Government's Exhibit 125.

23   Q    All right.  Ms. Allar, I'd like to come back to

24   Government's Exhibit 123-9, and again looking at column BL.

25             Do you see a transaction on February -- what types

1   of transactions do you see on February 16th, 2018?

2   A    I see a balance inquiry and then also a transaction for

3   $200.  They're both conducted at an ATM.

4         MR. PALACIO:  Mr. Rader, if we could show the

5   witness Page 1 of Government's Exhibit 123-5.

6   Q    Do you see that $200 transaction here?

7   A    I do.

8   Q    What type of transaction was it?

9   A    That was an ATM withdrawal done at a Capital One

10  location.

11  Q    What was the address of that location?

12  A    145-15 243rd Street Rosedale, New York.

13  Q    And did Capital One retain a still photo from the ATM

14  where that transaction took place?

15  A    Yes.

16        MR. PALACIO:  Mr. Rader, if we could show the

17  witness Page 3 of Government's Exhibit 125.

18        If we could enlarge that, please.

19  Q    Ms. Allar, do you see the date and timestamp here?

20  A    Yes.

21  Q    What is that?

22  A    It is February 16th, 2018, at 10:31:30 a.m. Eastern

23  Standard Time.

24  Q    And was this transaction at the same ATM as the ones on

25  February 12th and February 13th, 2018?

1  A    Yes.

2  Q    Ms. Allar, did Capital One also investigate additional

3  unauthorized transactions on the Odom checking account which

4  took place in March of 2018?

5  A    Yes.

6  Q    I'd like to show you Government's Exhibit 123-10.

7           MR. PALACIO:  If we could just scroll over to the

8  beginning.

9  Q    Now that we have this up as a group, can you tell us what

10  this is?

11  A    This is a spreadsheet of transactions occurring on the

12  account associated with debit card 6969.

13  Q    And again, that is connected to the Odom account ending

14  in 093; is that correct?

15  A    Yes.

16  Q    And does this spreadsheet essentially give us the same

17  information as the one we saw for the February transactions?

18  A    Yes.

19  Q    If we could just scroll over to column Z.

20           In column Z, do you see Verizon recurring pay?

21  A    Yes.

22  Q    What does that mean?

23  A    A Verizon recurring pay or a recurring pay transaction

24  indicates that it was an Auto-Pay setup to pull monthly or

25  whatever timeframe they set up the transaction for.

1        MR. PALACIO:  If we could scroll over to column BD.
2   Okay.
3   Q    Ms. Allar, on March 12th of 2018, do you see transactions
4   there?
5   A    I do.
6        MR. PALACIO:  And if we could scroll over to column
7   BA.
8   Q    Can you tell us what transactions you see there?
9   A    I see dollar amounts listed under column BA.
10  Q    For March, what dollar amount do you see?
11  A    I see a 0-dollar balance inquiry, as well as an $80
12  transaction.
13       MR. PALACIO:  Mr. Rader, if we could show Ms. Allar
14  Government's Exhibit 123-6.
15  Q    Ms. Allar, do you see in --
16       MR. PALACIO:  Sorry, Page 1 of that exhibit.
17  Q    Ms. Allar, do you see that $80 transaction here?
18  A    Yes, sir.
19  Q    What type of transaction was that?
20  A    It is an ATM withdrawal.
21  Q    From what location?
22  A    145-15 243rd Street, Rosedale, New York.
23  Q    Did Capital One retain a still photo from the ATM where
24  that withdrawal took place?
25  A    Yes.

1          MR. PALACIO:  Mr. Rader, if we could show the

2     witness the -- starting on the bottom, Page 1 of Government's

3     Exhibit 126.  I'm sorry -- that's right.

4               If we could enlarge that.

5     Q    Ms. Allar, can you tell us what we see here?

6     A    This is an ATM still photo from March 12th, 2018.

7     Q    And what's listed as the location of that ATM?

8     A    Rosedale, New York.

9     Q    What's the number associated with that location?

10    A    46605.

11    Q    Is this the same ATM as the February transactions?

12    A    It is.

13              MR. PALACIO:  And if we could show the witness the

14    top of Page 2.

15    Q    Ms. Allar, do you see the timestamp there?

16    A    I do.

17    Q    What is the time reflected there?

18    A    March 12th, 2018, at 5:14:43 p.m. Eastern Standard Time.

19    Q    So again, is that fair to say it's part of the same

20    transactions, the two stills?

21    A    It is.

22    Q    Did Capital One also retain a video of that ATM

23    transaction?

24    A    Yes.

25              MR. PALACIO:  Mr. Rader, if we could pull up

1   Government's Exhibit 127, please, and play that for the jury

2   from the beginning.

3            (Video recording played.)

4   Q    Ms. Allar, what is this?

5   A    This is an ATM video.

6   Q    And that corresponds to the two stills that we just

7   looked at?

8   A    It does.

9   Q    And again, this is for the Brandy Odom debit card; is

10  that correct?

11  A    Yes.

12           MR. PALACIO:  You can stop right there.

13           (Video recording stopped.)

14           MR. PALACIO:  Mr. Rader, if we could bring up again,

15  Government's Exhibit 123-10.

16  Q    And looking at column BD, what types of transactions do

17  you see on March 19th?

18  A    March 19th, I see three inquiry transactions.

19  Q    With a 0-dollar amount?

20  A    Correct.

21  Q    Is that consistent with multiple balance inquiries on the

22  same day?

23  A    It is.

24  Q    And did Capital One retain a still from those

25  transactions?

1  A    Yes.

2         MR. PALACIO:  Mr. Rader, if we could pull up Page 3

3  of Government's Exhibit 126.  Sorry, starting with Page 2, the

4  bottom of Page 2.

5  Q    Can you tell us what we see here?

6  A    This is a still image from Capital One ATM.

7  Q    And is that the same ATM that we've been looking at?

8  A    It is.

9  Q    What's the date and timestamp we see there?

10 A    March 19th, 2018, at 4:44:26 p.m. Eastern Standard Time.

11        MR. PALACIO:  And if we could just come back to

12 Government's Exhibit 123-10.

13 Q    And again looking at column BD for March 20th, do you see

14 a transaction in the dollar amount of 141.50?  In other words

15 $141.50?

16 A    I do.

17        MR. PALACIO:  And if we could turn to Page 1 of

18 Government's Exhibit 123-6.

19 Q    Ms. Allar, do you see the one -- the transaction for

20 $141.50?

21 A    I do.

22 Q    What type of transaction was that?

23 A    That is an ATM check deposit.

24

25             (Continued on the following page.)

1  DIRECT EXAMINATION

2  BY MR. PALACIO:  (Continuing)

3          MR. PALACIO:  Finally, if we could show the witness

4  the bottom of page 3 of Government Exhibit 126.

5          Can you give us a date and timestamp for that video

6  still?

7  A    This still image is from March 20, 2018 at 11:25:46 a.m.

8  Eastern Standard Time.

9  Q    And, again, is that the same ATM we have been looking at?

10 A    It is.

11         MR. PALACIO:  Mr. Rader, if we can show the witness

12 the last page of page 4, Government Exhibit 126.

13 Q    What do we see here?

14 A    This is an ATM still image.

15 Q    What is the date and timestamp?

16 A    March 20, 2018, at 11:25:46 a.m. Eastern Standard Time.

17 Q    So, again, fair to say it's part of the same transaction

18 we just looked at?

19 A    It is.

20         MR. PALACIO:  Your Honor, nothing further.

21         THE COURT:  Any cross-examination?

22         MR. CECUTTI:  Yes, Your Honor.

23 CROSS-EXAMINATION

24 BY MR. CECUTTI:

25 Q    Good morning, Ms. Allar.

1   A    Good morning.

2   Q    I want to continue with our discussion of March of 2018,

3   transactions that you just discussed with the Government.

4        Again, Capital One was investigating potential

5   fraudulent transactions during this time, in March of 2018.

6   A    Correct.

7   Q    And I believe you identified two transactions that were

8   potentially fraudulent occurring on March 12th and March 21st?

9   A    Correct.

10  Q    Now, no one reported those transactions as being

11  fraudulent?

12  A    Correct.

13  Q    And those transactions were not reversed by Capital One;

14  correct?

15  A    They were not.

16  Q    So the $80 transaction on March 12th, that was not

17  reversed; right?

18  A    It was not.

19  Q    And the March 21st deposit of $141.50, that transaction

20  was also not reversed?

21  A    It was not.

22  Q    And following Capital One's investigation into these

23  transactions, this Capital One account was not frozen; right?

24  A    It was not.

25  Q    Or closed; right?

1    A     It was closed.

2    Q     But there was no suspension of the account and these

3    transactions were not reversed?

4    A     That is correct.

5    Q     Now, the balance inquiries that occurred on March 19th,

6    there were three of those?

7    A     Yes.

8    Q     And no further investigative action was taken by Capital

9    One into those balance inquiries; correct?

10   A     There was not.

11   Q     Now, let's go in reverse order to February.

12          You had discussed potentially fraudulent

13   transactions that occurred on February 12th and February 13th.

14   A     Yes.

15   Q     And February 16th; right?

16   A     Yes, I believe so.

17   Q     And, again, no one reported those potentially fraud

18   transactions to Capital One; right?

19   A     Correct.

20   Q     And I believe there was two deposits and one withdrawal

21   on those dictate in February; right?

22   A     I believe so.

23   Q     And none of those transactions were reversed; correct?

24   A     Correct.

25   Q     And there were three balance inquiries during that time

1    period; right?

2    A    I believe so, yes.

3    Q    And Capital One took no further action, investigative

4    action following those balance inquiries; correct?

5    A    Correct.

6              MR. CECUTTI:  I have no further questions.

7              THE COURT:  All right.  Any redirect?

8              MR. PALACIO:  No, Your Honor.

9              THE COURT:  Thank you so much.  You can step down.

10             THE WITNESS:  Thank you, Your Honor.

11             (Witness leaves the stand.)

12             THE COURT:  Are you ready to call your next witness?

13             MS. HAJJAR:  Yes, Your Honor.  The Government calls

14   Selim Gultekin.

15             Just one moment, Your Honor.

16             THE COURT:  Sure.

17             (Pause.)

18             MS. HAJJAR:  I'm sorry, Your Honor, the witness is

19   using the restroom.  We are going to go out of order.

20             THE COURT:  That's fine.

21             MR. PALACIO:  Your Honor, the Government calls

22   Detective Kimberly Cenizal.

23             MS. HAJJAR:  I'm sorry, Your Honor.  The witness is

24   now here.

25             THE COURT:  That's okay.  Let's clarify which

1  witness is that.

2          MS. HAJJAR:  We will call Mr. Gultekin.

3          THE COURT:  Am I correct that this witness is

4  testifying with the assistance of a Turkish interpreter?

5          MS. HAJJAR:  Yes, Your Honor.

6          THE COURT:  I think the first thing we need to do is

7  swear our interpreter in.

8          THE COURTROOM DEPUTY:  Please raise your right hand.

9          (Interpreter sworn.)

10         THE COURTROOM DEPUTY:  Please state your name for

11  the record.

12         THE INTERPRETER:  A.J. Elterman, E-L-T-E-R-M-A-N,

13  last name.  A-J.  The last name is E-L-T-E-R-M-A-N.

14         THE COURT:  Just one second.

15         Let's have the witness come up.

16         THE COURTROOM DEPUTY:  Raise your right hand.

17         Do you solemnly swear or affirm that the testimony

18  you are about to give will be the truth, the whole truth and

19  nothing, but the truth?

20         THE WITNESS:  Yes, I do.

21         THE COURTROOM DEPUTY:  State your name for the

22  record.

23         THE WITNESS:  Selim Gultekin.

24         THE COURT:  Just a few instructions before we begin.

25  Do you speak any English?

1          THE WITNESS:  Yes.

2          THE COURT:  Since we have our interpreter here, wait

3     until she interprets what you say.  Okay?

4          And if there is a question that you don't

5     understand, just let me know and I will have the lawyers

6     rephrase it, okay?

7          THE WITNESS:  Okay.

8          THE COURT:  All right.  Go ahead.

9          MS. HAJJAR:  Thank you.

10         (Continued on next page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  **SELIM GULTEKIN**,

2       called as a witness, having been first duly

3       sworn/affirmed, was examined and testified as follows:

4  DIRECT EXAMINATION

5  BY MS. HAJJAR:

6  Q     Good morning.

7  A     Good morning.

8  Q     Do you currently live in Turkey?

9  A     Yes.

10 Q     And directing your attention to 2018, where did you live

11 at that time?

12 A     Queens, Woodside.

13 Q     What did you do for work at that time?

14 A     Garbage removal, demolition.

15 Q     What was the name of your business?

16 A     Allure Metal Processing, Inc.

17 Q     Could you spell that, please?

18 A     A-L-L-U-R-E.  Metal, M-E-T-A-L, Processing, Inc.

19 Q     And did you advertise under any other names?

20 A     Yes.

21 Q     What was the other name?

22 A     Diva Cleaning.

23 Q     Is that D-I-V-A?

24 A     Yes.  Correct.

25 Q     And where was your business located?

1   A    4913 69th Street, Woodside, Queens.

2   Q    Can you tell the jurors a bit about your garbage removal

3   business?

4   A    The customer calls us and then we would go there to them

5   and remove the demolition-related garbage that was collected

6   and discarded.

7            THE COURT:  Just make sure you are speaking into the

8   microphone.

9   A    And remove them.  The garbage that's demolition-related

10  garbage.

11  Q    What was your business telephone number at the time?

12  A    (646) 571-7520.

13  Q    How did you advertise?

14  A    Craig's List.

15  Q    And how many people did you employ in your business?

16  A    Some days, three; some days, five people.

17  Q    I would like show you part of what's in evidence as

18  Government Exhibit 112.

19           MS. HAJJAR:  Mr. Rader, could you play from the

20  timestamp 44.

21           Could you just pause there.

22           (Video playing.) (Video paused.)

23  Q    Do you recognize what's on the screen, Mr. Gultekin?

24  A    My truck.

25  Q    And can you just -- you might be able to indicate on the

1    screen.  Can you show the jurors which is your truck?

2    A    That thing over there, the white is my truck.

3              THE COURT:  So if you touch the screen.

4              THE WITNESS:  Oh, okay.

5              THE COURT:  Yes.

6    A    This (indicating).

7    Q    Now, do you recall being asked to come to this area for a

8    job?

9    A    Yes.

10   Q    Which house were you asked to come to?

11   A    Now, I cannot recall the address exactly, but....

12   Q    Are you able to point to it on the video?

13   A    So I went like this.  I turned like this around and I

14   went to this house.

15   Q    Was there a car in the driveway when you went to the

16   house?

17   A    Yes.

18   Q    What kind of car, if you recall?

19   A    To my recollection, as far as I remember, it must be

20   Nissan Maxima.

21   Q    How were you initially called for this job?

22             THE INTERPRETER:  I'm sorry, how?

23   Q    How were you initially called into this job?

24   A    Our customer called us from the Craig's List.  We have an

25   ad there.

1  Q     And do you recall what general neighborhood this house
2  was?
3  A     Queens, and it was between Jamaica and Rosedale.  I don't
4  know exactly.  I don't know the exact.
5  Q     Who was driving the truck?
6  A     Me, I was driving.
7  Q     And did you come with a crew?
8  A     Yes, I have a helper.
9  Q     What nationality is your helper?
10 A     From Uzbekistan.
11 Q     What language did he speak primarily?
12 A     In the language of Uzbek.
13 Q     Did he speak another language as well?
14 A     No, he cannot speak English.  He speaks Russian.
15 Q     What was his -- the language he used primarily?
16 A     Uzbek.
17 Q     Did you communicate with him in Uzbek?
18 A     Yes.
19 Q     Did he also speak Russian?
20 A     Yes, he knows.
21 Q     And was it just the two of you that came to this
22 location?
23 A     Yes.
24        MS. HAJJAR:  And Mr. Rader, if you can play the
25 video until timestamp 45 or so?

1          (Video playing.) (Video paused.)

2          MS. HAJJAR:  Mr. Rader, maybe keep it playing for

3    just a couple more seconds.  Thank you.

4    Q     Mr. Gultekin, did you drive the truck on to the driveway?

5    A     Yes, I did, because our customer wanted it that way.

6    Q     Was that typical for you?

7    A     No, it did not because this is not a common or a normal

8    situation.

9    Q     Can you explain that to the jury?

10   A     Because we were told to go backwards, back up like this

11   and told us -- he told us to bring the vehicle all the way

12   very close to the door.

13   Q     Is there a reason that's not typical for you?

14   A     No, it's puzzling or a surprising situation.

15   Q     Okay.  What happened next after you backed up all the way

16   into the driveway?

17   A     We opened the car -- the truck gate and we entered

18   inside.

19   Q     Did you speak with a man who had called you?

20   A     Yes, I did.

21   Q     What were you asked to do, if anything?

22   A     He pointed to the garbage bags.  He showed the TV stand,

23   and he also pointed to mattress, I mean the bed.

24          He told us to remove of them.

25   Q     What there another person at the residence?

1   A     There was a lady.

2   Q     Can you describe her?

3   A     I can.

4         Short, a little fat, but she did not look at my face

5   at all.  She was always looking downwards like this.

6   Q     Did she speak to you at any point?

7   A     No, she did not speak.

8   Q     You said that you were asked to remove garbage bags.

9   Could you describe those bags?

10  A     Now, when he pointed to those things, he asked the price

11  of us, what our price was.

12        The price we gave and it was okay, as soon as that

13  happened, the price was okayed, he took those three or four

14  garbage bags, very swiftly and threw them inside.  So it was

15  like helping us.

16        THE COURT:  In the truck, you mean?

17        THE WITNESS:  Yes.

18  Q     Were there other bags that you and your helper removed?

19  A     Yes.

20  Q     Could you describe those bags, please?

21  A     Black like this, long and tall, like heavy-duty black

22  garbage bags, and they were tide very tightly.

23  Q     Were they filled?

24        THE INTERPRETER:  I'm sorry?

25  Q     Were the bags filled?  Were they full of material inside?

1      THE INTERPRETER:  I'm sorry, can I --

2   Q   Were the bags filled?  Were there things inside the bag?

3      THE INTERPRETER:  Okay.

4   A   Yes.  But they weren't heavy.  We could lift them up with

5   one hand like this, with one hand.

6   Q   And approximately how many garbage bags were you asked to

7   remove?

8   A   Between 15 and 19, but I'm not sure.

9   Q   What about the mattress that you mentioned, where was

10  that mattress?

11  A   A little bit upper level, like you had to go five or

12  seven step up.

13  Q   What it near the stop of a staircase?

14  A   Yes.  Exactly.

15  Q   How did you get the mattress out of the house?

16  A   My worker went up there and that person, that gentleman

17  what will there.  My worker pushed it downwards.  I pulled it,

18  and then we threw it on to the truck together.

19  Q   At any point were you or your helper permitted to go

20  upstairs?

21      THE INTERPRETER:  I'm sorry, committed?

22      MS. HAJJAR:  Permitted.

23  A   No, never.

24  Q   Where was the man as you got the mattress down the

25  stairs?

1   A    He was up together with my helper, my worker.

2   Q    Could you see into any of the rooms on the upstairs

3   floor?

4   A    No, we didn't get a chance for that.

5   Q    And why not?

6   A    Because the gentleman was there and he told us there's

7   only a bed there and that there's nothing else there.

8   Q    And when he said the bed, did you understand him to be

9   referring to the mattress?

10  A    Yes.

11  Q    What did the mattress look like?

12  A    There were like stains, like yellowish, and also like

13  reddish, kind of wiped off look of women's issue-related

14  stains.

15  Q    By women's issue-related --

16        THE INTERPRETER:  Yes, I'm sorry.

17  Q    Are you referring to menstrual blood?

18  A    I think so.

19  Q    Did you have any type of conversation with a man?

20  A    Yes.

21  Q    Can you describe that?  I'm sorry.

22  A    He asked my job, my work.  He said what are you doing,

23  like how many kinds of jobs do you go to to take care of and

24  what do you do?

25        And he told -- while we were talking, he says, you

1  know, I'm not happy here, I want to go to Canada, I found

2  something, some work and that's like what-he said this and

3  then we did not have any other conversation.

4  Q    Was there anything unusual about this particular job?

5  A    What was unusual about this job is that he made us bring

6  the truck all the way up so close to the door, like door to

7  door almost.

8  Q    Do you generally avoid doing that?

9  A    Yes.

10  Q    Why?

11  A    The customers, in general, they wouldn't like us to go

12  over there so close inside there.

13  Q    Why not?

14  A    Because we might hit the roof of the house and also the

15  truck may disrupt or tear the cables, and because the driver

16  -- the concrete over there is thin.  The truck is heavy.  And,

17  in general, we don't enter that far in order to prevent them

18  from bringing complaints against us later.

19  Q    How long were you at the residence in total,

20  approximately?

21  A    Maybe 15, 20 minutes.

22  Q    Did you ever go back to that particular residence?

23          THE INTERPRETER:  I'm sorry?

24  Q    Did you ever return to that residence after?

25  A    No.

1          MS. HAJJAR:  No further questions.

2          THE COURT:  Any cross-examination?

3          MS. THIELE:  Yes, Your Honor.

4          THE COURT:  Okay.

5          MS. THIELE:  Thank you.

6    CROSS-EXAMINATION

7    BY MS. THIELE:

8    Q    Good morning, Mr. Gultekin.

9    A    Good morning.

10   Q    You testified that you had an appointment for junk

11   removal at a residence in Rosedale, Queens, on April 6, 2018;

12   is that correct?

13   A    Correct, yes.

14   Q    And while you were there, you met a woman?

15   A    Yes, I saw a woman together with -- she was also there.

16   Q    And you testified that while you were at the house, she

17   was looking down?

18   A    Yes.  I can describe.

19   Q    Sure.  Go ahead.

20   A    Going inside, on the right side kitchen, lady's over

21   there, man here, man talk lot, lady always looking down, never

22   look to my face together (in English).

23          THE INTERPRETER:  So I explained it like this, but

24   it is -

25          THE COURT:  Whoops, having a real tough time

1    hearing.

2          THE INTERPRETER:  The interpreter is being asked to

3    repeat what was said in English.

4          THE COURT:  Did the court reporter get everything

5    down?

6          COURT REPORTER:  Yes.

7          THE COURT:  Did everybody hear what the witness

8    said?

9          THE JURY:  Yes.

10         THE COURT:  I think that's okay.

11         MS. THIELE:  Thank you.

12   BY MS. THIELE:

13   Q    It's true, though, that you did not tell the NYPD on

14   August 26, 2019, when they interviewed you about those

15   specific movements by the woman; correct?

16   A    Those questions didn't come to me at that time and I also

17   didn't understand things that well, the questions.

18         Yeah, I'm telling you right now what I recall in

19   order to be helpful.

20   Q    Okay.  You also met a man that day; right?

21   A    Yes.

22   Q    And he testified that he told you he was moving to

23   Canada?

24   A    I mean, in the course of conversation, because he was

25   talking very much, he did mention that, you know, it came up.

1   Q    Okay.  Do you remember telling the NYPD during your

2   interview on August 26, 2019 that he was planning to move out

3   of state and not Canada?

4   A    No, I did not say anything like that, I don't recall

5   that.

6   Q    Okay.  I can show you a document.

7            MS. THIELE:  Can you please pull up 3500-ABG-1, just

8   for the witness and the parties.  And just zoom in on that

9   first paragraph.

10  Q    So don't read anything aloud.

11  A    Okay.

12           THE COURT:  I think it's possible the interpreter

13  has to tell him what it says.

14           MS. THIELE:  Sure.

15           THE COURT:  Can you see it?

16           THE INTERPRETER:  Yes.  The interpreter has to have

17  the angle straight.

18           MS. THIELE:  Maybe I can direct you to the line and

19  no one will understand the Turkish, presumably?

20           THE COURT:  That we know.

21           Which line do you want the interpreter and the

22  witness to look at?

23           MS. THIELE:  So please take a look at a sentence

24  that begins on line 8.

25           THE INTERPRETER:  Is it starting with the male

1  insisted?

2         MS. THIELE:  Don't read it aloud.  It's actually,

3  the sentence after that.  Just that one sentence that starts

4  at the end of line 8.

5         THE COURT:  You can read that to him in Turkish to

6  the extent that he can't read it in English.

7  A    Okay.  I think there is a misunderstanding or confusion

8  there because when I said out of state, I meant outside of the

9  country and that may have been the mix up.  I meant not like

10 outside of New York State but country.

11 Q    Okay.  And you didn't see any other people at the

12 residence that day, correct, besides the man and woman?

13 A    No, I did not see.

14 Q    And do you remember telling the NYPD on August 26, 2019

15 that a woman by the name of Brandy Odom was not at the

16 location?

17        THE INTERPRETER:  A woman by the name Brandy Odom?

18        MS. THIELE:  O-D-O-M.

19 A    I don't know the name of the lady.

20 Q    You don't remember the NYPD giving you Brandy Odom's name

21 during your interview?

22 A    I don't remember.

23 Q    Okay.  Do you remember them showing you any photographs

24 of the three individuals, Brandy Odom and the man and woman

25 you met that day?

1    A    No.

2         MS. THIELE:  Okay, Mr. Gover, can you pull that

3    document back up on the screen for the witness.

4    Q    And you can take a look at the second paragraph.

5         MS. THIELE:  Please do the same and translate it for

6    him, but don't read it aloud in English.

7         THE INTERPRETER:  The second paragraph was read.

8    Q    I will ask the question again.

9         Does that refresh your recollection as to whether

10   you told the NYPD on August 26, 2019 that you did not

11   recognize a woman named Brandy Odom to be at the location?

12   A    Now, there is an error here, a mistake.  Because we spoke

13   on the phone, NYPD, and my niece explained for me, but the

14   name, I do not remember these names and I was not shown a

15   photograph.

16   Q    Okay.  You testified on direct that the customer wanted

17   you to back into the driveway?

18   A    Yes.

19        MS. THIELE:  Can we please pull up what's already in

20   evidence as Government Exhibit 112.

21        Mr. Gover, can you go to a portion of the video that

22   has the moving truck in it.

23        (Video playing.) (Video paused.)

24        MS. THIELE:  Go a few seconds further if you could

25   so the driveway is visible.

1          You can stop there.  Thank you, Mr. Gover.

2    Q    Do you see that, Mr. Gultekin?

3    A    Yes.

4    Q    Okay.  That day, when you arrived at the residence, it's

5    true that there was a car in the driveway adjacent to the

6    driveway of the home you visited; right?

7    A    Yes.

8    Q    Okay.  And you have a big truck; correct?

9    A    Yes.

10   Q    And you sometimes collected large items for disposal?

11   A    Yes, yes.

12   Q    Like furniture?

13   A    Big, large furniture, printer machine, big printer

14   machine or heavy-duty stuff.

15   Q    Okay.  And the entrance to the residence is on the side

16   of residence; correct?

17   A     It's exactly here.  From there, it's like three steps

18   going in, three or four.

19   Q    So you would agree with another car in the adjacent

20   driveway it would be easier to load the truck if you backed in?

21               THE INTERPRETER:  Could you repeat that?

22               MS. THIELE:  Sure.

23   Q    Would you agree that with a car parked in the adjacent

24   driveway it would be easier to load the truck if he backed

25   into the driveway?

1    THE INTERPRETER:  Could you please repeat that again

2 because the meaning is not clear to the interpreter?  What you

3 mean by the car?

4    MS. THIELE:  Sure.

5 Q    There is a car in the driveway that is parked adjacent;

6 correct?

7 A    Yes.

8 Q    When you are loading items for disposal, you put them in

9 the back of the truck; correct?

10 A    Yes.

11 Q    So if large items are going to be placed into the back of

12 the truck, wouldn't you agree that backing in the driveway

13 would make more sense?

14 A    Agree.

15 Q    And you'd agree from looking at the video and knowing

16 where your truck was parked that there's very little space in

17 between where the truck was parked and the car next to it?

18 A    Here, it's like that, but it's not actually like that.

19 It's a long space.

20 Q    Can you elaborate?  I'm not sure what you....

21 A    Because the truck actually fits in there, because

22 otherwise if it didn't, it couldn't, and when we are on the

23 kind of inside the sidewalk and even if something happened, we

24 are -- I mean, we came all the way there and we parked there.

25    (Continued on next page.)

1  BY MS. THIELE (Continuing):

2  Q    Ultimately, you did enter the residence with your

3  partner, right?

4  A    Yes.

5  Q    And you removed a number of items?

6  A    Yes.

7  Q    Including garbage bags from the basement?

8  A    They were in the kitchen area.  Several from there we

9  took.

10 Q    And you testified the male individual at the residence

11 took the bags swiftly and threw them in the truck.

12 A    Correct.

13 Q    And you never told the NYPD that on your August 26, 2019,

14 phone call with them, correct?

15 A    I am trying to remember what I can bring up to memory in

16 order to be helpful.

17 Q    Okay.  You don't remember taking the plastic bags from

18 the basement?

19 A    I do not recall that because at the time, what I cannot

20 recall exactly, maybe yes, maybe no, my worker maybe went

21 downstairs.  But I can't remember.

22        THE COURT:  I just wanted to clarify something.

23        When you spoke to the police, was that in person or

24 on the phone?

25        THE WITNESS:  On the phone.

1    THE COURT:  And were you speaking in English or in

2 Turkish.

3    THE INTERPRETER:  In Turkish.

4    THE COURT:  And did you have somebody helping you?

5    THE WITNESS:  Yes.

6    THE COURT:  Was that someone in your family?

7    THE WITNESS:  Yes.

8    THE COURT:  All right.  Is that your niece?

9    THE WITNESS:  Yes.

10    THE COURT:  Sorry about that.  Go ahead.

11    MS. THIELE:  Mr. Gover, can you please pull up

12 3500-ABG-1 again just for the witness?

13 Q    It's going to be in the first paragraph, four lines from

14 the bottom.  The sentence that begins at the end of the forth

15 line from the bottom, what's just been highlighted.

16 A    Yes.

17 Q    So, after reading that, does it refresh your recollection

18 as to whether the bags were in the basement?

19    THE INTERPRETER:  Sorry, the interpreter

20 accidentally touched the screen.

21    THE COURT:  Could you...

22    I just want to clarify, did you read the witness the

23 portion that's highlighted in yellow?

24    THE INTERPRETER:  Yes, the interpreter -- we look

25 together and the interpreter read it in Turkish.

1          THE COURT:  Why don't you put your question to the

2     witness again?

3     Q     Did that refresh your recollection as to whether the

4     plastic bags were found in the basement?

5     A     That, I cannot recall.

6     Q     Okay.  And you testified that you did not see into any of

7     the rooms upstairs?

8     A     Yes.

9     Q     And that's because the mattress was the only item from

10    upstairs that needed to be taken for disposal, correct?

11    A     Yes.

12    Q     Do you have any knowledge about laptops or phones taken

13    from the residence that day?

14             THE INTERPRETER:  Tablets, you said?

15             MS. THIELE:  Laptops or cellular devices.

16    A     No, because I don't know that.

17    Q     And on August 26, 2019, during your call with the NYPD,

18    you understood that they were investigating a homicide?

19    A     They explained -- from what I was hearing indirectly

20    coming to me, what was being said in English, I tried to

21    explain and tell them the event, you know, the incident or

22    whatever happened there as it was to the best of my knowledge.

23    What I knew, I explained.

24    Q     Right.  You, as best you could, provided truthful and

25    accurate information to the NYPD.

1  A     Yes.

2  Q     And you did understand that they were investigating a

3  homicide at the time of the phone call?

4  A     No, I did not know.

5  Q     Okay.  But on that August 26, 2019, phone call, you did

6  not tell them anything about something unusual happening at

7  the residence when you were there, correct?

8  A     I just told the police whatever was there that I lived,

9  experienced, and I saw.

10          MS. THIELE:  Thank you.  Nothing further.

11          THE COURT:  Any redirect?

12          MS. HAJJAR:  No, your Honor.

13          THE COURT:  Thank you both so much.  You can step

14  down.

15          (Witness excused.)

16          THE COURT:  Are you ready for your next witness?

17          MR. PALACIO:  Yes, your Honor.  The Government calls

18  Detective Kimberly Cenizal.

19          (Witness takes the stand.)

20          THE COURTROOM DEPUTY:  Raise your right hand for me,

21  please.

22          Do you solemnly swear or affirm that the testimony

23  you're about to give will be the truth, the whole truth, and

24  nothing but the truth?

25          THE INTERPRETER:  Yes.

1       THE COURTROOM DEPUTY:  Please state your name for

2  the record.

3       THE WITNESS:  Detective Kimberly Cenizal.

4       THE COURT:  Just a few things before we start.

5  You've got the microphone in a good spot.  I do want to make

6  sure everyone can hear you.

7       Please don't speak too quickly.  It makes it very

8  hard for the court reporter.

9       And if there's a question you want to have clarified

10 or repeated, just tell me, okay?

11      THE WITNESS:  Okay.

12      THE COURT:  Go ahead.

13      MR. PALACIO:  Thank you, your Honor.

14 **KIMBERLY CENIZAL**,

15      called by the Government, having been

16      first duly sworn, was examined and testified

17      as follows:

18 DIRECT EXAMINATION BY MR. PALACIO:

19 Q    Detective Cenizal, who do you work for?

20 A    New York City Police Department.

21 Q    How long have you worked for the NYPD?

22 A    19 years.

23 Q    In what capacity currently?

24 A    I am a crime scene investigator in the crime scene unit.

25 Q    Can you tell us your career following graduation from the

1  academy?

2  A     Sure.

3         From the academy, I went to the 42 Precinct in the

4  South Bronx.  I worked there for about eight and a half years.

5  I did patrol, street narcotics, and domestic violence.

6         From there, I went to the crime scene unit and have

7  been there for eleven years.

8  Q     And before you went to the crime scene unit, were you

9  ever in the evidence collection team?

10 A     No, sir.

11 Q     Just remind us what the functions are of the crime scene

12 unit.

13 A     The crime scene unit is a unit within the police

14 department.  We respond to various crimes in all five boroughs

15 of the city.

16        We go to the more heinous crimes, which would be

17 assaults where the victims are likely going to die, homicides,

18 rapes, terroristic attacks, anything involving children or the

19 elderly, home invasions.

20        And it's my duty and responsibility to document the

21 scene and collect any potential evidence.

22 Q     So, just to back up a bit, can you tell us about your

23 training and experience to become a crime scene investigator?

24 A     Sure.  Once I get to the crime scene unit, we are in

25 training for 18 months.  During those 18 months, we have over

1    400 classroom hours and we are being trained by senior

2    detectives in the crime scene unit as well as different other

3    units in the NYPD and outside agencies.  So, we get trained by

4    the fire marshals, chief medical examiner's office, arson and

5    explosion.

6           And during that training, we are taught how to

7    process a crime scene.  So, we're going to learn how to take

8    photographs, sketches, diagrams.  We learn how to collect

9    different types of evidence, how to identify those types of

10   evidence, whether it's ballistics, firearms, DNA, hair and

11   fibers, shoewear impressions, fingerprints, and things like

12   that.  We also learn how to collect those items.

13          Some fingerprints you can't see with your naked eye,

14   so we learn to use different types of chemicals to bring those

15   fingerprints out to collect them.  So, we learn different

16   chemicals and different tools to use for forensics.

17   Q    And approximately how many crime scenes have you

18   investigated over the course of your career?

19   A    Probably over 300.

20   Q    And when you process a crime scene, do you go alone or

21   with a partner?

22   A    With a partner.

23   Q    I'm going to direct your attention to April 28 of 2018.

24   Do you remember that day?

25   A    Yes.

1   Q      Were you working that day?

2   A      I was.

3   Q      And what were your hours?

4   A      That was my double shift, so I worked from 2 p.m. on the

5   28th until 8 a.m. on the 29th.

6   Q      And did you have a partner?

7   A      Yes, I did.

8   Q      Who was your partner?

9   A      Detective Scarri, S-C-A-R-R-I.

10  Q      Did you become involved in an investigation into the

11  homicide of a dismembered female named Brandy Odom?

12  A      Yes, I did.

13  Q      What was your involvement?

14  A      I had a run to help execute the search warrant of a home

15  in the 105 Precinct in Queens.

16  Q      And tell us what the run number was for this job.

17  A      2018/153C, as in Charlie.

18  Q      Were you the lead investigator for this run?

19  A      Yes, I was.

20  Q      Can you tell us specifically what location you responded

21  to?

22  A      We responded to 249-45 148 Road in Queens, New York.

23  Q      And at about what time did you get to the location?

24  A      We arrived around 6:40 -- sorry, 6:25 p.m. we arrived at

25  the scene.

1   Q    Was that on the 28th?

2   A    On the 28th.

3   Q    And just describe briefly for the jury what that location

4   looked like.

5   A    It's a residential area.  The home in question is a

6   semi-attached home, so the front door of the home would be on

7   the side, where the driveway is, and it would be attached on

8   the left-hand side to another home.  It had a driveway as well

9   as a backyard.  It was, I would say, a little less than

10  midblock on that road.

11  Q    Again, I think you mentioned this, but that search was

12  pursuant to a judiciously authorized search warrant?

13  A    Yes, sir.

14  Q    How many floors was that location?

15  A    It had the main floor, a second floor, a basement, and an

16  attic.

17  Q    Now, can you tell us who you conferred with or what you

18  did when you got to the scene?

19  A    When we first arrive to the scene, we do a walk-through

20  and conferral with the supervisors who are on the scene, which

21  means they walk us through the scene, they point out any

22  potential evidence they want us to collect, and they'll give

23  us an idea of what they believe happened at that location.

24  Q    Did you do a walk-through?

25  A    Yes, sir.

1  Q    And after you did that walk-through, can you tell us what

2  you did?

3  A    Then we began to process the scene, with my partner,

4  which means we would take overall photographs of the scene as

5  it is when we first arrived.  From there, that would be our

6  first set of photographs.

7          We'll do another search.  We will look for any other

8  potential evidence that the other supervisors didn't notice or

9  didn't find relevant to tell us about.

10         We will put then yellow markers indicating which

11 pieces of evidence we want to collect.  We'll take overall

12 photographs with those markers.

13         Then we move to midrange photographs, which is just

14 a closer picture of the piece of evidence.  And then we go to

15 close-up photographs of that individual piece of evidence.

16         From there, we do measurements of each piece of

17 evidence and we collect it, package it, and secure it in the

18 truck until we're done with the scene.

19 Q    When you say the truck, what truck are you referring to?

20 A    My crime scene van.

21 Q    And you responded to the location in the crime scene van?

22 A    Yes, sir.

23 Q    Did you also prepare handwritten sketches of that scene?

24 A    Yes, sir.

25 Q    Did you later computerize those sketches?

1    A    Yes.

2    Q    How many sketches did you prepare for that house?

3    A    I prepared the outside, the main floor, the second floor

4    and the basement, so four.

5              MR. PALACIO:  Your Honor, with the Court's

6    permission, I'd like to show the witness what is marked as

7    Government Exhibit 739 for identification, 741 and 742 for

8    identification?

9              THE COURT:  All right.

10             MR. PALACIO:  We'll start with 739 for

11   identification.

12   Q    Can you tell us what you're looking at here?

13   A    This is the computerized diagram of the main floor of

14   249-45 148 Road in Queens.

15             MR. PALACIO:  And if we could turn to Government

16   Exhibit 741.

17   Q    Can you tell us what you're looking at here?

18   A    This is the basement diagram, computerized diagram, of

19   that same location.

20   Q    And Government Exhibit 742, what do you see here?

21   A    This would be the outside area.  It's an overview of the

22   house in question along with the backyard.

23   Q    And do these sketches fairly and accurately demonstrate

24   and depict what those locations looked like when you responded

25   to the scene on April 28, 2018?

1   A     Yes.

2         MR. PALACIO:  Your Honor, I'm offering government

3   Exhibit 739, 741 and 742 into evidence.

4         THE COURT:  Any objection?

5         MS. THIELE:  No objection.

6         (Government Exhibits 739, 741, and 742 so marked.)

7         THE COURT:  You can publish whenever you want.  I

8   guess now.

9         MR. PALACIO:  In just a moment, your Honor.

10        If we could show the witness Government Exhibit 740.

11        (Exhibit published to the jury.)

12        MR. PALACIO:  This is in evidence.

13  Q     Detective Cenizal, what does this map depict?

14  A     This is the second floor of that location.  It shows you

15  the three bedrooms and the bathroom on the second floor.

16  Q     And we'll refer back to these sketches as we progress

17  through the scene.

18        MR. PALACIO:  We can take that down for now.

19  Q     Now, you told us that you took photographs of the

20  location; is that correct?

21  A     Correct.

22  Q     And did you take pictures of the home exactly as you

23  found it when you responded to that location?

24  A     Yes, I did.

25        MR. PALACIO:  Your Honor, with the Court's

1  permission, if we could show the witness what's marked for

2  identification as Government Exhibit 744 to 788, 790 to 846.

3  And I have hard copies to show the witness.

4          THE COURT:  Let me ask, do you have any objection to

5  these exhibits coming in?

6          MS. THIELE:  Your Honor, if I could just flip

7  through them quickly, but we believe we know what's in them.

8          THE COURT:  Sure.

9          (Pause in proceedings.)

10          MS. THIELE:  No objection, your Honor.

11          THE COURT:  Just give us the numbers again.

12          MR. PALACIO:  It's Government Exhibit 744 to 788 and

13  790 to 846.

14          THE COURT:  Those are all in evidence.

15          (Government Exhibits 744 to 788 and 790 to 846 so

16  marked.)

17  Q    Detective Cenizal, you were telling us earlier that as

18  part of your training, you received training in using

19  different types of equipment and different types of chemicals

20  as a crime scene investigator; is that right?

21  A    Yes.

22  Q    Were you also trained on using different forensic tools

23  to process a crime scene?

24  A    Yes.

25  Q    I'd like to talk to you about some of those tools.

1    Can you tell us what ALS or the crime scope is and
2 what does that mean, how does that work?
3 A    The crime scope is a type of ALS, alternate light source.
4 It is a machine that gives off different wavelengths of light.
5 So, it is a search tool that we will use.
6    When we first turn it on, we put it on to white
7 light, which is like a very bright flashlight, your everyday
8 light bulb type of light.  You can see a little bit clearer if
9 you're looking for evidence because the light is so bright.
10    From there, we switch the wavelength with the color
11 of the light to what's called CSS15 -- 455.  It's a different
12 shade of a light and it's a different wavelength.  With those
13 different wavelengths, we use barrier filters.  So, we'll use
14 colored goggles, either red or orange for the certain types of
15 wavelengths.
16    With this machine, it will pick up -- it will
17 brighten or dim pieces of evidence that we're looking for.
18 So, if we're looking on a carpet and we're looking for hair
19 and fibers, we're going to use a different wavelength with a
20 different colored goggles to make that hair or fiber darker in
21 the color of the carpet.  If you're looking for semen, blood,
22 or urine, it's going to be a little bit brighter than the
23 carpet or whatever evidence that you're looking for.
24    So, we use this tool throughout the house, in the
25 three bedrooms and the bathroom, to see if there's any

1   evidence that we can't see with our naked eye.

2   Q    Did you use the crime scope in this case?

3   A    Yes.

4   Q    And again, just remind us in what locations it was used.

5   A    The three bedrooms on the second floor and the two

6   bathrooms.

7   Q    What were the results of using the crime scope?

8   A    They were negative.

9   Q    What does that mean that they were negative?

10  A    There was no additional evidence that we felt we could

11  see to pick up and collect.

12  Q    And can you tell us what Bluestar is and how it works?

13  A    Bluestar is a liquid chemical that we make.  We put it in

14  a spray bottle.  This chemical works with blood.  So, it will

15  react to blood.

16       We turn the lights off -- we mix the chemical, we

17  turn the lights off, and we spray the area that we believe

18  would have blood on it.  We typically use this type of

19  chemical for a cleanup job.  So, if we suspect there's blood

20  on the floor that has been cleaned up or on the walls or

21  ceilings, we will then use this chemical.

22       With this chemical, once it's sprayed and in the

23  dark, it will glow a very bright blue for a very long time.

24  It also reacts with rust or lead paint, but it gives off a

25  different type of glow, it's not as bright, and it's very,

1   very quick.

2   Q      Was Bluestar used in this case?

3   A      Yes.

4   Q      In what areas of the house?

5   A      Bluestar was used in the bathrooms, including everything

6   in the bathrooms like the sink the toilet, the bathtub, the

7   towels; all the bedrooms; and the basement laundry area.

8   Q      What was the result of the Bluestar test?

9   A      It was also negative.

10  Q      Can you tell us what a "barrier" is?

11  A      A barrier is something you would use to protect something

12  else.  A barrier could be like your raincoat.  It's raining

13  outside, you put on a raincoat to protect yourself from the

14  weather so your body doesn't get wet.

15         In crime scene, we use barriers or we see barriers

16  being used like a plastic or a rubber, something that's not

17  porous.  So, if something is spilt, it's easily cleaned up

18  with that barrier so anything underneath that barrier is not

19  going to get contaminated or have evidence on it.

20  Q      What are some other examples of barriers?

21  A      We see rubbers, tarps, plastic bags, the rolls of plastic

22  which are easier to line the floor and the walls and the

23  sealing, it's easier to cover up with the furniture.  Some

24  people use it when you're painting so you don't get paint on

25  your furniture and things like that.

1    Q    And what impact does a barrier have on the collection of

2    forensic evidence?

3    A    It makes it almost impossible for us to find anything.

4    Q    Why is that?

5    A    Because nothing will leak through that barrier, so

6    there's no evidence on the other side.

7    Q    Can you tell us what an OBTI test is and what it's used

8    for?

9    A    OBTI we use for when we think that a stain is blood.

10         So, we'll use a swab, which is like a Q-tip, we put

11   distilled water on that Q-tip, and we rub the area we believe

12   could be possibly blood.  We dunk that Q-tip into a water

13   solution, we shake it up, and we put it on the OBTI test,

14   which looks like a typical COVID test.

15         So, it has two windows.  The first window has a "C"

16   next to it, which is your control.  Once you drip the liquid

17   onto that test, you want a pink line for the control saying

18   that the test is working.  If the test isn't working and you

19   don't get that line, you throw that test out and you start

20   over again.

21         In the second window is a "T," saying this is the

22   test.  The liquid that you put on is either positive or

23   negative for blood.  So, if you get two lines, then your test

24   is positive for human blood, and if you don't get two lines

25   it's negative for human blood.

1  Q    Was that tool uses to process this crime scene?

2  A    Yes, it was.

3  Q    Where was it used?

4  A    Various walls.  On the main floor, the kitchen, the

5  living room, the hallways, the bathrooms.  The second floor

6  was in the bedrooms and the hallway.  And the basement was the

7  laundry room, washing machine, slop sink.

8  Q    And what was the result of the OBTI analysis?

9  A    It was all negative except for one.

10  Q    What was it positive for?

11  A    For human blood on a towel that was in the kitchen.

12  Q    Now, Detective Cenizal, I want to work through some of

13  your crime scene pictures.

14        Can you tell us what the cross-streets are for that

15  house at 249-45 148 Road?

16  A    If you're looking at the location, to the right would be

17  253 Street and to the left would be 249 Street.

18        MR. PALACIO:  If we could pull up for the witness

19  what's now in evidence as Government Exhibit 743.

20  Q    Detective Cenizal, I'll pull up these pictures.  And if

21  you could, walk us through describe for the jury what you see

22  in all of these pictures.

23        So, starting with 743.

24  A    This is a photograph of the front of the location.  The

25  home in question is to the left of your photograph --

1          MR. PALACIO:  Sorry, it's not up on the screen.  If

2    we could get that on the screen.

3          (Exhibit published to the jury.)

4    Q    If you don't mind just repeating that.

5    A    In this photograph, it's an overview photograph of the

6    location in question.  The home is to the left of your

7    photograph.  There is a black Nissan Maxima parked in the

8    driveway.  In front of that vehicle, you can see there's an

9    open door.  That would be the main entry door of that

10   location.

11   Q    We're showing you Government Exhibit 744.

12         (Exhibit published to the jury.)

13   A    This is an overview photograph.  If you're standing in

14   front of that location looking to the right, that would be

15   your cross-street of 253 Street.

16         MR. PALACIO:  Government Exhibit 745.

17         (Exhibit published to the jury.)

18   A    This is looking towards the home in question.  You can

19   see the black Nissan Maxima in the driveway.  Towards the far

20   end of your photograph, you can see there is a white shed in

21   the backyard of the location.

22   Q    Was that also part of the same property as this house?

23   A    Yes.

24   Q    Showing you Government Exhibit 746.

25         (Exhibit published to the jury.)

1  A     This is a close-up photograph of the rear of the black

2  Maxima that was parked in the driveway.

3  Q     Can you give us the license plate number for that Maxima?

4  A     New York license plate HLC7182.

5  Q     Did your team process this Maxima?

6  A     My partner and I did not.

7  Q     Do you know if a different crime scene team later

8  processed the Maxima?

9  A     Yes, they did.

10  Q     Are you aware if they did that offsite?

11  A     I believe it was offsite.

12  Q     Now I'd like to show you Government Exhibit 747.

13         (Exhibit published to the jury.)

14  A     This is a photograph of -- the house in question is to

15  your left.  Your entry door is up those stairs on the left of

16  your photograph.  And down the driveway, you again can see the

17  white shed in the backyard.

18  Q     We're showing you Government Exhibit 748.

19         (Exhibit published to the jury.)

20  A     This is a midrange view of the entry door to that home.

21  Q     And showing you Government Exhibit 749.

22         (Exhibit published to the jury.)

23  A     These are the stairs that lead to the front entry door on

24  the side of the house.

25         MR. PALACIO:  If we could show the witness

1    Government Exhibit 739.

2              (Exhibit published to the jury.)

3    Q    Now, Detective --

4              MR. PALACIO:  If we could blow that up a little bit,

5    starting with the top, actually.  The very top.

6    Q    Beginning with the top of Government Exhibit 739, can you

7    tell us what writing we see there?

8    A    This is the title for the diagram.  So, it is the NYPD

9    crime scene unit, the unit that I'm in.

10             We responded to a homicide, the date that we

11   responded to, which is 4/28/2018.  Our CSU run number 18/153C,

12   as in Charlie.

13             Which precinct the original homicide occurred in,

14   which was the 69 Precinct in Brooklyn.

15             The location that the sketch is for, 249-45 148

16   Road, Queens, New York.

17             And this is diagram of the main floor and I'm the

18   one that prepared it.

19   Q    And this is one of the four diagrams that you created; is

20   that right?

21   A    Correct.

22             MR. PALACIO:  We can show her the very bottom of the

23   diagram.

24   Q    Can you tell us what information we see on the bottom?

25   A    To the left of the diagram, you see the evidence legend.

1    This is the items of evidence that were recovered from that

2    floor.

3            KC2.  KC are my initials and item number two is the

4    evidence number.

5            So, KC2 was the towel that was tested positive for

6    blood in the kitchen, KC45 is the drainpipe from the kitchen

7    sink, 45A is the liquid from the drainpipe, 46 is the

8    drainpipe in the bathroom sink, and 46A is the liquid that was

9    inside that pipe.

10           It says the diagram is not to scale, it's

11   illustration only.

12   Q    Is it fair to say on all of these diagrams the evidence

13   will just list the item number that was collected and a

14   description of that item; is that fair?

15   A    Correct.

16           MR. PALACIO:  Now, if we could just blow up the

17   diagram itself for Detective Cenizal.

18   Q    All right, Detective, as we work our way through the main

19   floor of this house, first of all, can you show the jury where

20   the entrance is?

21           And you can use your finger to circle that area.

22   A    (Complies)

23   Q    You've indicated to the right of the photo; is that

24   right?

25   A    Correct.

1    Q    Now, once you come in, can you orient the jury of the

2    layout for the main floor?

3    A    Sure.  So, you're coming in through the main entry.  To

4    the left would be the living room, to the right would be the

5    kitchen.  If you went straight ahead, there was a small closet

6    and to the right of that closet would be the stares leading up

7    to the second floor.

8            Once you're in the living room, if you go to the

9    left of the living room -- I'm sorry -- there is a hallway

10   that will lead back to the kitchen.  In that hallway, you will

11   find a half bathroom.  And after that half bathroom, you will

12   find the stairs that lead down to the basement.

13           If you're looking in the kitchen, next to the

14   kitchen table, towards the top, is the back doors that lead to

15   the back porch to lead to the backyard.

16           MR. PALACIO:  There should be a button at the bottom

17   to clear those markings.

18           If we could show the witness Government Exhibit 750.

19           (Exhibit published to the jury.)

20   Q    What are we looking at here?

21   A    As you entered into that main entry door, to the right

22   would be the kitchen.  That is what you're looking at here.

23   On the right side of your photograph is the kitchen.  To the

24   left of the photograph is the stairs that lead to the second

25   floor.

1   Q      Showing you Government Exhibit 751.

2          (Exhibit published to the jury.)

3   A      This is an overall photograph of marker two.  KC2 is the

4   blue and white towel with blood that was recovered from inside

5   the kitchen.

6   Q      Is that the towel that you performed the OBTI test on?

7   A      Yes.

8   Q      Showing you Government Exhibit 752.

9          (Exhibit published to the jury.)

10  A      This is a photograph showing that the test -- OBTI test

11  was positive because you can see the two pink markers next to

12  the "C" and the "T" on the test.

13  Q      Showing you Government Exhibit 753.

14         (Exhibit published to the jury.)

15  A      This is a photograph of inside the kitchen.  I would be

16  standing right in front of that chair where the blue towel

17  was.

18  Q      Showing you Government Exhibit 754.

19         (Exhibit published to the jury.)

20  A      This is an additional photograph of inside the kitchen.

21  In the middle of the photograph you can see two white sliding

22  doors that will lead to the outside porch to the backyard.

23  Q      Showing you Government 755.

24         (Exhibit published to the jury.)

25  A      This is the sink that's in the kitchen.  You can see I

1    had opened up the cabinet doors underneath the sink.  Under

2    there, you can see some cleaning supplies, such as bleach and

3    Lysol.

4    Q    Showing you Government Exhibit 766.

5            (Exhibit published to the jury.)

6    A    This is a close-up photograph of that same cabinet

7    underneath the kitchen sink.  It's a better view of the pipe

8    and the cleaning supplies.

9    Q    I'm showing you Government 757.

10           (Exhibit published to the jury.)

11   Q    What is this meant to indicate?

12   A    This is KC46.  This is the pipe underneath the kitchen

13   sink.

14           We had the emergency service unit come to the

15   location to remove these pipes.  Once we removed the pipe,

16   we'll take the liquid that is inside that pipe and send it for

17   testing.

18           These pipes are important because it's like -- it's

19   a trap from -- whatever is in your kitchen sink or bathroom

20   sink goes down into your pipes and it's either an S- or a

21   U-shape, and stuff, items and debris, can get stuck in that

22   curved part of your pipe.

23   Q    And were the traps removed from the different locations

24   throughout the house?

25   A    Yes.

1   Q    I'm showing you Government 758.

2        (Exhibit published to the jury.)

3   A    As you walked into that front entry door, to the left was

4   the living room.  This is looking into the living room from

5   the entry door.

6   Q    Showing you Government 759.

7        (Exhibit published to the jury.)

8   A    This is a view inside that same living room showing the

9   items and the furniture inside the living room.

10  Q    And, again, this is exactly how you found the location

11  when you responded; is that right?

12  A    Correct.

13  Q    Showing you Government 760.

14       (Exhibit published to the jury.)

15  A    This is inside the same living room.

16  Q    I'm showing you Government 761.

17       (Exhibit published to the jury.)

18  A    This view is standing inside the living room.  To the

19  right would be your entry door and the kitchen.  To the left

20  would be the hallway that leads back to the kitchen along with

21  the half bath and the stairs leading to the basement.

22       In this photograph, you can see large holes or

23  indentations on the left side of your photograph on the

24  hallway wall as well as the wall that is in the living room

25  above that monitor.

1        MR. PALACIO:  Mr. Rader, if you could zoom in to

2   that area, please.

3   Q    Are we looking at a close-up of the wall on the left-hand

4   side of the photo?

5   A    Yes, sir.

6        MR. PALACIO:  If we could zoom in in that area above

7   what appears to be a monitor.

8   Q    And again, can you describe that?

9   A    It's an indentation in that wall above the monitor.  You

10  can see that the Sheetrock is cracked.

11  Q    Showing you Government 762.

12       (Exhibit published to the jury.)

13  A    This is a close-up photograph of that hallway that was to

14  the left of your previous photograph.  You can see a little

15  bit better the indentations on that wall to the left.

16       There's another one that is further down the

17  hallway, closer to the refrigerator.  There's also an

18  additional hole on the right side of that hallway above the

19  light switch.

20       MR. PALACIO:  Mr. Rader, can you zoom in on that

21  area, please?

22  Q    And we see a couple of doors.

23       Can you tell us what that leads to?

24  A    The first door that's closest to us in the photograph is

25  the door to the half bathroom.  And the one on the same side

1   of the wall after that is the stairs that lead to the

2   basement.

3   Q     Showing you Government 763.

4           (Exhibit published to the jury.)

5   A     This is a view standing inside the living room.  Straight

6   ahead would be the kitchen, to the right would be the entry

7   door, and to the left you can see the brown doors that lead to

8   the closet, and after that you'll see the railing that leads

9   to the second floor stairs.

10  Q     Showing you Government 764.

11          (Exhibit published to the jury.)

12  A     This is a view coming directly inside that entry door.

13  Your stairwell to the second floor is to the right of this

14  photograph.

15  Q     Showing you Government 765.

16          (Exhibit published to the jury.)

17  A     This is a photograph from the second floor hallway

18  landing leading down the stairs to the entry door that you can

19  see at the bottom of the stairs.

20  Q     And is that the door that's on the side entrance that

21  would lead us into the driveway?

22  A     Correct.

23  Q     Showing you Government 766.

24          (Exhibit published to the jury.)

25  A     This is standing at the bottom of the stairs that lead up

1   to the second floor hallway.  At the top of those stairs, you

2   can see a very large indentation in the wall directly in front

3   of those stairs.

4               MR. PALACIO:  Mr. Rader, if we could zoom in on that

5   top portion of that photo, please.

6   Q    And you're indicating the indentation below that clock

7   towards the ground; is that right?

8   A    Correct.

9   Q    I'm showing you Government 767.

10              (Exhibit published to the jury.)

11  A    This is a photograph of the half bath on the main floor.

12  So, once you go through the living room, that hallway, the

13  first door that you saw on the right is the half bath.

14  Q    Did this -- it's a half bath.

15              Did it have a bathtub in there?

16  A    No, this one did not.

17              MR. PALACIO:  If we could show the witness

18  Government 740.

19              (Exhibit published to the jury.)

20              THE COURT:  I wonder if this is a good time to take

21  a break.  We've been here for a little while.

22              I think Ms. Greene explained to you what our kind of

23  unusual schedule is today, but let's take 20 minutes.  Please

24  don't talk about the case, but we'll see you back here in a

25  few minutes.

1       THE COURTROOM DEPUTY:  All rise.

2           (Jury exits.)

3       THE COURT:  Everybody can sit down, the witness can

4  step down, and we'll be back here at 25 to 1.

5           (Recess taken.)

6           (In open court; jury not present.)

7       THE COURT:  Just before we continue, I want to give

8  you my ruling on these experts, defense experts.

9           The first thing I'll say about it is I instructed

10 that -- I ordered that the defense give the Government

11 information about both experts I think by February 5.  The

12 notices were late, they were incomplete, and the content and

13 the tardiness of it would be reason alone to deny the

14 application.  But I have considered it nevertheless.

15          Starting with Kristy Smith, I'm not going to permit

16 her to testify for a variety of reasons.

17          First, because it's not apparent to me what the

18 exact area of her expertise is.  She offers no basis for some

19 of the opinions to the extent that they're given in what the

20 defense has provided me.  She apparently told the Government

21 that she had not reviewed any records and that she had not

22 been asked to give an opinion about the dog Timoshenko and his

23 training.

24          On direct, the witness didn't testify as to anything

25 about what happened inside the house, it was the defense that

1   brought all that out on cross-examination and now seeks to

2   call somebody who, in my view may, not even be an expert to

3   refute that testimony.

4           So, I'm not going to permit that and the defense has

5   an exception to that ruling.

6           In an excess of caution, I will permit the -- I

7   can't think of his name -- the expert from Scotland to

8   testify.

9           He says, apparently, at one point he sees no reason

10  to dispute the findings of the Office of Chief Medical

11  Examiner, but I don't find that it's entirely inconsistent.

12          I will not permit him to testify that he doesn't

13  think that -- I think it's Mr. Lim has the training or the

14  education to make determinations here.  I don't think that's

15  part of his expertise.  But he can testify generally about his

16  findings.

17          And the Government has an exception to that ruling.

18          Let's get the witness back on the stand and the

19  jury.

20          (Witness resumes the stand; jury enters.)

21          THE COURT:  All right, everybody.  Welcome back.

22  We're ready to resume with the direct examination of the

23  detective.

24          Go ahead.

25          MR. PALACIO:  Thank you, your Honor.

1    THE COURTROOM DEPUTY:  The witness is reminded she's

2  still under oath.

3  BY MR. PALACIO:

4  Q    Detective Cenizal, before we broke, we started to talk

5  about the second floor of the house.

6  A    Yes.

7  Q    We're showing you here your crime scene sketch 740.

8         Can you orient us on the layout of the second floor,

9  starting with the steps?

10 A    Yes.

11        So, the steps that lead up to the second floor, at

12 the top of the stairs you'll be in the hallway on the second

13 floor.  If you go to the right of the stairs, you will go to

14 the full bath that's in the home.

15        To the right of that bathroom, is bedroom number

16 one.  As you come out of the door of bedroom number one and go

17 down the hallway, you will pass the stairs, and the first

18 bedroom on the left will be bedroom number two.

19        And the third bedroom will be all the way at the end

20 of the hallway on the second floor.  That's going to be

21 bedroom number three.  In bedroom number three, there is a

22 pull-down attic to gain access to the attic.

23 Q    Which is the largest of the three bedrooms?

24 A    Bedroom number three.

25        MR. PALACIO:  If you don't mind clearing that screen

1    and if we could show the witness Government 771.

2              (Exhibit published to the jury.)

3    Q    What are we looking at here?

4    A    This is inside of bedroom number one.  So, as you came up

5    the stairs to the second floor, you're going to make the

6    right, and it's the bedroom next to the bathroom.

7    Q    Showing you Government 772.

8              (Exhibit published to the jury.)

9    A    This is an overall photograph inside bedroom number one.

10   You can see there is a bed on the far wall of the photograph,

11   minimal bedding and pillows.  To the right of that photograph,

12   you'll see a stereo system.  On the bottom of the stereo

13   system, you'll see a box of baking soda.  There's also a

14   nightstand in the middle of your photograph.

15   Q    And from your experience, what is baking soda for?

16   A    Baking soda is typically used to remove stains or absorb

17   odors.

18   Q    Can you describe the flooring of bedroom number one?

19   A    The carpet is brown.  Some areas are darker and some

20   areas are lighter in color.

21   Q    And, again, is this the bedroom that's closest to the

22   full bathroom?

23   A    Yes.

24   Q    So, if you come out of this bedroom, the bathroom would

25   be to your immediate right?

1    A    Correct.

2    Q    Showing you Government 773.

3         (Exhibit published to the jury.)

4    A    This is inside bedroom number one if I was standing

5    closer to that stereo system looking on the opposite side of

6    the bedroom.

7    Q    Showing you Government 774.

8         (Exhibit published to the jury.)

9    A    This is inside bedroom number one.  Your bed is on the

10   right of your photograph.  And to the left of the photograph,

11   you can see the entry door to bedroom number one and you can

12   see the railing that leads down to the stairs to the main

13   floor.

14         MR. PALACIO:  Mr. Rader, if we could expand the

15   right-hand side of the photo -- I'm sorry, the left-hand side

16   of the photo near the door.

17   Q    Can you describe what we see on the wall?

18   A    So, the railing that is on the right side of your

19   photograph is the railing that leads to the stairs.  As you

20   come up the stairs, you can see the large indentation to the

21   wall on the hallway.

22   Q    Is that the one we saw earlier?

23   A    Correct.

24   Q    And I'm showing you Government 775.

25         (Exhibit published to the jury.)

1  A     This is a photograph inside bedroom number one if you're

2  standing towards the foot of the bed.  This is showing the

3  closet in that bedroom.

4  Q     Showing Government 778.

5          (Exhibit published to the jury.)

6  A     This is a photograph -- this one?

7          This is a photograph of the closet inside bedroom

8  number one.  As you can see, there's no clothing or any

9  personal items besides books in there.

10 Q     I'd like to move on to bedroom number two.  I'm showing

11 you Government 780.

12         (Exhibit published to the jury.)

13 Q     Can you describe the appearance of bedroom number two?

14 A     Bedroom number two is going to be the first bedroom on

15 the left of the staircase as you come up.

16         In this bedroom, it was more disarray.  There was

17 clothing and books and children's toys in this bedroom.  It's

18 harder to see the floor in this bedroom.  There's a lot of

19 debris on the floor.

20 Q     Showing Government 781.

21         (Exhibit published to the jury.)

22 A     This is inside bedroom number two.  As I said earlier,

23 there's children's toys.  Also, an Elsa chair, which is known

24 for children to use.  To the left of your photograph is the

25 closet and to the right is, like, a headboard.

1   Q    Did you eventually remove that little Elsa chair?

2   A    Yes, we did, when we did our search.

3   Q    Showing you Government 783.

4        (Exhibit published to the jury.)

5   Q    Can you tell us what we see here?

6        We see some markers.

7   A    This is inside bedroom number two.  You'll see yellow

8   markers 49 and 50, indicating two pieces of evidence that are

9   inside that black garbage can.  Those two items were black

10  garbage bags.

11  Q    Showing you Government 784.

12       (Exhibit published to the jury.)

13  A    This is a close-up photograph showing a better view of 49

14  and 50, the two black garbage bags.

15  Q    Showing you Government 786.

16       (Exhibit published to the jury.)

17  A    This is inside bedroom number two.  This is an

18  above-view, showing the walls; as you can see there's a

19  Jamaican flag on one wall; the closet door is off the hinges

20  and leaning against the door -- I mean the wall.

21  Q    And showing you Government 785.

22       (Exhibit published to the jury.)

23  A    This is inside bedroom number two, showing the entry door

24  that leads back out into the hallway.

25  Q    And where is the railing?

1  A    The railing would be on the right side of that bedroom

2  door in the center of your photograph.

3  Q    I'd like to move into bedroom number three, and we're

4  showing you Government 787.

5           (Exhibit published to the jury.)

6           MR. PALACIO:  Mr. Rader, if we could expand the area

7  around that door and the wall around it.

8  Q    Can you tell us what we see here?

9  A    This is a photograph standing inside the hallway that

10 leads to bedroom number three.  To the right of bedroom number

11 three, above the light switch you can see a large hole where

12 it is concaved and the Sheetrock is cracked.

13          As you walk into bedroom number three, on the

14 left-hand side wall there are large indentations and holes in

15 that wall as well.

16 Q    Is that on the left-hand side as you walk into the

17 bedroom?

18 A    Correct.

19 Q    Showing you Government 788.

20          (Exhibit published to the jury.)

21 A    This is an additional view of that wall to the left

22 inside bedroom number three.  You can have a better view of

23 two of the holes that you can see on that wall.

24          And this door leads into the third bedroom.  And on

25 the top of your photograph, you can see the string for the

1   handle for the pull-down attic.

2   Q    Showing you Government 789.

3         (Exhibit published to the jury.)

4   A    This is a photograph inside of bedroom number three.  To

5   the left, you can receive a crib and a bed.  On the wall that

6   is furthest away on the left-hand side, you can see a few

7   large holes in that wall.  In the middle of your photograph,

8   there is a dresser with a mirror with broken glass.  And to

9   the right, there is a chair and a lamp.

10        MR. PALACIO:  Mr. Rader, can we expand the left-hand

11  side of the photograph?

12  Q    Can you describe the damage we see there?

13  A    In this photograph, you can see two large holes and one

14  smaller hole above those two large holes.  This is the wall

15  that's next to that bed.

16  Q    Showing you Government 790.

17        (Exhibit published to the jury.)

18  A    This is a view inside bedroom number three looking out

19  towards the entry door.  In this photograph, you can see

20  multiple smaller holes on the wall in front of you to the

21  right of your photograph above that crib.

22        MR. PALACIO:  Mr. Rader, if you could expand around

23  that area, please.

24        If we could take that off and just the full picture.

25  Q    Do you see the area where the full bath is?

1   A    The full bath would be in the center of your photograph

2   after the railings for the stairs.

3   Q    Could you circle that?

4   A    (Complies)

5   Q    And you're indicating the middle of the photograph; is

6   that right?

7   A    Correct.

8   Q    We're showing Government Exhibit 791.

9        (Exhibit published to the jury.)

10  A    This is inside bedroom number three.  In this photograph,

11  you see the bed is off-centered.  The wall to the right is the

12  wall that had the two, now three, holes in it.  And to the

13  left would be the entry door.

14  Q    Showing you Government 792.

15       (Exhibit published to the jury.)

16  A    This is an overall photograph of that bedroom number

17  three.  The wall that's next to the bed, you can see three

18  large holes and two smaller holes on the left and above those

19  three larger holes in the wall.

20       MR. PALACIO:  Mr. Rader, could you expand around

21  that area, please?

22  Q    We're showing you Government 793.

23       (Exhibit published to the jury.)

24  A    This is a photograph inside bedroom number three standing

25  next to that wall that we just saw next to the bed.  Straight

1  ahead, there is the window to the left of your photograph;

2  there's a chair in the middle of your photograph; above that

3  chair, there's another large indentation hole in the

4  Sheetrock.

5          MR. PALACIO:  Mr. Rader, can you expand around that

6  area?

7  Q    And are you indicating the area underneath the white

8  calendar?

9  A    Yes.

10 Q    I'd like to move now to the bathroom on the second floor.

11 We're showing you Government 794.

12         (Exhibit published to the jury.)

13 A    This is a photograph standing at the top of the stairs on

14 the second floor.  Bedroom number one is to the right open

15 door, the bathroom is in the middle of your photograph, and to

16 the left you can see the closet doors that are brown.

17 Q    Showing you Government 795.

18         (Exhibit published to the jury.)

19 A    This is a photograph leading into that full bath on the

20 second floor.

21 Q    Showing you Government 796.

22         (Exhibit published to the jury.)

23 A    Once you step inside the bathroom, this is a photograph

24 showing the tub.  In the bathtub, there are two buckets.  Next

25 to the bathtub, there is a bucket on the floor and there's

1   also a pink bucket on the toilet.

2   Q    Showing you Government 797.

3        (Exhibit published to the jury.)

4   A    This is inside that same bathroom standing closer to the

5   tub.  You can see the entry door to the left of your

6   photograph.  In this photograph, you can see the sink as well

7   as the top of the toilet with buckets that were on top of the

8   toilet.

9   Q    Showing you Government 799.

10       (Exhibit published to the jury.)

11  A    This is a photograph of underneath that bathroom sink

12  with the cabinet door open.  You can see there are multiple

13  cleaning supplies under this sink.

14  Q    Showing you Government 802.

15       (Exhibit published to the jury.)

16  A    This is an overall photograph showing the bathtub to the

17  right of your photograph containing the two buckets.  There is

18  a black bucket in between the toilet and the bathtub as well

19  as the two buckets on the toilet.

20  Q    I'm showing you Government 804.

21       (Exhibit published to the jury.)

22  A    This is an overall photograph of the two buckets in this

23  bathtub.  The bathtub is approximately five feet long.  There

24  is no liquid in these two buckets.

25  Q    Detective Cenizal, I'd like to head down now to the

1    basement, but I'd like to look at first Government 741.

2           MR. PALACIO:  If we could expand the area around the

3    diagram.

4    Q    Detective, can you orient the jury as to how to access

5    the basement and the layout of the basement?

6    A    Yes.  So, from the main floor of the home, if you're in

7    the hallway, if you're standing in the living room and going

8    down the hallway to the left of the living room, you pass the

9    half bathroom and then you would reach the stairs that lead

10   down to the basement.

11          Once you get to the bottom of the basement, if you

12   make a left it's more of the laundry room with the washer and

13   dryer and slop sink.  As you come down the stairs, if you make

14   a right you enter into a larger open room where there was bags

15   of clothing and debris, boxing, workout equipment.  And then

16   there is also a closet underneath the stairwell of the

17   basement.

18          MR. PALACIO:  If you don't mind clearing that.

19          Let's look at Government 807.

20          (Exhibit published to the jury.)

21   A    This is a photograph from that main floor leading down

22   the basement stairs to the basement.

23   Q    Showing you Government 809.

24          (Exhibit published to the jury.)

25   A    This is inside that larger room of the basement.  If you

1   come down the stairs, you're going to make the right into this

2   larger room.

3   In this photograph, the door to the left is the

4   entry door to the closet that goes underneath the stairs.  In

5   this photograph, you can see multiple bags of clothing.

6   There's some tools and some wiring.

7   The doorway to the right of your photograph, right

8   outside the stairs, would lead you to the laundry room area.

9   Q    Showing you Government 811.

10   (Exhibit published to the jury.)

11   A    As you come down the stairs, if you turn to the right,

12   this is the view you have of that larger room.  In this

13   photograph, you can see that there is missing Sheetrock or

14   wall to the left of your photograph.  In the middle of your

15   photograph, you can see a weight bench with weights and

16   dumbbells.  There's also a heavy bag for boxing in that area.

17   The door to the right all the way in the back of

18   your photograph would be a room that holds the pipes for the

19   housing.

20   Q    Showing you Government 813.

21   (Exhibit published to the jury.)

22   A    This is a photograph of inside the closet underneath the

23   stairs in the basement.

24   Q    Show you Government 830.

25   (Exhibit published to the jury.)

1  A     This is a photograph of that larger room of the basement.

2  You can see a yellow marker, 51.  That's indicating the black

3  garbage bag that was removed for evidence.

4  Q     Showing you Government 814.

5            (Exhibit published to the jury.)

6            MR. PALACIO:  And if we could zoom in on sort of the

7  right-hand side of the photo.

8  A     So in this photograph, you can see the heavy bag for

9  boxing in the middle of that photograph.  There are also

10  dumbbells and a weight bench and more gym equipment to the

11  right of that photograph.

12  Q     Let's look to Government 815.

13            (Exhibit published to the jury.)

14  A     This photograph, you're standing inside the laundry room

15  looking into the larger room in the basement.  After this

16  door, your stairs would lead back up to the right to the main

17  area of the house.

18  Q     Can you tell us what types of items of evidence were

19  collected in the laundry room area?

20  A     In this laundry room, multiple articles of clothing,

21  samples of the water from the washing machine.  Swabs were

22  taken from the dryer -- I mean from the washing machine and

23  the slop sink.  The traps and the hoses were removed from the

24  slop sink and the washing machine.

25  Q     Showing you Government 816.

1          (Exhibit published to the jury.)

2    Q    Where we see all of these evidence markers, what is that

3    meant to show?

4    A    In this photograph, all the evidence markers that you see

5    indicate pieces of clothing, articles, both on the dryer,

6    which is the white box that is on the left-hand side of your

7    photograph, as well as on the drying racks in the center of

8    your photograph.

9    Q    Showing you Government 819.

10          (Exhibit published to the jury.)

11    A    This is an additional view of that same laundry room

12    indicating all the articles of clothing that were recovered

13    for evidence.  In this photograph, you can also see another

14    heavy bag for boxing as well as other equipment for exercise.

15    Q    Showing you Government 822.

16          (Exhibit published to the jury.)

17    A    In this photograph, you can see that same heavy bag on

18    the right side of your photograph.  In the middle of your

19    photo, you see a pinkish color square that would be the slop

20    sink.  And to the left of that would be the white washing

21    machine.

22    Q    Showing you Government 823.

23          (Exhibit published to the jury.)

24    A    This is a close-up photograph of the white washing

25    machine on the left-hand side and the slop sink is on the

1   right-hand side.

2            Usually a slop sink is used for when you're washing

3   your clothes, the water will drain out to a slop sink.  So,

4   the gray hose that's in the back of the slop sink is the water

5   that exits the washing machine into the sink.

6   Q    All right, Detective Cenizal, I'd like to now talk about

7   the exterior of the house.

8            MR. PALACIO:  If we could pull up Government 742.

9            (Exhibit published to the jury.)

10           MR. PALACIO:  And if we could expand around the area

11  of the diagram.

12  Q    Detective Cenizal, can you describe the exterior layout

13  of this house?

14  A    So, the home in question is 249-45, which is this home

15  right here.  These stairs is the door -- the entry door that

16  we were just looking at that lead into the kitchen and to the

17  living room.

18           As you walk down the driveway, there is a second

19  door to the left.  Those stairs lead to the back porch, where

20  you can enter into the kitchen.

21           If you walk passed the porch, you are in the

22  backyard of the area.  And in that backyard, there is a white

23  shed.

24

25           (Continued on the following page.)

1    DIRECT EXAMINATION

2    BY MR. PALACIO:  (Continuing

3    Q    And is the backyard fully enclosed?

4    A    Yes.

5              MR. PALACIO:  If we can pull up Government's Exhibit

6    832.

7    A    So this is standing next to the home in the driveway

8    area.

9              This pathway leads down to the porch on your

10   left-hand side and further down your photograph you can see

11   the white shed that is in the backyard.

12             MR. PALACIO:  I'd like to look now at Government's

13   Exhibit 833.

14   A    This is a photograph of the backyard.  As you can see,

15   there is fencing around the entire yard.

16             To the right of your photograph is the white shed

17   that we saw earlier in the previous photographs.

18   Q    I'm showing you Government's Exhibit 834.

19   A    This would be a photograph standing right outside the

20   shed leading back into the backyard of the home.

21             To the left of your photograph, you can see the

22   walkway that leads back to the driveway, the same black

23   Mazda -- sorry.  Not Mazda.  A Nissan is in that driveway.

24             And to the middle of your photograph are the stairs

25   that lead to the back porch.

1   Q    I'm showing you Government's Exhibit 835.

2   A    This is a photograph of the backyard.  To the left of

3   your photograph is the shed, and to the right of the

4   photograph would be the home.

5   Q    I'm showing you Government's Exhibit 836.

6   A    This is a photograph looking at the white shed in the

7   backyard.  In the photograph you can see marker number one on

8   the floor.

9   Q    What does that indicate?

10  A    Evidence was removed from that location.

11  Q    I'm showing you Government's Exhibit 838.

12       Can you describe what we see here.

13  A    This is a close-up photograph.  On this blue scale you

14  can see KC1.  That indicates -- it goes along with marker

15  number one that you saw in the previous photograph.

16       This is a closer photograph of a blue handsaw with

17  no blade.

18  Q    And is this how you saw that item?

19  A    Yes.

20  Q    Showing you Government's Exhibit 840.

21  A    This is the interior side of that shed in the backyard.

22  Marker number one would be on the floor to the right of your

23  photograph.

24  Q    Showing you Government's Exhibit 841.

25  A    These are the stairs that lead from the backyard to the

1   porch in the back of the house.

2   Q    And showing you Government's Exhibit 846.

3   A    This is inside that back porch.

4        In the center of your photograph towards the left

5   side, you'll see the entry door that leads down the stairs to

6   the backyard, and you can see on the right side two white

7   sliding glass doors, which would lead into the kitchen of the

8   home.

9   Q    All right.  Detective, after you completed your

10  processing of that house, at about what time did you leave

11  that crime scene?

12  A    I left that scene around 2:30 p.m. on the 29th.

13  Q    The following day?

14  A    Correct.

15  Q    I'm going to direct your attention to May 2, 2018.

16       Did you respond to that same house once again to

17  process the attic?

18  A    Yes.

19  Q    And what was the run number for that job?

20  A    2018/153 George, G.

21  Q    I'm sorry?

22  A    G, as in George.

23  Q    And were you the lead investigator?

24  A    I was not.

25  Q    Who was the lead investigator?

1    A     Detective Florio.

2    Q     Where is he today?

3    A     Retired.

4    Q     At about what time did you respond to that location on

5    May 2nd?

6    A     Around 11:30 a.m.

7    Q     Can you tell us -- I'd like show you what is marked for

8    identification Government's Exhibits 988, 989, and 990.

9              MR. PALACIO:  Your Honor, with the Court's

10   permission, I can show the witness hard copies.

11             THE COURT:  Whatever you want.

12             And is there an objection to these photographs?

13             MS. THIELE:  No objection.

14             THE COURT:  So these will be in evidence.

15             (Government's Exhibits 988, 989, and 990 received in

16   evidence.)

17   Q     Detective Cenizal, when you responded to that location,

18   did you use some of the forensic tools to process the attic

19   that we talked about?

20   A     Yes, we did.

21   Q     Which ones did you use?

22   A     We used regular flashlights and, again, the CrimeScope

23   for alternate light source.

24   Q     And what was the result of that?

25   A     They were negative for the attic.

1      MR. PALACIO:  Now, if we can show the witness
2  Government's Exhibit 988.
3  A    This is a photograph standing inside bedroom number three
4  on the second floor of the home.
5         In the middle of your photograph you can see that
6  string that leads to the attic stairs.  They are pull-down
7  stairs.
8  Q    Let's take a look at Government's Exhibit 989.
9  A    Once you pull down the stairs, these are ladder-type
10 stairs that lead to the attic.
11 Q    And let's look at Government's Exhibit 990.
12 A    This is a view of inside the attic.
13        The hole that you see on the floor would be where
14 you come up from the stairs, and this is just showing the
15 items that are in the attic.
16 Q    Were any items of evidence recovered from the attic?
17 A    No.
18 Q    Now, at about what time did you leave that scene?
19 A    That scene was around 6:30 p.m. that day.
20 Q    Now, other than preparing paperwork, did you have any
21 further role in the investigation of this homicide?
22 A    No.
23        MR. PALACIO:  Your Honor, nothing further.
24        THE COURT:  Cross-examination?
25        MS. THIELE:  Yes, Your Honor.

 1   CROSS-EXAMINATION

 2   BY MS. THIELE:

 3   Q     Good afternoon, Detective.

 4   A     Good afternoon.

 5   Q     Fair to say you've had hundreds of hours of training in

 6   processing crime scenes?

 7   A     Yes.

 8   Q     And experience from processing over 300 actual crime

 9   scenes?

10   A     Yes.

11   Q     And your testimony is about your response to a scene in

12   Rosedale, Queens, on April 28, 2018?

13   A     Correct.

14   Q     In your role as crime scene unit lead?

15   A     On the 28th, yes.

16   Q     And you arrived at the scene at around 6:25 p.m. on the

17   28th?

18   A     Yes.

19   Q     And you did not leave the scene until around 2:30 p.m.

20   the next day, April 2 9th?

21   A     Correct.

22   Q     So you were there for about 18 hours?

23   A     I think it was even more than that, but, yes.

24   Q     And you conferred with a number of officers when you

25   arrived?

1   A     It was mostly supervisors and detectives.

2   Q     Okay.  And part of your discussion with them was about

3   what they believed happened in the case?

4   A     Correct.

5   Q     And you were tasked with conducting a systematical and

6   methodical zone search of the residence?

7   A     Correct.

8   Q     To collect physical evidence?

9   A     Physical, yes.

10  Q     And once physical evidence was collected, they were

11  collected for testing because you believed they would be

12  probative; correct?

13  A     Correct.

14  Q     You also took over 200 photographs that day; right?

15  A     Yes.

16  Q     I want to go through some of the physical evidence that

17  was collected, if that's all right.

18        So you collected a blue handsaw from the shed in the

19  backyard?

20  A     Yes.

21  Q     A blue and white striped towel with a possible bloodstain

22  from the kitchen?

23  A     Yes.

24  Q     A black bucket from the bathroom?

25  A     Yes.

1  Q    Liquid from inside that bucket?

2  A    Yes.

3  Q    Two white hoodies on top of a dryer in the laundry room?

4  A    Yes.

5  Q    Approximately 36 other pieces of clothing from the

6  laundry room?

7  A    Yes.

8  Q    The gray drain hose from the washing machine?

9  A    Yes.

10  Q    And a water sample from the same?

11  A    Correct.

12  Q    The slop sink drain pipe from the laundry room?

13  A    Yes.

14  Q    And a water sample from that as well?

15  A    Yes.

16  Q    The drain pipe from the first floor bathroom sink?

17  A    Yes.

18  Q    And a water sample from that?

19  A    Yes.

20  Q    The drain pipe from the kitchen sink?

21  A    Yes.

22  Q    And a water sample from that sink?

23  A    Yes.

24  Q    The drain pipe from the upstairs bathroom sink?

25  A    Yes.

1   Q     And a water sample?

2   A     Yes.

3   Q     Also, the drain pipe from the bathtub in the upstairs

4   bathroom?

5   A     Correct.

6   Q     And a water sample from that as well?

7   A     Yes.

8   Q     Can you explain why, in your role processing this crime

9   scene, you would want to pull out pipes from the sinks and

10  bathtub in a case like this?

11  A     If it's a cleanup job, which I suspected when I got to

12  the scene, if the suspect washed their hands or washed any

13  tools or just ran the water, the blood would sometimes get

14  stuck in those traps that were removed, either in the bathtub

15  or the sink.

16        Some suspects will shower after a crime is

17  committed.  You can get hair and fibers from there too.

18  Q     Thank you, Detective.

19        Black plastic garbage bags were also recovered from

20  a black bucket in an upstairs bedroom?

21  A     Correct.

22  Q     Along with some black garbage bags from the basement?

23  A     Yes.

24  Q     And all of these items were seized to be forwarded to the

25  lab for further testing?

1   A      Correct.

2   Q      Like DNA or fingerprint testing?

3   A      Correct.

4   Q      And you testified that the residence was also searched

5   for forensic evidence?

6   A      Yes.

7   Q      Such as fibers, hair, blood, semen?

8   A      Yes.

9   Q      And you testified about a number of different tools that

10  were used in an attempt to collect that forensic evidence;

11  correct?

12  A      Correct.

13  Q      Evidence that's not often visible to the naked eye?

14  A      Correct.

15  Q      Or evidence that would survive a cleanup?

16  A      Correct.

17  Q      And you testified about OBTI testing.  And that's a rapid

18  screening test that presumes bloodstains are of human origin;

19  correct?

20  A      Correct.

21  Q      And if there is a positive test, you then gather swabs of

22  the stain for further testing by the lab?

23  A      Yes.

24  Q      To determine whether the stain is, in fact, human blood?

25  A      Correct.

1    Q    And, potentially, if DNA can be pulled from it?

2    A    Yes.

3    Q    So you went to a number of different rooms trying to

4    collect this forensic evidence; correct?

5    A    Yes.

6    Q    Including the second floor or upstairs bathroom?

7    A    Yep.

8    Q    And you tested the sink with Bluestar?

9    A    Yes.

10   Q    Body scrub bins or buckets?

11   A    Yes.

12   Q    The floor?

13   A    Yes.

14   Q    The walls?

15   A    Yes.

16   Q    Drains?

17   A    Yes.

18   Q    The cleaning supplies?

19   A    I believe so.  I don't know off the top of my head.

20   Q    Okay.  The rug?

21   A    Yes.

22   Q    Towels?

23   A    Yes.

24   Q    All yielding negative results; correct?

25   A    Correct.

 1  Q     You also did OBTI or presumptive blood testing in all

 2  areas of the second floor bathroom?

 3  A     Yes.

 4  Q     All yielding negative results as well; correct?

 5  A     Correct.

 6  Q     So you found no forensic evidence to collect in the

 7  second floor bathroom?

 8  A     Correct.

 9  Q     You also testified that you used the CrimeScope in all

10  three bedrooms upstairs?

11  A     Yes.

12  Q     And observed no fluorescents?

13  A     Correct.

14  Q     And the attic was searched and cleared as well; correct?

15  A     It was searched what?  Sorry.

16  Q     And cleared?

17  A     Yes.

18  Q     And you also conducted those OBTI tests on a wall behind

19  the entry door?

20  A     Yes.

21  Q     A main floor bathroom?

22  A     Yes.

23  Q     The steps leading to the basement?

24  A     Yes.

25  Q     Inside the washing machine?

1   A    Yep.

2   Q    Inside and the outside wall of the slop sink in the

3   laundry room?

4   A    Yes.

5   Q    Mattresses?

6   A    Yes.

7   Q    Closet doors?

8   A    Yes.

9   Q    All negative results as well; correct?

10  A    Correct.

11  Q    On May 2, 2018, a few days later, you returned for

12  another crime scene run at the residence; correct?

13  A    Yes.

14  Q    And the attic was visually searched for evidence that a

15  murder occurred within the attic?

16  A    Say that one more time.  Sorry.

17  Q    The attic was visually searched to try and find any

18  evidence that a murder might have occurred within the attic?

19  A    Correct.

20  Q    And no probative evidence was collected; correct?

21  A    Correct.

22  Q    And the same for the laundry room, it was searched for a

23  second time?

24  A    Yes.

25  Q    With a CrimeScope?

1    A    Yes.

2    Q    And no results; correct?

3    A    Correct.

4    Q    And you have no knowledge of U.S. currency being

5    recovered at the residence?

6    A    Not that I know of.

7    Q    Or drugs?

8    A    Not that I know of.

9    Q    Any drug paraphernalia?

10   A    I don't recall.

11   Q    Any firearms?

12   A    Not that I saw.

13            MS. THIELE:  Nothing further.

14            THE COURT:  Any redirect?

15            MR. PALACIO:  Very briefly, Your Honor.

16            THE COURT:  Okay.

17   REDIRECT EXAMINATION

18   BY MR. PALACIO:

19   Q    Detective, if a room or a bathroom is covered in plastic,

20   would you expect to collect any forensic evidence?

21   A    No, sir.

22   Q    Why not?

23   A    Like I said earlier, the barrier would prevent it from

24   being on that surface.

25            MR. PALACIO:  Nothing further, Your Honor.

1          THE COURT:  Anything else?

2          MS. THIELE:  No, Your Honor.

3          THE COURT:  All right.

4          MS. THIELE:  Thank you.

5          THE COURT:  Detective, thank you so much.  You can

6   step down.

7          (Witness leaves the stand.)

8          THE COURT:  Are you ready to call your next witness?

9          MS. DEAN:  Yes, Your Honor.  The Government calls

10  Hannah Whisler.

11         THE COURTROOM DEPUTY:  Raise your right hand.

12         Do you solemnly swear or affirm that the testimony

13  you are about to give will be the truth, the whole truth and

14  nothing but the truth?

15         THE WITNESS:  Yes.

16         THE COURTROOM DEPUTY:  Please state your name

17  witness Hannah Whisler.

18         THE COURT:  All right.  Ms. Whisler, good afternoon.

19  I just want to give you a couple of pointers before you begin

20  your testimony.  The first thing is I want to make sure

21  everybody can hear you.  That's why I've got the microphone.

22         THE WITNESS:  Okay.

23         THE COURT:  Also, our court reporter takes down

24  everything that you say, and if you speak too quickly, it

25  makes her job kind of hard, so I'm going to ask you to go

1    slowly.

2            If there is a question that you don't understand or

3    need to be repeated, just let me know.

4            Okay, go ahead.

5            MS. DEAN:  Thank you, Your Honor.

6    **HANNAH WHISLER**,

7        called as a witness, having been first duly

8        sworn/affirmed, was examined and testified as follows:

9    DIRECT EXAMINATION

10   BY MS. DEAN:

11   Q    Who do you work for?

12   A    I work for JPMorgan Chase Bank.

13   Q    What is your job there?

14   A    My job is a transaction manager and I'm also a custodian

15   of records.

16   Q    How long have you been in that position?

17   A    I've been in this position for six years.

18   Q    Could you describe for us your duties and

19   responsibilities?

20   A    I review and oversee productions of records that are

21   related to legal requests or subpoenas served on JPMorgan

22   Chase Bank.

23   Q    What is a subpoena?

24   A    A subpoena is a legal request that may call for

25   production of records or a court appearance that can be served

1    on any entity.

2    Q    Does Chase have a system of receiving and responding to

3    subpoenas from law enforcement that requests the production of

4    certain records?

5    A    Yes.

6    Q    Did Chase receive a subpoena dated April 25, 2017 to

7    produce records related to the use of an MCU debit card at a

8    Chase ATM at 163 Merrick Road, Valley Stream, New York?

9    A    Yes.

10   Q    What was the date of the relevant transaction that Chase

11   received a subpoena for?

12   A    March 16, 2017.

13   Q    And what was the time of the relevant transaction?

14   A    5:12 p.m. through 5:14 p.m.

15   Q    What was Chase asked to produce to law enforcement?

16   A    Chase was asked to produce any surveillance footage or

17   photographic images captured by any source of surveillance at

18   the Chase branch.

19   Q    And did Chase make a production to law enforcement of the

20   records that you just described relevant to that transaction?

21   A    Yes.

22   Q    What did Chase produce to law enforcement?

23   A    A video.

24            MS. DEAN:  I have no further question.

25            THE COURT:  All right.

1  Any cross-examination?

2  MS. THIELE:  No, Your Honor.  Thank you.

3  THE COURT:  All right.  You can step down.

4  (Witness steps down.)

5  THE COURT:  Do you want to call your next witness?

6  MS. DEAN:  Yes, the Government calls Luke Morris.

7  THE COURTROOM DEPUTY:  Raise your right hand.

8  Do you solemnly swear or affirm that the testimony

9  you are about to give will be the truth, the whole truth and

10  nothing but the truth?

11  THE WITNESS:  I do.

12  THE COURTROOM DEPUTY:  State your name for the

13  record.

14  THE WITNESS:  My name is Luke Morris.

15  THE COURTROOM DEPUTY:  Have a seat.

16  THE COURT:  Okay, Mr. Morris, a couple of things.

17  First, I want to make sure everybody can hear you, so use the

18  microphone; second, don't speak too quickly, it makes it hard

19  for the court reporter, and if somebody asks you a question

20  that you want to have clarified or repeated, just let me know.

21  Okay?

22  THE WITNESS:  Okay.

23  THE COURT:  Thank you.

24  **LUKE MORRIS,**

25  called as a witness, having been first duly

1    sworn/affirmed, was examined and testified as follows:

2   DIRECT EXAMINATION

3   BY MS. DEAN:

4   Q    Who do you work for?

5   A    I work at Google.

6   Q    What's your position there?

7   A    I work on Google's legal investigations team where I

8   serve as a custodian of records.

9   Q    How long have you been in that role?

10  A    I have been working at Google for about four-and-a-half

11  years now.

12  Q    Could you describe your duties and responsibilities?

13  A    Our primary responsibility is to respond to requests for

14  data from our users that come in the form of subpoenas, court

15  orders, or search warrants.

16  Q    Did Google produce records on November 3, 2020 to the FBI

17  pursuant to a judicially authorized search warrant?

18  A    Yes, we did.

19  Q    And those were related to what types of accounts?

20  A    They were related to Gmail accounts.

21  Q    Have you reviewed a hard drive labeled Government's

22  Exhibit 61 for identification?

23  A    Yes, I did.

24  Q    Does this contain the production that Google made to law

25  enforcement with regards to law enforcement's November 3, 2020

1    search warrant?

2    A    Yes.  It contains the data that we produced.

3    Q    Have you also reviewed Government's Exhibits 61-A, B, and

4    C?

5    A    Yes, I have.

6    Q    Are those documents portions of the material that Google

7    provided to the FBI in response to the same search warrant?

8    A    Yes.

9         MS. DEAN:  At this time I ask that Government's

10   Exhibit 61-A, B, and C be received into evidence.

11        THE COURT:  Any objection?

12        MS. THIELE:  No objection.

13        (Government's Exhibits 61-A, B, and C received in

14   evidence.)

15   Q    What is 61-A?

16   A    61-A, whenever Google produces information in response to

17   a search warrant, we include a certificate of authenticity,

18   and the certificate of authenticity contains the files that we

19   produced.

20   Q    Turning now to 61-B, was Google asked to produce

21   documents and materials related to an e-mail account

22   bkodom718@gmail.com*?

23   A    Yes.  That's correct.

24   Q    And is 61-B the entire response from Google with respect

25   to this account?

1  A    For that e-mail account, yes.

2        MS. DEAN:  Can we pull up please 61-B, subscriber

3  information document.

4  Q    Now that we can all see this subscriber information

5  document, are you able to tell us what date

6  bkodom718@gmail.com was created?

7  A    Yes.  It was created on December 15th of 2017.

8  Q    What was the date that this account was deleted?

9  A    The account was deleted on July 21st of 2018.

10 Q    How long, approximately, does Google retain records or,

11 in this case, e-mails, within an account after the user

12 deletes it?

13 A    After an account is deleted, we only retain documents for

14 a few weeks to a few months after.  After that, the records

15 are purged from our systems.

16 Q    So when Google received the search warrant from law

17 enforcement in November of 2020, was Google able to produce

18 any content within the bkodom718@gmail.com account?

19 A    Unfortunately, we were not since the account was deleted

20 in 2018.  By 2020, the content of this account had been purged

21 from our systems.

22 Q    And what was Google able to produce with respect to this

23 account?

24 A    Essentially, just the subscriber information folder that

25 just has a few pieces of information from when the account was

1   created and deleted.

2           MS. DEAN:  Let's turn now to 61-C, please.  And

3   could we open the subscriber document for 61-C.

4   Q    Was Google asked to produce documents and materials

5   related to an e-mail account wayne11422@gmail.com?

6   A    Yes, we were.

7   Q    And Government's Exhibit 61-C, is it correct that it is

8   only the subscriber page for this e-mail?

9   A    Yes.

10  Q    Is it fair to say that Google produced more than just a

11  subscriber page for the Wayne account?

12  A    Yes.  That's correct.

13  Q    What is the creation date of the Wayne account?

14  A    This account was created on May 1st of 2017.

15  Q    Is there any deletion date?

16  A    No, which means at the time we pulled this data the

17  account was still active.

18  Q    And that would have been around November of 2020 when you

19  got the search warrant?

20  A    Correct.

21  Q    What is the first and last name on the Wayne account?

22  A    The name on the account is CO space MA.

23  Q    What is the recovery e-mail?

24  A    The recovery e-mail is untouchable,

25  U-N-T-O-U-C-H-A-B-L-E, -718@outlook.com.

1    MS. DEAN:  Mr. Rader, if you can scroll down a

2    little bit.

3    Q    Are the recovery SMS number and the phone number the same

4    for the subscriber?

5    A    Yes, they are.

6    Q    What is that phone number?

7    A    Plus 1 (347) 779-6108.

8    MS. DEAN:  We can take down 61-C now, please.

9    Q    Was Google also asked by law enforcement to search for an

10   account BO24@gmail.com?

11   A    Yes, we were.

12   Q    Did any such account exist?

13   A    No.  At the time we did a search for that account, that

14   account did not exist.

15   MR. PALACIO:  I have nothing further.  Thank you.

16   THE COURT:  Any cross-examination?

17   MS. THIELE:  No, Your Honor.

18   THE COURT:  Thanks so much.  You can step down.

19   (Witness steps down.)

20   THE COURT:  Are you ready for the next witness?

21   MR. PALACIO:  Yes, Your Honor.  The Government calls

22   detective Cynthia Ramirez.

23   THE COURTROOM DEPUTY:  Raise your right hand.

24   THE WITNESS:  Sure.

25   THE COURTROOM DEPUTY:  Do you solemnly swear or

1  affirm that the testimony you are about to give will be the

2  truth, the whole truth and nothing but the truth?

3          THE WITNESS:  Yes.

4          THE COURTROOM DEPUTY:  Please state your name for

5  the record.

6          THE WITNESS:  Detective Cynthia Ramirez.

7          THE COURT:  All right.  Detective, just a couple of

8  things.  I do want to make sure everybody can hear you.  I

9  don't know if you realize that chair doesn't move, so if you

10 try to scoot it up, it doesn't go anywhere.

11         THE WITNESS:  Okay.

12         THE COURT:  The microphone does.  I also want to

13 make sure you don't speak too quickly so it is not too hard on

14 the court reporter.

15         THE WITNESS:  I will try not to.

16         THE COURT:  Do your best.

17         THE WITNESS:  Okay.  Thank you.

18         THE COURT:  If there is a question that you do not

19 understand or want repeated, let me know.

20         THE WITNESS:  Thank you.

21         Is this my water?

22         THE COURT:  It is.

23         THE WITNESS:  Thank you, I will take that.

24         THE COURT:  Go ahead.

25         MR. PALACIO:  Thank you, Your Honor.

1  **CYNTHIA RAMIREZ**,

2         called as a witness, having been first duly

3         sworn/affirmed, was examined and testified as follows:

4  DIRECT EXAMINATION

5  BY MR. PALACIO:

6  Q    Detective, how long have you worked for the NYPD?

7  A    I was hired in June of 1991.

8  Q    I'm sorry?

9  A    June of 1991.

10 Q    That's when you began?

11 A    That's when I began, yes.

12 Q    And where are you currently assigned?

13 A    I am currently assigned to the Latent Print Section of

14 the NYPD.

15 Q    How long have you worked at the Latent Print Section*?

16 A    I was assigned there in May of 2001.

17 Q    Have you been there since?

18 A    Yes.

19 Q    What are some of your duties and responsibilities in the

20 Latent Print Section?

21 A    So I analyze, compare and evaluate all the imprints that

22 come into my office from the various crime scenes and I try to

23 make identifications.

24 Q    Do any other units within NYPD deal with fingerprints?

25 A    Yes.

1          Well, you have the crime scene unit that actually

2    responds to scenes to retrieve latent prints.

3          You have the Latent Print Development Unit that

4    actually decides how best to process the surface of a piece of

5    evidence using chemicals or dyes or what have you to develop

6    latent prints.

7          You also have Bureau of Criminal Identification.

8    They have various personnel that would get fingerprints of

9    unknown individuals whether it's because they're unconscious

10   in the hospital or they're found floating in the water, God

11   forbid, or something like that.

12         They also deal with arrestee prints coming through

13   the system, dealing with the New York State Department of

14   Criminal Justice in terms of assigning NYSID numbers and

15   things of that nature.

16   Q    Do any other units actually make comparisons?

17   A    Well, we have the DOA desk that's in the Bureau of

18   Criminal Identification, and they would get prints from the

19   morgue, and they would search those prints in order to try and

20   identify these unknown victims of a crime.

21   Q    When you joined the Latent Print Section, did you receive

22   any specific training?

23   A    Yes, I did receiving training.

24         I did receive approximately three months in the

25   science of history of prints, as well doing comparison of

1    human prints, palm prints, and I did receive -- then I

2    mentored for the next 18 months before I was assigned my very

3    own case.

4            I have received training from instructors that are

5    certified by the International Association for Identification

6    from outside vendors for prints, palm prints, advanced palm

7    prints, training from the FBI, advanced FBI training,

8    distortion, simultaneous impressions, quantitative,

9    qualitative latent print analysis.

10           I also am certified by New York City in utilizing

11   the City's automated biometric identification system.

12           I'm also certified by New York State utilizing the

13   State automated biometric identification system.

14           I'm also certified by the FBI utilizing their

15   integrated automated fingerprint identification system.

16           And I myself am a certified latent examiner by the

17   International Association for Identification.

18   Q    Now, over the course of your time in latent prints,

19   approximately how many comparisons have you performed?

20   A    Easily in the thousands.

21   Q    Can you tell us what an identification is?

22   A    So an identification is when you replace an unknown

23   latent print impression physically side by side with a known

24   impression, meaning that I know who this print belongs to, and

25   utilizing my magnifying glass, I will look for various levels

1   of detail that must be in exact agreement to one another.

2   Q    Over the course of your career -- withdrawn.

3        After a fingerprint is compared with another

4   fingerprint and a match is made, what's the next step at the

5   Latent Print Section?

6   A    When there is an identification, it would be given to two

7   other latent print examiners also trained to competency, and

8   each one would do their own independent analysis, their own

9   independent comparison to come to their own independent

10  evaluation.  And if they happened to come to the same

11  conclusion as me, there would be some additional paperwork as

12  well.  But it would be done two additional times by two other

13  latent print examiners.

14  Q    Have you ever been the second or third examiner?

15  A    I have.

16  Q    And have you ever testified in court as an expert in

17  latent print commence?

18  A    I have.

19  Q    Approximately how many times and in which jurisdictions?

20  A    Approximately 85 times.  And that would be in Staten

21  Island Supreme Court, Queens Supreme Court, Brooklyn Supreme

22  Court, Brooklyn Criminal Court, Queens Supreme Court, Bronx

23  Supreme Court, Manhattan Criminal Court, Manhattan Supreme

24  Court, as well as Brooklyn Eastern Federal District Court,

25  Federal Southern District, as well Westchester Federal

1   District Court.

2   Q     Have you ever been denied expertise?

3   A     No.

4         MR. PALACIO:  Your Honor, at this time I offer

5   Detective Cynthia Ramirez as an expert in the field of latent

6   print examination pursuant to Rule 702.

7         THE COURT:  Any objection?

8         MS. THIELE:  No objection.

9         THE COURT:  All right.  I gave you the instruction

10  about experts before.  As I said, I think I told you at the

11  time, I'll give you a more complete instruction in my final

12  instructions.

13        Go ahead.

14        MR. PALACIO:  Thank you.

15  BY MR. PALACIO:

16  Q     Detective, I just want to step back and talk about

17  fingerprints generally.

18        When and how are fingerprints formed?

19  A     So while in utero, during the first three months, it's a

20  very, very finite time when these friction ridges begin to

21  develop on to the surface of the fingers, palms of the hands

22  and the soles of the feet.

23        And due to reasons of random growth, differential

24  growth, these friction ridges are unique unto you, and they

25  stay with you all throughout life until decomposition after

1    death, except, of course, for while you're living, if there is

2    any kind of extreme or severe scarring or severe burning or

3    for any kind of amputation.  But other than that, these

4    friction ridges will stay with you throughout the life.

5

6              (Continued on next page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  BY MR. PALACIO: (Continuing.)

2  Q    So fair to say they never change over the course of a

3  person's life?

4  A    That is correct.

5  Q    Can you tell us what the two basic factors are in

6  fingerprint identification?

7  A    So there are two basic factors.  There is uniqueness, and

8  permanence.  And what I mean by that is, once again, while in

9  utero, these friction ridges are developing while in the womb,

10  and due to reasons of various pressures and stressors, it

11  makes these friction ridges very unique, and those friction

12  ridges will be in the palm of the hands and soles of the feet

13  and they will stay with you all throughout life.

14  Q    Can any two people have the same fingerprints?

15  A    No.

16  Q    What about twins?

17  A    Not even identical twins.  So identical twins would share

18  the same DNA.  So that would be, like, same hair color, same

19  eye color, but even their fingerprints would be different,

20  because, once again, fingerprints are not dictated by DNA.

21  It's a physical phenomenon that takes place while in utero.

22  Q    I'd like to talk about different types of prints.

23       Can you tell us first what an inked print is?

24  A    So an inked print is a deliberate impression.  It's when

25  we purposely apply black printer's ink onto the friction

1  ridges of the fingers or the palm of the hands or soles of the

2  feet, and we would row those friction ridges onto a recording

3  surface for purposes of documentation.  So it's a deliberate

4  impression where I'm trying to get as much information as I

5  can recorded onto that surface for purposes of documentation.

6  Q    What is a plastic print?

7  A    So a plastic print is a -- it's, like, a

8  three-dimensional print.  So what I mean by that is, let's say

9  you have a piece of gum or piece of Silly Putty or maybe

10 beeswax, and you would, using, let's say, my thumbprint and

11 you apply your thumb onto that surface, and when you take it

12 off, you may see kind of like an engraving of your friction

13 ridges on to that serves.  That's called a plastic print.

14 Q    And can you describe the difference between a latent

15 print and a patent print?

16 A    So the term latent print, just the term itself, latent,

17 means hidden.  So you would need to utilize fingerprint

18 powders or chemicals or dyes to make those latent prints

19 visible to the naked eye.

20         A patent print is opposite.  A patent print you

21 could see.  What do I mean by that?  Let's say you're painting

22 and with your bare hands, you touch the paint, and you touch

23 the walls and then you can see, like, your prints on the wall.

24 Or it's not paint.  Let's say it's blood, you touch blood and

25 you touch a wall or a piece of paper.  Or even a Number 2

1    pencil like back in the day when we were kids, you would get

2    the shavings of a Number 2 pencil and get the lead on your

3    friction ridges and then you touch paper, you would leave

4    behind a reproduction of your friction ridges on that surface.

5    So that's the patent print because you could see it with your

6    naked eye.

7    Q    Can you tell us what causes prints to be left on a

8    surface?

9    A    So latent prints, as we go about our daily activities, we

10   exude moisture out of our friction ridges.  Our friction

11   ridges contain sweat pores, and we touch various surfaces,

12   that the moisture of the friction ridges as it makes contact

13   with the surface, you may or may not leave behind a

14   reproduction of those friction ridges on the surface.

15            THE COURT:  I'm just going to ask the witness just

16   to slow down a little bit --

17            THE WITNESS:  I'm sorry.

18            THE COURT:  There's a lot of content, and I think

19   it's a little harder for the court reporters.  So just turn

20   down the speed a little bit.

21            All right.  Go ahead.

22            MR. PALACIO:  Thank you, Your Honor.

23   Q    You've mentioned the term friction ridges.

24            Can you define that for us?

25   A    So a friction ridge, if you were to look at your finger

1   or the palms of the hands or the soles of the feet, you would

2   see, like, these lines, right, these unique lines that only

3   you have.  And those lines is what a friction ridge is.  It's

4   consisting of the single-cell units very very tightly put

5   together, that makes up these friction ridges or these lines

6   that you would see on your fingers, palms of the hands, and

7   soles of the feet.

8   Q    What can affect whether or not a latent print is left

9   behind?

10  A    Well, the most conducive surface to leaving behind a

11  latent print onto a surface which would be clean, smooth, and

12  non-porous.  For example, your cell phone.  The screen of your

13  cell phone, if you were to like wipe it down nice and clean,

14  and now you touch it, you may see behind a latent fingerprint

15  that you left behind on there.

16           If it's, let's say, the bark of a tree, that's not

17  as conducive because it's pitted, it's not smooth, it's a

18  whole different surface, altogether.

19           If that fingerprint is left where there is sunlight,

20  a fingerprint consists of 99.999 water.  So if that

21  fingerprint is left in direct sunlight, in theory, it may

22  evaporate.

23           If that print is left on the door to a very busy

24  deli where if says, push here, and we all go to the same deli

25  to get a cup of coffee, let's say, as we touch that door,

1    you're going to have print on top of print, on top of print,

2    so you're going to have cross-contamination, more than likely

3    a very dirty surface.  So once again, not the most conducive

4    surface to leave behind a latent print impression on there.

5            If you're wearing a pair of gloves, those gloves

6    would act as a physical barrier preventing your friction

7    ridges from making contact on to a surface.

8            Let's say that surface has dust on it or it has some

9    kind of soil or some kind of foreign matter on it, you may

10   touch that shelf, and when you pick it up, you may see five

11   little circles, but if you look at the edge of your

12   fingertips, you might see dust adhering to the end of your

13   fingertips, thereby, the dust acted as a physical barrier

14   preventing your friction ridges from making contact to that

15   surface.

16           Another example is, let's say you're going to a

17   jewelry store and you're looking at various pieces of jewelry,

18   and it's a glass display case, and you're pointing out to the

19   shop owner, let me see this piece or let me see that piece,

20   and the minute you leave the shop, he comes with the bottle of

21   Windex® and he wipes away, you know, those prints on that

22   glass display case.  So there are factors that would affect

23   whether or not you leave behind a latent impression on the

24   surface.

25   Q    So is it fair to say that not every time that a person

1   touches a surface they will leave behind a fingerprint?

2   A    That's fair to say.

3   Q    Can you tell us what it means for a print to be of value

4   or no value?

5   A    So as a latent print examiner, when I deem a latent

6   impression to be deemed of value, it means that there is

7   enough quality and/or quantity of information that allows me

8   to do a comparison.

9            When I deem a latent impression to be of no value,

10  it means the opposite.  So there is not enough quality and/or

11  quantity of information that allows me to do a comparison.

12  And obviously, to make identifications, I need to do

13  comparison.

14  Q    And can you walk us through what the different level of

15  detail are when it comes to the science of latent prints?

16  A    So there are three levels of detail.  So the first level

17  of detail is having to do with looking at the friction ridges,

18  right.  How much friction ridges do I have?  Do I have so much

19  so that I'm able to decipher a pattern, a fingerprint pattern.

20           You know, there are three types of fingerprint

21  patterns, loop, arch, and whirl.  What is the orientation,

22  right?  What's top and what's bottom?  How am I holding this

23  latent print impression?  What anatomy am I looking at?  Is it

24  a fingerprint?  Is it a palm print?  Is it a footprint?

25           Level two detail is having to do with the friction

1   ridge characteristic for which there are five.  There is the

2   ending ridge, there's the short ridge, there's the

3   bifurcation, there's the enclosure, and then there's the dot.

4   We all have it.  We all have it very very random, and that's

5   what helps to make our friction ridge unique.

6          And then third level detail is all the extraneous

7   information that I cannot help but see.  For example, a scar,

8   a blister, a wart, creases in the fingers, it's creases in the

9   hands, the creases that separate your finger.  Perhaps, the

10  ending of a friction ridge, how it may taper or it may bubble

11  up.  It's all this extra information that I cannot help but

12  observe and use that in my comparisons.

13  Q    And can you describe for the jury how you go about

14  examining a latent print to a known print?

15  A    So once again, I would physically just place the unknown

16  impression in my left side and physically place the known

17  impression, meaning, I know who this print belongs, to take it

18  on the right side, and utilizing my magnifying glass, I will

19  look for the various levels of details, level one, two, three

20  detail, that have to be in exact agreement to one another.

21  Q    Is there a set number of characteristics required in

22  order to determine if a print is of value?

23  A    There's no set number.  It's the totality of these levels

24  of detail that determine whether or not there's an

25  identification to be had.

1  Q    Did there come a time when you were assigned to examine

2  prints recovered in connection with the homicide of Brandy

3  Odom in April 2018?

4  A    Yes.

5  Q    When did you receive this case?

6           THE WITNESS:  Your Honor, may I refer to my notes?

7           THE COURT:  Sure.

8           THE WITNESS:  Great.  Thank you.

9  A    So I am referring to the latent print case notes sheet.

10 The case would be assigned to me on July 28th, 2023.

11 Q    Were you the original examiner?

12 A    I was not.

13 Q    Who was that?

14 A    It was Detective Liscano.

15 Q    And can you tell us where Detective Liscano is now?

16 A    I'm hoping happily retired.

17 Q    Did you review the work of Detective Liscano?

18 A    I did.

19 Q    Did you independently review the prints submitted for

20 comparison in this case?

21 A    I did.

22 Q    How many prints were received for comparison?

23 A    So there was a total of three lab runs, there was one

24 digital impression for each lab run, for a total of three

25 digital impression.

1   Q    And you said these were lab ones.

2        What does that mean?

3   A    So a laboratory run is, this is evidence that has been

4   submitted to the latent print development unit where they

5   decide how best to process the surface to that evidence

6   utilizing their toolbox which is, like, chemicals and dyes,

7   and if they were to develop any kind of latent print

8   impression, they would take digital photos, and that's how I

9   would receive the latent prints.  It would be digital photos.

10  Q    So in other words these are not prints that were

11  recovered on location at a crime scene?

12  A    That's correct.

13  Q    And how were those three prints designated?

14       THE WITNESS:  Your Honor, may I refer to the lab

15  report?

16       THE COURT:  Sure.  Whatever you need to, you can do

17  that.

18       THE WITNESS:  Thank you, Your Honor.

19  A    I'm sorry, your question again is?

20  Q    Yes.  How were these three prints that you received, how

21  were they designated?

22  A    I am referring to my case notes analysis worksheets.  I

23  have a worksheet for each lab run.  AD1 is one lab.  KA1 is on

24  the second lab.  KA2 on the third lab.

25  Q    Where did print AD1 originate from?

1   A    AD1 originated on inside of bag, item nine.

2   Q    I'm sorry?

3   A    Item nine.

4   Q    And do you have the voucher number for that item?

5   A    Okay.  I'm going to refer to the laboratory report.

6        You want the invoice number? because I don't have a

7   voucher number.

8   Q    The invoice number.

9   A    Okay.  Invoice number for AD1 is going to be 3000952042.

10  Q    Okay.  And do you have the invoice number for the plastic

11  bag?

12  A    Well, that is the plastic bag.

13  Q    Okay.  Withdrawn.

14       Where did print KA1 originate from?

15  A    Again, I'll be referring to the lab report.

16       You want the invoice number for KA1?

17  Q    If you can tell us where that originated from, KA1.

18  A    On exterior side of blade.

19  Q    And how about KA2?

20  A    Referring to my case notes analysis worksheet, origin of

21  latent on metal plate inside electric knife handle, item

22  number 108.

23  Q    Did you examine those three prints to see if they were of

24  value?

25  A    Yes.

1   Q    Were any of those prints of value?

2   A    AD1 was the only digital impression that I had deemed to

3   be of value.

4   Q    Were you able to determine what type of print AD1 was?

5   A    I have it as either a palm print or a footprint because

6   it's a very large surface area where friction ridges moving

7   from one side, ending in the other side.

8   Q    Discuss what an open lift is.

9   A    I'm assuming when you say open lift, you mean

10  unidentified lift?

11  Q    Yes.

12  A    So an unidentified lift or unidentified impression simply

13  means that it's unidentified.  So in other words, I don't know

14  who that print belongs to.

15  Q    Once you determine that AD1 was of value, did you use any

16  databases to assist in identifying that open lift?

17  A    Well, it was put into the city, state, and federal

18  databases.

19  Q    Can you tell us what those databases are and how they

20  work?

21  A    So you have the New York City databases.  Who's in those

22  databases?  People arrested, people who become police

23  officers, people who become firefighters, people who become --

24  who apply for pistol licenses, people who apply for good

25  conduct certificates, meaning, that their employer, perhaps

1    wants to make sure there's no warrants for you, right.  So
2    they would run your fingerprint.  It's called a good conduct
3    certificate.  Pistol license and anybody that applied for NYPD
4    and people arrested in the five boroughs.
5            When you jump up to New York State, that encompasses
6    all of New York State, including the five boroughs.  So you
7    would have people arrested all throughout the state, Niagara,
8    Schenectady, what have you, and that will encompass all the
9    other employers such as security guards, locksmiths --
10           THE COURT:  So basically a lot of people, right?
11           THE WITNESS:  A lot of people, yeah.
12           THE COURT:  All right.  Next question.
13   Q    Thank you, Detective.
14   A    Sure.
15   Q    How did you use those databases to assist in the
16   identification process?
17   A    Well, you would simply scan those unknown --
18   in this case, the known of-value impression using, like, a
19   scanner.  I would scan that written impression and then I
20   would point out some information to the computer in order to
21   do a more accurate search.
22   Q    And did you receive any results from that -- from those
23   databases?
24   A    There were results, but it did not come back to anybody
25   that matched -- that had exact agreement of information.

1  Q    Did there come a time when you were asked to compare that

2  print, AD1, against the known prints of multiple individuals?

3  A    Yes.

4  Q    And did those known prints belong to the following

5  individuals:  Brandy Odom?

6  A    Yes.

7  Q    Daquan Wheeler?

8  A    Hold on.  There's a lot of people there.  Let me just

9  look at the proper paperwork.

10        I am referring to my comparison evaluation

11 worksheet.

12        So you mentioned Wheeler and next?

13 Q    Delince Pierre?

14 A    Yes.

15 Q    Patrick Rance?

16 A    Yes.

17 Q    John Hector?

18 A    Yes.

19 Q    Angel Rivera?

20 A    Yes.

21 Q    Courtney Bell?

22 A    Yes.

23 Q    Samson Alabi?

24 A    Yes.

25 Q    Atiba Richards?

1   A   Yes.

2   Q   Hakeem Thomas?

3   A   Yes.

4   Q   Demond Thompson?

5   A   Yes.

6   Q   Leonard Salazar?

7   A   Yes.

8   Q   Jaleel Ottley?

9   A   Yes.

10  Q   Darrell Bristow?

11  A   Yes.

12  Q   Derrick Martin?

13  A   Yes.

14  Q   Danuela Drayton?

15  A   Yes.

16  Q   Keenan Jackson?

17  A   Yes.

18  Q   Rahlik Pinnock?

19  A   Yes.

20  Q   Michelet Villier?

21  A   Yes.

22  Q   Curtis Askew?

23  A   Yes.

24  Q   Jasper Moulder?

25  A   Yes.

1  Q     Samuel Lemus?

2  A     Yes.

3  Q     Adelle Anderson?

4  A     Yes.  But this individual did not have any prints at all

5  on file.

6  Q     Adelle Anderson?

7  A     Lydell Kirkland.

8  Q     Okay.  But I asked for Adelle Anderson?

9  A     Compared, yes.

10 Q     Cory Martin?

11 A     Compared, yes.

12 Q     And you said someone named Lydell Kirkland did not have

13 prints on file to compare?

14 A     That's correct.

15 Q     What type of prints did you receive for these individuals

16 for comparison purposes?

17 A     So for everyone, I had fingerprints and palm prints

18 except for Lydell Kirkland.  There was no fingerprints and no

19 palm prints to be compared, and no one had any footprints to

20 be compared, except for the victim, Brandy Odom.

21 Q     Were you able to identify the print in AD1 to any of

22 those individuals?

23 A     No.

24        MR. PALACIO:  Your Honor, nothing further.

25        THE COURT:  All right.  Any cross-examination?

1          MS. THIELE:  Yes, Your Honor.

2          THE COURT:  Okay.

3   CROSS-EXAMINATION

4   BY MS. THIELE:

5   Q    Good afternoon, Detective Ramirez.

6   A    Hi.  Good afternoon.

7   Q    You've been in the latent print section of the NYPD for

8   over 20 years, correct?

9   A    That's correct.

10  Q    And you testified about a latent print comparison in the

11  Brandy Odom case?

12  A    Yes.

13  Q    And there were three digital prints lifted from physical

14  evidence collected in this case that were sent to you for

15  comparison?

16  A    That's correct.

17  Q    And only one was of value?

18  A    That's correct.

19  Q    And that was the palm print labeled AD1?

20  A    Palm print or possibly a footprint.

21  Q    Okay.  And that print was lifted from the inside of a

22  black garbage bag?

23  A    That's correct.

24  Q    I believe you said that was item nine, correct?

25  A    Let me just confirm that because I want to be sure.

1   Q    Sure.

2   A    That's correct.

3   Q    And this was the only print in the case that was suitable

4   for comparison?

5   A    That's correct.

6   Q    In other words, you had enough quantity and/or quality to

7   compare it to other known prints?

8   A    That's correct.

9   Q    And at some point, the NYPD shared the names of

10  individuals in the case who they wanted the print to be tested

11  against?

12  A    That's correct.

13  Q    And you indicated in your report that all of these

14  individuals were suspects in the investigation, correct?

15         MR. PALACIO:  Objection.  That's not the testimony.

16         THE COURT:  Sustained as to the form.

17         Do you know who the suspects were?

18         THE WITNESS:  Your Honor, I'm just going to refer to

19  my notes, because that's how I designate it.  Let me see.

20         They were designated as suspects.  Let me just be

21  sure.

22         THE COURT:  Well, I'll sustain the objection any

23  way.

24         Next question.

25  Q    And all of the individuals that were named during your

1  direct testimony who you compared the print against were
2  excluded, correct?

3  A    That's correct.

4  Q    Except for Lydell Kirkland, who you did not have a known
5  print for, correct?

6  A    That's correct.

7  Q    And Brandy Odom, the victim, was also excluded, correct?

8  A    That's correct.

9  Q    And that would be true for both a handprint or palm print
10  of hers and a footprint, correct?

11  A    That's correct.

12  Q    And on July 28th, 2023, the Government requested that you
13  do a reexamination of the print?

14  A    That's correct.

15  Q    And again, all of these individuals were excluded?

16  A    That's correct.

17  Q    And around September 2023, you reviewed all the documents
18  in this case file for accuracy and completeness?

19  A    That's correct.

20  Q    And the results were also pier-reviewed?

21  A    That's correct.

22         MS. THIELE:  Nothing further.

23         THE COURT:  All right.  Any redirect?

24
25         (Continued on the following page.)

1    REDIRECT EXAMINATION

2    BY MR. PALACIO:

3    Q    Detective, Ramirez, can you clarify the reason for the

4    reexamination in 2023?

5    A    Sure.

6    Q    You told us that Detective Liscano had retired; is that

7    right?

8    A    Yes.  I'm reading directly off my latent print case notes

9    worksheet that says here July 28th, 2023, United States

10   District Attorney's office --

11             THE COURT:  Well, hold on just a second.

12             Just read it to yourself and see if it refreshes

13   your recollection why you did the re-- is that the question,

14   why she did the reexamination?

15   A    Well, basically that line just states, simply that you

16   guys requested a reexamination.

17   Q    Is it because Detective Liscano had retired?

18   A    That would be the case, yes.

19   Q    Is it common practice when a detective retires, to have a

20   detective who is still working to reexamine the work to be

21   able to testify in Court?

22   A    Yes.

23             MR. PALACIO:  Nothing further, Your Honor.

24             THE COURT:  Anything else?

25             MS. THIELE:  No, thank you.

1           THE COURT:  Thanks so much, Detective.  You can step

2   down.

3           THE WITNESS:  Thank you.

4           THE COURT:  Are you ready to call your next witness?

5           MS. DEAN:  The Government calls Julie Casale,

6   Casale.

7           (The witness steps down.)

8           (The witness enters the stand.)

9           THE COURTROOM DEPUTY:  Raise your right hand for me,

10  please.

11          (The witness was sworn and/or affirmed in by the

12  courtroom deputy.)

13          THE WITNESS:  Yes.

14          THE COURTROOM DEPUTY:  Please state your name for

15  the record.

16          THE WITNESS:  Detective Julie Casale.

17          THE COURTROOM DEPUTY:  You can have a seat.

18          THE COURT:  All right, Detective.  Just a couple of

19  things.  I want to make sure everybody can hear you, so you've

20  got the microphone.  Don't speak too quickly.  It just makes

21  the court reporter's job very hard.  So speak slowly.  And if

22  there's a question that you want to have clarified or

23  repeated, just tell me, okay.

24          Go ahead.

25          (Continued on the following page.)

1   **JULIE CASALE**,

2               called by the Government, having been

3               first duly sworn, was examined and testified

4               as follows:

5   DIRECT EXAMINATION

6   BY MS. DEAN:

7   Q    Who do you work for?

8   A    NYPD Crime Scene Unit.

9   Q    How long have you been with the NYPD?

10  A    Seventeen years.

11  Q    And how long have you been with the crime scene unit?

12  A    Eight years, five months.

13  Q    What is your rank?

14  A    Detective.

15  Q    Can you tell us about your past assignments with NYPD

16  before crime scene?

17  A    Sure.  I graduated the police academy in June of 2007.  I

18  was assigned to the 7-1 Precinct which is Brooklyn South.  I

19  was assigned to Impact which is a foot post.  I worked

20  6:00 p.m. to 2:00 a.m.  I was there for approximately nine

21  months.  In March of 2008, I was transferred to the 1-2-3,

22  which is the South Shore of Staten Island.  I worked 4:00 to

23  12:00, patrol.  I was there for a few months.  October of

24  2008, I was then assigned to Staten Island Task Force.  I

25  worked 6:00 at night to 2:00 in the morning.  We responded to

1   protests, riots, any highly populated events.  When nothing
2   was going on around the City, we were assigned to high-crime
3   areas in Staten Island.  In September of 2015 is when I was
4   transferred then to crime scene.
5   Q    When you got transferred to crime scene, did you receive
6   any specialized training?
7   A    Yes.
8   Q    Tell us about that.
9   A    We received three months of in-classroom training where
10  we learned how to operate the camera, how to appropriately
11  document crime scenes with photos, notes, how to do diagrams,
12  how to collect and package evidence, how to dust for prints.
13  After three months, we were then assigned with a experienced
14  investigator for the remaining 15 months --
15           THE COURT:  Just slow down a little bit.  Well.
16           THE WITNESS:  Sorry.
17           THE COURT:  That's okay.
18  A    For the remaining 15 months, we were assigned with an
19  experienced investigator, until I was promoted to detective.
20  Q    And what do you -- everything you've just described, do
21  you do all those things as a detective with the crime scene
22  unit?
23  A    Yes.
24  Q    Approximately how many crime scenes have you investigated
25  during your career?

1  A    A few hundred.

2  Q    When you're assigned to process a crime scene, do you go

3  by yourself or do you always have a partner?

4  A    A partner.

5  Q    I want to talk to you now about April 30th of 2018.

6       Did you work that day?

7  A    Yes.

8  Q    What were your hours that day?

9  A    We worked 7:00 a.m. to 3:00 p.m.

10 Q    Who was your partner?

11 A    Detective Beltre.

12 Q    Where is she now?

13 A    She's retired.

14 Q    Did you become involved in an investigation going on into

15 the homicide of Brandy Odom?

16 A    Yes.

17 Q    What was your involvement?

18 A    Our job was to process the house which was the first

19 floor and the second floor we were focused on.

20 Q    Is that the same house that detective Kim Cenizal

21 processed before, that you arrived on April 30th?

22 A    Yes.

23 Q    Who was the lead investigator for your run?

24 A    Detective Beltre.

25 Q    And what run were you?

1  A    We were 153E, as in Eddie.

2  Q    What was the address of the location?

3  A    249-45 148 Road in Queens, which is in the confines of

4  the 105 Precinct.

5  Q    And why were you assigned to go to this house where crime

6  scene detectives had already been?

7  A    We were trying to look for evidence of blood, any kind of

8  biological evidence from a crime that occurred in that house.

9  Q    On April 30th of 2018, what time did you get to the

10  house?

11  A    Approximately 8:30 in the morning.

12  Q    Was that location already secured by police when you

13  arrived?

14  A    Yes.

15  Q    What did you do first?

16  A    My partner and I, we split up, she focused on the second

17  floor, I was focused on the first floor which consisted of the

18  kitchen and the bathroom.  We both processed, photos were

19  taken.  She took photographs of the entire apartment -- sorry,

20  the entire house, as well as the outside.  Detective Beltre

21  took photographs of the shed and the second floor, as well as

22  the first floor, and then we used the crime scope, also known

23  as the alternate light source, on every room in the house with

24  the exception of bedroom number two, and also Bluestar was

25  utilized, and there was swabs to determine if any blood was

1   present in any areas of that house.

2   Q    Was a sketch of the crime scene prepared related to yours

3   and Detective Beltre's work that day?

4   A    Yes.

5   Q    How many sketches?

6   A    Two.

7            MS. DEAN:  If I can show for the witness only,

8   Government's 712 and 713, please.

9   Q    Do you recognize those?

10  A    Yes.

11  Q    What are those?

12  A    These are her finalized diagrams of the first floor and

13  second floor.

14  Q    When you say, hers, do you mean Detective Beltre?

15  A    Yes.

16  Q    Did these sketches or diagrams, as you called them,

17  fairly and accurately depict the main and second floor at the

18  location that you processed on April 30th?

19  A    Yes.

20           MS. DEAN:  I ask that Government 712 and 713 be

21  received in evidence?

22           THE COURT:  Any objection?

23           MS. THIELE:  No objection.

24           THE COURT:  All right.

25           (Government Exhibits 712 and 713, were received in

1  evidence.)

2           MS. DEAN:  And if we can first publish 712.

3           (Exhibit published.)

4           MS. DEAN:  Can we zoom in, please, on the diagram

5  portion itself.

6  Q    If you could just describe for us the area that you

7  processed using this diagram.

8  A    We processed the kitchen, which is the top portion of the

9  diagram.

10 Q    And did your -- did you and Detective Beltre process the

11 living room at all or no?

12 A    Just photographs were taken of the living room.

13          MS. DEAN:  And if we can now turn to 713.

14          And again, if we can zoom on the sketch.

15 Q    Can you describe for us the area that you and Detective

16 Beltre processed on the second floor?

17 A    The bathroom which is the top left of the diagram, the

18 bedroom number one, which is the top right, the hallway closet

19 which is the middle left, and the bottom part of the sketch,

20 which is bedroom number three, was also processed.

21 Q    You mentioned that paragraphs were also taken?

22 A    Yes.

23          MS. DEAN:  I'm going to ask to show the witness

24 what's been marked as Government's 3 -- I'm sorry, 714 to 738.

25          Do you mind if I provide a hard copy, Your Honor?

1          THE COURT:  No.  Have you had a chance to look at

2   these?

3          MS. THIELE:  No, Your Honor.

4          THE COURT:  I mean, you have copies of them, you

5   just haven't seen the ones today?

6          MS. THIELE:  That's correct.

7          THE COURT:  Do you want to show them to counsel

8   first and then just let me know if you object to them.

9          MS. DEAN:  Absolutely.

10

11          (Continued on the following page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1       MS. THIELE:  No objection, your Honor.

2       THE COURT:  Those exhibits are in evidence.

3       (Government Exhibits 714 through 738 so marked.)

4       MS. DEAN:  May I hand this?

5   Q    Detective if you could just take a look at these exhibits

6   in evidence and confirm for us that those are, indeed, some of

7   the photographs that were taken during your and

8   Detective Beltre's time working at the residence.

9       (Pause in proceedings.)

10  A    Yes, they are.

11  Q    Let's start with the shed.

12       Did you do anything with respect to the outdoor

13  shed?

14  A    Just photographs were taken of the shed.  And the

15  alternate light source was utilized inside as well and came up

16  with negative results, meaning no blood or biological evidence

17  was fluoresced when the crime scope was used.

18  Q    Where was that in the shed?

19  A    The whole shed, the inside of the shed.

20  Q    When you say "the inside," are you talking about floors

21  and walls --

22  A    Floors, walls, all the items that would have been in the

23  shed.

24  Q    Did you go to the basement?

25  A    Yes.  Just photographs of the basement was taken.

1    Q    Did you collect any property there?

2    A    No.

3         MS. DEAN:  If we could put up Government 713,

4    please.  And if we could zoom in first on bedroom one, which

5    is marked with the letters CV.

6         (Exhibit published to the jury.)

7    Q    What does that signify?

8    A    Complainant/victim.

9    Q    What was done in bedroom one?

10   A    Photographs were taken of the bedroom.  The alternate

11   light source was utilized as well as Bluestar on every item

12   that was in the bedroom; every wall, floor, ceiling.

13        Even the rug was pulled up, and there were four

14   stains that Detective Beltre did notice.  She did test with

15   the OBTI to determine if blood was present.  On the rug, the

16   underneath the rug, like, the filler, as well as the floor,

17   and that all came up negative.  So, all results in bedroom

18   number one were negative.

19        MS. DEAN:  If we could move and zoom down to bedroom

20   three, please.

21   Q    Was anything recovered from bedroom three?

22   A    Yes, four items were collected.

23   Q    Let's start with the items on the diagram labeled YB-1

24   and YB-2.

25        What are those items?

1  A    YB-1 was a Samsung smartphone and YB-2 was an Apple

2  iPhone that was inside of a purse inside of bedroom number

3  three.

4  Q    Would I be correct to say that any electronics collected

5  before April 30 from this location were collected by members

6  of law enforcement other than you and Detective Beltre?

7  A    Correct.

8  Q    But you collected the two phones in the purse labeled

9  YB-1 and -2?

10 A    Yes.

11 Q    What else was recovered from bedroom three?

12 A    By the bed -- the diagram is actually a little off.  The

13 bed was actually lifted up at this point.

14       In between the bed and the wall there were pillows.

15 The pillows had stains that Detective Beltre noticed.  She

16 tested the stains on the pillowcases and they did test

17 positive for blood.

18       So, with that, the pillowcases as well as the

19 pillows were both collected.

20 Q    And, so, just to be clear, both the pillowcases tested

21 positive for blood?

22 A    Yes.

23 Q    YB-3 and YB-4?

24 A    Yes.

25 Q    Was the crime scope and Bluestar used in bedroom three?

1  A    Yes.  Once the items were collected, the crime scope was

2  utilized which yielded negative results.  There was no signs

3  of any kind of biological fluids.

4         And Bluestar was also utilized on everything that

5  was in the bedroom.  The floor, the wall, the ceiling, every

6  item that was inside of the bedroom was also used Bluestar

7  with.

8  Q    And when you said that everything was -- I'll strike

9  that.

10        The upstairs bathroom, what did you do in the

11 bathroom?

12 A    In the bathroom, photos were taken.  Also, swabs were

13 taken to determine if any blood was present.

14        So, the caulking along the bathtub, every area that

15 you could possibly find blood, faucets, everything was swabbed

16 to determine if blood was present, which everything was

17 negative results.

18        Also, Bluestar as well as the alternate light source

19 was also utilized in the bathroom, which yielded negative

20 results.  There were no signs of blood or any other kind of

21 biological evidence that fluoresces with Bluestar or the crime

22 scope.

23 Q    And when you're using Bluestar and it does activate, what

24 does it look like?

25 A    If it's blood, it's going to be like a dull blue, like,

 1  illuminating.

 2          If it's like bleach, it will be more, like,

 3  electric, almost like fireworks.  It will be blue and it will

 4  be very quick and it will dull very quick.

 5  Q    What about the upstairs hallway closet that you

 6  mentioned, what did you do there?

 7  A    Photos were taken and all the items that were inside of

 8  the hallway were viewed with the crime scope and nothing

 9  fluoresced to indicate there were any signs of biological

10  evidence.

11          MS. DEAN:  If we could turn to Government 712.

12          (Exhibit published to the jury.)

13  Q    I'd like to talk to you about what items you collected

14  from the first floor of the house.

15          MS. DEAN:  Can we zoom in maybe on the top half of

16  the diagram?

17          That's perfect.  Thank you.

18  A    YB-5 through YB-8, there was an island in the middle of

19  the kitchen.  We recovered four knives.  Those items were

20  photographed and packaged and sent to the lab.

21          YB-9 was a serrated knife in a box with a handle.

22  Those were also forwarded to the lab --

23  Q    Let me just stop you right there.

24          MS. DEAN:  If I could just pull up the legend.

25  Q    I just cut off your legend, so let me pull that up for

1  you.

2  A    I mixed it up.

3  Q    Could you clarify now that you can see the legend what

4  YB-9 was?

5  A    YB-9 was a box of bags.  It was indicating that it was

6  black plastic garbage bags, but inside that box were clear and

7  white plastic bags that were inside.

8         MS. DEAN:  If you could maybe minimize that,

9  Mr. Rader.

10         Is there a way, can you zoom in on the diagram also

11  with the legend a little bit so we can enlarge it but keep the

12  legend?

13         Thank you.

14  Q    So, YB-9A, B, C, and D are what?

15  A    A through D, they are all plastic bags that were inside

16  that box.

17  Q    And what was YB-10?

18  A    YB-10 was a cardboard box containing a blade and a knife

19  that was recovered above the -- by the oven.

20  Q    What was YB-10A and B?

21  A    A was the blade that was inside of the box and 10B was

22  the actual plastic Toastmaster knife itself.

23  Q    Why did you collect these items from the kitchen?

24  A    They were possibly used in this crime.  So, anything that

25  was sharp, anything that could cut a human being, we

1    collected.

2    Q    And did you actually have any idea whether or not the

3    knives were used in the commission of the crime?

4    A    No.

5    Q    So, let's turn to the photographs now.

6              MS. DEAN:  If we can take a look at 714.

7              (Exhibit published to the jury.)

8    Q    What does this show in 714?

9    A    This is the kitchen that shows the island and it shows

10   the cabinet above the oven, which is where we recovered those

11   items.

12   Q    When you say "those items," what are you talking about?

13   A    Inside the island is where we recovered those four

14   knives, and above the oven is where we recovered that

15   Toastmaster knife.

16             MS. DEAN:  Can we see 715, please?

17             (Exhibit published to the jury.)

18   Q    And what is 715?

19   A    This is the opposite view.  This is looking on the other

20   side of the island, which is where -- those drawers is where

21   we recovered those knives.

22             MS. DEAN:  If it's possible, can I just approach the

23   witness to get the hard copy pictures back?

24             THE COURT:  Sure.

25             MS. DEAN:  Can we turn to 716, please?

1        (Exhibit published to the jury.)

2   Q    What do you see in 716?

3   A    This is the other side of the kitchen.  You see the

4   drawers to the island, you see the oven.  Just another

5   perspective of the kitchen.

6            MS. DEAN:  And can we turn to 718 next?

7            I'm just going to ask can you enlarge, Mr. Rader,

8   the area just below the sink?

9   Q    Could you describe to us some of the items that were

10  below the sink?

11  A    Below the sink looks like there's a bottle of Drano, some

12  kind of spray bottle with some kind of cleaning solution in

13  it.  Common items that you'd find under a sink.

14           MS. DEAN:  If we could turn to 719, please.

15           (Exhibit published to the jury.)

16  Q    What area of the home was this?

17  A    This is in the basement.

18  Q    And is it fair to say you took a number of pictures of

19  the basement during your work there?

20  A    Yes.

21           MS. DEAN:  If we could turn to 722, please.

22           (Exhibit published to the jury.)

23           MS. DEAN:  Could you please zoom in on the washing

24  machine and the area just above it?

25  Q    Could you describe what you see in Government 722?

1    A      This is in the basement.  This is the laundry room.

2    Above the washing machine or dryer, there's also cleaning

3    solutions on the shelf.  Indicating above, there's also a

4    turned-over bottle of looks like Clorox bleach.

5              MS. DEAN:  Could we also turn now to 723?

6              (Exhibit published to the jury.)

7    Q      What room is this?

8    A      This is the upstairs bathroom.

9    Q      And what do we see in Government 723?

10   A      Additional cleaning products underneath the sink in the

11   bathroom.

12             MS. DEAN:  Turning to 724.

13             (Exhibit published to the jury.)

14   Q      What is in 724?

15   A      This is bedroom number three.  This is the purse which is

16   where we recovered the two cell phones.

17             MS. DEAN:  Could we turn to 725, please?

18             (Exhibit published to the jury.)

19   Q      Is that just another angle of the same thing?

20   A      Yeah, this is, like, a top photo of it looking into the

21   purse.

22             MS. DEAN:  And if we could turn to 726, please.

23             (Exhibit published to the jury.)

24   Q      What are these?

25   A      This is a close-up photograph of YB-1 and YB-2, which is

1   the Samsung phone and the Apple iPhone that were located

2   inside the purse.

3           MS. DEAN:  Can we turn to 727, please?

4           (Exhibit published to the jury.)

5   Q    Are these just the backs of the same cell phones?

6   A    Yes, this is just showing both sides of the cell phone.

7           MS. DEAN:  Can we move to 728?

8           (Exhibit published to the jury.)

9   Q    What is in Government 728?

10  A    This is the pillowcase that we recovered inside of

11  bedroom number three, YB-3.

12          MS. DEAN:  Can we zoom in on the white object to the

13  right of the pillowcase?

14  Q    Tell us what we're looking at here.

15  A    This is the OBTI test that we did to test to see if blood

16  was present.

17          The bottom line that says T indicates that the test

18  is working and -- sorry, it tested positive.  And the C

19  indicates that the test actually works.  So, you have the

20  control and you have the test.

21          It tested positive that blood was present, so she

22  took a photograph to indicate that the stain on the pillowcase

23  was, in fact, blood.

24          MS. DEAN:  Can you turn to 729, please?

25          (Exhibit published to the jury.)

1    Q    Is this just the opposite side of that same pillowcase?

2    A    Yes.

3              MS. DEAN:  Can we have 730, please?

4              (Exhibit published to the jury.)

5    Q    What is Government 730?

6    A    This is the other pillowcase.  This is YB4.  This is a

7    close-up photograph.

8              It also indicates the OBTI test that's by the blue

9    scale.  That's indicating that it tested positive for blood,

10   the stain that was on the pillowcase.

11             MS. DEAN:  Can we turn to 731 now, please?

12             (Exhibit published to the jury.)

13   Q    And, again, is this just the other side of YB-4, the

14   pillowcase?

15   A    Yes.

16   Q    Let's look at Government 732.

17             (Exhibit published to the jury.)

18   Q    What is Government 732?

19   A    These are close-up photographs of the four knives that we

20   collected in the island in the kitchen, YB-5 through YB-8.

21   Q    And I'll turn to Government 733.

22             (Exhibit published to the jury.)

23   Q    What is 733?

24   A    This is a close-up photograph of one of the knives,

25   labeled YB-5, with the scale and the tape measure to indicate

1  its size.

2          MS. DEAN:  Can we zoom in on the blade of the knife,

3  please?

4  Q    Did you notice anything about the blade of the knife?

5  A    It was broken.

6  Q    How so?

7  A    The top part of the blade was snapped off, so it was

8  flat.

9          MS. DEAN:  Can we please move now to Government 734?

10         (Exhibit published to the jury.)

11 Q    What is Government 734?

12 A    This is YB-8.  This is the last knife we recovered inside

13 the -- in the kitchen.  It also has a broken tip.  So, the tip

14 broke off and it's now flat.

15         MS. DEAN:  Can we take a look at Government 735,

16 please?

17         (Exhibit published to the jury.)

18 Q    What is that?

19 A    This is the box of garbage bags, indicates it should be

20 black bags inside.  But inside was white and clear garbage

21 bags.

22 Q    So, all the bags inside were white and clear rather than

23 black?

24 A    Yes.

25         MS. DEAN:  Can we look at 736, please?

1   Q    Is this another angle of that box we just saw?

2   A    Yes.

3           MS. DEAN:  Can we turn to 737 now?

4           (Exhibit published to the jury.)

5   Q    What do we see here?

6   A    This is the contents that were inside YB-9.  These are

7   the bags.

8           MS. DEAN:  And can we turn now to 738?

9           (Exhibit published to the jury.)

10  Q    What is this?

11  A    This is YB-10, which is the electric carving knife, which

12  is the box and the contents.

13          MS. DEAN:  We can take those down, please.

14  Q    Was the property that you just described to us collecting

15  with Detective Beltre, was that vouchered and packaged and

16  sealed?

17  A    Yes.

18  Q    What was the voucher number assigned to YB-1 and YB-2,

19  the cell phones we just looked at together?

20  A    That was 3000960634.

21          MS. DEAN:  And your Honor, may I approach the

22  witness with Government 343 which is in evidence and 363 which

23  is identification only?

24          THE COURT:  All right.  Why don't you show 343 to

25  counsel?

1          (Pause in proceedings.)

2          THE COURT:  Any objection to the one that's not in

3    evidence?

4          MS. THIELE:  No, your Honor.

5          THE COURT:  All right.

6          (Government Exhibit 343 so marked.)

7    Q    If you could, take a look at 343 and 363 and tell us if

8    you recognize the original packaging for the phones that you

9    vouchered and the Samsung phone that you previously described

10   to us.

11   A    Yes, so the packaging that the -- that we put it in,

12   which is the property clerk bag, that's what we handed the

13   phone over to the detective.  And then this is the bag that

14   she wrote all the information on here.

15   Q    And that bag is still marked with the same designator

16   YB-1, correct?

17   A    Yes.

18   Q    What was the voucher number used for YB-3 and -4, the

19   pillowcases and the pillows that you've described to us?

20   A    That should be 6000018800.

21   Q    What was the voucher number for YB-5, -6, -7, -8, and

22   -10A, the knives and that metal blade that you just described

23   to us that we looked at together?

24   A    Should be 6000018799.

25   Q    And just to clarify, that's 60000?

1  A    Yes.

2  Q    What was the voucher number for YB-9, -9A, -9B, -9C, -9D,

3  YB-10, and YB-10B, the plastic bags and the Toastmaster box

4  and handle that we all just looked at together?

5  A    Should be 6000018798.

6  Q    Was this property forwarded to the NYPD lab?

7  A    Yes.

8  Q    At approximately what time did you leave 249-45 148th

9  Road?

10 A    8 p.m.

11 Q    On April 30, the same day you started?

12 A    Yes.

13 Q    Other than what you just described to us, did you have

14 any other role in this investigation?

15 A    No.

16            MS. DEAN:  I have no further questions.

17            THE COURT:  All right.

18            Any cross-examination?

19            MS. THIELE:  Yes, your Honor.

20            THE COURT:  Just let me see the parties briefly at

21 the side just for scheduling.

22            (Discussion off the record.)

23            THE COURT:  I think now is a good time to break for

24 your late lunch.  And, so, I'm going to ask you to be back

25 here at ten to four and we'll resume.

1          So, have a good lunch or afternoon tea or whatever

2     this is, but don't discuss the case or look anything up.

3     Thanks.

4               (Jury exits.)

5               THE COURT:  You can step down.  We'll see you a

6     little bit before 4 o'clock.

7               Anything else before we break?

8               MS. DEAN:  No, your Honor.

9               THE COURT:  Okay.  See you in an hour.

10

11              (Luncheon recess taken.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              AFTERNOON SESSION

2              (In open court; jury not present.)

3              MS. DEAN:  Can I preview?

4              THE COURT:  Yes.

5              MS. DEAN:  We have the rest of this witness, and

6    then I believe three additional witnesses today.  I don't

7    think we will go over.

8              THE COURT:  As long as not they are not as chatty as

9    the fingerprint person.

10             MS. DEAN:  We may fall shy of 6:00 --

11             THE COURT:  That's okay.

12             MS. DEAN:  -- but I think it will be a full day.

13             THE COURT:  You will have your witness available

14   Thursday?  Do we have an update?

15             MS. THIELE:  Yes, Your Honor.  So, we've been in

16   touch with Dr. Jameson and the earliest flight that he got out

17   of Edinboro to come into New York City will get him into

18   Newark on Thursday at approximately 12:20 p.m.  So if he comes

19   straight from the airport, he should be available after the

20   lunch hour.

21             THE COURT:  Okay.  Is there a reason why we couldn't

22   get him earlier?

23             I'm putting aside the question of whether there is

24   anybody in this country that could also testify about DNA.

25   But, I mean, I guess we can all hope that he gets here on

1    time, but it would be really better if he could get here so

2    that we don't have to worry about whether his plane is going

3    to get in.

4              MS. THIELE:  Yes, Your Honor.

5              So, I think when we originally believed that the

6    Government would rest on Friday, he was prepared for Monday

7    testimony.  And then he did clear his schedule in case he

8    would be testifying this Friday.  And it wasn't until a couple

9    of days ago that we learned the Government might be resting

10   midday Thursday, so he tried to push as many of his other

11   obligations aside, and this is the earliest he could come.

12             THE COURT:  Well, let's see what happens.

13             Let's get the witness back on the stand and the

14   jurors.

15             (Witness resumed the stand.)

16             THE COURTROOM DEPUTY:  All rise.

17             (The jury enters the courtroom.)

18             THE COURTROOM DEPUTY:  You may be seated.

19             THE COURT:  All right.  Everybody, I'm sorry about

20   that.  There was some situation and we just couldn't get

21   started sooner, but I do want to press ahead.

22             I think we can still get through all of our

23   witnesses.  We may have to stay a little bit later, but I

24   think it's worth it to keep us on track.

25             So it is the cross-examination of the detective.

1        THE COURTROOM DEPUTY:  The witness is reminded she's

2   still under oath.

3   CROSS-EXAMINATION

4   BY MS. THIELE:

5   Q    Good afternoon, Detective.

6   A    Good afternoon.

7   Q    You testified about the fact that you responded to a

8   scene in Rosedale, Queens on April 30, 2018?

9   A    Correct.

10  Q    And you were a Crime Scene Unit lead that day?

11  A    No.  I was the assistant.

12  Q    Okay.  And who was the lead on that day?

13  A    Detective Beltre.

14  Q    And you arrived to the scene at approximately 8:30 a.m.

15  on that day?

16  A    Correct.

17  Q    And you were there for about 12 hours?

18  A    Yes.

19  Q    And when you first arrived to the scene, you conferred

20  with a number of officers?

21  A    Yes.

22  Q    Would you say you were aware, generally, of what the

23  officers believed happened at the residence?

24  A    Yes.

25  Q    And you were tasked with conducting a systematical and

1  methodical zone search of that residence?

2  A    Yes.

3  Q    To collect physical evidence?

4  A    Yes.

5  Q    And when physical evidence was collected, those items

6  were collected because you believed they might be probative in

7  the case; correct?

8  A    Correct.

9  Q    For example, you testified about a couple of pillowcases

10 that were seized?

11 A    Correct.

12 Q    Is it true that they were seized to be tested for the

13 victim's blood?

14 A    Victim or suspect.

15 Q    And you also seized knives from the kitchen?

16 A    Correct.

17 Q    And you testified that that was because the victim was

18 dismembered?

19 A    Correct.

20 Q    That included a few kitchen knives?

21 A    Correct.

22 Q    And a Toastmaster electric carving knife?

23 A    Correct.

24 Q    And also some trash bags were seized; correct?

25 A    Correct.

1  Q    You also testified that the residence was searched for

2  forensic evidence --

3  A    Correct.

4  Q    -- with a number of different tools, including CrimeScope

5  and Bluestar?

6  A    Correct.

7  Q    And OBTI?

8  A    Correct.

9  Q    And OBTI is a rapid screening test that presumes

10 bloodstains are of human origin; correct?

11 A    Yes.

12 Q    I believe you showed us on direct the actual test;

13 correct?

14 A    Correct.

15 Q    It looks kind of like a COVID test?

16 A    Correct.

17 Q    And if there's a positive test, you gather swabs of the

18 presumed bloodstain for further testing by the lab?

19 A    Either swabs or we'll actually collect the whole item to

20 submit to the lab.

21 Q    And was this to determine whether the stain is, in fact,

22 human blood?

23 A    And whose -- and determine who it is.

24 Q    Right.

25       You went to a number of different rooms trying to

1    collect forensic evidence?

2    A    Correct.

3    Q    Including the victim's bedroom?

4    A    Correct.

5    Q    And those forensic tools we discussed were used on the

6    ceilings?

7    A    Correct.

8    Q    The walls?

9    A    Correct.

10   Q    The carpet?

11   A    Correct.

12   Q    And the carpet was actually lifted up as well?

13   A    Correct.

14   Q    And some stains that you believed might be possible blood

15   were also tested; correct?

16   A    Correct.

17   Q    The bed was also tested?

18   A    Yes.

19   Q    Other furniture?

20   A    Yes.

21   Q    A laundry basket?

22   A    Yes.

23   Q    The legs of the bed frame?

24   A    Yes.

25   Q    And the victim's bedroom yielded no positive forensic

1   results, correct?

2   A    That's correct.

3   Q    You also testified about collecting forensic evidence or

4   attempting to collect forensic evidence from another upstairs

5   bedroom, bedroom three?

6   A    Correct.

7   Q    And Bluestar and CrimeScope were also used on the

8   ceilings in that room?

9   A    That's correct.

10  Q    The walls?

11  A    Yes.

12  Q    Floor?

13  A    Yes.

14  Q    Bed?

15  A    Yes.

16  Q    Mattress?

17  A    Yes.

18  Q    Baby furniture?

19  A    Yes.

20  Q    A chair?

21  A    Yes.

22  Q    A dresser?

23  A    Yes.

24  Q    You also searched the upstairs bathroom for forensic

25  evidence; correct?

1   A      Correct.

2   Q      And there's only one bathroom on the second floor of the

3   residence?

4   A      Correct.

5   Q      And you used CrimeScope and Bluestar on the walls of that

6   bathroom?

7   A      Correct.

8   Q      Ceiling?

9   A      Correct.

10  Q      Tub?

11  A      Correct.

12  Q      Floor?

13  A      Correct.

14  Q      Sink?

15  A      Correct.

16  Q      Toilet?

17  A      Correct.

18  Q      Shower curtain?

19  A      Correct.

20  Q      Shower hose?

21  A      Correct.

22  Q      Showerhead?

23  A      Correct.

24  Q      The bathmat?

25  A      Correct.

1   Q     And you also did OBTI or presumptive blood testing on the

2   bathtub?

3   A     Correct.

4   Q     The corners of the tub?

5   A     Correct.

6   Q     The grout?

7   A     Correct.

8   Q     Over and under the bathtub caking?

9   A     Correct.

10  Q     The corner of the tub where it met the floor?

11  A     Correct.

12  Q     Any stains you saw?

13  A     Correct.

14  Q     The showerhead?

15  A     Correct.

16  Q     A loofah?

17  A     Correct.

18  Q     The tub handle?

19  A     Correct.

20  Q     The drain release?

21  A     Correct.

22  Q     A stain above the toilet?

23  A     Correct.

24  Q     The sink handle?

25  A     Correct.

1    Q    A hand towel?

2    A    Correct.

3    Q    And a rug?

4    A    Correct.

5    Q    And you found no forensic evidence in that bathroom;

6    correct?

7    A    Correct.

8    Q    You also searched the upstairs hallway closet?

9    A    Correct.

10   Q    And any tests related to the collection of forensic

11   evidence in that closet were also negative; correct?

12   A    Correct.

13   Q    And the same is true for the first floor bathroom, all

14   negative forensic results; correct?

15   A    Correct.

16   Q    And you searched the kitchen as well?

17   A    Yes.

18   Q    Using CrimeScope and Bluestar on the ceiling?

19   A    Correct.

20   Q    The floors?

21   A    Correct.

22   Q    The walls?

23   A    Correct.

24   Q    Behind, under and inside the fridge?

25   A    Correct.

1  Q    The fridge handle?

2  A    Correct.

3  Q    The kitchen furniture?

4  A    Correct.

5  Q    Paper towel holder?

6  A    Correct.

7  Q    A step ladder?

8  A    Correct.

9  Q    Dish towels?

10  A    Correct.

11  Q    All negative results as well; correct?

12  A    Correct.

13  Q    And, finally, you used a CrimeScope in the tool shed in

14  the backyard; right?

15  A    Correct.

16  Q    And no positive results there; correct?

17  A    Correct.

18  Q    Did you become aware of another crime scene run that was

19  completed on May 1, 2018?

20  A    I'm not aware.

21        MS. THIELE:  Nothing further.

22        THE COURT:  Any redirect?

23        MS. DEAN:  Just very briefly.

24  REDIRECT EXAMINATION

25  BY MS. DEAN:

1  Q    Detective, what, if anything, would affect your ability

2  to locate and recover forensic evidence at a scene like this?

3  A    If barriers or covers were utilized in a scene like this

4  where they literally just take the whole crime scene away, so

5  which would explain why we came up with nothing with our

6  investigation.

7  Q    How, if at all, does the frequent running of water over

8  time affect your ability to recover evidence of blood or

9  bleach in a bathtub, for instance?

10 A    It would dilute it.  It would wash it completely away.

11            MS. DEAN:  I have nothing further.

12            THE COURT:  Anything else?

13            MS. THIELE:  No, Your Honor.

14            THE COURT:  Thank you so much, Detective.

15            You may step down.

16            (Witness steps down.)

17            THE COURT:  Are you ready to call your next witness?

18            MR. PALACIO:  Yes, Your Honor.

19            The Government calls Andrew Hoffman.

20            THE COURTROOM DEPUTY:  Raise your right hand.

21            Do you solemnly swear or affirm that the testimony

22 you are about to give will be the truth, the whole truth and

23 nothing but the truth?

24            THE WITNESS:  I do.

25            (Witness sworn.)

1          THE COURTROOM DEPUTY:  Please state your name for

2    the record.

3          THE WITNESS:  Andrew Hoffman.

4          THE COURTROOM DEPUTY:  Have a seat.  Thank you.

5          THE COURT:  Okay.  Just a couple of things.  I want

6    to make sure everybody can hear you.

7          THE WITNESS:  Okay.

8          THE COURT:  So, the chair doesn't move, but the

9    microphone does.  If you want to bring it up a little bit

10   closer.

11         THE WITNESS:  Hello.

12         THE COURT:  That's very good.

13         THE WITNESS:  Yes.

14         THE COURT:  All right.  If there is a question that

15   somebody asks you that you don't understand, just let me know

16   and I will have them rephrase it.

17         Also, keep in mind that our court reporter takes

18   down your testimony and it's important that you not speak too

19   quickly it make it harder for her to do her job okay.

20         THE WITNESS:  Okay.

21         THE COURT:  Go ahead.

22         (Continued on next page.)

23

24

25

1    **ANDREW HOFFMAN**,

2          called as a witness, having been first duly

3          sworn/affirmed, was examined and testified as follows:

4    DIRECT EXAMINATION

5    BY MR. PALACIO:

6    Q     Good afternoon, Mr. Hoffman.

7                How old are you?

8    A     I'm 63 in June.

9    Q     Do you work or are you retired?

10   A     I'm retired.

11   Q     What are you retired from?

12   A     I worked for the Federal Government, Department of

13   Defense.

14   Q     Do you have any children?

15   A     No.

16   Q     Can you tell us with whom you live?

17   A     I live alone.

18   Q     And without giving us an address, what part of New York

19   do you live in?

20   A     Nassau County.

21   Q     How long have you lived in Nassau County?

22   A     My whole life, except for two years when I was in

23   college.

24   Q     Where was that?

25   A     In Arizona.

1   Q    Can you tell us what your phone number is?

2   A    (631) 855-0043.

3   Q    Was that also your phone number in 2017 into 2018?

4   A    I believe so.

5   Q    Do you believe so or --

6   A    Yes.

7   Q    -- was that your phone number?

8   A    Yes.

9   Q    Now, did there come a point when you met a young woman

10  towards the end of 2017?

11  A    Yes.

12  Q    And how did you meet that young lady?

13  A    Online.

14  Q    What platform did you meet her on or what website?

15  A    It was either on Craigslist or Web Crawler.

16  Q    And did you ever meet her in person?

17  A    Yes.

18  Q    Approximately how many times did you meet her?

19  A    From the end of 2017 to when she passed, probably about

20  10 times.

21  Q    Do you remember today, as you sit here today, what her

22  name was?

23  A    I knew her as Lina, but I understand her name is Brandy.

24  Q    Can you tell us what type of relationship you had with

25  Lina?

1  A    Yes, it was -- she was a good -- she wound up being a

2  good friend.  We got to be very -- we had intimate encounters,

3  you know, at the time we were together.

4  Q    And were those encounters paid for?

5  A    It was 30 minutes for -- I paid for 30 minutes and we

6  were intimate then.

7  Q    And what was the price that you would pay for that half

8  hour?

9  A    One-hundred -- $100.

10 Q    And would that involve sex?

11 A    Yes.

12 Q    How was the price determined?

13 A    She told me it.

14 Q    And how would you communicate with Lina?

15 A    On a text.

16 Q    And when you met with Lina, where did that happen?

17 A    In Queens, Nassau borderline by Green Acres Mall.

18 Q    And did you always meet her at her house?

19 A    Yes.

20 Q    Do you remember what her house looked like?

21 A    I don't remember what it looked like, but I remember it

22 was on the north side of the street and it was second from the

23 corner.

24 Q    And do you remember the layout of the house, how you

25 would come into the house?

1  A    Yes.  There were steps to the door on the side and we

2  would go -- I would go in there and then we'd go around the

3  stairs to -- to her room.

4  Q    And what time of day would you generally meet her?

5  A    About 10:00 or 11:00 in the morning.

6  Q    And when you would go to her house and into her room, can

7  you describe what her bedroom looked like?

8  A    The only thing I really remember about it is she had a

9  little stand where she put the wigs on and she would comb out

10 the wigs and stuff like that.  So that's the only thing I

11 really remember about it.

12 Q    And what did you understand about that object and the

13 wigs?

14 A    Well, she told me that she was going to be a hairdresser

15 and she was going to hairdressing school.

16 Q    Was anyone ever home when you visited that house?

17 A    I never saw anyone.

18          THE COURT:  Anyone else?

19          THE WITNESS:  I never saw anyone else.  Excuse me.

20 Q    Mr. Hoffman, can you tell the jury what Lina was like as

21 a person?

22 A    She was fun, a very sweet girl.  I grew to like her a

23 lot.  We talked about maybe doing an overnight date one time.

24 I got to be very fond of her.

25 Q    If you were to see a picture of Lina today, would you

1  remember her?

2  A    No.  I made it a point not to pay any attention to the --

3  you know, the murder after the detectives came to visit me

4  because I wanted to remember her without looking at a website

5  or something like that.  So, no, I couldn't -- couldn't tell

6  you.

7  Q    So you don't have an independent memory of what she

8  looked like?

9  A    No.

10  Q    And have you had any medical episodes?

11  A    I've had a stroke in 2022.

12  Q    Do you remember the last time that you saw Lina?

13  A    Probably April of 2018.

14  Q    Mr. Hoffman, I would like to show you Government Exhibit

15  304.

16  A    Where do I look?

17  Q    On the screen in front of you.  It should be up in just a

18  moment.

19  A    Okay.

20  Q    This is called DML file.

21       MR. PALACIO:  Mr. Rader, if we can go to....

22  Q    Mr. Hoffman, do you see the screen in front of you?

23  A    Yes.

24  Q    Do you see an entry, it says April 3rd, 2018?

25  A    Yes.

1  Q    At 23:27?

2  A    Yes.

3  Q    Do you see your phone number there?

4  A    Yes.

5  Q    Is it the 0043 number that you gave us?

6  A    Yes.

7  Q    Mr. Hoffman, did there come a point when you no longer

8  heard from Lina?

9  A    Yes.

10 Q    What happened?

11 A    I got a call from someone that identified themself as a

12 friend of the family, a woman, and she told me that -- what

13 had happened to her, and I told her I was sorry to hear that.

14 Q    You said it was a female's voice?

15 A    Yes.

16 Q    What else did they tell you, that person?

17 A    They told me she -- they -- like I said, they identified

18 themselves as a friend of the family or a cousin or something

19 like that, and, you know, I -- I felt terrible and I -- I told

20 them -- told them I felt bad, really bad that that happened

21 to -- to Brandy.

22 Q    Did that person say the name Brandy?

23 A    Yes.

24 Q    Was that the first time you learned the name Brandy?

25 A    Yes.

1   Q    And did you later meet with police and talk to them about

2   what you knew about Brandy and your relationship with her?

3   A    Yes.

4   Q    Did you give police a sample of your DNA?

5   A    Yes.

6   Q    Mr. Hoffman, are you familiar with Canarsie Park in

7   Brooklyn?

8   A    No.

9   Q    Have you ever been there?

10  A    No.

11  Q    Do you have any further information regarding Lina or

12  Brandy's murder?

13  A    No.

14       MR. PALACIO:  Nothing further.

15       THE COURT:  Any cross-examination?

16       MS. THIELE:  Very briefly, Your Honor.

17  CROSS-EXAMINATION

18  BY MS. THIELE:

19  Q    Good afternoon, Mr. Hoffman.

20  A    Good afternoon.

21  Q    You testified that you believed you met who you now know

22  as Brandy approximately 10 times; is that correct?

23  A    Yes.

24  Q    Between the end of 2017 and early 2018?

25  A    Yes.

1   Q    But you don't remember the exact day of the last

2   encounter you had with her; right?

3   A    No.

4   Q    And you testified about receiving a call from a female

5   not long after her murder?

6   A    Yes.

7   Q    And do you remember telling the NYPD that that woman

8   identified as Brandy's sister?

9   A    I don't remember what -- what she identified.  I just

10  knew that she said she was a friend of the family or a

11  relative.

12  Q    Okay.

13  A    I can't remember as a sister.

14       MS. THIELE:  Mr. Gover, can you please pull up

15  3500-AH-2, just for the witness.

16  Q    Okay.  Mr. Hoffman, so don't read anything aloud.

17  A    Okay.  Okay.

18  Q    Take a look at paragraph 1, towards the bottom of

19  paragraph 1, the last few sentences.

20       Read those to yourself and let me know when you have

21  finished.

22  A    Okay.

23  Q    Okay.  After reading that, did it refresh your memory as

24  to whether you told the NYPD that the woman identified as

25  Brandy's sister?

1   A    I don't know.  I don't remember it.  I just don't

2   remember.  It was five or six years ago.

3   Q    Okay.  The woman purporting to be Brandy's family member

4   as you remember called you from an unrecognized number, is

5   that correct?

6   A    Yes.

7   Q    It was not a number that you had previously down as

8   Brandy Odom's number?

9   A    Oh, I don't know.  I wouldn't -- I wouldn't remember.

10  Q    Okay.  And that woman who called you did, ultimately,

11  share with you that Brandy had been killed; correct?

12  A    Yes.

13  Q    Okay.

14          MS. THIELE:  Nothing further, Your Honor.

15          THE COURT:  Any redirect?

16          MR. PALACIO:  No, Your Honor.

17          THE COURT:  Thank you so much, sir.  You may step

18  down.

19          (Witness steps down.)

20          THE COURT:  Next witness.

21          MR. PALACIO:  The Government calls Detective George

22  Velez.

23          THE COURTROOM DEPUTY:  Raise your right hand.

24          Do you solemnly swear or affirm that the testimony

25  you are about to give will be the truth, the whole truth and

1    nothing but the truth?

2              THE WITNESS:  I do.

3              (Witness sworn.)

4              THE COURTROOM DEPUTY:  State and spell your name for

5    the record.

6              THE WITNESS:  My name is retired Detective George

7    Velez.  G-E-O-R-G-E, V-E-L-E-Z.

8              THE COURTROOM DEPUTY:  Thank you.  Have a seat.

9              THE COURT:  All right.  Congratulations on your

10   retirement.

11             THE WITNESS:  Thank you.

12             THE COURT:  I just want to give you a couple of

13   instructions before you testify.

14             I want to make sure everybody hears you.  You can

15   pull the microphone up a little bit closer.  The chair doesn't

16   move.  So that won't work.  You can pull the whole thing

17   closer, perfect.  All right.

18             Make sure you don't speak too quickly.  It's hard on

19   the court reporter and if you have -- if there is something

20   that you don't understand that someone asks you, just let me

21   know and I will have them rephrase.

22             THE WITNESS:  Yes, Your Honor.

23             (Continued on next page.)

24

25

 1   **GEORGE VELEZ**,

 2        called as a witness, having been first duly

 3        sworn/affirmed, was examined and testified as follows:

 4   DIRECT EXAMINATION

 5   BY MR. PALACIO:

 6   Q    Detective, I believe you just mentioned that you are

 7   retired; is that correct?

 8   A    Yes, sir.

 9   Q    Are you retired from the NYPD?

10   A    Yes, sir.

11   Q    How long did you work for NYPD?

12   A    22 years.

13   Q    What was your final assignment before retiring from NYPD?

14   A    I was an NYPD crime scene investigator.

15   Q    And how long -- with the Crime Scene Unit?

16   A    Yes, sir.

17   Q    How long were you with the Crime Scene Unit?

18   A    Nine years.

19   Q    What were some of your assignments before you joined

20   crime scene?

21   A    Previously to arriving to crime scene, I was in evidence

22   collection, a technician, basically doing the same forensic

23   investigation but minor crime.

24   Q    And what were some of your duties and responsibilities as

25   a crime scene investigator?

1  A     As a crime scene investigator, our responsibilities and

2  duties are to collect packages and submit any potential

3  physical evidence, serological evidence for testing and to get

4  a result of an identification of a possible suspect.

5  Q     Detective, I'd like to direct your attention now to April

6  11, 2018.

7         Were you working that day?

8  A     Yes, sir.

9  Q     And what were your hours that day?

10 A     My hours were from 7:00 in the morning to 3:00 p.m.

11 Q     Did you have a partner?

12 A     Yes.

13 Q     Who was your partner?

14 A     Detective Beltre.

15 Q     Did there come a point that day when you became involved

16 in an investigation into the homicide of a dismembered female

17 named Brandy Odom?

18 A     Yes, sir.

19 Q     What was the run number assigned to that case?

20 A     The run number to this particular case was 2018, 153 boy.

21 B, as in boy.

22 Q     Were you the lead investigator?

23 A     I was the assisting investigator.

24 Q     Who was the lead investigator?

25 A     Detective Beltre.

1   Q    Where is she today?

2   A    She's also retired.

3   Q    All right.  Can you tell the jury what location you were

4   specifically assigned to respond to?

5   A    Yes.  We were assigned to respond to the confines of the

6   69th Precinct in Brooklyn, Canarsie Park, within the

7   perimeters of the park area, the walkway areas.

8   Q    Can you tell the jury at about what time you got to that

9   scene on the 11th?

10  A    We arrived at -- we were notified -- forgive me.  We

11  arrived at the scene at 11:55 a.m.

12  Q    And what were the weather conditions like that day?

13  A    The weather conditions were clear and approximately 45 to

14  50 degrees.

15  Q    Was there a police presence at the park when you got

16  there?

17  A    Yes, sir.

18  Q    And, actually, when you got to the park, can you tell us

19  what you did first?

20  A    Upon arrival, we did a walk-through and conferral with

21  the scene detectives at this particular case.  It was a

22  Detective Welch and a Sergeant Francis.  Excuse me.  It was --

23  they walked around and indicated to a specific location near

24  the walkway of -- inside the park where a garbage can was

25  located with items inside.

1   Q     So is it fair to say that your crime scene run was

2   specifically to process a garbage can inside of the park?

3   A     Yes, sir.

4   Q     Can you tell us more or less where that garbage can was

5   in relation to Seaview Avenue?

6   A     Yes, sir.  Seaview Avenue was north of the location where

7   the garbage can was located, between East 86th and East 87th

8   Street in Brooklyn.

9   Q     Can you tell us just generally speaking what items of

10  evidence you saw in and around that garbage can when you got

11  there?

12  A     Yes.  We saw multiple plastic bags, as well as multiple

13  Saw-zall blades, and other miscellaneous paperwork, as well as

14  possible human hair.

15  Q     And, again, were those items inside and outside the

16  garbage can?

17  A     Both, sir.

18  Q     And did you take pictures of that scene as you saw it

19  when you responded?

20  A     Yes, sir.

21        MR. PALACIO:  Your Honor, I would like to show the

22  witness what's marked as Government's 881 to 906 marked for

23  identification.

24        THE COURT:  Have you shown those to the defense?

25        MR. PALACIO:  Yes.

1       THE COURT:  Have you seen those?

2       MS. THIELE:  Yes.

3       THE COURT:  Do you have any objection to those?

4       MS. THIELE:  No, Your Honor.

5       THE COURT:  All right.  Those will be in evidence.

6       (Government's Exhibits 881 to 906 received in

7   evidence.)

8   Q    Detective, I would like to run through some of the

9   pictures that you took that day.

10      MR. PALACIO:  If we can show the witness Government

11  Exhibit 881.

12  Q    First of all, can you tell us what location we are

13  looking at?

14  A    Yes, sir.

15      From this photograph, we are facing north.  It's an

16  overall photograph toward the garbage can, which you see here

17  located right in the middle, and as well our vehicle inside

18  Cunningham Park in between East 86th and East 87th Street.

19  Q    What street is your van parked on?

20  A    We're basically adjacent to Seaview Avenue.

21      MR. PALACIO:  Mr. Rader, if you can zoom in in that

22  area where Detective Velez has indicated.

23  Q    Detective, do you -- the marking is a little off now.

24  But could you draw a circle around the garbage can that you

25  processed?

1    A    Yes, sir.

2    Q    And you are indicating the garbage can just a little off

3    the walkway?

4    A    Correct, sir.

5         MR. PALACIO:  If we can show the witness Government

6    Exhibit 882.

7    Q    And there should be a button at the bottom of the screen

8    to clear these markings.

9    A    Is it a cream box?

10        THE COURTROOM DEPUTY:  On the left.

11   Q    Can you tell us what view we are looking at here in 882?

12   A    Yes, sir.  We're on the walkway facing south of Seaview

13   Avenue towards the garbage cans.

14   Q    Can you circle again the garbage can?

15   A    Yes, sir.

16   Q    Can you --

17   A    Forgive me, sir.

18   Q    All right.  You have indicated the left side of the

19   photograph; is that correct?

20   A    Correct, sir.

21        MR. PALACIO:  And if we could show the witness

22   Government Exhibit 885.  If you don't mind clearing that

23   please.

24   Q    And, again, can you circle the garbage can that you

25   processed.

1        You have indicated just below the mid-line of the

2   photograph is that correct?

3   A    Right, sir.

4   Q    Detective Velez, I would like to talk about some of those

5   items that you saw in and around the trash can.

6            MR. PALACIO:  And if we could show the witness

7   Government Exhibit 886.

8   Q    Can you tell us what we see here?

9   A    Here, we have -- on the right-hand side would be the

10  black garbage can previously indicated, as well as multiple

11  plastic bags, a white Modell bag, to be more specific, and

12  evidence markers one, two, three, four, and five.

13  Q    And do you see another bag?

14  A    Yes, sir.

15  Q    What color is that bag?

16  A    It is a black bag.

17  Q    And were these items on scene in that way when you

18  responded?

19  A    Yes, sir.

20  Q    Are you aware if members of service had placed those

21  items there?

22  A    Yes, sir.

23  Q    And I would like to show you Government Exhibit 887.

24            What do we see here?

25  A    Here is a bird's eye view showing evidence marker one

1  through five and evidence next to each yellow marker.

2         MR. PALACIO:  Mr. Rader, if we can zoom in around --

3  the area around those two bags.

4  Q    Detective, did those bags contain items in them?

5  A    Yes, sir.

6  Q    I'm showing you Government Exhibit 888.

7         What do we see here?

8  A    On the evidence marker one, just below, would be a

9  Saw-zall blade, and on -- under evidence marker number two is

10 a Saw-zall blade just a bit longer than the one on the right.

11 Q    I'm showing you Government Exhibit 890.

12        Can you tell us what this?

13 A    Yes, this is a close-up photograph of evidence marker No.

14 4, indicating the item on the right, a white Modell's bag, and

15 evidence marker No. 5 indicating on the left a black bag.

16 Q    And what type of bag was that?

17 A    A canvass bag, sir.

18 Q    Did it have any markings on it?

19 A    Yes, sir.

20 Q    What does it say?

21 A    DeWalt on top.

22 Q    I'm showing you Government Exhibit 892.  And what is

23 this?

24 A    Evidence marker No. 9, just below are just wires, black

25 and red, along with other attachments.

1    Q    And was this also next to the bags that we just saw?

2    A    Yes, sir.

3    Q    I'm showing you Government Exhibit 891.

4              MR. PALACIO:  If we can zoom in in the area around

5    the garbage can.

6    Q    Detective, can you tell us what we see here?

7    A    Yes, this is a mid-range photograph facing sought of

8    Seaview Avenue towards the evidence marker one, two, nine,

9    three, four and five, as well as 10.

10   Q    Is this -- was this picture taken after those items were

11   removed from the scene to your crime scene van?

12   A    Yes, sir.  These items were collected.

13   Q    And we see in the exhibit marker 10, what is that meant

14   to indicate?

15   A    It's indicating that the items were found inside the

16   garbage can.

17   Q    Were there items of evidence in the garbage can?

18   A    Yes.

19   Q    What were those items?

20   A    The items that were found inside the garbage can were a

21   Saw-zall blade as well possible human hair.

22   Q    And I'm showing you Government Exhibit 893.

23              Were there other items of evidence collected away

24   from the location of that garbage can?

25   A    Yes, sir.

1   Q    What were those items of evidence?

2   A    They were other items that may indicate possible human

3   hair as well.

4   Q    We may be able to see that a little bit closer on 894.

5              What were the evidence marker for those items?

6   A    The evidence markers for the items I mentioned were six

7   and seven.

8   Q    Do you know if that hair had any relation or any

9   relevance to this case, this investigation?

10  A    No, sir.  But we deemed it as a potential source of

11  evidence.

12  Q    And if I could show you Government Exhibit 895.  What do

13  we see here?

14  A    This is a close-up photograph of evidence marker No. 6

15  with the possible human hair just below, and on the right-hand

16  side is a blue scale, which gives the evidence scale to

17  indicate the length and the width of the item.

18  Q    The letters YB, are those for the initials of Detective

19  Beltre?

20  A    Yes, sir.

21

22              (Continued on next page.)

23

24

25

1  (Continuing.)

2         MR. PALACIO:  If we could show you Government

3  Exhibit 896.

4  BY MR. PALACIO: (Continuing.)

5  Q    What do we see here?

6  A    This would be evidence marker -- a closeup photograph of

7  evidence marker number seven.  Just below is another possible

8  human hair, and just above -- I mean, just below the possibly

9  human hair would be a blue scale marked YB7.

10 Q    Now, Detective, were all of those items later examined

11 separately and individually in the crime scene van?

12 A    Yes, sir.

13 Q    I'd like to talk about the contents of the black trash

14 bag first.

15        MR. PALACIO:  If we could show the witness

16 Government's Exhibit 900.

17 Q    Can you tell us what we see here?

18 A    Yes, sir.  Indicating on the right of the photograph,

19 would be the black plastic bag, and on the left would be the

20 contents within the black plastic bag.

21 Q    And at the bottom, if we could zoom in around the scale.

22        What was the evidence number or marker given to this

23 item of evidence?

24 A    For this item of evidence would be YB8.

25 Q    And were each of these -- were each of the items, the

1  contents spread out and photographed?

2  A    Yes, sir.

3         MR. PALACIO:  If we could look at Government

4  Exhibit 901.

5  Q    What do we see here?

6  A    These are the items that were found inside of the black

7  bag and given a subletter for each individual item.

8  Q    So in other words, YB8A and so forth?

9  A    Correct.

10  Q    Okay.  Can you describe some of the contents that we

11  saw -- that we see inside of what came from that black bag?

12  A    Inside of the black bag were also more SAWZALL blades, as

13  well a Home Depot receipt, as well as other miscellaneous

14  papers, and a latex glove.

15  Q    What do we see here in the zoom?

16  A    Here we have five SAWZALL blades.

17         MR. PALACIO:  And Mr. Rader, if we could zoom in

18  around the receipt.

19  Q    What was the marker given to this receipt?

20  A    This receipt received marker YB8K.

21  Q    And what type of receipt was that?

22  A    This was a Home Depot receipt, sir.

23  Q    Detective Velez, was this receipt later vouchered?

24  A    Yes, sir.

25  Q    And what was the voucher number for this receipt?

1  A    The invoice number for this receipt was 3000952597.

2  Q    And was an item number assigned to this receipt?

3  A    Yes, sir.

4  Q    What was that item number?

5  A    Item number six.

6        MR. PALACIO:  Your Honor, with the Court's

7  permission, if we could show the witness what is marked as

8  Government's 360A for identification.

9        THE COURT:  All right.  Any objection to that going

10 into evidence?

11       MS. THIELE:  Can I just take a look at it?

12       THE COURT:  Sure.

13       (Pause in the proceedings.)

14       MS. THIELE:  No objection, Your Honor.

15       THE COURT:  All right.  That's in evidence.

16       (Government Exhibit 360A, was received in evidence.)

17       MR. PALACIO:  Ms. Greene, may I use the ELMO?

18 Q    Detective Velez, can you see this from here?

19 A    Yes, sir.

20 Q    Again, can you remind us where this receipt is from?

21 A    Home Depot, sir.

22 Q    And do you see the date of this receipt?

23 A    Yes, sir.

24 Q    What is the date on the receipt?

25 A    It reads 08/04/17.

1      MR. PALACIO:  We can go back to the computer view.

2   Q    Okay.  Detective Velez, I'd like to talk about the white

3   Modell's bag.

4      MR. PALACIO:  If we could show the witness

5   Government's Exhibit 904.

6   Q    What do we see here?

7   A    Yes, sir.  Here, indicating on the left, is a white

8   plastic Modell's bag, and on the right-hand side are the

9   contents within that bag.  Underneath the white Modell's bag

10  is YB4 scale.

11     MR. PALACIO:  And if we could show the witness

12  Government's Exhibit 905.

13  Q    Can you tell us what we see here?

14  A    Yes, sir.  Here indicates miscellaneous paperwork, as

15  well as receipts, Modell's receipts, Home Depot receipts.

16  Q    And were all of these items inside of the white Modell's

17  bag?

18  A    Yes, sir.

19     MR. PALACIO:  Mr. Rader, if we could zoom in around

20  those two Home Depot receipts.

21  Q    What evidence markers were assigned to those two

22  receipts?

23  A    On the left-hand side, evidence marker was given YB4F,

24  and on the right-hand side, a Home Depot receipt would get

25  YB4G.

1          MR. PALACIO:  If we could zoom in sort of towards

2     the top portion of these receipts.

3     Q     Did you see any writing on these receipts?

4     A     Yes, sir.

5     Q     Can you describe that for us?

6     A     On the right hand of the photograph, the Home Depot

7     receipt on the right has a green, and we believe to be like a

8     backwards E, possibly marked by the security officer as the

9     person with the receipt was exiting the premise.

10          And on the left, we have a black backwards E, as

11    well, I believe used in pen.  I believe used by the -- marked

12    by the security officer when the person was exiting the

13    premise.

14    Q     And were these items also vouchered?

15    A     Yes, sir.

16    Q     Under what number were they vouchered?

17    A     The items were vouchered under 3000952595.

18    Q     Under what item numbers?

19    A     Item Numbers Seven and Eight.

20          MR. PALACIO:  Your Honor, offering into evidence as

21    Government's Exhibit 960B -- 360B and 360C.

22          THE COURT:  Any objection?

23          MS. THIELE:  No objection.

24          (Government Exhibits 360B and 360C, were received in

25    evidence.)

1    MR. PALACIO:  Your Honor, may I approach the

2  witness?

3         THE COURT:  Yes.

4         MR. PALACIO:  Actually, I'll post it here.

5         THE COURT:  Yes.

6  Q    Detective Velez, I'll start with Government's

7  Exhibit 360B.

8         MR. PALACIO:  And I'm sorry, Ms. Greene.  Thank you.

9  Q    Can you tell us what we see here?

10 A    This is a Home Depot receipt with the backwards E marked

11 in pen.

12 Q    I'm now showing you Government Exhibit 360C.

13        What do we see here?

14 A    Here is another Home Depot receipt with the green marking

15 on it, as well as dated 03/27/15.

16        MR. PALACIO:  If we can return it to the computer.

17 Q    Detective Velez, I'm showing you Government's

18 Exhibit 906.

19        Were these also contents inside of the white

20 Modell's bag?

21 A    Yes, sir.

22 Q    And I'm showing you Government's Exhibit 903.

23        What do we see here?

24 A    On the left-hand side, sir, marked YB10A is possibly

25 human hair, and on the right-hand side, marked YB10, is also a

1   SAWZALL blade.

2   Q    And where were these items?

3   A    These items were collected from inside of the black

4   garbage can inside of Canarsie Park.

5   Q    And I'm showing you Government's Exhibit 897.

6        What do we see here?

7   A    Here is a black bag with the markings DEWALT on the top

8   marked YB5?

9   Q    And was this the black canvas bag that you saw on the

10  ground outside of the trash can?

11  A    Yes, sir.

12  Q    Now, at approximately what time did you leave this crime

13  scene?

14  A    We completed the scene at 8:00 o'clock.

15  Q    On April 11th?

16  A    Yes, sir.

17  Q    That's 8:00 p.m.?

18  A    Yes, sir.

19  Q    Now, Detective Velez, I'd like to direct your attention

20  now to April 29th, 2018.

21  A    Yes, sir.

22  Q    Were you working that day?

23  A    Yes, sir.

24  Q    And what hours were you working?

25  A    My hours were from 7:00 a.m. to 3:00 p.m.

1  Q    Did you have a partner that day?

2  A    Yes, sir.

3  Q    Who was your partner?

4  A    Detective Blunt.

5  Q    Were you the lead investigator or the assisting?

6  A    The lead investigator, sir.

7  Q    Now, did there come a point that day when you were

8  assigned to process a car at the NYPD forensic garage?

9  A    Yes, sir.

10  Q    Can you tell the jury what a forensic garage is and what

11  takes place there?

12  A    A forensic garage is basically a garage that has been

13  especially prepared to process vehicles that which are

14  involved in crimes.  And in order to attain forensic evidence

15  with minimal contact with other items, the garage is

16  maintained, clean and pristine, as best as possible to recover

17  the evidence.

18  Q    Where is that garage located?

19  A    The garage is located on 222nd Street in the confines of

20  the 105 Precinct garage area.

21  Q    And was a run number assigned that job?

22  A    Yes, sir.

23  Q    What was that?

24  A    2018 153D, as in David.

25  Q    At about what time did you respond to the garage?

1   A    Well, we arrived at the garage at 9:50 a.m.

2   Q    And what kind of car did you process at the garage?

3   A    The vehicle that was -- the vehicle was a 2005 Nissan

4   Maxima, black, four-door sedan.

5   Q    And what was the license plate number for that car?

6   A    The license plate for that vehicle was HLC7182.

7   Q    Was it a New York plate?

8   A    Yes, sir.

9   Q    And did you search that car pursuant to a search warrant?

10  A    Yes, sir.

11  Q    Did you also prepare a sketch to show where items of

12  evidence were recovered on that car?

13  A    Yes, sir.

14         MR. PALACIO:  Your Honor, if we could show the

15  witness what's marked as Government's Exhibit 907 for

16  identification.

17         THE COURT:  Yes.  Do you have any objection to this?

18         MS. THIELE:  No objection.

19         THE COURT:  Okay.  That'll be in evidence.

20         (Government Exhibit 907, was received in evidence.)

21         MR. PALACIO:  And at the same time, Your Honor, I

22  would offer Government's 908, 914 -- I'm sorry, Government's

23  Exhibit 914 and 916 to 1933 in evidence.

24         THE COURT:  Are those photos?

25         MR. PALACIO:  Yes.

1        THE COURT:  Any objection?

2        MS. THIELE:  No objection.

3        THE COURT:  Okay.  Those are in evidence.

4        (Government Exhibits 914 and 916 to 1933, were

5   received in evidence.)

6        MR. PALACIO:  If we could show the witness

7   Government's 907.  And just starting at the top, if we could

8   blow that out a little bit.

9   Q    Just tell us what information we see at the top.

10  A    Yes, sir.  It's the run number which is on the top left,

11  as well as the precinct where the crime occurred, along with

12  the complaint number and the date of the processing, and the

13  location, the investigator, as well as the details on the

14  vehicle.  In this particular, it's indicating 2005 Nissan

15  Maxima black with New York plate HLC7182, as well as the VIN

16  number on the right-hand side.

17  Q    All right.

18       MR. PALACIO:  And if we could expand the lower

19  portion of the diagram.  All right.

20  Q    Detective Velez, explain to the jury what we see here.

21  A    If you see the GV1 through 15, along with the arrow, are

22  the items where DNA swabs were placed and possible epithelial

23  cells were collected.

24  Q    Can you tell the jury how you swab a surface for possible

25  DNA?

1  A    In all these cases, when we're swabbing for DNA, we use

2  personal protective equipment, we use sterile water to high

3  grate the swab, and then apply the swab onto the surface of

4  where we're trying to obtain the DNA, and the item is

5  collected and placed separately into a packaging, and closed

6  and submitted for testing.

7  Q    And this area, can you just generally describe the

8  locations of the car that were swabbed?

9  A    Yes, sir.  Indicating GV1, GV3, GV7 and GV5 are the

10 exterior door handles of the vehicle.  GV2, GV4, GV6 and GV8

11 are the interior door handles of the vehicle.  And GV9 is the

12 steering wheel, GV10 are -- and GV11 are the turn indicators

13 as well as the wiper blade button.  GV12, 13, and 14, are the

14 center console front dash areas of the vehicle.

15 Q    Okay.  And did you process the car -- various areas of

16 the car with Bluestar or OBTI® tests?

17 A    Yes, sir.

18 Q    And what was the result of that?

19 A    We conducted a zone search which is basically we section

20 off the vehicle and we use alternate light sources to see for

21 any possible blood or any serological evidence within the

22 vehicle.  And at this moment, it was negative results.

23 Q    Did you also process the trunk of the car with some of

24 these forensic tools?

25 A    Yes, sir.

1    Q    And what was the result of that?

2    A    Negative result, sir.

3    Q    Can you --

4              MR. PALACIO:  If we can show the witness --

5              THE COURT:  Can I see the parties at the side for

6    just a second with the court reporter?

7              (Continued on the next page.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (The following occurred at sidebar.)

2          THE COURT:  Are you going to go through every

3   picture?

4          MR. PALACIO:  No, no.  I think they've seen enough

5   pictures of the car.

6          THE COURT:  All right.  I was just trying to get an

7   idea.

8          MR. PALACIO:  I have maybe, like, five more

9   questions.

10          THE COURT:  Okay.

11          (End of sidebar conference.)

12
           (Continued on the next page.)
13

14

15

16

17

18

19

20

21

22

23

24

25

1           (In open court; Jury present.)

2           MR. PALACIO:  If we could show the witness

3    Government Exhibit 909.

4    DIRECT EXAMINATION (Continued)

5    BY MR. PALACIO:

6    Q    Detective, can you just describe generally the appearance

7    of the car?

8           THE COURT:  Well, I think the picture speaks for

9    itself.

10          Is there anything special you noticed about the car?

11          THE WITNESS:  Yes, ma'am.

12          The vehicle -- may I proceed?

13          THE COURT:  Yes.  Go ahead.

14   A    The vehicle did have on the exterior obvious signs of

15   oxidation in the trunk and roof areas of the vehicle.

16          Another observation made, the vehicle trunk area had

17   a strong smell of pine oil.

18          THE COURT:  Of what?

19          THE WITNESS:  Of pine oil disinfectant.

20   Q    Was that inside the trunk?

21   A    Yes, sir.

22   Q    And about what time did you complete your processing of

23   the car?

24   A    The vehicle was complete at 20:30 hours.

25   Q    Is that 8:30 p.m.?

1    A    Yes, sir.

2    Q    And was that on April 29th?

3    A    Yes, sir.

4    Q    Detective, did you have any further involvement in the

5    investigation of this case?

6    A    No, sir.

7              MR. PALACIO:  Nothing further, Your Honor.

8              THE COURT:  All right.  Any cross-examination?

9              MS. THIELE:  Just briefly, Your Honor.

10   CROSS-EXAMINATION

11   BY MS. THIELE:

12   Q    Good afternoon, Detective.

13   A    Good afternoon, ma'am.

14   Q    You testified about items you recovered from a garbage

15   can in Canarsie Park, correct?

16   A    Yes, ma'am.

17   Q    And that garbage can was close to where Brandy Odom's

18   body was found?

19   A    No, ma'am.

20             We were just called to respond to a location.  We

21   had no idea where the body was recovered from.

22   Q    Okay.  But the garbage can was close to Seaview Avenue,

23   correct?

24   A    Correct.

25   Q    Close to the main entrance to Canarsie Park?

1    A    Yes, ma'am.

2    Q    And as apart of that collection, you recovered eight

3    serrated SAWZALL blades?

4    A    Yes, sir.

5    Q    You also collected an owner's manual from a DEWALT

6    SAWZALL saw?

7    A    Yes, ma'am.

8    Q    And it was also noted that a number of these items found

9    in this garbage can were noted as having possible bloodstains?

10   A    Yes, ma'am.

11   Q    You also testified that you used a number of forensic

12   tools on the Nissan Maxima?

13   A    Yes, ma'am.

14   Q    And they were all -- they all yielded negative results,

15   correct?

16   A    Correct, ma'am.

17   Q    And there's no report that you prepared in April of 2018

18   or at any time that indicates that you remembered spelling

19   pine oil inside of the trunk of the car, correct?

20   A    Yes, ma'am.

21           MS. THIELE:  Nothing else, Your Honor.

22           THE COURT:  Okay.  Anything else on redirect?

23           MR. PALACIO:  Just briefly, Your Honor.

24           (Continued on the next page.)

25

1   REDIRECT EXAMINATION

2   BY MR. PALACIO:

3   Q    Detective Velez, defense counsel asked you questions

4   about observing our smelling the smell of pine oil in the

5   trunk.

6             Do you remember that question?

7   A    Yes, sir.

8   Q    Did you document that in your original notes?

9   A    Yes, I did.

10  Q    And that was documented at or around the time that you

11  processed this Nissan Maxima in the forensic garage?

12  A    Correct.

13            MR. PALACIO:  Okay.  Nothing further.

14            THE COURT:  Anything else?

15            MS. THIELE:  No, Your Honor.

16            THE COURT:  Okay.  Thank you so much, Detective.

17            You can step down.

18            Next witness.

19            MS. DEAN:  The Government calls Kathleen Mitterway.

20            (The witness steps down.)

21            (The witness takes the stand.)

22            THE COURTROOM DEPUTY:  Raise your right hand for me,

23  please.

24            THE WITNESS:  Yes.

25            (The witness was sworn and/or affirmed in by the

1  courtroom deputy.)

2           THE WITNESS:  I do.

3           THE COURTROOM DEPUTY:  Please state and spell your

4  name, for the record.

5           THE WITNESS:  Kathleen Mitterway.  It's

6  K-A-T-H-L-E-E-N, Mitterway, M-I-T-T-E-R-W-A-Y.

7           THE COURT:  All right.  Ms. Mitterway, good

8  afternoon.

9           I just want to make sure everyone can hear you.  So

10 the chair doesn't move, but the microphone does, so you can

11 move it a little bit closer.

12          THE WITNESS:  Okay.

13          THE COURT:  Also, just make sure that you don't

14 speak too quickly.  Our court reporter takes down everything

15 that you say, and I don't want him to quit, so just make sure

16 you speak slowly.

17          If there's a question that you don't understand,

18 just let me know, and I'll have the lawyers rephrase, okay.

19          THE WITNESS:  Thank you.

20          THE COURT:  All right.  Go ahead.

21          MS. DEAN:  Before I begin, the Government moves

22 Government's 129A through C, 130, and 131A through F into

23 evidence.  129A through C is certified records from JP Morgan

24 Chase, 130 is certified records from Queens County Court, and

25 131A through F is certified records from Shellpoint Financial.

1          THE COURT:  All right.  Any objection?

2          MS. THIELE:  No objection.

3          THE COURT:  All right.  Those are in evidence.

4          (Government Exhibits 129A through C, 130, and 131A

5   through F, were received in evidence.)

6   **KATHLEEN MITTERWAY**,

7               called by the Government, having been

8               first duly sworn, was examined and testified

9               as follows:

10  DIRECT EXAMINATION

11  BY MS. DEAN:

12  Q    Good afternoon, Ms. Mitterway.

13  A    Yes.  Good afternoon.

14  Q    Where do you work?

15  A    I work at the Federal Bureau of Investigation.

16  Q    How long have you been there?

17  A    I've been there two years.

18  Q    Tell us what your role is there.

19  A    I'm a forensic accountant.

20  Q    Are you with a particular unit or squad?

21  A    I support six squads in the Criminal Investigative

22  Division in Violent Crimes.

23  Q    What do you do as a forensic accountant with the FBI?

24  A    So as a forensic accountant, I utilize my accounting and

25  auditing skills to investigate and review financial records

1  for criminal proceedings.

2  Q    Could you tell us your education?

3  A    I have a bachelor of science in accounting from Saint

4  John's University, I have a master's in business and

5  management from Saint John's University.

6  Q    And can you summarize for us your background and training

7  in your particular field prior to joining the FBI?

8  A    Well, so for over 30 years, I worked in the corporate

9  sector for Verizon in internal auditing, and in state and

10 local government in the Long Island Power Authority as the

11 chief audit executive, and in the town of North Hempstead as

12 the comptroller.

13 Q    Do you have any certifications in your field?

14 A    Yes.  I am a certified public accountant, I'm a certified

15 forensic examiner, I'm a certified internal auditor, and I'm a

16 certified information systems auditor.

17 Q    What, if any, training did you receive when you joined

18 the FBI?

19 A    When I joined the FBI, I went to FACTS training.  So that

20 stands for Forensic Accountant Core Training Session, and

21 that's a five-week program in Quantico, Virginia, and that

22 consists of an overview of the FBI's processes and systems and

23 the financial investigation techniques.

24 Q    Can you tell the jury what types of things you do for the

25 FBI?

1  A    I review financial records, bank statements.  We also

2  look at, for example, some person-to-person records, financial

3  records, for example, Zelle, Venmo, CashApp, and anything

4  doing with the financial records.

5  Q    Did there come a time when you were asked to look at

6  financial records from financial institutions related to the

7  investigation into the homicide of Brandy Odom?

8  A    Yes.

9  Q    What year did you do that?

10  A    In 2024.

11  Q    What company's records were you asked to take a look?

12  A    JP Morgan Chase, Seterus and Shellpoint Mortgage

13  Services.

14  Q    What were these records about, generally?

15  A    About the foreclosure of a property.

16  Q    And what property is that?

17  A    This was the property located at -- located in Rosedale

18  Queens at 148th Road.

19        MS. DEAN:  And if we could pull up Government

20  Exhibit Government's 129A, Page 5.

21  Q    I'm going to ask you to look at some photographs from the

22  records you reviewed.

23        Does this refresh your recollection regarding the

24  exact address of the property on 148th Road?

25  A    Yes, it does.  It's 249-45 148th Road, Rosedale Queens.

1  Q    And you mentioned that these records were all about the

2  foreclosure on this property?

3  A    Yes.

4  Q    What does that mean?

5  A    A foreclosure is the legal proceeding where the owner

6  forfeits its rights to the property based on the inability to

7  make the monthly mortgage payments.

8         MS. DEAN:  Can we scroll down this page so that we

9  can see the photographs on it.

10 Q    Are these photos of the property at issue in these

11 records?

12 A    Yes.

13 Q    Does Page 5, the one we're looking at here, have a year

14 at the bottom of it if we keep scrolling?

15 A    Yes, it does.  It's 2015.

16 Q    And you've reviewed Government's 129A through C, 130, and

17 131A through F, right?

18 A    Yes, I did.

19 Q    Fair to say those are just some of the records from a

20 much larger set of records from these financial institutions

21 related to the foreclosure on this property?

22 A    Yes.

23         MS. DEAN:  If we can just look at these pictures for

24 a moment.

25 Q    How many cars are in the driveway here?

1  A    Two.

2  Q    And what colors are the cars?

3  A    There's a black car, and a white car.

4        MS. DEAN:  If we can turn to Page 312.

5        And this is Government's 129A, for the record.

6  Q    Do these records contain the mortgage on the house that

7  was at issue?

8  A    Yes, they do.

9        MS. DEAN:  If we can turn to Page 327, please.

10  Q    Who signed the mortgage on this house?

11  A    Elaine R. Taylor-Martin.

12        MS. DEAN:  If we can turn to Page 328.

13  Q    On what date did Elaine Taylor-Martin sign this mortgage?

14  A    On April 5th, 2006.

15        MS. DEAN:  If we can turn to Page 206, please.

16        And if you can just -- Mr. Rader, if can you make

17  the document a little smaller.  Oh, that works.  Actually,

18  that's perfect.

19  Q    As you're seeing this document scrolling down, do you

20  recognize it?

21  A    Yes.

22  Q    Could you tell us what this document is?

23  A    This document is a letter from Elaine R. Taylor-Martin

24  giving the full power of attorney to her son, Cory Martin.

25  Q    The power of attorney for what, specifically?

1  A    For the property, for the property in Rosedale.

2  Q    And could you actually just read the highlighted sentence

3  there.

4  A    Sure.

5         I, Elaine R. Taylor-Martin, the mortgagor for the

6  property at 249-45 148th Road, Rosedale, New York 11422, am

7  giving full power of attorney to my son, Cory Martin, who also

8  resides at the above address to handle all matters pertaining

9  to the mortgage payments and other transactions for the said

10 property.

11 Q    Who signed this document?

12 A    Elaine R. Taylor-Martin.

13 Q    And who else?

14 A    And Cory Martin.

15 Q    On what date?

16 A    On January 20th, 2015.

17 Q    Underneath the highlighted name, Cory Martin, there's a

18 stamp.

19         Can you tell us about that stamp and what it means?

20 A    That stamp is from a notary public, Jean Marcellos, and

21 what the notary public does is they validate the signatures on

22 the document.

23 Q    And validate them how?

24 A    For their identity.

25 Q    So these identities were confirmed on this document?

1  A    Yes.

2  Q    So do you know from the financial review of the documents

3  in this case from the institutions you described when Elaine

4  Taylor-Martin died?

5  A    February 1st, 2015.

6  Q    Did there come a time after that when Chase or JP Morgan

7  Chase began sending notices to Elaine Taylor-Martin at 249-45

8  148th Road national mortgage was in default?

9  A    Yes.

10  Q    When, approximately, did those notices begin coming?

11  A    In April of 2015.

12  Q    And what does that mean, to default on a mortgage?

13  A    Not paying the mortgage that -- the mortgage when it's

14  due.

15       MS. DEAN:  Could we turn now to Government's 129C,

16  Page 203.

17  Q    What is   the month and year of this mortgage loan

18  statement?

19  A    It's April 16th, 2015.

20       MS. DEAN:  Can we scroll down just a little bit.

21  Q    What does this statement show?

22  A    This statement is showing that there's a missed payment

23  date.  The payment was due April 1st, 2015, and the past due

24  amount is $1,183.1.

25       MS. DEAN:  Can we turn to Page 207, please.

1  Q    Is this statement -- I'm sorry.

2        When is this statement from?

3  A    This statement is dated May 16th, 2015.

4        MS. DEAN:  And can we scroll down a little bit on

5  this statement.

6  Q    What is the notice here under, important notice?

7  A    The notice is saying, you missed one or more payments on

8  your mortgage loan is in default.

9  Q    And what does it say at the bottom of the page under

10 summary of your most recent payments?

11 A    It's saying -- there's two columns.  The first column has

12 the payment due date and the amount remaining due.  So there

13 was a payment due April 1st, 2015, for $1,183.01, and there

14 was a payment due May 1st, 2015, for $1,183.01.

15 Q    Neither were paid?

16 A    Neither were paid.

17 Q    And now, if you see at the bottom of the page where it's

18 highlighted, it says payment due date, and you follow up from

19 there.

20       It's not highlighted, but do you see where it says

21 delinquency status?

22 A    Yes.

23 Q    What does delinquency status mean?

24 A    It means they haven't been making their mortgage

25 payments.

1        MS. DEAN:  Can we turn to Page 19 of this document.

2   Q    What is the date of this letter?

3   A    June 1st, 2015.

4   Q    And what is this letter about?

5   A    It's reminding Elaine Taylor-Martin that the mortgage

6   payment is now 30 days or more past due.

7        MS. DEAN:  And if we can turn to a still on 129C,

8   Page 183 now.

9   Q    And the highlighted line, can you explain that -- tell us

10  what it says, and also explain that to us?

11  A    The highlighted line says, Your mortgage loan will be

12  serviced by Seterus starting July 1st, 2015.

13  Q    What does that mean?

14  A    That means that Seterus, instead of JP Morgan Chase, will

15  be taking care of the mortgage loan starting July 1st. --

16  Q    Sorry, go ahead.  Starting July 1st, when?

17  A    2015.

18  Q    Did the default notices like the ones you've just walked

19  us through here continue throughout 2015?

20  A    Yes.

21  Q    How frequently, approximately?

22  A    Monthly.

23  Q    Were any payments made on the mortgage as far as you can

24  tell from any of the records you reviewed from April 2015,

25  onwards?

1    A     No.

2              MS. DEAN:  If we can look at Government's

3    Exhibit 129A on Page 269.

4    Q    What is the date on this document?

5    A    The date is December 9th, 2015.

6

7              (Continued on the following page.)

1    BY MS. DEAN (continuing):

2    Q    And this is a document from Chase?

3    A    It was a document saying that the foreclosure litigation

4    had been served, had been processed and served.

5    Q    Foreclosure litigation on what property?

6    A    On the property at 249-45 148th Road in Rosedale.

7    Q    And what do you mean it had been "processed and served"

8    in December of 2015?

9    A    The documents had been given to them.

10   Q    So, Chase actually began a legal proceeding in December

11   of 2015 on the property?

12   A    Yes.

13   Q    Do you lose your home if a bank forecloses on it?

14   A    Yes.

15         MS. DEAN:  Can we look now at Page 281, please.

16         And if we can scroll down a bit.  That's perfect.

17   Q    What is this document on Page 281?

18   A    This is a summons and it's a notice to the defendants of

19   the foreclosure action.

20   Q    And when you say "defendants," in this case is it fair to

21   say that one of those is Elaine Taylor-Martin or her estate?

22   A    Yes.

23   Q    And what does it say under "notice"?

24   A    You are in danger of losing your home.

25   Q    If we look at Page 286, the end of this document, can you

1  tell us what the date is on the document?

2  A    December 2, 2015.

3         MS. DEAN:  Can we now turn to Government 131?

4  Q    Well, Government 131 contains records from both Seterus

5  and Shellpoint, right?

6  A    Yes.

7  Q    What was Shellpoint's relationship to this mortgage?

8  A    Shellpoint was the mortgage servicer after Seterus.  They

9  became the mortgage servicer after Seterus.

10 Q    Is it correct to say the documents we're about to look at

11 in Government 131 is some but not all of the records produced

12 by Shellpoint relevant to this foreclosure?

13 A    Yes.

14 Q    And did it include billing statements sent between 2015

15 and 2018 for this property?

16 A    Yes.

17        MS. DEAN:  If we can turn to 131D, please and

18 pull -- it's already up.

19        (Exhibit published to the jury.)

20 Q    What is the date next to "statement date" on this account

21 statement?

22 A    July 15, 2015.

23 Q    What was the payment amount due on the mortgage by this

24 date?

25 A    $5,967.57.

1      MS. DEAN:  Can we scroll to Page 4, please?

2  Q    Did this statement list all of the outstanding payment

3  dates?

4  A    Yes.  It shows that a due date -- starting from April 1,

5  2015, an amount due of $1,183.01, and also for May 1, 2015;

6  June 1, 2015; and July 1, 2015.  The same amount, $1,183.01.

7  Q    I'm going to skip ahead to a statement dated December 16,

8  2015.  That's still Government 131D.

9      By December 15, what is the amount due on the

10  mortgage?

11  A    $11,956.69.

12  Q    If we can now skip ahead an entire year to December 8 of

13  2016 and move to that billing statement, what is the amount

14  due on this mortgage by the end of December of 2016?

15  A    $37,962.04.

16  Q    So, no payments had been made at this point?

17  A    No payments had been made.

18      MS. DEAN:  Now, if we can go back for just a moment

19  to the December 16, 2015, billing statement and scroll to Page

20  3.

21  Q    Was there a phone number associated with this account in

22  December of 2015?

23  A    Yes.

24  Q    What was that number?

25  A    It was 718-341-2093.

1       MS. DEAN:  Now, if we can turn to the December 2016,
2  statement and if we can scroll to Page 3.
3  Q    Was there a number associated -- a second number now
4  associated with the account in December of 2016?
5  A    Yes.  There's now a work phone and it's 347-779-6108.
6       MS. DEAN:  Can we turn to Government 131E?
7  Q    And we're going to jump ahead a whole year to a December
8  2017 billing statement.
9       (Exhibit published to the jury.)
10 Q    What is the date of this statement?
11 A    The date is 12/20/2017.
12 Q    And is the mortgage still unpaid by this time?
13 A    Yes.
14 Q    What does it say next to "reinstatement amount" on this
15 mortgage statement from Shellpoint?
16 A    It's $60,050.19.
17 Q    And what does "reinstatement amount" mean?
18 A    That would be the amount that would have to be paid in
19 order to reinstate the mortgage to get the mortgage back in
20 action.
21      MS. DEAN:  And if we can now turn to January 19,
22 2018.
23 Q    Did Shellpoint send an additional mortgage statement in
24 January of '18?
25 A    Yes.

1    Q    What was the reinstatement amount by then?

2    A    $62,158.61.

3    Q    So, that is the amount of money it would have taken to

4    keep the home at 249-45 148th Road by January of 2018?

5    A    Yes.

6    Q    Was 249-45 148th Road foreclosed on?

7    A    Yes.

8              MS. DEAN:  If we can take a look now at Government

9    131A.

10             (Exhibit published to the jury.)

11   Q    What is this document?

12   A    This is the judgment of foreclosure and sale.  So, this

13   is the document -- this is the foreclosure.

14   Q    And this gets filed in court?

15   A    Yes.

16   Q    What is the date that this judgment of foreclosure and

17   sale was filed in Queens County Supreme Court?

18   A    I think -- I don't see it.

19             MS. DEAN:  Mr. Rader, if you could scroll down,

20   please.

21   A    It was filed and recorded on June 12, 2018.

22   Q    Based on your review of records from the financial

23   institutions we've been discussing, between 2015, when Chase

24   sent its first late notice, until June 2018, when the house

25   was foreclosed on and this judgment was filed, were any of the

1   overdue payments on this mortgage ever made by Cory Martin?

2   A    No.

3   Q    Were any of the overdue payments ever made at all?

4   A    No.

5   Q    What happened to this house after the judgment of

6   foreclosure?

7   A    It was sold.

8             MS. DEAN:  Can we turn to 131C?

9             (Exhibit published to the jury.)

10  Q    Was there a specific kind of sale?

11  A    A short sale.

12  Q    Can you explain to us what that means?

13  A    A short sale is where the mortgage company -- the house

14  is sold for less than is owed on the mortgage.

15  Q    Is this document, 131C, related to that short sale of the

16  property?

17  A    Yes.

18            MS. DEAN:  If we can scroll down to Page 2, please.

19  Q    Who was the buyer?

20  A    Eleventh Hour Holdings, Inc.

21  Q    Who was the seller?

22  A    The seller was Elaine R. Taylor-Martin.

23  Q    Fair to say that was her estate?

24  A    Estate, yes.

25  Q    What was the date of the sale?

1    A    I think it was --

2         MS. DEAN:  We can actually scroll down this

3    document.

4    A    November 30, 2018.

5         MS. DEAN:  Mr. Rader, could you highlight the name

6    above "seller signature"?

7    Q    Who was the seller?

8    A    Brenton Taylor.

9    Q    What does it say under the signature Brenton Taylor?

10   A    As administrator.

11        MS. DEAN:  If we could turn now to Government 130.

12        (Exhibit published to the jury.)

13        MS. DEAN:  And could we scroll to Page 2, please?

14   Q    Is this the same judgment of foreclosure and sale that we

15   were just discussing a few minutes ago from the Queens County

16   Supreme Court?

17   A    Yes.

18   Q    Does it list Elaine Taylor-Martin's date of death in the

19   case caption about halfway down?

20   A    Yes.  It says:  Elaine Taylor-Martin, who was born in

21   1947 and died on February 1, 2015.

22        MS. DEAN:  Can we turn to Page 14, please.

23   Q    Does this document list Cory Martin or someone else as

24   heir at law and next of kin of Elaine Taylor-Martin?

25   A    This document lists Brenton Taylor as heir at law and

1   next of kin of Elaine R. Taylor-Martin.

2   Q    So, not Cory Martin.

3   A    Not Cory Martin.

4             MS. DEAN:  I have no further questions.

5             THE COURT:  Any cross-examination?

6             MS. THIELE:  One moment, your Honor.

7             (Pause in proceedings.)

8             MS. THIELE:  No questions, your Honor.

9             THE COURT:  Thank you so much.  You can step down.

10            (Witness excused.)

11            THE COURT:  Do you have another witness?

12            MS. DEAN:  No, your Honor, that's all for the day.

13            THE COURT:  Pretty good.

14            So, let me see the parties at the side.  I want to

15   get an idea what we're doing tomorrow.

16            (Discussion off the record.)

17            THE COURT:  I just was talking to the parties about

18   scheduling and we're on a good path.  I'm not going to give

19   you specifics because I don't want to jinx it, but we are

20   moving along at a good pace.

21            So, I'm going to excuse you for the evening, I will

22   see all of you tomorrow, and please don't talk about the case,

23   don't look anything up, but have a good night.  I'll see you

24   tomorrow.

25            THE COURTROOM DEPUTY:  All rise.

1    (Jury exits.)

2    THE COURT:  Everybody can sit.

3    I think the last thing we have to resolve is this

4  question about the notebooks.  The Government submitted a

5  letter to which I didn't receive a response.

6    Are you still objecting to the admission of those

7  notebooks?

8    MR. CECUTTI:  Yes, we are.

9    THE COURT:  On what basis.

10    MR. CECUTTI:  Based upon 401 and 403.  I can expand

11  upon that as well at this point.

12    THE COURT:  Just to have a balanced record, why

13  don't you give us a summary of why they are relevant and not

14  overly prejudicial?

15    MS. DEAN:  Your Honor, as we stated in the letter

16  the notebooks are relevant for a number of reasons.

17    First, the notebooks are relevant so that the jurors

18  can compare the Defendant's handwriting to specific

19  handwriting on both the Brandy Odom Globe Life insurance

20  policy itself, where Ms. Anderson noted that the date on the

21  Brandy Odom policy was not written by her and pointed out that

22  it was not her sevens.  These notebooks have multiple

23  reference points of the Defendant's very distinct sevens.

24    Also, on the Western Union money orders, that is

25  another reference point of the sevens, the ones for the Brandy

1   Odom premium payments, a reference point for the sevens and

2   also the Defendant's handwriting where he writes gmail.com.

3   In the Defendant's notebooks, he also writes gmail.com.

4        So, where the defense is certainly arguing that the

5   defendant had no role in the payment or the taking out of

6   these Brandy Odom life insurance policies, his handwriting in

7   the notebooks is extremely relevant to show that he actually

8   did have a part in both the premium payments and the policy

9   application.

10        Beyond that, your Honor, Ms. Anderson testified that

11   his motive for wanting the life insurance money was the payout

12   and specifically what he wanted to do with the money was move

13   to El Paso and buy real estate, that he was actually taking

14   classes to further that goal in real estate.

15        Two of the three notebooks have notes by the

16   Defendant on real estate.  One of them has about 15 pages of

17   notes on buying and selling real estate, indicating that he is

18   taking classes.  This corroborates Ms. Anderson's testimony

19   that it was one of the Defendant's goals to take the money,

20   start over in El Paso, and get involved in buying real estate

21   with his new-found wealth.  This was specifically questioned

22   on cross-examination by the Defendant as well.

23        Additionally, getting into the short story that the

24   Defendant wrote, the short story is really a blend of the

25   Defendant and Ms. Anderson.  In the protagonist of the short

1  story, there are numerous points of corroboration on

2  Ms. Anderson's testimony.

3  Specifically, many of them on areas where she was

4  challenged on cross-examination by the defense.  Everything

5  from the use of the terms "Daddy" and "Baby Girl," which is

6  referenced repeatedly in the story, to the depiction of a

7  protagonist who is both a boxer, as Ms. Anderson testified the

8  Defendant was, and also loses first her father and then her

9  mother and whose house falls into financial despair.

10  THE COURT:  Just so I'm clear, the protagonist is a

11  female but the female experiences things that the Government

12  alleges were going on in the Defendant's life.

13  MS. DEAN:  Yes.

14  Very specifically, your Honor, including one of the

15  scenes where after the funeral of the protagonist's mother,

16  the protagonist returns home, the power has been shut off at

17  the house, the other utilities are shut off at the house.  The

18  protagonist checks the account of the mother's, the deceased

19  mother's, and realizes there's 52 cents in the account and

20  there's no way to make ends meet.

21  This mirrors so specifically what Ms. Anderson

22  described when after the Defendant's mother passed, he had to

23  ask Ms. Anderson and Brandy Odom for assistance turning the

24  lights back on in his house because he had no power.

25  This goes specifically to financial hardship of the

1  Defendant.  It is an exact mirror of the testimony we've

2  heard.

3  Moreover, the witness Ms. Anderson testified as to

4  some of the physical abuse and specifically the rape that she

5  suffered at the hands of the Defendant.  This protagonist, who

6  has many, many mixed qualities of both the Defendant and

7  Ms. Anderson, is raped twice violently in the short story.

8  The defense specifically in cross-examination called

9  Ms. Anderson's account of being raped into question with a

10  series of questions about she claims that she was raped with

11  these objects but she's sending the Defendant sexual text

12  messages.

13  Your Honor, it makes these depictions of the

14  protagonist's rape in the story even more relevant because of

15  the way that she was cross-examined.

16  Additionally, indicating even further how the

17  Defendant drew on Ms. Anderson in the story and his own life,

18  because of the financial hardship after the loss of her

19  parents, the protagonist turns first to stripping and then to

20  prostitution, eventually rising up in her prostitution

21  business to become a sort of madam in charge of other women in

22  the business, which mirrors the role Ms. Anderson explained

23  Mr. Martin wanted her to play, both with respect to Brandy

24  Odom, managing her sex work, and with respect to recruiting

25  other women into prostitution.  That is also another point of

1  corroboration of Ms. Anderson.

2          I think these are the high points, your Honor.

3          To address your question about its probative value

4  versus its prejudicial value --

5          THE COURT:  Well, I think I understand the probative

6  value.  I guess I'm having trouble understanding what's

7  prejudicial about it, unfairly prejudicial?

8          I'll put that question to the defense because it's

9  clearly relevant.  I don't think you're conceding that he

10  wrote the Western Union or filled out the insurance policy

11  application, so it's certainly relevant for that.

12          The entries about taking classes for real estate and

13  that he wanted to move and that he wanted a payout from the

14  insurance policies, there's nothing unfairly prejudicial.  I

15  mean, all of the evidence is prejudicial if it establishes his

16  guilt, but it's not unfair prejudice.

17          Then there's the short story which, as the

18  Government describes, is factually similar to a lot of the

19  testimony that the cooperating witness testified about.  And

20  with respect to some of the details, at least to my mind, the

21  cross-examination of Ms. Anderson tested her credibility on a

22  variety of subjects but included quite specific questions that

23  were designed to call into question her claim that the

24  Defendant raped her.

25          So, I guess I don't think you are disputing that the

1  handwriting evidence is relevant.

2          Are you disputing all of it or...

3          MR. CECUTTI:  Our main focus is the short stories.

4          THE COURT:  Okay.

5          MR. CECUTTI:  And 403 objection.

6          THE COURT:  Okay.

7          MR. CECUTTI:  And we do believe that this is -- the

8  short stories -- and, again, they are stories, they are

9  fictional accounts -- contain information while some of it has

10 some similarities, a significant amount of it is dissimilar.

11         And there are excerpts from the story that were

12 highlighted that describe in significant detail details that

13 were never elicited by Ms. Anderson concerning rape and sexual

14 violence.  So, just stating that she testified to being raped

15 and sexually assaulted by Mr. Martin is one thing, but there

16 needs to be some kind of nexus with respect to details.

17         THE COURT:  Why does there?

18         You suggested by reading what were very graphic

19 texts that a person who sent those texts wouldn't also be

20 raped.  At least that's the way I took it.  I might be

21 interpreting it wrong but that's certainly one interpretation,

22 the cross-examination was designed to undermine that claim

23 that Mr. Martin exercised quite a bit of control over her.

24         MR. CECUTTI:  We absolutely do challenge that and

25 dispute that.

1    THE COURT:  Right.

2    MR. CECUTTI:  But to then allow certain portions of

3  his stories to come in that relate to sexual violence I think

4  crosses the line.  And any probative value is certainly

5  outweighed by the unfair prejudice associated with that.

6        So, I think there needs to be a limit.  And that

7  limit is under 403 with respect to those excerpts of the short

8  story.

9    THE COURT:  So, you're not objecting to any of

10  the -- you're not objecting to the handwriting, you're not

11  objecting to the thing about taking real estate classes.

12        Correct so far?

13    MR. CECUTTI:  Correct.

14    THE COURT:  And even some of the things in the

15  stories you're probably not objecting to.  You're simply

16  objecting to the portions that describe the forcible rape of

17  the protagonist.

18        Is that correct?

19    MR. CECUTTI:  Yes.

20    THE COURT:  I haven't seen them.  I suppose I have

21  to look at them before I can make a decision about it, but it

22  sounds to me like the point of dispute is pretty limited right

23  now.  It's limited to these descriptions.

24        How many incidences are described in the writings?

25    MS. DEAN:  There are two instances of forcible rape.

1        The Government's proposal also, which is why we

2   color coded what we sent over to your Honor --

3        THE COURT:  You already sent it to me and I didn't

4   look at it yet?

5        MS. DEAN:  Yes, through USAFX.  It was on Sunday.

6        THE COURT:  All right.

7        MS. DEAN:  But the color coding actually is meant to

8   indicate the Government's proposal for how we would streamline

9   this; pink being something that the agent would summarize,

10  yellow being something that the agent would read or show

11  verbatim.

12        There's almost no yellow.

13        THE COURT:  Here's another question, though.  If

14  everything is coming in, obviously if the jury wants to look

15  at it, they can look at it.

16        So, that's my question:  Is there a way that -- I

17  don't know the extent to which you've tried to reach some kind

18  of an accommodation which might be more efficient than -- I'll

19  look at it as well, but I'm going to suggest that on these

20  topics, that if there's a way you can reach an accommodation

21  about it, you should try to do that.

22        Otherwise, I'll make the decision.  I'm not going to

23  make it now because I haven't looked at them yet.

24        MS. DEAN:  I think I'm understanding correctly that

25  the only issue is these two rape scenes?

1    THE COURT:  Sounds like it.

2    MR. CECUTTI:  Not quite.

3    THE COURT:  I fast talked you there, right?

4    MR. CECUTTI:  I got boxed into a bit of a corner and

5  I'm stepping out a little bit.

6         There's a lot of references to drugs.  I would

7  categorize the Government's highlights to be sex, violence,

8  and drugs, if I could put it in one bucket.

9         And I think what's important is that these are

10  stories.  Yes, we acknowledge that there are some

11  similarities, but there is a large portion that is not, that

12  is dissimilar.  And this is an individual who is writing

13  stories and these are quite common stories out of urban

14  fiction.

15         THE COURT:  You're not analogizing this to the rap

16  lyrics, though, because it's not the same thing.  It's a great

17  decision, but I don't think it applies here.

18         MR. CECUTTI:  Well, I think there is a comparison

19  here because this is an individual who is writing stories.  It

20  is out of a certain literary genre of urban fiction.  Urban

21  fiction is a well-known literary genre.  And in this genre,

22  there is a lot of writing about sex, violence, and drugs.

23         And, so, this individual is writing about these

24  things.  Yes, there are some similarities, just like any

25  artist will draw from their own personal experiences and

1  write, sing, whatever type of artistic expression they're

2  engaging in.  So I just think that that is an important

3  element of all of this.

4         THE COURT:  But is it your position that any time

5  anybody writes an -- this is different than certain versions

6  of, for example, rap music, where certain topics -- and Judge

7  DeArcy Hall went through a very thorough examination of this

8  and I don't pretend to have done the research that she did.

9         But when you're talking about somebody whose writing

10  something that's autobiographical, I think that's something

11  quite different.  It may be.  I haven't seen it so I'm kind of

12  at a loss here.

13         I'm not really trying to trick you, I'm trying to

14  narrow down what I have to consider because some of this is

15  clearly relevant; the handwriting, the taking the real estate

16  classes, the extent to which the Defendant is drawing on

17  things that happened in his relationship with Adelle Anderson.

18  And some of them may be quite specific.  Again, I don't know

19  what they are.

20         I'm inclined to -- what I would encourage the

21  parties to do is to see what you can really agree on and then

22  redact some of the stuff that doesn't need to be in there.

23  I'm not sure the drug stuff needs to be in there.

24         I take it there's no writing that's similar to the

25  actual crime here.

1    Is there?

2    MS. DEAN:  Yes, your Honor.

3    One of the things that we flagged for your Honor and

4  that is included in our submission is with regard to an

5  individual who gets tied up in the basement of the house and

6  is then murdered.  There is a very specific description of the

7  way in which the evidence of the murder is gotten rid of,

8  which is hiring a trash hauling company to get rid of the

9  evidence.

10    Your Honor, there are other similarities as well.  I

11  could go on.  I agree with your Honor that it is not akin to

12  the -- when the Government moves on admitting rap music at a

13  trial.  I do not think we're in that wheelhouse.

14    However, with Judge DeArcy Hall's opinion, the

15  thrust of that was that it was just not substantially similar,

16  it was too vague.  And here, it is not that.  It is so, so, so

17  specific.  It is specific in so many ways to the way

18  Ms. Anderson testified and the way that certain things were

19  done by the Defendant in this case, even in the commission of

20  the crime, so specific to his background, so specific to who

21  he is, what happened to him, the things that have come out in

22  evidence.

23    And with respect -- I'm certainly happy to work

24  where Mr. Cecutti about a proposal or narrowing the issues

25  with respect to the rape.  The way Ms. Anderson was

1  cross-examined, I think it is absolutely probative and

2  appropriate at this time to show that the Defendant in writing

3  this story, which is autobiographical and features many

4  elements of Ms. Anderson, is describing his protagonist's

5  violent rape.

6          THE COURT:  Like I said, I haven't read it.  So, I

7  have my night's work cut out for me, but I'll take a look at

8  it.  But in the meantime, you should see what areas of

9  agreement you can reach.

10          Is there anything else we have to talk about?

11          I don't think there's any point in saying any more

12  about it.  I have to look at it.

13          So, anything else that we need to discuss?

14          MS. DEAN:  Nothing from us, your Honor.

15          THE COURT:  Mr. Cecutti?

16          MR. CECUTTI:  No, your Honor.

17          THE COURT:  All right.  I'll see everybody tomorrow.

18

19          (Matter adjourned until Wednesday, February 28,

20  2024, at 9:30 a.m.)

21

22

23

24

25

1                    I N D E X

2  WITNESS                                        PAGE

3

   JORDAN ALLAR                                  988
4       DIRECT EXAMINATION BY MR. PALACIO        988
        CROSS-EXAMINATION BY MR. CECUTTI         1018
5  SELIM GULTEKIN                                1024
        DIRECT EXAMINATION BY MS. HAJJAR         1024
6       CROSS-EXAMINATION BY MS. THIELE          1033
   KIMBERLY CENIZAL                              1044
7       CROSS-EXAMINATION BY MS. THIELE          1091
        DIRECT EXAMINATION BY MR. PALACIO        1099
8  HANNAH WHISLER                                1101
        DIRECT EXAMINATION BY MS. DEAN           1101
9  LUKE MORRIS                                   1103
        DIRECT EXAMINATION BY MS. DEAN           1104
10 CYNTHIA RAMIREZ                               1110
        DIRECT EXAMINATION BY MR. PALACIO        1110
11      CROSS-EXAMINATION BY MS. THIELE          1131
        REDIRECT EXAMINATION BY MR. PALACIO      1134
12 JULIE CASALE                                  1136
        DIRECT EXAMINATION BY MS. DEAN           1136
13      CROSS-EXAMINATION BY MS. THIELE          1161
        REDIRECT EXAMINATION BY MS. DEAN         1169
14 ANDREW HOFFMAN                                1172
        DIRECT EXAMINATION BY MR. PALACIO:       1172
15      CROSS-EXAMINATION BY MS. THIELE          1178
   GEORGE VELEZ                                  1182
16      DIRECT EXAMINATION BY MR. PALACIO        1182
        CROSS-EXAMINATION BY MS. THIELE          1206
17      REDIRECT EXAMINATION BY MR. PALACIO      1208
   KATHLEEN MITTERWAY                            1210
18      DIRECT EXAMINATION BY MS. DEAN           1210

19

20

21

22

23

24

25

**E X H I B I T S**

| **EXHIBIT** | **PAGE** |
|---|---|
| Government Exhibits 123-1 to 123-10, 125, 126, and 127 | 993 |
| Government Exhibits 739, 741, and 742 | 1051 |
| Government Exhibits 744 to 788 and 790 to 846 | 1052 |
| Government's Exhibits 988, 989, and 990 | 1089 |
| Government's Exhibits 61-A, B, and C | 1105 |
| Government Exhibits 712 and 713 | 1140 |
| Government Exhibits 714 through 738 | 1143 |
| Government Exhibit 343 | 1156 |
| Government's Exhibits 881 to 906 | 1186 |
| Government Exhibit 360A | 1194 |
| Government Exhibits 360B and 360C | 1196 |
| Government Exhibit 907 | 1200 |
| Government Exhibits 914 and 916 to 1933 | 1201 |
| Government Exhibits 129A through C, 130, and 131A through F | 1210 |