```
 1    UNITED STATES DISTRICT COURT
      EASTERN DISTRICT OF NEW YORK
 2    -------------------------------x
                                         20-CR-549(AMD)
 3    UNITED STATES OF AMERICA
                                         United States Courthouse
 4                                       Brooklyn, New York
                -against-
 5                                       March 1, 2024
                                         9:30 a.m.
 6    CORY MARTIN,

 7              Defendant.
      -------------------------------x
 8
                   TRANSCRIPT OF CRIMINAL CAUSE FOR TRIAL
 9               BEFORE THE HONORABLE ANN M. DONNELLY
                     UNITED STATES DISTRICT JUDGE
10                        BEFORE A JURY

11    APPEARANCES

12    For the Government:      UNITED STATES ATTORNEY'S OFFICE
                               Eastern District of New York
13                             271 Cadman Plaza East
                               Brooklyn, New York 11201
14                             BY:  EMILY J. DEAN, ESQ.
                                    TANYA HAJJAR, ESQ.
15                                  ANDRES PALACIO, ESQ.
                               Assistant United States Attorneys
16
      For the Defendant:       LAW OFFICE OF ANTHONY CECUTTI
17                             217 Broadway - Suite 707
                               New York, New York 10007
18                             BY:  ANTHONY CECUTTI, ESQ.

19                             KESTINE THIELE, ESQ.
                               305 Broadway- Suite 700
20                             New York, New York 10007
                               BY:  KESTINE THIELE, ESQ.
21

22    Court Reporter:          LINDA D. DANELCZYK, RPR, CSR, CCR
                               Phone:  718-613-2330
23                             Fax:    718-804-2712
                               Email:  LindaDan226@gmail.com
24
      Proceedings recorded by mechanical stenography.  Transcript
25    produced by computer-aided transcription.
```

*LINDA D. DANELCZYK, RPR, CSR, CCR*
Official Court Reporter

1              (In open court; Jury not present.)

2         THE COURTROOM DEPUTY:  All rise.

3         THE COURT:  Hi.  Everybody can be seated.

4              (Defendant enters the courtroom.)

5         THE COURT:  Okay, good morning, everybody.  I think

6    we're ready to get going.

7              Anything before we start?

8         MS. DEAN:  No, Your Honor.

9         MR. CECUTTI:  No, Your Honor.

10        THE COURT:  Okay.

11             Let's get the jurors.

12        THE COURTROOM DEPUTY:  All rise.

13             (Jury enters the courtroom.)

14        THE COURTROOM DEPUTY:  You may be seated.

15        THE COURT:  Good morning, everybody.

16             As I told you yesterday, we're moving on to the next

17   phase of the trial, and this is the part of the trial where

18   the lawyers have the opportunity to address you in closing

19   arguments.

20             Under our system, the prosecutor goes first, then

21   the defense counsel, and then the prosecutor has another

22   chance to address you.

23             Keep in mind during the course of these arguments,

24   as I told you at the beginning of the trial, what any lawyer

25   says during the course of a summation or for that matter at

1    any point during the trial is not evidence.  And it's your

2    recollection of the facts that controls.

3            But this is the lawyers' opportunity to talk about

4    the evidence and to suggest to you some reasonable inferences

5    that you can draw from it.

6            So we'll begin with the closing argument from the

7    government.

8            Ms. Hajjar?

9            MS. HAJJAR:  Thank you, Your Honor.

10           MS. HAJJAR:  Good morning.  Brandy Odom was 26 years

11   old when the defendant strangled her.  She spent the last

12   moments of her life being choked to death in her bedroom by a

13   man she lived with, by a man she worked for, and a man she

14   trusted.

15           You have seen and heard evidence that the defendant

16   made money from Brandy Odom's body while she worked for him as

17   a sex worker.  And you have also seen and heard the evidence

18   proven that he murdered her in the hope of a payout.  He tried

19   to profit from her murder.

20           The defendant came up with a scheme to make, in his

21   words, "easy money".  He and Adelle Anderson fraudulently

22   applied for insurance policies on Brandy Odom.  One for

23   $50,000 and one for $150,000.  And then the defendant killed

24   Brandy and tried to collect on those policies.

25           You have heard how the defendant put her body in the

bathtub and over the course of a few days cut her body into

pieces.  He used different tools to sever her bones on the

arms and at the legs.  And when he wasn't able to break

through the bone, he bought an electric saw to finish the job.

And then he and Adelle Anderson dumped Brandy Odom's body

parts in Canarsie Park, as if she were trash.

          The defendant tried to make his money off of Brandy

Odom dead or alive.  And now it's time to hold the defendant

accountable for this murder.

          Over the past two weeks, the government has

introduced many different types of evidence to demonstrate

what happened to Brandy in the weeks and months before her

death.  You saw the insurance policies, the text messages, the

surveillance video, the cell phone location records, the DNA

evidence, and the searches from the defendant's own phone.

          You have heard from Samson Alabi, the man the

defendant tried to recruit into this murder-for-hire scheme.

And you heard from Adelle Anderson, the defendant's

co-conspirator who told you in detail about the defendant's

plot murder Brandy Odom for the insurance money.  She told

what you happened before and after the murder, about how the

defendant killed Brandy and how he tried to collect on the

insurance policies.

          This morning I'm going to talk through some of the

evidence that's been presented through the course of this

1    trial.  And I'll explain how the evidence fits together, how

2    it demonstrates beyond a reasonable doubt that the defendant

3    Cory Martin is guilty of the crimes charged.

4              But before I do that, I want to thank you, thank you

5    for your careful attention over the past two weeks.  And,

6    remember, as you listen to the arguments today, remember, the

7    jury, you are the finders of fact.  As you deliberate, you can

8    ask for any of the evidence that's cited in summation, any of

9    the transcripts from the trial.  So I will try to specifically

10   reference government exhibit numbers or transcript pages from

11   any quotations that I reference.  And you may ask for that

12   evidence as you deliberate.

13             Now as you heard at the beginning of this trial, the

14   defendant is charged with five counts.  Murder for hire.

15   Murder for hire conspiracy.  Wire fraud conspiracy.

16   Aggravated identity theft.  And fraudulent use of

17   identification.  And I'm going to address Counts One and Two

18   together because they both relate to murder for hire.

19             Now the name "murder for hire" may make you think of

20   a professional hitman or assassin, but Judge Donnelly will

21   instruct you on the actual legal elements of this charge.  And

22   it's quite simple.  I don't expect the word "assassin" or

23   "hitman" to come up.

24             Now if anything I say differs in any way from what

25   Judge Donnelly instructs you, you should, of course, follow

1   the Judge's instruction, but I expect that she will tell you

2   that the government must prove three things to prove the

3   defendant guilty of murder for hire.

4           The first is the defendant either used or caused

5   someone else to use a facility of interstate commerce; a

6   telephone, internet, or the U.S. mail.

7           Second, that the use of the facility of interstate

8   commerce was done with the intent that a murder be committed.

9           And third, that the intended murder was to be

10  committed as consideration for receiving anything of pecuniary

11  value.  Those are the elements for Count One.

12          Now for Count Two, I expect that Judge Donnelly will

13  tell you that a conspiracy is a legal term for unlawful

14  agreement between two or more people.  And to prove the

15  conspiracy charged in Count Two, the government must prove:

16          First that two or more persons knowingly and

17  willfully conspired or agreed to commit an unlawful act.  Here

18  the murder for hire of Brandy Odom.  And second, that the

19  defendant knowingly and willfully joined in the conspiracy.

20          So starting with the first element of murder for

21  hire that a defendant used or caused someone else to use a

22  facility of interstate commerce.

23          And I expect that Judge Donnelly will instruct you

24  that a facility of interstate commerce simply means

25  transportation or communication that is capable of crossing

1    state lines.  That includes phone calls, text messages, the

2    use of internet and U.S. mail.

3            And throughout this trial, you have seen hundreds of

4    examples in which the defendant and Adelle Anderson used their

5    cell phones, including text messages, phone calls and the

6    internet to communicate regarding this insurance murder plot.

7            You heard the insurance policies in this case were

8    transmitted by mail and by the internet.

9            And Special Agent Busick testified that the cell

10   phones used in this case, which were all serviced by major

11   provides, were capable of placing calls between states and, of

12   course, you saw they were connected to the internet as well.

13           And you saw the insurance policies that were taken

14   out on Brandy Odom's life -- on Brandy Odom's life before her

15   murder in April 2018.  You say Government Exhibit 120, the

16   policy on Brandy with Globe Life Insurance for $50,000, with

17   Adelle Anderson as the beneficiary.  That's Government

18   Exhibit 120.  And you saw Government Exhibit 122, that's the

19   policy on Brandy with American National Life Insurance for

20   $150,000.

21           And the evidence is overwhelming that the defendant

22   and Adelle Anderson used telephones and the internet to obtain

23   these policies, and to communicate about them.

24           You saw a list of some of these calls to both life

25   insurance in Government Exhibit 116, and you've listened to

1   some of these calls earlier this week.

2           You heard the calls in which Adelle Anderson called

3   customer service pretending to be Brandy Odom, in which she

4   provided Brandy's identifying information, included her

5   birthdate and her Social Security number.  You saw example

6   after example of that, including in Government Exhibit 115E.

7           As you saw on this call and on others, Adelle

8   Anderson called into Globe Life pretended be Brandy Odom and

9   provided Brandy's identifying information over the phone.  And

10  you heard how this policy, Government Exhibit 120, was sent

11  via U.S. mail to Globe Life Insurance.

12          You saw the same things for the calls to American

13  National.  Adelle Anderson called American National on

14  January 24th, 2018 pretending be to be Brandy Odom and asking

15  to update her beneficiary information.  She provided Brandy's

16  true date of birth, January 8th, 1992, and her Social Security

17  number.  And that's Government Exhibit 122A.

18          And that policy, we know, corresponded to the

19  150,000-dollar insurance policy that the defendant and Adelle

20  Anderson obtained in Brandy Odom's name with American National

21  that was sent electronically to an agent and then sent

22  electronically to American National.

23          Now I don't expect there to be any serious dispute

24  that Adelle Anderson used a facility of interstate commerce in

25  order to obtain the life insurance policy in Brandy Odom's

1    name.  But the evidence also overwhelming shows that it was

2    the defendant who was at the heart of this insurance murder

3    plot.  This murder was long in the planning, and long in the

4    preparation, and it all started with the defendant.

5          The evidence in the case shows the defendant was

6    interested in life insurance, and a life insurance murder scam

7    all the way back in July 2016, nearly two years before he

8    murdered Brandy Odom.  Globe Life told you that the earliest

9    inquiry they received as part of this case was a Tory Martin

10   with phone 847-799-6108.

11         Now the Globe Life representative, Blythe Bradley,

12   explained to you that the reason there are two inquires, and

13   the fact that this inquiry shows up twice in Globe Life

14   records reflect that this caller asked for a juvenile and an

15   adult policy, two insurance policy applications.

16         Now the customer service representative wrote down

17   "Tory" not "Cory," but I submit it's clear as day that this is

18   the defendant.  He provided his address in Rosedale, New York,

19   249-45 148th Road.  And you know this number, the 6108 number,

20   was the defendant's own cell phone number.

21         It is a number associated with three of the phones

22   that we looked at yesterday.  Government Exhibits 400, 401,

23   and 402 that the defendant was clearing using.  As you can see

24   in Government Exhibit 400, the auto-fill function on that

25   phone populates with Cory Martin, his email address,

1    Wayne11422@gmail and his own address.  He's receiving text

2    messages on that phone from other people greeting him with,

3    "Hi, Cory."

4              Same thing for Government Exhibit 402.  The other

5    phone the defendant used.  Multiple text messages sent to that

6    number, the 6108 number, addressing him as "Cory".

7              The 6108 number is also the phone number the

8    defendant provided to Globe Life in connection with his own

9    insurance policy that he applied for to make things look less

10   suspicious.  That's Government Exhibit 121.  And it's the

11   phone number that's associated with the subscriber information

12   of an email address, that Wayne at a Gmail email account.

13             Now you know why the defendant wanted insurance

14   policies for an adult and a juvenile.  At this time, the

15   defendant wanted to take out insurance policies on Adelle

16   Anderson's ex, as well as Anderson's two sons from those

17   relationships.

18             And you saw the Global Life Insurance policies that

19   were taken out in the names of Adelle Anderson's minor

20   children.  And you saw the mistakes that were made on those

21   applications, including the wrong birth date and the wrong

22   middle name for her child.  I submit Adelle Anderson didn't

23   get her own child's birthday wrong.

24             The evidence reflects that those applications on

25   Anderson's children were taken you out by the defendant, and

1   the defendant placed these call in 2016, again, years before

2   Brandy Odom was murdered for insurance proceeds.

3           You saw how months after that, in December of 2016,

4   using the same phone number, that 6108 number, the defendant

5   again called Globe Life Insurance.  And this time he pretended

6   to be Villardouin Villard, Adelle Anderson's ex, whom she

7   called Alex Villard.  And that's Government Exhibit 116.

8           (Audio played; Audio stopped.)

9           MS. HAJJAR:  Now you know this is the defendant, not

10  just because Adelle Anderson identified his voice, but because

11  the caller is clearly not Villardouin Villard.  He doesn't

12  know Villard's date of birth.  And you also know because the

13  phone number that he is using, again it's that 6108 number,

14  the defendant's phone number.

15          And the defendant calls two more times on the same

16  date, December 28th, 2016, once at 11:13 Central Time, and

17  once at 11:17 Central Time or 12:17 p.m. Eastern Time.  And

18  you can see the defendant's phone, Government Exhibit 402,

19  actually contains a record of this call being placed on

20  December 28th, 2016, at 12:12 p.m. Eastern Time to a contact

21  saved in his phone as "F United".

22          You heard Blythe Bradley, the Globe Life Insurance

23  representative, explain that the number there, the

24  (315)451-2544 number is a customer service number that gets

25  routed to a call center in McKinney, Texas.  And that "F

1   United" for First United American Life Insurance, which

2   Ms. Bradley explained, was a previous name for Globe Life

3   Insurance.

4           And you saw the insurance policy that was taken out

5   on Alex Villard without his knowledge.  And you heard how the

6   defendant and Adelle Anderson wanted to murder him for the

7   proceeds.

8           Now as you know, the defendant and Adelle Anderson

9   took out the Globe Life Insurance policy on Brandy Odom in

10  March 2017.  And about two months later, at the end of

11  May 2017, the defendant applied for a Globe Life Insurance

12  policy on himself with Adelle Anderson's son as the insured.

13  And that's Government Exhibit 121.

14          And from all the evidence you have seen and heard in

15  this case, you know this was never a legitimate life insurance

16  policy application.  Ms. Bradley from Globe Life Insurance

17  told you that this insurance policy was never actually even

18  enforced, because no premium payment was ever made on this

19  policy.  This was a fake policy, a decoy policy, and Adelle

20  Anderson told you this was to make the Brandy Odom policy look

21  less suspicious.

22          And you also saw the fake policy the defendant

23  applied for with American National Life Insurance only two

24  weeks before he submitted the Brandy Odom policy.  And you can

25  see the paperwork of this policy also specified that an

1    initial premium is required before the policy can be placed in

2    force.

3            And you saw all the correspondence between Robert

4    Young, the Arizona-based agent from True Blue Life Insurance

5    about the defendant's failure to go ahead with this policy, or

6    to pay the first premium.

7            These are the texts from Government Exhibit 405 from

8    Bob at True Blue Life Insurance.

9            We see he says, "Cory, what's going on with your

10   policy acceptance?  We haven't gotten a delivery receipt or

11   your premium back yet."

12           "Cory, are you going to accept your coverage, please

13   let me know either way.  Thanks.  Bob at True Blue Life."

14           And you saw the defendant receive the cancelation

15   notification from American National dated January 30th, 2018

16   because no premium policy -- no premium payment had been made

17   on the policy.

18           And now that he's seen how it's worked, less than

19   two weeks later, the defendant uses the same agent, Robert

20   Young, Bob at True Blue Life Insurance, to take out a policy

21   on Brandy Odom.  And you can see that Brandy's policy uses the

22   same agent and it's electronically signed just like the

23   defendant's was.

24           Now, the defendant and Adelle Anderson didn't spend

25   a dime on the policies with themselves as insureds.  The only

1  policies they paid for were the insurance policies they

2  expected to collect from.  Policies that they expected to

3  profit from.

4          And you saw that in the payments that the defendant

5  and Anderson made on the Brandy Odom Globe Life Insurance

6  policy.  You saw a payment in the amount of $64.58 made in

7  June 2017 by Western Union money order that was mailed in to

8  Globe Life.  Another 33-dollar payment was made in

9  January 2018, again by Western Union money order, that was

10 mailed in.

11         Now take a look at the payments on the left side of

12 the slide.  You'll see that the handwriting is very different

13 from the handwriting on the money order itself.  And the

14 evidence shows that it's the defendant's handwriting.  You can

15 compare it to the handwriting in the defendant's notebooks

16 that you saw yesterday, Government Exhibit 44.  And you can

17 compare it as well to the date of the Brandy Odom Globe Life

18 policy, the date that Adelle Anderson said was not her

19 handwriting, as well as the way in which the defendant wrote

20 his 7s in the defendant's notebooks that we saw yesterday.

21 They're exactly the same.

22         And there's another payment was made to Globe Life

23 in February 2018.  And you can see from the payments made on

24 the American National Life Insurance policy on Brandy that

25 were debited from her Capital One account in December 2017, as

1    well as January through April of 2018, and that's Government

2    Exhibit 123.

3              Now you know the defendant had access and control

4    over Brandy Odom's Capital One account.  Adelle Anderson

5    testified that he controlled Brandy's money, and you know that

6    the defendant used Brandy's Capital One account to make

7    deposits, and used her card to make deposits and to make

8    withdrawals from her account.  And you saw that in Government

9    Exhibits 125 and 126.

10             You can see the defendant in the still images from

11   the ATM in Rosedale, New York where the defendant made these

12   deposits and withdrawals from Brandy's Capital One account.

13             Adelle Anderson identified the defendant in one of

14   these still photographs.  And she told you this is one of his

15   favorite shirts with Biggie Smalls on it.  And you saw the

16   photograph, Government Exhibit 998, of the defendant and

17   Adelle Anderson together in which he's wearing the exact same

18   shirt.

19             You also saw the many, many text messages that were

20   exchanged between the defendant and Adelle Anderson about the

21   insurance policy murder scheme, and the need to make sure the

22   policies didn't lapse.

23             On December 2nd, 2017, Anderson texted the

24   defendant:  Insurance place closed today.  And that policy is

25   no longer going to be active if you don't try and do something

1    with that bitch this week.

2            And I submit she is telling the defendant if you

3    want to profit off of this murder, you need to kill Brandy

4    Odom before this policy lapses.  And this is Government

5    Exhibit 405, page 110.

6            Now the same day, as we saw yesterday, Anderson

7    texted the defendant:  Send a pic of the Cap One please.  And

8    that's Government Exhibit 405.

9            And a few minutes later, at 2:06 p.m., the defendant

10   text Anderson back:  The photograph?  The photograph of Brandy

11   Odom's Capital One card, both the front and the back.

12           And that's not the first time that Adelle Anderson

13   asks for Brandy's Capital One information.  A few weeks later,

14   on December 21st, 2017, Anderson again texted the defendant:

15   Send Cap One info please.  Take pic of card.

16           The defendant again responds with the same

17   photograph with Brandy Odom's Capital One card.  And he texted

18   Anderson saying:  Save the fucking pic.

19           It's the defendant who's keeping control of Brandy

20   Odom's financial information.  As you heard yesterday, he's

21   the one whose phone captured the photograph of this card, and

22   he's the one with access to this card.  And when he said:

23   Save the pic, I submit it's because he's annoyed that he has

24   to keep sending Adelle Anderson the photograph he's keeping in

25   his phone.

1          Now you saw that at the end of 2017, Globe Life

2    Insurance issued a notice that the Brandy Odom policy was in

3    danger of lapsing.  And a few days later, at 10:38 on

4    December 28th, 2017, the defendant texted Adelle Anderson.  He

5    writes:  Don't forget to call them people.

6          Anderson responds:  Yes, I'm going to do it ASAP.

7    Send me the address again just in case, please.

8          The defendant texts back, at 10:51 a.m.:  Where did

9    you put it?

10         And Anderson responds:  Never mind, I'll ask her.

11         The defendant texts back:  Stop touching and moving

12   shit.

13         And Anderson writes:  It's on a dresser, but I got

14   it, never mind, she told me.

15         Whose dresser?  The defendant and Adelle Anderson's

16   dresser.  And you heard that even after her death, the

17   defendant kept Brandy Odom's Social Security card on his

18   dresser.  You heard from Detective Jean Pierre who told you

19   that he recovered Brandy Odom's Social Security card from the

20   dresser of the defendant's home during the execution of a

21   search warrant on April 28th, 2018.

22         The defendant still had it.  Even after her death,

23   even after the house was thoroughly cleaned, Brandy's Social

24   Security number, her card, was still on his dresser.

25         Now less than an hour after the defendant and

1   Anderson have this exchange about not forgetting to call the

2   insurance company, Adelle Anderson places a call to Globe Life

3   Insurance customer service line pretending to be Brandy Odom.

4   This is at 10:44 Central Time or 11:44 Eastern Standard Time.

5           Now midway through this call, which, again, began at

6   11:44, Eastern Time, Anderson tells the representative that

7   she has a new telephone number and email address.  And at this

8   point, at 11:47 a.m., while she's still on the phone with

9   Globe Life, Adelle Anderson texted the defendant:  What's the

10  email you using for insurance?

11          Now the defendant doesn't respond by text, but I

12  submit he still gives Anderson her answer.  In the middle of

13  an exchange Anderson stops talking and the representative

14  says:  Hello?  And you can hear some crackling on the line.

15  And Anderson then quickly changed the subject and says:  No,

16  no, no, I got a new telephone number and email address.

17          (Audio played; Audio stopped.)

18          MS. HAJJAR:  Now you know from Google, Google

19  representative who testified, that BO24@gmail does not exist.

20  It's a completely fake email account.

21          And so when Anderson texted the defendant:  What's

22  the email you using for insurance?  You know what she's really

23  asking is, what's the fake Brandy Odom email account you're

24  using for the insurance, and the defendant provides that

25  information in person while Adelle Anderson is on the phone

1   with the company.

2           The defendant and Adelle Anderson got these life

3   insurance policies out on Brandy Odom's life using fake email

4   addresses.  They pretended Adelle Anderson was Brandy's

5   sister, which she's not, and in one of the calls we listened

6   to earlier this week, Anderson actually forgot the fake

7   relative she was supposed to be and told the customer service

8   representative that she was Brandy Odom's cousin.  And that's

9   Government Exhibit 407.

10          And this is just a sampling of the many, many

11  communications shared between the defendant and Adelle

12  Anderson about the Brandy Odom policies.  Their need to pay

13  premiums and the need to keep the policies current.

14          You also saw how the defendant's own phones

15  reflected read and search history and emails related to

16  insurance.  This is on -- this is in Government Exhibit 401.

17  We looked at these yesterday.  You saw searches for True Blue.

18  Searches for Haven Life.

19          More web history related to True Blue and customer

20  reviews.  Some URLs related to American National.  FAQs.  True

21  Blue Life Insurance.  More True Blue Life Insurance.  It goes

22  on.  And then here, you can see that the defendant, even based

23  on the URL, is inserting information about Brandy Odom.  Here

24  look it says birthday, the birth year 1982, January 8th.

25  That's Brandy's birthdate and her -- and it says email.

1    And so he is looking for True Blue quotes for an

2    individual who sent this email, and his birthdate is

3    January 8th, 1992.  That's Brandy's birthday.  He is searching

4    for insurance quotes for Brandy Odom in November of 2017, and,

5    again, that's months and months before her murder in

6    April 2018.

7    Now these are just a few examples of facilities in

8    interstate commerce that were used by the defendant, and used

9    by Adelle Anderson in this murder-for-hire scheme.  It is not

10   an exhaustive list.  You do not need to find the defendant

11   used one of these facilities of interstate commerce himself,

12   although he clearly did, you only need to find that the

13   defendant used a facility of interstate commerce or caused

14   Adelle Anderson to use facility of interstate commerce to

15   commit the murder for hire of Brandy Odom to find this element

16   satisfied.

17   You need to find one piece.  A single phone call.  A

18   single text.  A single internet search.  That's it.  That's

19   enough to satisfy this element.  And you have seen

20   overwhelming evidence that proves the first element of murder

21   for hire.  That the defendant used or caused Adelle Anderson

22   to use a cell phone, the internet, or U.S. mail with the

23   intent of committing the murder of Brandy Odom.

24   And that brings us to the second element.  That the

25   facility of interstate commerce was used with the intent that

1    a murder be committed.  And you've seen and heard all the

2    evidence demonstrating that these phone calls, these text

3    messages, these internet searches, were conducted because the

4    defendant intended to kill Brandy Odom and collect the

5    insurance proceeds.

6            You know this from the text messages exchanged

7    between Adelle Anderson and the defendant about the insurance

8    place being closed and the policy not going to be active if

9    the defendant didn't do something with that bitch.

10           And you heard directly from this murder -- about the

11   murder-for-hire plot from Adelle Anderson.  She told you that

12   she and the defendant planned Brandy's murder and wanted the

13   body to be found so they could collect on the life insurance

14   policies that they had taken out on her.  And this is from the

15   trial transcript at page 233.

16           Can you explain to us the reason that you and the

17   defendant planned Brandy's murder and wanted the body to be

18   found?

19           For insurance money.

20           What kind of insurance?

21           A life insurance policy.

22           And you heard this from Samson Alabi as well.  He

23   testified that defendant tried to recruit him to kill Brandy

24   in exchange for $25,000 for what Samson was told was half the

25   insurance money.

1    Alabi testified:  I went back to the house later on

2  and, well, he finally told me what is to take place.  He said

3  that he had a name.  That we can make quick money.

4    And I asked him what that was about?  He said it

5  was, you know, life insurance he was trying to do.  He had a

6  life insurance policy out on somebody that he had filed for,

7  and to just give him more time and he was going to -- he

8  wanted me, he wanted me to kill the girl.  And that's at the

9  trial transcript at 154.

10    And Alabi also testified that he was going to --

11  supposed to split the money, that he was going to split the

12  insurance money.

13    "QUESTION:  And did he specify how much that

14  was?

15    About $25,000.

16    Was that the full amount or your half?

17    I think that was my half.

18    You can also see that in the text messages between

19  the defendant and Alabi that we looked at yesterday.  Now as

20  early as July 26, 2017, the defendant texted Samson:  I might

21  have a play for, N word, easy work.  In a few months.  Talking

22  like 25K.  And that's Government Exhibit 401 at page 552 --

23  522.

24    Now remember that July 26, 2017 was nine months

25  before Brandy's murder.  At that time, the defendant and

1   Adelle Anderson hadn't taken out that second policy, the

2   policy with American National life insurance.  So the only

3   policy in effect at this time was the Globe Life Insurance

4   policy in an amount of $50,000.  And Anderson told you why the

5   defendant wanted to take out that second policy with American

6   National.  She testified:  Why was the second life insurance

7   policy taken out?

8           He wanted more money because he knew if someone else

9   was going to help him, he would have to pay them as well.  He

10  didn't want it to come out of his cut.

11          What do you mean he didn't want it to come out of

12  his cut?

13          Anderson explained:  He wanted to keep the whole

14  amount of the policies.  So he would keep the first one.  He

15  would keep the one for the higher amount, and use the lower

16  amount to pay the person who helped him.  And that's trial

17  transcript 334.

18          Now, I just want to say a few things about Adelle

19  Anderson and Samson Alabi.  I don't know what the defense

20  attorney is going to argue, but I expect they will do

21  everything they can to try to undermine the testimony of

22  Adelle Anderson and Samson Alabi.  And that's because Adelle

23  Anderson and Samson Alabi provide powerful evidence of the

24  defendant's guilt.

25          Adelle Anderson, as you know, is the defendant's

1    long-time girlfriend, the woman he called "wifey".  The woman

2    he physically and sexually abused for a long period of time.

3    The woman he trusted to commit this murder with him, and to

4    keep her mouth shut.

5             And Samson Alabi is the defendant's long-time friend

6    who spent a lot of time on the defendant's block in Canarsie,

7    who had committed violent crimes in the past, and who sold the

8    defendant the gun.

9             The defendant chose Adelle Anderson and Samson

10   Alabi.  He chose Anderson and conspired with her in a plot to

11   kill Brandy Odom.  And the defendant unsuccessfully tried to

12   recruit Samson Alabi in his murder-for-hire scheme because he

13   believed Alabi would do it, I suspect.

14            You are not being asked to like Adelle Anderson or

15   Samson Alabi.  The question at this trial is whether you

16   believe their testimony about this murder-for-hire plot.

17            So as I summarize some of the evidence about the

18   murder, including the testimony they provided, ask yourself if

19   that testimony is consistent with the other types of evidence

20   that has been presented at this trial.

21            And you saw the evidence come in at different times.

22   You saw cell phone location evidence.  You saw the text

23   messages yesterday.  You saw the video surveillance

24   compilation.  You heard the testimony.

25            I'd like to put those pieces together now to show

 1    you how the evidence proves beyond a reasonable doubt the

 2    defendant intended to commit and did commit the murder of

 3    Brandy Odom.  And to do that, we need to look at the evidence

 4    of the last days of Brandy's life, starting on April 2nd,

 5    2018.

 6              Now at this time, as you know, Brandy Odom was

 7    working as a sex worker for the defendant with Adelle

 8    Anderson.  She was using the Pinger number, the app-based

 9    number (929)357-7056.

10              Now Nicole Odom, Brandy's mother, told you the last

11    two numbers that Brandy was using before her death, that one

12    of those numbers wasn't in use any more, and the other number,

13    ending in 7437, was barely being used by the end of March.

14              Special Agent Busick told you, though, that nearly

15    every single time that number connected to the network, it

16    connected to a cell site by the defendant's house in Rosedale,

17    New York.  And that's consistent with what Adelle told you as

18    well.  Anderson told you the defendant had cut off Brandy's

19    regular phone number because he didn't want anyone to access

20    her in the weeks before her death.  But she continued to use

21    her Pinger number to communicate.

22              And you can see the text messages from April 2nd in

23    Government Exhibit 309, which was exchanged between Brandy

24    Odom and Adelle Anderson talking about a date with a regular

25    client of Brandy's, whose name is Jeff.

1        Now you know that Adelle Anderson was using this

2   TextNow number.  That's the number subscribed with her email

3   address that frequently messaged about dates with Brandy.

4   That's Government Exhibit 302.

5        Brandy's Pinger number, the 7056 number, is

6   subscribed in the name Brandy Odom.  And remember what Samuel

7   Lemus told you earlier this week, that this is one of the

8   numbers that he texted with Brandy with.

9        And you can see this date with Jeff on the video

10  surveillance footage compilation that Detective Santiago put

11  together.  And that's Government Exhibit 112.

12       At 11:37 a.m., you can see a male figure approach

13  the house, and seconds later you can see Adelle Anderson text

14  Brandy:  He here.  Again, this is an outgoing text from Adelle

15  Anderson's TextNow number on Government Exhibit 309.

16       At 11:41, Brandy texted Adelle Anderson:  Yes, he

17  here inside.  And then just about 30 minutes later at

18  12:13 p.m. Brandy Odom text her back:  He gone.

19       And you can clearly see this on the video

20  surveillance.  The same figure, Jeff, who had walked into the

21  Rosedale house for a date with Brandy, then walked out a half

22  an hour later right before Brandy text:  He gone.  And this

23  tells you that on April 2nd, 2018, Brandy Odom is alive and

24  Brandy Odom is inside the defendant's Rosedale house.

25       Now Adelle Anderson testified that the last day she

1    made a date for Brandy was the day she went to her mother's

2    house.  She testified:  Just me and Cory, and me and Cory got

3    into an argument because I wasn't supposed to make that date.

4    Because he was trying to stop the foot traffic so he can have

5    the notion to say she wasn't in the house.  So he wanted to

6    stop her coming and going, or anybody coming and going in and

7    out of the house.  And that's trial transcript at 266.

8              Now you can see how the cell site evidence and the

9    video surveillance footage corroborates this testimony because

10   you can see that on the same day the defendant does drop

11   Adelle Anderson off at her mother's house, just as she said

12   that he did.

13

14              (Continued on the following page.)

15

16

17

18

19

20

21

22

23

24

25

1        MS. HAJJAR:  (Continuing) You can see on the cell

2   phone that the cell site maps that Special Agent Busick put

3   together -- and this is Government Exhibit 26 -- before

4   8:00 p.m., both the defendant and Adelle Anderson's phone

5   location data show they're connecting to the same cell site in

6   the vicinity of the defendant's Rosedale house.  Remember that

7   the location of the defendant's phone is indicated in black

8   with the last four digits of the phone number 4723, and Adelle

9   Anderson's phone location data is indicated in blue, last four

10  digits 1072.

11       But, at 7:54 p.m., you can see on the video

12  surveillance footage the Nissan Maxima pulls out of the

13  defendant's driveway in Rosedale and starts driving east

14  toward Adelle Anderson's mother's house in Jamaica, Queens.

15  And you can see that by 9:00 p.m. on April 2nd, 2018, Adelle

16  Anderson's phone is now connecting to cell sites near her

17  mother's house in Jamaica.

18       Now, as you can see on the video surveillance

19  footage, at approximately 9:22 p.m., the defendant drives back

20  to the Rosedale home and pulls into the driveway.  And the

21  cell site evidence shows the same thing.  By 10:04 p.m., the

22  defendant's cell phone is back home with him.  No one else has

23  left the house.  So this means that Brandy is in the house

24  alone with the defendant on the night of April 2nd.

25       Now, on April 3rd, as you can tell from the cell

1   site location evidence, Martin makes a few trips, the

2   defendant makes a few trips, but Anderson's phone is

3   consistently in the vicinity of her mother's house in Jamaica.

4   And you know from Brandy Odom's Pinger records, again using

5   the 7056 number, that she is still alive.

6          At 11:23 p.m., she sends an electronic message to

7   631-855-0043, which is the number that Andrew Hoffman told you

8   was his number.  And this is the very last outgoing message

9   from Brandy's phone records.  And you can, this is in

10  Government's Exhibit 304C.  Again, this tells you that as of

11  April 3, 2018, Brandy is still alive.

12         Now, on April 4, 2018, you can see from the cell

13  site records that Adelle Anderson is still at her mother's

14  house and the defendant is at home with Brandy alone.

15         Now, on the video surveillance footage -- again,

16  this is Government Exhibit 112 -- at approximately 4:40 p.m.

17  on April 4th, you can see a larger figure and a smaller figure

18  walk out of the defendant's Rosedale home and turn a corner.

19  And you know from the testimony and the evidence you've seen,

20  the defendant is 5-11 and Brandy Odom is a slender, small

21  woman.  And you know this isn't Adelle Anderson because if you

22  look at the inset from the cell site map, Adelle Anderson's

23  phone is connected actively to cell sites at her mother's

24  house consistently between 12:00 a.m. and 11:00 p.m. on

25  April 4th, 2018.

1       This, I submit, is the defendant and Brandy Odom.

2  This is the last time you can see Brandy alive.

3       About 41 minutes later, the defendant and Brandy

4  return, and this time you can see the smaller figure, Brandy,

5  holding white bags as they re-enter the home.  And Adelle

6  Anderson testified there were several stores within walking

7  distance of the defendant's Rosedale home.  She said there

8  were two corner stores, a Walgreens and a bar, and that's at

9  trial transcript 470.

10       And you can see this very trip reflected in the cell

11  site records too, because between 8:00 a.m. and 3:18 p.m., the

12  defendant is connecting consistently to cell site by his

13  Rosedale home, but by 5:18 p.m., the defendant's cell phone

14  connects to a different sector, still in the vicinity of his

15  residence but that's consistent with him taking that 40-minute

16  walk with Brandy.  And by 5:35 p.m., the defendant's phone

17  returns to its original location at his home and it stays

18  there for the rest of the night.

19       Now, at this time, while the defendant is at his

20  home, the cell site location data reflects that Anderson is

21  still at her mother's house, and you know that because her

22  cell phone is connecting in the vicinity of her mother's house

23  and because the defendant and Adelle Anderson exchange a

24  flurry of text messages all night, between 10:30 p.m. to

25  11:00 p.m.  You can see in the phone records that this is a

1   significant change from the prior few nights, when there are

2   just a few contacts between those two phones.

3          And that's also consistent with what Adelle Anderson

4   told you.  She told you that when she went to her mother's

5   house, she knew that Brandy was going to be killed and the

6   defendant told her not to contact him during that time.

7   That's at trial transcript 371.

8          But Anderson also told you that there came a time

9   when she was at her mother's home and the defendant told her

10  that Brandy had been murdered.  The defendant texted, "I got

11  the pair of black Uggs for you."  And Anderson testified that

12  she understood by that text that it was done, "because he told

13  me that he was going to reference the Uggs after it, after he

14  killed her, when we were discussing a code word, and that's

15  what he chose to say.  So I knew that he had killed her."  And

16  that's trial transcript 373.

17         Now, Anderson also explained how this code came

18  about.  She told you that one Christmas the defendant told her

19  to give Brandy one of her black Uggs, which she didn't want to

20  do, and the defendant told her you are going to give her your

21  boots and you are going to get them back.  And that's what

22  that code meant.  That's why she understood from that text

23  that Brandy was dead.  And she also told you that when she got

24  that text, she thought oh, shit, he really did it.

25         Now, remember that the defendant and Anderson got

1    rid of their phones after the murder.  So you can't see the

2    content of the text messages during this time frame.  And you

3    know this because Adelle Anderson told you, but you also know

4    this because Ms. Hwang told you that she compared the IMEI to

5    the devices in the phone records reflected here and she

6    compared them to IMEI for every device recovered in this case

7    and the IMEIs didn't match.

8            So the text messages themselves are gone.  So you

9    can see the defendant and Adelle Anderson exchanging these

10   rapid-fire text messages back and forth on April 4, 2018, the

11   night before the defendant picks up Anderson from her mother's

12   house.

13           Now, by early afternoon on April 5th, 2018, Adelle

14   Anderson is still at her mother's house.  You can see that in

15   the cell site records.  And the defendant is at home, working

16   on his car.  And you know what he's doing to his car.  Adelle

17   Anderson told you that she had gotten into a fender bender and

18   that, as a result, the bumper of the Nissan Maxima was

19   dragging and hanging as she described it; and that's at

20   page 357 of the trial transcript.

21           She testified the defendant said he needed to fix up

22   his car so there wouldn't be any issues.  He didn't want his

23   car to stick out in any way.  And you know why he didn't want

24   his car to stick out in any way, because Brandy Odom was

25   already dead, and the defendant was planning how he was going

1   to get her body out of the house.

2           Now, at approximately 7:17 p.m. on April 5th, 2018,

3   the defendant left his Rosedale home and starts driving east

4   towards Anderson's mother's home.  And, by 7:00, and by

5   7:34 p.m. his phone connects to a cell site in the vicinity of

6   Anderson's mother's home because he's there to pick her up.

7           He calls Anderson's phone -- that's the 1072 number,

8   and this is the number highlighted on Government Exhibit 26 --

9   and this is exactly consistent with what Adelle Anderson

10  testified to.  She told you that she had spent the past few

11  days at her mother's home with her newborn.  She had a

12  30-day-old baby.

13          And she told you that the defendant called her and

14  told her to come the fuck outside.  I argued with him and told

15  him that me and my sister had plans to go to Red Lobster, and

16  he said if you don't fucking come outside, I'm coming to that

17  door and you know what happens when I come to that door.  So I

18  got me and my daughter dressed and go outside.

19          Ms. Anderson also testified that after that, after

20  he picked her up, they went to Green Acres Mall and went to

21  Walmart and Red Lobster, and this is trial transcript 374 to

22  375.  And you can see from the cell phone location data that,

23  just as she testified, Adelle Anderson and the defendant are

24  both in the vicinity of Walmart at the Green Acres Mall in

25  Valley Stream, New York at approximately 8:00 p.m. on April 5,

1    2018.

2            As you can see from Government Exhibit 132, Adelle

3    Anderson's MCU account records, that there's a record of a

4    transaction for $140.13 at Walmart in Valley Stream, New York,

5    on April 5th.  Anderson told you that she and the defendant

6    bought cleaning supplies and a Shark vacuum to be used in

7    cleaning the house to get rid of evidence from Brandy's

8    murder.

9            And you can see in the video compilation, by

10   11:20 p.m. on April 5th the defendant's Nissan Maxima returns

11   to the defendant's home, and you can see it pull into the

12   driveway.  And you can see quite clearly on the video

13   surveillance compilation that two figures get out of the car,

14   and you know from all the evidence that it's defendant and

15   Adelle Anderson, who's also bringing home their baby.  And the

16   cell site location data shows exactly the same thing.

17           For the first time since April 2nd, the defendant

18   and Adelle Anderson's phones are in the same place at the same

19   time, the vicinity of the defendant's Rosedale home.

20           This is the first time that Adelle Anderson is

21   returning to the defendant's home after Brandy is murdered.

22   And even though she knows that Brandy Odom is dead, this is

23   the first time that she sees her.

24           Adelle Anderson testified that she and the defendant

25   ate the food that they bought and after she fed her baby she

1  walked into Brandy Odom's bedroom.  Anderson was naked at the

2  time because as she testified, the defendant had a rule that

3  she had to take off all her clothes while she was inside the

4  house.

5          Anderson testified that the defendant directed her

6  towards where Brandy's room was and he opened the door and

7  showed her to Anderson.  Brandy was on the floor, she

8  testified, butt naked, laying there and blood was coming out

9  of her nose.

10          Question:  And did he tell you how he actually

11  killed her?

12          Answer:  He told me that he choked her until she

13  wasn't breathing no more," and that is at trial transcript 379

14  to 380.

15          She also told you the defendant wore rubber gloves

16  up to his elbows so he wouldn't leave DNA and prints at the

17  scene.

18          And Anderson's testimony is also consistent with

19  Dr. Straub's testimony, who told you that Brandy Odom died of

20  homicidal asphyxia.  Dr. Straub told you that before her

21  death, Brandy Odom was a perfectly healthy 26-year-old woman.

22          She told you that she saw evidence of neck

23  compression, due to the hemorrhaging or bleeding in Brandy's

24  eyes.  She showed you photographs of the petechia, the tiny

25  pink-red marks caused by burst blood vessels, and she told you

1  this can happen when your neck is compressed.  She also told

2  you that she saw, reflected under the skin of Brandy's neck,

3  evidence of hemorrhaging, which is consistent with manual

4  strangulation.

5          And now Anderson told you what happened after this.

6  She told you that she and the defendant taped heavy-duty

7  garbage bags every where in the bathroom.  They covered the

8  ceiling, they covered the bathroom, the window in the

9  bathroom, the floor, the door, the sink, the toilet and the

10  tub, everything.  She told you the defendant wanted to make

11  sure that there was no blood in the bathroom when they were

12  done.  This is trial transcript 382.

13          And this is when the defendant starts to try to

14  dismember Brandy's body.  Anderson described the gruesome

15  scene in the bathroom.  She told you the defendant doused

16  Brandy's body with bleach and that he used tools and tried to

17  cut up her body, including a manual saw from the shed in the

18  backyard.  And she told you the entire time the defendant was

19  trying to cut up Brandy's body he was wearing a black jogging

20  suit, Timberland boots and rubber gloves all the time that he

21  was in the bathroom and that he took those items off when he

22  exited the bathroom.

23          Now, at the beginning of the day on April 6th, both

24  the defendant and Adelle Anderson are at the defendant's

25  residence in Rosedale.  But at 2:00 p.m. that day, the

1   defendant begins searching on his phone for junk removal or

2   garbage removal companies and looking at Craig's List ads, and

3   we can see some of those searches in Government Exhibit 405.

4           A little after 2:00 p.m., the defendant starts

5   making calls to a number, 646-571-7520.  And you know whose

6   phone number that is because Selim Gultekin, the witness who

7   owned the garbage removal company, told you it was his phone

8   number, and that's trial transcript at 1025.

9           And you can see on the video surveillance footage

10  exactly what Mr. Gultekin described at about 2:42 p.m. on

11  April 6th.  You can see Mr. Gultekin's truck turn on the

12  defendant's block and, at the defendant's request, back up all

13  the way into the driveway, and Mr. Gultekin testified that he

14  remembered this job so clearly because he was never asked to

15  do that.

16          Mr. Gultekin testified that the defendant told him

17  that he needed to get rid of large, heavy-duty garbage bags

18  that, the way he described it, tied very tightly and a dirty

19  mattress.  He told you that neither he or his helper were

20  permitted upstairs.

21          In contrast to the defendant, Mr. Gultekin testified

22  Adelle Anderson said nothing at all.  Mr. Gultekin testified

23  he saw a woman in the house but she did not look at my face at

24  all, he testified.  She was always looking downwards like

25  this.  And Mr. Gultekin demonstrated that to you.

1          Did she speak to you at any point?

2          Answer:  No, she did not.

3          That's at trial transcript 1029.

4          And Adelle Anderson's testimony is entirely

5     consistent with that.  She testified that when asked what, if

6     any, rules were in place about how you had to behave when

7     other men were around, Anderson testified:  "We couldn't talk,

8     we only answered when we were spoken to, and we could not make

9     eye contact.  I did that one day with his friends, he punched

10    me dead in my mouth."

11         Now, Adelle Anderson also testified that after the

12    bathroom was completely covered floor to ceiling with black

13    garbage bags, the defendant started to cut up Brandy's body.

14    She testified that there was a small, a regular manual saw

15    that you cut like wood with and it was in the shed in the

16    backyard.  It was a tool shed in the backyard.

17         Question:  Was that manual saw something you had

18    ever seen the defendant use before?

19         Answer:  Not before she was killed, no.

20         Question:  Did the defendant do any construction

21    projects that you ever saw?

22         Answer:  No.

23         Question:  If you know, why did the defendant go out

24    and get a different saw?

25         Answer:  Because the first one wasn't working.

1          That's trial transcript 386.

2          But before he goes to Home Depot, as you saw in

3    Government Exhibit 405, the defendant searched his Samsung

4    phone for Home Depot listings for different saws.  We saw that

5    he searched for saws, portable, band saws, reciprocating saws,

6    and then the DeWalt 12-amp corded reciprocating saw.  These

7    searches take place between 4:35 p.m. and 4:39 p.m.

8          And in the video surveillance footage, you can see

9    that less than an hour later, at 5:22 p.m., after those

10   searches, the defendant can be seen crossing the street to get

11   his car.  Remember the Nissan Maxima was moved because of the

12   garbage removal truck earlier that afternoon.

13         And you can see where he goes by the cell site

14   location data.  You can see reflected in the cell site data

15   that the defendant leaves his home and heads over to the Home

16   Depot in Green Acres Mall in Valley Stream, where his phone

17   connects in the vicinity of Home Depot.

18         And Adelle Anderson testified that she stayed home

19   with the baby and, just as she testified, you can see on the

20   cell site map that Adelle Anderson's phone remains at the

21   defendant's residence in Rosedale.

22         And Adam Van Duzer testified that Home Depot

23   recorded a cash transaction at 4:52 p.m., sorry, 5:52 p.m.,

24   just before the defendant placed that call that connects to

25   his cell site in the immediate vicinity of Green Acres Mall.

1   You can see that the cell site data, Government Exhibit 26,

2   and this transaction at Green Acres Mall, Government Exhibit

3   56, match up perfectly.  And this transaction is for a DeWalt

4   12-amp reciprocating saw, five blades, and 45 gallon trash

5   bags.

6            And you can see these items in Government Exhibits

7   48, 49 and 60 and the physical evidence that you saw with Adam

8   Van Duzer.

9            Now, by 6:52 p.m., the defendant returns home from

10  his trip at Home Depot, and you know at this point Brandy Odom

11  is dead in the bathroom and the defendant has been trying

12  unsuccessfully to cut and chop her body into pieces.  And at

13  7:15 p.m., just about 15 minutes after he gets home, the

14  defendant searches YouTube for these two searches:  "How to

15  insert blade for reciprocating saw," "Using reciprocating

16  saw," and this is on the YouTube application at 7:15 p.m. and

17  7:20 p.m. on April 6th.  And Ms. Hwang told you that these

18  searches, both of these searches were deleted after they were

19  made.

20           Now, the defendant bought a saw and searched YouTube

21  for how to insert blade for reciprocating saw and using

22  reciprocating saw because Brandy Odom's corpse was still in

23  his bathroom, in his bathtub, and he had unsuccessfully tried

24  to cut her up using a manual saw and now he was going to try a

25  more powerful mechanical saw.

1          And remember what Dr. Soler told you yesterday.

2    She told you that she concluded that there were several sharp

3    instruments that were used to dismember Brandy through a

4    combination of cutting, chopping, and the use of mechanically

5    powered blade.  She also told you there was a significant

6    difference between the cuts to the upper body and those

7    specifically to the knees.

8          The cuts to the arms showed evidence of many

9    different types of cuts with different blades, as indicated in

10   Government Exhibit 218, and even evidence of manual fracture.

11   In contrast, the cut to the knees were much cleaner.  Those

12   cuts were complete cuts and had unique features typical of use

13   of mechanically powered blade.

14         And this is entirely consistent with what Adelle

15   Anderson told you.  She told you, and this is at trial

16   transcript 383 to 84:  "When I was sleeping with my daughter,

17   it was in the middle of the night, like 2:00 in the morning,

18   and I just heard," indicating a loud sound, "something like a

19   machine, like something.  So I woke up and stormed in the

20   bathroom like what the fuck are you doing, you're making a lot

21   of noise."

22         "And when I opened the door I saw Brandy laid up in

23   the tub and her arms were already cut off and it was sitting

24   in a bag on the floor, a garbage bag, a black garbage bag on

25   the floor.  And so when I walked in, he was right like under

1  the butt area by where the thighs is.  He was telling me this

2  shit is hard.  I never chopped up a body before, but this is

3  like a meaty area and it's giving me some trouble."

4          Now, on April 7th, 2018, you can see from the

5  defendant's cell site location data that he's in the vicinity

6  of Canarsie Park around 7:25 p.m.  And Special Agent Busick

7  testified from the activity from the defendant's phone and the

8  minute-to-minute changing of the cell towers, they reflected

9  he's in the direct vicinity of Canarsie Park, right in the

10 center of the map.  He's in an area near all three of those

11 towers, and his phone in fact connects to all three towers.

12         And Adelle Anderson is not with him.  You can see

13 that her, her cell phone is in the vicinity of her mother's

14 house.

15         Now, what is the defendant doing in Canarsie on

16 April 7th?  I submit he's doing a test run, just like he did a

17 test run of the American National Life insurance policy that

18 he took out on himself before he took one out on Brandy Odom.

19 He is casing the exact spot he is planning to throw out Brandy

20 Odom's body parts the following day.  And you know now that

21 these are the areas that Brandy Odom's body parts are later

22 found by law enforcement.

23         By 11:00 p.m., both the defendant and Adelle

24 Anderson are back at the defendant's home, and you can see

25 that on the cell site map.

1           Now, you know that the defendant and Adelle Anderson

2   took two trips to Canarsie Park in the Nissan Maxima to get

3   rid of Brandy's body parts.  Anderson told you they were

4   back-to-back trips and that she was the driver and the

5   defendant was a the passenger.  The first trip, she told you,

6   was a Saturday into Sunday morning.  And the second trip was a

7   Sunday into Monday morning.

8           And the video surveillance footage is entirely

9   consistent with what Adelle Anderson told you.  At around

10  6:00 a.m. on Sunday morning, April 8th, you can see some

11  activity around the defendant's house.  You can see, I submit,

12  the defendant open and close the trunk, and then walk away,

13  re-enter the house.  And about four minutes later, he opens

14  the trunk again.

15          And Adelle Anderson told you that she didn't see the

16  defendant load the trunk but she knew there were two garbage

17  bags of Brandy Odom's body parts.

18          Now, the defendant comes back out.  He stands by the

19  car.  And then he goes again to the front of the car and he

20  crouches down.  He crouches down in front of the car again for

21  a significant period of time, and you can see clearly he's

22  wearing all black.

23          And, remember, what Adelle Anderson told you about

24  their phones for this trip to Canarsie Park.  She told you the

25  defendant told her to wear all black and that he told her that

1    when she went to grab her phone, the defendant punched her and

2    said what are you doing, why are you grabbing your phone.  She

3    told you that she and the defendant left their phones at home

4    for those two nights they disposed of Brandy's body and she

5    told you this is because the defendant didn't want his phone

6    to be used to locate him.

7         Now, the defendant gets the Nissan ready and he

8    brings out his newborn baby in what I submit is clearly an

9    infant car seat right there.  He puts it in the back seat of

10   the car.  And you know from Adelle Anderson that she and the

11   defendant take their newborn with them on this trip to

12   Canarsie Park to dump Brandy Odom's limbs.

13        Then the defendant installs the car seat and

14   eventually he gets in the car.  And then he's joined by

15   another figure indicated with the green arrow, Adelle

16   Anderson, and Anderson gets into the car and then she gets

17   out, she goes back in the house but eventually they drive,

18   they pull out of the driveway and they head towards the park.

19        And you remember what Detective Santiago told you

20   about the distinctive markings, the fade marks on the top of

21   the vehicle that make the Nissan Maxima easy to identify and

22   easier to spot.

23        Now, Adelle Anderson told you that she got on the

24   Belt Parkway, she took exit 13, she drove down into this

25   cul-de- sac indicated right here, and parked right there,

1   right at the entrance to the park.  She told you she parked

2   there, the defendant got out, he took out a shopping cart and

3   he loaded up, it up with the garbage bags of Brandy Odom's

4   body parts.  That's trial transcript 394.

5          And you can see on Government Exhibit 12 that

6   there's a clear route between where the defendant, where

7   Adelle Anderson parked and here, indicating with a Y, where

8   Brandy Odom's body parts were recovered or where they were

9   found and recovered.

10         The evidence makes clear which way the defendant

11  took that morning to dump Brandy Odom's body parts.  He went

12  down that path toward the baseball fields.

13         Now, two of the bags recovered in this location

14  contained Odom's body parts.  This is Government Exhibit 709.

15  And just as Adelle Anderson told you, those bags contained

16  Brandy's limbs.  And here are closeups of those bags.  You can

17  see the bag to the left was knotted tightly, and the bag under

18  the tree contains Brandy's thighs.

19         Now, you heard about DNA evidence recovered from

20  these bags.  That's the knotted bag to the right of the slide,

21  depicted in Government Exhibit 288.

22         You heard testimony from Mr. Lim, an expert in

23  forensic biology from the Office of the Chief Medical Examiner

24  or OCME.  He told you that the OCME unknotted the bag and

25  swabbed the area of the knot.  Not surprisingly, he told you

1    that Brandy Odom was the largest contributor of DNA to the

2    sample that was tested.  And so OCME also conducted what's

3    called Y-DNA testing, which only looks at the Y chromosome,

4    which only men have.

5          Y-DNA testing, he told you, allows an analyst to

6    detect and isolate male DNA on an item of evidence, even if it

7    would otherwise be masked by a larger quantity of female DNA.

8    Through Y-DNA testing, OCME found that the major male

9    contributor of DNA to the bag was a profile called male donor

10   A.

11         Mr. Lim also told you that OCME analyzed

12   pillowcases, pillowcases taken from the defendant's home, from

13   his bedroom.  OCME also conducted a Y-DNA testing on the blood

14   stains from the defendant's pillowcases, and they identified a

15   male donor A profile on the pillowcase as well.

16         OCME concluded that the defendant's DNA matched the

17   profile of male donor A, based on both autosomal DNA testing

18   and Y-DNA testing.

19         OCME also directly compared the defendant's Y-DNA

20   profile on the pillowcases to the Y-DNA profile of male donor

21   A on the back and concluded they were the same profile.  In

22   other words, the Y-DNA on the defendant's pillowcases, which

23   came from his bedroom, matched the Y-DNA from the plastic bag

24   found in Canarsie Park containing Brandy Odom's body parts.

25   This means that the defendant, or a male parental, paternal

1  male relative such as a father, a grandfather, brother, or

2  uncle or cousin on the father's side, could be the source of

3  that Y-DNA.

4         But you know the defendant's father and grandfather

5  are deceased.  He has no uncles, and he has no relationship

6  with his brothers.  I submit that none of these relatives who

7  laid on the defendant's own pillow and none of these relatives

8  left DNA inside a knot containing Brandy Odom's body parts.

9  That was the defendant's DNA.

10         Now, after Brandy's limbs were discarded in the

11  park, the defendant and Adelle Anderson returned home.  And,

12  as you can see on the video surveillance, around 9:30 p.m. on

13  April 8th a vehicle pulls up to the defendant's house, and

14  someone gets out holding delivery food in his hand.

15         You know what that is.  Adelle Anderson told you.

16  She told you the defendant wanted an alibi, and so on the two

17  nights that they were getting rid of the body, one night he

18  ordered pizza.  That's trial transcript 417.  And that's

19  exactly what you see on the video surveillance.

20         Now, the second trip to Canarsie Park starts a

21  little bit earlier, just before midnight on April 8th.  They

22  have to come back to the house because, as Adelle Anderson

23  told you, the defendant forgot his gloves.

24         Now, shortly after midnight, the defendant and

25  Adelle Anderson get into the Nissan Maxima again with their

1  newborn and start driving to Canarsie Park.  Now, remember

2  that Adelle Anderson told you that the purpose of this trip

3  was to discard Brandy's torso and the defendant had packed it

4  inside his mother's suitcase and packed the suitcase in the

5  trunk.  That's trial transcript 399.

6        Adelle Anderson drives all the way to Canarsie and,

7  again, Brandy Odom's torso is in the trunk.  Their newborn is

8  in the back seat.

9        Then defendant and Anderson drive down Seaview

10  towards the park.  And again, you can see those distinctive

11  markings on the Nissan Maxima.  The spillage of the headlights

12  that Lieutenant Santiago described and those fade marks,

13  especially on the top of the vehicle that are indicated right

14  there.

15        That's the same Nissan Maxima you saw in front of

16  the defendant's house in Rosedale.  That's the same Nissan

17  Maxima outside Canarsie Park at 12:30 a.m.

18        Members of the jury, you can request a copy of this

19  video compilation, that's Government Exhibit 112, or any of

20  the underlying video used to create the compilation during

21  your deliberations.  You are the judges of the facts and you

22  can make these comparisons yourself.

23        In reviewing the video compilation, you can see all

24  of the movement in and out of the defendant's house and you

25  can see for yourself the distinctive markings on the Nissan

1   Maxima, the top of the Nissan Maxima and the way the spillage

2   referred to in the headlights, the way the headlights are

3   oriented.  You can see that it makes clear that it's the same

4   car in Rosedale and the same car in Canarsie Park.

5           Now, the defendant dumped Brandy's naked body into a

6   pile of leaves and debris just off the footpath close to the

7   entrance of the park on Seaview.  And while that was

8   happening, Anderson was driving up and down Seaview Avenue

9   looking for him.  You have video here of the defendant walking

10  out of the park with the suitcase in hand looking side to side

11  as he crosses the street.  That's that suitcase in his hand

12  right there.

13          And after dumping Brandy's torso, the defendant was

14  looking for Adelle Anderson.  He was walking up and down

15  Seaview Avenue with an empty suitcase.

16          Now, remember that Dr. Straub told you that Brandy's

17  torso weighed almost 80 pounds, just her torso, and you can

18  tell at this point the defendant has already dumped Brandy

19  Odom's body.  The suitcase in his hands looks light.  He's

20  holding it easily with one hand, without dragging it at all;

21  and he's looking around because he can't find Adelle Anderson

22  and they left their phones behind so they can't communicate.

23          And you see, can you see on the video how Adelle

24  Anderson and the defendant keep missing each other, keep

25  passing each other on Seaview Avenue.

1          Now, think for a moment how unusual it is to be

2     driving around in the middle of the night with a baby without

3     your phone.  The evidence makes clear the only reason the

4     defendant and Adelle Anderson don't have their phones this

5     night is because they're getting rid of Brandy Odom's body.

6          And you know from Adelle Anderson, she testified:  I

7     just kept driving around until I found him.  I seen him

8     walking, like down the block.  I couldn't go down that block,

9     so I made it in a way to where he was walking down the block.

10     I caught him on the end of the block of his coming down, and

11     that's how we was able to meet back by the Jewish school.

12          Question:  Why couldn't you just call each other?

13          Answer:  Because I was instructed to leave my phone

14     at home.

15          That's transcript 401.

16          Now, you know it took a while for the defendant and

17     Anderson to finally find one another, and here at

18     approximately 1:51 a.m. you can see the defendant and Adelle

19     Anderson return home from the park.

20          Your Honor, I think we're having some technical

21     issues.

22          THE COURT:  Can you get a little help maybe?

23          MS. HAJJAR:  Yes.  Let me see if I can.

24          (Pause.)

25          THE COURT:  It looks like it's working.

1          MS. HAJJAR:  Thanks, Your Honor.

2          So, again, the defendant returns home with Anderson.

3          Now, only after about 20 minutes of them getting

4    back to the park, the defendant and Adelle Anderson leave

5    again, this time to dispose of evidence on Snake Road.

6          And Adelle Anderson told you about that too.  She

7    told you they went to Snake Road to dispose of the evidence in

8    the marshes because it was grassy and muddy, and Detective

9    Santiago confirmed that it's a marshy, swampy area.  And

10   Adelle Anderson told you that while they were driving, the

11   defendant threw out the boots he was wearing, the clothes he

12   was wearing and the saw.

13         The defendant told her that no one's coming here in

14   the swamps to look for evidence.  That's trial transcript 404.

15   And you can see how close Snake Road is from the defendant's

16   residence.

17         Now, Anderson told you that after the trip to Snake

18   Road, she stayed home while the defendant returned to Canarsie

19   Park because he told her that he forgot a plastic bag and

20   needed to go back because he was concerned that his prints

21   might be on the bag, and he didn't want to be linked to the

22   murder.  Here you see the defendant walking back to the house

23   after returning around 5:00 a.m. and parking around the

24   corner.

25         Less than an hour later, at 6:00 a.m., the defendant

1    gets into his car, gets into his car and starts loading trash

2    bags into it, and then at this point, the Defendant loads

3    additional trash bags into the trunk of the car.

4          Now, the defendant drove away, returning about 22

5    minutes later, and remember that Anderson testified there was

6    a Popeye's dumpster close to the house where the defendant

7    threw out the plastic bags used to line the bathroom.

8          And after returning to the house, the defendant gets

9    a suitcase from the house and puts it into the Nissan Maxima.

10   That's the suitcase he's holding in his right hand.

11         Compare that to the suitcase the defendant is

12   holding at 12:40 that morning.  I submit it's the same

13   suitcase.

14         Now, after loading that suitcase into the back seat

15   and disposing of it, the defendant drives to Queens County

16   Criminal Court because he has to appear that day for a

17   domestic violence arrest that Police Officer Raymondo told you

18   about in January of 2018.

19         Government Exhibit 46 shows you a copy of the

20   certified order of protection that was issued against him the

21   same day, April 9, 2018.  And you can see on Government

22   Exhibit 46 that he was advised in court of the issuance of the

23   order of protection that day.

24         Now, it's only that morning, while he's already in

25   the vicinity of Queens County Criminal Court, that activity on

1    his phone suddenly begins again.

2            Now, think about that.  On a normal day, a person's

3    cell phone usage starts at home, sometime after waking up,

4    like it did for the defendant, on April 2nd, on April 3rd, on

5    April 4th, on April 5th, on April 6th, and April 7th.  But

6    April 9th is not like those other days because the evidence

7    shows the defendant had been up all night disposing of Brandy

8    Odom's body parts in Canarsie Park, and he doesn't use his

9    phone at all.  The phone is off until he's at court.

10           The phone is first turned on and first starts

11   receiving and exchanging data when he's at court.  And at that

12   time, you can see a lot of contact between Adelle Anderson and

13   the defendant.

14           The morning of April 9th is also when Brandy Odom's

15   body is found.  You heard from Robert Clouden, who said that

16   at 8:00 a.m. on April 9, he was walking his dog in Canarsie

17   Park and saw what he believed to be a doll in the park.  And

18   then by 6:00 p.m. on April 9th, Patricia Smith was walking her

19   doing at Canarsie Park and she saw Brandy Odom's torso.  She

20   told you she realized what she was seeing.

21           She ran out of the park and called 911.  By that

22   evening, law enforcement has responded to the scene and

23   discovered Brandy Odom's body.

24           Now, by April 10th, the defendant is searching for

25   confirmation that Brandy Odom's body has been found.  And you

1   can see his searches on Government Exhibit 405.  Days after he

2   searched for the DeWalt 12-amp reciprocating saw, the

3   defendant searched for Eyewitness News New York City, and you

4   saw yesterday all the searches he made on his phone for news

5   articles about the dismembered woman found in the park.

6           As Adelle Anderson told you, the defendant cleaned

7   the house, he threw out the plastic garbage bags that had

8   covered the bathroom, he threw out Brandy's belonging, he

9   shampooed the carpet in Brandy's room, and he replaced the

10  phones that he and Adelle Anderson had used.  He also had the

11  Nissan and trunk fully cleaned and fully detailed.

12          Still, you heard from Detective Colecchia, who told

13  you that his K9, K9 Timoshenko, a dog trained in the scent of

14  human remains, reacted to the scent of human remains in the

15  trunk of the defendant's car, the trunk where the defendant

16  and Adelle Anderson transported Brandy Odom's body parts.

17          And that's not the only location he hit on.

18  Colecchia told you that all the locations in the house, of all

19  of those locations, Timoshenko aggressively reacted to

20  Brandy's bedroom and the bathroom near her bedroom.  K9

21  Timoshenko hit on the exact location where Brandy was

22  discovered.

23          So now, turning to the elements of the murder for

24  hire, there's overwhelming evidence that the second element is

25  met, that the use of the facility of interstate commerce was

1    done with the intent that murder be committed.

2            Now, the last element of this crime is that the

3    defendant intended that the murder in question be committed as

4    consideration for receiving anything of pecuniary value.

5            Now, I expect Judge Donnelly will tell you this

6    element requires that before the murder there was some mutual

7    agreement or understanding that something of value would be

8    exchanged for committing the murder; and, in this case, that

9    thing of value was the insurance proceeds.

10           Now, you know why the defendant committed this

11   murder.  It was a murder for the insurance proceeds.  Adelle

12   Anderson told you the whole purpose of this murder was so that

13   the defendant, so that she could collect as beneficiary of the

14   two life insurance policies taken out on Brandy and that she

15   would then give that money to the defendant.

16           And she testified:

17           Question:  Did you and the defendant have any

18   conversations about leaving her body in a park versus hiding

19   the body?

20           "Answer:  He did not want to hide the body because

21   he said you cannot collect on an insurance policy if a person

22   is missing.  If a person is missing, you have to wait ten

23   years before an insurance company pays out.  So he wanted the

24   body to be found."

25           That's trial transcript 391.

1          MS. HAJJAR:  Adelle Anderson told you that she

2    agreed to give all the policy proceeds to the defendant for

3    him to control just like she had with the money she made in

4    sex work and just like the money Brandy made in sex work.

5          And you've seen that before with Anderson.  You saw

6    the defendant previously us Anderson to make money from a

7    fraud involving her MCU account.  He made the withdrawals

8    using her MCU card and then told her to make a complaint of

9    fraud.  And you saw the wanted flyer that was created of one

10   of those transactions at a Valley Stream ATM.  That was the

11   defendant at the ATM, you can see that photo in

12   Government Exhibit 134.  And that's why Brandy's body was left

13   in the public park.  Her explanation of being able to collect

14   on the insurance policy is consistent with the witness from

15   Global Life Insurance told you.  She said Globe Life typically

16   requires a death certificate before they'll process a claim

17   and that not having the death certificate such as when someone

18   goes missing means the claim will be delayed.

19         You also saw the continuing efforts from Adelle

20   Anderson to collect on the policy found in

21   Government Exhibit 116.  Call after call to Globe Life

22   Insurance from April 26th through August 28th trying to

23   collect on Brandy Odom's policy.  And you saw that with the

24   request to American National as well.  Request after request

25   that Anderson sent to the company in an effort to collect on

1    the policy, that's Government Exhibit 122.

2            And after the murder, you know that Adelle Anderson

3    tried to get a copy of Brandy's death certificate.  You saw

4    the records from the Bureau of Vital Statistics in

5    Government's Exhibit 47 reflecting that Anderson ordered

6    Brandy's death certificate and went in person to get a copy.

7    Anderson told you that she needed to get documents signed by

8    Nicole Odom, Brandy's mother, she couldn't get.  And you saw

9    the paperwork that Nicole Odom received in

10   Government Exhibit 54 requesting documentation as the legal

11   next of kin.

12           You heard overwhelming evidence of the defendant's

13   financial situation at the time he was taking out these

14   policies on Brandy Odom.  Adelle Anderson told you that when

15   she moved into the defendant's house, the electricity had been

16   cut off and she and Brandy had to use the money they used from

17   sex work to get the lights turned on again; that's trial

18   transcript 275.

19           And you heard the defendant's own account of that in

20   the stories he wrote.  You heard Agent Niederer told you a

21   fictional story the defendant wrote in which -- that was

22   clearly dawn from the defendant's life in I which the

23   protagonist's parents die and the lights were cut off, the

24   electricity was cut off.  And although the protagonist

25   expected there will be money to pay the bills, in the end

1    there was nothing.  And that's actually the financial

2    situation the defendant was in.  You saw in documents that in

3    January 2015, shortly before his mother's death, she gave the

4    defendant full power of attorney over her mortgage; that's

5    Government Exhibit is 129-A.  And the defendant almost

6    immediately starts to miss payments.  By April 2015, he begins

7    to get notices in the mail reflecting those missed payments

8    like this one in Government Exhibit 129-C.

9            By the end of 2015, Chase has instituted foreclosure

10   proceedings, and two years later, by the end of 2017, the

11   reinstatement the defendant would need to pay to keep his home

12   is over $60,000.  And remember, it is at this time that he

13   takes out the second life insurance policy, that American

14   National life insurance policy on Brandy Odom.  At this point,

15   the defendant is only months away from losing his home.  And,

16   indeed, by June 12, 2018, two months after Brandy Odom's

17   murder, his home as foreclosed upon; that's

18   Government Exhibit 130.

19           Now, the evidence is overwhelming that the defendant

20   committed the murder of Brandy Odom with the expectation of

21   receiving insurance proceeds after her death.  That was the

22   deal, murder for money.  That's why the defendant kept

23   continually searching for insurance policies.  That's why he

24   took out test policies on himself and why those policies never

25   went into effect because they were never paid.  The defendant

1    wasn't actually interested in life insurance except as a means

2    to profit except, as a means for a payout.

3           The defendant planned this murder for a long time.

4    The first life insurance policy he took out on Brandy was over

5    a year before her murder.  And the took a lot of precautions

6    when committing this crime.  He studied for it.  He read

7    reviews of life insurance products.  He covered his home in

8    plastic.  He even searched for reviews of the reciprocating

9    saw that he ended up purchasing.  He also threw out evidence

10   like Brandy's mattress.  He turned off his phone and he later

11   threw it out.

12          All this planning, all this preparation reflects the

13   nature of this crime and the purpose of his crime.  This was

14   not a murder committed in a spur of the moment.  This murder

15   was not motivated by hate or by rage or by passion.  This was

16   a crime for money; that was a crime for greed.  And it's clear

17   that are this third element has opinion met.

18          Now, if you find that all three of these elements

19   are met, then you'll be asked to determine if the

20   murder-for-hire resulted in the death of Brandy Odom and of

21   course that has been established as well.

22          Now, for Count Two, murder-for-hire conspiracy, I

23   expect Judge Donnelly will tell you that a conspiracy is that

24   agreement by two or more people to do something illegal.  And,

25   in this case, that thing illegal was the murder-for-hire of

1   Brandy Odom.

2          I expect the judge will also tell you the conspiracy

3   doesn't have to be spoken or on paper.  It can be an agreement

4   that's expressed through actions.  And the evidence is

5   overwhelming here that the defendant and Adelle Anderson

6   agreed to commit the murder- for-hire of Brandy Odom.

7          Moving now to the fraud counts:  Wire fraud

8   conspiracy, aggravated identity theft, and fraudulent use of

9   identification.  We've already gone through much of the

10  evidence relevant to these charges.

11         Now, for wire fraud conspiracy, I expect

12  Judge Donnelly will instruct you that there are three

13  elements.

14         First, that there was a scheme to defraud or obtain

15  money or property from the two life insurance companies,

16  Globe Life Insurance and American National, by materially

17  false and fraudulent pretenses representations or promises.

18         Second, that the defendant or a co-conspirator

19  knowingly and willfully devised or participated in the scheme

20  or artifice to defraud with the intent to defraud.

21         And third, that the defendant or a co-conspirator

22  used or caused the use of interstate or foreign wire

23  communications.

24         And each of these element have been met in this

25  case.  You know that the defendant and Adelle Anderson agreed

1   to make false statement in the insurance policy applications

2   for Brandy Odom.

3           For the Globe policies, it's Government Exhibit 120.

4   They falsely represented that Adelle Anderson was Brandy's

5   sister and they forged her signature.  For the American

6   National policy, Government Exhibit 122, they falsely

7   represented that Brandy worked in tax and accounting as a

8   dispatcher for Encore Service.  They falsely represented that

9   Adelle Anderson was Brandy's sibling, and that Brandy hadn't

10  applied far any other life insurance policy.

11          And the insurance policy representative explained to

12  you why they rely on these representations in evaluating

13  whether or not to issue coverage in this particular case -- it

14  affected their decision making.

15          And so, the Government has proved that there was a

16  scheme to defraud or obtain money or property from Globe Life

17  Insurance and American National life insurance by these

18  materially false and fraudulent pretenses.  That the defendant

19  and Adelle Anderson participated in the scheme with the intent

20  to defraud and the defendant and Adelle Anderson used or

21  caused the use of interstate and foreign wire communications

22  and those are the same interstate wire communications we've

23  been talking about, the cell phone communications, the

24  internet communications.

25          For aggravated identity theft, similarly, the

1    Government has proved each of these elements beyond a

2    reasonable doubt.

3           First, that the defendant knowingly and transferred

4    or possessed or used a means of identification of Brandy Odom.

5    You saw all the examples in which the defendant had Brandy

6    Odom's Capital One card, her name, her date of birth, her

7    social security card.  I expect the judge will instruct you

8    that a means of identification can be any name or number used

9    to identify Brandy Odom like name, a social security number,

10   or a date of birth:

11          Second, the defendant used the means of

12   identification during, and in relation to, Count Three, the

13   wire fraud conspiracy.  And you know he did because the

14   defendant used all of these means of identification -- her

15   social, her date of birth -- to take out life insurance

16   policies, to defraud the insurance policies in Brandy Odom's

17   name.

18          And third, the defendant acted without lawful

19   authority.  The defendant used Brandy Odom's financial

20   information and other information for commit wire fraud

21   without lawful authority he had in authorization to use her

22   identifying information in that way.  And so, each of these

23   elements have been met.

24          Lastly for fraudulent use of identification, each of

25   these elements have been met as well.

1          First, the defendant knowingly transferred or pooed

2   or use a means of identification of Brandy Odom again like the

3   last count.  The defendant clearly possessed and used and

4   transferred many means of identification of Brandy Odom

5   including her Capital One card, her date of birth, her social

6   security number, and other means of identification.

7          Second, the defendant knew the means of

8   identification belonged to Brandy Odom, of course he did.  The

9   defendant acted without lawful authority, that's the same as

10  the prior instruction on that.  The defendant acted with the

11  intent to commit or to aid and abet or in connection with

12  Counts One, Two, or Three and that's the murder-for-hire or

13  the wire fraud charge or the conspiracy to commit

14  murder-for-hire charged in those counts.

15         And lastly, that the transfer or possession or use

16  occurred in or affected interstate or foreign commerce.  And,

17  again, you know that the applications in this case were

18  mailed; that the communications relating to Brandy Odom's

19  means of identification were communicated with using

20  facilities of interstate commerce.

21         And lastly, if you find that each of these elements

22  have been met, which I submit they have been, you will be

23  asked if the Government has also proved that this crime was

24  committed in connection with a crime of violence, the murder

25  of Brandy Odom.  And for all the reasons we've already

1   discussed you know that it has.

2          Now, very briefly, I expect the judge is also going

3   to instruct you that there is another way you could also find

4   the defendant guilty of Counts One, Four, and Five.  That's

5   the murder-for-hire, aggravated identity theft, and fraudulent

6   use of identification counts.

7          I expect the judge will instruct you about aiding

8   and abetting, the legal term for ordering someone to commit a

9   crime or helping someone to commit a crime.  And again, what

10  the judge says controls but I expect she'll tell you that

11  another way you can find the defendant guilty of these

12  particular counts is if a crime was committed, if the

13  defendant knowingly associated with himself for that crime,

14  and if the defendant did some act, any act, to help it

15  succeed.  And that's just another theory by which you could

16  find the defendant guilty of the charged crimes.

17         Members of the jury, this brings me to the end of

18  the Government's summation.  I want to thank you again for

19  your careful attention to this case.

20         The video surveillance footage, the cell phone

21  location data, photographs, the DNA evidence, the physical

22  evidence, the recordings, and the witness testimony.  All of

23  the evidence that you've heard over the past two weeks fit

24  together to form a clear picture about how Brandy Odom died

25  and why.  She was murdered because the defendant and Adelle

1  Anderson thought they could profit from a get-rich-quick

2  scheme by taking out insurance policies on her life, killing

3  her, and then trying to cover it up.

4          This was no spur-of-the-moment murder.  This was a

5  deliberate careful intentional plan motivated not by hate but

6  by money.  And it is time to hold the defendant accountable

7  for taking the life of this young woman, for taking the life

8  of Brandy Odom.

9          I ask you to return the only verdict that is

10 consistent with all the evidence in this case and that is a

11 verdict of guilty on all counts.

12         Thank you.

13         THE COURT:  Thank you, Ms. Hajjar.

14         I think it's might be a good idea to take about a

15 15-minute break to stretch your legs.  And when we come back,

16 we'll hear the summation by defense counsel.

17         Again, please do not talk about the case or look

18 anything up.  We'll see you in just a few minutes.

19         COURTROOM DEPUTY:  All rise.

20         (Jury exits courtroom.)

21         THE COURT:  All right.  Everybody can sit down.

22 We'll be in recess for 15 minutes.

23         (A recess in the proceedings was taken.)

24         THE COURT:  Are we ready to go?

25         MR. CECUTTI:  Yes.

1          THE COURT:  Let's get the jury.

2          Mr. Cecutti, do you have a sense of how long?

3          MR. CECUTTI:  An hour and 15.  Let see if I get it

4     right.

5          THE COURT:  No pressure.  Just wondering.

6          (A brief pause in the proceedings was held.)

7          COURTROOM DEPUTY:  All rise.

8          (Jury enters courtroom.)

9          COURTROOM DEPUTY:  You may be seated.

10         All right, everyone.  We're ready to continue with

11    the summation of Mr. Cecutti.

12         Whenever you're ready.

13         MR. CECUTTI:  Thank you, your Honor.

14         Good afternoon.  What we told you would happen

15    happened.  It happened right here in this courtroom over about

16    10 to 14 days.  Without the testimony of Adelle Anderson, the

17    Government has no case against Cory Martin.

18         The dozens of other witnesses and the hundreds of

19    exhibits that were presented to you were done for one

20    reason -- to distract you.  None of the other witnesses that

21    they put up, none of the exhibits that they showed you told

22    you that Cory Martin is guilty.  So every minute of this trial

23    that wasn't testimony by Adelle Anderson served to distract

24    you from the simple fact that Adelle Anderson is a liar and a

25    manipulator and a deceiver.  And in an attempt to convince you

1    that they have corroborating evidence, consistent evidence,

2    and we're going to talk about those things.

3            All the Government has done to try and explain why

4    they don't have the evidence you'd expect them to have.  The

5    underlying objective truth is that direct, credible evidence,

6    that Cory committed these crimes does not exist.  They don't

7    have Cory making the decisions to take out these policies,

8    paying the premiums, or trying to cash them out.  They can't

9    tell you what tools were used in the dismemberment.  They

10   can't show you possible tools that were even in Cory's

11   possession.  They can't tell you when exactly the murder

12   happened.  They can't show you that it happened at the

13   Rosedale house.  They can't even show you that Brandy was

14   inside the house.  They can't show you location data of Cory

15   near Canarsie Park.  They can't show you Cory with a plastic

16   bag.  They don't have DNA.  They don't have fingerprints.

17   They don't have forensic or biological evidence.  And they

18   don't have planning.  And they don't have preparation.  And

19   they don't have motive.

20           I don't need to tell you that this is a heinous

21   crime.  We all saw the photos from Canarsie Park.  Who does

22   something like that?

23           Ask yourselves:  What did they show you at this

24   trial that suggests that Cory Martin had a motive to do

25   something so horrific to Brandi Odom?  To not just kill her,

1   but to dismember her and scatter her body parts around

2   Canarsie Park for joggers to find.

3          As you've seen in this trial, the federal government

4   is not an abstract power.  It is a real force that has thrown

5   infinite resources at this man that they suspected committed

6   these horrific crimes.  But even in throwing these infinite

7   resources at him, the Government fell short of proving the

8   charges against Cory.  And when you don't have objective

9   proof, your responsibility is not to fill in the gaps.  Your

10  responsibility is not to assume.  Your responsibility is to

11  conclude that the Government has not met their burden.

12         What we told you would happen happened.

13         The Government put up their cooperator, Adelle

14  Anderson, and made every effort to try and corroborate her

15  story.  But the rest of the evidence presented to you at this

16  trial is not corroborating evidence.  If you do not believe

17  Adelle.  And you cannot trust or believe Adelle Anderson.  The

18  Government overpromised and the Government underdelivered.

19  And since they did so, since they did not present enough

20  evidence to prove Cory's guilt beyond a reasonable doubt, you

21  must acquit him of all counts.  You have an obligation to do

22  so.  That is what the law requires, nothing less.

23         Before I go any further, I want to remind you about

24  an important yet simple principle to guide you in your

25  deliberations.  You must follow the instructions by

1    Judge Donnelly.

2              For instance, you know that Cory did not testify and

3    you cannot hold that against him in any way.  You cannot

4    attach any significance to the fact that he didn't.  No

5    defendant is required to prove their innocence.

6              For a conviction, the Government must prove a

7    person's guilt beyond a reasonable doubt.  It is their burden,

8    they carry that.  It falls squarely on them as the accuser.

9    Related to this is that we, the defense, do not have the

10   burden to present any evidence to prove that Cory is not

11   guilty.

12             Adelle Anderson is a liar, a manipulator, and a

13   deceiver.  She has a long history of dishonesty and deceit.

14   She lied and manipulated Cory, Brandy, detectives from the

15   N.Y.P.D. and the Government.  She also has no regard for human

16   life.  To get whatever she wants, she will lie and that's what

17   she's done her entire life.  There's no reason to believe that

18   she has changed.  Here, she has not just lied, but she has

19   fabricated an elaborate and detailed story in the hopes of

20   avoiding accountability for doing something so horrific to

21   Brandy.

22             Adelle sold the Government a story that they wanted

23   and that they needed.  This happened several years ago and

24   occurred around the time of her arrest on November 4, 2020,

25   when she had a meeting after her arrest and was told that she

1  wouldn't go to jail.  This was a week after her interview with

2  the N.Y.P.D. on October 29, 2020, when a detective held her

3  hand while she lied to them and told them about a story about

4  how and why Brandy was murdered.  The Government bought it,

5  and no matter how many times Adelle violates her cooperation

6  agreement with the Government, even just a few weeks ago when

7  she lied about serious crimes while being out on bail and

8  facing mandatory life in prison, the Government will not rip

9  it up.  They never, ever will.  And that's because of how much

10 they need her.  They will tolerate anything and just give her

11 a new agreement and keep her out of jail.  And Adelle fully

12 knows that.

13         Adelle testified that Cory physically and sexually

14 abused her nearly every day and lived in fear.  You saw her

15 testify over two days.  Did she look afraid to you?  Did she

16 look like she could be under anyone's control?  Did she look

17 like she took instructions from anyone?  No.  She looked like,

18 and is the kind of person, who'd lie about being a victim to

19 avoid one second of any consequence or going to prison.

20         And I'll discuss more about Adelle's absolutely

21 false allegations of sexual and physical abuse.  Remember who

22 Adelle Anderson is.  She committed crimes beginning at a young

23 age including boosting and shoplifting and she did that for

24 years.  She brazenly went into stores like Macy's and Barney's

25 and Target and stole items, expensive and inexpensive, and

1    either sold them and made money or used them for herself.  She

2    also fraudulently married, cheated on men she was in

3    relationships with, and forged signatures.

4            She also did other work.  She told you she was a sex

5    worker for years before moving into the Rosedale house with

6    Cory.  This is an independent woman who makes her own

7    decisions and those decisions are about making money and

8    getting other benefits.  Keep this in mind.  Always keep this

9    in mind when you're evaluating the evidence in this case.

10           I want to go back to 2015, almost ten years ago at

11   this point.  She was doing sex work with Brandy while living

12   on Fulton Street.  She told you she made a business proposal

13   to Cory.  Do in-calls at his house now that both of his

14   parents have died so she could make, what, more money and not

15   pay any kind of rent.  That's a great business move.  She also

16   convinced Cory to have Brandy move in.

17           Now, Adelle claims that Cory was always abusive

18   throughout her life beginning in high school.  She also claims

19   that beginning in 2015, he wanted her kids murdered and that

20   he wanted her ex, Alex Villard, to also be murdered.

21           Just think about that.  He wanted these horrible

22   things to happen, and yet, what did she do?  She moved into

23   the Rosedale house with Cory.  You don't move into a man's

24   house when he threatens to kill everyone you know.  When he

25   threatens to kill your young children.  That makes absolutely

1    no sense.

2              And here's what also doesn't make sense.  That after

3    moving into his house, she somehow decided to relinquish all

4    control, all independence, all agency, over her own work and

5    own life to Cory Martin.  And now she's -- upon moving in, day

6    one, day two, now she's being told you got to be naked in the

7    house, take off all your clothes as soon as she steps inside

8    that door.  And she can't even eat she wants or when she wants

9    to.  And you saw a series of text messages on

10   cross-examination that completely undermine that.  She's also

11   told that she can't shower when she wants to or go anywhere

12   without Cory's approval.  There is absolutely no explanation

13   for why she would do something like that.  And that's because

14   it's just not true.

15             She told you she trusted him and made her feel safe.

16   That's what she said.  And that was around this decision for

17   Cory to be the pimp.  She made that decision despite all this

18   abuse.  Yet, somehow he made her feel safe.  Was that before

19   or after he threatened to kill her two children?  That must

20   have been during, as she called it, "the good times," when

21   things were still good.  We didn't hear about any of those

22   good times on direct examination, all we heard were the bad

23   times.  But then on cross-examination, you heard about the bad

24   times, the good times, a lot more good times, a few more good

25   times, and how Cory made her feel so special.  That's why, I

1    guess, she moved in.

2         She told you about these good times at the end of

3    2017 and the beginning of 2018.  After getting punched in the

4    face countless times, raped in the basement with objects like

5    hammers and liquor bottles and a broomstick.  Being forced to

6    fill out life insurance policies on all the people she claimed

7    to love and during the months that Cory was allegedly planning

8    and preparing to murder Brandy.

9         Those slip-ups by Adelle on cross-examination about

10   the good times and about her love for Cory and how he made her

11   feel special are extremely revealing because a woman who is

12   actually enduring constant physical and sexual abuse not just

13   like while she's in high school or while she's living and

14   married to her men, but while she's with her abuser day in and

15   day out for nearly four years does not slip up.  A liar is

16   somebody who slips up.  A manipulator is somebody who slips

17   up.  A deceiver, that is also somebody who slips up.  That's

18   what all of those types of people do.  Liars, manipulators,

19   deceivers, they slip up.

20        Adelle claimed that she was in pain.  That she had

21   anal bleeding.  That she had been punched in the face by this

22   trained boxer.  But she was in and out of the hospital during

23   her pregnancy from the summer of 2017 when she learned that

24   she was pregnant until March of 2018, March 1st to be exact,

25   when their daughter was born.  Yet, there are no records of

1    black eyes, broken jaws, broken noses, vaginal trauma, anal

2    trauma, bruising of any kind.  A pregnant woman with visible

3    injuries is not walking out of a hospital or a doctor's office

4    or a medical clinic without a doctor asking if she's safe at

5    home.

6          And that's why Adelle stayed at the Rosedale house.

7    Not because of fear.  Not because of control.  She was making

8    money and she was not being abused.  She told you herself with

9    respect to the abuse, I always lied about the abuse.  She also

10    lied about Cory physically abusing her kids.  She me claims

11    Cory punched T in the face and the chest and tried to her own

12    son Z out of the window.  But no 911 calls, no records, or

13    concerns from T's school, teachers, principals about injuries.

14    No running out of the house screaming.  No picking up their

15    stuff and moving out of the house.  And no testimony from T to

16    corroborate.

17          The Government showed you a few sets of hospital

18    records.  On February 19, 2017, she went to the emergency room

19    after getting a cut above her eye trying to break up a fight

20    between two girls at a party.  Of course, she told you that it

21    was Cory.

22          Now, in 2024, while cooperating with the Government

23    that's very convenient for her to do that.  Then on July 4,

24    2017, she went to Jamaica Hospital and said a small ladder

25    landed on her.  She initially had swelling and pain that

1    improved after resting the first two days, though, her

2    swelling about pain steadily increased.  With another detailed

3    story, she claims to have lied then, but certainly not now,

4    and just like in February, she returned to live with Cory

5    after being released.

6            And then there's the incident on January 27, 2018.

7    This time she did call 911.  She ran out in a black robe and

8    told the police that Cory punched her on both sides of her

9    face, choked her, and then threw her against the wall and

10   grabbed a knife and threatened to kill her and T.  And I want

11   you to take a look for yourself.  What do you see?  What you

12   see is someone who is not afraid to call 911.  Someone who is

13   not afraid to have Cory Martin arrested.  Someone who is not

14   afraid to implicate him.  Someone who will sit in front of

15   police officers and make that face and try to tell them that a

16   man punched her square in the face twice.

17           Detective Raymondo who came to the house after

18   Adelle called 911 made sure to note in his report that he

19   observed no visible markings.  Because nothing is more

20   dangerous than someone willing to falsely accuse another

21   person of a crime.  Cory was released the next day and

22   returned home where Adelle was.  A home where Adelle was never

23   scared.  A home where Adelle was in charge of the finances.  A

24   home where Adelle was the boss.

25           If you don't believe that Cory controlled Adelle, if

1   you don't believe he forced her into everything that she did,

2   then you have to believe that every step of this life

3   insurance scheme and the murder of Brandi Odom started with

4   Adelle and ended with Adelle.

5              I want to take you back a few years before Brandy

6   was murdered and specifically the summer of 2016.  And at that

7   time, Adelle had made a decision to leave her ex, Alex

8   Villard, and move in with Cory at his home in Rosedale.  She

9   had already been working there as a sex worker.  And, again,

10  she wanted to make more money doing in-calls because that's

11  what she's about -- making money.

12             She had known Cory since high school.  Previously

13  dated him and had resumed a sexual relationship with him.  You

14  saw probably hundreds of text messages yesterday over hours

15  and hours involving Cory.  And what did they tell you?  And I

16  encourage you to go back during your deliberations and read

17  them for yourself.  Government Exhibits 400 to 405.  Take the

18  time, go through them.  What did they show you?  He wasn't a

19  businessman.  He didn't even know what he was doing.  He

20  didn't know anything about sex work.  About prostitution.

21             How about Adelle?  Adelle knew everything about sex

22  work and prostitution.  She had been a long-time sex worker.

23  She brought prostitution to Cory's house first initially on a

24  part-time basis and then, when she moved in, it was full time.

25             And what else did she do?  She brought in Brandy.

1    The two of them had their business going.  Meanwhile, Corey,

2    what was he doing?  He was trying to catch up with Adelle.

3    He's Googling how to be a pimp, trying to figure this all out.

4    That's not somebody with experience and knowledge.  He was

5    trying to keep up with Adelle, who, as she told the N.Y.P.D.

6    in an interview on April 28, 2018, was the head of the

7    household.  When Adelle moved into the Rosedale house, she

8    learned that Brandy had a sexual relationship with Villard.

9    And after several months, Cory started having sex with Brandy.

10   And guess what happened?  Brandy and Adelle fought.  Cory even

11   had to break up some of the physical fights between them.

12   Adelle did not love Brandy.  Adelle was not a close friend of

13   Brandy.  Adelle was not a sister to Brandy.  Adelle grew to

14   dislike her, and by the time of her murder, Adelle hated her.

15   And that's motive.

16          Let's go to 2017.  In that year Adelle applied for

17   and took out two life insurance policies on Brandy.  The first

18   as you know was for $50,000 with Globe Life, that was in

19   April.  And later that year in December, a policy of $150,000

20   with American National was taken out.

21          And, again, as you know, she was the sole or only

22   beneficiary on both of those policies.  Brandy knew about

23   those policies.  If Adelle wanted to hide these policies from

24   Brandy, if that's what her real intention was, they would have

25   sent the mail to different addresses.  Don't buy in this

1    supposed rule that existed that Adelle and Brandy couldn't

2    even look at the mail, that's not true.  Also, Brandy signed

3    documents.  Adelle said on cross-examination, and this was

4    very important, the only signature she ever forged was Alex's.

5           Adelle also testified that life insurance documents

6    were going to one of Brandy's real e-mail addresses.  Also,

7    American National had the home landline at Rosedale which

8    Brandy could have easily picked up at any time.  And there was

9    no rule about that, picking up the landline.

10          I want to pause on the policies that were taken out

11   in Brandy's name and take a moment to discuss the evidence of

12   other policies that you heard about.

13          Adelle convinced adults around her, Alex and Cory,

14   to take out policies so her scheme with Brandy wouldn't look

15   so obvious.  And she tried to take out policies on her own

16   kids.  She had lied about that to the Government.  If Cory was

17   raping and beating her and beating her up so bad so that she

18   would fill out applications for these policies, you better

19   believe he would have done the same to make sure that she paid

20   on the premiums.  And that never, ever happened.

21          And a question for you to think about -- would Cory,

22   attempting to avoid detection at every turn, deliberately try

23   and take out policies in his own name for Adelle's son T with

24   Globe Life, or his own kids with American National, at around

25   the same time at Brandy's policies were taken out?  That would

1    immediately connect him to Brandy's policies and make him a

2    suspect.  And take a close look at Government Exhibit 121,

3    that includes the famous seven.  It's different and you don't

4    know whose handwriting that is.  At the end of the day, if any

5    of these policies were active, there's only one person who

6    could cash out and you know who that is.  Adelle and not Cory.

7                Now, let's go back to this case and Brandy's

8    policies.

9                (Continued on the next page.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1     MR. CECUTTI:  (Cont'g.)  The government brought out

2  Government Exhibit 405 with you this morning.  It's a text

3  exchange.  And the exchange says -- by Adelle to Cory:  Try

4  and do something with that bitch this week.

5          And that's in December of 2017.  And that's before

6  the second policy was ever taken out.  This has nothing to do

7  with murder.  There's no evidence at all that corroborates

8  that.

9          What is key about Government Exhibit 405 is the

10 phrase "she told me."  Read that.  It's in there.  Who's

11 "she"?  She's Brandy.  Who's "me"?  That's Adelle.

12         What did Brandy tell Adelle?  Brandy told Adelle

13 what her Social Security number was.  Once again revealing

14 Brandy's knowledge of the life insurance policies.

15         Now as you know Adelle was regularly checking on the

16 status of the policies and payments, calling Globe Life and

17 American National, telling representatives that she was

18 Brandy.  Adelle was also busy doing other things; running,

19 operating and managing the prostitution business at the time.

20         After Brandy was murdered, right after reaching out

21 to Brandy's johns, with her own cell phone number to tell them

22 that she was dead, Adelle contacted the life insurance

23 policies -- I mean companies.  She called Globe Life.  She

24 called American National.  And she did that several times.

25 She pretended to be Brandy's sister.

1          You heard the calls.  They show you the deception.

2     They show you the manipulation that is at the heart of Adelle

3     Anderson.

4          Adelle also sent emails and faxes to Globe Life.

5     And she also did the same with American National.  She also

6     recruited her good friend, Maggie Jones, to try and collect on

7     the policies.  And Adelle made other efforts, including

8     obtaining Brandy's death certificate.

9          Let's go back to some of the calls.  Adelle called

10    Globe Life on April 26th, 2018.  And again on June 20th, 2018.

11    On April 26th, 2018, what does Adelle do?  Adelle plays to the

12    sympathies of the representative from Globe Life.  When

13    offered prayer by the representative, Adelle's says:  Thank

14    you so much.  And then follows up with:  Yes, please, every

15    prayer helps.

16         The representative confirms the mailing address on

17    the policy.  And Adelle mentions that it's been really rough.

18    She then tells Adelle the items that she needs to provide as

19    part of her claim, along with further instructions.  Adelle

20    responds that she's been really going through it the last

21    couple of weeks, and that mail from Globe Life was sent to her

22    that she wasn't expecting and didn't remember.

23         On June 20th what happens?  Well, it's another call

24    with Globe Life.  And this time she speaks with two Globe Life

25    representatives.  She needs to get a death certificate, and

1    has learned that to get it she needs a letter from Globe Life

2    verifying that she, in fact, is the beneficiary.

3            When transferred to the second representative, the

4    representative apologizes for the delay.  Adelle says:  It's

5    no rush.  I just had a baby.  I've been busy.  She's just now

6    able to get around to it, as she had totally forgot about it.

7    Why?  Because of the baby.

8            What happens the next day?  Well, she remembers to

9    call American National.  I guess the baby didn't cause her to

10   forget to do that.  And what happens during that call?

11           While in trying to collect on the life insurance,

12   she acknowledged that Brandy had been murdered, telling the

13   representative:  Um, I hate saying it, it's just -- it's just

14   unbelievable.

15           She gave her address in New Jersey.  Her date of

16   birth, and the last four digits of her Social Security number.

17   She also asked the representative to mail her documents, how

18   she could get Brandy's death certificate and how to submit the

19   claim form.

20           Along with all the calls, I encourage you, during

21   your deliberations, to listen to the calls and listen to this

22   call.  This is a woman who is fully in control.  Who is

23   independent.  Who's acting out of her own agency and is trying

24   to collect on these policies.  And she's absolutely not afraid

25   to do it.

1        Now what happens the next day?  Adelle emailed

2   American National, and in her email she stated that she was

3   the sole beneficiary and provided her contact information.

4        What happens two days later?  She called Globe Life

5   again on June 24th, 2018.  Five days later she sent a fax to

6   American National.  Adelle's been busy in June of 2018.  She's

7   calling.  She's sending faxes.  She's sending emails.  And

8   even though she has the baby, she hasn't forgotten to do any

9   of this stuff.  In the fax that she sends on June 29th, she

10  states that she's the sole beneficiary, and she's provides a

11  New Jersey address.

12       Let's go back a little earlier in June.  Because

13  June is a busy month for Adelle.  She was also in

14  communication again with her former friend, Maggie Jones, to

15  collect on the American National policy.  She gave the

16  American National policy paperwork to Maggie Jones.  Why?

17  It's another way to try and collect on this policy.

18       Then in July, in early July, she sent a claim form

19  to American National, on July 7th, and provided the death

20  certificate that she finally got for Brandy, which was

21  requested by American National.

22       And then the next month in August, she sent a claim

23  form to Globe Life on August 24th, along with a HIPAA form.

24       Adelle called Globe Life at the end of August, on

25  August 28th, 2018.  And why did she do that?  She did it

1    because she wanted to see if they received the death

2    certificate and other mail that she had sent.  She received

3    further instructions from the representative, and Adelle said

4    that she would call back in a few days on Friday, or the

5    following week.

6            So that brings us to September of 2018.  And that

7    last call is important.  Because she tells the representative

8    I'm going to call you back on Friday.  Or if I can't get

9    around to it, maybe because of the baby, the following week.

10           Now where was Cory all this time?  Because I haven't

11   mentioned him over the last few months.  Well, while all of

12   this was happening, that busy June month, July, August, Cory

13   wasn't around.  He and Adelle were not together.

14           As she admitted on cross-examination, Cory was away

15   for months.  He was living with his cousin, Whitney, in

16   Virginia in May or June and July.  Then he moved to Florida

17   with his friend John.  And during those months there was

18   plenty of time to distance herself from Cory, or even confess

19   to the police.  Plenty of time to tell Brandy's family what

20   had happened or even her own family.  Plenty of time to let

21   the kids heal from all the abuse at the Rosedale house.  But,

22   nope, none of that happened.  Why?  Because Adelle was focused

23   and focused on one thing, collect on those policies.

24           After Labor Day, she picks up Cory from the airport

25   and drives him to her cousin Dwayne's house where she was

1   living with the kids.  You heard that correct.  She picked him

2   up at the airport.  And at the time she was living with a

3   family member, Dwayne, her cousin and along with her kids.

4   And she drove to the airport and picked Cory, the abuser, the

5   violent rapist, up and brought him into her home with her

6   children.  I guess those must have been the good times that

7   she spoke about.

8           In 2019 and 2020, she paid for both of their

9   apartments in New Jersey.  She worked while Cory stayed home

10  with the kids.  And they continued their relationship.  And in

11  his spare time, he wrote some short stories, and those short

12  stories have absolutely nothing to do with this case.  Stories

13  about life challenges.  Stories about drugs and sex and

14  violence that he and many others that he knew from his

15  neighborhood had experienced.

16          As you heard, contrary to what Adelle told you,

17  after 2018, there were no further communications between her

18  and Globe Life or American National.  And you know that to be

19  true from the representatives of both of those companies who

20  testified in this trial.  Adelle made the independent decision

21  to stop trying to collect.  When?  When Cory returned.

22          So going back to August 28th in that last phone call

23  she had with Globe Life and said I'll give you a call back on

24  Friday or the following week?  Guess what happened?  Cory came

25  back.  And that's when she stopped, and that is not a

1    coincidence.

2            It tells you something.  She tried to collect when

3    he was gone, but it just became too hard to get everything in

4    order.  To cash in on the death of her close friend and

5    sister, and so she stopped.  But she kept the paperwork.  And

6    she kept Brandy's driver's license.  And where did she keep

7    it?  You heard that yesterday.  She kept it in her tote bag in

8    case there was an opportunity and she changed her mind for the

9    future.

10           Now I want to pause, and I'll come back to Adelle,

11   but I want to pause now and talk about another person that you

12   heard from in this trial that you cannot trust.  And that

13   person is Samson Alabi.  Samson is a former friend of Cory's.

14   And while there was some dispute about it during

15   cross-examination, I think we all got it squared away, he's a

16   three-time convicted felony, a scammer that he fully

17   acknowledged, and a liar.  And he admitted eventually all of

18   that to you.

19           He also gave wildly different accounts to the NYPD

20   and the government in 2018 and 2020 and now in 2024.  You have

21   his reported statement in 2018.  You also have his grand jury

22   testimony from 2020.  And obviously what he told you now in

23   2024.  And, again, I encourage you, during your deliberations,

24   review this material.  Because what you will be reminded of is

25   that his story evolved and evolved dramatically, from hearing

1    from Cory about some life insurance scam to asking him to

2    commit a murder.  Get a 50 percent cut.  And also a detailed

3    plan of how to do it.  The robbery that went wrong.  None of

4    that was talked about in 2018.

5         He only came to law enforcement and started talking

6    when he got into trouble.  So you learned about Brandy's

7    murder in April of 2018.  He didn't do anything in April, May,

8    June, July.  August, when he gets arrested.

9         And now that he's in a lot more trouble, he has a

10   tremendous amount at stake with his pending state court

11   criminal case.  He's facing a lot of time in prison.  He has a

12   serious motivation to lie, curry favor with the government,

13   and guess what?  He has lied.  Now you will hear from

14   Judge Donnelly that he, just like Adelle, has his own interest

15   in this case.  And it's different from an ordinary witness.

16   And that like Adelle, his testimony must be scrutinized with

17   caution, and weighed with great care.

18        A final thought on Samson Alabi.  The government

19   showed you this morning Government Exhibit 401.  And that's a

20   text message from July 25th, 2017 referring to $25,000.

21        The government said it's connected to a life

22   insurance scheme.  And here's my question:  And this is

23   really, really important.  I'm going to talk about this

24   several more times.  But this is really important.

25        They had this text message when he testified.  It's

1   not like they found it yesterday.  They had it.  When he was

2   sitting there with his jump suit on, they had it in one of

3   their binders.  I don't know where it is, maybe one of those

4   (indicating).  They had that text message or they had it on

5   the screen.  But they didn't show it to him.

6           Why?  That's an easy move, right?  You got

7   confirmation right there with that text message.  But they

8   didn't show it to him.  You have to ask yourself why.

9           He told you that he met with them four to five times

10  this year.  Today's March 1st, so the past two months, met

11  with him four to five times.  You better believe that text

12  message came up, right?  If it was that important?  It came

13  up.  They sat him down, they looked him in the eye, showed him

14  the message and said, what is this?

15          But clearly it didn't corroborate what they now

16  claim is true.  Because if it did, then that text message

17  would have been brought up with him when he testified.  But

18  they made a deliberate decision not to do it, because it would

19  not corroborate, and it would not be consistent with their

20  case.

21          Do not let them interpret when they have a witness

22  that they called into this courtroom to explain things.  That

23  is totally inappropriate in a serious case like this to hide.

24  You called a witness, you have this strong evidence against

25  Cory, ask the questions.  Don't wait until later and provide

1    interpretations.

2            Do not let the government to get away with this.

3    This was done in this trial over and over again, giving

4    interpretations of evidence to fit their case instead of

5    asking their own witnesses that they prepped, specifically

6    Adelle Anderson.

7            We know by now that Adelle Anderson's all over the

8    life insurance fraud.  She plead guilty to fraud offenses.

9    And she also pled guilty to participating in Brandy's murder.

10   Her participation is not in dispute.  She knows what happened.

11   She knows who did it.  She knows where it happened.  And when

12   it happened.  She knows all those things.  And she shared a

13   chilling part of her story with you.  And it was not only just

14   chilling, but it was also quite disturbing.

15           According to her, and her story, her detailed story,

16   about Brandy's murder, she left Cory's house with her newborn

17   and she went to her mother's.  Now that's not the disturbing

18   part.  What is disturbing is that she did that knowing that

19   Brandy was going to get murdered.

20           When she got to her mother's, what happened?  Well,

21   she enjoyed her time with her mother and her sisters and the

22   baby knowing that Brandy was going to get murdered.  And not

23   only that, she continued to set up dates knowing that Brandy

24   was going to get murdered.  And you see that in the text

25   messages from April 2nd.

1          And knowing that she was going to get murdered, she

2    never once warned her close friend whom she dearly loved.

3    Loved like a sister, Brandy.  She never did any of those

4    things.

5          She didn't call or text.  Or call 911 or the police

6    to say, look, like I know what's going to down.  Help.  She

7    didn't do any of those things.

8          Again, Brandy was supposedly her close friend, her

9    sister and you know she wasn't.  You know that by now.  What

10   was she to Adelle?  She was a money maker.  That's all that

11   she was.

12         And this is the government's star witness.  The one

13   who uses others for their own personal gain.  The one that

14   they have asked you to fully trust and believe in.  The one

15   who is out on bail, and as she said, "a free woman" hoping for

16   time served and no jail time, and has repeatedly violated her

17   cooperation agreement, and the only consequence for doing all

18   those things, is really no consequence at all.  It's just

19   getting another cooperation agreement.

20         And after Brandy's murder knowing what happened, she

21   posted a disturbing message for all to see on Facebook telling

22   the world that she loved Brandy and she couldn't believe that

23   she was murdered, and she told Brandy to be careful, to watch

24   her surroundings, and that she will never be forgotten.

25         And she ended with:  I will always help look for

1   whoever did this to you because I know you didn't deserve

2   this.  That's just flat out disturbing.  And this is the

3   government's star witness, who they have joined forces with,

4   and who, if they don't have, they have no case against Cory

5   Martin.

6           Now instead of telling the truth about who did it?

7   She tried to sell you a detailed and totally inconsistent

8   story about Cory murdering and dismembering Brandy Odom.

9   Adelle told you Brandy was at the Rosedale house.  But did any

10  other evidence tell you that?

11          The government has argued that the video

12  surveillance evidence corroborates that.  But you saw the

13  video and, again, look at it during deliberations.  Look at

14  the compilation video, but look also at all of the underlying

15  video.  No one can be identified in that video.  You can't

16  even tell if someone's a man or a woman, let alone

17  specifically Adelle, Brandy, Cory or anyone else.  There's

18  absolutely no way to discern from the surveillance footage

19  presented to you who was walking in and out of that house, at

20  any point during the first week of April 2018.

21          There were multiple opportunities, even in the video

22  compilation, where Brandy could have exited the house,

23  especially during the nighttime trips where you can't see

24  anything, let alone how many people are getting into and out

25  of the car.

1          I just want to pause on the video, and I'm going to

2    come back to it momentarily.  You know that there were texts

3    during the week of April 2018 that were exchanged between

4    Adelle and Cory.  Where are they?  You heard for hours text

5    messages, none from this time period, including this infamous

6    UGG's text.  The government gave you explanations.  They gave

7    you excuses but, again, that is not a substitute for evidence.

8          Let's go back to the video, and specifically

9    Detective Santiago, who complied that video, put it together.

10   How did he know that it was a pizza box?  I'm sure you may

11   remember that.  During his testimony he said, oh, that's a

12   pizza box right there.  How does he possibly know that?  It

13   wasn't because he could actually see a pizza box, or was it

14   because the entire point of cherrypicking compilation footage

15   was to try and corroborate Adelle's sensational story.

16         Now the government has told you an interesting story

17   with the video surveillance and the cell site evidence.  I

18   want to come back to this point that I was going to emphasize

19   with you with respect to Samson Alabi and that text from

20   July 25th, 2017.

21         Why didn't they put up the video compilation when

22   Adelle was testifying?  Why?  They had it.  Again, probably

23   somewhere in there or on their computers.  They had it.

24   Detective Santiago had made that video, and Adelle Anderson

25   was here.  All the technology was here; screens, everything

1   was here.  All they had to do was press play for Adelle.  And

2   instead of red and white arrows, circles and spills of

3   headlight spillage patterns, why not have Adelle identify

4   Brandy coming out of the house, supposedly on April 4th?  Why

5   not just do that?  Why not have her explain the movements of

6   the Nissan?  Driving around, making a left turn on this

7   street, right turn on that street, going to Canarsie and back?

8   Why not just have her explain it?

9           Why not have her point out the individual who

10  appears to walk out of Canarsie Park with a suitcase and say,

11  yep, that's him, that's Cory Martin, right there on the

12  screen.  Why not do that?  There can only be one reason.  She

13  could not have done it without lying.  What she would have

14  said would have not been corroboration, it would not have been

15  consistent with the government's case.  That is the only

16  reasonable inference that can be drawn.

17          Now some lies Adelle told you, they couldn't even

18  try to corroborate with the hundreds of hours of footage and

19  cell site location data, which tells you nothing, by the way,

20  the cell sight location data tells you nothing about when

21  phones are on or off.  And only provides data for SMS text or

22  voice calls.

23          From all this footage, the hundreds of hours of

24  footage, they couldn't get the alleged first trip to the park

25  on Scheneck Street with the shopping cart.  They couldn't get

1   the suitcase going into the truck of the car.  They couldn't

2   get the disposal of the suitcase.  They couldn't get the

3   disposal of the cleaning supplies and saw apparently on Snake

4   Road.  They couldn't get the trip to Home Depot.  They

5   couldn't get the garbage bags with Brandy's limbs going into

6   the trunk of the car in the middle of the night.

7           And by the way, Adelle told you that the first trip

8   occurred at night, but now the government is arguing to you

9   that it happened during the day.  And also the government says

10  that the bag that leads to car on April 9th was black, Adelle

11  says it's beige.

12          Look, what they did, what's captured are ordinary

13  activity, activities of people moving out of the house, which

14  there's more than enough evidence to support that, buying

15  groceries and running errands.  The truth is, is that

16  surveillance does not tell you anything.  The NYPD has had

17  that surveillance since 2018, and when you're not able to

18  identify a single individual, get a license plate on a single

19  car or come to a clear understanding of what the activities on

20  the videos actually show, it means next to nothing.

21          The government tries to use the video surveillance

22  to corroborate Adelle's testimony, but they struggled for all

23  the things that I just mentioned.

24          The government has focused a lot on the moving

25  company.  You heard it from that witness the other day.  The

1    gentleman with the white boxed truck that backed into the

2    driveway.  Adelle said Cory was getting rid of forensic

3    evidence.  That was her testimony.  But she also said the

4    dismemberment didn't happen until three to five days after the

5    murder, and the movers came the day after.

6            So what exactly would Cory have been getting rid of?

7    Were we supposed to believe that liters of bodily fluid and

8    bloody tarps were getting sent off in a random Craigslist junk

9    removal truck?  The bottom line is that Mr. Gultekin, the

10   owner of that company, who told the NYPD that he did not see

11   Brandy in the house, acknowledged there was nothing unusual.

12           But this morning we also heard something else.  And

13   that is the government arguing that according to their own

14   timeline with respect to Brandy's murder, the garbage removal

15   company came before the dismemberment.  That's completely

16   inconsistent.  And then according to this government timeline,

17   Cory then somehow messes up the house by finishing off the

18   dismemberment.  But this would have been after the junk

19   removal company left.  That makes no sense.  No sense.

20           And Adelle also told you something else about

21   removal companies, garbage removal companies.  That there was

22   a mysterious second company that came.  The government never

23   tried to corroborate that.  There's no video of that, because

24   there's no second company.

25           Now let's talk about the infamous Home Depot

1    purchase at Valley Stream on April 6th, 2018 that no one can

2    confirm was made by Cory.  Adam Van Duzer told you that the

3    only information the NYPD had on a tool Cory was looking for

4    was that it was on Aisle 72, Bay EC1.

5            Van Duzer told them it might have been a Makita saw,

6    and that 85 like it were sold in the area.  Then he pulled the

7    cash only receipt on April 6th showing a purchase of a DeWalt

8    saw that was not on any surveillance at the Home Depot or in

9    the parking lot of the Green Acres Mall.

10           They want you to think that cell site location data

11   that could never actually tell where a device exactly is,

12   especially in a suburban area where the cell sites are so

13   spread out, proves that Cory was in this Home Depot at that

14   time?  And is it believable that he went in the middle of the

15   afternoon knowing he would be caught by cameras and seen by

16   other people to buy a tool that he'd use to dismember a body?

17   No way.

18           Back to Adelle and the selective way in which the

19   government used her during the trial.  They didn't even have

20   Adelle identify the DeWalt saw the government purchased to

21   show you at this trial.  Because she wouldn't have.  That's

22   the point.  Whenever they don't show a witness something, it

23   means it would not have corroborated their case or been

24   consistent with their case.  And I encourage you during your

25   deliberations to think about that.

1    When a witness testified why didn't they show us

2    certain things?  Why didn't they ask certain questions?  And

3    you know now what the answer is.  Because it would not have

4    corroborated their case, and it would not have been consistent

5    with their case.

6    Back to the saw and Adelle.  They didn't have her

7    identify the DeWalt saw because she knows Cory never made that

8    purchase.  There's no evidence that Cory ever bought, had, or

9    used that saw.  Adelle's testimony is that Cory strangled

10   Brandy.  Left her on the floor for three to five days, then

11   dragged her naked body into the bathroom to begin the

12   dismemberment.

13   First of all, if Brandy was left on the floor for

14   three to five days, there would have been evidence of blood

15   settling and becoming fixed in her body.

16   Dr. Shana Straub observed none.  That happens to a

17   body eight to 12 hours after death.  If she was left on the

18   floor for that long, if she was kept in bags for that long

19   retaining heat, you'd see more decomposition.  That happens 36

20   to 48 hours after that.  Dr. Straub observed none.  Adelle's

21   timeline is all wrong.

22   Adelle also said the entire bathroom was covered

23   with garbage bags.  So that means no leakage whatsoever?

24   None.  No transfer of DNA, or blood, or fibers?  That means

25   that over the two days that Cory allegedly was dismembering

1    Brandy in the bathroom, cutting off her arms and her legs in

2    four spots with multiple tools, that no forensic evidence was

3    left.  That nothing spilled in between two garbage bags taped

4    together.  No particles of blood, tissue, or bone splattered

5    as a mechanical tool cutting through limbs?  That nothing was

6    transferred when garbage bags from the kill room were pulled

7    off the walls and the ceilings and the floors.  That none of

8    the five to seven liters, almost two gallons of blood, that

9    Dr. Straub said would have leaked out of Brandy's body was

10   left any where?  Or even cleaned up?  Not in the trap of the

11   bathtub drain, not in the corners of the tub, or under the

12   caulking, not on the walls.  Nothing.

13           Imagine two gallons, and balancing two gallons of

14   liquid on garbage bags that are taped together without letting

15   a single drop of that liquid fall.  Is that what Adelle is

16   saying Cory Martin did here?  That is simply not possible.

17           The government wants to run with the story that the

18   DeWalt reciprocating saw was used along with some other tools.

19   It's possible that a saw, of which there are hundreds of

20   different kinds, was used to make complete cuts in Brandy's

21   bones, but as Dr. Soler told you, it's also possible that it

22   wasn't.  She told you it's possible a saw was not even used in

23   this case.

24           But let's assume that it was.  Dr. Soler could not

25   tell you what kind, what width, what height, whether it was

1  serrated, how many teeth per inch it had, or really any other

2  information about it, other than the fact that it had the

3  power to cut through bone, which we already knew, and we knew

4  that because Jasper Moulder told you that these tools can cut

5  through sheetrock, wood, and metal.

6          So if Cory did use a reciprocating saw why did it

7  take two days, instead of a few minutes?  Why are the cuts to

8  the bone jagged and irregular.  Why use multiple tools?

9          The government could have had Dr. Soler compare

10 those chef's knives, or the Toastmaster electric carving knife

11 from the kitchen in the Rosedale house to the incomplete cuts,

12 but they chose not to do that.  Only those Diablo blades.  And

13 we encourage you to take a look at those Diablo blades.  Even

14 on those unused saw blades, the bright red paint is chipped.

15         Dr. Soler told you no foreign material or residue

16 was found in the cuts.  That's highly significant.  So you're

17 left with this.  An instrument like a knife of unknown size

18 and some sort of blade that went black and forth that make

19 markings atypical of normal saw blades.  Again, another

20 witness that you heard from with no conclusions that implicate

21 Cory Martin in the murder of Brandy Odom.

22         To recap, Adelle's timeline of the murder and

23 dismemberment is contradicted by Dr. Straub's testimony.  The

24 government declined to ask Dr. Soler to compare the possible

25 dismemberment tools that were actually found at the Rosedale

1    house.  And not a drop of forensic evidence was left during a

2    dismemberment that took two days, and a disposal that involved

3    multiple trips to multiple locations.

4            What's the more likely story?  And I'll pose two of

5    them for you.  That a high school drop out, with no

6    specialized knowledge of forensics, just watching an

7    excruciatingly inaccurate and fictional television show,

8    whether it's First 48 or Dexter, performed the messy,

9    time-consuming murder and dismemberment of a human body and

10   left no evidence for collection by maybe the most highly

11   trained and skilled forensic team in the country?  That's

12   story number one.  Okay?  Or that none of this happened at the

13   Rosedale house?

14           Clearly we know what the government wants you to

15   believe.  The government wants you to believe that they're

16   constant showering by Adelle and Cory saved them from

17   detection.  But Detective Cenizal told you herself, they go

18   and collect evidence not visible to the naked eye.  Evidence

19   that survives a cleanup.  Evidence that even after showers

20   will be left for experts to find.

21           Detective Casale told you that with the crime scope

22   tool, bleach would show up.  So not only do they not have

23   evidence of a murder, but they don't even have evidence of an

24   actual cleanup.

25           These crime scene detectives conducted thorough and

1   methodical searches over several days at the house.  Just the

2   two who testified at this trial spent over 30 hours at the

3   scene in an attempt to collect forensic and biological

4   evidence.

5          From Brandy's bedroom?  Negative results.  From the

6   second floor bathroom?  Negative results.  From the other

7   upstairs bedrooms?  Negative.  From the downstairs bathroom?

8   Negative.  From the attic?  Negative.  From the laundry room?

9   Negative.  From the shed?  Negative.  And no money, no drugs

10  nor drug paraphernalia or firearms either.

11         Detective George Velez found SAWZALL blades.  A

12  DeWalt reciprocating saw bag, and items that looked like they

13  had blood on them, in the park by Seaview Avenue, but none of

14  those items were sent to OCME and none of them of were

15  connected to Cory.

16         They also never found the gloves that Adelle told

17  you about.  The gloves that apparently smelled like death.

18  The gloves that she said were thrown out in a garbage can in

19  Canarsie Park, I guess.  Never recovered by the NYPD.

20

21         (Continued on the following page.)

22

23

24

25

1      MR. CECUTTI:  (Continuing) George, Detective George

2  Velez did tell you that he tested the Nissan with a CrimeScope

3  and Bluestar.  Negative, negative forensic results in a trunk

4  where Cory allegedly placed a suitcase that contained Brandy's

5  torso in it.

6      And a shopping cart with two large plastic bags

7  filled with body parts?  No leakage, no transfer, even during

8  the alleged drives to the disposal sites.  Nothing.  Negative.

9      Now, let's talk about the testimony of

10 Detective Colecchia.

11     He testified with tremendous certainty:  I know when

12 my dog is indicated.  And that's because apparently he talks

13 to his dog and the dog talks to him, and nobody can understand

14 each other but the two of them.  He's from the K-9 unit and he

15 worked with his dog Timmy that he referred to him as and he

16 also referred to Timmy as his partner.  In Detective

17 Colecchia's mind, despite not being able to recall any details

18 about Timmy's training past 2012 and certifications, Timmy is

19 infallible and he always gives reliable indications.

20     Detective Colecchia claimed that Timmy alerted at

21 the trunk of the Maxima.  That's just not reliable.  Again, as

22 Detective Velez told you, there was no forensic evidence

23 recovered from the trunk of the Maxima.

24     Detective Colecchia also testified that Timmy

25 reacted inside the house in multiple areas.  That is also

1  unreliable as, again, no forensic or biological evidence was

2  recovered from inside the house related to Brandy's murder.

3         And it is very important to remind you that we

4  brought up Timmy's supposed reactions inside the house, not

5  the government.  The government never asked

6  Detective Colecchia anything about Timmy's activities inside

7  the house on direct examination.  That's because they didn't

8  trust that Timmy ever went inside the house and reacted.  It's

9  not in his report and it's not in his memo book.  So all of

10  Timmy's reactions, indications, wagging his tail, are

11  unreliable.

12         The testimony of every single one of the witnesses

13  that I just discussed casts serious doubt that Brandy's

14  murder, let alone her dismemberment happened at the Rosedale

15  house.  This casts serious doubt that Brandy's body was ever

16  in the Nissan Maxima.  And do not fall for the government's

17  explanations of why evidence does not exist.  Not only do they

18  not have evidence of a cleanup but, more importantly in this

19  case, they do not have forensic evidence of the murder and

20  dismemberment.

21         Let's talk about fingerprints.

22         Detective Ramirez, another highly experienced

23  detective, told you that she received one latent print that

24  had a sufficient amount of information to compare to possible

25  suspects in this case.  Detective Ramirez compared this print

1    to those of dozens of people, including Cory.  Cory was

2    excluded and there is no fingerprint evidence connecting him

3    to Brandy's murder or dismemberment, but there's more.

4            There is a print on the inside of the plastic bag

5    and the NYPD did not determine who that print belongs to.

6    That is highly significant.  Prints are 100 percent unique.

7    They cannot be transferred.  You'd think that the person who

8    touched the inside of one of those bags in which Brandy's

9    limbs were found was involved in her murder.

10           Let's now talk about DNA.

11           You heard from two experts yesterday and the day

12   before in this case, both of whom acknowledged that from the

13   findings in the OCME reports, no one can tell you how anyone's

14   DNA was deposited on an item.  No one can tell you whether

15   anyone actually came in contact with an item.  It is not touch

16   DNA.  DNA can spread through the air.  It can be transferred

17   from surface to surface and person to person, to the point

18   where your DNA can be found on a distant item that you've

19   never even seen before.

20           Certainly, there's no clear evidence tying Cory to

21   any incriminating item.  The DNA analyses conducted in this

22   case imagine many, many different possibilities and the tests

23   are not confirmatory.

24           So when the government tries to connect or tie Cory

25   to that plastic bag via that matching Y profile, even though

1   he was completely excluded via the nuclear DNA test, and they

2   remind you that his dad is dead and that it probably wasn't

3   his grandfather or uncle, you have to remember the statistics.

4           There could be thousands or more men with the same

5   profile just in New York City.  And what's amazing about this

6   is that there was even another government witness in this

7   case, Samuel Lemus, who had a Y profile that matched the DNA

8   mixture on the bag.  Incredible.  But even if you believe

9   somehow that Cory's DNA was there, we know that Adelle was

10  involved in this and lived in the same house as Cory.  We all

11  know that.  They were in a romantic relationship and his DNA

12  could have been all over her.

13          I want to come back to a point that I mentioned near

14  the beginning of my closing argument.

15          The dismemberment of Brandy Odom was horrific, truly

16  awful, and for this to have happened, someone must have really

17  hated Brandy.  And from the testimony of her mother and her

18  former clients, Brandy appears to have been a sweet and kind

19  person.  Cory did not know her that well.  He did not have a

20  reason to hate her.  However, there is one person, one person

21  in this case who did, and that is Adelle Anderson.

22          Brandy had sexual relations with two of her

23  children's fathers:  Alex Villard and Cory.  Adelle also had

24  regular fights with Brandy that Cory had to break up.  They

25  had a long history in a dangerous business surrounded by

1    dangerous people, but Brandy, again, was not her sister, was

2    not her close friend, she did not like Brandy, she used her

3    and she couldn't care less about her.  She decided it was more

4    important to try and collect $200,000 than to keep her alive.

5              I want to talk about the charges that Cory faces.

6              He's been charged with murder-for-hire, not murder

7    for money, murder-for-hire, and conspiracy to commit

8    murder-for-hire.  Each of these crimes have elements that the

9    government must prove beyond a reasonable doubt, and I want to

10   highlight one which is as consideration for the receipt of

11   anything of pecuniary value.

12             As you will hear from Judge Donnelly, the government

13   must prove that Cory participated in Brandy's murder with the

14   understanding based on a mutual agreement that he would

15   receive in exchange something of pecuniary value.

16             Even if you suspect that Cory killed Brandy, there's

17   no credible evidence that he did so pursuant to any mutual

18   agreement or as consideration for the receipt of pecuniary

19   value.

20             Adelle, once again, is the sole source to prove this

21   and she has told law enforcement at different times that Cory

22   wasn't involved and didn't kill Brandy and then, later on,

23   saying that the murder had absolutely nothing to do with

24   money.

25             If you don't believe her story of abuse, and you

1   shouldn't, you cannot believe that she would have given any of

2   the payout to Cory.  That money would have been hers and hers

3   alone.  There was no mutual agreement.  There was nothing of

4   pecuniary value.  You can't be sure of what the truth is and

5   can't trust that Adelle is now telling the truth to you now.

6            Finally, the nature of this offense doesn't fit the

7   government's motive that this was a murder purely intended to

8   collect on life insurance proceeds.  If Brandy's murder was

9   just about cashing out on a policy, there's no need for

10  dismemberment.  The murder of Brandy Odom and her

11  dismemberment was motivated not by money, but by sheer hatred,

12  something that Cory did not have.

13           Cory has also been charged with fraud offenses,

14  conspiracy to commit wire fraud, aggravated identity theft and

15  fraudulent use of identification.  This last offense is

16  connected to the murder charges.  He didn't murder Brandy Odom

17  as consideration for anything.

18           Lastly, the government failed to prove that Cory

19  participated in these crimes.

20           Now, the government argued to you this morning that

21  you can find guilt, Cory Martin guilty in another way:  Find

22  him guilty of murder-for-hire in another way.  And that's if

23  they proved to you beyond a reasonable doubt that he knowingly

24  associated with the murder under an aiding and abetting

25  theory.

1      That's totally inconsistent with what their case has

2 been from start to finish, totally inconsistent.  That's the

3 first time that we've heard that in this case.  Offering you

4 an alternative theory at this late stage in this trial to

5 convict him?  That's unbelievable.  What does that tell you?

6 They're not sure about their theory.

7      Be smart.  Why do they do that?  They try and

8 convincingly tell you that Cory Martin strangled, murdered and

9 then dismembered Brandy Odom and then come upright at the end

10 and say, oh, we've got another theory for you to consider.  Be

11 smart.  It's telling you something.  It's telling you that

12 they themselves don't fully believe in their case.  It's

13 telling you that they don't fully believe or trust their star

14 witness, Adelle Anderson.

15      Cory Martin is presumed innocent of all the charges.

16 He is presumed innocent unless and until you decide

17 unanimously that the government has met its burden and proven

18 him guilty beyond a reasonable doubt.  When this trial began,

19 Cory had this presumption and right now, as he's sitting here,

20 he still has it unless and until you are convinced that the

21 government has proven his guilt beyond a reasonable doubt.

22      Now, what is reasonable doubt?  Judge Donnelly is

23 going to tell you what it is.  I believe she will tell you

24 that it is a doubt based upon reason and common sense, the

25 kind of doubt that would cause a reasonable person to hesitate

1   to rely on it and act on it in a matter of importance in his

2   or her personal life.  Keep that in mind.  You are going to

3   hear it again.  The kind of doubt that would cause you to

4   hesitate to rely and act on.

5          Cory's presumption of innocence and the government's

6   burden of proof are so important to this system and right now,

7   in this trial.  It's how we make sure mistakes are not made

8   when thinking about the most serious thing that can happen to

9   a person losing their liberty and life.

10          You are the first people ever in this case who have

11  been given the responsibility of applying this presumption of

12  innocence.  The NYPD was never given this responsibility and

13  neither was the FBI and neither were the federal prosecutors.

14  The NYPD, the FBI, the prosecutors did not apply the

15  presumption of innocence to Cory.  The prosecutors were not

16  presuming innocence when they gave Adelle Anderson a deal to

17  cooperate back in September of 2021 against Cory and they

18  certainly were not presuming Cory's innocence when

19  Ms. Anderson, Adelle, lied to them just a few weeks ago,

20  violated her cooperation agreement and then gave her another.

21          Ladies and gentlemen, the government here has made a

22  horrible, horrible mistake.  They have bought this story from

23  Adelle Anderson and, of course, they cannot meet their burden

24  because Adelle has, once again, falsely accused Cory of crimes

25  that he did not commit.

1           To convict Cory Martin, you have to fully trust

2    Adelle, you have to fully believe her, and you simply cannot.

3    You can only hesitate to rely on her word and act on it and

4    the inability to fully trust and believe her is reasonable

5    doubt.  The reality is that anyone would hesitate, anyone

6    would hesitate to rely and act on the word from Adelle and

7    that, again, is reasonable doubt.

8           And they also can't meet their burden because of the

9    lack of forensic evidence connecting Cory to Brandy's murder.

10   And let's put the burden of proof in this case in context with

11   other burdens.  It's the highest one.

12          If you're in a serious car accident and you were

13   seriously injured --

14          THE COURT:  Mr. Cecutti, I'll instruct the jury on

15   the burden of proof.

16          MR. CECUTTI:  The burden of proof in this case where

17   Cory Martin is accused of horrific and serious crimes is the

18   highest in this country and the government team will argue

19   later this afternoon that their case is airtight, airtight

20   with all the evidence that they have presented, but it's far

21   from it.

22          It's been established that the government, if they

23   choose, can track down any person, any document, that will be

24   helpful in their case.  What has also been established is that

25   there are holes and there are gaps in their case against Cory.

1      The government may argue to you that you don't need

2 anything else to convict based on what they've presented.  You

3 should absolutely reject that.  Don't be insulted by what you

4 need and don't need.  You get to decide if you have been shown

5 what you believe is enough and that whether sufficient

6 evidence has been presented to you.  Not the government.  And

7 here, in this case, the government has fallen short.  There

8 are too many holes.  There are too many gaps.  There are too

9 many unanswered questions.  There are too many excuses for

10 lack of evidence such as pine oil at the trunk of the Maxima

11 and possible barriers inside Cory's home.  And all of that is

12 just excuses, maybe even explanations, but excuses and

13 explanations are not substitutes for evidence.

14      I cannot emphasize this enough but the government

15 has not proven the charges in this case.  Having suspicion is

16 not enough.  Probable guilt is not enough.  Possible guilt is

17 not enough.

18      Again, this afternoon, the government is going to

19 stand up here and argue that they have proven the case.  And

20 if I had the chance or if Ms. Thiele had the chance or both of

21 us could come up here, we would argue against all of their

22 points, but because they have the burden, they get the last

23 word.  And I want to leave you with a few thoughts before I

24 finish that I hope will assist you, help you in your

25 deliberations.

1          My first thought:  The government wants you to

2    believe that they have presented a full and complete picture

3    to you.  They haven't, and they have demonstrated in this

4    trial that they are afraid to do that.

5          They were afraid to play the compilation video with

6    Adelle as they were uncertain of what she would say.  They

7    were afraid to show Samson Alabi, that text message from

8    July 25, 2017, because of what he would say.  They were afraid

9    to present all of those text messages that you heard yesterday

10   with Adelle Anderson and ask her questions about it because

11   they were afraid of her answers.

12         The government shouldn't play a lengthy video,

13   present hundreds of text messages, and not have critical and

14   key witnesses to explain that evidence.  When the government

15   comes back up here, I challenge them to tell you why they made

16   those decisions.  And when --

17         MS. DEAN:  Objection.

18         THE COURT:  Sustained as to that.

19         MR. CECUTTI:  Ask yourselves why they didn't do

20   that.  If Cory's actually in the video, why didn't they have

21   Adelle identify him?  Why was she not shown the text exchanges

22   and asked to explain?  She, after all, is their star witness.

23         Other questions:  Why didn't they show you the

24   contents of the other dozen electronic devices seized from the

25   home?  What are they trying to keep hidden and secret or

1   latent from you?  And if they truly believed in

2   Detective Colecchia, why didn't they ask him about Timmy's

3   reactions when he supposedly went inside the house?  Why

4   didn't they show you Samson Alabi's not only text message but

5   agreement and share with you its terms.  We did that.  There

6   are so many questions that remain.

7           And what about other witnesses?  What about

8   individuals like Ross, John Hector, friends of Cory's that he

9   supposedly discussed this plan for life insurance proceeds?

10  What about Adelle's mother and older son, T?

11          Their explanations will all fall short.  Keep asking

12  yourself these questions during deliberations.

13          Second thought:  No forensic or biological evidence

14  was ever recovered and that is a reasonable doubt.  And, of

15  course, there was no forensic or biological evidence

16  connecting Cory to Brandy's murder and that's not because of

17  some claim that Cory has these impeccable cleanup skills that

18  he learned from "Dexter" or "First 48."  The reason is

19  actually a lot more simple:  He did not do it.

20          Third point, third thought:  The relationship

21  between Adelle and the government.

22          You know by now that Adelle was arrested on

23  November 4, 2020.  She was told that she would not be

24  prosecuted even though the government had overwhelming

25  evidence against her of her involvement in Brandy's murder.

1   So she told lie after lie and story after story and falsely

2   accused Cory.  She eventually pled guilty to a cooperation

3   agreement with the government on September 30th.

4           She continued meeting with the government and,

5   again, just a few weeks ago, in early February, the government

6   confronted her about her lies and instead of ripping up her

7   agreement, they just gave her a new one.  There's no

8   consequence for her violations of her agreement.  There's no

9   consequences for her violating her bail conditions or telling

10  other people about her cooperation and also committing new

11  crimes.

12          The government desperately needs her.  Without her,

13  there is no case against Cory Martin.  She can violate her

14  agreement in many different ways and, again, there is no

15  consequence.  They've bought Adelle's story and they cannot

16  ask for a refund.  They are stuck with that story and Adelle

17  also needs them.

18          Without the government's power to give her a 5K

19  letter, she will spend the rest of her life in prison.

20  Although she now claims that she is a free woman, again, she

21  too desperately needs them.  There's no way for her to achieve

22  her goal in the case of time served or no jail time without

23  the government's help.

24          The government lacks trust in their own witnesses

25  including their star witness and there are unanswered

1   questions.  There are gaps.  There are holes in their case.

2   There is reasonable doubt.

3          Next thought:  Don't assume Cory's guilt because of

4   bad relationship decisions, his conflictual and toxic

5   relationship that he had with Adelle, his involvement with

6   prostitution, or his associations with Adelle and Samson who

7   have committed crimes and have long criminal histories.  These

8   things do not make him guilty.  He had a different lifestyle

9   than Adelle.  After losing his parents, he stayed at home.  He

10  sometimes worked on cars and, yes, he wrote some short

11  stories.

12         Again, Cory had no motive to kill and dismember

13  Brandy and they have nothing except Adelle and her lies to

14  suggest that he did.  The truth is the government does not

15  know exactly what happened with Brandy's murder, when it

16  happened, where it happened.  They had to rely on Adelle 's

17  story and it simply is not corroborated by the evidence.  It's

18  a story that if they don't have and tell you, they, again, do

19  not have a case against Cory.

20         So, again, the only way, the only way to convict

21  Cory Martin is to fully believe and trust in Adelle.

22  Everything else is a distraction, camouflage.  Everything else

23  was presented to you to prop her up and there's no way you can

24  and you must acquit.

25         You have a great responsibility.  You and you alone

1   are the final check on the government.  You and you alone will

2   decide what the truth is.  You and you alone will decide if

3   the government has proven these charges against Cory beyond a

4   reasonable doubt.

5          I don't need to tell you this but this is an

6   extremely serious case and I'm asking that you give Cory the

7   same consideration that you would want if you found yourself

8   in this position.  Each of you took an oath to be fair in

9   assessing the evidence.  Be the type of juror that you would

10  want if you or a loved one was sitting at the defense table

11  with us.  Work hard.  Work hard as you've been doing.

12  Scrutinize the evidence, review the documents, review the

13  reports, look at the photos, watch the compilation video,

14  watch all the underlying video.  Listen to the calls, Globe

15  Life, American National.  Even read the notebooks.  Examine

16  the Diablo sagas.  Apply the presumption of innocence.

17         Hold the government team to their burden.  You

18  wouldn't want insufficient evidence.  You would want more than

19  that.  You would want what this country, what our constitution

20  holds, and it is not possible guilt, probable guilt or

21  suspicion.  What is necessary for any conviction is proof

22  beyond a reasonable doubt.  You are the judge of the facts.

23  You get to decide.  And you, again, are the final check on the

24  government.

25         Later this afternoon or early next week, you will

1   deliberate and we trust that when you do, you are going to

2   work hard, you are going to take your responsibilities very

3   seriously, and we trust that when you conclude your

4   deliberations, you'll come back into this courtroom and tell

5   us and, more importantly, tell Cory Martin, not guilty.

6          Thank you.

7          THE COURT:  Thank you, Mr. Cecutti.

8          I just want to see the lawyers on timing for just a

9   second.  Bear with me for a minute.  I don't think we need the

10  reporter.

11         (Discussion off the record at sidebar.)

12         THE COURT:  All right, everybody.  I'm going to

13  excuse you for lunch.  Your lunch is here.  And we will begin

14  again --

15         Hold on for just one second.

16         (Pause.)

17         THE COURT:  I don't want to rush you but I'd like to

18  start in 45 minutes.  So we'll come back at 2:30.  I think

19  that will be plenty of time.  Don't talk about the case and

20  I'll see you in a little bit.

21         THE CLERK:  All rise.

22         (Jury exits.)

23         THE COURT:  All right.  Everybody can sit down.

24         Anything before we break?

25         MS. DEAN:  May I have just one moment, please?

1                THE COURT:  Sure.

2                (Pause.)

3                MS. HAJJAR:  Your Honor, we just wanted -- we will

4      think about if there's any corrective instructions that we

5      would propose to you, Your Honor, but there were a couple of

6      comments in defense's summation that were not accurate.

7                THE COURT:  Well, you can respond.

8                MS. HAJJAR:  I'm sorry?

9                THE COURT:  You can respond.

10                MS. HAJJAR:  Some of the things, it would be

11      difficult to respond to, like defense's suggestion that we

12      should have put in the agreement with Mr. Alabi.  We're

13      prohibited from doing that.  We cannot put in an agreement

14      without the credibility being impeached.

15                There were a couple of instances like that where

16      there's really no way to sort of convey that to the jury at

17      this point.

18                THE COURT:  Well, if there are things like that, you

19      can let me know.

20                I didn't hear that.  Is that what you said, that

21      they didn't put it in evidence?

22                MS. HAJJAR:  Yes.

23                MR. CECUTTI:  We did.  It's a defense exhibit.

24                MS. HAJJAR:  But that's the whole point, that we

25      couldn't have put it in evidence.  It's not proper for us to

1    offer it.

2            MR. CECUTTI:  But they offered Adelle Anderson's

3    cooperation agreement on direct examination.

4            MS. HAJJAR:  That's because defense's opening

5    directly put her credibility squarely at issue and thus we

6    were able to do it.

7            MR. CECUTTI:  We did the same thing with Samson

8    Alabi.  He identified a criminal that would also be

9    testifying.

10           THE COURT:  I don't think he said anything about a

11   cooperation agreement though or an agreement.

12           If you want to draft something, I'll consider it.  I

13   mean I do think that -- I do take the point that they're not

14   in a position to argue whether they can do it or can't do it

15   but, you know, if it warrants an instruction, I'll give it.

16           All right.  We're in recess.

17           (Luncheon recess.)

18

19

20

21

22

23

24

25

1                    AFTERNOON SESSION

2              (In open court; outside the presence of the jury.)

3              THE COURT:  Hi.  Everybody can sit.

4              MS. DEAN:  Your Honor, may I use a demonstrative?

5              THE COURT:  Yes.  Have you shown it to --

6              MS. DEAN:  They've seen it before at our office.

7              MR. CECUTTI:  Yes.

8              THE COURT:  Do you have a thought, by the way, on

9    whether you want me to instruct anything on that agreement?

10             MS. HAJJAR:  I don't think so.

11             THE COURT:  I don't think it's necessary.  I mean

12   the only thing to do would be to strike the comment but I

13   don't think it's worth it.

14             All right.  Are we ready for the jury?

15             MS. DEAN:  Yes, Your Honor.

16             (Jury enters.)

17             THE COURT:  Good afternoon, ladies and gentlemen.  I

18   hope you had enough time to eat lunch.

19             We're ready to proceed with the rebuttal summation

20   by Ms. Dean.

21             MS. DEAN:  Thank you, Your Honor.

22             The defense just stood before you and they gave a

23   summation that might have made sense at Adelle Anderson's

24   trial.  They made an argument to you that Adelle Anderson is

25   guilty of these crimes.  He didn't need to do that.  There is

1    a case, United States versus Adelle Anderson.  It's been

2    decided.  She is guilty.  She came in here.  She told you

3    that.

4          THE COURT:  Ms. Dean, I am so sorry to interrupt

5    you.  I don't think your microphone is on.

6          MS. DEAN:  Okay.  Is that better?

7          THE COURT:  That's okay.  Go ahead.

8          MS. DEAN:  She came in here and she told you that.

9    She pled guilty in court.  She's awaiting her sentencing.

10          This is the case of United States versus Cory

11    Martin, this defendant.

12          The suggestion to you over the last hour and a half

13    that there's no other evidence that proves his guilt other

14    than Adelle Anderson, it's preposterous.  It assumes that you

15    haven't been here.  It assumes that you've had your eyes

16    closed and your ears tucked but you have been here.  You've

17    been watching.  You've been attentive as the mountain of

18    evidence has poured in every day of this trial that proves

19    beyond a reasonable doubt this defendant's guilt.

20          The argument that was just made to you, members of

21    the jury, is nothing more than a request for you to disregard

22    all the evidence in this case.

23          The cell phone evidence, the video surveillance, the

24    phone calls, his searches, the financial evidence, the

25    financial despair that he was in as the months grew closer and

1   closer to Brandy Odom's murder.  Most of that evidence the

2   defense didn't even mention when they just stood in front of

3   you.

4           The defense has no burden in this case.  That burden

5   rests solely on us.  It's a burden that we welcome, to prove

6   to you the defendant's guilt beyond a reasonable doubt,

7   however, when the defense stands before you and they suggest

8   things to you and they make arguments to you, you get to look

9   at those arguments and ask:  Does this make any sense?  Is

10  this what I saw?  Or should I disregard this entirely?

11          You saw at this trial the defendant's own cell phone

12  searches, and there was no dispute at trial about whose phones

13  were whose.  It was clear the defendant used cell phones with

14  the 4723 number, with the 6108 number.  Adelle Anderson used

15  cell phones with the 1072 number.

16          I don't know if you remember in opening statement,

17  Ms. Thiele did address that search for the saw when she stood

18  in front of you and she said the defendant searched for the

19  saw at the most inopportune time.  You didn't hear that again

20  in closing.  You didn't hear anything about the search for the

21  saw on the defendant's phone, but Ms. Thiele said he searched

22  for the phone at the most inopportune time.

23          On April 6th of 2018, when Brandy Odom was dead in

24  that house in Rosedale, the defendant had to know how to

25  insert blades into a reciprocating saw.  He searched for life

1   insurance policies for Globe and American National Life

2   Insurance.  He corresponded with that guy Bob.  Remember him?

3   Robert Young for True Blue, the guy he bought the Brandy Odom

4   American National policy from?

5           You saw the video evidence in this case.  That

6   evidence allows you to follow Adelle Anderson and Cory Martin

7   throughout the entire week, to follow their motions.  It

8   allows you to follow the defendant and Adelle Anderson to the

9   park on April 9 th where you get to watch him coming from the

10  park with that suitcase she described to you.

11          You saw the text messages.  And Mr. Cecutti just

12  said:  Well, there were a lot of text messages that the

13  government didn't read in, what did those say?

14          Look, you saw how long it took to read in even the

15  ones that you saw, those important text messages for you to

16  see and understand, but all of those text messages are in

17  evidence.  You can look at them for as long as you want when

18  you're deliberating.

19          You saw his text messages with Adelle Anderson about

20  using, about what e-mails to use for the insurance and about

21  getting rid of Brandy Odom before the policy lapses.

22          Now, when Mr. Cecutti stood up here, he said the

23  first half of that text, the "getting rid of Brandy Odom"

24  text, but he didn't remind you about the second part of the

25  text, "before the policy lapses."  That was the complete text

1    you saw and you heard about.

2              You also saw the cell site activity in this case

3    that let's you track them for the entire week.  And in

4    addition to seeing where the cell site records put the

5    defendant and Adelle Anderson, it also shows you something

6    very important:  The attempts to avoid detection, like when on

7    April 8th, at around 6:36 p.m., the defendant no longer has

8    any cell phone activity until 11:18 a.m. the next day.  That's

9    not consistent with the world we live in.  That is suggestive

10   of someone who didn't want their location known.

11             The evidence in this case paints a clear picture of

12   a man who prepared for this crime and he prepared for this

13   crime for over one year.  Remember the first date on the

14   Brandy Odom Globe life insurance policy?  March 28th of 2017.

15   That's the date that the first policy was taken out of on her

16   life.  So for 13 months, this defendant was able to think.

17             The defense said over and over and over again at

18   this trial, they talked about the systematic and methodical

19   search that the crime scene unit did in this case.

20             The defendant had 13 months to think about how

21   systematic and how methodical that search would be and to

22   plan.  And in this case, all of the evidence that you've heard

23   shows that everything leads back to the defendant.

24             Mr. Cecutti when he stood up here said that the

25   government didn't show any evidence of planning.  You saw

1    overwhelming proof of that.

2              He called the insurance company.  The defendant put

3    this scheme into motion when the plan was Alex Villard,

4    Villardouin Villard.  He called him from his own phone number,

5    that 6108 number.  You saw that in the Globe records.  He

6    called pretending to be Alex Villard.  You heard those phone

7    calls.  You listened to where he couldn't even answer the

8    question about Alex Villard's birthday and then just hung up.

9              The defendant thought about how to make things look

10   good.  Remember those dummy policies?  He thought about how to

11   make it look like everybody in the house has a policy, but you

12   know that he did not spend a penny on those fake policies.  He

13   and Adelle Anderson, they saved their money for the real

14   thing:  The policies that they planned to cash in on when

15   Brandy Odom was killed.

16             The defendant filled out the date on the Globe life

17   insurance policy.  Mr. Cecutti said they are not the same

18   "7's."

19             Members of the jury, I invite you to decide that for

20   yourself.  Those notebooks that the defendant wrote, they're

21   in evidence.  There's a ton of examples of those "7's" in the

22   notebook and there's an example of the "7" right on this

23   policy.  So you get to look at the evidence in this case, you

24   get to decide if they're the same, not because Mr. Cecutti

25   says it's not and not because I say that it is.

REBUTTAL SUMMATION - MS. DEAN          1847

1        The defendant did test runs with American National.

2   He did a test run on himself from his own phone with that

3   agent Bob from True Blue Life Insurance where he went through

4   all the steps to take out a policy before doing the real thing

5   on Brandy Odom.  You saw that and in the defendant's cell

6   phone.  That's Government's 401.

7        Let me show you something else that the defendant

8   did in his own cell phone in his own search history or web

9   history, rather.

10       Look at an example of the way that the defendant

11  went about this plan.  Look at the information in this search

12  history.  Where it says "birth month" and "birthday," "birth

13  month 6," "birthday 1," and it's split on the other line,

14  "18."  The evidence at this trial showed that June 18th of

15  1987, that was the defendant's birthday, June 18th.  But what

16  does it say next to "birth year" here?  1992.  Brandy Odom's

17  birth year.  What does it say next to "feet"?  "5 inches 1."

18  What does it say next to "weight"?  "115."  And next so "sex"?

19  "Female."  That is in the defendant's phone.

20       Why does the defendant need to search True Blue Life

21  Insurance for a 5-foot-1, 115-pound female, with the year of

22  birth in 1992?  He's doing a test run and he's being sneaky

23  because he's got his month and his day of the date of birth

24  still in the year.  That's the evidence of the planning that

25  you see when you look at the evidence against the defendant in

CMH     OCR     RDR     FCRR

1    this case that shows you beyond a reasonable doubt that he was

2    a part of this plan.

3         And as Ms. Hajjar said to you this morning, he

4    studied for this.  He studied for this.

5         Mr. Cecutti made it sound like you need some kind of

6    advanced medical degree or some kind of science doctorate to

7    figure out how to cover up a crime scene or conceal forensic

8    evidence.  Cory Martin thought that all he needed was a

9    television.  So he watched some shows.

10        He watched "Dexter" and then he wallpapered his kill

11   room from floor to ceiling in plastic bags to prevent

12   detectives from recovering forensic evidence in his home.

13        He watched the "First 48" to learn law enforcement

14   tactics.  He learned -- remember Ms. Anderson said he learned

15   about the blue light?  Who came in here and talked about the

16   blue light?  Detective Casale, Detective Cenizal, the crime

17   scene detectives.  They told you about how it's that thing

18   that they spray and if it picked something up, it fluoresces

19   blue.

20        He studied these things.  You don't need a doctorate

21   in anything to turn on a TV, members of the jury.

22        And Ms. Hajjar mentioned this earlier, but I want to

23   take a look at this with you.  This is from Government's 405,

24   the defendant's Samsung phone.  It had the 4723 number that

25   you heard about, the number he used at the time of the

1    commission of the crime.

2            Take a look at this from the defendant's phone.

3    "Reviews:  12-amp corded reciprocating saw."  He has to make

4    sure it's going to get the job done because you heard he had

5    been struggling.  He said he got stuck at a mediary, at the

6    thighs, so if you are going to go out and get a saw, you

7    better make sure you get one that's well reviewed.

8            This is from Government's 401.  What else did the

9    defendant look into?  "Globe Life Insurance, pros and cons."

10   The defendant wanted to make sure he picked the right life

11   insurance companies.  Remember, ones that wouldn't be too

12   little money to make it not worth it, but ones that you can

13   get a policy without raising red flags to law enforcement.

14           And you know from sitting through this trial, why?

15   He didn't do it out of hate.  Unlike what Mr. Cecutti says,

16   this was not a case about hate.  He did it for a payday.  This

17   was not hate.  This was pure greed.

18           The defendant had no job.  He had no savings.  His

19   income was off the backs of women.  He had no inheritance.

20   His mother's heir was his brother, not Cory Martin.  Almost as

21   soon as his mother signed over power of attorney on the

22   mortgage, he stopped making payments.  The walls were closing

23   in on him.  Foreclosure proceedings started in 2015 and it

24   just escalated from there.  You looked with us at those bills.

25   First 1,000, then 11,000, 30,000, 50,000, until in June of

1   2018, the bill was 62,000 plus to keep his home.

2          Months away from being out on the street, he acted.

3   In April of 2018, he killed Brandy Odom.  He thought he could

4   collect that money, but he wasn't able to get the payday after

5   all.

6          (Continued on next page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          MS. DEAN:  The defendant says that this entire case

2     comes down to Adelle Anderson.

3          I submit to you that you don't have to rely on her

4     alone for a single theft in this case.  Her testimony about

5     this scheme and the defendant's role in it is corroborated by

6     every single piece of evidence in this case.  The evidence

7     that cannot be cross-examined.  That cannot be changed.  The

8     evidence that you have seen.  And this is the crime that

9     happened, and this is the defendant's involvement, not because

10    Adelle Anderson says that it happened that way but because all

11    of the evidence taken together proves it.

12         Mr. Cecutti stood before you just a little bit ago

13    and he told you that Brandi Odom knew about these life

14    insurance policies.  And, again, the defense has no burden of

15    proof, they don't have to do anything, but this is what I mean

16    when I say when they make an argument to you examine it,

17    examine it the way you would examine any of the information in

18    this case and ask yourself if it makes any sense.

19         The suggestion that Brandi Odom knew that life

20    insurance policies were being taken out in her name is

21    ludicrous, it's not grounded in evidence.  This is an adult

22    woman.  If she knew she was getting a life insurance policy,

23    Adelle Anderson would not have to call in pretending to be

24    her.  If she was knew she was getting a life insurance policy,

25    the e-mails that were being used for the policy wouldn't be

1    fake.  You heard that one of those e-mails was created and

2    deleted only months later and the other one never even existed

3    at all.

4            What about her Capital One account?  The defense

5    said she knew she was getting a life insurance policy, but the

6    evidence is clear that the defendant was holding her ATM card.

7    You saw all of those transactions, the still images, the video

8    of the defendant being captured using her Capital One card at

9    the ATM.  He took that card the way he took her money from sex

10   work.  She had no idea she was paying the premiums to ward the

11   policy that would result in her murder.

12           Remember the policies themselves?  If Brandi Odom

13   knew, why wouldn't it be her handwriting on the face of the

14   application?  Mr. Cecutti said that there was no evidence that

15   any one other than Brandi Odom signed this.  But Adelle

16   Anderson told you when she testified that she signed this.

17   Why wouldn't Brandi Odom fill out all the information.  Why

18   would it be someone else's handwriting if she knew?

19           If Brandi Odom knew, then why was her social

20   security card and identification on Adelle Anderson and the

21   defendant's dresser in their bedroom.  No one keeps their

22   social security card and their I.D. in their roommate's room.

23           And Mr. Cecutti said to you the fact that

24   Ms. Anderson can could get Brandi Odom to tell her her social

25   security that that means would Brandy Odom knew all about

1    this.  That's a real stretch, members of the jury.

2         You know that Ms. Anderson ran Brandi Odom's work

3    including her web camming and her presence online.  The fact

4    that Ms. Anderson would could ask Brandy Odom for her Social

5    Security Number does not mean that Brandi Odom knew that there

6    were two people taking out life insurance policies in her

7    name.

8         So why, why does the defense stand in front of you

9    and spend all of this time telling you that you cannot believe

10   Ms. Anderson and Mr. Alabi's testimony in this case.  It is

11   because their testimony is devastating for the defendant.

12   It's because their testimony gives you all of the details of

13   this crime that he committed.  What did they say to you?  They

14   said you can't believe Ms. Anderson.  She is a liar, you can't

15   trust her.  And she is saying whatever she needs to say to get

16   out of jail.

17        And about Mr.  Alabi, the defendant's own friend who

18   he tried to recruit into this scheme, they say, well,

19   Mr. Alabi is just a criminal he's saying to get whatever he

20   needs help on open state case.

21        When you think about Mr. Alabi and Ms. Anderson, I

22   ask you to remember something that Ms. Hajjar said to you

23   earlier which is that we did not choose these witnesses, the

24   defendant chose these witnesses and he chose them

25   deliberately.  He chose them because of who they are.

1          When the defense says to you Mr. Alabi is a

2    criminal, we agree.  He has convictions, you heard all about

3    them.  And doesn't that make sense that the defendant didn't

4    go to church to find someone that he was going to try to

5    recruit into this scheme.  He asked someone who had recently

6    come home from jail, who was looking to scam with him, who

7    needed money.  He asked someone who has access to guns, who

8    had sold him a gun.  Someone who had done shootings before

9    just as Samson Alabi told you he had.

10          When you think about that remember the defendant

11    evaluated those same qualities and determined this is the kind

12    of person that I can ask to commit a crime like this with me;

13    that I can offer money to, and maybe he'll accept.

14          And regarding Ms. Anderson.  I think Mr. Cecutti

15    said she's a shoplifter, she has told lies, she has lied to

16    law enforcement.  She has lied to the Government and she

17    didn't care about Brandy and didn't try to save her.  And, of

18    course, was all in on this plan to profit from her death.  And

19    we agree.  We agree with all of those things and the defendant

20    knew that, too.

21          The defendant knew everything about Ms. Anderson.

22    He knew her since high school.  He believed he could control

23    her and he did control her.  He believed that she would lie

24    for him and she did lie for him.  He believed that she was

25    terrified of him and she was terrified of him.  And he

1  believed that she would stand by him through unthinkable

2  things and she did.  Through unimaginable violence against her

3  and through the cold-blooded murder of her friend in which she

4  was a full-throated participant.

5          He very deliberately chose Ms. Anderson as his

6  accomplice in this because of who she is and because of the

7  person that you met that you saw up there on the witness stand

8  in this case.

9          But with regards to Mr. Alabi and Ms. Anderson, the

10  defendant miscalculated.  With Mr. Alabi, he miscalculated

11  that $25,000 would be enough for Mr. Alabi to agree to take a

12  life.  And it left the defendant vulnerable to exactly what

13  happened here, to Samson Alabi getting in that chair and

14  telling you all about what the defendant tried to recruit him

15  to do.

16          And with Ms. Anderson.  He miscalculated that a

17  woman he used to tell when she could and could not bathe would

18  ever walk into court and testify against him.  And that is why

19  the defense stands before you and tells you that you can't

20  believe them because their testimony is absolutely devastating

21  to the defendant and it is proof that he had every detail of a

22  role that they describe in his commission of the crimes.

23          Now, the defense tells you that Mr. Alabi will say

24  anything that the Government wants because he's been promised

25  the moon on his open case.  But that is not grounded in the

1    evidence that you heard.  There's no evidence at this trial

2    that he was ever given a benefit for providing information

3    about the defendant's plan to take out life insurance policies

4    and to kill Brandi Odom.  And remember what the judge will

5    tell you it's the questions that the lawyers ask, I'm sorry,

6    the questions that the lawyers ask are not evidence.  The

7    witness's answers are what is in evidence in this case.

8            Mr. Alabi told you that the information that he

9    provided did not affect his state prosecutions.  And when

10   Mr. Cecutti tells you that Samson Alabi is saying what he

11   needs to say to get help with his state case, remember that

12   case didn't even exist when Mr. Alabi first gave this

13   information to the police.  The letter that was signed between

14   the Government and Samson Alabi is in evidence.  We asked

15   about it on direct examination.  He talked to you about what

16   the terms were.  It is not a cooperation agreement, you can

17   take a look at it yourself and you can compare it to

18   Ms. Anderson's cooperation agreement in this case.

19   Mr. Alabi's letter states that if he provides truthful

20   testimony, the Government will let the D.A.'s office and the

21   sentencing court know that he did so.  It says right on its

22   face, it's not a promise of anything, it can't change the

23   outcome of his case, it can't make his case go away.  It's not

24   even a case at the United States Attorney's Office.  He told

25   you he didn't receive any promises.

1        And, of course, he hopes that this will help him but

2   this is the same information that he has been providing for

3   six years now.  And Judge Donnelly will tell you that because

4   he does hope that this will help him, you should examine his

5   testimony carefully and you must.  You should scrutinize the

6   testimony of both Mr. Alabi and Ms. Anderson and compare it to

7   all of the evidence in this case.

8        The evidence shows that Mr. Alabi gave a clear and

9   detailed account of the defendant's plan to kill a woman for

10  life insurance money in August you have 2018 when he was

11  arrested by the N.Y.P.D.  He then spoke to an assistant

12  district attorney and he made that audio recording that you

13  all heard.  That's in evidence, you can review it again if you

14  like.  And he said that the defendant approached him about a

15  plan to kill a girl with nowhere to go, that no one cares

16  about.  That the defendant said he was making payments on a

17  life insurance policy.  He was going to pay it for a year and

18  get the check and that the defendant said he had her social

19  security card and he had her birth certificate.

20       Mr.Alabi told you that he was offered $25,000.

21  That's exactly half the amount of the Globe Life insurance

22  policy.  How could he know that unless that's what the

23  defendant actually offered him.  And you don't know it just

24  because he said it to you, it's also in the text messages.

25  That text message that you saw again this morning:

1          I might have a play for N words easy work in a few

2    months talking like 25,000.

3          You've seen that text.

4          When Mr. Cecutti stood up here and argued to you, he

5    fantasized about a meeting between the Government and

6    Mr. Alabi where Mr. Alabi supposedly gave contradictory info.

7    Information that was different than what was in the text

8    message.  That's what I'm talking about when I tell you that

9    just because Mr. Cecutti says something to you, if it's not

10   based in the evidence in this case, then you can disregard it

11   entirely.  There is no evidence in this case that Mr. Alabi

12   ever contradicted the information that you see plain as day in

13   the text messages.  There is no evidence of that whatsoever.

14         And think about this text itself.  Where was the

15   defendant going to get the $25,000 from that he was offering

16   to Samson Alabi.  This is on July 25, 2017, by that time, if

17   you remember the financial records, the amount that was due on

18   his mortgage had ballooned well into the tens of thousands of

19   dollars.  He had no job or savings or prospects.  If he had

20   $25,000, don't you think the defendant would have been paying

21   his mortgage?

22         He went into great detail with Mr. Alabi about how

23   he wanted him to do this.  Remember he described to you that

24   he wanted -- the defendant wanted Mr.  Alabi to make it look

25   like a robbery.  That was the same thing that Ms. Anderson

1    told you about when she talked to you about the defendant's

2    different theories on how Brandi Odom would be killed.  One of

3    them was make it look like a robbery gone wrong.  And the

4    other was make it look like it was a date, like a John did it.

5            How could Mr. Alabi know that that was one of the

6    defendant's theories of how to do this unless he was actually

7    asked to do this?  There is no evidence in this case that

8    Mr. Alabi and Adelle Anderson even know each other except

9    through Cory Martin.  In fact, Mr. Alabi didn't even know

10   Ms. Anderson's name.  He referred to her as Cory Martin's

11   baby's mother.

12           What else did he tell you that detailed about taking

13   a girl that no one cares about and no one will miss.  That's

14   the same thing that Ms. Anderson described the defendant

15   saying to her about why Brandi Odom was the perfect target for

16   this crime.  He said that no one will miss her.  He spoke

17   about her the way that he treated her in life like just a

18   paycheck to be cashed.  And it's because the defendant

19   recruited him.

20           It's because the defendant asked Samson Alabi to do

21   this.  That when this broken on the news and Samson Alabi and

22   his girlfriend saw it, Samson Alabi knew that the defendant

23   had done this and he reached out to him, something you heard

24   from both Ms. Anderson and Samson Alabi, that Mr. Alabi

25   reached out to the defendant and asked him, you know, what's

1  good how?  Are things going?  Ms. Anderson said that Samson

2  Alabi said, you're a wild boy.

3          In attempting to recruit Mr. Alabi, in telling

4  Mr. Alabi the specifics of his plan, the defendant left

5  himself vulnerable to exactly what happened here which is

6  Mr. Alabi coming to court and telling you what happened and

7  what the defendant was planning and what he did.

8          So why then does the defendant tell you you can't

9  believe Adelle Anderson?  I think it boiled down to three

10  principal things.

11          The first was the cooperation agreement that she

12  stands to gain a benefit in this case.  The second was that

13  she told a lie to the Government.  And the third had to do

14  with some kind of master plan to just get Cory Martin to get

15  at the defendant.

16          So let me just take these one at a time and I'll

17  start with this idea that Mr. Cecutti is telling you and

18  asking you to believe that the defendant was not involved in

19  this at all and this is all part of Adelle Anderson's plan to

20  get him.  This is all made up, none of this actually happened.

21          If you think that through to its logical end, does

22  that make any sense?  Why would Adelle Anderson's master plan

23  be to take out life insurance policies on Brandi Odom, kill

24  her, dismember her, get arrested, plead guilty to

25  murder-for-hire and other crimes, face life in jail, and then

1    come in here and testify against Cory Martin?  That seems like

2    a lot.  That seems like a lot.  It's a pretty bad master plan,

3    it doesn't make any sense.

4            So let's talk about the cooperation agreement and

5    I'll just remind you that you can look over, I know we only

6    looked at a few pages of it together, but you can look over

7    all of the pages of it and see all of its details.

8            It probably came as no surprise to you that

9    Ms. Anderson was not here testifying out of the goodness of

10   her heart.  She's hoping to get leniency at sentencing.  And

11   the defense is asking you to believe that this is some kind of

12   a slap on the wrist.  But you heard that she faces life in

13   jail, that if she lies at this trial, she goes to jail for the

14   rest of her life.  And that even with a 5K letter where the

15   Government describes the crime she committed and the ways in

16   which she assisted the Government, she can still be sentenced

17   to anything up to and including life in jail.  That is not a

18   slap on the wrist.  Does the agreement give her hope that she

19   could do less than life, of course it does, that's why she

20   testified.

21           She knows that the only way to get a 5K letter is to

22   testify truthfully about this crime from beginning to end.

23   And that's really the point of an agreement like this, it's to

24   incentivize someone who would otherwise never be truthful

25   about a crime.  To come in and take you inside a plot like

1    this.  To give you an inside look into how this was planned,

2    how this was committed, and all of those little details that

3    you learned through her testimony.

4           But you don't have to rely on her for even one thing

5    to know beyond a reasonable doubt that the defendant is guilty

6    in this case.  And the other thing that the defense argued to

7    you about is the idea that you can't believe Ms. Anderson

8    because she lied to the Government and then got a new

9    cooperation agreement.

10          Mr. Cecutti tells you that Ms. Anderson can't be

11   believed because she lied during the course of her

12   cooperation.  And let's just talk about what that lie was.

13          She told the Government that the defendant wanted to

14   kill Alex and her kids.  Alex Villard and her children.  And

15   she did not tell the Government that she was also part of the

16   plot to kill Alex Villard.  And she did not tell the

17   Government originally that she filled out that life insurance

18   policy you saw on Z.

19          And I submit to you that you can consider this and

20   you should consider this.  You have to evaluate Ms. Anderson

21   in whole.  You have to evaluate everything she says and every

22   part of this to determine whether you can rely on her

23   testimony, so it is fair for you to consider.

24          And I'm not here to make excuses for her.  You've

25   heard that it's going to be one of the things that

1    Judge Donnelly considers when she sentences Ms. Anderson.  You

2    heard that she can be sentenced to anything up to and include

3    life in jail and even in excess of life in jail in this case.

4    That's up to the judge.

5           But I do ask that you think about the information

6    that she did withhold for that period of time, what it was

7    that she didn't tell from the beginning.  The plot and what

8    happened to Brandi Odom is horrific enough.  It's hard to even

9    imagine something horrific than what was done to Brandi Odom.

10   But what Ms. Anderson didn't admit to for some time was

11   actually plotting with the defendant to kill the father of her

12   child and to filling out a life insurance application for her

13   child when the defendant wanted to kill him.

14          When the defendant was plotting to make Z disappear

15   or have a really bad accident to get life insurance money, she

16   filled this out.  She yessed him, and in doing that she knew,

17   even if she thought she could prevent to, this incentivized

18   the defendant to go through with it because of the possibility

19   of a payout.  And she sat upon the witness stand and she told

20   you, I'm a piece of shit, that's what she said.  To say it out

21   loud, that she filled out a policy on her child, even to the

22   Government, even under her cooperation agreement, it means

23   that that fact lives forever for as long as she lives and as

24   long as her child lives and she did withhold that for a period

25   of time.

1           And unlike what Mr. Cecutti told you, she didn't

2     just get a fresh cooperation agreement with no consequence,

3     that's what he said.  He said there was no consequence.

4     That's not what happened.  She had to plead guilty to another

5     very serious crime, a murder-for-hire conspiracy.  She's

6     facing up to an additional ten years in jail.  She's facing

7     additional time on top of facing life and an additional ten

8     years in jail no matter how you look at it.  That's not

9     nothing.  And not just that, but now at her sentencing, the

10    judge will consider that conduct as well.

11          Mr. Cecutti references what she said on the stand

12    about feeling like a free woman and he referenced that to you

13    in suggesting to you that that was in the context of whether

14    or not she will do time in jail.  Ms. Anderson was very clear

15    about what she meant by that.  She meant that she was free

16    from Cory Martin, from this defendant, not that she was free

17    from the possibility of doing significant, serious time in

18    jail in this case.

19          What the evidence has shown is that Ms. Anderson did

20    tell the truth fully about her role in this crime, about her

21    role in the plot on Alex Villard, and even about filling out

22    that policy on Z.

23          I submit to you the evidence showed who wanted to

24    kill Alex and who wanted to kill her children.  It's in the

25    text messages that you saw yesterday where the defendant rants

1    at Ms. Anderson about her kids and refers to her child as,

2    "that fucking baby," berates her about having children with

3    another man like she described to you.  Think about who was

4    moving forward on this plan from the beginning.  Government's

5    115.

6            The first calls to the life insurance company, those

7    Tori Martin calls with the defendant's address from the

8    Defendant's 6108 number.  It was the defendant who called

9    Globe Life in July of 2016 and asked for an adult and a

10   juvenile policy.  The defendant was the only one in all of

11   those calls that asked for both.

12           And remember those first two policies, it's been a

13   while since we looked at them, but those first two policies

14   from 2016 in the name of Ms. Anderson's kids with the mistakes

15   in the date of birth, with the mistake in the middle initial,

16   with the mistakes in Ms. Anderson's e-mail?  I submit to you,

17   it was not Ms. Anderson making those mistakes, the defendant

18   filled out those policies.

19           The defense also stood before you and argued to you

20   that the defendant has nothing to do with this plot because

21   Ms. Anderson tried to collect on the life insurance policies

22   during the summer when the defendant took trips for Virginia

23   and Florida.  He called it "moving to Florida" but, in fact,

24   the testimony was that he went to visit his friend John in

25   Florida.  In making that argument, the defense doesn't mention

1    to you that the calls to collect on the life insurance policy

2    began in April of 2018 when Ms. Anderson and the defendant

3    were still living together, not when the defendant was on a

4    trip to see a family member or a friend.

5              Ms. Anderson also told you that she continued to try

6    to collect and the defendant moved into her New Jersey place

7    around Labor Day and he wanted her to get the next of kin form

8    signed by Brandi Odom's mother, Nicole Odom.

9              Now, you heard about the difficulty with that.

10   Mr. Cecutti stood before you and he suggested to you that all

11   activity to try to get the life insurance money ceased when

12   the defendant came back from Florida.  That's not what the

13   evidence was in this case, that's not what the testimony was.

14             The evidence in this case showed that the next of

15   kin form created a problem because the life insurance company

16   needed a signature from Nicole Odom and Nicole Odom also told

17   you she was getting this life insurance paperwork in the mail

18   and had to call to find out what was going on with it.  The

19   defendant and Ms. Anderson, to get Nicole Odom's signature,

20   they would have to expose themselves and say they took out

21   this policy.  It's not so easy as just calling up her mother

22   and saying, I named myself as the sister on this policy form.

23             The defendant and Ms. Anderson kept the life

24   insurance documents in their home.  They were found in 2020

25   when they were arrested and not just in Ms. Anderson's tote

1    bag as Mr. Cecutti told you.  Remember when we looked at the

2    items that were packaged together?  You also saw life

3    insurance forms from American National with Cory Martin's I.D.

4    and Cory Martin's notebook.  They were adults living together

5    who kept these forms and they also kept Brandi Odom's

6    identification.  You saw that was in their apartment, too.

7            There is overwhelming evidence in this case that the

8    defendant had a hand in every stage of this crime, not just

9    the first phone call, the Tori Martin call that we looked at,

10   but the first recorded call as well paying the Alex Villard

11   policy.  It was the defendant who searched the life insurance

12   policy information using Brandi Odom's birth year, height, and

13   weight in his cell phone.  It was the defendant who wrote

14   bkodom718@gmail.com where you can see @gmail.com and the 7s on

15   that premium payment slip.

16           And I submit to you that Ms. Anderson, being the

17   beneficiary, Ms. Anderson being kind of the face of this to

18   the life insurance policies, this was by design.

19           Look at this American National policies, for

20   example.  Ms. Anderson's name was on the policy but it was

21   driven by the defendant.  The defendant called the agent.  The

22   defendant did the test run.  The defendant figured out what

23   information was needed.  It was like the idea to use Mr. Alabi

24   for a robbery gone wrong.  The defendant's attempt to distance

25   himself from this crime.  It's very similar to that MCU fraud

1    scheme that Ms. Hajjar reminded you about this morning, very

2    similar structure to the plan.  The defendant goes to an ATM

3    and starts removing money out of Ms. Anderson's account.  But

4    Ms. Anderson is the one expected to call the bank and make the

5    claim and go to the police and complain about fraud.

6    Ms. Anderson is out in front of it, but the defendant is

7    behind it.  Ms. Anderson looked at this photo and told you

8    when she testified this is Cory Martin.  The structure is the

9    same.  Distance himself from the crime as much as possible.

10   But when Samson Alabi, the person he tried to recruit, didn't

11   agree to do the murder, the defendant had to do it himself.

12            Let me make things a little easier.

13            It doesn't matter at all who masterminded this.  It

14   doesn't matter if the defendant thought of it first, if

15   Ms. Anderson thought of it first.  It doesn't matter if they

16   both came up with ideas or which one of them did what or

17   played what role.

18            When Judge Donnelly charges you on the law, she will

19   not tell you that to find the defendant guilty, you have to

20   find that this was his idea or you have to find that he made

21   one of the phone calls, or even that he killed Brandi Odom.

22            Now, I submit to you there's overwhelming evidence

23   he did kill Brandi Odom as part of this scheme.  But one of

24   the things that the Judge will charge you on when she tells

25   you about the law in this case is the concept of aiding and

1    abetting.

2          Mr. Cecutti mentioned it to you a little bit ago and

3    he mentioned it to you he started saying, This is a new

4    theory; be smart.

5          The judge is going to charge you on the law this is

6    the point we're at in the trial.  We're at the part of the

7    trial where you get to hear the law in this case.  And I

8    submit to you, Mr. Cecutti got worked up about it in front of

9    you because it's so simple.  And let me just preview for you

10   and, of course, if anything I say differs from what

11   Judge Donnelly says, it is Judge Donnelly's description of the

12   law, her charge on the law, that controls.

13         But what I believe that she will tell you is that

14   all you have to find to find the defendant guilt of

15   murder-for-hire is that Adelle Anderson committed

16   murder-for-hire, the defendant knew the crime was being

17   committed, and the defendant engaged in some affirmative

18   conduct, some act for the specific purpose of bringing about

19   that crime.  That is it.  You don't have to decide whose idea

20   it was or with a who played the biggest role.

21         When you compare Ms. Anderson's testimony to all the

22   evidence, I believe that you'll determine you can rely on it.

23   And you can do that when you deliberate.  You can compare it

24   to the video evidence, the cell site evidence, the phone

25   evidence.

1          And I want you to think about what you saw in the

2    video evidence with respect to Ms. Anderson telling you that

3    she and the Government made two trips to the park to dispose

4    of Brandi Odom's body parts.  She told you that the first

5    night they went to the U-turn by the baseball fields to drop

6    the garbage bags containing Brandi Odom's arms and legs.  And

7    the second night, they went to Seaview where he brought the

8    suitcase and he put Brandi Odom's head and torso in the park.

9    That's the night where they lost each other and where she

10   drove around looking for him and he walked around looking for

11   her.

12          Now, Mr. Cecutti pointed out to you, but you heard

13   this when she testified, that Ms. Anderson has never seen this

14   video surveillance.  Ms. Anderson, when she testified, said

15   she didn't know if any video surveillance existed by the park.

16   She had not seen any video surveillance related to this case

17   other than a clip of video that she was shown at a precinct of

18   her and the defendant in their driveway loading bags into the

19   Nissan.

20          And think about why that's important.  Mr. Cecutti

21   says it's because something must be wrong, something must be

22   wrong, she wouldn't be able to identify herself or the

23   defendant on the video.  But think about why that's important

24   to you that she hasn't seen the video.

25          Ms. Anderson has to testify from her recollection.

1  What she did, what she heard, what she saw, what she remembers

2  about what she and the defendant did as part of the plan to

3  kill Brandi Odom.  You get to look at the video surveillance

4  in this case.  You get to look at the cell site records.  You

5  get to look at those things and say, is what she's telling us,

6  does that make sense.  Does that match up?  You're not hearing

7  from her, you're not hearing from her.  If she had seen the

8  video surveillance and then came in and testified, you'd never

9  be able to do that because she could be just telling you what

10  she had seen on all of the video surveillance.  But now you

11  can evaluate her recollection, her account of what took place

12  and you can compare it to the evidence that's in front of you

13  in this case.

14          I want you to think about what you saw on the video

15  outside of Seaview Park on April 9th when Ms. Anderson

16  described to you that the defendant had a suitcase and he took

17  it into the park.  You not only see her and the defendant's

18  black Nissan Maxima with the unique marks on the top of the

19  car.  But you see the man with the suitcase.  What are the

20  odds of that?  What are the odds that when she describes to

21  you where she met up with him, the locations that they went,

22  where she dropped him off, where they met back up.  There he

23  is on the video carrying the exact thing that she described.

24  Those are the things you can compare and decide if you can

25  rely on her testimony.

1        I also want you to think about the day Ms. Anderson

2    made the last date for Brandy because Mr. Cecutti spent time

3    telling you that Brandi Odom was not in the house and that

4    this murder did not happen in the Rosedale house.

5        But that's not what the evidence shows in this case.

6    And not just because Ms. Anderson said that Brandy was in the

7    house but because all of the records, the phone records, the

8    texts, the video show you and prove to you that she was in the

9    house.  How on April 2nd you have the texts between Anderson's

10   Text Now number and Brandy's Pinger number talking about that

11   Jeff coming from the date.  And you can watch it as you did

12   with Ms. Hajjar this morning happening on be the video.  It's

13   to the minute, members of the jury, it's to the minute that

14   puts Brandi Odom in that house.

15       And while Mr. Cecutti said, who knows what's on the

16   video compilation, you know what's on the video compilation.

17   Detective Santiago testified about how he reviewed that video.

18   He reviewed the entire week of video from April 2nd all the

19   way until the end of the week until after Brandi Odom's body

20   was found and he included in the video compilation every

21   single movement from that house from that driveway.  You can

22   go and you can look at everything that happens outside the

23   house.

24       So when the defense says to you, well, who knows if

25   she left the house, you can't see at night.  Look at that

1  video for yourself.  The underlying video is in evidence, too.

2  You can look at it for as long as you want.  You can watch

3  that house for the entire week.  The only time you'll ever see

4  Brandi Odom leave that house is with the defendant on April

5  4th when she returned with that white bag that Ms. Hajjar

6  pointed out to you this morning.  And you know that it's not

7  Adelle Anderson because you can look at the cell site records

8  and the phone records.  The phone records were Government's

9  300 and 301 for Ms. Anderson and you can line item them

10 yourself and you can see that every single part of the day, as

11 Ms. Anderson texts and calls and connects to the network, she

12 is at her mother's house all day.

13          And what else does the defendant suggest about this?

14 He suggests to you that these could just be random people.

15 You don't know whose in that house.  That's not what the

16 evidence has shown at this trial.  The evidence has shown that

17 Brandi Odom, the defendant, and Adelle Anderson were the

18 adults living in that house.  That is the universe of people

19 that we're talking about.  And the people that you saw come

20 and go that week are the defendant, Ms. Anderson, and that one

21 time when Brandi Odom leaves the house and goes back in.

22          Mr. Cecutti also gave you a list of all the places

23 that he said the N.Y.P.D. couldn't get video and the things he

24 claimed that N.Y.P.D. didn't get video of.  And that list was

25 just not accurate.

1          First, the detectives collected video based on when

2    the crime happened and where it happened.  You heard from

3    Detective Santiago that they were collecting it from primarily

4    dusk on April 8th through the morning of April 9th through the

5    time that Ms. Odom's body was found.

6          In April 2018, the detectives collecting video did

7    not have an inside look at every detail of the plan.  They

8    couldn't possibly know there were two trips to the park over

9    two days.  And Mr. Cecutti said that there's no video that

10   shows you when the suitcase goes into the trunk down by

11   Seaview Park.  I submit to you there is video that shows that,

12   when the defendant goes over to the sidewalk, pops the trunk,

13   and puts something into the trunk.

14         Mr. Cecutti also told you there is no video that

15   shows you taking the suitcase to get rid of the suitcase.

16   When you looked at that video with Ms. Hajjar this morning,

17   it's in the Queens house when the defendant loads that same

18   suitcase into his car.

19         So when Mr. Cecutti tells you that something doesn't

20   exist, just take a look at the evidence and decide for

21   yourself and I submit to you that it does.

22         I could be up here all day telling you how all of

23   the evidence, all of the records, all of the video

24   corroborates Ms. Anderson's testimony but I know that you've

25   been here, you've been paying attention you've been here

1    morning, noon, and night listening to the evidence in this

2    case and I know you can do this yourselves and you're going to

3    do this yourselves.  And I submit to you when you do, you will

4    see how everything she tells you when she describes how it

5    happened is corroborated by all of the evidence in this case.

6              So that brings us to what Mr. Cecutti spent about 30

7    minutes on in front of you during summation.  The claim that

8    he made that it is absolutely false allegations that Adelle

9    Anderson was abused.

10              When you think about the defense argument that

11    Adelle Anderson was not an abuse victim.  I want you to

12    consider why they're even suggesting that to you.  Because I

13    submit to you it is undeniable at this trial that Adelle

14    Anderson suffered physical abuse at the hands of the

15    defendant.  And I don't say that as a way to excuse her.

16    There is no excuse for the actions she took in this case, for

17    the things that she did and for what she is guilty of.

18              However, it is undeniable that this defendant

19    horrifically abused her.  You listened to all of those text

20    messages yesterday and there are more where those came from

21    and they're in evidence.  And not just the ones that touched

22    on the abuse itself like the night of February 19th when she

23    was texting the defendant.  "Nothing could be worse than

24    this."  "I didn't sign up for this."  "Anywhere is better than

25    here."  And that's the same day she goes to the hospital for

1  stitches in her eye and when she and the defendant are texting

2  back and forth in July of 2017 about her leg that he broke in

3  the fight that you heard about.

4          But I'm not just talking about the texts that show

5  the threats he would make against her, the things he would say

6  to her, the texts, like, "if you go on birth control I'm going

7  to hurt you."  All of the different things that you heard read

8  into the record yesterday.

9          (Continued on the next page.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          MS. DEAN:  (Cont'g.)  I'm also talking about the

2    text that showed the cycle of domestic violence in this

3    relationship and how in a matter of hours it could go from the

4    lowest low to the highest of high.

5          But to listen to Mr. Cecutti stand here in front of

6    you, he discounts that domestic violence and the cycle of

7    domestic violence in a relationship can even exist.  He

8    suggests to you that someone who loves somebody else cannot be

9    abused by that person.

10         He argues to you that if it's ever been good, it can

11   never be bad.  And he discounts all of the women and men who

12   live in this cycle and who go back to the person that they

13   love because they see something good in them.

14         And Ms. Anderson was honest with you about that from

15   the stand.  Remember in this -- almost in the same breath that

16   she would describe to you how she had been beaten and abused

17   and rape, she would also tell that you he was kind and made

18   her feel safe.

19         It's the cycle of domestic violence, members of the

20   jury, that Mr. Cecutti just brushed aside as if it doesn't

21   exist.  The same way that on cross-examination he stood in

22   front of her and he read to her the sexual text messages that

23   she exchanged with the defendant, and he suggested to you all,

24   and he suggested to her, that a woman who's ever consented to

25   sex cannot be raped by that same person.

1    You have the evidence in front of you.  You've heard

2    the testimony.  You have the medical records.  You have that

3    911 call.  You heard it a while ago, but I imagine you

4    remember it where she sounds absolutely terrified for her

5    life.  That's how Ms. Anderson was living.

6    So when Mr. Cecutti stands up and suggests that none

7    of that exists, when he puts up a quote on his PowerPoint

8    presentation that says, quote, I lied about the abuse, and

9    suggests to you that means she lied about the abuse in court,

10   that was something she said when she was talking about how she

11   would lie about the abuse to doctors at the hospital because

12   she was afraid of the defendant and what he would do if she

13   told the truth.  And because she loved him and wanted to go

14   back to him.  When he puts up a quote like that and suggests

15   to you that has to do with her testimony, consider that when

16   you it decide whether to credit anything that he has to say to

17   you at all.

18   Now, Mr. Cecutti told you that Ms. Anderson was

19   wrong about her description of the defendant dismembering

20   Brandy Odom over the course of a couple of days, because

21   Dr. Straub told you that there were not certain signs of

22   decomposition.

23   But that's not what the testimony was at all.

24   Ms. Anderson actually told you that the defendant opened the

25   windows to let in the air so that law enforcement wouldn't be

1    able to know her time of death.

2            And when you do review the video surveillance in

3    this case, you'll see that on those days you'll see at some

4    point there's snow on the ground.  So you can get an

5    understanding of what the temperature was like during that

6    time.  And Dr. Straub told you that the temperature and

7    whether it is cold, that's one of the things that can slow

8    down decomposition.

9            The defense also argued to you that Ms. Anderson is

10   lying because you don't have the text that she told you about

11   about the black UGGs.

12           Now Ms. Hwang who testified yesterday already

13   explained that.  She said that every single device has that

14   unique IMEI number, and that she reviewed all the devices that

15   were recovered by law enforcement, and none of them had the

16   IMEI number that matched the devices that the defendant and

17   Adelle Anderson were using during the week of this crime.  And

18   that makes sense because Ms. Anderson told you she and the

19   defendant got rid of their devices and they were using that

20   one.

21           So you don't have that text, but you do have a

22   couple of things.  One of those things is a photograph from

23   Ms. Anderson's phone, this is Government's 403, and that's a

24   photograph of Ms. Anderson black UGGs.

25           So when she tells you that there was this issue over

1    her UGGs, and that she didn't want to give a pair of her UGGs

2    to Brandy Odom you have photographic evidence that black UGGs

3    did exist.

4            You also have a mention of UGGs in the defendant's

5    short story that you heard parts of yesterday.  Now that's in

6    evidence.  You can look at it as much as you want.  You can

7    read the whole thing cover to cover, if you like.

8            But that that story, as you heard yesterday, the

9    defendant blended parts of his and Ms. Anderson's lies, and he

10   blended them together and he created a protagonist and filled

11   the story with things that were important to him.  And one of

12   the things he mentions in that story was shopping for UGGs.

13   So that is something that was significant to him.  And why was

14   that significant to him?  That was his code that he used to

15   tell Ms. Anderson the murder was done.

16           And what else did he include in that story?  The

17   protagonist, who was referred to as "Baby Girl" throughout the

18   story, who became a striper, became a sex worker, began

19   running a group of women who were doing sex work, who called

20   the men in her life Daddy and Zaddy, he wrote two scenes where

21   that protagonist was violently raped.

22           So consider when Mr. Cecutti stands in front of you

23   and says Ms. Anderson is lying about being raped, there's no

24   evidence of that in this case.  The defendant's own story, he

25   creates a character modeled, in part, after Ms. Anderson and

1   then rapes her in the story.

2           Mr. Cecutti argued to you that Brandy Odom was not

3   killed in the Rosedale house.  We already talked about how you

4   know that Brandy Odom had a final date in that house on

5   April 2nd.  We talked about how the defendant planned for

6   this, thought about it for more than a year.  How he watched

7   TV.  How he studied for this.

8           Remember what the crime scene detectives told you.

9   Detective Cenizal talked about how one thing that would make

10  it impossible to recover forensic evidence is the creation of

11  a barrier within a room.  Detective Casale said, if you put

12  plastic around a room and then you removed it, it would be

13  virtually like removing the whole room.  You would take the

14  crime scene with it.  And that's what the defendant did in

15  this case.

16          And remember the testimony about -- from

17  Ms. Anderson about how he wanted to run the water.  This was a

18  guy who you saw, and you saw this in the text messages

19  yesterday, you saw that he did not want Ms. Anderson to

20  shower.  He did not like when his girlfriend showered at all.

21          And all of a sudden everybody was allowed to shower

22  in the house.  Ms. Anderson could take two showers a day.  The

23  defendant was showering twice a day, too.  Because he wanted

24  to run the water as much as possible.  And Detective Casale

25  said that running the water repeatedly over time would dilute

1    all of it, blood and bleach, would dilute it like it was never

2    there.

3              When you think about some of the planning, and some

4    of the thinking about getting rid of evidence that the

5    defendant was doing, I want to draw your attention about

6    something -- to something from government's 405.  These are

7    pages 443 and 444.

8              The defendant searches -- first I'll show you the

9    metadata from the search so we know the date.  This is

10   March 15th of 2018.  The defendant searches 1269

11   East 85th Street, Brooklyn, Avenue L and Avenue M.  And you

12   heard testimony that was his old block.  And he's looking at

13   the trash pickup dates.  Tuesday and Friday.  Recycling pickup

14   days.  Why is the defendant searching for trash pickup days in

15   his old block when he's lived in Rosedale, Queens, since 2007?

16             You heard from Ms. Anderson that one of the things

17   he was considering doing is leaving Brandy Odom's body in his

18   old neighborhood.  He was talking about leaving her in an

19   alley.  And I submit to you as early as March 2018 he's

20   already researching trash pickup days in preparation for

21   disposing of her in Canarsie.

22             What is some of the other evidence of the clean-up

23   he did that you saw in this case that shows you that he did

24   this in the house?  The baking soda, you might remember, in

25   Brandy Odom's room.  The strong smell of pine oil in the trunk

1    of the car.

2              Mr. Gultekin, who the defendant called on April 6th

3    to haul away 15 or so huge bags and Brandy Odom's bed.

4    Mr. Cecutti wants you to believe that at this point they're

5    just innocently getting rid of trash, they're just hiring a

6    junk remover, a trash guy to haul away trash.

7              But why is the defendant getting rid of Brandy

8    Odom's bed on April 6th if Brandy Odom is still alive, right?

9    Mr. Cecutti is suggesting to you that the defendant has no

10   idea that she is dead that she's not coming back.  Why is he

11   getting rid of her bed?  Why is he getting rid of her things?

12   And when Mr. Cecutti says that this trash pickup guy is --

13   it's too early, he said, he said it's April 6th and she's not

14   dismembered yet, so this doesn't make sense to the

15   government's theory.

16             That's not what the evidence in this case showed.

17   It showed that he did this in stages.  He hired the trash

18   pickup people to come on April 6th to take the mattress, to

19   take additional items, I submit to you emptying out Brandy's

20   room.  And Ms. Anderson told you that after he finished the

21   dismemberment of Brandy's body, he packaged up the room.  He

22   packaged up the bathroom, all the plastic bags, and he took

23   those to a dumpster over by the Popeyes.

24             Now the defendant cleaned out the house, but he did

25   not anticipate the K9 Timoshenko.  The defense asks you to

1   discredit the K9 Timoshenko.  According to the defense, even

2   this K9 is in kahoots with Ms. Anderson and Mr. Alabi against

3   the defendant.  This is a dog who you heard placed first in

4   national competitions for finding cadavers, who found cadavers

5   in collapsed buildings and mud slides, found missing children,

6   who can pick up the odor of decomposition, even if someone who

7   has been very careful, even if someone who's clean.

8         Detective Colecchia said that he had no other

9   involvement in this case.  He didn't know and he didn't want

10  to know.  He didn't want to influence his dog.  He let the dog

11  lead him.

12        And where does this dog alert?  In trunk of the

13  Nissan.  In the slop sink in the house.  And he told you he

14  started working odor going back and between Brandy Odom's

15  bedroom and the bathroom where she was dismembered.  And he

16  jumped in the tub and he stuffed his nose in the drain, not in

17  any other spots in the house.

18        This was the trunk of the car where Timoshenko hit

19  that carried Brandy body parts to the car.  That's where

20  Timoshenko did the nose poke, the bark and the scratch.  And

21  that's the same trunk where you heard the carpet from the

22  trunk was tested.  Bo Lim told you the results were

23  presumptive for blood.

24        The strengths of this evidence is why you met

25  Dr. Jamieson, fresh off a plane from Scotland yesterday.

1  After Bo Lim came in and testified about how Cory Martin's

2  Y-STR DNA profile was on the bag, the plastic bag, after all

3  that testimony where you learned that either Cory Martin or a

4  paternal male relative handled that bag, that their DNA on

5  that bag, the defense brought in an expert of their own.

6          The guy from the Forensic Institute, a private,

7  for-profit, unaccredited company he created that only

8  testifies for defense attorneys.  For a fee of $250 an hour,

9  he will fly around the world to share his expertise on pretty

10 much any topic he can think of.  Closed circuit TV?  Yes.

11 Arson?  Yes.  Toxicology?  Absolutely.  Shaken baby syndrome?

12 Yes.  And yesterday you were treated to his expertise in DNA.

13 But what was he even here for?  He agreed with everything OCME

14 concluded.

15         There were two things, really, to take away from

16 this.  The first was that he tried to suggest to you that Cory

17 Martin's Y-DNA profile was transferred to the bag, and that

18 Cory Martin or a paternal male relative didn't touch it

19 directly.  And he also tried to suggest that the defendant had

20 to so many paternal male relatives that the possibilities were

21 simply endless.

22         During that testimony where he started throwing out

23 numbers to you all, where he said maybe that's 3,000 or 4,000

24 in New York, the witness himself said that he was speculating.

25 He gave you no information about where those numbers were

1    coming from.

2          And what I ask is that you follow these arguments to

3    their logical end.  The defendant is asking you to believe

4    that Cory Martin didn't touch the bag of Brandy Odom's arms

5    and legs.  So then what did he do?  Did he just shake the hand

6    of the person who had the bag of her arms and legs?  It

7    doesn't make any sense.

8          I think when Mr. Cecutti was up here he even said

9    something about maybe his DNA floated through the air.  Ask

10   yourself if that makes any sense whatsoever, if that is

11   credible.  Mr. Cecutti also said there was much as Y-STR DNA

12   shows the defendant's association with the DNA on the bag, it

13   also shows Samuel Lemus.

14         That's not what the evidence was in this case.

15   Mr. Lim explained that he pulled out a complete profile for

16   the defendant from the DNA mixture, and that was a match for

17   the defendant's known Y-STR DNA profile from the defendant's

18   oral swab.  The defendant is Male Donor A from the bag, and

19   also from his own pillowcases.

20         The defendant's Y-STR profile is not seen any other

21   times in the Y-STR database.  Compare that to what Mr. Lim

22   told you about Samuel Lemus'.  Samuel Lemus was compared to

23   the remainder of the mixture of the DNA on the bag.  Not to

24   that profile.  He's not Male Donor A.  The defendant's profile

25   was the match to -- the defendant's profile was Male Donor A.

1          When Samuel Lemus was compared to the mixture, the

2    evidence shows that the alleles associating Samuel Lemus with

3    the DNA mixture on the bag were so common that they appeared

4    1,010 different times in the database alone.  Cory Martin's

5    appeared zero other times in the database.

6          And set that aside for a second.  You met Samuel

7    Lemus in this trial.  He had no motive to kill Brandy Odom.

8    You heard that when he found out what happened to Brandy Odom,

9    he went to the police.  He tried to be helpful.  He gave them

10   the phone numbers.  He gave them his DNA.  There's absolutely

11   no evidence that Samuel Lemus was involved in the crime.

12         And what else did the defense argue to you about the

13   forensics?  They told you that because there was a single

14   print, either palm or a footprint, if you recall

15   Detective Ramirez's testimony, and that the defendant's

16   fingerprint and palm print was excluded, well this is how you

17   know it's not defendant, they said.

18         Remember what Detective Ramirez told you.  She said

19   it was not a fingerprint.  It's a partial palm or a partial

20   footprint.  The only person whose footprint she had as a point

21   of comparison was Brandy Odom's.  She did not have the

22   defendant's or the Adelle Anderson footprint to compare.

23         And why does that matter?  It matters because of

24   what Adelle Anderson told you that she and Cory Martin did in

25   that bathroom.  Covering the floor, covering the walls,

1  covering every single surface with black plastic bags.  The

2  black plastic bags that ended up containing Brandy Odom's arms

3  and legs.

4          And what else did you learn about what was going on

5  in that bathroom?  Because there was not just one, but there

6  were two completely naked people in that bathroom at various

7  times during the setup and the dismembering of Brandy Odom.

8          First, Ms. Anderson told you that she helped set up

9  the bathroom.  Helped cover it in black plastic bags.  And she

10 also told you about another night when she was woken up by the

11 sound of the saw.  And she walked into the bathroom completely

12 naked and the defendant was using the saw on Brandy Odom.

13 Remember, that this is someone who's walking around and who

14 had helped set up the room of black plastic bags.

15         And the second thing you learned from her is that

16 the defendant had an outfit and specific boots that he wore

17 during the course of the dismemberment.  That he would take

18 off completely disrobe, including shoes, including clothes and

19 leave in the bathroom because he didn't want to track any

20 evidence around.  So that's a second person who was walking

21 around on the black plastic bags.

22         So the fact that not a fingerprint but either a palm

23 or a partial footprint ended up on one of those black plastic

24 bags actually makes perfect sense in this case.

25         Mr. Cecutti also talked to you about the Home Depot

1   purchase.  He reminded you about Mr. Van Duzer's testimony,

2   and he said it didn't may any sense that Mr. Van Duzer was

3   providing some information about something that was looked up

4   on Aisle 72, Bay EC1.

5           However, that was also from the defendant's phone.

6   That was from Government's 405.  This is page 446 of

7   Government 405.  The defendant's own search:  Pick up in store

8   today, Aisle 72, Bay EC1 when law enforcement was trying to

9   track down what the defendant was searching, what he used to

10  kill Brandy Odom.

11          Law enforcement was also able to provide Adam Van

12  Duzer with information, and Adam Van Duzer was able to return

13  a receipt.  You heard that the receipt he provided to law

14  enforcement had those three items.

15          The item, you saw the saw.  You also saw the blades.

16  And you saw a photograph of the trash bags.  The three items

17  that were purchased on April 6th, at the same time that the

18  defendant's cell sites were connecting at a cell site location

19  right at the Home Depot.  Right after he had searched the

20  items, including the reciprocating saw, and right before he

21  returned home and searched for how to use the reciprocating

22  saw, and how to insert blades in the reciprocating saw.

23          The defense also said that there was no evidence

24  that the defendant had an expectation of payment with respect

25  to this murder.  That goes against common sense.  Think about

1   everything you've seen that the defendant did to make this

2   happen.  Taking out a 50,000-dollar policy, then a

3   150,000-dollar policy.  Having possession of Brandy Odom's

4   personal identifying information.  Sending Adelle Anderson the

5   Capital One card.  She had pictures of Adelle Anderson's

6   children's birth certificates.  And he in his phone had the

7   copy of Brandy's signature.  That's from Government's 402.

8          This was in the defendant's phone.  He had the copy

9   of Brandy Odom's signature.  He was the one talking about

10  moving to El Paso.  He was the one getting into the real

11  estate industry.  You saw his pages and pages of notes in his

12  notebook showing that he was studying for this new career in

13  real estate.  All of a sudden writing all these notes about

14  buying real estate.  Where was this new-found wealth coming

15  from?  He was the one in the dire financial straights.  He was

16  the one offering Samson $25,000 to do a scam with him.  Where

17  was that money coming from?

18         Mr. Cecutti said in opening statement that this was

19  just a search for a saw at an inopportune time.  An

20  inopportune time like when a body was being decapitated in his

21  home?  What was the defendant going to do with that saw?

22         Remember the pictures of the holes in his house?  We

23  know that the defendant wasn't getting a saw to fix all the

24  holes in his house.  We know that the defendant wasn't big

25  into sheetrocking.  We know that when the NYPD went in, they

1    didn't find a woodworking studio or a metal shop.  He wasn't

2    cutting up any pipes.  He wasn't in construction.  And if he

3    needed this saw all of a sudden on April 6th, suddenly in

4    desperate need of a reciprocating saw, then where was the saw?

5          Why, three weeks later, when the police went into

6    his house, didn't they find the saw?  He only needed the saw

7    for just a moment in time, and then it was gone three weeks

8    later?  That doesn't make any sense.  And where were the

9    blades for the saw, and where was this box of trash bags, 50,

10   45-gallon trash bags?  This wasn't there either.  Where were

11   these things?

12         Mr. Cecutti said to you that Dr. Soler concluded

13   that it was not possible that a saw was used.  That's not the

14   testimony that you heard from Dr. Soler.  Dr. Soler described

15   to you how some of the cuts where bones were missing, that was

16   consistent with mechanical saw because it was how it would

17   destroy the bones.

18         And what did you learn from Ms. Anderson?  She told

19   you that he was using a manual saw before he went out to get

20   the reciprocating saw.  And Dr. Soler testified, and she said

21   about -- she talked about the other cuts, the other chopping

22   marks, and also the marks that were made by a blade with

23   reciprocating motion, and she went like this (indicating).

24   She moved her arm back and forth.

25         When Detective Cenizal photographed all over the

1    defendant's house, what was photographed in the shed?  A

2    manual saw that was missing its blade.  That was laying out on

3    top of everything else.  Where is the blade for this manual

4    saw?  Why is it missing?  Where is the SAWZALL that the

5    defendant had to know how to use on April 6th?

6           Look at the search history from Government's 405.

7    Right above how to insert blade for reciprocating saw.  Right

8    before that, on April 6th, the defendant is searching BMW 435I

9    M Sport expecting to come into some money be able to get a

10   luxury vehicle.  And look at the search right before that.

11   April 4th, 2018, at 10:38:55 p.m., Mercedes CLS 500 review.

12          Remember when Ms. Hajjar showed you earlier the

13   timing of those text messages.  That flurry of text messages

14   between the defendant and Adelle Anderson on April 4th of

15   2018?  They started at approximately 10:32 p.m. on April 4th.

16   The day before the defendant picked her up at her mom's and

17   went to Walmart.

18          Only minutes into that flurry of text messages from

19   Ms. Anderson, the text messages that I submit to you are the

20   texts from the defendant informing Ms. Anderson with the coded

21   text that Brandy Odom has been killed, minutes later he's

22   searching Mercedes CLS 500 reviews.

23          Expectation of payment.

24          None of this is a coincidence, members of the jury.

25   The defendant is the man who committed these crimes.  The

1  government has proven beyond a reasonable doubt that he was

2  part of the scheme to cash in on Brandy Odom's death, and we

3  ask that you return the only possible verdict in light of the

4  evidence in this case, a verdict of guilty on all charges.

5          THE COURT:  Thank you, Ms. Dean.

6          Ladies and gentlemen, I'm going to give you ten

7  minutes to stretch your legs, then I'm going to charge you on

8  the law.  So we'll see you in ten minutes.

9          Don't talk about the case.

10          THE COURTROOM DEPUTY:  All rise.

11          (Jury exits the courtroom.)

12          THE COURT:  All right, everybody can sit.  My law

13  clerks have copies of the charge, the final charge, for you to

14  follow along.  We'll be back in about ten minutes.

15          (A recess was taken at 3:56 p.m.)

16

17

18

19

20

21

22

23

24

25

1          (In open court; outside the presence of the jury.)

2          THE COURT:  Let me just make sure also.  Do you have

3     all of your exhibits to go back?  Because if you don't,

4     collect them quietly while we're doing this because I don't

5     want to have a gap between the charge and when we send the

6     things back.  And Ms. Greene is going to get a laptop to go

7     back with them unless you have a cleared one.

8          MS. DEAN:  I don't think we do.

9          THE COURT:  We'll take care of it.

10          MS. DEAN:  We have everything but 5 and Mr. Rader is

11    getting that for us.

12          THE COURT:  Okay.

13          (Jury enters.)

14          THE CLERK:  You may be seated.

15          THE COURT:  All right.  Ladies and gentlemen, you've

16    heard all of the evidence in the case and you've heard the

17    lawyers' closing arguments.  I am now going to instruct you on

18    the law that applies to this case.  You have all paid such

19    careful attention during the course of this trial and I'm

20    going to ask that you continue paying attention as I give you

21    these instructions.

22          I'm going to divide the charge into three parts.  In

23    the first part, I'm going to talk to you about the general

24    rules that define and govern your duties as jurors in this

25    criminal case.  In the second portion of the charge, I'm going

1   to instruct you about the crimes charged in the case and the

2   elements that the government must prove beyond a reasonable

3   doubt for those crimes.

4          In the final section of the charge, I will give you

5   some general instructions about the process of your

6   deliberations.

7          I want to begin by reminding you of your role as

8   jurors and my role as the judge.

9          As I told you in my opening instructions, your job

10  as jurors is to find the facts from all of the evidence in the

11  case.  You are the sole judges of the facts, and it is for you

12  and you alone to determine the weight that you are going to

13  give to the evidence, to resolve any conflicts in the

14  evidence, and to draw those inferences that you believe are

15  reasonable and warranted from the evidence.

16         My job is to instruct you on the law.  You must

17  follow the law as I give it to you and apply the law to the

18  facts as you find them.  It is your sworn obligation to follow

19  the law as I give it to you, whether you agree with the law or

20  not.  You should not be concerned about the wisdom of any rule

21  of law that I state.  Regardless of any opinion that you might

22  have about what the law may be or what you think it should be,

23  you would violate your oaths as jurors if you were to base

24  your verdict on anything other than the law as I describe it

25  to you.

1           If the lawyers have said something about the law

2     that's different from what I give you in these instructions,

3     you must ignore that and be guided only by what I'm telling

4     you during the course of these instructions.  You should not

5     single out any one instruction, but consider these

6     instructions as a whole.

7           Since it is your job and not mine to determine what

8     the facts are, I have not expressed or implied an opinion

9     about what I think, about how I think you should decide the

10    facts of this case.  You should not conclude from anything

11    that I have said or any ruling that I have made or anything

12    about these instructions that I have an opinion about the case

13    or about how you should find the facts.

14          So, I think as I told you at the beginning, don't

15    assume that just because I asked a witness a question, that I

16    have some kind of an opinion.  I think as I told you at the

17    beginning I did that either because I didn't understand the

18    testimony or I thought it had to be clarified for you.  You

19    shouldn't -- in determining whether the defendant is guilty or

20    not guilty on any of these charges, you mustn't consider

21    anything that I have said or done.  I have no view about the

22    defendant's guilt or innocence.  It is your job to determine

23    the facts, not mine.

24          The fact that the government is prosecuting the case

25    in the name of the United States of America should not affect

1   your evaluation of the evidence or of the facts before you.

2   The government is not entitled to greater consideration than

3   the defendant.  By the same token, it is entitled to no less

4   consideration.  All parties, government or individuals, stand

5   as equals in this court and are entitled to equal

6   consideration.  Neither the government nor the defendant is

7   entitled to any sympathy or favor.

8          It is your duty to decide these, to decide the facts

9   with complete fairness and impartiality and without any bias

10  or prejudice or sympathy for any party.  You must perform your

11  duties as jurors with complete fairness and impartiality.  You

12  must consider the evidence carefully and impartially, follow

13  the law as I give it to you, and reach a just verdict

14  regardless of the consequences.

15         It would be improper for you to consider any

16  feelings that you might have about the defendant's race,

17  religion, national origin, ethnic background, occupation, sex,

18  age or political views.  Each person is entitled to the

19  presumption of innocence, and the government has the same

20  burden of proof as to every defendant.  It would also be

21  improper for you to allow any feelings that you might have

22  about the nature of the crimes charged to influence your

23  decisionmaking process.

24         As I believe I told you in my opening instructions,

25  the indictment is a document that the government uses to give

1   the defendant notice of the charges against him and to bring

2   him before the court.  The indictment is an accusation and

3   nothing more.  It is not evidence and it is entitled to no

4   weight in your determination of the facts.  The defendant has

5   pled not guilty to the indictment.  The burden is on the

6   government to prove the defendant's guilt beyond a reasonable

7   doubt.  This burden never shifts to the defendant.  He does

8   not have to prove that he is innocent.  He does not have to

9   present any evidence at all.  If the government does not meet

10  its burden of proving the defendant's guilt beyond a

11  reasonable doubt, you must reach a verdict of not guilty.

12          The defendant is presumed to be innocent of the

13  charges against him.  The presumption of innocence alone,

14  unless overcome by proof beyond a reasonable doubt, is

15  sufficient to reach a verdict of not guilty.  The defendant is

16  presumed innocent unless and until you decide unanimously that

17  the government has met its burden and proven him guilty beyond

18  a reasonable doubt.  This presumption was with the defendant

19  when the trial began and remains with him now, and will

20  continue into your deliberations, unless and until you are

21  convinced that the government has proved his guilt beyond a

22  reasonable doubt.

23          What is a reasonable doubt?  It is a doubt that's

24  based on reason and common sense.  The kind of doubt that

25  would cause a reasonable person to hesitate to rely on it and

1   act on it in a matter of importance in his or her personal

2   life.

3           A reasonable doubt is not a caprice or a whim.  It

4   is not speculation or suspicion.  It is not an excuse to avoid

5   an unpleasant duty.  It is not based on sympathy.  Proof

6   beyond a reasonable doubt is not proof beyond all doubt;

7   rather, it is proof that is so convincing that a reasonable

8   person, based on that proof, would not hesitate to draw the

9   conclusion offered by the government.

10          If after fair and impartial consideration of all the

11  evidence that you have heard in this trial you have a

12  reasonable doubt, it is your duty to acquit the defendant.  On

13  the other hand, if after fair and impartial consideration of

14  all the evidence you that you have heard you are satisfied of

15  the defendant's guilt beyond a reasonable doubt, you should

16  vote to convict.

17          Under your oath oaths as jurors, you are not

18  permitted to consider the question of the punishment the

19  defendant may receive if he is convicted.  It is my duty, and

20  my duty alone, to impose a sentence if the defendant is

21  convicted.  It is your job to weigh the evidence in the case

22  and to determine whether the defendant is guilty beyond a

23  reasonable doubt, solely on the based on the evidence.

24          I'm now going to talk to you about evidence and how

25  you should consider it.  You must determine the facts in this

1   case based only on the evidence presented, and on inferences

2   that can be reasonably drawn from that evidence.  The evidence

3   consists of testimony from the witnesses on direct and

4   cross-examination, the physical exhibits that were admitted

5   into evidence, and the stipulations between the parties.  A

6   stipulation between the parties is an agreement that certain

7   facts are true and you should regard those agreed facts as

8   true.

9           There are certain things that are not evidence and

10  you should disregard them in deciding what the facts are in

11  this case.

12          As I told you before, the arguments and statements

13  of lawyers, including in their opening statements and closing

14  arguments, are not evidence.  If one of the lawyers said

15  something about the evidence that conflicts with your

16  recollection of the evidence, it is your recollection of the

17  evidence that controls.

18          Second, questions that a lawyer asked the witness

19  and that the witness did not answer are not evidence.

20          Objections to questions or exhibits are not

21  evidence.  And to the extent that any lawyers made any

22  objections, made any statements when they objected, I don't

23  think anybody did, but if they did, that is not evidence.  The

24  attorneys have a right and duty to object and to ask for a

25  sidebar conference if they believe that a question is improper

1  or that certain evidence shouldn't come in, but you shouldn't

2  be influenced by any objections or by the way I ruled on those

3  objections.  If I sustained an objection, ignore the question.

4  If I overruled it, then treat it like any other answer.

5          The fourth thing is that testimony and exhibits that

6  I have stricken from the record and told you to disregard are

7  not evidence.

8          Fifth, anything that you might have seen or heard

9  outside of the courtroom is not evidence.  Your verdict must

10  be made based solely on the evidence that was presented in

11  this trial or on the lack of evidence.  In this regard, I have

12  instructed you not to read any articles to the extent that

13  there are any, to watch any or listen to any news accounts of

14  this case or read anything about the case or look anything up

15  on the internet.  That instruction continues until the very

16  end of the case, until after you've rendered a verdict.

17          There are generally two types of evidence:  Direct

18  evidence and circumstantial evidence.  You may use both kinds

19  of evidence in reaching your verdict in this case.

20          Direct evidence is testimony from a witness about

21  something that the witness knows from the witness' own senses,

22  something the witness has seen, felt, touched, tasted or

23  heard.

24          Circumstantial evidence is proof of a chain of

25  circumstances that point to the existence or the nonexistence

1    of certain facts.  In this courthouse, we use a very simple

2    example to describe circumstantial evidence.

3            Suppose you come court on a day when the weather is

4    clear, sunny and dry, but you've been in the windowless

5    courtroom for a good part of the day and then you see someone

6    coming in wearing a wet raincoat and another person coming in

7    shaking an umbrella.  Now, you can't look outside of the

8    courtroom and you can't see whether it's raining or not.  So

9    you have no direct evidence that it was raining.  But it would

10   be reasonable and logical for you to infer from these

11   circumstances, the wet coat, the dripping umbrella, that it

12   rained outside while you were sitting here in court.

13           That's all there is to circumstantial evidence.  On

14   the basis of reason, experience and common sense, you may

15   infer the existence or nonexistence of a fact from one or more

16   established facts.  Inferences are conclusions that reason and

17   common sense lead you to draw from the facts established by

18   the evidence.  Use your common sense in drawing inferences.

19   An inference is not a suspicion or a guess.  It is a reasoned,

20   logical decision to conclude that a disputed fact exists on

21   the basis of another fact that you know exists.  So while you

22   are considering the evidence presented to you, you are

23   permitted to draw reasonable inferences from the proven facts

24   in this trial.

25           Our law makes no distinction between the weight to

1    be given to direct or circumstantial evidence.  One kind is

2    not better than the other.  You must base your verdict on a

3    reasonable assessment of all of the evidence in the case.  I

4    remind you that whether, based on direct or circumstantial

5    evidence or upon logical, reasonable inferences that you draw

6    from the evidence, you must be convinced of the defendant's

7    guilt beyond a reasonable doubt before you may convict.

8         You have heard evidence that the defendant engaged

9    in conduct, including crimes, other than the crimes that are

10   charged in the indictment.  The defendant is not on trial for

11   committing any acts that are not charged in the indictment or

12   for acts that were committed outside the time periods that are

13   described in each count of the indictment.  Consequently, you

14   may not consider evidence of those other facts as a substitute

15   for evidence that the defendant committed the crimes that are

16   charged in this case.  Nor may you consider evidence of those

17   other acts as proof that the defendant has a criminal

18   propensity, that is, you may not conclude that he likely

19   committed the crimes charged in the indictment because he was

20   predisposed to criminal conduct.

21        Instead, you may consider evidence of the

22   defendant's uncharged conduct only for the limited purposes

23   that I'm going to describe for you now.

24        So you may only consider the uncharged conduct:  As

25   evidence explaining the background and nature of the

1  relationship between the defendant and Adelle Anderson, the

2  formation and the development of the illegal relationship, the

3  conspiracy between them, assuming you find one; as evidence of

4  the development of relationships of mutual trust between the

5  defendant and Adelle Anderson; as evidence of conduct that is

6  inextricably intertwined with the evidence of the charged

7  crimes; as evidence that enables you to understand the

8  complete story of the charged crimes; and as evidence

9  corroborating the testimony of other government witnesses.

10      You may not consider evidence of uncharged crime by

11  the defendant for any other purpose than the ones I've just

12  described for you.

13      The government has presented several exhibits in the

14  form of charts or summaries.  These charts and summaries were

15  shown to you in order to save time, to make certain evidence

16  more meaningful, and to help you in considering the evidence.

17  It is for you to decide whether the charts or summaries

18  correctly present the information that's in the testimony and

19  in the exhibits on which they were based.  Because the charts

20  and summaries were admitted into evidence, you may consider

21  them as evidence, but are you to give them no greater

22  consideration than you would give to the evidence on which

23  they were based.

24      The government also presented videos as part of its

25  case, some in a compilation and recordings as well.  Your

1  understanding of the evidence controls.  That means it's your

2  job, as the fact finder, to interpret what's on the videos or

3  the recordings.  If you believe that you saw or heard

4  something different than what a witness' testimony was about a

5  particular video, your interpretation controls.

6          In my opening remarks to you, I believe I spoke to

7  you briefly about assessing the credibility of witnesses which

8  is one of your jobs as jurors.  You are the sole judges of the

9  credibility of the witnesses and of the weight their testimony

10 deserves.  There is no magical formula that you use to judge a

11 witness' testimony.  You make all of these decisions in your

12 own lives, and the standard that you use when you're trying to

13 decide whether you believe what someone's telling you are the

14 same standards that you use here.  Your determination of

15 credibility depends on the impression that a witness made on

16 you as to whether that witness was telling the truth or giving

17 you an accurate version of what occurred.  One of the best

18 tools that you have in making this decision is your common

19 sense.

20          In making your decision, you may take into account

21 any number of factors, including the following.  Did the

22 witness have the opportunity to see, hear and know about the

23 events that the witness described?  Could the witness remember

24 and describe those things accurately?  How did the witness

25 testify?  Was the witness honest and forthright?  Did it seem

1   like the witness was hiding something?  Was the witness

2   evasive?  Did the witness testify differently on

3   cross-examination than on direct examination?  Was the

4   witness' testimony reasonable in light of all the evidence in

5   the case?  Did the witness have any possible interest in the

6   outcome of the trial?  And was the witness' testimony

7   contradicted by other testimony that the witness had given, by

8   what the witness said or did on a prior occasion, by other

9   witness's testimony or by other evidence?

10          Inconsistencies or discrepancies in witness

11  testimony, or among the testimony of different witnesses, may

12  or may not cause you to discredit a witness's testimony.  If

13  there is a discrepancy or an inconsistency, you should

14  consider whether it relates to an important fact or whether

15  it's unimportant, whether it was intentional or whether it was

16  the result of an innocent mistake, and whether the witness had

17  a common sense explanation for the inconsistency.  If you

18  determine that a witness has purposely lied to you, that's

19  important and you should consider it seriously.

20          A witness's testimony may be discredited or

21  impeached by showing the witness previously made statements

22  that are inconsistent with the witness's testimony in front of

23  you.  It's your job to determine the weight, if any, to be

24  given to all or part of the testimony of a witness who has

25  been impeached by prior inconsistent statements.  You should

1    first determine whether the prior statement is inconsistent.

2            If you find that a witness made an inconsistent

3    statement, you may consider that fact in assessing the

4    witness's credibility.  You may consider whether you believe

5    the witness or accept the witness's testimony even though

6    there was a prior inconsistent statement.  In making this

7    determination, you should consider the importance of the

8    subject matter of the statement.  If you find that the matter

9    is relatively unimportant, you may decide not to attach much

10   significance to the inconsistency.  If you find that the

11   matter is important, you might decide that it casts

12   substantial doubt on the witness's credibility.

13           If you find that a witness's testimony on the

14   witness stand is false, either in whole or in part, you may

15   disregard the particular part that you find to be false or you

16   may disregard the witness' entire testimony.

17           Now, you heard expert witness testimony from the

18   following witnesses:  Special Agent Richard Busick, who

19   discussed historical cell site location information and

20   drafted a report detailing this data; Dr. Shana Straub, from

21   the Medical Examiner's Office, who performed the autopsy and

22   testified as to the cause of Brandy Odom's death and the

23   nature of her injuries; Dr. Angela Soler, a forensic

24   anthropologist; Bo Lim, who testified about DNA analysis;

25   Detective Cynthia Ramirez, who testified about fingerprint

1  analysis; and Dr. Allan Jamieson who testified about DNA

2  analysis.

3          An expert witness is allowed to express an opinion

4  about which that person has specialized knowledge and

5  training.  Ordinarily, witnesses are limited to testify

6  concerning matters of fact, and the rules of evidence do not

7  allow witnesses to testify about their opinions or

8  conclusions.  Experts are the exception to this rule.  If

9  specialized knowledge will help the jurors understand the

10 evidence or decide a disputed fact, a witness who is qualified

11 as an expert by knowledge, experience, training or education

12 may testify about that evidence or facts in the form of an

13 opinion.

14         You should consider the expert testimony you heard

15 in this case and give it the weight you think it deserves.  In

16 weighing expert testimony, you may consider the expert's

17 qualification, the expert witness' opinion, the witness'

18 demeanor and reasons for testifying, as well as all of those

19 other considerations that ordinarily apply when you are

20 assessing a witness' credibility.  If you decide that the

21 expert witness's opinion is not based on sufficient education

22 and experience or that the reasons given in support of the

23 opinion are not sound, or that the opinion is outweighed by

24 other evidence, you may disregard the opinion entirely.

25         In short, the expert witness is the same as any

1    other witness.  You should not accept an expert witness'

2    testimony merely because the witness is an expert or merely

3    because I permitted the witness to testify about the witness'

4    opinion.  Nor should you substitute it for your own reason,

5    judgment and common sense.  The determination of the facts in

6    this case as I mentioned before rests solely on you.

7            You also heard the testimony of law enforcement

8    agents and officers.  You should evaluate these witnesses'

9    testimony in the same manner that you evaluate the testimony

10   of any other witness.  The fact that a witness is a law

11   enforcement agent does not mean that you should give that

12   witness' testimony any more or less consideration than any

13   other witness.  You should use all of the tests of credibility

14   that I have discussed with you to evaluate a law enforcement

15   witness' testimony.  It's up to you to decide, after you

16   review the evidence, whether to accept the testimony of law

17   enforcement witnesses, and to give it whatever weight you feel

18   that it deserves.

19           Now, you heard the testimony of two witnesses who

20   testified pursuant to agreements with the government.

21           Samson Alabi testified pursuant to an agreement with

22   the government in which the government agreed that if he

23   testified truthfully, the government would inform the

24   prosecutor and any sentencing judge in that pending state

25   court case of that fact.

1          Adelle Anderson testified pursuant to a cooperation

2    agreement with the government after she pleaded guilty to

3    federal crimes.

4          The government argues, as it is permitted to do,

5    that it must take the witness as it finds her.  The law

6    permits the government to use the testimony of alleged

7    accomplices and co-conspirators.  Indeed, it is the law in

8    federal courts that the testimony of an accomplice or a

9    co-conspirator may be enough in and of itself for conviction,

10   if the jury finds that the testimony establishes the

11   defendant's guilt beyond a reasonable doubt.

12         These agreements were between Samson Alabi and the

13   government, and Adelle Anderson and the government, not the

14   court.  The government is permitted to enter into such

15   agreements and there is nothing improper about the

16   government's use of such agreements.  However, you should bear

17   in mind that each of these witnesses has an interest in this

18   case that is different from the ordinary witness.  Therefore,

19   you must scrutinize such testimony with caution and weigh it

20   with great care.

21         You should ask yourself whether the witness would

22   benefit more by lying or by telling the truth.  Was the

23   witness's testimony made up in any way because the witness

24   believed or hoped that he or she would somehow receive

25   favorable treatment by testifying falsely?  Or did the witness

1   believe that his or her interests would be best served by

2   testifying truthfully?  If you believe that the witness was

3   motivated by hopes of personal gain, was the motivation one

4   that would cause the witness to lie or was it one that would

5   cause the witness to tell the truth?

6          You have also heard testimony that Adelle Anderson

7   has been promised that if she provides substantial assistance

8   to the government and testifies truthfully, that she was

9   promised that if she provided substantial assistance to the

10  government and testifies truthfully, completely and fully, the

11  government will provide the sentencing court with what's

12  called a 5K 1.1 letter.

13         The 5K1.1 letter sets forth the cooperating

14  witness's criminal acts as well as the substantial assistance

15  that the witness has provided.  I instruct you that the 5 K1.1

16  letter does not guarantee the cooperating witness a lower

17  sentence.  This is because the sentencing court may, but is

18  not required to take the 5K1.1 letter into account when

19  imposing sentence on the cooperating witness.  Even with a

20  5K1.1 letter, the court has the discretion to impose any

21  reasonable sentence that the court deems appropriate up to the

22  statutory maximum.  The final determination as to the sentence

23  to be imposed rests with the court, not with the government.

24         In sum, you should look at all of the evidence in

25  deciding what credence and what weight, if any, you want to

1   give to such witnesses.

2          All right.  The defendant did not testify in this

3   case.  Under our constitution, the defendant in a criminal

4   case never has any duty to testify or to come forward with

5   evidence.  This is because the burden of proof remains on the

6   government at all times, and the defendant is presumed

7   innocent.  A defendant is never required to prove that he is

8   innocent.  You may not attach any significance to the fact

9   that the defendant did not testify.  You may not draw any

10  inference against him because he did not testify.  And you may

11  not consider this against the defendant in any way during your

12  deliberations in the jury room.

13         All right.  As I said before, there's certain facts

14  that have been stipulated to.  When the attorneys on both

15  sides stipulate and agree to the existence of a fact, you must

16  accept that stipulation as evidence and regard that fact as

17  proved.

18         There was also testimony that the attorneys

19  interviewed witnesses when preparing for and during the trial.

20  You may not draw any unfavorable inference from that fact.  On

21  the contrary, attorneys are obliged to prepare their cases as

22  thoroughly as possible, and in discharging that

23  responsibility, it's appropriate that they interview witnesses

24  in preparation for trial and during the trial.

25         You have heard evidence that witnesses made

1    statements on earlier occasions which counsel argues are

2    inconsistent with their trial testimony.  Evidence of the

3    prior statements was admitted for the limited purposes of

4    helping you decide whether you believe the trial testimony of

5    the witness who is alleged to have contradicted himself or

6    herself.  If you find that the witness made an earlier

7    statement that conflicts with the trial testimony, with the

8    witness' trial testimony, you may consider that fact in

9    deciding how much of the trial testimony of the witness, if

10   any, to believe.

11        In making this determination, you may consider

12   whether the witness purposely made a false statement or

13   whether it was an innocent mistake, whether the inconsistency

14   concerns an important fact, or whether it had to do with a

15   small detail, whether the witness had an explanation for the

16   inconsistency and whether that explanation appealed to your

17   common sense.

18        It is exclusively your duty, based on all the

19   evidence and your own good judgment, to determine whether the

20   prior statement was inconsistent, and if so, how much weight

21   should be given to the inconsistent statement in determining

22   whether to believe all, part or none of the witness's

23   testimony.

24        Now, there are a number of people whose names you

25   have heard during the course of the trial that did not

1   testify.  I instruct you that each party had an equal

2   opportunity or lack of opportunity to call any of these

3   witnesses.  Therefore, you should not draw inferences or reach

4   any conclusions as to what they would have testified about had

5   they been called.  Their absence should not affect your

6   judgment in any way.

7           Remember that the defendant in a criminal case does

8   not have a burden to call witnesses or to produce any

9   evidence.

10          Although the government bears the burden of proof,

11  and although a reasonable doubt can arise from a lack of

12  evidence, the law does not require the government to prove its

13  case through any particular means.  Law enforcement techniques

14  are not your concern.  You are not to speculate as to why the

15  government used the techniques that it did or why it did not

16  use other techniques.  Your concern is to determine whether,

17  based on all of the evidence presented in the case, the

18  government has proved the defendant's guilt beyond a

19  reasonable doubt.

20          During the trial, you have heard evidence about a

21  variety of investigative techniques and means of correcting

22  evidence.  I instruct you that any evidence that was presented

23  to you was obtained legally, and you can consider it.  The

24  methods used to collect evidence or to investigate should not

25  enter into your deliberations in any respect.

1          Among some of the exhibits that came into evidence,

2    there are some exhibits that are redacted.  Redacted means

3    that part of the document was taken out.

4          The redacted portions of an exhibit are not

5    evidence, and you should only concern yourself with the part

6    of the exhibit that's been admitted into evidence.  Don't

7    speculate as to why the exhibit was redacted and what might be

8    in any redacted portions of the exhibit.

9          (Continued on next page.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    THE COURT:  Now, I'm turning to the second part of

2  this charge where I'll explain to you the elements of the

3  crimes charged in the indictment that the Government must

4  prove beyond a reasonable doubt.

5    The indictment in this case contains five separate

6  counts and you'll be called upon to render a separate verdict

7  as to each count.  Each count charges the defendant with a

8  different crime.  You must consider each count separately and

9  return a separate verdict of guilty or not guilty for each.

10  Whether you find the defendant guilty or not guilty as to one

11  offense should not affect your verdict as to any other offense

12  charged.

13    You will note that the indictment charges the

14  conduct occurred "on or about" a certain date.  The Government

15  does not have to establish the exact date of an alleged

16  offense.  It is sufficient if the evidence establishes beyond

17  a reasonable doubt that an offense was committed on a date

18  that's reasonably near the dates alleged.

19    Although the indictment charges that the statute was

20  violated by acts that are connected by the word "and" it's

21  sufficient if the evidence establishes violations of the

22  statute by any one of acts charged.  Of course, it must be

23  proof beyond a reasonable doubt.

24    Venue refers to the location of the charged crimes.

25  Each count of the indictment alleges that the crime charged

1    occurred in whole or in part in this judicial district, which

2    is the Eastern District of New York.  This district includes

3    Brooklyn, Queens, Staten Island, Nassau and Suffolk Counties

4    on Long Island and the waters surrounding Manhattan.  To

5    establish venue for a crime in this district, the Government

6    must prove that some act in furtherance of the crime happened

7    in the Eastern District of New York.

8            Unlike the other elements, the Government must prove

9    venue only by a preponderance of the evidence, that is, that

10   it is more likely than not that some act in furtherance of the

11   crimes occurred in Brooklyn, Queens, Staten Island,

12   Long Island or the waters surrounding Manhattan.

13           During these instructions, you'll hear me use the

14   words, "knowingly" and "intentionally."  I will define these

15   terms for you before addressing the individual charges.  As a

16   general rule, the law holds individuals accountable only for

17   conduct that they undertook intentionally.  Accordingly,

18   before you can find the defendant guilty of the crimes charged

19   you must be satisfied that he was acting knowingly or

20   intentionally.

21           A person acts knowingly if he acts voluntarily and

22   intentionally, not because of ignorance, mistake, or accident.

23   A person acts intentionally if he acts with a specific intent

24   to do something the law forbids.  The person need not be aware

25   of the specific law or rule that his conduct may be violating,

1   but he must act with a specific intent to do whatever it is

2   the law forbids.

3           These issues of knowledge and intent require that

4   you make a determination about a defendant's state of mind,

5   something that can rarely be proved directly.  A wise and

6   careful consideration of all the evidence before you and

7   circumstances may permit you to make a determination as to the

8   defendant's state of mind.  Indeed, in your everyday affairs,

9   you are frequently called upon to determine a person's state

10  of mind from his words and actions in given circumstances.

11  And that's what you're asked to do here.

12          I have admitted into evidence against the defendant

13  the acts and statements of Adelle Anderson who the Government

14  charges was a co-conspirator of the defendant.

15          The reason to allow this evidence has to do with the

16  nature of the crime of conspiracy.  A conspiracy is often

17  referred to as a partnership in crime.  Thus, as in other

18  types of partnerships, when people enter into a conspiracy to

19  accomplish an unlawful end, each and every member becomes an

20  agent for the other conspirators in carrying out the

21  conspiracy.

22          Accordingly, the reasonably foreseeable acts,

23  declarations, statements, and omissions of any member of the

24  conspiracy and in furtherance of the common purpose of the

25  conspiracy are deemed under the law to be the acts of all of

1  the members.  And all of the members are responsible for those

2  acts, declarations, statements, and omissions.

3          If you find beyond a reasonable doubt that the

4  defendant whose guilt you're considering was a member of the

5  conspiracy charged in the indictment, then any acts done or

6  statements made in furtherance of the conspiracy by anyone

7  that you find have been members of that conspiracy, may be

8  considered against the defendant.  This is so even if those

9  acts were done and statements were made in the defendant's

10 absence and without his knowledge.

11         I'm now going to explain to you what aiding and

12 abetting means.  The relevant statute provides:

13         That, whoever commits an offense against the

14 United States or aids and abets or counsels, commands, or

15 induces or procures its commission is punishable as a

16 principal.

17         And whoever willfully causes an act to be done

18 which, if directly performed by him, would be an offense

19 against the United States, is punishable as a principal.

20         Under the aiding and abetting statute, the

21 Government does not have to prove that a defendant physically

22 committed the act or crime with which he is charged in order

23 to find the defendant guilty.  A person who aids or abets

24 another to commit a crime is just as guilty of that crime as

25 if he committed it himself.

1          Accordingly, you may find the defendant guilty of

2     the crimes charged in Counts One, Four, and Five if you find

3     that the government has proven beyond a reasonable doubt that

4     another person actually committed the crime with which the

5     defendant is charged and the defendant aided or abetted that

6     person in the commission of the crime.

7          As you can see, the first requirement is that you

8     find that another person has committed the act or crime

9     charged.  No one can be convicted of aiding and abetting the

10    criminal acts of another if the other person didn't commit the

11    crime in the first place.  If you do find that a crime was

12    committed, then you must consider whether the defendant aided

13    or abetted the commission of that crime.

14         In order to aid and abet another to commit a crime,

15    it is necessary that the defendant knowingly associate himself

16    in some way with the crime, and that he knowingly seek by some

17    act to help make the crime succeed.

18         To establish that the defendant knowingly associated

19    himself with the crimes charged in Counts One, Four, and Five,

20    the Government must be establish that the defendant newspaper

21    that the crime was being committed.

22         To establish that the defendant participated in the

23    commission of the crime, the Government must prove that the

24    defendant engaged in some affirmative conduct or overt act for

25    the specific purpose of bringing about that crime.

1          The defendant's mere presence at a place where the

2     crime is being committed, even if he knew that a crime was

3     being committed or merely associating with others who are

4     committing a crime is not sufficient to establish aiding and

5     abetting.

6          Further, someone who has no knowledge that a crime

7     is being committed or is about to be committed, but

8     inadvertently does something that aids in the commission of

9     the crime is not an aider or abettor.  That is to say, an

10    aider and abettor must know that the crime is being committed

11    and act in a way which is intended to bring about the success

12    of the criminal venture.

13         To determine whether the defendant aided or abetted

14    the commission of the crime with which he is charged ask

15    yourself these questions:

16         Did he participate in the crime charged as something

17    that he wished to bring about?

18         Did he knowingly associate himself with the criminal

19    venture?

20         Did he seek by his actions to make the criminal

21    venture succeed?

22         If he did, then the defendant is an aider and

23    abettor, and therefore guilty of the offense.  If, on the

24    other hand, your answer to any one of these questions is "no,"

25    then the defendant is not an aider and abettor and you must

1    find him not guilty under that theory.

2              As I said, the indictment contains five counts.  I'm

3    going to summarize the counts and explain the law for each.

4              Count One of the indictment charges the defendant

5    with murder-for-hire and it reads as follows:

6              In or about and between March 2017 and April 2018,

7    both dates being approximate and inclusive, within the Eastern

8    District of New York and elsewhere, the defendant Cory Martin,

9    together with others, did knowingly and intentionally use and

10   cause another to use one or more facilities of interstate

11   commerce to wit:  One or more telephones and the internet,

12   with intent that a murder be committed in violation of

13   New York Penal Law Section 125.25, to wit:  The murder of

14   Brandy Odom as consideration for the receipt of, and is

15   consideration for a promise and agreement to pay, something of

16   pecuniary value and the death of Brandy Odom did result.

17             The relevant language of the statute provides that:

18             Whoever uses or causes another to use any facility

19   of interstate or foreign commerce with intent that a murder be

20   committed in violation of the laws of any state or the

21   United States as consideration for the receipt of, or as

22   consideration for a promise or agreement to pay, anything of

23   pecuniary value, or who conspires to do so, shall be guilty of

24   a crime.

25             Here, the elements of the offense of

1    murder-for-hire.

2              First, that the defendant either used or caused

3    someone else to use a facility of interstate commerce.

4              Second, that the use of this facility of interstate

5    commerce was done with the intent that a murder be committed.

6              And third, that the intended murder in question was

7    committed as consideration for receiving anything of pecuniary

8    value.

9              I will now explain each of these elements in greater

10   detail.

11             The first element is that the defendant used a

12   facility of interstate commerce.

13             And the government must prove beyond a reasonable

14   doubt that the defendant caused or caused someone else to use

15   a facility of interstate commerce.

16             An interstate facility is a vehicle or means of

17   communication that crosses state lines in the course of

18   commerce.  For example, using the internet or making a

19   telephone call or sending a telegram constitutes the use of a

20   facility of interstate commerce regardless of whether the

21   particular alleged communication actually crossed a state

22   line.  Any use of the United States mail constitutes the use

23   of a facility of interstate commerce.

24             Use of an interstate facility must have occurred to

25   facilitate or further the commission of the murder.  It need

1   not have been the only, or even the principal reason, for the

2   use of an interstate facility as long as it was one of the

3   reasons for the travel or for the use of a facility.

4           The defendant has been charged with using or causing

5   to use one or more facilities of interstate commerce to wit:

6   One or more cellular telephones and the internet.  If the

7   government has proved these facts beyond a reasonable doubt

8   then you may have find that it has proven the first element of

9   the charge against the defendant.

10          The second element that the Government must prove

11  beyond a reasonable doubt is that the use of a facility of

12  interstate commerce was done with the intent that a murder be

13  committed in violation of the laws of New York State.

14          I instruct you that section 125.25 of the New York

15  Penal Code provides in part that a person is guilty of murder

16  when, with the intent to cause the death of another person, he

17  causes the death of such person.  A person intends to cause

18  the death of another person when his conscious aim or

19  objective is to cause the death of that person.

20          If you find beyond a reasonable doubt that the

21  defendant intended to cause the death of another person, then

22  you will find that this element has been met.  If you find

23  that the government has not proven this beyond a reasonable

24  doubt, then the element of intent will not have been met.

25          You are thus being asked to look in the mind of the

1    defendant and ask what his purpose was, what he used or caused

2    to be used a facility of interstate commerce.

3              You may determine intent from any evidence in the

4    record including the defendant's statements and his conduct

5    both before and after the use of the interstate facilities

6    took place.

7              The third element that the government must prove

8    beyond a reasonable doubt is that the defendant intended that

9    the murder be committed as consideration for the receipt of

10   anything of pecuniary value.  This element requires that

11   before the murder there was a mutual agreement, understanding,

12   or promise that something of value would be exchanged for

13   committing the murder.  "Anything of value" means money,

14   negotiable instruments or anything else the primary

15   significance of which is economic advantage.

16             The Government does not have to prove that money or

17   a similar item was actually exchanged or delivered.  The

18   Government does not need to show that the defendant actually

19   received anything of pecuniary value for his participation in

20   the events.  Only that he participated with the understanding

21   based on a mutual agreement that he would receive in exchange

22   something of pecuniary value.  If, however, you find that

23   there was no mutual agreement before the murder that something

24   of value would be exchanged, then payments of money after the

25   murder standing alone would not satisfy this element.

1    If you find that the government has satisfied the

2    elements of the crime of murder-for-hire beyond a reasonable

3    doubt, then you must also determine if the murder- for-hire

4    actually resulted in the death of Brandy Odom.  In order to

5    establish that the crime resulted in the death of Brandy Odom,

6    the Government must prove beyond a reasonable doubt that but

7    for the charged murder-for-hire scheme, Brandy Odom would not

8    have died.

9    Count Two of the indictment charges the defendant

10   with conspiring to commit murder-for-hire.

11   Count Two reads:

12   In or about and between March 2017 and April 2018,

13   both dates being approximate and inclusive, within the Eastern

14   District of New York and elsewhere, the defendant Cory Martin

15   together with another did knowingly and intentionally conspire

16   to use or cause another to use one or more facilities of

17   interstate commerce to wit:  One or more telephones and the

18   internet, with intend that a murder be committed in violation

19   of New York Penal Law Section 125.25 to wit:  The murder of

20   Brandy Odom, as consideration for the receipt of, and as

21   consideration for a promise, an agreement to pay, something of

22   pecuniary value and that death of Brandy Odom did result.

23   As you will note, this count charges the defendant

24   with conspiracy to commit murder-for-hire in violation of same

25   statute charged in Count One.  That is Title 18 United States

1   Code Section 1958.  This is because that statute prohibits

2   certain conduct as well as conspiracy to engage in that

3   conduct.

4           Count One charges the defendant with engaging in the

5   prohibited conduct, whereas Count Two charges him with

6   conspiracy to engage in the prohibited conduct.

7           I have instructed you about the elements of the

8   crime of murder-for-hire involving the use of interstate

9   facilities, and I'm now going to explain to you what it means

10  to conspire to commit a crime.

11          With respect to the conspiracy charge, the

12  murder-for-hire statute states:

13          That whoever conspires to use or cause to be used a

14  facility of interstate commerce with intent that a murder be

15  committed in violation of the laws of any state, as

16  consideration for the receipt of or as consideration for a

17  promise to or agreement to pay anything of pecuniary value,

18  which can include anything of monetary value will be guilty of

19  the crime.

20          Let me explain to you what I mean by the charge of

21  conspiracy.  Conspiring to commit a crime is a separate and

22  distinct offense from the substantive crime that is the object

23  of the conspiracy.  Forming a conspiracy -- which is a

24  partnership for criminal purposes -- is in and of itself

25  unlawful.  The essence of the crime of conspiracy is an

1   agreement to violate the law.

2           A conspiracy, even if it should fail of its purpose,

3   is nevertheless a crime, and therefore it is not necessary for

4   the Government to prove that commission of any substantive

5   offense for you to fine the defendant guilty of conspiracy.

6           In order to prove the defendant guilty of conspiring

7   to commit murder-for-hire, the Government must establish three

8   elements beyond a reasonable doubt.

9           First, that two or more people knowingly and

10  willfully conspired or agreed.

11          That they agreed to commit an unlawful act.

12          And that the defendant knowingly and willfully

13  joined the conspiracy.

14          I'm going to describe each one of these elements in

15  greater detail.

16          The first element of conspiracy requires that two or

17  more people knowingly and willfully conspired or agreed.  I

18  will explain to you more fully the nature of a conspiracy, and

19  the kind of evidence that proves the existence of a knowing

20  and willful agreement.

21          A conspiracy is an agreement by two or more people

22  to accomplish an unlawful purpose or purposes.

23          Although conspiracy involves an agreement to effect

24  an unlawful act, the participants do not have to have entered

25  into an express or formal agreement, or to have stated orally

1    or in writing, what the unlawful act was or how it was to be

2    accomplished.  It is sufficient to show that they came to a

3    mutual understanding to accomplish the unlawful act.

4            You may, of course, find the existence of an

5    agreement to effect an unlawful act has been established by

6    direct proof.  Because, however, conspiracy is often

7    characterized by secrecy, such an agreement might be inferred

8    from the circumstances and from the conduct of the parties.

9    But mere association with or contact with co-conspirators,

10   even with awareness of their unlawful activity, does not make

11   a person a co-conspirator.  Similarly, mere presence in a

12   place where a crime is being committed, even coupled with the

13   knowledge that the crime is being committed, does not make the

14   person a co-conspirator.

15           In the context of conspiracy cases, actions often

16   speak louder than words.  In this regard, you may, in

17   determining whether an agreement existed, consider the actions

18   and statements of all of those you find to be participants as

19   proof that a common design existed on the part of those people

20   to act together for the accomplishment of an unlawful purpose.

21           The second element of the crime of conspiracy is the

22   agreement to commit an unlawful act.  The unlawful act alleged

23   in Count Two of the indictment is the murder-for-hire of

24   Brandy Odom.  I've already instructed you on the elements of

25   murder-for-hire with respect to Count One.  I'm just reminding

1    you for purposes of the conspiracy count the defendant is not

2    charged in this count with actually committing the unlawful

3    act, but rather with conspiring to commit it.

4              The third element of the crime of conspiracy is the

5    defendant knowingly and willful life joined the conspiracy.

6    For the Government to prove the conspiratorial guilty of the

7    defendant, it must establish that both a conspiracy existed of

8    and that the defendant became a member of or participated in

9    the conspiracy willfully and with knowledge and in furtherance

10   of its unlawful purposes.  In deciding whether the defendant

11   was a member of the conspiracy, you should consider whether,

12   based on all of the evidence, it has been shown that the

13   defendant knowingly and willfully joined the conspiracy.  Did

14   he anticipate in it with knowledge of its unlawful purpose and

15   with the specific intention of furthering its business or

16   objectives?

17             If the defendant did so participate, the extent of

18   his participation has no bearing on the issue of his guilt.

19   Each member of a conspiracy may perform different acts and may

20   perform them at different times.  Even if the defendant played

21   only a minor role in the conspiracy, you may have find the

22   defendant guilty of participation.

23             The Government must prove beyond a reasonable doubt

24   that the defendant's participation in the conspiracy by proof

25   based on reasonable inferences drawn from the evidence of his

1   own acts, conduct, statements, or declaration and his

2   connection with the acts and conduct of other alleged

3   co-conspirators.

4           The defendant need not have been a member of the

5   conspiracy from its very start to be a co-conspirator.  He may

6   have joined it at any point during its progress and be held

7   responsible for all that was done thereafter as long as he

8   remained a member of the conspiracy.  A person who has no

9   knowledge of the conspiracy but happens to act in a way that

10  furthers some object or purpose of the conspiracy does not

11  thereby become a co-conspirator.  To find that the defendant

12  joined a conspiracy, you must be convinced beyond a reasonable

13  doubt that the defendant did not act unknowingly or out of

14  mistake, but rather that he knowingly and voluntarily entered

15  into the alleged agreement.

16          Moving on to Count Three.

17          Count Three charges the defendant with participating

18  in a conspiracy to commit wire fraud between March 2017 and

19  August 2018.

20          Count Three reads as follows:

21          In or about and between March 2017 and August 2018,

22  both dates being approximate and inclusive, within the Eastern

23  District of New York and elsewhere, the defendant Cory Martin,

24  together with another, did knowingly and intentionally

25  conspire to devise a scheme, an artifice to defraud one or

1    more life insurance companies, to wit:  Globe Life and

2    Accident Insurance Company and American National Insurance

3    Company, and to object money and property from said life

4    insurance companies by means of one or more materially false

5    or fraudulent pretenses, representations and promises, and for

6    the purpose of executing such scheme and artifice to transmit

7    and cause to be transmitted by means of wire communications in

8    interstate and foreign commerce, one or more writings, signs,

9    signals, pictures, sounds, to wit:  Telephone calls and

10   monetary transfers, e-mails, and other electronic

11   communications.

12          I've already instructed you on the definition of

13   conspiracy which, as I said, is an agreement among two or more

14   people to commit a crime.  I remind you that the conspiracy,

15   the crime of conspiracy, to violate a federal law is a

16   separate offense from the underlying crime.

17          Conspiracy to commit wire fraud is separate and

18   distinct from an actual violation of wire fraud which is the

19   object of the conspiracy and it's what we call the

20   "substantive crime."

21          In order to find the defendant guilty of conspiracy

22   to commit wire fraud, you must find that two or more people

23   agreed to commit the crime of wire fraud and that the

24   defendant knowingly and intentionally became a member of that

25   conspiracy.

1          THE COURT:  (Cont'g.)  The wire fraud statute

2    provides, in relevant part:

3          Whoever, having devised or intending to devise any

4    scheme or artifice to defraud, or for obtaining money or

5    property by means of false or fraudulent pretenses and

6    representations or promises, transmits or cause to be

7    transmitted by means of wire, radio, or television

8    communication in interstate or foreign commerce, any writings,

9    signs, signals, pictures, or sounds for the purpose of

10   executing such scheme or artifice shall be guilty of a crime.

11         The crime of wire fraud has three essential elements

12   that the government must prove beyond a reasonable doubt.

13   First, that there was a scheme or artifice to defraud or

14   obtain money or property from Globe Life and Accident

15   Insurance Company and American National Insurance Company by

16   materially false and fraudulent pretenses representations and

17   promises.  Second, that the defendant or a co-conspirator

18   knowingly and globally devised, or participated in this scheme

19   or artifice to defraud with knowledge of its fraudulent nature

20   and with the specific intent to defraud.  And third, that

21   interstate wire facilities were used in furtherance of this

22   scheme to defraud.

23         The first element is that the government must prove

24   is that there was a scheme or artifice to defraud or to obtain

25   money or property from Global Life and Accident Insurance

1   Company and American National Insurance Company by materially

2   false and fraudulent pretenses, representations or promises.

3           A "scheme or artifice" is a plan for the

4   accomplishment of an object.  In this case, the term "defraud"

5   means to deprive another of money, property, or any other

6   thing of value by dishonest means.  A "scheme to defraud" here

7   is simply a plan, device or course of action to obtain money

8   or property from someone by trick, deceit, deception or

9   swindle.

10          A scheme or artifice to defraud may not be shown by

11  direct evidence, but may be established by all the

12  circumstance and facts in the case.

13          In this case, it is alleged that the scheme to

14  defraud was carried out by making false and fraudulent

15  statements, representations and claims.  A statement,

16  representation or a claim is false if it is untrue when made,

17  and was then known to be untrue by the person making it or

18  causing it to be made.  A representation or statement is

19  fraudulent if it was falsely made with the intention to

20  deceive.  Deceitful statements or half truths, or the

21  concealment of any material facts may also constitute false or

22  fraudulent statements under the statute.

23          The deception need not be premised upon spoken or

24  written words alone.  The arrangement of the words or the

25  circumstances in which they are used may convey the false and

1    deceptive appearance.  If there is a deception, the manner in

2    which it is accomplished is immaterial.

3            The false or fraudulent pretense, representation,

4    promise or statement must relate to a material fact or matter.

5    A material fact is one that reasonably would be expected to be

6    of concern to a reasonable and prudent person in relying upon

7    the pretense, representation, promise or statement in making a

8    decision.

9            This means that if you find a particular statement

10   of fact or representation to have been false, you must also

11   determine whether that statement or representation was one

12   that a reasonable person would have considered important in

13   making his or her decision.  The same principle applies to

14   fraudulent half truths or omissions of material facts

15   necessary to make the statements that were not materially

16   misleading.  The government does not have to prove that anyone

17   actually relied on a false statement or representation.

18   Rather, it is sufficient if the misrepresentation is one that

19   is capable of influencing a reasonable person's decision and

20   is intended to do so.

21           In addition to proving that a pretense,

22   representation, promise or a statement was false or

23   fraudulent, and related to a material fact, in order to

24   establish a scheme to defraud, the government must prove that

25   the alleged scheme contemplated depriving another of money or

1   property.  The government is not required, however, to prove

2   that the scheme or artifice to defraud actually succeeded;

3   that is, the government is not required to prove that the

4   defendant or a co-conspirator realized any gain from the

5   scheme, or that the intended victim suffered any loss or harm.

6   The question for you to decide is whether the government has

7   proved that the defendant knowingly devised or participated in

8   a scheme to defraud.  Whether or not the scheme actually

9   succeeded is not a question you may consider in determining

10  whether the scheme existed.

11          The second element that the government must prove

12  beyond a reasonable doubt is that the defendant or a

13  co-conspirator knowingly and willfully devised or participated

14  in a scheme or artifice to defraud with knowledge of its

15  fraudulent nature, and with the specific intent to defraud.

16          To "devise" a scheme to defraud is to concoct or

17  plan.  To "participate" in a scheme to defraud means to

18  associate one's self with a view and intent toward making it

19  succeed.  I've already defined the terms "knowingly" and

20  "willfully," and you should follow those instructions here as

21  well.  "Intent to defraud" means engaging or participating in

22  a fraudulent scheme with some realization of its fraudulent or

23  deceptive character, and with an intention to be involved in

24  the scheme to defraud, and to help it succeed with the purpose

25  of obtaining money or property from the victim.  Of course,

1   the government does not need to prove that the intended victim

2   was actually harmed, only that the defendant intended to harm

3   the victim by obtaining money or property.

4          The question of whether a person acted knowingly,

5   willfully, and with intent to defraud is a question of fact

6   for you to determine, like any other fact question.  This

7   question involves one's state of mind.  As I previously

8   mentioned, direct proof of knowledge and fraudulent intent is

9   and often not available.

10         The third and last element that the government must

11  establish as to the wire fraud count, is that interstate wire

12  facilities were used in furtherance of the scheme to defraud.

13  The "interstate" or "foreign" requirement means that wire

14  communication must pass between two or more states, for

15  example, a telephone call, or wire transfer of funds between

16  banks in different states, or an email or electronic message

17  that was transmitted over interstate wires.

18         It is not necessary for the defendant to be directly

19  or personally involved in any wire communication, as long as

20  the communication is reasonably foreseeable in the execution

21  of the alleged scheme to defraud in which the defendant is

22  accused of participating.  In this regard, it would be

23  sufficient to establish this element of the crime if the

24  government has proven that the defendant caused the wires to

25  be used by others, and this does not mean that the defendant

1    himself must have specifically authorized or directed others

2    to execute a wire communication.  When a person acts with

3    knowledge that the use of wires facilities will follow in the

4    ordinary course of business, or where the use of wire

5    facilities can reasonably be foreseen, even though not

6    actually intended, then he causes the wires to be used.

7    Furthermore, the requirement that an interstate or foreign

8    wire facility was used, is satisfied even if a wire facility

9    was used by a person with no knowledge of the fraudulent

10   scheme, including a victim of the alleged fraud, so long as

11   the wire was in furtherance of the alleged scheme.

12           The use of the wire facility need not itself be

13   fraudulent.  Stated another way, the material sent by a wire

14   need not contain any fraudulent representation or even any

15   request for money.  It's sufficient if a wire facility was

16   used to further or assist in carrying out the scheme to

17   defraud.

18           Only the use of a wire facility must be reasonably

19   foreseeable, not its interstate or foreign component.  If you

20   find that the use of a wire facility was reasonably

21   foreseeable, and an interstate or foreign wire facility was

22   actually used, then this element is satisfied, even if it was

23   not foreseeable that the wire communication would cross state

24   or national boundaries.

25           I remind you that the crime of conspiracy, an

1   agreement to violate the law, as charged in this count of the

2   indictment, is an independent offense.  It is separate and

3   distinct from the actual violation of any specific law, such

4   as the law prohibiting the crime of wire fraud.  Accordingly,

5   you may find the defendant guilty of the offense charged in

6   Count Three, even if you find that the crime of wire fraud was

7   never actually committed.

8           Count Four is aggravated identified theft.

9           This count charges the defendant -- I'm sorry, this

10  count of the indictment reads as follows:

11          In or about and between March 2017 and August 2018,

12  both dates being approximate and inclusive, within the Eastern

13  District of New York and elsewhere, the defendant Cory Martin,

14  together with others during and in relation to the crime

15  charged in Count Three, did knowingly and intentionally

16  transfer, possess and use, without lawful authority, one or

17  more means of identification of another person, to wit: a

18  name, date of birth, and Social Security number of Brandy

19  Odom, knowing that these means of identification belonged to

20  another person.

21          The relevant statute provides that:

22          Whoever, during and in relation to any felony

23  violation enumerated in subsection (c) of 1028A, knowingly

24  transfers, possesses or uses without lawful authority, a means

25  of identification of another person, shall be guilty of a

1    crime.

2              In order to find the defendant guilty of aggravated

3    identified theft, the government must prove the following

4    elements beyond a reasonable doubt:

5              First, that the defendant knowingly transferred or

6    possessed, or used a means of identification of another

7    person;

8              Second, that the defendant used the means of

9    identification during and in relation to the offense of

10   conspiring to commit wire fraud as charged in Count Three; and

11             Third that the defendant acted without lawful

12   authority.

13             I'll explain each element in greater detail.

14             The first element is that the defendant knowingly

15   used, transferred or possessed a means of identification of

16   another person.  "Means of identification" means any name or

17   number that may be used alone or in conjunction with any other

18   information to identify the specific individual, including,

19   for example, any name, Social Security number, date of birth,

20   official date -- a state or government-issued driver's license

21   or identification number, or insurance identification number.

22   In addition, the government must prove both that the means of

23   identification was that of an actual person, living or dead,

24   and that the defendant knew that the means of identification

25   was that of an actual person.

1        I've already instructed you on the considerations

2   appropriate to determine whether the defendant acted

3   knowingly.  Those instructions apply here.

4        The second element is that the defendant used the

5   means of identification during and in relation to the offense

6   charged in Count Three.  That's the conspiracy to commit wire

7   fraud.  "During and in relation to" the offense of wire fraud

8   conspiracy, means that the possession, use or transfer of the

9   means of identification of another was the core of what made

10  the underlying conspiracy unlawful.  The salient point is

11  whether the defendant used the means of identification to

12  further or facilitate the fraud.

13       The third element is that the defendant acted

14  without lawful authority.  For this element, the government is

15  not required to show that the defendant stole or illegally

16  obtained the means of identification.  All that is necessary

17  is that the defendant transferred or possessed or used the

18  means of identification of another person without lawful

19  authority during and in relation to the offense of wire fraud

20  conspiracy charged in Count Three.

21       Now we're into the last count of the indictment,

22  which is Count Five.  This charges the defendant with

23  committing, or aiding and abetting the commission of identity

24  theft of Brandy Odom.  The indictment reads as follows:

25       In or about and between March 2017 and August 2018,

1    both dates being approximate and inclusive, within the Eastern

2    District of New York and elsewhere, the defendant Cory Martin,

3    together with others, did knowingly and intentionally

4    transfer, possess and use without lawful authority in and

5    affecting interstate commerce one or more means of

6    identification of another person, to wit: the name, date of

7    birth, and Social Security number of Brandy Odom, with the

8    intent to commit and to aid and abet, and in connection with

9    the unlawful activity that constituted one or more violations

10   of federal law, to wit: the crimes charged in Count One, Two

11   and Three.

12        It must also be shown that the defendant committed

13   the offense charged in Count Five in connection with a crime

14   of violence, to wit: the murder of Brandy Odom.

15        The relevant statute makes it a federal crime for

16   anyone knowingly to transfer, possess and use without lawful

17   authority, a means of identification of another person with

18   intent to commit or to aid and abet, or in connection with any

19   unlawful activity that violates federal or state law.

20        To prove this crime, the government must prove the

21   following elements beyond a reasonable doubt:

22        First, that the defendant knowingly transferred or

23   possessed or used a means of identification of Brandy Odom;

24        Second, that defendant knew that the means of

25   identification belonged to Brandy Odom;

1    Third, that the defendant be ing acted without

2    lawful authority;

3    Fourth, that the defendant acted with intent to

4    commit or to aid and abet, or in connection with the crime of

5    murder-for-hire and conspiracy to commit murder-for-hire as

6    charged in Counts One and Two, or the crime of conspiring to

7    commit wire fraud as charged in Count Three;

8    Fifth, that the transfer or possession or use of the

9    means of identification occurred in or affected interstate or

10   foreign commerce where the means of identification as

11   transported in the mail in the course of the transfer or

12   possession or use.

13   I've already defined the terms "means of

14   identification," "use", "transfer and possess," and will now

15   repeat them here.  This is also true for the second and third

16   elements regarding the defendant's knowledge and whether the

17   defendant acted without lawful authority.

18   The fourth element that the government must prove

19   beyond a reasonable doubt is that the defendant used or

20   transferred or possessed the means of identification with the

21   indent to commit or to aid and abet, or in connection with an

22   unlawful activity that violates federal law.  To establish

23   this element, the government does not need to prove that the

24   defendant actually committed the crimes charged in

25   Counts Three and Four.  This element is satisfied if you find

1    that the government proved beyond a reasonable doubt that the

2    defendant used or transferred or possessed the means of

3    identification with the intent to commit, aid and abet, or in

4    connection with any of these offenses.

5            As to the fifth element, interstate commerce means

6    the movement of goods, services, money and individuals between

7    any two or more states.  To satisfy this element, the

8    government must prove that the defendant's conduct affected

9    interstate in any way, no matter how minimal.

10           If you find that the government has satisfied these

11   elements of Count Five beyond a reasonable doubt, then you

12   must also determine whether the government has proven beyond a

13   reasonable doubt that the defendant committed the crime in

14   connection with the crime of violence; that is, the murder of

15   Brandy Odom.

16           Okay, we've reached the third and final and much

17   shorter part of the instructions.  In a few minutes you will

18   begin your deliberations.  And so I'm now going to give you

19   some general rules that should guide you in your

20   deliberations.  Keep in mind that nothing that I have said

21   during these instructions is intended to suggest to you in any

22   way what I think your verdict should be.  That is entirely for

23   you to decide.

24           In order for your deliberations to proceed in an

25   orderly fashion, you must have a foreperson.  Traditionally

1   Juror Number 1 acts as the foreperson, but when you begin your

2   deliberations, if you all decide that you want to elect

3   another foreperson, you can do that.  The foreperson is

4   responsible for signing all of the communication to the Court,

5   and for handing them to the deputy marshal during your

6   deliberations.  Of course, the foreperson's vote is entitled

7   to no greater weight then that of any other juror.

8        Your duty is to reach a fair conclusion from the

9   law, as I have given it to you, and the evidence presented in

10  this case.  This duty is important.  When you are in the jury

11  room, listen to one another, discuss the evidence and the

12  issues in the case among yourselves.  It is the duty of each

13  of you as jurors to consult with one another and to deliberate

14  with a view toward reaching a verdict, if you can do that

15  without surrendering your individual judgment.  No one should

16  surrender a conscientious conviction of what the truth is, and

17  what the weight and effect of the evidence is.  Each of you

18  must decide the case for yourself and not nearly acquiesce in

19  the conclusions of your fellow jurors.  You should examine the

20  issues and the evidence before you with candor and frankness,

21  and with proper deference to and regard for the opinions of

22  your fellow jurors.

23       You should not hesitate to reconsideration your

24  opinions from time to time, and to change them if you become

25  convinced that you were wrong.  But do not surrender an honest

1   conviction about the weight and effect of the evidence simply

2   to arrive at a verdict.  The decision that you reach must be

3   unanimous; you must all agree.

4         It is very important that you not communicate with

5   anyone outside of the jury room about your deliberations or

6   about anything related to this case.  You may not use any

7   electronic device or media, like a telephone, cell phone,

8   smartphone, smart watch, tablet, computer, the internet or any

9   instant messaging service or text, blog, or social network to

10  communicate with anyone regarding any information about this

11  case, or to do any research or investigation about this case

12  until after I've accepted your verdict.

13        There is only one exception to this rule.  If you

14  have a question for me, or it becomes necessary to communicate

15  with me, you may send a note through the deputy marshal that

16  is signed by your foreperson.  No juror should attempt to

17  communicate with me, except by a signed note, and I will never

18  communicate with any member of the jury on any subject

19  touching on the merits of this case, other than in writing or

20  here in open court.

21        If, during your deliberations, you have questions

22  about the law, or a further explanation about the law, please

23  send me a note.

24        You will be permitted to review the exhibits that

25  were admitted at trial, as well as transcripts of the trial

1   testimony.

2           The government must prove the defendant's guilt

3   beyond a reasonable doubt, as we have discussed.  If you find

4   that the defendant has met this burden, then your verdict

5   should be guilty.  If you find that the defendant has not met

6   this burden, your verdict should be not guilty.  To reach a

7   verdict, as I said, it must be unanimous.  I have prepared a

8   verdict form that may help you in your deliberation.  The form

9   is in no way meant to tell you how to deliberate or to decide

10  the facts of this case.  The foreperson should use a checkmark

11  in the appropriate space for "guilty" or "not guilty."  The

12  foreperson should also put his or her initials and the date

13  beside the checkmark on the verdict form.  Again, this form

14  must reflect your unanimous verdict.

15          As we discussed, you are each entitled to your own

16  opinion, however, you should consult with one another and

17  reach an agreement that's based solely and wholly on the

18  evidence, if you can do that without contradicting your

19  individual judgment.  Each of you must decide the case for

20  yourself after consideration with your fellow jurors.

21  However, if after you carefully consider all the evidence and

22  the arguments of your fellow jurors, your view is different

23  from the others, you should not change your opinion just

24  because you're outnumbered or because it's late.  Your final

25  vote must reflect your conviction as to how the issues should

1    be decided.

2              When you have reached a verdict, simply send me a

3    note that your foreperson signed that says you have reached a

4    verdict.  On that note, don't write down what the verdict is.

5    You should never give a numerical count of where the jury

6    stands in its deliberations in any communication with the

7    Court.

8              The government, the defendant and the Court rely on

9    you to give full and conscientious deliberation and

10   consideration to the issues and evidence before you.  By doing

11   so, you carry out your oaths as jurors, to render a true

12   verdict.

13             I'm just going to ask you to be patient for a

14   minute, I want to discuss with counsel whether there's

15   anything further we need to charge.

16             (Continued on the next page.)

17             (Sidebar conference.)

18

19

20

21

22

23

24

25

1          (The following occurred at sidebar.)

2          THE COURT:  Okay, there are a number of typos in the

3    charge, which I'm trying to go along and fix, and we'll fix

4    that before we send the charge.

5          Any objection by defense?

6          MR. CECUTTI:  No.

7          THE COURT:  Anything?

8          MS. DEAN:  No.

9          THE COURT:  All right, I'm going to send them back.

10          (End of sidebar conference.)

11          (Continued on the next page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (In open court; Jury present.)

2              THE COURT:  Is our deputy marshal here?

3              THE COURTROOM DEPUTY:  Please raise your right hand.

4              (Whereupon, the marshal was sworn.)

5              THE MARSHAL:  Yes.

6              THE COURTROOM DEPUTY:  Thank you.

7              THE COURT:  All right, ladies and gentlemen, the 12

8    regular jurors should go with the deputy marshal and begin

9    your deliberations.

10             And all our alternate juror will go with Ms. Greene.

11             (The jury retired to commence deliberations at

12   5:35 p.m.)

13             (Jury exits the courtroom.)

14             THE COURT:  Does everybody have their evidence

15   together so when Ms. Greens comes back she can take it back to

16   the jury?

17             No one's talking.

18             MS. DEAN:  No, Your Honor, our paralegals are still

19   getting together the last pieces.

20             THE COURT:  Okay, you have all of yours?

21             MR. CECUTTI:  We provided electronically our four

22   exhibits to the government.

23             THE COURT:  Okay, all right.  And just as soon as we

24   get that done it would be good.

25             (Pause in the proceedings.)

1        THE COURT:  Are we close?

2        MS. DEAN:  We are.

3        MS. HAJJAR:  We just have three defense exhibits.

4        THE COURT:  They said they gave them to you.

5        MS. HAJJAR:  Electronically, we need have go them

6   printed.

7        THE COURT:  Oh, okay.

8        Wait, wait, wait, we'll print them here.

9        (Pause in the proceedings.)

10       THE COURT:  All right, we're still waiting for

11  Mr. Martin, but we did get a note from the jury, and we'll

12  give you a copy on Monday.  The notes reads:

13       We would like to go home for the weekend.  And it's

14  signed by the foreperson.

15       So I take it no one objects?

16       MS. DEAN:  No.

17       MR. CECUTTI:  No objection.  We consent.

18       THE COURT:  Okay.

19       (Defendant enters the courtroom.)

20       THE COURTROOM DEPUTY:  All rise.

21       (Jury enters the courtroom.)

22       THE COURTROOM DEPUTY:  You may be seated.

23       THE COURT:  Ladies and gentlemen, thank you for your

24  patience.

25       I've received your most recent note, which reads:

1   We would like to go home for the weekend.

2           It's a very reasonable request, so I am going to

3   excuse you for the weekend.

4           You've got the weekend, obviously, before we meet

5   again, so please continue to follow those instructions.  Don't

6   look up anything on the internet, don't discuss the case with

7   anybody, but do have a relaxing weekend.

8           And we'll see you again on Monday at 9:30.  Thanks

9   so much.

10          THE COURTROOM DEPUTY:  All rise.

11          (Jury exits the courtroom.)

12          THE COURT:  All right, see everybody Monday.

13

14                      *    *    *    *    *

15          (Proceedings adjourned at 6:45 p.m. to resume on

16  March 4, 2024 at 9:30 a.m.)

17

18

19                        I N D E X

20                                     PAGE

21  SUMMATION           BY MS. HAJJAR      1724

22  SUMMATION           BY MR. CECUTTI     1787

23  REBUTTAL SUMMATION  BY MS. DEAN        1841

24  CHARGE OF THE COURT BY THE COURT       1916

25