1  UNITED STATES DISTRICT COURT
   EASTERN DISTRICT OF NEW YORK
2

3  - - - - - - - - - - - - - X

4  UNITED STATES OF AMERICA,    :    20-CR-549(AMD)

5
        -against-             :    United States Courthouse
6                                   Brooklyn, New York

7  CORY MARTIN,                :
                                    February 29, 2024
8          Defendant.         :    9:30 o'clock a.m.

9  - - - - - - - - - - - - - X

10
                    TRANSCRIPT OF TRIAL
11        BEFORE THE HONORABLE ANN M. DONNELLY
          UNITED STATES DISTRICT JUDGE, and a jury.
12

13  APPEARANCES:

14
   For the Government:         BREON PEACE
15                             United States Attorney
                               BY: EMILY J. DEAN
16                                 TANYA HAJJAR
                                   ANDRES PALACIO
17                             Assistant United States Attorneys
                               271 Cadman Plaza East
18                             Brooklyn, New York

19

20  For the Defendant:          ANTHONY CECUTTI, ESQ.
                               KESTINE THIELE, ESQ.
21

22  Court Reporter:             Charleane M. Heading
                               225 Cadman Plaza East
23                             Brooklyn, New York
                               (718) 613-2643
24
   Proceedings recorded by mechanical stenography, transcript
25  produced by computer-aided transcription.

CMH      OCR      RDR      FCRR

1      (In open court; outside the presence of the jury.)

2      THE COURT:  All right.  Anything before we bring in

3  the jury?

4      MS. DEAN:  No, Your Honor.

5      MR. CECUTTI:  No.

6      THE COURT:  We don't have to talk about it now but

7  did everybody get the charge and have the chance to go over

8  it?

9      MS. DEAN:  Yes.

10     THE COURT:  So we'll figure out a time to talk about

11 that.

12     MR. CECUTTI:  Okay.

13     THE COURT:  Let's get the jury.

14     (Pause.)

15     (Jury enters.)

16     THE COURT:  All right.  Good morning, everybody.  We

17 are ready to begin.

18     Are you ready to call your next witness?

19     MS. DEAN:  Yes, Your Honor.  The government calls

20 Special Agent Matthew Wiedemer.

21     THE CLERK:  Please raise your right hand.

22     (The witness, MATTHEW WIEDEMER, was duly

23 sworn/affirmed by the clerk.)

24     THE CLERK:  Please state and spell your name for the

25 record.

1     THE WITNESS:  Matthew Wiedemer, M-A-T-T-H-E-W,

2  W-I-E-D-E-M-E-R.

3     THE COURT:  Okay.  Just a couple of things before

4  you begin.  The first thing is I want to make sure that the

5  court reporter can get everything that you have to say.  So

6  don't speak too quickly.  And I also want to make sure

7  everybody hears you.  So make sure the microphone is in a good

8  spot.

9     If there's any question that's unclear, just tell

10  me.  Okay.

11     THE WITNESS:  Thank you, Your Honor.

12     THE COURT:  Okay.

13     MS. DEAN:  Thank you, Your Honor.

14  DIRECT EXAMINATION

15  BY MS. DEAN:

16  Q    Good morning, Special Agent.

17       Where do you work?

18  A    Federal Bureau of Investigation.

19  Q    What's your position there?

20  A    I'm a special agent.

21  Q    How long have you been with the FBI?

22  A    Almost seven years.

23  Q    What squad are you currently assigned to?

24  A    I'm currently assigned to the Eurasian Organized Crime

25  Task Force.

1   Q    What do you do with that squad?

2   A    I investigate crimes associated with organized crime,

3   such as extortion, racketeering, crimes related to

4   racketeering, and, you know, other items, serving search

5   warrants and arrest warrants.

6   Q    Where did you work within the FBI before the squad you

7   just described to us?

8   A    I was on the New York Metro Safe Streets Task Force.

9   Q    What does that squad do?

10  A    It's a gang squad that investigates violence associated

11  with gangs within New York City, firearms, narcotics and

12  associated trafficking and other investigations associated

13  with gangs.

14  Q    And is that squad the Safe Streets Task Force where you

15  worked in 2020?

16  A    It was.

17  Q    Did you become involved in the investigation into the

18  homicide of Brandy Odom?

19  A    I did.

20  Q    How did you become involved?

21  A    I was involved during the day of the arrest of two

22  subjects and a subsequent search.

23  Q    You mentioned two subjects.

24       Did you have arrest warrants for these people?

25  A    Yes.

1    Q    And what were their names?

2    A    Cory Martin and Adelle Anderson.

3    Q    What date was their arrest scheduled for?

4    A    It was November 4th of 2020.

5    Q    Could you describe for the jury the plan for their

6    arrest?

7    A    The plan for the arrest on that date, because it was in

8    another division and another field office's area of

9    responsibility in Newark, it was outside of Trenton, the

10   Newark field office utilized their swat team to conduct the

11   arrest for this day.

12   Q    Was there a particular location where your team and that

13   swat team you just described planned to arrest them?

14   A    Yes, at the residence of the subjects.  I believe it was

15   113 Rossell Avenue, Trenton, New Jersey.

16   Q    Can you describe that building and that area?

17   A    The building or the area in general was a residential

18   neighborhood, and the building itself was a two-story,

19   multiple-unit apartment complex.

20   Q    What did you do on the morning of November 4, 2020,

21   before going out to the arrest location?

22   A    As with most operations, when we conduct either an arrest

23   or a search warrant, we meet at a predetermined location to go

24   over the operation.  So going over the kind of the plan on how

25   it's going to be executed and the tactics and the order of

1    what's going to happen that day.

2          So on that morning we met at a predetermined

3    location.  The case team and the Newark swat team briefed how

4    they would conduct that arrest.

5    Q    What is an entry team?

6    A    The entry team is typically the first entity comprised of

7    law enforcement personnel that will conduct the entry into the

8    whatever, the residence or dwelling or building that is in

9    question for the operations on this case.  The entry team,

10   it's going to be the first group to go into the subject

11   residence.

12   Q    Were you part of the entry team?

13   A    I was not.

14   Q    Why not?

15   A    The operation was being conducted by the Newark swat

16   team.  So they were the entry team and conducted that arrest.

17   Q    And after they did enter, was anybody arrested?

18   A    Yes.

19   Q    Who?

20   A    Cory Martin and Adelle Anderson.

21   Q    Did you interact with either of those two people on that

22   day?

23   A    Adelle Anderson.

24   Q    Did you make any requests of Ms. Anderson?

25   A    Yes.  I requested consent to search the residence.

1    Q    Did she consent?

2    A    She did.

3    Q    Approximately what time was it that you spoke to her and

4    she consented to the search?

5    A    It was approximately 7 a.m.

6    Q    Did you do anything to ask her to memorialize her

7    consent?

8    A    Yes.  She signed an FD-26, consent to search form.

9    Q    Did you and other members of your team then search the

10   apartment that Ms. Anderson and Mr. Martin shared?

11   A    Yes.

12   Q    Did you do anything prior to beginning that search?

13   A    Well, as with most searches, we, the TL, the team leader

14   for the search, will do a walk-through of the residence or

15   whatever premises that's going to be searched, get an idea of

16   the layout of the place, and then we will divvy up roles and

17   responsibilities for the conduct of that search and then begin

18   with taking entry photos.

19   Q    Who was the team leader?

20   A    I was.

21   Q    And were entry photos taken?

22   A    They were.

23   Q    And was a diagram made of the layout of the apartment?

24   A    Yes.

25        MS. DEAN:  Your Honor, at this time, I move

1   Government's 962, 963 and 964 as well as 965 through 987 into

2   evidence, I believe on consent.

3           THE COURT:  Any objection?

4           MR. CECUTTI:  No objection.  That's on consent.

5           THE COURT:  Okay.  Those are all in evidence.

6           You can publish.

7           MS. DEAN:  Okay.

8           (Government Exhibits 962 through 987 so marked.)

9           MS. DEAN:  If we can put up Government's

10  Exhibit 962, please.

11  Q    Could you just briefly describe the layout of the

12  apartment that you searched, and we'll get into the search

13  later?

14  A    Yes.  This is the diagram of the apartment, and you'll

15  notice that there's a first floor and a second floor

16  annotated; and within each portion of that diagram there are

17  letters, which show the rooms that those letters are

18  associated with.  So on the first floor, there's room A, which

19  is the kitchen; room B, which is the living area; and then to

20  the side of that diagram there's the stairs that go to the

21  second floor.

22           And then same kind of breakdown on the second floor.

23  There's the stairs that go up.  Room C; room D, which is a

24  bedroom; room E, which is another bedroom; below that, room F,

25  a bedroom; and room G, a bedroom.

1  Q    Were there any adults living in that apartment besides

2  Ms. Anderson and Mr. Martin?

3  A    No.

4  Q    Without saying their names, were there children present?

5  A    I believe there were.

6  Q    Were you the agent that handled the children on that day?

7  A    No.

8        MS. DEAN:  If we can now put up Government's 963,

9  please.

10 Q    Can you tell us what is an evidence log?

11 A    An evidence log is a form that we use to, to write down

12 all the evidence or any items that we seize during the course

13 of the search.  So within that form, there will be a breakdown

14 of what the item is, where that item was located.  Usually it

15 corresponds with those letters and rooms that were shown in

16 the diagram, and then who was either observed or collected

17 that item.

18        MS. DEAN:  We'll just have it back up on the screen

19 in just a moment.

20 Q    Can you just talk us through, using your evidence log,

21 the items that were recovered during your search of the

22 residence.

23 A    So the first item is a black Samsung phone, which was

24 located in room F.  The second item is money orders from

25 Global Currency Services.  RSB papers with, it's Brandy Odom's

1   life insurance paperwork.

2           THE COURT:  What does RSB stand for, do you know?

3           THE WITNESS:  I do, Your Honor.  It's in -- I'd have

4   to check --

5           THE COURT:  It's all right.

6           THE WITNESS:  -- one of the items we already have in

7   evidence, I believe.

8           THE COURT:  It's all right.  Go ahead.

9   A    Black wallet and New York State ID cards, there was

10  multiple New York State ID cards; a tote bag and miscellaneous

11  clothes; cash app letter and an Apple iPad, an LG phone.  Item

12  nine is miscellaneous Social Security, SSN paper.

13  Q    SSN is Social Security number?

14  A    Social Security number, yes.

15  Q    If we can turn to the next page so you can finish telling

16  the jurors what you collected that day.

17  A    An ID card, notebook, life insurance letter.  Item 11 is

18  a red notebook and one life insurance letter and an E-ZPass

19  letter.  And 12 are two blue notebooks.  And item 13 is a

20  black laptop and charger.

21  Q    And on this log, you designate the room that each item

22  was collected from?

23  A    Yes, that's correct.

24  Q    And the specific location as well?

25  A    Correct.

1  Q    And do you also keep a photographic log, that's now in

2  evidence as Government's Exhibit 964, to document what you

3  took photos of?

4  A    Yes.

5  Q    Now, I'm going to ask that we turn to some of your

6  photographs.

7        Is it correct that Government's 965 through 987,

8  those are some but not all of the photographs that were taken

9  that day?

10 A    That's correct.

11 Q    If we can look first at Government's Exhibit 965, please.

12       And what is 965?

13 A    This is the front door, entry photo of the front door.

14 Q    Can we turn to 966.

15       Which room is 966?

16 A    I believe this is room B.

17 Q    And if we can turn to 967, what does your photograph

18 capture here?

19 A    This is another entry photo of a closet within that same

20 room, room B.

21 Q    If we can turn to 968, and if I can point you to the bag

22 that you can see part of in that photograph, was that one of

23 the items that you collected?

24 A    I believe it was.

25 Q    Can we turn to 970, please.

1          And what is 970?

2   A    This is an entry photo of one of the bedrooms.

3   Q    Can we turn to 971.

4          What do we see in 971?

5   A    This is a photo of one of the black wallets that's

6   referenced in the collected item log.

7   Q    Okay.  And if we can turn to 972, please.

8          Did you photograph the ID that was within that

9   wallet?

10  A    Yes.

11  Q    And whose ID was that?

12  A    Cory Martin.

13  Q    Can you turn to 973.

14         What is 973?

15  A    973 is a miscellaneous paperwork.

16  Q    Can you turn to 974, please.

17         Did you photograph here another wallet and person's

18  identification?

19  A    Yes.

20  Q    And whose identification was this?

21  A    Can I reference the photo that I have that's a little

22  clearer?

23  Q    The copy of the same?

24  A    Yes.

25         MS. DEAN:  With The Court's permission.

1        THE COURT:  Sure.

2        (Pause.)

3    Q    And actually, I think we can turn to 976, and that photo

4    is clearer as well.

5    A    This is one of the, this is Adelle Anderson's driver's

6    license.

7    Q    And if we can go back to 975 now, a closeup of one of the

8    items in 974, what did you photograph in 975?

9    A    This is a money order, Global Currency Services.

10   Q    Can we turn to 977.

11       What is in 977?

12   A    This is one of the tote bags where some of the items were

13   found.

14   Q    And turning to 978, did you photograph some of the

15   paperwork inside the tote bag?

16   A    Yes.

17   Q    Now, The Court asked you earlier what RSB was.

18       If we zoom in under the logo, I think hopefully you

19   might be able to answer that.

20       THE COURT:  Got it.

21   A    Yes.  This is paperwork that says Research Service

22   Bureau.

23   Q    And if we zoom out now to look at the photograph, what

24   kind of paperwork was this?

25   A    This is life insurance paperwork addressed to Adelle

1  Anderson that has Brandy Odom's name and American National

2  Life Insurance information on it.

3  Q    Did you collect that paperwork?

4  A    Yes.

5  Q    Can we turn to 980, please.

6         Did you photograph the identifications that were

7  within the black wallet in the tote bag?

8  A    Yes.

9         MS. DEAN:  Are we able to rotate this, Mr. Rader?

10 Thank you so much.  If we can zoom in.

11 Q    Whose identification cards were these?

12 A    This is, from the top to the bottom, Brandy Odom's on

13 top, Cory Martin's in the middle, and Adelle Anderson's on the

14 bottom.

15        MS. DEAN:  Can we turn to page 981, please.  And if

16 we can just zoom in on the envelope on top of the brown

17 suitcase.

18 Q    Could you read us what was written on the envelope that

19 you photographed that day?

20 A    This is a person's name and some number that we were

21 unsure of, but Samson Aladi and then the number 141160-2735,

22 and then the letters OBCC, and then a phone number at the

23 bottom.

24 Q    What do you know what OBCC is?

25 A    I do not.

1   Q    Can we turn to 982.

2        Did you photograph another piece of paper that you

3   found that day?

4   A    Yes.

5        MS. DEAN:  If we could zoom in on the piece of

6   paper.

7   Q    Why did you photograph this piece of paper?

8   A    This appears to be someone's name, date of birth, and

9   what appears to be a Social Security number and then an

10  address.  So it would appear to be PI, personal information.

11       MS. DEAN:  You can zoom out, Mr. Rader.  Thank you.

12  Can we take a look now at Government's 983.

13  Q    In Government's 983, does this picture show items that

14  you collected?

15  A    Yes.

16  Q    Tell us which ones.

17  A    Both of these.  There's a notebook and then an American

18  National -- I believe it's one of the life insurance letters

19  that we had collected.

20  Q    And if we can turn to 984, please.

21       What do we see in 984?

22  A    This is a photo of a New York State Department of State

23  Division of Licensing Services, it's a New York State ID card

24  for Cory Martin and then an American Express card.

25  Q    Now, the background of this photo, you see that blue

1  background?

2  A    Yes.

3       MS. DEAN:  If we can toggle back to 983, please.

4  Q    Do you see that same background in 983?

5  A    Yes.

6  Q    What is that?

7  A    That was a bin in one of the rooms.  A number of items

8  were found in the vicinity of or within.

9  Q    And did that include this American National letter, the

10 notebook, and also the Cory Martin state division of licensing

11 service ID that was depicted in Government's 984?

12 A    Yes.

13      MS. DEAN:  Can we look at Government's 985.

14 Q    Are we still looking at items from the same blue bin?

15 A    That's correct.

16 Q    And what do we see in Government's 985?

17 A    This is a blue backpack with multiple items.  We had

18 zoomed in on one of the previous items, which was the ID

19 that's to the left, and then there are some other paperwork

20 spread throughout.  There's a blue notebook and then a

21 certificate of death in the middle.

22      MS. DEAN:  Can we zoom in on the death certificate,

23 please.

24 Q    And whose, if you can read --

25      MS. DEAN:  We might need to zoom in a little bit

1   more.

2   Q    Whose certificate of death was this?

3   A    Elaine Taylor Martin.

4   Q    Can we now turn to Government's 986.

5        Is it fair to say we've moved away from the blue

6   bin?

7   A    Yes.

8        MS. DEAN:  Can you zoom in, Mr. Rader, exactly where

9   you are, the items on the bottom of the screen there.  That's

10  perfect.

11  Q    To the extent you can, can you tell us what you

12  photographed here in Government's 986?

13  A    There's a red steno pad notebook.  In the middle there's

14  an E-ZPass letter.  And then a, I believe this is one of the

15  life insurance letters on the left.

16       MS. DEAN:  And if we can zoom out, Mr. Rader, are

17  you able to zoom in just on that left letter that the agent is

18  describing?

19  Q    Are you able to see who that life insurance letter is

20  from?

21  A    Yes.  It's American National.

22  Q    Did you collect it?

23  A    We did.

24  Q    Can we turn to Government's 987.

25       And what did you take a photo of here?

1   A    These are two blue notebooks.

2   Q    Did you collect those?

3   A    We did.

4        MS. DEAN:  I'm now going to ask that Government's

5   346 through 351A and B, which are all physical property from

6   the search warrant, be received in evidence.

7        MR. CECUTTI:  No objection.

8        THE COURT:  All right.  Those are in evidence.

9

10       (Government Exhibits 346 through 351A and 351B so

11  marked.)

12       MS. DEAN:  Your Honor, do you mind if I put these on

13  the Elmo?

14       THE COURT:  I don't.

15       MS. DEAN:  If we can start with what has been marked

16  Government's 346.  First I'll show you -- can we switch to the

17  Elmo.

18  Q    Do you recognize this item?

19  A    I do.

20  Q    I'll open up the package.

21       Is this one of the items that we looked at as we

22  went through the pictures?

23  A    It is.

24  Q    And which one is this?

25  A    This is the Social Security number paperwork with some

1  name, date of birth, and an address.

2  Q    Do you know Oludare Abiemi is?

3  A    I do not.

4  Q    Let's take a look at Government's 347.

5       Do you recognize this item?

6  A    This is a black wallet that was seized at the residence.

7  Q    And is this where you found these three pieces of

8  identification?

9  A    Yes.

10 Q    And specific to Brandy Odom's, this is her driver's

11 license?

12 A    It is.

13 Q    Looking at Government's 348 now, I'm just going to go

14 through these pages just one by one.

15      What is this document here that you found in

16 Mr. Martin and Ms. Anderson's home?

17 A    This is a New York State Department of Health form.  On

18 the top of the form it says "Authorization for Release of

19 Health Information Pursuant to HIPAA," and then the patient's

20 name Brandy Odom, her date of birth, Social Security number,

21 her address, and then --

22 Q    What is that case number, that case number that you see?

23 A    The case number is K18-9095.

24 Q    Is that a medical examiner number?

25 A    I don't know.

1    Q    Okay.  And what do you see under, about halfway down the

2    page, the name and address of health provider or entity to

3    release information?

4    A    It's the Office of the Medical Examiner records

5    department and then the address is 421 East 26th Street,

6    New York, New York.

7    Q    And if you look at the box checked other, what is being

8    requested with this release?

9    A    It says coroner, autopsy and toxicology report.

10   Q    Turn to this paper, this RSB paper that we looked at,

11   where it says, As part of this process.

12        Could you just tell us what it says in those two

13   sentences?

14   A    Would you like me to read it or just summarize?

15   Q    You can read it.

16   A    "As part of the process, we have been asked to obtain

17   medical record from some of Ms. Odom's providers.  For this

18   some additional documentation is needed to be provided by the

19   legal next of kin.  I've enclosed two copies of the following

20   authorizations" --

21   Q    You can stop there.

22        Is it a request for a next-of-kin paperwork?

23   A    It is.

24   Q    I'm going to show you items that have been labeled 349A

25   and 349B.  So I'll start with Government's 349A.

1          The envelope is from what company?

2   A    American National Life Insurance.

3   Q    And could you just describe to us what this letter is

4   about, and you can summarize this.

5   A    This is a letter which has the requested medical records

6   from the chief medical examiner.  It's requesting, it's

7   requesting those items.

8   Q    And it's with regards to whose policy?

9   A    This is in regard to Brandy Odom's policy.

10  Q    Now, I'm going to show you Government's 349B.

11         When property is packaged together as 349A and B

12  were, what does that signify?

13  A    Typically, if we are packaging an item together, that

14  means they've either been found together or within the

15  vicinity of each other.

16  Q    I will just display a couple of pages from 349A.

17         I'm now going to show you 350A, B and C.  Were these

18  items all packaged together?

19  A    They were.

20  Q    Was this the Cory Martin ID that we saw earlier?

21  A    It is.

22  Q    And I'll show you 350B.

23         What company is this envelope from?

24  A    American National Life Insurance.

25  Q    Is this another letter of request regarding the Brandy

1  Odom life insurance policy, like the one we saw earlier about

2  the medical records being requested?

3  A    It is.

4  Q    And then I will display for you 350C.

5         What is 350C?

6  A    This is a spiral bound notebook.

7  Q    And is there a scanned copy of the pages of this notebook

8  with writing in them?

9  A    Yes.

10  Q    And is that -- have you reviewed that at Government's 44?

11  A    Yes, I have.

12         MS. DEAN:  Okay.  I ask that Government's 44 be

13  received in evidence as the scanned copy of the pages from

14  this notebook.

15         THE COURT:  Any objection, other than what we've

16  discussed before?

17         MR. CECUTTI:  Other than what we discussed.

18         THE COURT:  Okay.  So that will be in evidence.

19         (Government Exhibit 44 so marked.)

20  Q    I'll also show you Government's Exhibit 351A and B.

21         These are also packaged together?

22  A    Yes.

23  Q    What is 351A?

24  A    One of the blue notebooks.

25  Q    And what is 351B?

1    A    One of the other blue notebooks.

2    Q    Have you reviewed the scanned copies of the pages from

3    these notebooks which are marked Government's 42 and 43,

4    respectively?

5    A    Yes.

6    Q    And are they the same as the pages from the original

7    notebooks themselves?

8    A    Yes, they are.

9         MS. DEAN:  Your Honor, I ask that they be received

10   in evidence.

11        THE COURT:  With the same proviso?

12        MR. CECUTTI:  Correct, Your Honor.

13        THE COURT:  Okay.  Those are in evidence.

14        (Government Exhibits 42 and 43 so marked.)

15   Q    So if we can talk now about government's three -- I guess

16   we'll use the scanned numbers -- Government 44, 42 and 43, the

17   scanned copies of the three notebooks that we just looked at.

18   A    Okay.

19   Q    Have you reviewed these in full?

20   A    I have.

21   Q    Starting with -- I guess could you give us a summary of

22   what all three of the notebooks contain, just generally.

23   A    Generally, the first notebook, the beige, the beige

24   notebook is a, it has a lot of notes in it, mostly that have

25   to do with the real estate industry.  It seems to be notes

1   about like from a class or something where the writer of this

2   book was taking notes on how to buy and sell houses, mortgage

3   information, that kind of thing.

4           The second two notebooks, the blue notebooks, begin

5   with similar information as what's in the beige notebook with

6   the same kind of notes from either a class or some sort of

7   information about the real estate industry.  So it's like

8   mortgage and buying and selling homes.

9           But then the blue notebooks, the bulk of the blue

10  notebooks are a short story written about a young girl from,

11  it's in the perspective of first person female.

12  Q    And let me stop you there.  You said that the, that both

13  of the notebooks, that both of the blue notebooks contain that

14  short story.

15  A    That's correct.

16  Q    And is it one short story or two separate short stories?

17  A    It's one short story that covers a period of time.

18  Q    And so before we get into the blue notebooks, if I can

19  start with Government's 44, the one you called the beige

20  notebook, if we can just take a look briefly at this together.

21          MS. DEAN:  I'll ask -- also, if we can switch back

22  to the screen, please.

23  Q    And if we can just turn to page 6 of the Government's 44.

24          THE WITNESS:  Your Honor, may I reference my, the

25  scanned copy?

1    THE COURT:  Sure.

2    MS. DEAN:  Can we zoom in, Mr. Rader, on the middle

3  of the page, the highlighted line.

4  Q    Read us the highlighted line on page 6, please.

5  A    It says, short sale my house Queens, New York.  And

6  there's a phone number (388)926-7722, how to short sale.

7    MS. DEAN:  I'm going to ask to publish side by side

8  the Government's 120, page 1, and a portion of what Special

9  Agent Wiedemer just read to the jury.

10 Q    And, just for the record, Government's -- if you can,

11 Agent Wiedemer, before we zoom in, Government's 120, page 1,

12 do you see what it says at the top in bold next to

13 "Application"?

14 A    Can we zoom in to where we're --

15 Q    Just to refresh everyone's memory about where we're

16 looking at.

17 A    It's Globe Life Insurance Company of New York,

18 application for five-year renewable term life insurance.

19 Q    And then the proposed insurer, is that for Brandy Odom?

20 A    It is.

21    MS. DEAN:  Okay.  Mr. Rader, if you can now zoom in

22 please on the date, specifically the year, and if you can zoom

23 in on the last four digits and the phone number in the

24 notebook that we just looked at.

25    Thank you, Mr. Rader.  If we can return now to

1  Government's 44, the same page, page 6.

2  Q    Moving up from the short sale my house line, to the upper

3  left-hand corner, and I'd like to specifically direct you to

4  the e-mail address, what is the e-mail address you see here?

5  A    The e-mail is T-R-U or A, it's hard to make out,

6  tru14834@gmail.com.

7           MS. DEAN:  And, Mr. Rader, if you can zoom in on the

8  @gmail.com from what the special agent just read, and if you

9  can pull up please Government's 120, page 68.  Before you zoom

10 in, Mr. Rader, if we can enlarge this to take a look at it and

11 refresh on what it is.

12 Q    Agent Wiedemer, do you see the name at the top of this,

13 right above policy number?

14 A    Yes.  It's Brandy Odom.

15          MS. DEAN:  Mr. Rader, I'll ask you to zoom in on the

16 BK Odom 718, just the portion that says @gmail.com, so we can

17 compare it to what we just saw in the notebook.

18          If we can now turn back to Government's Exhibit 44,

19 the beige notebook.

20          MR. CECUTTI:  I'm sorry, Your Honor.  Can we have a

21 sidebar, please?

22          THE COURT:  Sure.

23          (Continued on next page.)

24

25

1          (The following occurred at sidebar.)

2          MR. CECUTTI:  The government is presenting exhibits

3    and seeking to draw a comparison without even asking in any

4    questions.  This is appropriate for summation, but eliciting

5    this or doing this on direct examination I don't think is

6    appropriate.

7          THE COURT:  I don't know that there's any

8    prohibition against it.

9          MR. CECUTTI:  No questions are being asked of the

10   witness.

11         THE COURT:  What do you want her to ask, does it

12   look the same?

13         MR. CECUTTI:  No.

14         THE COURT:  I mean, I understand your request, but

15   I'm going to deny it.

16         MR. CECUTTI:  Okay.

17         (Sidebar conference ends.)

18         (Continued on next page.)

19

20

21

22

23

24

25

BY MS. DEAN:

Q    If we can now turn back to Government's 44, the beige notebook, and turn to page 8.  You had told us earlier a little bit about what these notes are about.

If we can zoom in on page 8, is page 8 an example of that?

A    Yes.

Q    And could you just explain that.

A    Yes.  There's multiple items in here that show that it's about buying and selling houses and mortgage information.  For example, the middle of the page towards the --

THE COURT:  Slow down just a little bit.  Okay?

THE WITNESS:  I'm sorry, Your Honor.

THE COURT:  That's okay.

A    Towards the bottom of the page, it says beginner's millionaire matrix, $5,000 per deal, one deal per month, for example.

Q    If we can turn now to page 13, if we can zoom in on the highlighted portion, please.

Does page 13 contain examples of handwritten numbers, more examples I should say, including the number seven?

A    Yes.

Q    If we can now turn to -- we can remove this and we'll turn to the blue spiral notebooks, Agent Wiedemer.

1        So you were starting to tell us about the, that the

2    notebooks contained I guess you said a couple of different

3    things, right?

4    A    That's correct.

5    Q    Could you summarize, please --

6            MS. DEAN:  And why don't we put it up while you're

7    doing it.  Government's 42, please.  Let's start with page 4.

8    If we can zoom in a little bit closer.  That's perfect.  Thank

9    you.

10   Q    Can you remind us, approximately the first 14 handwritten

11   pages of the notebook, can you just remind us what the first

12   14 pages are about?

13   A    Yes.  They're generally about buying and selling houses,

14   real estate industry notes taken about the such.

15   Q    And if we can turn to page 8, please.

16           Is there a list on page 8?

17   A    There is.

18           MS. DEAN:  If we can zoom in on that portion.

19   Q    What does it say right above the list?

20   A    It says step by step closing a deal, and then 1 through

21   14 is the list.

22           MS. DEAN:  And we can remove that now, please.  And

23   we can move to page 17.

24   Q    Okay.  You were starting to describe to us a short story

25   that's in both notebooks.

 1  A    Yes.

 2           MS. DEAN:  And if we can just take it down for a

 3  moment.

 4  Q    Agent Wiedemer, I'm going to ask you to summarize for the

 5  jury the short story -- did you read the whole thing?

 6  A    I did.

 7  Q    Can you summarize it for the jury?

 8  A    The short story spans the rest of this notebook and then

 9  the following other blue notebook.  The short story is about a

10  young girl.  The character's name is Issy, or Isabel is her

11  full name, and it's written in the first person perspective

12  from her.

13           The story begins with her as a 15-year-old right

14  prior to her sweet 16 and then goes through high school and at

15  some point thereafter high school.  It's a, the portions of

16  the book, there's some time jumps throughout the book.

17           The short story is basically this girl's life from

18  that starting point.  The book contains a lot of drug use,

19  some very explicit sex scenes to include two very graphic and

20  explicit rape scenes.

21           There's a lot of information about this girl's

22  family, her friends, the things that they're doing, her time

23  as a boxer.  She's, the main character is a boxer.  Her father

24  runs a gym and is also a drug dealer.

25           They have, the main character has a number of, her

1   mother and father both die in the course of this book, and

2   then it ends with her beginning to, she becomes a stripper and

3   then she begins a, operating a brothel essentially.

4   Q    I'm going to ask you to review just certain portions of

5   the short story with us.

6         MS. DEAN:  If we can turn to page 17.  If we can

7   zoom in, if we can zoom in maybe the middle of the page right,

8   just a little lower.  Thank you.  That's good.

9   Q    Is there a particular name or nickname that the main

10  character is referred to throughout this book at numerous

11  different occasions?

12  A    Yes, Baby Girl.

13  Q    And do we see that on this page?

14  A    We do.

15         (Continued on the next page.)

16

17

18

19

20

21

22

23

24

25

 1   DIRECT EXAMINATION

 2   BY MS. DEAN:  (Continuing)

 3   Q    I'm going to ask to turn to page 20, the highlighted

 4   portion at the top.

 5            Could you summarize that for us?

 6   A    This portion is about the main character and her friend

 7   Jessi using ectasy.

 8   Q    Are there other specific types of drugs that are used

 9   throughout the book?

10   A    Yes.  Cocaine, Molly, and marijuana.

11            MS. DEAN:  Can we turn to page 28, please.

12   Q    Is there a particular nickname that the main character

13   uses to refer to her actual father in this book?

14   A    Daddy.

15   Q    And is that throughout the book?

16   A    It is.

17            MS. DEAN:  If we can turn to page 29, please.

18   That's fine.  Thank you.

19   Q    The highlighted portion at the bottom which reads, "He

20   spends most of his work hours at the boxing gym."  You said

21   the main character was a boxer.  Is someone else a boxer too?

22   A    Yes.  One of her friends -- a couple of her friends and

23   her father runs a boxing gym.

24   Q    Are there boxing and fighting scenes throughout the book?

25   A    There are.  She has multiple fights and training scenes

1    throughout the book.

2         MS. DEAN:  Can we turn to page 36, please.  And if

3    we can publish.  If we could just enlarge the highlighted

4    portion.

5    Q    What is the highlighted portion here?

6    A    The number seven.

7         MS. DEAN:  Can we turn now to page 54.

8    Q    Is there a particular way that the main character refers

9    to her boyfriend during the book?

10   A    Yes, as Zaddy with a Z.

11   Q    Can we turn to page 58.  Can you read to us the

12   highlighted portion starting with "my mom always"?

13   A    "My mom always called him daddy even when she was mad at

14   him.  I thought it was so cute."

15        MS. DEAN:  Can we turn to page 69, please.

16   Q    And can you read to us just the highlighted line?

17   A    "We went into the shoe store where I picked out four

18   pairs of Uggs.

19        MS. DEAN:  Can we turn to page 81, please.

20   Q    Can you tell us about the highlighted portion at the top

21   of the page, above where the story is written?

22   A    Above the story, there's this portion where it appears to

23   be notes for the story.

24        It says, "Jessi mom dies after killed her mother's

25   boyfriend Izzy.  Mom dies after Jessi.  Pop's dies after the

1   sweet 16."

2   Q    Izzy is the main character?

3   A    That's correct.

4   Q    Do both Izzy's father and mother die over time throughout

5   the course of this story?

6   A    Yes.

7        MS. DEAN:  Can we turn to page 89, please.

8   Q    What begins -- what part of the story begins on page 89?

9   A    This is the portion where Izzy's father dies.

10       MS. DEAN:  If we can turn to Government's 43, the

11  second blue notebook.

12  Q    The story continues; right?

13  A    That's right.

14  Q    Let take a look at page 6.

15       Can you read to us the highlighted portion.

16  A    "Good morning, again, Isabelle.  You can call me Mike

17  though.  Look, I'm sorry about earlier.  It's okay, baby girl.

18       "Please don't call me baby girl.  My dad called me

19  baby girl."

20  Q    Who is Mike in the story?

21  A    Mike is Isabelle or Izzy's mother's boyfriend who she

22  begins dating after Izzy's father dies.

23  Q    The mother begins dating Mike?

24  A    That's correct.

25       MS. DEAN:  Now, can we turn to page 8.

1  Q    Could you summarize the pink highlighted portion?

2  A    This is a portion where Izzy begins using cocaine with

3  one of her friends.

4  Q    Does that cocaine use escalate throughout the rest of the

5  story?

6  A    It does.

7  Q    I'm going to ask you now to turn to page 27.  I'm sorry.

8  28, please.

9          Can you summarize for us the scene that begins on

10 page 28 of Government's 43?

11 A    This is one of the two graphic and explicit rape scenes

12 that happens to Izzy.  Mike, the boyfriend of Izzy's mother,

13 forcibly and violently rapes Izzy.

14         As this portion goes on, Izzy goes through this

15 event with Mike and then, again, it's pretty explicit and

16 graphic, but there are some portions in here where Izzy is

17 very confused because her body appears to enjoy it and she --

18 the writer describes that whole incident.

19 Q    And does this go on for multiple pages?

20 A    It does.

21         MS. DEAN:  If we can turn now to page 34, please.

22 Q    Could you summarize for us what happens on page 34?

23 A    This is another rape scene, kind of very similar to the

24 way that the other rape scene was written where Mike forces

25 himself on to Izzy.

1    MS. DEAN:  Okay.  If we can turn to page 38, please.

2  Q    And can you summarize what scene begins on page 38?

3  A    After Izzy is raped by Mike, she ended up -- the second

4  time, she ended up telling her mother and her friends, and

5  Izzy's mother and her friends then kidnap Mike, beat him and

6  tie him to a chair in the basement.

7  Q    So in this scene he is tied up in the basement?

8  A    That's correct.

9  Q    What ultimately happens to Mike in this screen?

10 A    Once he is tied up in the basement and beaten, Izzy then

11 shows up and shoots and kills Mike.

12    MS. DEAN:  If we can turn to page 39, and if we can

13 zoom in on the top portion.

14 Q    Could you just describe what's going on in the top half

15 of this page?

16 A    So after Izzy shoots Mike, she asks to her mother what

17 now.  She replies I have a trash can that picks up the

18 garbage, y'all get out of here, we got this.

19    MS. DEAN:  Can we turn to page 51, please, and Mr.

20 Rader, if you can zoom in on the yellow highlight portion.

21 Q    Is this just another example of a seven in this book?

22 A    Yes.

23    MS. DEAN:  Can we turn to page 65.

24 Q    What scene begins here on page 65?

25 A    In this scene, Izzy and her mother get into a car

 1   accident and where Izzy's mother ended up dying.

 2           MS. DEAN:  If we can turn to page 74, please.

 3           Mr. Rader, can you zoom in from the yellow

 4   highlighting down.  Thank you.

 5   Q    Can you summarize for us what's going on at the bottom of

 6   page 74?

 7   A    In this portion, after Izzy's mother dies, she becomes

 8   like almost like a recluse where she's using more drugs,

 9   staying at home and not taking care of herself.  She -- it's

10   described that she smells very badly and only two people will

11   hang out with her.  Another one of her friends, which is

12   junky, as it states, and then her ex-boyfriend who would

13   continue to have sex with her.

14           MS. DEAN:  Could you turn now to page 79?

15   Q    Now, before -- I'm going to ask you to read the

16   highlighted portion from 79 that continues on to 80.

17           Can you explain where this scene is taking place?

18   A    This is at her family's house.

19   Q    The main character's?

20   A    The main character's.

21   Q    Can you read to us the yellow highlight?

22   A    The sun shining in my eyes wake me up the next morning.

23   I used the bathroom before I went to the kitchen.  I hit the

24   light switch.  Nothing happens.  Okay, I'll change the bulb

25   later, I thought.

1    I went to the fridge to get some juice when I
2 realized the light in the refrigerator was off also.

3    I plugged my phone into the charger and it wasn't
4 charging.  Oh, shit.  The power was off.  Ain't this a bitch,
5 I screamed.

6    We had a separate account that stayed on auto pay.
7 My mom always reassured me it had enough money it to keep us
8 going for at least two years.  I opened the bills, everything
9 from the water to the cable.  It was either disconnected or
10 about to be.  This couldn't be right.

11    I looked feverishly for the bank statements.
12 Finally, I found it.  Available balance red, 52 cents.  Then I
13 looked at all the withdrawals.  Somebody had cleaned out the
14 account.  Fuck, fuck, fuck, I said, when I looked at the
15 dates.

16    How did my mom not notice this shit or was it her, I
17 wondered, but I couldn't be worried about that.  I had to pay
18 these bills.

19    After I finished paying all the past-due bills and
20 then my car insurance, I was down to $1,500.

21    If I didn't make something happen fast, I would be
22 broke in 30 days.  I sat there thinking how can I make some
23 fast money.  Then it came to me:  I will dance with Jessi.

24    I called Jessi and told her I was ready to dance.
25 All she said was pull up tonight.

1   Q    And what happens with the main character after this scene

2   you just read?

3   A    She begins to dance or strip with her friend Jessi.

4         MS. DEAN:  Can we turn to page 87.

5   Q    Now, when you gave us your initial summary of the story,

6   you said that things escalated from stripping?

7   A    Yes.

8   Q    What happens after stripping?

9   A    After Izzy begins stripping, she ends up making a

10  considerable amount of money and ended up being successful in

11  it.  She decides to get her and her other friends to kind of

12  go off on their own to strip, and she ends up buying a house

13  on her own so that she can essentially run a brothel.

14  Q    Can you read to us the highlighted line?

15  A    We wake up to all sorts of messages.  All five of us had

16  many men interested in hooking up.  We each met our thousand

17  dollar quota by lunchtime.  It was easy.

18         MS. DEAN:  I have no further questions.

19         THE COURT:  Any cross-examination?

20         MR. CECUTTI:  Yes, Your Honor.

21  CROSS EXAMINATION

22  BY MR. CECUTTI:

23  Q    Good morning, Special Agent.

24  A    Good morning.

25  Q    Let's just keep talking about the notebooks.

1         The notebooks contain short stories, correct?

2    A    That's correct.

3    Q    And fair to say that those two notebooks are quite

4    voluminous?

5    A    Yes.

6    Q    They contain pages and pages of single-spaced text?

7    A    Yes.

8    Q    Now, you went over a number of yellow highlights?

9    A    I did.

10   Q    And pink highlights; right?

11   A    That's correct.

12   Q    And those highlights were either created by you or

13   another member of the prosecution team; correct?

14   A    By the prosecution team, yes.

15   Q    And fair to say that in your direct examination you only

16   covered some of the portion of those stories?

17   A    That's correct.

18   Q    Let's move on from the notebooks and let's talk about the

19   arrest of Adelle Anderson and Cory Martin.

20   A    Okay.

21   Q    That happened on November 4th of 2020?

22   A    That's correct.

23   Q    And you participated in the arrest of both of those

24   people?

25   A    Not in the arrest, I was -- because it was a SWAT arrest

1   by the Newark field office, typically with a SWAT arrest the

2   SWAT team does that and anyone who is not part of the SWAT

3   team will be at a separate location and then will come to the

4   arrest location after the fact.

5   Q    You participated in the search; correct?

6   A    Yes.

7   Q    And you're aware that Adelle Anderson's children were

8   present during that search?

9   A    Yes.

10  Q    Now, regarding that search, that was pursuant to Adelle

11  Anderson's consent?

12  A    That's correct.

13  Q    You recovered a variety of items from the house or the

14  apartment?

15  A    Yes.

16  Q    You recovered RSVP papers?

17  A    Yes.

18  Q    And those papers related to the life insurance pertaining

19  to Brandy Odom?

20  A    That's correct.

21  Q    And that paperwork was addressed to Adelle Anderson?

22  A    I believe so, yes.

23  Q    And that paperwork was found inside a white envelope?

24  A    There was multiple insurance paperwork and many of them

25  were in envelopes, yes.

1  Q    And, ultimately, those envelopes were found in a tote
2  bag?
3  A    Some were.  I would have to look at the collected item
4  log to where each one was found, but, yes, I believe one was
5  found in the tote bag.
6  Q    Well, let's just stick with the RSVP paperwork related to
7  the life insurance of Brandy Odom.
8          Was that found in a tote bag?
9  A    If I could reference the collected item log.
10 Q    Sure.  I think you have it in front of you.
11 A    I do.
12 Q    I believe it is item number three.
13 A    That's correct.
14          The RSVP papers that Brandy Odom life insurance
15 policy was inside a white envelope in a tote bag, yes.
16 Q    And sticking with your log, there were three New York
17 State ID cards that were also recovered?
18 A    Yes, that's correct.
19 Q    I believe that's item No. 4?
20 A    Correct.
21 Q    And those items were found in a black wallet?
22 A    Correct.
23 Q    And that black wallet was also inside the tote bag,
24 correct?
25 A    That's correct.

1  Q     And you also recovered American National paperwork;

2  correct?

3  A     Yes.

4  Q     And that paperwork was addressed to Adelle Anderson and

5  related to the life insurance policy of Brandy Odom?

6  A     Yes.

7           MR. CECUTTI:  Thank you very much.  I have nothing

8  further.

9           THE COURT:  All right.  Any redirect?

10           MS. DEAN:  No, thank you, Your Honor.

11           THE COURT:  Thank you so much.  You can step down.

12           THE WITNESS:  Thank you.

13           (Witness steps down.)

14           THE COURT:  Are you ready to call your next witness?

15           MR. PALACIO:  Yes, Your Honor.

16           MS. DEAN:  May I clean up the exhibit area?

17           THE COURT:  Sure.  Which witness are you calling?

18           MR. PALACIO:  Your Honor, before I call the next

19  witness, may I read a stipulation into the record?

20           THE COURT:  Sure.

21           MR. PALACIO:  Your Honor, this is Government's

22  Exhibit 1203.

23           THE COURT:  Okay.

24           MR. PALACIO:  If we could have it up for the jury,

25  please.

1    It is hereby stipulated and agreed by and between
2    the United States of America, by the undersigned Assistant
3    United States Attorneys, and the defendant Cory Martin, by his
4    undersigned attorneys, as follows:
5        GX 340 is a Coolpad cellular phone (FBI 1B23) with
6    IMEI number 861325030866544 and assigned number (347)
7    779-6108.  GX 340 was seized by law enforcement and vouchered
8    under Invoice 3000960296.  GX 340A is a forensic copy of
9    Government Exhibit 340.
10       Government Exhibit 341 is an LG cellular phone (FBI
11   1B23) with MEID 35726908438603 and assigned numbers (347)
12   729-4723 and (347) 779-6108.  GX 341 was seized by law
13   enforcement and vouchered under Invoice 3000960318, Item 4.
14   GX 341A is a forensic copy of Government Exhibit 341.
15       GX 342 is an LG G Stylo cellular phone (FBI 1B24)
16   with IMEI number 356567070877152 and assigned number (347)
17   779-6108.  GX 342 was seized by law enforcement and vouchered
18   under Invoice 3000960318, Item 5.  GX 342A is a forensic copy
19   of GX 342.
20       GX 343 is a Samsung Galaxy J7 Prime 2017 cellular
21   phone (FBI 1B17) with IMEI 5562008540454 and assigned number
22   (718) 600-1072.  GX 343 was seized by law enforcement and
23   vouchered under Invoice 3000960634, Item 1.  GX 343A is a
24   forensic copy of GX 343.
25       GX 344 is an LG Tribute HD cellular phone (FBI 1B26)

1    with IMEI 35726908437174 and assigned number (718) 600-1072.

2    GX 344 was seized by law enforcement and vouchered under

3    Invoice 3000960318, Item 7.  GX 344 is a forensic copy of GX

4    344.

5            GX 345 is a Samsung Galaxy J7 Prime 2017 cellular

6    phone FBI 1B16 with IMEI 355620084601133 and assigned number

7    (347) 729-4723.  GX 345 was seized by law enforcement and

8    vouchered under 3000960344, Item 1.  GX 345A is a forensic

9    copy of GX 345.

10           In each of the above-referenced exhibits, the term

11   "UTC minus five" refers to Eastern Standard Time.  The term

12   "UTC minus four" refers To Eastern Daylight Time.  The term

13   "party" refers to the users of cell phones identified in the

14   exhibit.  The terms "incoming" and "outgoing" refer to the

15   direction of a message from a user.  The term "deleted" where

16   followed by a "yes" indicates that the item was deleted by the

17   user of the applicable device.

18           This stipulation is admissible in evidence as

19   Government's Exhibit 1203 and this stipulation is signed by

20   the parties.

21           THE COURT:  All right.

22           (Government's Exhibit 1203 received in evidence.)

23           MR. PALACIO:  Your Honor, at this time the

24   Government calls Eungee Hwang.

25           THE COURTROOM DEPUTY:  Raise your right hand.

1          Do you solemnly swear or affirm that the testimony

2     you are about to give will be the truth, the whole truth and

3     nothing but the truth?

4               THE WITNESS:  I do.

5               THE COURTROOM DEPUTY:  Please state and spell your

6     name for the record.

7               THE WITNESS:  My name is Eungee Hwang, E-U-N-G-E-E,

8     H-W-A-N-G.

9               THE COURTROOM DEPUTY:  Thank you.

10               THE COURT:  All right.  Just a couple of things.  I

11     want to make sure that everybody can hear you.  So we have got

12     the microphone.

13               The second thing is you can't talk too fast.  I want

14     to make sure the court reporter is able to get down everything

15     that you say.

16               If someone asks you a question that isn't clear that

17     you want to have repeated, just let me know and I will have

18     them rephrase.  All right?

19               THE WITNESS:  Thank you.

20               THE COURT:  Go ahead.

21               MR. PALACIO:  Thank you.

22     **EUNGEE HWANG**,

23          called as a witness, having been first duly

24          sworn/affirmed, was examined and testified as follows:

25     DIRECT EXAMINATION

 1  BY MR. PALACIO:

 2  Q    Ms. Hwang, who do you work for?

 3  A    I'm employed by the New York County District Attorney's

 4  Office.

 5  Q    And what is your current role and what is your title?

 6  A    I'm an intelligence analyst currently assigned to the

 7  U.S. Attorney's Office.

 8  Q    In the Eastern District of New York?

 9  A    Yes.

10  Q    How long have you worked in this capacity?

11  A    Since October of 2022.

12  Q    What do you do in that position?

13  A    As an analyst, I assist the Assistant U.S. Attorneys with

14  cases and investigations, specifically with the review of --

15  review and analysis of digital evidence.

16  Q    And where did you work prior to working at the U.S.

17  Attorney's Office?

18  A    I was a senior intelligence analyst at the Kings County

19  District Attorney's Office.

20  Q    And how long did you work there?

21  A    I was an analyst at the DA's office for four-and-a-half

22  years.

23  Q    What did you do at the DA's office?

24  A    In a similar analyst role, I assisted the Assistant

25  District Attorneys in the trial division with cases through

1    the investigations, Grand Jury and trial stages, also

2    pertaining to digital evidence.

3    Q    Can you tell us about your educational background?

4    A    I have a bachelor's of science in criminal justice and

5    national security studies from the University of New Haven.

6    Q    As part of your current role, did you do work on a case

7    involving the homicide Brandy Odom?

8    A    I did.

9    Q    Did you review digital evidence in this case?

10   A    I did.

11   Q    What type of digital evidence did you review?

12   A    I reviewed phone records and device extraction reports.

13   Q    Did you also review phone records from TextNow?

14   A    I did.

15   Q    What is TextNow?

16   A    TextNow is a third-party messaging application.

17   Q    How does it work?

18   A    Similar to Google voice or Pinger, a user can download

19   the application, create an account, and a phone number can be

20   assigned to that user.

21         MR. PALACIO:  Your Honor, at this time I offer into

22   evidence certified records from AT&T for phone number

23   (516) 491-0840 as Government's Exhibit 306 pursuant to Rule

24   902(11) and 902(13).

25         THE COURT:  Any objection?

1          MR. CECUTTI:  No objection.

2          THE COURT:  All right.

3          (Government's Exhibit 306 received in evidence.)

4          MR. PALACIO:  As well as I introduce certified

5     records from TextNow for phone number (347) 966-3855 as

6     Government's Exhibit 302 pursuant to Rule 902(11) and (13).

7          MR. CECUTTI:  No objection.

8          THE COURT:  All right.

9          (Government's Exhibit 302 received in evidence.)

10         MR. PALACIO:  And with the Court's permission, if we

11    can show the witness only what is marked Government's Exhibit

12    304 for identification.

13         THE COURT:  Do you have any objection to this

14    exhibit?

15         MR. CECUTTI:  No.

16         THE COURT:  All right.  That will be admitted into

17    evidence.

18         (Government's Exhibit 304 received in evidence.)

19         MR. PALACIO:  If we could show it to the jury, and

20    if we can zoom in around the information at the top.

21    Q    Can you tell us what these records are for, Ms. Hwang?

22    A    This is the subscriber information for a Pinger account.

23    Q    And can you tell us what the Pinger -- what is Pinger?

24    A    Similar to TextNow, it is also a third-party messaging

25    application.

1  Q    And what is the phone number associated with this Pinger

2  account?

3  A    It is 1 (929) 357-7056.

4  Q    And what is Pinger username?

5  A    The username is BrandyOdom08.

6          MR. PALACIO:  Mr. Rader, if you could pull up from

7  Government's Exhibit 304 a file that's called DML file, and if

8  we could zoom in around April 3rd.

9  Q    Ms. Hwang, do you see the last outgoing activity on this

10  phone?

11  A    I do.

12  Q    And what date was that and at what time?

13  A    April 3rd at 11:27:06 p.m. in UTC time.

14  Q    Could you convert that into Eastern Time?

15  A    To Eastern Time would be Eastern Daylight Time UTC minus

16  four, so that would be 7:27:06 p.m. on April 3rd.

17  Q    And was this an outgoing call from a Pinger number to a

18  different number?

19  A    It was.

20  Q    What was that number?

21  A    It's an outgoing to the phone number (631) 855-0043.

22          MR. PALACIO:  All right.  If we could show you

23  Government's 302 now.

24  Q    All right.  Ms. Hwang, can you tell us what information

25  we see here from the TextNow phone number?

1  A    This is the subscriber page for the phone number of this

2  TextNow number.

3  Q    Who was the owner of that phone number from November 20,

4  2017 to May 4, 2018?

5  A    Username BklynJellz718.

6  Q    And what was the e-mail associated with that user?

7  A    sapphireb12054@gmail.com.

8  Q    After May 4th of 2018, was the TextNow number reassigned

9  to a different person?

10  A    It was.

11  Q    Ms. Hwang, we are now showing you a different file.  It's

12  called messages.  This is also part of Government's 302.  Can

13  you tell us what information we see here?

14  A    This shows the messages sent and received by that phone

15  number, as well as the message and the date and timestamps.

16  Q    Did you prepare a chart isolating the text communications

17  between the Brandy Odom Pinger number and the Brooklyn Jellz

18  TextNow number?

19  A    I did.

20        MR. PALACIO:  Your Honor, if we could show the

21  witness Government's Exhibit 309 for identification.

22        THE COURT:  Any objection?

23        MR. CECUTTI:  No.

24        THE COURT:  That will come into evidence.

25        (Government's Exhibit 309 received in evidence.)

1    MR. PALACIO:  If we could show it to the jury.

2  Q    Ms. Hwang, can you tell us what you created here?

3  A    This is the summary chart that I created from the

4  messages file that we just saw previously.  The purpose of

5  this was to isolate communications with the phone number

6  (929) 357-7056.  The timestamps have been converted to Eastern

7  Daylight Time as we see in the label time UTC minus four and

8  the messages have been highlighted, as we see.  So the

9  outgoing messages are highlighted in blue; the incoming

10 messages are highlighted in yellow.

11 Q    What's the timeframe reflected in this chart?

12 A    March 23, 2018 through April 2, 2018.

13 Q    And did you see any further communication between these

14 parties, the Brandy Odom Pinger number and the Brooklyn Jellz

15 TextNow Ms. Hwang.

16 A    No.

17    MR. PALACIO:  Mr. Rader, if we can begin on April 2,

18 2018 at 11:09 a.m. Eastern.

19 Q    Ms. Hwang, what I would like to do is I'll read out the

20 text messages for Brooklyn Jellz.  If you could read the text

21 messages for the Brandy Odom Pinger number.  Again, that's

22 starting at 11:09 a.m.

23    Yo, you up???

24 A    Yeah, I'm up.

25 Q    Jeff in 20 minutes.  Get ready.

1    A    Okay.

2    Q    Text when ready.

3    A    Okay.

4    Q    You ready or not?

5    A    I'm ready.

6    Q    Okay.  Me coming now.

7    A    Okay.

8    Q    Be here.

9    A    Okay.

10   Q    Coming to door.  Is he in?

11   A    Yes, he here.  Inside.  He gone.

12   Q    K.

13            Ms. Hwang, did you prepare another summary chart

14   showing all communications between a phone number belonging to

15   Adelle Anderson (718) 600-1072 and a phone number belonging to

16   Cory Martin (347) 729-4723.

17   A    I did.

18            MR. PALACIO:  Your Honor, if we could show the

19   witness Government's Exhibit 310 for identification unless

20   there is an objection.

21            MR. CECUTTI:  No objection.

22            THE COURT:  Could I see the parties at the side

23   along with the court reporter for a second.

24            (Continued on next page.) (Sidebar conference.)

25

1          (The following occurred at sidebar.)

2          THE COURT:  I don't mean to put you on the spot, I

3    just figured if you don't have any objection to any of these

4    exhibits.

5          MR. CECUTTI:  We have no objection to any of these.

6          THE COURT:  All right.  So they are all in.

7          MR. PALACIO:  It will make it easier.

8          THE COURT:  Thank you so much.

9          MR. CECUTTI:  Okay.

10          (End of sidebar conference.)

11          (Continued on next page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (In open court.)

2          THE COURT:  Just when you come to each exhibit, just

3    let us know so we can record it properly.  But those exhibits

4    that we discussed at the side are all in evidence.

5          MR. PALACIO:  Yes, Your Honor.

6          (Government's Exhibit 310 received in evidence.)

7    BY MR. PALACIO:

8    Q    Ms. Hwang, we are looking at Government's Exhibit 310 on

9    consent.

10          Can you tell us what that is, what this chart

11   summarizes?

12   A    The summary chart is sourced from the call detail records

13   for the phone number (718) 600-1072.  It highlights

14   communication from April 1, 2018 through April 10, 2018.  And

15   the highlights show blue and red.  Incoming communications are

16   highlighted in red; outgoing communications are highlighted in

17   blue.

18   Q    And does this show communications with a phone number

19   belonging to Cory Martin ending in 4723?

20   A    Yes.

21   Q    Ms. Hwang, as part of your work in this case, did you

22   review extraction reports?

23   A    I did.

24   Q    What is an extraction report?

25   A    An extraction report is data that has been extracted from

1  a mobile device and it is presented in a report in an easy to

2  review format.

3  Q    What are some of the formats that they come in?

4  A    The reports come in different formats, also using

5  different types of forensic software.  So the reports can be

6  provided in a PDF format and some of the different software

7  can be Cellebrite Reader or XAMN Viewer, XAMN.

8  Q    And what are those platforms, Cellebrite and XAMN?  What

9  do they help you do?

10 A    To allow the user or the viewer to be able to review the

11 extraction reports in an easy reader friendly format.

12 Q    Did you review the full forensic copies for physical

13 phones in evidence as Government's Exhibit 340 to 345?

14 A    I did.

15 Q    Did you export a subset of information from each of those

16 forensic copies?

17 A    I did.

18 Q    And have you also reviewed the stipulation in evidence as

19 Government's Exhibit 1203?

20 A    I have.

21        MR. PALACIO:  If we could show the witness what's in

22 evidence on consent as Government's Exhibit 407.

23        (Government's Exhibit 407 received in evidence.)

24 Q    Ms. Hwang, can you tell us what this chart reflects?

25 A    This chart shows the devices, as well as the device

1   identifiers and phone numbers, device users, and its

2   respective Government exhibit numbers.

3   Q    Can you tell us what in the column says IMEI MEID number,

4   what is that?

5   A    IMEI stands for International Mobile Equipment Identity,

6   and MEID stands for mobile equipment identifier.  They're

7   essentially a series of digits that uniquely identifies the

8   device handset.

9   Q    Is it fair to say that they are like serial numbers that

10  are unique to a device?

11  A    Serial numbers that relates to either an IMEI or an MEID.

12  Q    And these are the six devices that you reviewed for this

13  case?

14  A    Yes.

15  Q    Did you also review call detail records for the 1072

16  number belonging to Adelle Andersen and the 4723 number

17  belonging to Cory Martin for April 2018?

18  A    I did.

19  Q    What was the cell phone provider for both of those

20  numbers?

21  A    AT&T.

22  Q    Did those records lists the IMEI for the devices

23  associated with those numbers?

24  A    Yes.

25  Q    Did the IMEI numbers from the AT&T call detail records

1  match any of the serial numbers for the devices listed in this

2  summary chart?

3  A    No, they did not.

4  Q    Did you also compare the IMEI numbers from the AT&T call

5  detail records to the serial numbers from other devices

6  recovered by law enforcement in connection with this case?

7  A    I did.

8  Q    And did the IMEI numbers from those call detail records

9  match any of those other devices?

10  A    They did not.

11  Q    What did that mean to you?

12  A    Either an IMEI, MEID, or sometimes even an ESN are digits

13  or sometimes letters and digits that uniquely identifies the

14  handset.  So if those numbers are different across the

15  devices, that would mean that they're different devices.

16       MR. PALACIO:  Your Honor, if I may at this time, I'd

17  like to go through Government's Exhibit 400 to 405, which are

18  the extraction reports.

19       THE COURT:  Okay.

20       MR. PALACIO:  I have physical copies for Ms. Hwang.

21  May I hand them up to her?

22       THE COURT:  Sure.

23  Q    All right.  Ms. Hwang, I'd like to -- if we can pull up

24  Government's Exhibit 400.

25       Ms. Hwang, what is Government's Exhibit 400?

1    A    It contains all the exports from the Coolpad device.

2    Q    And is this what an extraction report generally looks

3    like?

4    A    The summary page, yes.

5    Q    If you could tell us on the summary page what phone this

6    is, the device that this phone is associated with?

7    A    This is a Coolpad device with the Model Number 3622A.

8    Q    Just turning to page 2.  Under device information, do you

9    see the model type for this phone?

10   A    I do.

11            (Continued on next page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1  BY MR. PALACIO: (Continuing.)

 2  Q    What is that?

 3  A    It says cool pad 3622A.

 4  Q    And do you see a column that says MSISDN?

 5  A    I do.

 6  Q    What is that?

 7  A    That is essentially the phone number that's associated

 8  with the SIM card in the device.

 9  Q    And is that the 6108 number?

10  A    It is.

11  Q    Is that the number associated to Cory Martin in the

12  chart -- summary chart we saw a little bit earlier?

13  A    It is.

14       MR. PALACIO:  Now turning to Page 3.

15  Q    Can you tell us what auto fill is?

16  A    Auto fill is a feature that helps users complete fields.

17  And so it's dependent on the user settings, the application,

18  or its source.  It helps users complete fields related to

19  personal information such as name, address, credit card info,

20  or log-in credentials, and more.

21  Q    And what's the information that we see in the auto fill

22  fields?

23  A    Full name, Cory W. Martin, e-mail Wayne11422@Gmail.com,

24  street address, 249-45 148th Road.

25       MR. PALACIO:  All right.  If we could turn to Page

 1  4, line two.

 2  Q    What information do we see on this part of the extraction

 3  report?

 4  A    These are the contacts.

 5  Q    And specifically, on line two, what's the name of the

 6  contact and the phone number for that contact?

 7  A    Brandy 2, phone number (518)730-5202.

 8  Q    And looking at Page 4, line three, what is the name of

 9  the contact and the phone number?

10  A    Brandy 3, (347)564-7923.

11  Q    On Page 4, line four, what is the name of the contact and

12  the phone number?

13  A    Adelle, phone number (646)399-7637.

14  Q    Now, on Page 4, line nine.

15       What is the name of the contact and the phone

16  number?

17  A    Baby girl, phone number (718)600-1072.

18  Q    Is that the number associated with Adelle Anderson?

19  A    It is.

20  Q    Now, on page -- on Page 5.  Line 16 and 17.

21       Can you give us the name of the contact and the

22  phone number?

23  A    Brandy, phone number (718)913-2819.

24  Q    All right.  Ms. Hwang, if we can turn to Page 20.

25       Can you tell us what, searched items, means in an

1  extraction report?

2  A    Searched items would reflect the searched terms that the

3  user would have access search results for.

4  Q    And looking at the searched items here, can you give us a

5  time of the searches and what was searched?

6  A    Both are from April 13th, 2018.  First one is from

7  10:57:22 a.m.  Source is YouTube application.  The search

8  terms are, woman found in park.

9        The second one is also sourced from YouTube

10 application.  Time 3:07:58 p.m.  Search terms, woman found in

11 park.

12 Q    And when you say, source from YouTube, does it mean that

13 it was a search done through YouTube?

14 A    Yes.

15 Q    And were any of those searches deleted from the device?

16 A    The one from 10:57:22 a.m. has been marked for deletion.

17           MR. PALACIO:  Now, if we could turn to Page 25.

18           I'm sorry, before that, if we could go to Page 21,

19 the top of Page 21.

20 Q    Ms. Hwang, looking at the top of Page 21, what type of

21 information do we see in this part of the extraction report?

22 A    Web history or web browser history which show the

23 websites that the user of the device had accessed.

24           MR. PALACIO:  Now if we could go to Page 25.  And

25 starting about five rows up.

1  Q    Beginning on April 13th, 2018, at 10:42:01, can you tell

2  us what type of activity you saw?

3  A    The user access search results for the search terms, body

4  found in Brooklyn park.

5  Q    What do we see between there as we scroll up?

6  A    We see it continue, web history for search results for

7  those search terms, as well as a Wall Street Journal article

8  with the title, Dead Body Found in Brooklyn Being Investigated

9  As a Homicide.

10 Q    What other searches did you see?

11 A    Search results for search terms, body found in Brooklyn

12 park, and on Page 22, there are search results for the

13 searched terms, woman found in park.

14 Q    And what are some of the articles that were accessed by

15 the user after that -- those terms were searched?

16 A    Staying on Page 22, the user accessed the web page from

17 New York Daily News with the title, Hunt Continues For Killer

18 of a Woman Found Dismembered in Brooklyn.

19 Q    And Ms. Hwang, did you see other similar searches during

20 that timeframe between the 13th and 15th of April 2018?

21 A    Yes.  Also continuing on Page 21.

22      MR. PALACIO:  If we could go to Page 31.

23 Q    Ms. Hwang, generally, before we begin, what information

24 do we see here?

25 A    This is the SMS or text message category.

1  Q    And just so we're clear, what are SMS messages?

2  A    SMS stands for short messaging service, also known as

3  text message.

4  Q    And can you describe or tell us what the color-coding

5  scheme here is?

6  A    The outgoing messages are highlighted in red, the

7  incoming messages are highlighted in blue.

8  Q    And are the messages in red, messages sent by the user of

9  this device, Cory Martin?

10  A    Yes.

11  Q    And the messages in blue, are they messages sent by the

12  contact, Baby Girl, on the 1072 number belonging to Adelle

13  Anderson?

14  A    Yes.

15         MR. PALACIO:  If we could start at the top of Page

16  31.

17         THE COURT:  I'd hate to interrupt you.  I don't know

18  if this is a convenient time to break if you have a different

19  topic coming.  I think we'll take our morning break now.

20  It'll be 15 minutes.  Don't talk about the case.  We'll see

21  you after the break.

22         THE COURTROOM DEPUTY:  All rise.

23         (Jury exits the courtroom.)

24         THE COURT:  All right.  Everybody can sit down.

25  We'll be in recess.  You can step down and we'll see you after

1  the break.

2              (The witness steps down.)

3              (A recess was taken.)

4              THE COURTROOM DEPUTY:  All rise.

5              (Judge ANN M. DONNELLY enters the courtroom.)

6              THE COURT:  Hi.  Everyone can sit down.

7              MS. HAJJAR:  Your Honor, I made a couple of proposed

8  revisions to the Court's charge.

9              THE COURT:  Okay.

10             MS. HAJJAR:  But the formatting is really wonky

11 because of the PDF.  I don't know your Court staff --

12             THE COURT:  -- a word document?

13             MS. HAJJAR:  Yes.

14             THE COURT:  Okay.  Can we do that?  That'll be

15 great.

16             (The witness resumes the stand.)

17             THE COURT:  All right.  Are we ready for the jury?

18             MR. PALACIO:  Your Honor, may I approach?

19             THE COURT:  Yes.

20             (Pause in the proceedings.)

21             THE COURTROOM DEPUTY:  All rise.

22             (Jury enters the courtroom.)

23             THE COURTROOM DEPUTY:  You may be seated.

24             THE COURT:  All right.  We are ready to resume with

25 the direct examination.  Go ahead.

1    THE COURTROOM DEPUTY:  The witness is reminded she's

2  still under oath.

3    MR. PALACIO:  Ms. Greene, if we could have -- there

4  we go.

5  DIRECT EXAMINATION (Continued)

6  BY MR. PALACIO:

7  Q    Ms. Hwang, before we get started with these messages, are

8  these messages in Government's 400 for this extraction, are

9  they in reverse chronological order?

10 A    They are.

11 Q    So if you could please read the messages from Adelle

12 Anderson in blue, I'll read the messages from Cory Martin in

13 read, and if I could please start at the top of Page 31 with a

14 message on May 11th, 2017 at 22:20:50 UTC.

15 A    Sorry.

16    Wasn't no family reunion.  I didn't even go inside.

17 Q    IDGAF.

18    And Ms. Hwang, do you know what that stands for?

19 A    I don't give a fuck.

20 Q    Please continue.

21 A    I wanted you there with me.  Sorry I had you waiting.

22 Q    You think I give a fuck who Jade cousins sister aunties

23 are?  No.  And we not going to pretend we cool.

24 A    You right.  I didn't looks at it that way.  I was just

25 trying to be cordial.

1  Q   Yo I'm getting real fucking sick of this baby father

2  shit.

3         It's always you wanting to be fucking nice.  Fuck

4  him and his family.

5  A   I apologize because it wasn't worth upsetting you.  I

6  really didn't give a fuck.  SMH.

7  Q   Do you know what SMH stands for?

8  A   Shaking my head.

9         It's my fault.  I apologize for making you feel this

10  way and not thinking.  Once again.

11         Can you not be enraged at me, please?

12  Q   I'm done texting you.  I will talk to you when we get

13  home.

14  A   I won't say nothing else because that's what you want.

15  But can you please just keep calm.

16  Q   Nobody is hype.

17  A   LJS.  Okay.  Cool.

18  Q   Do you know what LJS stands for?

19  A   No.

20  Q   I'm sorry.  I didn't mean to yell at you.

21  A   It's cool.  I pissed you off.  I was doing too much.  I

22  fucked up.  I'm sorry.  I should of considered your feelings a

23  more than I did.  Of how you would feel.  Of what you would

24  think.  And I apologize daddy.  I should have handled the

25  situation better.  I'm sorry.  I should have thought of it out

1   a little better and smarter.

2   Q    You never thought how would you feel if you were in my

3   position?

4   A    Yes.  And I'm learning as we go through.  I don't want to

5   disrespect you.  I love you.

6   Q    I'm sorry, if we could end there, Ms. Hwang.

7               May 11th, 2017, at 23:39.

8               MR. PALACIO:  If we could please turn to Page 39.

9   Q    Ms. Hwang, we see here a message from a contact saved

10  under the name, bitch, under (347)860-3181.

11              Could you read the message for us?

12  A    Hi Cory.  I've tried to call you but I haven't been able

13  to reach you.  Call me back so that we can speak, please.

14              MR. PALACIO:  Turning to Page 46.

15  Q    Ms. Hwang, we see messages here that are in different

16  colors.

17              Can you explain that color-coding scheme?

18  A    What's consistent from the previous message thread is the

19  red highlights.  So the outgoing messages are still

20  highlighted in red, the incoming messages, this thread, is

21  highlighted in yellow.

22  Q    And the outgoing messages, are they from the Cory Martin

23  phone number?

24  A    From this device, yes.

25  Q    From this device.

1    And the -- what is the name of the contact with the

2  incoming messages?

3  A    Brandy 2.

4  Q    Okay.  Ms. Hwang, beginning at the bottom of Page 46 with

5  the text message on May 2nd, 2017, at 19:55:29.  I'll read the

6  messages from the Cory Martin number, if you could read the

7  other ones.

8    Hey.  How's everything going?

9  A    Good.  Game still going.

10 Q    How are his eyes?  Damn I thought y'all would have been

11 leaving already.

12 A    I'm ready to go.  I'm getting bit.

13    The next day on May 3rd.

14    Hey daddy.  Just checking up on you.

15 Q    Everything is okay.  How's school?  You okay?

16 A    School is good.  I'm ready to get out that class.

17 Q    Teacher still fucking with you?

18 A    Yeah, but I'm good.  Enjoying my salad.

19 Q    The next day on May 4th, 2017.

20    Hey what's up?  Everything good?

21 A    Yeah, I'm good.  My phone was dead.  Studying for this

22 test sorry.  I didn't hit you guys back up earlier.

23 Q    It's okay.  How's school?

24 A    Good.  I failed my test.  She said I can take it again

25 tomorrow.

1    Are you okay, daddy?  I know yous was upset.

2    That was me that just called.

3  Q  My bad.  I was downstairs.  I ain't see it.

4  A  It's cool, daddy.  But are you okay?

5  Q  Yeah, I'm straight.

6  A  That good.  No stressing.

7    Hey daddy.  Just got out.  OMW.

8  Q  Ms. Hwang, do you know what OMW stands for?

9  A  On my way.

10  Q  Iight baby.  Take the LIRR.

11  A  On the train already.  By Jamaica.

12    Jeff still coming?

13    You want anything from the store?

14    The next day on May 6, 2017:  I got a Bacardi and

15  three thotty.

16  Q  Okay.  That's what's up.

17    On May 8th, 2017.  I'm sorry.

18  A  Hey daddy.  I'm on the floor.

19  Q  How do you like it?

20  A  Hey daddy.  Checking up on you.  I'm working hard today.

21  Q  Don't work too hard.

22    I'm okay.  How are you?  How you?  Like the floor?

23  A  Yeah, I got 100 for finger waves.  I'm so excited.

24  Q  That's what's up, girl.

25  A  Yeah.  Finishing my curls now.

1  Q    Ms. Hwang, that concludes that text thread on May 8th,

2  2017, at 15:26:39.

3           MR. PALACIO:  If we could turn to Page 41.

4  Q    All right.  Ms. Hwang if you could begin with a message

5  on May 13th, 2017, at 1:12:26.

6  A    Daddy, it's a bitch party.  Saying 30 in house fee no N

7  words here.

8  Q    What?  That sounds crazy.

9  A    Word IB.

10 Q    What them bitches trying to do?

11 A    There no good ser.

12 Q    The cab is pulling up.

13 A    Pulling up.  I'm good.  It's still empty.  Girls just CO.

14 Talk or call.  Can't.  Phone is so stupid.  I have to wait

15 until it's unfreeze.

16 Q    That phone is retarded.

17 A    Yeah.  I.  Guys coming in now.

18 Q    Hey.  How's it going?  How they acting?  Did you get to

19 apply?

20 A    Daddy did two VIPs so far.  I'm doing good daddy.  Are

21 you okay?

22 Q    KM -- I'm sorry.

23 A    KM.  I'm leaving noe.  Now.

24 Q    What's the address to the club?

25           MR. PALACIO:  And that concludes that text thread on

1  May 14, 2017, at 3:56:33.

2  Q    Ms. Hwang, did you also review text messages from a

3  different number for Brandy under Brandy 3 with a phone number

4  ending 7923?

5  A    I did.

6  Q    Okay.  If we could start on Page 49.  I'm going to begin

7  with a text message on May 18th, 2017, at 16:12:21.

8            Text me when you in Queens.

9  A    Okay.  It's 30 extra.

10  Q    No.  Take train.

11  A    Tell him to drop me off the LIRR.

12  Q    Take the train.  Take the train.  Get out the cab babe.

13  You don't need to spend dollar sign just because you have it

14  okay.

15  A    I'm out the cab.  Walking to the train.

16  Q    Bring home some hot wings and fries when you get close to

17  the house.

18  A    Okay.

19            We waiting for the LIRR.

20  Q    Okay.

21  A    We in here.  Going to the chicken spot.

22  Q    Good girl.  Get two thotties, one for you one for delle.

23  A    Okay.

24  Q    Text me when you get there.

25  A    Okay.

1            We finish.  On our way back.

2   Q    Cool.

3   A    Daddy open the door.

4   Q    It's 60 for the house fee.

5            I'm sorry.

6            Tell him you got to go to the ATM.

7   A    Okay.

8   Q    They got a ATM there?

9   A    ATM fee is $8.

10  Q    Oh, fuck it we'll pay the $8 take the money off and just

11  know you better bring home 100 the least but get all the

12  fucking paper back.

13  A    Shit is dead.

14  Q    Well they don't close till four so do what you do.

15  A    They sending me home.

16           A1.  Okay.  I'm okay daddy.

17  Q    Okay mamma.

18  A    I'm packing up daddy.  I'm ready to go.

19  Q    Okay.  Sending Uber.  Let me know when you outside.

20           Yo.

21           MR. PALACIO:  And that concludes that thread on

22  May 20th, 2017, at 3:39:39.

23           And if we could show the witness, Government

24  Exhibit 407.

25  Q    Ms. Hwang, looking at the second column GX 401, can you

1  tell us what device and user name that corresponds to?

2  A    The LG device, device user is Cory Martin, and there are

3  two phone numbers associated with that device.

4  Q    And what are those numbers?

5  A    (347)729-4723 and (347)779-6108.

6            MR. PALACIO:  And if we could show row 403.

7  Q    Let's begin with that one.

8            Can you tell us the phone number and the user name?

9  A    Phone number associated with the device is (718)600-1072.

10  The device user is Adelle Anderson.

11           MR. PALACIO:  You can take that down.

12           And if we could show the witness, Government's

13  Exhibit 403, the extraction report for that phone number that

14  we just talked about.

15  Q    Starting on Page 1, Ms. Hwang, do you see the device type

16  there?

17           MR. PALACIO:  Actually, a little bit further down.

18  A    The device model?

19  Q    Yes, the device model.

20  A    I do.  It's a Samsung Galaxy J7 Prime.

21           MR. PALACIO:  And turning to Page 3.

22  Q    What does this information show us here?

23  A    This is the phone number associated with the SIM card in

24  the device.

25  Q    And just remind us what that number is?

1  A    (718)600-1072.

2  Q    Does this extraction report also have contacts for this

3  phone number?

4  A    It does.

5         MR. PALACIO:  If we could go to Page 4.

6  Q    Could you give us the name of that contact and the phone

7  number?

8  A    Andrew Jew, phone number (631)855-0043.

9         MR. PALACIO:  Turning to Page 5, lines one and two.

10  Q    Can you give us the names of those contacts and the phone

11  numbers associated with those contacts?

12  A    The first one is B Odom.  There are two phone numbers.

13  The first one is (516)309-7437.  The second phone number is

14  (929)357-7056.  The second contact is BB Trap Selfie.  Phone

15  number (347)564-7923.

16         MR. PALACIO:  If we can go to Page 7.

17  Q    Can you give us the name of that contact and associated

18  phone number?

19  A    Daniel Lena Custy.  (516)491-0840.

20         MR. PALACIO:  Turning to Page 8.

21  Q    Can you give us the name of the contact and the phone

22  number?

23  A    Puppy.  Phone number (347)729-4723.

24  Q    And based on your review of the extraction reports, the

25  stipulations, and the summary charts, is that a phone number

1  associated with Cory Martin?

2  A    It is.

3         MR. PALACIO:  And turning to Page 9.

4  Q    Can you give us the name of the contact and that phone

5  number?

6  A    John Lynbrook.  Phone number (516)993-0101.

7         MR. PALACIO:  Mr. Rader, if you could pull up Pages

8  21 and 22, side by side.

9         And if you could expand -- yes.

10 Q    Ms. Hwang, can you tell us what information the

11 extraction report has here?

12 A    There is metadata associated with the photo.

13 Q    What is metadata?

14 A    Metadata is data about data.  So it reveals more

15 information about data.

16 Q    And the photograph next to it which is Page 22, what is

17 that in relation to what we see in Page 21?

18 A    It is a photo of a Capital One bank card.

19 Q    And are you able to tell if this photo was taken by this

20 device or any other information?

21 A    There is metadata noting the make and model of the device

22 used to take the photo, as well as the capture time.

23 Q    And what was the capture time?

24 A    December 2nd, 2017, at 2:06 p.m.

25 Q    And was that taken by this device?

1   A    It was taken with the device with the same phone model.

2   Q    Can you give us the number of the Capital One card that

3   we see on the right-hand side?

4   A    The card number is 5147592102516969.

5   Q    And who is the owner of that card?

6   A    The name on the card is Brandy K. Odom.

7        MR. PALACIO:  Mr. Rader, if you could pull up Page

8   23 on the right-hand side.

9   Q    Ms. Hwang, does that appear to be the back of that card?

10  A    Yes.

11       MR. PALACIO:  If we could pull up Page 24 on the

12  left-hand side with Page 28 on right-hand side, please.

13  Q    Ms. Hwang, can you explain what we see on the left-hand

14  side in relation to what we see the photo we see on the

15  right-hand side?

16  A    The left-hand side shows the metadata associated with the

17  photo that is on the right-hand side.

18  Q    And could you describe that photo?

19  A    It appears to be a photo, partial photo of someone's

20  legs, and what appears to be black boots.

21       MR. PALACIO:  And Mr. Rader, if you could pull up

22  page 30.

23  Q    Ms. Hwang, can you tell us what information we have here?

24  A    This is a video file.

25  Q    And that video was on this phone?

1  A    Yes.

2  Q    Thank you.

3        MR. PALACIO:  If we could turn to the summary chart

4  on Page 407.

5        Mr. Rader if we could zoom in around GX 402.

6  Q    And Ms. Hwang, can you tell us what information the phone

7  number and the device user associated with the extraction

8  report for Government's Exhibit 402?

9  A    The phone number associated with this report is

10 (347)779-6108, and the user associated with the device is Cory

11 Martin.

12       MR. PALACIO:  Mr. Rader, If you could pull up the

13 extraction report under GX 402.  And if we could go to Page 2.

14 Q    Ms. Hwang, do you see the phone number there?

15 A    I do.

16 Q    And is that the same number we saw earlier?

17 A    It is.

18       MR. PALACIO:  If we could turn to Page 5, line 68.

19 Q    Can you give us the name of the contact on line 68 and

20 the phone number?

21 A    Baby girl.  Phone number (718)600-1072.

22       MR. PALACIO:  Now if we could turn to Page 11, line

23 227.  At the very top.

24 Q    Can you give us the name of that contact and that

25 contact's phone numbers?

1  A    Insurance Man.  There are two phone numbers.  Mobile
2  number (347)732-4049.  Work number, (929)397-1867.
3           MR. PALACIO:  Now turning to Page 19, line 472.
4  Q    Can you give us the name of that contact and the phone
5  number for that contact?
6  A    Samson.  Phone number (347)852-7976.
7           MR. PALACIO:  Turning to Page 100.
8  Q    Before we begin, Ms. Hwang, what information do we see
9  here in this section, where it says call log?
10 A    Calls that were placed to and from the device.
11 Q    Can you tell us what calls -- were these -- first of all,
12 on Page 100, are these incoming or outgoing calls?
13 A    All three calls are outgoing.
14 Q    And outgoing to which party?
15 A    To party identified as Capital One.
16 Q    And what is the phone number for Capital One?
17 A    Phone number (800)655-2265.
18 Q    And on what date were those calls made?
19 A    All calls were made on January 20th, 2017.
20           MR. PALACIO:  Now, turning to Page 101.
21 Q    Can you tell us what type of call this was?
22 A    This was an outgoing call.
23 Q    To what party?
24 A    Party identified as F United.
25 Q    And what is the phone number for F United?

1  A    It is (315)451-2544.

2  Q    I'm sorry, could you repeat that?

3  A    (315)451-2544.

4  Q    And when was that call made?

5  A    December 28th, 2016, at 12:12:45 p.m.

6  Q    And was that call deleted?

7  A    It was marked for deletion.

8  Q    Ms. Hwang, I want to turn to searched items on this phone

9  on Page 102.

10         Can you give us the time that this search was

11 conducted and what type of search was made?

12 A    The search terms were, rules to pimping, timestamp

13 August 28th, 2016, at 3:44:52 p.m., source YouTube

14 application.

15 Q    So in other words, the user searched YouTube for rules to

16 pimping?

17 A    Yes.

18         MR. PALACIO:  If we could turn to Page 103, about

19 halfway down the page.

20         That's good.

21 Q    Ms. Hwang, can you tell us what types of searches were

22 conducted on or about April 19th, 2017, at 2:12:40?

23 A    The user access search results for the search terms, can

24 you purchase a money order with debit card.

25         MR. PALACIO:  And if we could scroll up slowly,

1   Mr. Rader.

2   Q    Can you tell us what other types of searches were

3   conducted on the 19th?

4   A    Following that searched terms, the user also accessed web

5   pages such as from mightytravels.com, with the title, a quick

6   guide to purchasing a Walmart money order from

7   ACEcashexpress.com, titled money orders from MoneyGram, ACE

8   Cash Express.

9   Q    And up towards the top of the page?

10  A    The user accessed search results for the search term, can

11  I purchase a money order with debit card.

12       MR. PALACIO:  And turning to Page 105.  A little bit

13  below halfway.

14  Q    Ms. Hwang, do you see a search on April 16th, 2017, at

15  12:25:08 a.m. UTC?

16  A    I do.

17  Q    What is that search for?

18  A    This appears to be a searched items from New York

19  Craigslist.org, search terms, New York woman seeking men.

20  Q    And the search above that, can you read that to us?

21  A    This is a web history result for Backpage.com.

22  Q    All right.

23       MR. PALACIO:  Now turning to Page 107.  Just a

24  little above the bottom of the page.

25  Q    Ms. Hwang, do you see a search on April 13th, 2017, at

1  21:03:38 UTC?

2  A    I do.

3  Q    What is that search?

4  A    The user access search results for the search terms, city

5  cutoff water and gas.

6  Q    And above that, can you tell us what other searches you

7  saw?

8  A    How do you know if your water ID getting cut off.

9  Q    All right.

10        MR. PALACIO:  Turning to Page 232.

11  Q    Ms. Hwang, again are those SMS messages?

12  A    They are.

13  Q    Okay.  And can you explain the color-coding scheme here?

14  A    Similar to the previous SMS threads, the outgoing

15  messages are highlighted in red, and the incoming messages are

16  highlighted in a beige color.

17  Q    What is the name of the party with the incoming messages?

18  A    Snails.

19  Q    All right.  Ms. Hwang, I'll read the messages associated

20  to the phone number for Cory Martin, if you could read the

21  other ones.  Beginning at the bottom of March 6, 2016, at

22  1:43:47.

23        Cory.

24        Fair to say that's a YouTube address next?

25  A    Yes.

1   Q    You good bro?  I thought I seen your car by a accident on

2   the Belt?

3   A    Yeah.  I'm great.  My boys man's wrapped.

4   Q    Damn my N.  Shit looking crazy.  As along as you good, my

5   N.

6            Your man Gucci?

7            Ms. Hwang turning, to Page 231?

8            Can you tell us the party exchanging messages with a

9   phone number for Cory Martin?

10  A    Party identified as Samson.

11  Q    And the phone number, please.

12  A    (347)852-7976.

13  Q    All right.  I'll begin the messages at the bottom sent by

14  Cory Martin 249-45 148th Road, Rosedale, NY.

15  A    Yo bro.  Yo.  What's the word, brodie.  Two question

16  marks.  I was out there and shit.  Sam said to ask is

17  everything good with you.

18  Q    I'm good.  What's up with this N?  When he coming home?

19  A    Not sure.  I was trying to call you earlier.  He wanted

20  to talk to you.

21  Q    Damn.  I know missed a call.  He good though?  He need

22  anything?

23  A    Yeah.  He good.  He don't need anything.  If he call me

24  tomorrow, I'll call you.

25  Q    Iight bet.  Hit me if he call you.

1   A     All right.

2   Q     Ms. Hwang, turning to Page 226.

3         What is the name of the party exchanges messages

4   with Cory Martin here?

5   A     Party identified as Jermaine.

6   Q     All right.  I'll begin at the bottom.  If you could read

7   the messages from Jermaine.

8         It's Cory bro.  I heard what happened my G.  Sorry

9   for your loss.  I could only imagine what you going through.

10  Hold your head bro and just get back to you whenever you can.

11  Condolences again, bro.

12  A     Thanks bro.

13  Q     Yo what's the address?  It's mad traffic out here.

14        Bro I'm on my way though.

15  A     Got it.

16  Q     Iight.

17  A     (718)819-9931.

18  Q     Number not working.

19  A     Answer when it calls.

20  Q     Iight.

21  A     (718)819-9931.

22  Q     Got it.

23  A     The 473726571 3473126571.

24  Q     Luxurycreditinc@Gmail.com.

25        I'm sorry, that was you.

1           Shit just got really real.

2   A    Yup.

3   Q    All right.  Ms. Hwang, on Page 2225.

4           Can you tell me the party exchanging messages with

5   Cory Martin?

6   A    Party identified as Insurance Man.

7   Q    And the phone number for Insurance Man?

8   A    (929)397-1867.

9   Q    Ms. Hwang, could you read the messages from Insurance Man

10  starting at the bottom?

11  A    *I please give me your driver's license and number as

12  well.

13  Q    Untouchable718@Outlook.com.

14  A    Okay.

15  Q    Your address is 249-45 148th Road?

16  A    Yes.

17  Q    Ms. Hwang, turning to Page 214.

18

19           (Continued on the following page.)

20

21

22

23

24

25

1  BY MR. PALACIO:  (Continuing)

2  Q    Ms. Hwang, starting, looking at these text messages, can

3  you explain -- we see several colors.  Can you explain what we

4  see?

5  A    This message thread is a little bit different than the

6  ones we saw previously.  This entire thread contains messages

7  from multiple different phone numbers and multiple threads

8  that are combined and so we see more than two colors here.

9         What's consistent is the red color that's still

10  highlighted with outgoing texts and we see a lighter red color

11  that is also used to highlight outgoing texts.  Those are to

12  highlight text messages outgoing to phone numbers associated

13  with Brandy Odom.  The darker red color is used to highlight

14  outgoing messages to phone numbers associated with Adelle

15  Anderson.

16         Continuously the blue highlights are associated, are

17  used to highlight messages that are incoming from phone

18  numbers associated with Adelle Anderson.  And continuously the

19  yellow highlights are used to highlight incoming messages with

20  phone numbers associated with Brandy Odom.

21  Q    Okay.  So, Ms. Hwang, starting on page 214, with an

22  outgoing message from Cory Martin to Brandy at 7/21/2016, I'll

23  read those.  If you can read the other messages from Adelle

24  Anderson or Brandy?

25         THE COURT:  I'm so sorry.  So the darker orange red

1   is Cory Martin.  The lighter orange red is?

2            THE WITNESS:  Still Cory Martin.

3            THE COURT:  Okay.  The blue?

4            THE WITNESS:  For incoming messages from Adelle

5   Anderson.

6            THE COURT:  All right.  Sorry about that.  Go ahead.

7   Q    So on 7/21/2016, at 12:50:52, an outgoing message to

8   Brandy:  Sincere.

9            Outgoing message to Adelle Anderson:  I'm coming

10  home by dare in like 30.

11  A    Incoming message from Adelle:  Oh, baby.  Park on PD2.

12  Where you at?  SUP.

13  Q    Outgoing message to this phone number associated to

14  Adelle Anderson:  Mad traffic.  Be there in like ten minutes.

15  A    Incoming message from Adelle Anderson:  K.

16           The next day on July 22, 2016, incoming message from

17  Brandy:  I left my wallet in the bag.  Everything all right?

18  Q    Outgoing message to Adelle Anderson:  Iight baby girl.

19           Outgoing message to Brandy:  Wassup chocolate?

20  A    Incoming message from Brandy:  Hey wassup.

21  Q    Outgoing message to Brandy:  Shit.  I'm thinking about

22  you.  How are you.

23  A    Incoming message from Brandy:  Really.  Same here.  What

24  you into.

25  Q    Outgoing message to Brandy:  Nothing.  I'm relaxing

1  today.  Wanna find out about you.  Got some questions for you.

2  Have you ever had a daddy before?

3  A    Incoming message from Brandy:  Yeah.  I have a daddy

4  before.  Why.  You a pimp.

5  Q    Outgoing message to Brandy:  If that's what you wanna

6  call it.  I'm a businessman.  Pimps normally beat girls up and

7  treat women disrespectful.  I'm not into all that.  What I'm

8  into is making money and making sure my girls is fly and taken

9  care of.  I see you got big dreams and we can make all them

10 dreams come through if you choose me cause I want you.  You're

11 a beautiful female.  Your potential is unlimited.  I don't

12 gotta tell you what you already know.  Only thing you missing

13 is a daddy.

14 A    Incoming message from Brandy:  I don't know.  Like I said

15 I had a daddy and it's always some.

16 Q    Outgoing message to Brandy:  Always some what?

17 A    Incoming message from Brandy:  BS behind it.

18        Incoming message from Adelle Anderson:  Yes.  What,

19 my face look diff.

20 Q    Outgoing message to Brandy:  I don't know what kind BS

21 you talking about but you don't got time for none of the BS.

22 You probably thinking of that's why I don't call myself a

23 pimp.

24 A    Incoming message from Brandy:  Oh, okay.  Well, we just

25 have to see.

1  Q    Outgoing message to Brandy:  You can ask Adelle anything

2  you need to know but I can tell you my word is real.  One

3  thing I don't do is lie, cheat or deceive.  What you see is

4  what you go.  And I like you.  You and I be wanna go to the

5  top with you but the decision is all yours mamma.

6         Outgoing message to Adelle Anderson:  Nah, you just

7  look different.  Period.  I could tell.

8  A    Incoming message from Brandy:  Okay.  I think about it.

9         Incoming message from Adelle Anderson:  O.

10  Q    Outgoing message to Brandy:  Iight, baby girl.

11  A    Incoming message from Adelle Anderson:  Okay.

12  Q    Outgoing message to Adelle Anderson:  On another note I

13  need you to get into this bitch head.  I think she must have

14  had a bad experience with a pimp.  So Brandy seem kind of

15  leery to choose.  So I need you to get in her head and make

16  her choose.  But like I said, babe, eat healthy, stay on your

17  work out.  Shit, get that body right and take care of that

18  situation.  I know you can do it baby girl.

19  A    Incoming message from Adelle Anderson:  Okay boo.  I got

20  you.  You text already?

21  Q    Outgoing message to Adelle Anderson:  Yeah, I was just

22  texting her.

23         MR. PALACIO:  All right.  Mr. Rader, if we can turn

24  to page 186.

25  Q    Ms. Hwang, are these messages between Cory Martin and

1    Adelle Anderson?

2    A    Yes.

3    Q    I'll begin on October 29, 2016 at 1:26:44.

4         I need you to hold me down.  Now you know my

5    situation with everything is fucked up.  I need you to help me

6    get back on my feet.  I hate to sound like Alex but I need you

7    to trust me.  I'm swallowing my pride and saying I need help.

8    Something I hate doing.

9    A    What's wrong -- I'm sorry.

10        Incoming message from Adelle Anderson:  What's wrong

11   daddy?  I'm going to hold you down and I'm going to track

12   tonight.

13   Q    The shit with the car.  My whole situation.  I just hate

14   to feel like I'm putting everything on you.

15   A    I don't feel like that so don't worry about it.  You

16   gotta eat.  Spot is packed.

17   Q    Money on there.  In.

18   A    UEA.  By Ty old school.

19   Q    Oh, okay.  What the bitches look like?

20   A    Mad bitches.

21   Q    Well, stand out from the rest of them.  Outshine them

22   bitches.

23   A    Okay.

24   Q    Ms. Hwang, if we can turn to page 165.

25        Again, does this text thread show a combination of

1  messages between different parties?

2  A    It does.

3  Q    Ms. Hwang, if you could begin with a message reading up

4  on January 15, 2017 at 12:34:36, from Brandy 3.

5  A    We now setting up.  So I'm getting ready.

6  Q    Outgoing to Brandy:  You okay?

7  A    Incoming message from Brandy:  Yeah.  I'm okay.

8  Q    And I think these are only between Brandy and Cory.  Is

9  that correct?

10  A    They are.

11  Q    Good baby.  Do your thing in there.

12  A    Okay daddy.  Okay daddy.  I'm ready.

13  Q    Iight baby.  Coming.

14  A    Okay daddy.  Phone dying daddy.

15  Q    We gonna pull up with them, with them in front.

16  A    Okay.  Coming.

17  Q    No.  We not there yet.

18  A    Okay daddy.

19  Q    Come outside.  118-28197 Street.  That should carry you

20  through the night.  By time you get there, you should be on

21  time but keep it classy, baby girl.

22  A    Okay daddy.

23  Q    If you start feeling crazy, feel free to call me.  Just

24  stay hydrated babe but don't drink too much water.  Just

25  enough to keep you from getting too hot.

1  A    I'm ready.  Okay.  I just want to get to work daddy.

2  Q    That's what I like to hear baby girl.  Go get the money.

3  OT boys.

4  A    Yeah.  I'm almost there.  I'm here.

5  Q    Okay momma.  He said you gonna be the first girl there.

6  So do your thing.  How you feel baby girl?

7  A    I'm okay.  Nobody here.  It looks like yesterday.

8  Q    How you doing.

9  A    Okay daddy.  It really slow.

10 Q    What you mean slow.  It's mad girls.  No guys.  What?

11 A    Both daddy.

12 Q    Okay.  I ask Prince if more guys is on the way so you

13 know if you should stay or not.  Read his reaction to see if

14 he's telling the truth and see what you get from it.  Then let

15 us know.  Okay.  Ask Prince.

16 A    I just asked him that, daddy.  He looks like he doesn't

17 know.  So I'm just doing me.

18 Q    How much money you make.  You bust, you bust any dates?

19 A    No.  Not really.  I don't know how much I made.  No.

20 It's not a lot.

21 Q    If nothing changes by 3:30, leave.  I'm looking up a cab

22 for you now.  Stand by.  A cab is on the way.  Be ready, be on

23 point and keep working.  I'll let you know when the cab is

24 outside.

25 A    Okay, daddy.

1   Q    The cab is outside.  He gonna leave.  Don't fuck around.

2   A    Okay.  I'm doing a VIP.

3   Q    Make it fast baby.

4   A    Okay, I'm doing a VIP.  Okay daddy.

5   Q    The cab probably left babe but you was getting, dollar

6   sign, dollar sign.  So don't sweat it.

7   A    Okay.  Daddy the shirt is whack.

8   Q    Cab on the way.  Just called him.  Said he will beep when

9   outside and call my phone just in case.  Look out for him

10  though.  Outside.  Cab outside.  Go outside.  Go outside.  Cab

11  outside.  Yo.

12  A    Okay.

13  Q    Now.  See you soon.

14  A    Okay.  I'm in the cab.

15  Q    Okay.  Good.  But when closer -- okay.  Good.  Text when

16  closer boo.

17  A    Okay.

18  Q    Okay.

19           That concludes that text thread on January 16, 2017

20  at 4:15:33.

21           MR. PALACIO:  Mr. Rader, if we can go to page 159.

22  Q    Ms. Hwang, can you begin with an outgoing message from

23  Brandy 3 on January 19, 2017, at 12:23:07.

24  A    Hey daddy.

25  Q    What's up baby?

1  A     Nothing.  Getting you some groceries for you then I'm

2  coming home.  TY.  TY.

3  Q     Iight.

4  A     It's okay daddy.  Not much N-words.

5  Q     Oh, okay.  Do whatever you can.

6  A     Daddy since it's so dead I told date to come over.  Is

7  that cool?

8  Q     Come where.  To the spot or the house.

9  A     To the spot daddy.

10  Q     Yeah that's cool.

11  A     I really want to make some more money.  I hope I can get

12  a VIP.

13  Q     Keep doing your thing in the meantime and maybe a VIP

14  will come.  Keep grabbing singles.  Until then how are you

15  feeling babe.  You all right.

16  A     Yeah daddy.  It getting crowded.

17  Q     Get that VIP.

18  A     Daddy I got one so far.

19  Q     Say they love that chocolate.

20  A     Yeah.

21  Q     I'm about to leave to X-O-M-E.  Get you mama.  Have jelly

22  phone.

23  A     Okay daddy.  It's so dead.  N-words don't wanna spend.

24  They want a take me home.

25  Q     That's a dub.

1  A    I know daddy.  They scare me.  I don't know what type of

2  crowd like some pimp type.  N-words.

3  Q    That concludes at January 17, 2017 at 3:25:59.

4         MR. PALACIO:  Mr. Rader, if you can turn to

5  page 149, beginning about halfway down.

6  Q    Ms. Hwang, are these text messages between Cory Martin

7  and Adelle Anderson?

8  A    Yes.

9  Q    I'll start at February 16, 2017, at 12:36:57.

10         I hope you're not faking or overexaggerating this

11  mental thing because I spent weeks doing research and helping

12  myself understand.  So if you're faking or overexaggerating,

13  this is your chance to come clean, boo.  I won't be upset.

14  A    No, I'm not baby.  That's why I need you to understand.

15  And the fact that you're trying to prove your love for me.  I

16  love you daddy.

17  Q    Of course I want to understand.  I love you too.  You are

18  my complete package.

19  A    I got the Jew coming in morning and Fredrick coming at

20  lunchtime for her tomorrow.  So she's going to miss a day of

21  school tomorrow.  I'm at work working.  LOL.

22  Q    Fuck her school.  Our money is more important.

23  A    I'm going to try and get Jeff and Papi to come over as

24  well.  We broke.

25  Q    Facts.

1  A    LOL.  And we gonna post up outside a spot when Tang take

2  the kids.  Tanya.  So she can go to the clubs this weekend.

3  Q    Iight.  She need a phone even if it's a put because we

4  gotta be sure about that info we see from it.

5  A    I wanna fuck so bad.  My pum pum pum on fucking fire.

6  What the fuck.  We can book up the trap in the top drawer or

7  hook up the cool pad, daddy.

8  Q    We'll conclude there On February 16, 2017 at 12:49.

9         MR. PALACIO:  Mr. Rader, before we continue, can you

10 pull up GX-63, page 5, and if you could zoom in first at the

11 very top of the page.

12 Q    Ms. Hwang, do you see the date at the top at ADM?

13 A    I do.

14 Q    Can you read that date for us?

15 A    February 19, 2017.

16        MR. PALACIO:  And, Mr. Rader, if you can go towards

17 the bottom, please.  If you could highlight where, beginning

18 where it says, "Patient."

19 Q    Ms. Hwang, can you read that information?

20 A    "Patient is a 28 YO female presenting with trauma.  The

21 history is provided by the patient.  No language interpreter

22 was used."

23 Q    I'm sorry, Ms. Hwang.  If you could read starting at the

24 bottom where it says, starting with "PT"?

25 A    "PT was at a party last night and two girls were

1  fighting.  She tried to break up the fight and was thrown

2  against a wall.  PT sustained LAC of L eyebrow at about 12 MN.

3  She went home and presents to ED today.  PT C/O HA-mild.  No

4  neck pain.  Denies LOC/N/V."

5  Q    And I'm sorry.  The date at the top?

6  A    February 19, 2017.

7           MR. PALACIO:  Mr. Rader, if we can come back to

8  GX-402, at page 146.

9  Q    Beginning with a text message on February 19, 2017, at

10 12:35:26 from Adelle Anderson, can you read that one,

11 Ms. Hwang?

12 A    I'm just gonna walk away from this all.  I'm sorry.  I'll

13 leave.  This is too much and you will never forgive me.  Imma

14 leave you alone.  I'm not with this shit.  Didn't sign up for

15 this.  Anywhere but here is better.  Bye.

16           Several hours later.

17           I'm just sitting in triage now.

18 Q    And we couldn't come with you.  Bullshit.

19 A    Facts.  So if you want, y'all can leave to go get the

20 kids.  Imma be in here a while.  Shake my head.

21 Q    Nah, cause I don't wanna leave and you finish.

22 A    Imma be in here a while.  Shake my head.

23 Q    We leave together baby.

24 A    Okay baby.  Thanks.

25 Q    No problem.

1  A    Tell that bitch to keep her fucking so call money.  If

2  she never owed her that bread she would have told her that the

3  first time when she asked for it.  My aunt can't fucking talk.

4  She's in intensive care.  That's not my friend and I do not

5  know -- and I do know that she owe my aunt money.  Bitch is

6  crazy.  Duppy know who I frighten.  You know a crosses.  Come.

7  What are you doing.

8  Q    How the fuck he know that's her phone.  My, my, don't you

9  look pretty.  We look good together.  How you feel babe?

10 A    Great if Ty would sit the fuck down.  Shit.  What the

11 fuck.  Damn, I wish he would get out so I can take a fucking

12 hit.  Even though my head bussin' already.

13 Q    You can do it when we on our way to 5 town.  How the tea

14 tree oil make you cut feel?

15 A    Okay.  And it's okay.

16 Q    It stopped itching?

17 A    A little.

18 Q    A little is better than none.  If this C-A-S-R, the tea

19 tree is gonna make it heal faster though.

20 A    Okay.  Great.  Thanks daddy.

21 Q    Because it's a natural antiseptic and when we get your

22 prescription, I'll get you vitamin E oil for your face.  Today

23 is about you.  I used to do the same thing when I was younger.

24       MR. PALACIO:  Mr. Rader, if we can turn to page 123.

25 Q    Ms. Hwang, starting on March 28, 2017, at 23:40, can

1  you -- I'll begin messages from Cory Martin.  If you could

2  read messages from Adelle Anderson.

3          She's a snake?

4  A    DHR charge slithering up the block now.  I'm looking out

5  the window.

6  Q    Yuck.

7  A    I'm following your lead.  If she moving around the crib,

8  let me know.  Keep me posted.  Turn your brightness on your

9  screen down.

10 Q    It's all the way down.

11 A    Okay, good.  It's on and popping.

12 Q    Facts.

13 A    Oh, well.

14 Q    I don't give a fuck.

15 A    Me either.  It will be worth it in the long run.

16 Q    Word.  That's why she S-I-N-T care where you let her out.

17 She been stopped going to school.  She be with him.  And if

18 she's still going, show only going to get that check in dip.

19 A    That's what she waiting for.  You're gonna find all that

20 out tomorrow.

21 Q    Yup.

22 A    And she can talk until the check come.

23 Q    Yeah.  Anyway, fuck her.  I told you she was dirt from

24 the jump.  I want to start a business with you.

25 A    Facts.  And what kind of biz?  Was that her at the door?

1  Q    We already have a biz.

2        Sorry.  That was you.

3        No.

4  A    Okay.  Told you next door sound like it's in the house.

5  Q    I hate this attached shit.

6  A    Yup.  I hate it too.  But back to your biz idea.  My

7  baby, you need a charger?

8  Q    No. 77 percent.

9  A    Okay.  You good.  Your biz plan.

10 Q    I don't know, babe.  We have to sit down and talk about

11 it but we complement each other.  So why not make, dollar

12 sign, dollar sign, dollar sign, off it.

13 A    Facts.  Like we talk about.

14 Q    That concludes that text thread on March 29, 2017 at

15 1:18:15.

16       MR. PALACIO:  Mr. Rader, if you can pull up to

17 page 112.

18 Q    And, Ms. Hwang, if you could begin with an outgoing text

19 message from Adelle Anderson on April 4, 2017, at 19:01:18.

20 A    Did you meet incoming?

21 Q    I'm sorry.  Incoming.

22 A    I know our love is that strong.  We can get through

23 anything.  When it comes to this shit, it doesn't feel like

24 it.  I apologize daddy.  I apologize for being a dumb bitch.

25 I apologize for taking you for granted all these years.

1  Q    I'll be completely honest with.  I hate everything that

2  has to do with that.

3  A    Yes.  Me too so.

4  Q    I've been accepted -- I've been accepting your apologies

5  but it don't change.  How the shit went down.  It's much more

6  deeper than that fucking baby.  It's everything.

7  A    Yes, I know.  So are you going to be mad at me when I

8  need you the most?  And you took me in with the good and bad

9  but Imma going to go through this alone.  I don't need you to

10 hold my hand.  Okay?  I'm a big girl.  I just don't want you

11 to feel bad -- I just don't want you to feel any more pain

12 regarding the situation.

13 Q    You fucking lie to me about some fucking N-word being so

14 fucking great just to fucking make me jealous.  Then go have a

15 baby with the motherfucker to prove to him -- to prove to me

16 how much you love him.  If you never played yourself in the

17 past, you did it 10,000 times that time.  Everybody got what

18 they wanted except for me.

19         And that concludes that text thread on April 4,

20 2017, at 19:11:25.

21         MR. PALACIO:  Mr. Rader, if you can pull up page 235

22 and if you could pull up page 236 next to it, please.

23 Q    Ms. Hwang, can you tell us what we can see from the

24 metadata from the image on the right?

25 A    The create time stamp and the capture time stamp is

1  August 17, 2016, at 7:32 p.m.

2  Q    And can you tell us the name of the person on the

3  driver's license on the right?

4  A    Brandy K. Odom.

5        MR. PALACIO:  Mr. Rader, if you can pull up page 240

6  and 241 together.

7  Q    Let's begin with the metadata on the left-hand side for,

8  on page 240.

9        What information do we see here?

10 A    The create time stamp and the capture time stamp is

11 January 25, 2017, at 10:53.

12 Q    Can you tell if this picture was taken by this device?

13 A    Based on the make and model listed in the metadata, it

14 is, it matches the make and model of this device.

15 Q    And if we can look at the photo on the right-hand side,

16 can you read the name, the name there?

17 A    Z Villard.

18       MR. PALACIO:  Okay.  We can take that down.  If you

19 can pull up, Mr. Rader, pages 242 and 243 together.

20 Q    All right.  Ms. Hwang, can you tell us about the metadata

21 for the photograph on the right?

22 A    The create time stamp and the capture time stamp is

23 March 27, 2017 at 9:52.

24 Q    And was that taken by this device?

25 A    The make and model, camera make and model, the metadata

1  matches the phone make and model.

2      MR. PALACIO:  Mr. Rader, if you can zoom in on the

3  photograph on the right, 243.

4      If we can pull up pages 244 and 246, side by side,

5  and if you could expand the information at the top, Mr. Rader.

6  Thank you.  If actually we can start with 244 and 245

7  together.

8  Q    All right.  Ms. Hwang, can you give us the capture time

9  for this photograph?

10  A    January 25, 2017, at 1:15 p.m.

11  Q    Can you read what you see at the very top of the

12  document, what type of document this is?

13  A    This is a certificate of birth registration form.

14  Q    And can you give us the name?

15  A    Z Villard.

16      MR. PALACIO:  If we can pull up 246.

17  Q    Can you give us the date and time for this photograph

18  taken by this device?

19  A    The capture time is January 25, 2017, at 1:15 p.m.

20  Q    Now showing you 246.  Again, what type of document is

21  this?

22  A    This is also a birth certificate.

23  Q    And what's the first initial of the person on the birth

24  certificate?

25  A    T.

1  Q     And the name of the mother?

2  A     Adelle Denise Anderson.

3        MR. PALACIO:  Mr. Rader, if we can go to page 249

4  line 3.

5  Q     What information do we see on this portion of the

6  extraction report?

7  A     This is the e-mails category.

8  Q     So, in other words, are these e-mails sent or received by

9  this phone?

10 A     Yes.

11 Q     On line 3, can you tell us what the -- first of all, the

12 time stamp for this e-mail?

13 A     March 22, 2017 at 1:47:30.

14 Q     From whom?

15 A     From CS@havenlife.com.  Paya at Haven Life.

16 Q     To what e-mail address?

17 A     SapphireB12054@gmail.com.

18 Q     Can you read the subject line?

19 A     "Thanks for applying, Brandy.  Need help?"

20 Q     And then the body?

21 A     "Hi, Brandy.  Paya from Haven Life here.  Just wanted to

22 say hello and introduce myself.  We noticed you haven't signed

23 your application yet.  Just reaching out to see if you had any

24 questions before proceeding.  Let me know and I will be happy

25 to help.  Have a great day.  Paya."

1  Q    And turning to page 254, Ms. Hwang, what type of

2  information do we see on this part of the extraction report?

3  A    This is from the notes category.

4  Q    What are the notes?

5  A    Notes is an application that is native, natively

6  installed on a device and users typically tend to use it to

7  write down notes like notes to self.

8  Q    Now, on line 2, can you tell us the date and time of this

9  note?

10 A    The created time is February 1, 2017, at 6:53:39 a.m.

11 Q    All right.  And can you read the text of the note?

12           THE COURT:  Can I see the parties at the side,

13 please, for just a second with the court reporter.

14           (Continued on next page.)

15

16

17

18

19

20

21

22

23

24

25

1        (The following occurred at sidebar.)

2        THE COURT:  Is this really necessary to have her

3   read this?

4        MR. PALACIO:  I can skip this portion.

5        THE COURT:  I mean maybe I'm old fashioned, but I

6   think it's a little -- I mean if it's totally necessary, but I

7   don't really think we need to have her read that unless it's

8   key, key to the case.

9        MR. PALACIO:  Can I speak with --

10       THE COURT:  Sure.

11       (Pause.)

12       MR. PALACIO:  I'll move away from it.

13       THE COURT:  Okay.  Whatever you want.

14       (End of sidebar.)

15       (Continued on next page.)

16

17

18

19

20

21

22

23

24

25

1       MR. PALACIO:  Mr. Rader, can you pull up

2  Government's 407, please, and if you could highlight GX-401.

3  BY MR. PALACIO:

4  Q    Ms. Hwang, can you give us the user phone numbers and the

5  user name associated with this device?

6  A    There are two phone numbers associated with the device,

7  347-729-4723, and 347-779-6108.  User associated with the

8  device, Cory Martin.

9  Q    And what type of device is it?

10  A    This is an LG device.

11       MR. PALACIO:  Mr. Rader, if you could turn to page 2

12  on Government's Exhibit 401.

13  Q    Do you see, Ms. Hwang, the phone numbers there that we

14  just referenced on the summary chart for this device?

15  A    I do.

16  Q    And are those the same numbers that we looked at?

17  A    Yes.

18       MR. PALACIO:  If you could turn to page number 3,

19  Mr. Rader.

20  Q    What's the name of the contact and the phone number?

21  A    Baby Girl.  Phone number 718-600-1072.

22  Q    And on page 4, what is the name of contact and the phone

23  number?

24  A    Brandy.  Phone number 347-564-7923.

25  Q    And page number 9.  Can you tell us the name of the

1  contact and the phone numbers associated with those contacts

2  in lines 1 and 2?

3  A    The first row, Samson 2.  There are two phone numbers.

4  Work number, 347-836-2274.  Mobile number, 347-376-9467.

5  Second contact, Samson Shorty.  Mobile number, 347-932-9479.

6  Q    Okay.  Ms. Hwang, I'm going to turn to the searched items

7  section of the extraction report starting on page 79.

8       Beginning about halfway down at 11/16/2017 at

9  4:00 a.m., Can you read to us what that search was for?

10 A    Source says YouTube application.  Searched terms were

11 "Secretly track cell phone location without installing

12 software."  The second one, also YouTube, search terms were

13 "Trace someone location by phone number."

14 Q    And what other types of searches did you see within that

15 same time frame?

16 A    From Google Chrome, search terms, "cell phone tracker."

17 Continuing with Google Chrome, search terms, "Track someone

18 cell phone without them knowing" and search terms "Track

19 someone cell phone location with no app."

20      MR. PALACIO:  Okay.  If you could turn to page 90,

21 towards the top.

22 Q    What type of search do you see there, Ms. Hwang, on

23 11/14/2017 at 22:49:16?

24 A    I'm sorry.  Can you repeat that?

25 Q    Yes.  What type of search do you see on 11/14/2017 at

1    22:49:16?

2    A    This is a web history log for

3    Quotes.TrueBlueLifeInsurance.com.

4    Q    And looking at -- the information that we see in there,

5    how do you describe that information after, within the URL?

6    A    Following Quotes.TrueBlueLifeInsurance.com/results, it

7    appears to have a list of results that are part of the URL.

8    Q    Do you see any other information that would have been

9    inputted by the user?

10   A    I see information such as state, birth month equals 6,

11   birthday equals 18, and birth year equals 1992, feet equals 5,

12   inches equals 1, weight equals 115, sex equals F.

13   Q    So is this information that would have been inputted by

14   the user?

15   A    It appears to be.

16   Q    Okay.  Ms. Hwang, if we can turn to page 90 -- I'm sorry.

17   98, about halfway down.

18        What do we see here in the search history on

19   10/4/2017 at 1:00 a.m., 1:06:57.

20   A    This is a web history log for Backpage.com.

21        MR. PALACIO:  Turning to page 100, Mr. Rader, if we

22   can start halfway down and sort of just scroll down a little

23   bit.

24   Q    Ms. Hwang, can you tell us what type of information we

25   have from the web history we have for this phone as we scroll

1    down?

2    A    From Quotes.TrueBlueLifeInsurance.com, and continuing,

3    there are additional web history logs from

4    MutualOfOmaha.com/lifeinsurance.  Also

5    MutualOfOmaha.com/lifeinsurance/calculator.

6    Q    We can continue to page 101.

7    A    MutualOfOmaha.com, also AmericanNational.com.

8    Q    And if we can stop right there.

9    A    There's also a history log for LifeHappens.org.

10   Q    Is that for life insurance?

11   A    Yes.  And I see web history logs for

12   AmericanNational.com.

13   Q    Ms. Hwang, if we could turn to page 105.  If we can start

14   towards the top.  What type of web history do you see there on

15   August 25, 2017, at 2:40:40?

16   A    Web history log from Currentbankforeclosures.com.

17   Q    If we could turn to page 106.

18        Ms. Hwang, could you please read these text messages

19   from phone number 347-966-3855?

20   A    Yo Brooklyn girl.  Daddy, it's me, Baby Girl.  This is a

21   text free number.  I'm about to post her.

22   Q    If we could turn to page 434, please.

23        Ms. Hwang, are these text messages between Cory

24   Martin and Adelle Anderson?

25   A    Yes.

1  Q    All right.  Starting at the top on May 27, 2017, at
2  11:31:43, I'll read the message from Cory Martin.
3            I hope you ain't over there showering.
4  A    Hell no.
5  Q    If you could turn to page 411, please, starting at the
6  top and, again, are these text messages between Cory Martin
7  and Adelle Anderson?
8  A    Yes.
9  Q    I'll start on June 9, 2017 at 12:49:57.
10           Call me back as soon as you can.
11 A    Okay.
12 Q    You did something.
13 A    As far as?
14 Q    That is the most foolish selfish thing you have ever done
15 to me.  When you knew I would have fucked with you over any
16 bitch and you're coming into my relationship with my fucking
17 baby.  I would have loved that fucking child to death but
18 whatever, yo, I'll see you later, Adelle.  I feel an emptiness
19 I've never felt before.
20 A    I apologize for my selfish behavior.  I didn't realize
21 how much you wanted one.  Now I feel bad I can't give you and
22 I feel bad we don't have.  But okay.  I understand why you
23 feel the way you do.
24 Q    Bitch, all I ever fucking do is tell you how bad I always
25 wanted a kid.  How the fuck you ain't know.  Kids with you.

1  A    Never did stop yelling at me.  I was busy being a thought

2  and flying high through this thing we call life.  You know

3  that so stop it.

4  Q    Okay.  And that never stopped me from telling you I

5  wanted to breed you.

6  A    I've always been self-absorbed.

7  Q    Whatever.  My time is always off.  My timing is always

8  off.  With me it was just never the right time.

9  A    And I was always insecure.

10  Q    But you was secure enough to have kids with an N-word

11  that has a bunch of baby mothers.  Then when I say bitches

12  have kids with N-words, they feel secure with I'm making it

13  up.

14  A    I apologize.  I don't know what else to say.

15          THE COURT:  I think this is probably a good time to

16  break for lunch so we'll, we'll meet up again at 2:15.

17          Please don't talk about the case at all and don't

18  look anything up but do enjoy your lunch.  I'll see you this

19  afternoon.

20          THE CLERK:  All rise.

21          (Jury exits.)

22          THE COURT:  All right.  Everybody can sit down.

23          The witness can step down.

24          (Witness steps down.)

25          THE COURT:  Just a couple of things.

1      Have you heard from your witness?

2          MS. THIELE:  Not yet, Your Honor, but I've been

3    tracking his flight and he has been here.

4          THE COURT:  Okay.  Good.

5          And do you know how about how much longer you have,

6    Mr. Palacio?

7          MR. PALACIO:  Your Honor, I would say maybe a little

8    over an hour.  I do think we'll be able to finish this witness

9    and continue with the defense witness.

10         THE COURT:  All right.  And I just want to see the

11   parties at the side without the court reporter for just a

12   second.

13         (Discussion off the record.)

14         THE COURT:  All right.  So we'll be back here at

15   2:15.

16         (Luncheon recess.)

17

18

19

20

21

22

23

24

25

1                        AFTERNOON SESSION

2              (In open court; jury not present.)

3              THE COURTROOM DEPUTY:  All rise.

4              THE COURT:  Everybody can sit.

5              MR. PALACIO:  Your Honor, may we approach at the

6    side?

7              THE COURT:  Sure.

8              (Sidebar conference without court reporter.)

9              THE COURT:  All right.  Are we ready for our jury?

10             MS. DEAN:  Yes, Your Honor.

11             THE COURT:  Okay.

12             THE COURTROOM DEPUTY:  All rise.

13             (The jury enters the courtroom.)

14             THE COURTROOM DEPUTY:  You may be seated.

15             THE COURT:  All right.  Everybody, we are ready to

16   resume with the direct examination of the witness?

17             THE COURTROOM DEPUTY:  The witness is reminded she's

18   still under oath.

19             THE WITNESS:  Thank you.

20             MR. PALACIO:  Mr. Rader, could you please pull you

21   up Government's Exhibit 503 and highlight the top portion of

22   that.

23   DIRECT EXAMINATION

24   BY MR. PALACIO:  (Continuing)

25   Q    Ms. Hwang, can you read the date that's highlighted at

1   the top here?

2   A    July 4, 2017.

3   Q    Can you read what follows mechanism of injury comment?

4   A    SP crush injury five days ago.  She stated a ladder fell

5   on her R lower leg.

6         MR. PALACIO:  Mr. Rader, if we could come back to

7   Government's Exhibit 401 on page 322.

8   Q    And Ms. Hwang, I'm going to begin with a text message on

9   July 3rd, 2017 from Cory Martin to the Adelle Anderson phone

10  beginning at 13:45:55.  How's the leg?

11  A    Better.

12  Q    I wish I had an oxy fa you.

13  A    Waiting for the pill to kick in.  I kno me2.  What are

14  you doing?  You good daddy, you okay.

15  Q    Yeah.  That crib making us sick.

16  A    You feel better outside?  Why you say hot.

17  Q    Yeah.  Ten minutes out of that crib.

18  A    Really.  Damn.

19  Q    Bet?

20  A    I love you.  Glad you feel better.  Got to go to the

21  hospital.  This is crazy.  Keeps swelling back up.

22  Q    We will go in the mornin.

23  A    Shake my head.  What are you doing.

24  Q    Finding out about a job.  I think I'm going to go back to

25  work.

1   A    Awwww really daddy.

2   Q    How you feel --

3   A    How you feel about that.

4   Q    Not good but it is what it is.

5   A    I feel you.  So when you coming home.

6   Q    I don't know because I want to shoot da fair wit kris.

7   A    Your sick.  Stop it, so you decide to leave the house and

8   get into mess.  We got enough going on.

9   Q    Nah.  He running his mouth crazy.

10  A    Come on.  Shake my head.  He bugging, but you know I'm

11  home.  I need you daddy.

12  Q    You right but he spreadin gossip.  I ain't feelon dat.

13  A    Okay.  You gotta handle your biz.  Imma take them to the

14  hospital with me so I can check on my leg.  I'll keep you

15  posted.

16           Need raw paper, knee raw papee.  Be careful.  You

17  good baby.

18           MR. PALACIO:  Mr. Rader, if we can go to page 257.

19  If we could start towards the bottom of the page.

20  Q    Ms. Hwang, if you could begin with a text message

21  starting on August 14, 2017 at 18:05:55.

22  A    For months you made me feel like I have no voice,

23  whateva.

24           THE COURT:  I think people can see what that says.

25  Q    I'm sorry.  Ms. Hwang, if you could start on August 4,

1    2017 at 18:05:55, on page 257 beginning with "I will never be

2    enough for you."

3    A    I will never be enough for you.  I'm sorry.

4         I'm not good enough and I been told you that.

5         So you was right.  Everybody was right.  I will eat

6    tonight if need be.  You don't have to stay downstairs you

7    know I'm cray.  Cindy was loyal.  Maybe you should give her a

8    call now.

9    Q    Alex is the other 50 percent of your broken family.

10   He'll definitely take you back.  I'm sure.

11   A    I don't fucking want him or shit to do with him.  He

12   ain't shit to me, so don't you start.  I have no home now.

13   Do.

14   Q    Okay.  I don't want Cindy which I made clear.

15   A    I'll go back to the streets, like I always do.  They

16   always welcome you with open arms.

17        Yeah, well, and he knows how to be a Martin, so

18   you're better off, right.

19   Q    They also don't like being lied to either so keep it up,

20   you won't be on the streets too long.

21   A    Nothing y'all can't work out, right.

22   Q    And Alex had something that is very precious and dear to

23   your heart.  You guys can pick up where you'll left off.

24   You'll probably be better to him now since you learned a

25   little something from me.

1    You can get rid of my baby and keep the one you

2  already have and live happily ever after.

3    This should be easy to do, you did it before,

4  remember.

5  A    Shake my fucking head.  Wow.  Shake my head.  Okay.

6  Q    I told you I don't want that girl.  You keep bringing her

7  up.  I chose you over her years ago.  You declined my fuckin

8  offer back then.  Later in life I came at you again.  You

9  declined again.  You didn't choose the street.  You didn't

10  choose to be single.  You chose Alex.  So don't bring up none

11  of the bitches that I ever was with cuz if you wasn't so busy

12  playing yourself there would have been no tea there, would

13  have been no Z.

14    MR. PALACIO:  Mr. Rader, if we can go to page 251.

15  Q    Beginning with a text message on August 15, 2017 at

16  18:24:38.

17    I hope my baby drives you fucking crazy.  I hope my

18  baby takes whatever brain you got left and you dropping

19  another one early 2019.  Good you pull up your leggings down.

20  And if you ever try to go on birth control, I will hurt you.

21    Ms. Hwang --

22    MR. PALACIO:  Mr. Rader, if you can turn to page

23  501.

24  Q    Ms. Hwang, are these text messages between Cory Martin

25  and the Brandy phone number ending in 7923?

1  A    Yes.

2  Q    If you could start from a text message towards the bottom

3  on June 11, 2017 at 23:16:28.

4  A    Daddy these bitches is hating, lol.

5  Q    That mean you doing the right thing.  How much you made

6  so far?

7  A    I believe 80 so far.

8  Q    Good, baby girl.  That's my bitch and it's still early.

9  A    Yeah, I'm getting it.

10  Q    Get 'em girl.

11  A    Soon about to leave, daddy.

12        Daddy, I'm getting ready to leave.

13        Daddy, I'm coming home.

14        I found this phone, do you know where she's to give

15  it back.

16        MR. PALACIO:  We can end there.

17        Turning to page 486.

18  Q    Ms. Hwang, if you can begin with a text message on August

19  3, 2017 at 2:54:03.

20  A    Someone tip 10 TKNS and a couple of 1s.

21        Thanks daddy.  You're the best.  We have 569 tokens.

22  Q    So like 13.  We're goin' for the thousand.

23  A    Yeah me dancing while I'm looking at the camera.

24  Q    Yes.  You gotta work da camera.  The camera is ya trick

25  right now.

1   A    I realize I gotta get my likes up.  The camera is you.

2   Q    Thanks.  We workin get dem token girl.

3   A    Lol.  That right.  Yeah.  I'm hot as fuck.

4   Q    I'm sure you lookin crazy in a good way.

5   A    Yeah, you gotta cool off.

6   Q    If you mean, you goin ham.  You posed to b sweatin.

7   A    Nah, daddy.  I'm calling it a night.  You don't up around

8   the same time.  Plus I'm upstairs.

9        MR. PALACIO:  Mr. Rader, if we can turn to page 468.

10  Q    Ms. Hwang, if you can begin with a text message from the

11  Brandy number on October 2, 2017 at 8:53:59.

12  A    Morning, daddy.  Just checking up on you.

13  Q    What's up.  GM.  How you?

14  A    Good.  Another day, another dollar.

15  Q    Facts.  Only make that $$$ sign.  Girl.

16       MR. PALACIO:  Mr. Rader, if you can turn to page

17  527.

18  Q    Ms. Hwang, can you tell us who these text messages are

19  between?

20  A    Between the device Caesar and the party identified as

21  Samson 2.

22  Q    If you can begin reading a text on July 18, 2017 at

23  12:51:54 from the Samson phone.

24  A    Yoow brody.  You still making that move to BK today?

25  Q    My bad bro I cant even make dat move my g.

1   A    Ite.  It's all good bro.  Yo.  What you fucking with,
2   bro.
3   Q    What's good, bro.  I was knocked out.
4   A    Yo, what's good, bro.  You good.
5   Q    Om str8 my g.  Everything good with you my G.
6   A    Yeah, bro, just cooling and seeing how you doing that's
7   all my n word.
8   Q    Wat you dealin wit tomorrow N word, probably link up.
9   A    Shit.  I'm in BK now, thinking about going back to the
10  crib and shit.
11  Q    Just let me know bro because I ain't dealing with shit.
12  A    Bet.  Got you bro.
13  Q    Yo -- sorry.
14  A    Two days later.
15          Yo, what's good my G.
16          Just seeing what's good with you.  How you been my
17  "N" word.
18  Q    Yooo, you good my G.
19  A    Yeah, my G.
20  Q    So just checking in what you dealing with.
21  A    Shit bro.  Just cooling.  Seeing how you doing.  That's
22  all my G.
23  Q    I might have a play for N word ez work in a few months,
24  talkin like 25K.
25  A    Oh, word, bro, I'm with it.

1  Q    Whateva.  N words link, I'll put you on to the scheme.  I

2  ain't 100 percent sure yet, but it looks like it's going to go

3  thru.  Dat shit will definitely put "N" words on dey feet.

4  A    Bet out by you, bet, word need that.

5  Q    Beauty of it, it's anywhere move as long as it's done

6  properly.

7        MR. PALACIO:  Mr. Rader, if you could turn to page

8  535, please.

9  Q    Ms. Hwang, was this a photo that was on this device?

10 A    It was.

11       MR. PALACIO:  And now, turning to page 538, if we

12 could put that side by side with page 539.

13 Q    Ms. Hwang, what do we see on the left-hand side?

14 A    That is the metadata associated with the photo that we

15 see on the right-hand side.

16 Q    Is that photo on the right-hand side, is that a screen

17 shot?

18 A    It appears to be, yes.

19       MR. PALACIO:  I'm sorry, if we could go back to the

20 metadata.

21 Q    What is the time that was created?

22 A    The created time is June 10, 2017 at 8:43.

23       MR. PALACIO:  And now if we could go to -- just the

24 top portion.

25 Q    What URL do we see at the top?

1  A    Bluelifeinsurance.com.

2  Q    And the time in the top right-hand corner, is that the

3  same as the time on the capture time?

4  A    The time that we see in the photo is 8:42 p.m.

5       MR. PALACIO:  Pull up pages 540 and 541 together.

6  Q    Ms. Hwang, what do we see on the left-hand side?

7  A    The metadata that's associated with the photo on the

8  right-hand side.

9       MR. PALACIO:  Let's take a take a look at the photo

10 on the right-hand side.

11 Q    What do we see in that photo?

12 A    It is a post of a TD Bank card.

13 Q    What's the name of the accountholder?

14 A    The name on the card is Brandy Odom.

15      MR. PALACIO:  If you could turn to page 549, just

16 the top portion.

17 Q    What is this section of the phone extraction, Ms. Hwang?

18 A    This is the e-mail's category.

19 Q    Who is this e-mail from?

20 A    Bob Young, Bob@truebluelifeinsurance.com.

21 Q    When was that message sent?

22 A    December 8, 2017.

23 Q    Who was that message sent to?

24 A    Wayne11422@gmail.com.

25 Q    What is the subject?

1  A    Your application for life insurance from American

2  National Life Insurance Company of New York.

3  Q    Could you read the body of the text?

4  A    Hi, Corey.

5        Thank you for requesting a life insurance policy

6  with American National Life Insurance Company of New York.

7  We'll need to have a brief call to answer questions and

8  complete your application.

9        Please call me direct at (480) 582-1574 or click on

10 the blue quote box appointment button below to schedule a time

11 for me to call you.

12       Sincerely, Bob.

13       MR. PALACIO:  Turning to page 552.

14 Q    Again, Ms. Hwang, can you tell us who this e-mail is from

15 and who it is to?

16 A    From truebluelifeinsuranceinfo@truebluelifeinsurance.com

17 to wayne11422@gmail.com.

18 Q    Can you read the language in blue at the top?

19 A    We have received your application.

20 Q    And how much -- what's the amount that you see at the

21 bottom?

22 A    $250,000 coverage amount.

23       MR. PALACIO:  Can we turn to page 553.

24 Q    Ms. Hwang, is this part of the same e-mail?

25 A    It is.

1       MR. PALACIO:  If we can turn to page 554.

2   Q   Ms. Hwang, can you read the name in the name field?

3   A   Cory Martin.

4   Q   And the phone number?

5   A   (347) 729-4723.

6   Q   Is the e-mail the same Wayne Gmail that we saw earlier?

7   A   It is.

8   Q   And is this part of that same e-mail that we have been

9   reading?

10  A   It is.

11      MR. PALACIO:  Mr. Rader, if we can turn to page 556.

12  Q   Ms. Hwang, can you tell us who this e-mail is from and

13  to?

14  A   From Brittany at Haven Life, news@havenlife.com to

15  wayne11422@gmail.com.

16  Q   And when was this e-mail sent?

17  A   November 30, 2017.

18      MR. PALACIO:  Mr. Rader, if you can focus in on the

19  body of the e-mail.

20  Q   Ms. Hwang, can you read what it says below that

21  photograph?

22  A   How to make sure your children appreciate everything.

23      MR. PALACIO:  Mr. Rader, if you turn to page 565.

24  Q   Ms. Hwang, can you tell us who this e-mail is from and

25  who it is to?

1  A    Haven Life help at haven life.com to

2  wayne11422@gmail.com.

3  Q    When was this e-mail sent?

4  A    May 5, 2017.

5        MR. PALACIO:  Mr. Rader, if you can just zoom in on

6  the body turning to page 576.  Actually, if we can go first to

7  the top of 574.

8  Q    Ms. Hwang, can you tell us what this portion of the

9  extraction is?

10  A    This is the cookies category.

11  Q    What are cookies?

12  A    Cookies are files that are saved on electronic devices,

13  so that can be phones, laptops, or tablets.  And it is saved

14  on a device when a user accesses a website and those files can

15  contain information related to the user's activity on a

16  website or settings or references and more.

17        MR. PALACIO:  Now, if you could turn to page 576

18  towards the top.

19  Q    Ms. Hwang, do you see a cookie entry on November 13, 2017

20  at 23:50?

21  A    I do.

22        MR. PALACIO:  Mr. Rader, if you could highlight

23  that.

24  Q    Where is that from?

25  A    Termlifetogo.com.

1  Q     And what do we see to the right of that, two columns down
2  to the right of that?
3  A     Global Life Insurance reviews pros and cons.
4        MR. PALACIO:  Mr. Rader, if we can pull up
5  Government's Exhibit 407, please.  And if we could highlight
6  the row, the GX 404 for me.
7  Q     Ms. Hwang, for Government's Exhibit 404, can you tell us
8  the name of the device user and the phone number associated
9  with that phone?
10 A     The user associated with the device is Adelle Anderson,
11 phone number associated with the device is (718) 600-1072.
12 Q     What type of device is that?
13 A     It is an LG Tribute device.
14       MR. PALACIO:  Okay.  If we can go to Government's
15 Exhibit 404.  Just to the bottom.
16 Q     Ms. Hwang, do you see that same 1072 phone number?
17 A     I do.
18       MR. PALACIO:  Mr. Rader, if we can go to page 16.
19 Q     Ms. Hwang, can you tell us who the contact is under
20 number three?
21 A     BB trap selfie.
22 Q     And what's the phone number associated with that contact?
23 A     (347) 564-7923.
24       MR. PALACIO:  Mr. Rader, if you can go to page 48.
25 Q     Ms. Hwang, can you give us the name of that contact and

1   the phone number for that contact?

2   A    Zaddy, phone number (347) 729-4723.

3        MR. PALACIO:  Mr. Rader, if we can go to page 128.

4   Q    Ms. Hwang, can you tell us who the parties are to this

5   text thread?

6   A    Between phone numbers 1072 and 7923.

7   Q    The 1072 number, is that the number for Adelle Anderson?

8   A    It is.

9   Q    And the other one, the BB trap selfie, is that a number

10  associated with Brandy Odom?

11  A    Yes.

12  Q    Which ones -- when we see green and when we see gray, who

13  is which party?

14  A    The green messages on the right-hand side are the

15  outgoing messages and the messages on the left-hand side are

16  incoming.

17  Q    Is it fair to say that the green ones would be sent from

18  the Adelle Anderson phone?

19  A    Yes.

20  Q    I'll read the messages from Adelle Anderson and if you

21  can read the phone messages associated with Brandy Odom,

22  starting at the top of 128.

23        Take good care of him lol, don't forget, you went by

24  fonz.  I need help.  I'm sick.  Makeup and sexy outfit on and

25  put on shorts?

1  A    Doing makeup.  Don't see him.

2  Q    Go to door 417.  He looking on block for you, WRU.

3        Do you know what that means?

4  A    Where are you.

5  Q    He on block for you.  Where are you on the block?  By

6  where?  Where you at on block?

7  A    With him.  I'm with a date, brb.

8  Q    Get ready.  He still wanna come for BJ?

9  A    No BBJ.

10 Q    He be here around 8:30 so chill out.  He text when he

11 close.

12       Yeah, you was right he wanna BBJ.  He be willing to

13 pay 80, and I told him make sure it's clean and he bath he on

14 his way to work.

15       MR. PALACIO:  If we can skip ahead to page 132, at

16 the bottom, line 6.

17 Q    Jean on his way.  Get ready.  Jean on the way.  Makeup,

18 lip gloss, new outfit.

19       Next date coming in 20.

20       Yo, yooooo.

21 A    We just got off the exit.

22 Q    How long until you reach?

23 A    We right.  It's going good.  No dates came, but we got

24 some book this week.

25 Q    Okay.  Michael White bald "N" word coming back on his way

1  in 20.

2  A    Okay.  I'm already dress.

3  Q    Toast, toast, plz with butter.  Call daddy.  I'm sick

4  boo.  That's why people hate.

5  A    Yeah, that what people do hate but that won't break us

6  that going to make us stronger, on strip chat, yeah earlier.

7  Tell him to come out.

8  Q    You ready to go back on cuz you still up there, go back

9  on and get crazy don't waste time anyway let's get him.

10  A    I was fixing your wig.

11  Q    Okay.  You can do that but you don't gotta do a lot.

12  A    Cumming fixing myself up.

13  Q    Imma dye my hair until you done working and it's time for

14  you to take a break.

15          Ms. Hwang, if you can go to page 146, and starting

16  on line 3, I will begin with a message from the Adelle

17  Anderson on August 31, 2017 at 10:12:27.

18          Get dressed.  Papi in Freeport wants you now.  Get

19  dressed.  How close?

20  A    Nine minutes away.

21  Q    He rushin' you of course.

22  A    Getting off the highway.

23  Q    Jimmy white boy coming in 20.  Where you at?

24  A    On the highway.

25  Q    Eric coming at 110.  10:00 a.m. Eric.

1          Jeff coming.

2          You back up.  Txt bongo.  Get ready to goooo online.

3  A    The computer still say no internet connection.

4  Q    Need pics.  Let's gooo, let gooo.  No more ok I'm good.

5          White boy.

6          Get ready.

7          Date on way.

8          Get ready.

9  A    Yeah, it's coming along.  I'm starting to get to the

10 internet word.

11 Q    Good girl.  Love you.  You sexy bitch you.  Keep it up.

12 Ok.

13         You want anything from outside.

14         Look sexy he might.

15         WTA.

16 A    Five minutes away, Brookville and Francis Lewis.

17 Q    Where he at.

18         Send me some sexy selfies.

19         Nice face pics.

20         With a smile.

21         With bra no clothes.

22         Orange shirt?

23         Cory on his way.  He is on his way, 330?

24 A    Okay.

25 Q    Do your job.  Do ya job well, ok?

1      MR. PALACIO:  Ms. Hwang, if we can turn to page 174.

2  Q    I'm starting at the top with a message from Adelle

3  Anderson on 10/13/2017 at 2:00 p.m. 09.

4           Make sure you do whatever the hell he wants.

5           Make him happy do whatever he wants.

6  A    I'm up texting G.

7  Q    Ok what that gotta do with you getting ready.

8           Date at 4.

9           Keep eye one time.

10  A    I'm back on Chaturbate.

11  Q    How?

12  A    I send the pics of myself and ID.

13  Q    Good bring computer let me see.

14           Hows it going?

15  A    Good.

16           I did 2 PVT on on Chaturbate one earlier one bonga.

17  Q    Good keep posting when you can?

18  A    Okay.

19  Q    Brb.

20           You got batteries ya toy right?

21  A    Okay yeah I have batteries.

22           You have the white phone.

23  Q    Yea prince do.

24  A    Can I get a shot.

25  Q    Date on da way.

1    A    Okay.  Getting ready.

2    Q    Make sure you tweet that you are online.

3    A    I posted a tweet.

4    Q    Good.  My mom said hi.

5    A    Yeah that's on me.  I'm on all three tell her I said

6    hello.

7    Q    Will be back.

8    A    Okay boo.  Posting on Twitter and looking for clubs.

9    Q    Clubs for what.

10        Don't do that.  It's over.  You always fucking up

11   with the clubs.  So it's over.

12   A    I'm online twerking.  It's good a lil slow my regulars

13   not on today.

14        The computer froze again.

15   Q    Bring it.

16        Eric.

17        Wanna come by.

18        Get ready just in case.

19        Wyd.

20        Come in 20.

21   A    Getting ready.

22   Q    Go to door.

23        Come for a sec please.

24   A    Its good boo okay.

25   Q    He coming.

1    Tell him you gone come to him.

2    Tell him you coming to him.

3    A    He wasn't home.  I told him what I needed.

4    MR. PALACIO:  Ms. Hwang, if you can turn to page

5    274.

6    Q    And I'm going to start at the top with the message -- I'm

7    sorry.  Before I begin, who are these sets of messages with?

8    A    Between the phone numbers associated with Adelle Anderson

9    and Cory Martin.

10   Q    Beginning at the top from August 23, 2017.

11   GM up?

12   A    Not really.  Fuckin thot.

13   Q    Ya fuckin wife "N" word.

14   A    I know my wife is an fuckin whore you fuckin slut.

15   Q    I'm sorry, Mr. Hang.  From here going forward I'll read

16   the Cory Martin text messages and if you could read the Adelle

17   Anderson ones.

18   On page 342.  If you could begin with an outgoing

19   message from Adelle Anderson on November 12, 2017 at 5:27:56.

20   A    I love you so much.  I appreciate everything you do for

21   me.  I see the toll it takes on you and I'm so sorry.  Imma

22   get better soon.

23   I don't know how you love a piece of shit like me,

24   I'm always fuckin up and I been fuckin up.

25   Sorry I'm a dumb bitch.

1    Even tho I know you'll never love me like before.

2  Youll try my best to do better.

3  Q    Ya love for yourself and every situation you ever created

4  or 50 percent wanted to be a part of is what fucks us up.

5    You don't know how to give a fuck about nothing but

6  yourself and your children at least I know no matter what my

7  daughter will be okay.

8    MR. PALACIO:  If we're going to mark as turn to page

9  351.

10  Q    Beginning at the top, on November 7, 2017, at 4:19:31.

11  A    But fuck it.  T least to be on time.  Tryna make it a

12  good habit.

13    I just wanna make sure I do the right for us at this

14  point.

15    But I don't wanna keep putting you thru this sorry I

16  hurt you and imma piece of shit daddy.

17    I want you to heal in a way that's healthy and good

18  4hh.

19    Hello?

20    You heard me.

21  Q    NI what's wrong wit ya phone.

22  A    I'm not sure I wanna come back.

23    You need ya space.

24    I'm tryin.  I'm tryna try.

25    Daddy please.

1    I don't know why but I'm trying daddy.

2  Q   Ms. Hwang, if you can turn page 380, if you could start

3  with a message at the top on November 15, 2017.

4  A   Today again please stop daddy.  This love is pain.

5  Q   Why do you refuse to answer the phone?

6  A   Don't want to talk.  This is all to much for me.  Never

7  thought we would get here.

8  Q   Come home please.

9        I need you to come home.

10       I'm telling you it's urgent.

11       Where are you.

12       Adelle please.

13       I'm fucking begging you to talk to me.  I'm telling

14  you I need you and you can't even pick up the phone.  I want

15  to talk to you.  Please stop.  Come home.

16       I'm sorry.  Yo I love you I'm telling you I need you

17  and you can't even respond.

18       We all make mistakes I'm sorry but I need you right

19  now and you ignore me when I'm saying I seriously need you.

20  A   Need me how.

21       I made 2much mistakes.  You cant 4give me -- you

22  cant 4give me 4, and im sorry.  Im so mad we even going thru

23  this.  B4 we have our babygirl.

24  Q   Im mad -- im mad to u think it makes me feel good?  No, I

25  hate feeling like this.

1          Adelle, please I need u to come home.  Im fuckin

2     beggin u please.

3          How we go from ill see you tomorrow till im never

4     coming back?

5     A    Knowing I already did 2much and u dont love me da same no

6     more.  I didn't sleep good.  Our relationship toxic.

7     Q    I do love u the same way im just hurt and its hard.....

8     im sorry i made you feel that way.  U really dont care that im

9     beggin you, im tellin you its serious delle i really fuckin

10    need u to come check me im not fuckin around please.

11         I totally understand that ur done with me... and it

12    doesnt make fee feel good... but i really fuckin need at the

13    moment can u come to the house please im fuckin beggin u.

14         Where r u at?

15         Can u please not do this right now of all times not

16    right now Adelle please.  Yo, u dont understand.

17         Nobody bringin u nowhere to fight none of that.  I

18    really fuckin need u.

19         Hello Adelle, wtf.  Yo, i never begged u fa nuttin

20    b4.  Its not a game.  Where r u?  I fuckin need u.  I been

21    tellin u this since last night.

22         U really ignorin me wen im tellin u its somethin

23    serious?  U really gonna ignore me wen im beggin u?..... do u

24    even care?

25         Im tellin u i need u and u can barely respond and u

1   dont even care to find out why im askin u.  Its us serious.

2   Can u please stop ignoring me?

3   A    Im not ignoring u.

4   Q    Yo, can u not leave me hangin like this right now?  This

5   is a very serious thing.  Yo, i need u to answer ya phone.

6            Im tellin u I need u.

7            U really shittin on me.  Hopefully u come.

8            Im depending on u.  Please dont play me on this one.

9   A    Ok daddy.

10  Q    U really doin this after I told u and made it clear im

11  depending on u to b here and now u doin this again.

12           I dont believe u really doin this to me.

13  A    I can come to u, but im not talkin in that house.

14  Q    Whatever, i jus need u to come.

15           Damn, I was really depending on you.  I told u i

16  needed u and u really did this....iight man, fuck it.

17  A    The next day on November 16, 2017.

18           Tomorrow is another day we try again.

19           U ok daddy.

20  Q    Im good boo.

21  A    I love u baby.  I feel so much better talkin 2u.

22           MR. PALACIO:  Mr. Rader, if you can pull up pages

23  416 and 417 together.

24  Q    Ms. Hwang, what do we see on the left-hand side?

25  A    A thumbnail of the photo and the metadata that's

1   associated with the photo on the right.

2   Q    When was this photo created?

3   A    September 18, 2017.

4           MR. PALACIO:  Let's turn to the right-hand side.

5   Yes.  Just the top portion, Mr. Rader.

6   Q    On the top left-hand corner, what's the name of this

7   entity that we see here?

8   A    BC Media Group.

9   Q    And in that box of information, do you see a name right

10  above "address"?

11  A    I do.

12  Q    What is that?

13  A    Brandy K. Odom.

14  Q    What's the address for Brandy K. Odom listed there?

15  A    2945 148th Road.

16  Q    Below that, what do you see next on the next two lines?

17  A    Payment by direct deposit.  Payout to Brandy K. Odom.

18  Q    What is the phone number that you see there?

19  A    (718) 600-1072.

20  Q    And the next line below, next to "bank name," what do you

21  see?

22  A    Capital One Bank.

23  Q    And at the bottom next to "account number," what account

24  number do we see?

25           If you could just give us the last three digits,

1    it's fine.

2    A    Ending in 093.

3    Q    And at the very bottom, "total to pay," what sum do you

4    see there?

5    A    $86.34.

6         MR. PALACIO:  Mr. Rader, if we can pull up

7    Government's Exhibit 407 and the last line for GX-405, Ms. Hwang,

8    can you tell us what the phone number and the user is

9    associated with this device.

10   A    The phone number associated with the device is

11   (347) 729-4723.  The user associated with the device is Cory

12   Martin.

13   Q    What type of device is this?

14   A    This is a Samsung Galaxy device.

15        MR. PALACIO:  Mr. Rader, if we could come back to

16   405, into page 2 on line one.

17   Q    What is the e-mail that you see associated with this

18   account, this phone?

19   A    The e-mail is wayne11422@gmail.com.

20        MR. PALACIO:  Mr. Rader, if we could go to page 3,

21   line 9.  Actually, line 7, 7 to 9.

22   Q    Can you give us the contacts on line 7 and 9 and their

23   respective numbers?

24   A    Row 7, Baby Girl, phone number (718) 600-1072.  Line 9,

25   Brandy, phone number (516) 309-7437.

1    MR. PALACIO:  Going to page 4, line 19.

2  Q    Can you give us the name of the contact and the phone

3  number?

4  A    John, phone number (240) 483-5027.

5  Q    Now, on line 7.

6  A    Samson.  There are two phone numbers.  Home number is

7  (347) 455-9144.  The mobile number is (347) 836-2274.

8    MR. PALACIO:  Ms. Hwang, I would like to turn to the

9  web history for this device on page 30, starting on line 13.

10    I'm sorry, if we could start on line 2 and then

11  scroll down.

12  Q    Ms. Hwang, what do you see on the web history on line 2

13  on April 6, 2018 at 2:03:28 p.m., UTC-4?

14  A    A web history log for craigslist.com.

15  Q    And as we scroll down, can you tell us what type of web

16  history we see?

17  A    Newyork.craigslist.org.

18  Q    On line 6, what do you see there?

19  A    Based on the URL, what we see on the left-hand column

20  there appears to have been a search on Craigslist for the

21  search terms "junk removal."

22  Q    On line 13, can you tell us?

23  A    The same.

24  Q    As we scroll down, as we make our way down to lines 24

25  and 25, what do you see there?

1  A    24 is the same as well.  And then 25 it appears to have
2  been another web page within newyork.craigslist.org, and the
3  title is "Demolition and garbage removal junk services, scrap
4  metal, moving serv - labor/hauling/moving.
5  Q    Now, at the top of page 31, what do you see here in this
6  phone's web history starting on April 6, 2018 at 4:33:47 p.m.?
7  A    The web history log for homedepot.com.
8  Q    Now, going down to lines 32 to 38, can you describe that
9  web history for us?
10          So, beginning on April 6, 2018, 4:34:36 p.m.
11 A    From line 33 through 38 they appear to be continued web
12 history logs from homedepot.com with saws, power tools,
13 portable band saws, reciprocating saws, and DeWalt 12-amp
14 corded reciprocating saw.
15 Q    What do you see on line 38?
16 A    In the URL or title?
17 Q    In the URL.
18 A    The homedepot.com/p/reviews/DEWALT-DWE305-12-Amp-
19 Corded_Reciprocating-Saw -- a series of numbers -- and sort
20 most helpful reviews ratings.
21          (Continued on next page.)
22
23
24
25

1  BY MR. PALACIO: (Continuing.)

2  Q    Is this consistent with the user looking at the reviews

3  and ratings for a 12-amp corded reciprocating saw?

4  A    Based on the URL, it appears to be.

5  Q    And is that the same thing that we see on line 29 -- I'm

6  sorry, 39?

7  A    Yes.

8  Q    Ms. Hwang, when you looked at these particular -- this

9  particular web history, was there a screenshot also captured

10  at or around the time of these searches?

11  A    There was.

12       MR. PALACIO:  Mr. Rader, if you could pull up Pages

13  445 and 446 together.

14  Q    Ms. Hwang, can you tell us what the created time for this

15  screenshot was?

16  A    April 6th, 2018, at 4:39:48 p.m.

17       MR. PALACIO:  And if we could look at the photo on

18  the right.

19  Q    Ms. Hwang, can you just read out what you see on the top

20  portion?

21  A    The price that we see?

22  Q    Yes.

23  A    $99 each.

24  Q    And is this from Home Depot?

25  A    The following two lines, there's a reference to Home

1   Depot.

2          MR. PALACIO:  You can take that down.

3          All right, Ms. Hwang -- and Mr. Rader, if we could

4   go to Page 35, lines 102 to 108.

5   Q   Ms. Hwang, can you tell us what type of web history we

6   see here between lines 102 and 108?

7   A   From row 102, based on the URL, the user accessed search

8   results for the search terms, breaking news NYC today.  These

9   are accessed web page ABC7NY.com.  The user accessed the web

10  page continuing on ABC7NY.com with the title, search area

11  expands after dismembered body found in Canarsie Park in

12  Brooklyn.

13         And then there are continued ABC7NY.com.

14  Q   Were those between about 2:51 p.m. and 3:25 p.m. on

15  April 10th?

16  A   Yes.

17         MR. PALACIO:  Turning now to Page 38.  Just starting

18  at the top.  And slowly scrolling our way down.

19  Q   Again, can you describe the web history you see on

20  April 10th at about five -- beginning at about 5:20 p.m. until

21  6:53 p.m.?

22  A   The user access search results for the search terms ABC

23  Live.  The user accessed search results for the search terms,

24  Eyewitness News the user accessed the web page ABC7NY.com

25  News, and then the user accessed the web page Twitter.com.  It

1   looks like within the web page -- it was a title with

2   Eyewitness News on Twitter.  Person walking dog discover

3   remains of woman in Brooklyn park.

4           And then continuing down on the same page, the user

5   access search results for the search terms, Eyewitness News

6   and ABC Live.

7           MR. PALACIO:  All right.  If we could turn to Page

8   40, lines 34 and 35.

9           Before we go there, actually, Mr. Rader...

10  Q    What part of the extraction report are we looking at

11  here?

12  A    This is the search items category.

13          MR. PALACIO:  Now we can go to lines 34 and 35.

14  Q    And can you give us the title of the searched item and

15  the date and time for those searches, starting with 34?

16  A    Both searches are from April 6th, 2018, at 7:15:32 p.m.

17  There is a search terms for how to insert blade for

18  reciprocating saw.  At 7:28 p.m. there are search terms for

19  using reciprocating saw, and both sources for both searches

20  are from YouTube.

21          THE COURT:  Can you remind us what the red yes means

22  at the end of the line.

23          THE WITNESS:  If we reference back to Page 39, the

24  column header it says, deleted.  So if it says yes, it would

25  mean that those artifacts have been marked for deletion.

1    THE COURT:  Oh, okay.  Thanks.

2    MR. PALACIO:  And now looking at Page 42, line 110.

3  Q    Can you tell us what was searched there?

4  A    Line 110?

5  Q    Yes.  And the date and time, please.

6  A    On April 11th, 2018, at 5:58:51 p.m., there are search

7  terms for exclusive interview of mother of girl found in park,

8  and the source is YouTube.

9  Q    And was that a deleted search?

10  A    It appears to be, yes.

11  Q    Ms. Hwang, I'm turning now to text messages on Page 52.

12       And can you tell us who these messages are between?

13  A    The messages are between the user of the device and the

14  phone number ending in 1072.

15  Q    And that's the number associated with Adelle Anderson?

16  A    Yes.

17  Q    Ms. Hwang, I'll begin reading an outgoing message from

18  Cory Martin on November 21st, 2017, at 12:55.

19       You was my hoe by job but you was never no bottom

20  bitch.  You was always my baby girl.  I always loved you.  I'm

21  so proud of you babe.  You put in the work.  We might have

22  went through shut, but I'll never take that away from you.

23  The baddest bitch award definitely goes to you.  You earned

24  that.  That's why I said you're done you paid its dues.  I

25  just want to say it was an honor and pleasure babe.

1  A    Three emojis.  Your words mean a lot to me.  Wow daddy

2  you have my blushing.  I thank you for seeing that.  Good to

3  know it's not going unnoticed.  And I want to keep putting in

4  work for us and our family.  I wouldn't change doing it with

5  you for nothing.

6  Q    You trusted me when I said Delle, let me pimp you.  I

7  won't mistreat you.  Let's just get this money.  I promise.

8  And you came.  That meant the world to me.  And now you

9  bringing a baby girl into the world.  Fucking love you and

10 adore you.  Can't wait to see my girls together.

11 A    Yes.  With -- and then several emojis.

12      I get up and go to work every day for us daddy.  I

13 love you is will do anything to make sure we good.

14 Q    And I'm willing to do the same.  I love you.

15      MR. PALACIO:  Mr. Rader, if we can go to Page 94.

16 Q    Okay.  And I'll begin with the text message from Cory

17 Martin on November 27, 2017 at 12:17.

18      I hope you smell as good as you look.

19 A    LOL.  Me too.  I should.

20 Q    Should?  You walk around with it.  You should know.

21 A    LOL.  I ain't smelling so raw these days.

22      What are you doing?  Bob is done.  I'm on my way

23 home.

24 Q    You not smelling?  What?  I'm going to need to you get it

25 together.

1    Ms. Hwang in your review of these devices, were

2  there additional references to not showering?

3  A    There was.

4         MR. PALACIO:  If we could turn to Page 110.

5  Q    And if you could begin with a message at 12 -- on

6  12/2/2017 at 1:05 p.m.

7  A    I'm sorry, can you repeat the time again?

8  Q    Sure.  December 2nd, 2017, at 1:05:34.

9  A    Insurance place closed today.  The policy is no longer

10  going to be active if I don't try and do something with that

11  bitch this week.  You.

12         Send a pick of Cap One, please.

13  Q    Now, Ms. Hwang, did you review to see if there was a

14  photograph that was received in connection with this text

15  thread?

16  A    There were MMS messages that followed this text message.

17  Q    What is an MMS message?

18  A    MMS stands for multimedia message messaging service.

19  It's essentially a text message with multimedia content such

20  as photos or videos.

21         MR. PALACIO:  Mr. Rader, if we can go to Page 428,

22  lines two and three.  And if you could place Page 31 next to

23  that.

24  Q    All right.  Ms. Hwang, what can you tell us about who

25  this message was sent from and what metadata we see here?

1  A    Both messages are outgoing messages to the 1072 number

2  associated with Adelle Anderson and the timestamps are

3  December 2nd, 2017, at 2:06:41 p.m.

4       MR. PALACIO:  Mr. Rader, if we could look at that

5  picture on the right-hand side.

6  Q    Can you read the last four digits of that, what you see

7  on that picture?

8  A    The last four digits of the card are 6969.

9  Q    And who does that card belong to?

10 A    The name on the card is Brandy K. Odom.

11      MR. PALACIO:  Mr. Rader, if we could go to Page 122.

12 Q    Ms. Hwang, if you could begin reading a text message from

13 the Adelle Anderson December 7, 2017, at 1:52:31?

14 A    Imma start getting my shit together, so you don't have to

15 worry about me because I'm a burning Cory.  I'm sorry.

16 Q    Don't be.

17 A    Don't be what?  I'm just letting you know because I know

18 we no longer have a future together.  So you don't want to be

19 with me, then you don't have to be.

20 Q    Sorry.  Apologies.  Mean, I want you forgive me and I

21 won't do nothing else to hurt you.  You continue to cause me

22 pain so don't be sorry.  Your sorry is empty.

23 A    Understand.  You right.

24 Q    You care about your son.  That's the only person that

25 matters to you.

1 A    I understand.  And when he knows the piece of shit that I

2 am will change also.  So you right.

3 Q    You canceled the appointment -- the APPT.  I didn't

4 fucking tell you to do that after you said I'll do whatever it

5 takes to fix it.

6 A    Yeah.  It don't make no sense coming all the way to

7 Brooklyn to have a kid I can have in Queens.  I was doing too

8 much any ways.  I don't need a water birth.  I'm not going to

9 drag you through this preg with me.  Let's just get through

10 these next two months as best as we can and I'll stay out your

11 way in the meantime.

12 Q    Whatever bitch.  Just continue your selfish ass ways.

13 I'm good.  SMD.

14 A    I don't want to but you don't want me Cory so why even go

15 through all the extra shit?  I'm accepting what I did.

16 Q    Bye.  I'll see you later.

17 A    Hopefully.

18       I'm really contemplating drinking a lethal dose of

19 something.  It's tied between VISINE® and antifreeze.

20 Q    I'm not surprised.  That what selfish people do.  Fuck

21 the baby.  It's a girl any way.  You like boys.

22 A    I want my baby.  I just hate myself and I don't want to

23 be a piece of shit mom which is what I'm clearly going to be

24 because I can't raise no girl.  I have nothing good to teach

25 or show her.  She's better off with you.  But you're not

1  minding no child you don't want nothing to do with.

2  Q    Well idiot if you drink poison, it kills the both of

3  y'all.  She won't be with me or you shell be dead.

4        MR. PALACIO:  Mr. Rader, if you can turn to Page

5  142.

6  Q    And Ms. Hwang, if you could read two text messages on

7  12/9 -- starting on 12/9/2017 at 2:07:30 and the one below it.

8  A    Take pic of Cap One card PLZ.  It deleted out of my

9  phone.

10 Q    And was there also a MMS message associated with this

11 text thread?

12 A    There was.

13       MR. PALACIO:  Mr. Rader if you could pull up Page

14 428, lines four and five, next to Page 31.

15 Q    Okay.  Ms. Hwang, is this a photo sent from Cory Martin

16 to Adelle Anderson?

17 A    Yes.  Both are outgoing.

18 Q    What's the date of this?

19 A    2:08:02 p.m. and 2:08:03 p.m. on December 9th, 2017.

20       MR. PALACIO:  And Mr. Rader, on the left-hand side.

21 Q    Is this the same card that we saw a little earlier?

22 A    It is.

23       MR. PALACIO:  Now turning to Page 146.

24 Q    Ms. Hwang, if you could -- I'll begin with a message at

25 the top.  On 12/10/2017 at 12:45:46.

1       It's just when I tell you I want you doing certain

2  things and trying to control you and I don't want you to have

3  a life I'm trying to look at out for you.  I'm being

4  overbearing and crazy.  I don't know what to do so F it I just

5  won't do nothing at all.

6       It's not overbearing when it's weird motherfucker

7  standing in the lobby and what you are you talking about.

8       Well I need to know that you go with my own two eyes

9  because you don't do a good job at calling me when you get

10  places son.

11       I told you text me or call me when you got by your

12  mother crib the other day.  You never called.  You forgot

13  about that.

14  A    It's not controlling me.  I no longer view it that way.

15  I am your wife.  Yeah you right.  You are my protector so I

16  can't really be mad.  It you.  It's cute.  It's just crazy and

17  a bit much at times.  But it's okay.  Fuck it.  LOL.

18       I'm not mad either baby.  You just crazy.  That's

19  all.  I don't mind.

20       MR. PALACIO:  Okay.  If we could turn to Page 150.

21       Actually, we'll go to Page 171.  And about halfway

22  down with a text message on 12/21/2017 at 1:00 p.m.

23  Q    On phone with date.  Her phone skills suck.  Ugh.  I need

24  you to work the phone.

25  A    Ugh.  Stick to text messages.  Don't let her take any

1   calls.  Make her hang up.  If they don't like texting, too

2   bad.

3   Q    Too late.  He hung up.

4   A    Good.  Ha ha.  Her bad phone skills scared him off.

5   Q    We lost that one.

6   A    Shake my head.  OMG.  Horrible.  Shake my fucking head.

7   Q    He wanted a fucking hour.

8   A    She better hit up her regs.  Keep trying.

9   Q    I'm still working supposed to be coming now.

10  A    Okay.

11           You posted for the special, right?

12  Q    Yes N word.

13  A    My N word.  Okay good.  LOL.  Send Cap One info plz.

14  Q    Son save the fucking pic.

15           Ms. Hwang, was there also an MMS message associated

16  with this text thread?

17  A    There was.

18           THE COURT:  Was it one similar to what we've seen

19  before?

20           THE WITNESS:  Yes.

21  Q    All right.  Ms. Hwang, if you can turn to Page 191.

22           And starting with a text message on 12/27/2017 at

23  1:15.

24           I never looked at you as my property.  I always

25  looked at you that one girl that always had my heart that no

1  matter what I always loved I always wanted kids with you

2  because I felt like that was something nobody could every take

3  away from us and I always knew you would be a good mother.

4  Most whores don't have good qualities.  I always saw more you

5  in you than you seen in yourself.

6  A    I'm on the work baby.

7        BRB busy okay.

8  Q    And if you could just read the following text.

9  A    At 11:    12:11 a.m.?

10  Q    Yes.

11  A    I never never how much all this spent to you when we were

12  younger.  I'm sorry I was such a dumb bitch my whole life

13  baby.  I always loved you the same.  I'm just mad at myself

14  for taking you for granted and thinking you didn't feel the

15  same as me.

16        MR. PALACIO:  Turning to Page 200.

17  Q    Ms. Hwang, if you could read an e-mail -- I'm sorry, a

18  message beginning on December 28th, 2017, at 11:47:52.

19  A    What's the e-mail.

20        Using for insure.

21        Three question marks.

22        You good?

23        I am fine babe.

24        It was nothing more to talk about that's all.

25        It's no biggie.  Okay.

1   Q    We can stop there.

2        MR. PALACIO:  And turning to Page 235.  Starting

3   with a text message on January 14th, 2018, at 11:18:57.

4   Q    I told you I fucking love you.  Always have loved you.

5   A    I know just never seen someone love so.

6        I love you as well.  It's not as extreme as your

7   love.

8        You're just a fucking psycho.

9        I'm not even being funny.

10  Q    I never been like this you make me crazy like this.

11  A    You make yourself crazy.

12       Cuz I'm fine.

13       Never seen someone get as crazy you do.

14       It's mind boggling.

15  Q    You should have thought about that when you gave me your

16  number in the lab ninth period.

17  A    STFU.

18       You should have not been fucking cutting in my

19  class.

20       Coming with this fucking handsome bullshit.

21       Never before then I had any encounters with a young

22  fly handsome.

23       Rolling my eyes.

24       You see why I always stayed away from y'all pretty

25  boys.  I should have listened to my gut and stayed away

1  because now look, even years later, you still nothing but

2  horrible.

3          But like always I just can't help myself.  Trouble

4  is never far away from me.  Ugh.

5  Q    But you still love me.

6  A    Always.

7          Rolling my eyes.

8          You and John need to fucking go somewhere.  He a

9  piece of shit himself.

10          I don't know why he even decided to come to class

11  that day.

12          It's all his fault.

13  Q    Well, I'm glad he did.  I met the love of my life?

14  A    Emoji with heart eyes.

15  Q    We can stop there.

16          MR. PALACIO:  We can go to Page 339.

17  Q    Ms. Hwang, if you could begin with a text message towards

18  the bottom on March 8th, 2018, at 2:14 p.m.

19  A    I'm sorry, what page?

20  Q    I'm sorry, 339.

21  A    Jeff here.

22          He one minute away.

23          He's in.

24  Q    Well I'm right here.  I think I can hear that.

25  A    Emoji.

1     Smart ass.  Well I'm just saying.

2     I'm in baby.

3  Q    You can stop there.

4        MR. PALACIO:  If we can turn to Page 342.

5  Q    Ms. Hwang, who are these text messages from -- what phone

6  number, rather?

7  A    The phone number 3476 -- I'm sorry -- 269-3960.

8  Q    And if you could please read these text messages --

9        THE COURT:  Can you actually summarize what's in

10 them instead of reading them word for word?

11       THE WITNESS:  Yes.

12       THE COURT:  Okay.

13 A    There are five text messages, all incoming, and they

14 reference the name, Cory, and they all appear to be related to

15 life insurance and American National Life Insurance Company

16 and that policy has been approved and the following processes

17 after that.

18       MR. PALACIO:  And finally, if you can go to Page

19 441.  If you could put that side by side with Page 442,

20 Mr. Rader.

21 Q    Ms. Hwang, when is this screenshot created?

22 A    The created time of the photo is January 31st, 2018, at

23 1:59:52 p.m.

24 Q    On Page 442, if you could just read the first line for

25 us.

1   A    The letters appear to be cut off a little, but it reads,

2   American National Life Insurance Company of New.

3              MR. PALACIO:  All right, Your Honor.  I have nothing

4   further.

5              THE COURT:  Cross-examination?

6              MR. CECUTTI:  No, Your Honor.

7              THE COURT:  Okay.  Thank you so much.  You can step

8   down.

9              THE WITNESS:  Thank you.

10             (The witness was excused.)

11             THE COURT:  I think this is probably a good time for

12  our break, so I have a couple of legal matters to discuss with

13  the lawyers.  So it may take about 20 minutes.

14             So please don't talk about the case.  We'll see you

15  in a little bit.

16             THE COURTROOM DEPUTY:  All rise.

17             (Jury exits the courtroom.)

18             THE COURTROOM DEPUTY:  You may be seated.

19             THE COURT:  Are you going to rest right after this?

20             MS. DEAN:  Yes, Your Honor.

21             THE COURT:  All right.  How do you want to do this

22  in terms of the motion?

23             MR. CECUTTI:  I want to reserve decision.

24             THE COURT:  Okay.  So you're not going to make the

25  motion now?

1          MR. CECUTTI:  No.

2          THE COURT:  And then as soon as they rest, you're

3    going to call your witness, who I understand is here?

4          MR. CECUTTI:  He's here, yes.

5          THE COURT:  And then are you going to call any other

6    witnesses?

7          MR. CECUTTI:  No.

8          THE COURT:  And perhaps this is a good time for me

9    to ask Mr. Martin, Mr. Martin, have you talked to your lawyers

10   about whether or not you wish to testify?

11         THE DEFENDANT:  Yes, I have.

12         THE COURT:  And have you had enough time to discuss

13   with them whether you want to testify?

14         THE DEFENDANT:  Yes, I have had enough time to talk

15   to them.  Yes.

16         THE COURT:  And what's your decision; do you want to

17   testify or not?

18         THE DEFENDANT:  No.

19         THE COURT:  Are there any additional questions you

20   want me to put to Mr. Martin?

21         MS. DEAN:  No, Your Honor.

22         THE COURT:  All right.  So what we'll do is we're

23   going to reserve on the motions, everybody will take a few

24   minutes' break, and then when we come back, we'll have the

25   witness.  And then I think that I think, we've sent you word

1  copies of the charge, and when we're finished with the

2  witness, I don't think there will be any rebuttal or anything,

3  will there?

4           MS. DEAN:  Well, that depends on -- Mr. Lim is here,

5  so we would just ask for a brief few minutes to consult with

6  him to see if that's necessary.

7           THE COURT:  All right.  Is he going to sit in while

8  the testimony --

9           MS. DEAN:  Yes.

10          THE COURT:  All right.  So we'll meet back here 15

11 minutes or so.

12          (A recess was taken.)

13          THE COURTROOM DEPUTY:  All rise.

14          (Judge ANN M. DONNELLY enters the courtroom.)

15          THE COURT:  Everybody can sit down.

16          All right are we ready for the jury?

17          MS. DEAN:  Yes, Your Honor.

18          MR. PALACIO:  Actually, Your Honor.

19          THE COURT:  Let's wait for Mr. Martin.  Sorry about

20 that.

21          (Defendant enters the courtroom.)

22          MR. PALACIO:  Your Honor before we bring in the

23 jury, may I just raise an issue?

24          THE COURT:  Yes.  But let me just grab Donna really

25 quick.  Why don't we come over to the side.

1          (The following occurred at sidebar.)

2          MR. PALACIO:  Yes, Your Honor before the defense

3     witness testifies, I wanted to make sure I understood the

4     parameters of his permitted testimony.

5          In the first disclosure, there was a conclusion

6     where he said that the evidence of the presence of

7     Mr. Martin's DNA on pillow case -- there is the presence of

8     Mr. Martin's DNA on pillow cases, but no evidence of them --

9     of them being involved in the case.

10          THE COURT:  He's not going to testify that that?

11          MS. THIELE:  No.

12          THE COURT:  Is it your witness?

13          MS. THIELE:  Yes.

14          MR. PALACIO:  And then I think I understood

15     correctly that he's not going to talk about Mr. Lim's level of

16     education?

17          MS. THIELE:  No, no.

18          MR. PALACIO:  Okay.

19          THE COURT:  I love it when everybody agrees.

20          (End of sidebar conference.)

21          (Continued on the next page.)

22

23

24

25

1          (In open court; Jury not present.)

2          THE COURTROOM DEPUTY:  All rise.

3          (Jury enters the courtroom.)

4          THE COURTROOM DEPUTY:  You may be seated.

5          THE COURT:  All right, everybody.  We're ready to

6     continue.

7          Does the Government have any more evidence to put

8     on?

9          MS. DEAN:  No, Your Honor.  At this time, the

10    Government rests.

11         THE COURT:  Does the defense wish to put on a case?

12         MS. THIELE:  Yes, Your Honor.  The defense calls

13    Mr. Allan Jamieson.

14         THE COURT:  Okay.

15         (The witness takes the stand.)

16         THE COURTROOM DEPUTY:  Raise your right hand for me,

17    please.

18         (The witness was sworn and/or affirmed in by the

19    courtroom deputy.)

20         THE WITNESS:  I do.

21         THE COURTROOM DEPUTY:  Please state and spell your

22    name, for the record.

23         THE WITNESS:  Allan Jamieson, A-Double L-A-N,

24    J-A-M-I-E-S-O-N.

25         THE COURTROOM DEPUTY:  Thank you.  You maybe seated.

1          THE COURT:  All right.  Just a couple of things

2     before you begin.

3          I want to make sure everybody can hear you.  The

4     chair doesn't move, but the microphone does.

5           THE DEFENDANT:  Self-discovered.

6          THE COURT:  Yeah, that's one of our little tricks

7     around here.  But pull the microphone a bit closer.  Yeah.

8          And the other thing, I want to make sure you don't

9     speak too quickly.  The court reporter has to take down

10    everything that you say, and it makes it hard if you're a fast

11    talker.

12         And then if there's a question you want to have

13    clarified or have repeated, just let me know, okay.

14         All right.  Go ahead.

15         ALLAN JAMIESON, called as a witness, having been

16    first duly sworn/affirmed, was examined and testified as

17    follows:

18    DIRECT EXAMINATION

19    BY MS. THIELE:

20    Q    Good afternoon, Mr. Jamieson.

21    A    Good afternoon.

22    Q    Can you tell us where you work?

23    A    I'm the director of the Forensic Institute in Glasgow,

24    Scotland.

25    Q    And what are your duties in that role?

1  A     Managing the firm and doing criminal casework, mostly in

2  DNA.

3  Q     And what else does the forensic institute do, generally?

4  A     We work primarily for the defense reviewing casework and

5  then giving evidence, if necessary.

6  Q     And how long have you worked there?

7  A     Twenty-two years or thereabout.

8  Q     Can you tell the jury a bit about your educational

9  background?

10  A     I have a first class, double first-class honors degree in

11  biology and genetics, I have a PhD from the forensic science

12  unit at the University of Strathclyde also in Glasgow.  I'm a

13  Fellow of the Royal Society of Biology.  Those are the main

14  academic qualifications.

15  Q     And what work did you do before the Forensic Institute?

16  A     I was head of the police forensic science laboratory in

17  agency in Edinburgh, Scotland.

18  Q     Can you tell us what forensic biology is?

19  A     Forensic biology is the use of biology in matters of law.

20  Q     And how long have you been in this field, approximately?

21  A     Thirty years or thereabouts.

22  Q     Have you written any publications on the topic?

23  A     Yes.  As well as research papers.  I coedited with an

24  American author, the largest encyclopedia of forensic science

25  in the world, with a colleague published a book on forensic

1  DNA profiling, and we've published numerous research papers.

2  Q    Have you been qualified as an expert in the field of

3  forensic biology in the past?

4  A    Yes.

5  Q    Approximately how many times have you testified about

6  this topic?

7  A    Over 100, let's say.

8  Q    When you testified in those cases, did you give testimony

9  regarding statistical calculations associated with DNA

10  testing?

11  A    In some of the -- most New Zealand, Australia, and New

12  York, Florida, and all of the jurisdictions in the UK, and

13  Ireland would all be statistical, yes.

14  Q    Have you ever been denied qualification as an expert?

15  A    No.

16         MS. THIELE:  Your Honor, at this time, I offer

17  Dr. Allan Jamieson as an expert in the field of forensic

18  biology and DNA analysis and testing.

19         THE COURTROOM DEPUTY:  Any objection?

20         MR. PALACIO:  No objection.

21         THE COURT:  All right.  As I said before, I'll give

22  you an instruction on that in my final charge.

23         Go ahead.

24  Q    Dr. Jamieson, did you review any New York City Office of

25  Chief Medical Examiner reports related to the DNA testing done

1  in case?

2  A    Yes, I did.

3  Q    Before this case, had you ever seen these kinds of

4  reports produced by OCME?

5  A    Yes.

6  Q    And how did you become familiar with them prior to this

7  case?

8  A    Because I worked another casework involving various

9  softwares and casework.

10 Q    And do you have any reason to challenge the findings as

11 they are stated in the OCME reports in this case?

12 A    No.  That's how they did the analysis and that's the

13 results they obtained.

14 Q    What is DNA?

15 A    DNA is the biological molecule which transfers genetic

16 information from parent to child.  It carries the code, if you

17 like, for the proteins that ultimately make your body.  If you

18 imagine you're starting from one -- a biology lesson -- but

19 you start from one fertilized egg, and all the information

20 that becomes you is contained within that one fertilized egg,

21 and that is the genetic material which switches off and on as

22 you develop.

23 Q    And where can DNA come from?

24 A    DNA comes from the central or nucleus of a cell, and it

25 can come from any tissue in the body with the exception of red

1  blood cells where the nucleus is ejected early on in the

2  development of the red blood cell.  But all the other cells in

3  the body, the DNA, the exceptional ones are the sperm and egg

4  which have half the amount of the DNA which is reassembled, if

5  you like, on fertilizations.

6  Q    And have you ever heard of the phrase touch DNA?

7  A    Yes.  I disparage it.  It's not a phrase that I would

8  use, and the literature is now recognizing it's a misleading

9  term.  I've actually written papers on that.  And as I review

10  and published papers, as well, before they're published, and

11  we're trying to prevent this term being used because it

12  misrepresents the fact that DNA can come on an item without

13  you ever talking an item.

14  Q    Can you tell us more about DNA transfer?

15  A    Yes.  We've done probably in the last 25, 30 years

16  there's been a lot of research on DNA transfer.  Myself and a

17  colleague published the review in 2013 which basically said,

18  we know of some of the mechanisms that DNA can be transferred,

19  we don't really know them all, and all the factors involved,

20  and recent reviews in '21, '22 -- not by me -- are still in

21  that position.

22         So, for example, the one factor which is becoming

23  increasingly important is what's called shedder status.  One

24  person may shed a lot of DNA when you touch something, and

25  another person may not.  But that also varies in time, and

1   each individual will vary depending on their activities

2   immediately before we touch something.  So for example, if I

3   wash my hands and then touch an item, I may not leave any DNA

4   at all.  And it's quite possible to such an item without

5   leaving your DNA, but you can also transfer DNA from other

6   people.  So if I shake your hand, you drive home, you could

7   leave my DNA on your steering wheel, even though I've never

8   been in your car.

9           I come in from Newark Airport just a short while

10  ago, and I was on the train.  The ticket collector takes my

11  ticket, which will probably have my DNA on it, and she now

12  puts her DNA on that, and hands it back to me, and I now have

13  her DNA on my hand, and I could transfer that to another

14  object.

15          So you might think that direct is the most obvious,

16  but anyone who's ever had paint or oil on their hands knows

17  that many objects can be secondary transferred, and the amount

18  doesn't tell you anything either.  The example I use is, I go

19  to Mc Donald's, I have a bottle of Ketchup -- I don't know if

20  they use bottles now -- but you've got a bottle of Ketchup and

21  I squirt some Ketchup on the table, and this you touch.  So

22  there is the primary or direct transfer to the table.  I touch

23  it and then I've got Ketchup on my finger.  You could not tell

24  from the amount of that Ketchup whether it was from the bottom

25  or the table.  And I wipe the table with my finger,

1  transferring most of the Ketchup to my finger, which is

2  secondary transfer, and there's more on my finger than on the

3  table.  If I then take a handkerchief from my pocket and wipe

4  the finger, it's all on the handkerchief, and that's tertiary

5  transfer.  So don't think that because it's obvious that when

6  you touch something, you'll leave your DNA, that that's the

7  only way that it can get on something.

8          I noticed the mask.  COVID is a good example of how

9  small biological molecules can move about.  You get about

10  10,000 cells on the head of a pen and most of the dust in your

11  house will contain your DNA, but it may not.  I'm sorry, that

12  was a long explanation, but you did ask me to explain DNA

13  transfer.

14          MS. THIELE:  Thank you, Dr. Jamieson.

15          (Continued on the following page.)

16

17

18

19

20

21

22

23

24

25

1  BY MS. THIELE: (Continuing)

2  Q    Is it fair to say that you do not have to have touched a

3  surface in order for your DNA to be found on that item?

4  A    Which is why the term "touch" is wrong.

5  Q    How long can DNA last on a surface?

6  A    Hundreds of years.

7  Q    Does DNA also move through the air?

8  A    DNA moves through the air generally in cells, but there

9  is free DNA so, yes.

10  Q    Did OCME attempt to extract DNA profiles from a number of

11  items in this case?

12  A    Yes.

13  Q    Can you tell us what a DNA mixture is?

14  A    DNA mixture is simply the DNA from several people put

15  together.

16  Q    If you are able to pull out a DNA profile from a mixture,

17  does that mean that there was more of that person's DNA than

18  other possible contributors?

19  A    It depends how you've pulled it out.  A DNA profile is a

20  series of peaks on a graph, and if there's more than one

21  person's DNA there, then it may be that one person contributes

22  a lot more DNA and that person's peaks are so much higher and

23  there could be so much higher that they create a single source

24  profile.

25          In other words, there's no more than two components

1   at every area because you can have it two components, one from

2   mom, one from dad.  So one of the identifiers of a single

3   profile is we don't see any more than two components in a

4   number of areas.

5           But when you add someone else's DNA, if there's an

6   equal amounts, all you see is four peaks, and you don't know

7   how to separate them.  But if somebody is so much above all

8   the rest, then it can be reasonable to assume a single source.

9   Q    If there is a single source extracted from a DNA mixture,

10  does that mean that that person was the most likely to have

11  come in contact with the item?

12  A    No.

13  Q    Can you explain the difference between a nuclear test and

14  a Y-STR test?

15  A    Nuclear test is the one that's done on all of the areas

16  of DNA that are not associated with the sex chromosomes, in

17  particular the Y chromosome, which is inherited through the

18  male line.

19  Q    Is a nuclear test the same as an autosomal test?

20  A    Yes.

21  Q    Did OCME run both these tests on the plastic bags, item

22  one and two, in this case?

23  A    Yes.

24  Q    Can you explain generally what a likelihood ratio is?

25  A    Yes.  Okay.  A likelihood ratio is a number that's

1   calculated to give you an idea of the weight of evidence.  And

2   the important thing about it is that it's talking about the

3   probability of the evidence, not the probability of the

4   explanation.

5           So what do I mean by explanation and evidence?

6   Let's say that I come into a room and I switch on the light

7   but the bulb doesn't light.  So that's the evidence.  I can

8   then create a hypothesis or explanation for that, which is the

9   bulb has blown.  So the probability of that evidence, if the

10  bulb has blown, is one, or 100 percent, however you want to

11  work probability.  But equally, if I create a hypothesis of

12  explanation that it's the fuse that's blown, the probability

13  of the evidence is also one.

14          So it's important to recognize that when we deal

15  with likelihood ratios, we're not talking about the

16  probability of the proposition of the hypothesis.  It's the

17  probability of the evidence, if the hypothesis is correct; but

18  I've just given you two there where, that they're not both

19  correct, but if you considered only is it the bulb or is it

20  the fuse, you then go with 50/50 unless you used your prior

21  information, and that's called the prior probability, which is

22  not used with the likelihood ratio, which is one of my

23  objections, and to the use of that for DNA.

24          So here, in this case, for example, you have one of

25  the bags has, according to the autosomal DNA, two

1  contributors; but, according to the Y-STR, there's three

2  contributors.  They can't both be right but they're both

3  producing likelihood ratios, or could.  And so that's the

4  problem, is that you assume what you're trying to prove and

5  then you compared the probability of the evidence under those

6  two different assumptions.

7           If you don't understand it, don't worry, because

8  every piece of scientific research illustrates just that.

9           MR. PALACIO:  Objection.

10          THE COURT:  Sustained.  Let's just stick to the

11  questions from counsel.  Go ahead.

12 Q    Dr. Jamieson, did you review reports related to the DNA

13 testing of pillowcases?

14 A    Yes.

15 Q    Did any of the findings from the DNA tests related to

16 pillowcases indicate that Brandy Odom's blood was found on

17 those pillowcases?

18 A    Not to my knowledge, no.

19 Q    Did you review reports related to autosomal testing

20 comparing DNA found on two plastic bags, item one and two,

21 with a DNA sample for Cory Martin?

22 A    Yes.

23 Q    Can you explain what you understood the results to be of

24 the autosomal testing?

25 A    They're uninformative.  The 3.7 is what the OCME

1 described as uninformative, which means there's no

2 information, no data. So therefore not helpful either way.

3 And the other one, he was excluded.

4 Q    And what does that mean to you?

5 A    It means there was no detectable DNA from Mr. Martin,

6 Martin? In the sample.

7 Q    Did you review reports related to Y-STR testing for the

8 same items?

9 A    Yes.

10 Q    Did Cory Martin's Y profile match a Y profile pulled from

11 plastic bag item two?

12 A    Yes.

13 Q    When there's a Y profile match in a test like this, what

14 can it tell you?

15 A    It tells you that the, the person of interest is one of a

16 number of people who could have contributed that profile,

17 which is why there's this statistic.

18 Q    Is it any more likely that a possible contributor was one

19 of Cory's immediate male family members versus any other

20 person in the same paternal line?

21 A    No. To explain this line thing, it's not necessarily an

22 immediate paternal line. The line could go back years and it

23 could be a distant relative by now that you don't even know

24 because if it's -- you go back ten generations, where the

25 first, it's called a haplotype, the profile, it then moves

1  down through generations and generations as the families

2  separate.

3          I mean, I've probably got in Scotland relatives that

4  I'm completely unaware of and I've got 63 cousins.  So if I'm

5  not aware of them, there's quite a lot of them about.

6          So that's the point.  It doesn't need to be

7  immediate.  It may be a distant relative and still with that

8  profile.

9  Q    And speaking generally, is it possible for thousands of

10 men to share the same Y profile?

11 A    Yes.  That's why there's the statistic.  I think, I mean,

12 my estimate was about 3 or 4,000 maybe people, men in New York

13 might share that.

14         Again, it depends where that data was from.  If the

15 data used was only from New York, it will give you an accurate

16 figure, but if the data was from the USA, then the figure's

17 probably wrong because New York, I don't think from other

18 genetic studies is typical of, for example, California.

19 Q    Can you tell us what you can conclude from the results of

20 the Y-STR testing on plastic bag item number two?

21 A    That Mr. Martin is one of the possible number of

22 contributors to that profile.

23 Q    Can any of the findings in the OCME reports in this case

24 that you reviewed lead you to conclude that Mr. Martin touched

25 either of the plastic bags?

1  A    No.  I think the fairest way to state things is that the

2  DNA could have come from Mr. Martin; and, if it came from

3  Mr. Martin, then one of the possible explanations is that he

4  may have touched the bag, but it's also possible that it was

5  transferred indirectly.  That would be the, in my opinion,

6  objective statement of the evidence.

7           MS. THIELE:  Nothing further, Your Honor.

8           THE COURT:  Cross-examination?

9           MR. PALACIO:  Yes, Your Honor.

10 CROSS-EXAMINATION

11 BY MR. PALACIO:

12 Q    Good afternoon, Dr. Jamieson.

13 A    Good afternoon.

14 Q    Dr. Jamieson, you are the director of The Forensic

15 Institute?

16 A    Yes, and owner.

17 Q    And the owner?

18 A    Yes.

19 Q    And that's in Edinburgh, Scotland?

20 A    Glasgow.

21 Q    Glasgow, Scotland.

22           How many people are employed by The Forensic

23 Institute?

24 A    Five at the moment.

25 Q    So that's you and four other employees?

1  A    Yes.

2  Q    Are those individuals scientists?

3  A    All but one, who's my PA.

4  Q    And the website for The Forensic Institute is

5  TheForensicInstitute.com, correct?

6  A    Yes.

7  Q    And that's because it's a for-profit agency, correct?

8  A    I'm hoping, yes.

9  Q    It's not a nonprofit agency, in other words?

10  A    Correct.

11  Q    It's not an agency like the Office of Chief Medical

12  Examiner New York, correct?

13  A    No.

14  Q    It's also not a lab, correct?

15  A    Not a forensic lab.

16  Q    And you don't perform DNA testing and DNA -- you don't

17  perform DNA testing at the Forensic Institute?

18  A    We interpret profiles.

19  Q    My question is:  You don't test DNA at the Forensic

20  Institute, correct?

21  A    You're using the term "test."

22        THE COURT:  You don't perform a test on evidence, I

23  think is what he's saying.  Is that correct?

24  Q    What I'm asking, Dr. Jamieson, is if you perform

25  extraction, amplification, and quantification at your lab?

1   A    No.

2   Q    At your institute?

3   A    No.

4   Q    You do not do that?

5   A    We interpret the profiles.

6   Q    And, unlike OCME, The Forensic Institute is not an

7   accredited organization, correct?

8   A    There's no accreditation system that applies to us.

9   Q    And, in other words, there's no oversight, correct?

10  A    You're the oversight.

11  Q    You yourself oversee your own work, correct?

12  A    Yes.

13  Q    There's not an independent agency that comes in to verify

14  if you're following standards and protocols in the field of

15  forensic biology, correct?

16  A    We're published.  We're an academic institution in some

17  respects.

18  Q    So you're not a lab in the same way that OCME is, that

19  follows procedures and protocols in the field of forensic

20  biology?

21  A    We do follow procedures.

22       What we don't do is the liquid part of the assay.

23  The assay produces an electronic data file, which we then

24  interpret in the same way the OCME and all the other labs in

25  the world do; and, in that respect, we probably have more

1   experience of interpreting DNA profiles than the OCME.

2   Q    I'm not talking about interpretation.  I'm talking about

3   testing and analysis.  You don't do that?

4   A    I don't have any problem with the testing.

5   Q    Now, because there is no oversight, you can't be

6   disciplined, for example, if there's a mistake in your

7   interpretation, correct?

8   A    Correct.

9   Q    And you can't be fired either?

10  A    No.

11  Q    Now, The Forensic Institute performs, provides other

12  expert testimony; is that correct?

13  A    Yes.

14  Q    Not just in the field of DNA, correct?

15  A    That's correct.

16  Q    The Forensic Institute also offers expert testimony and

17  analysis and examination of CCTV, correct?

18  A    Yes.

19  Q    What is CCTV?

20  A    Closed circuit television.

21  Q    And have you testified as an expert in the analysis and

22  examination of CCTV?

23  A    Yes.

24  Q    The Forensic Institute also offers expert testimony in

25  arson cases?

1   A    I don't think so.

2   Q    How long has The Forensic Institute been in business?

3   A    Since 2000.

4   Q    So in the last 24 years, has The Forensic Institute

5   offered expert testimony in the field of, in arson cases?

6   A    Yes.

7   Q    In the field of bite marks?

8   A    Yes.

9   Q    And have you --

10  A    Sorry.  Can I just -- I've offered opinion on bite marks,

11  yes.  The general underpinning science, I've not interpreted

12  any bite marks.

13  Q    Have you tested as an expert in the field of bite marks?

14  A    No, nor do we offer it.

15  Q    Has anyone in your institute, in your organization,

16  testified in that field?

17  A    No.

18  Q    So would it be a surprise if you, at one point in time

19  your website listed that as an area in which you offered

20  expert testimony?

21  A    No.  That would be when we engaged self-contractors to do

22  that work, in the same way as fire investigation.  It's quite

23  a common thing.

24  Q    So you contract with other individuals to offer that

25  testimony?

1   A     Yes.

2   Q     Under the umbrella of The Forensic Institute, correct?

3   A     Yes.  That was the initial concept of the institute, was

4   a collegiate number of scientists.

5   Q     And your institute offers expert testimony in Shaken Baby

6   Syndrome?

7   A     No.

8   Q     At one point it did, correct?

9   A     Yes, a much wider variety of what we do now.  And the

10  other thing, in shaken baby I've certainly offered assistance

11  on the scientific underpinning for the diagnosis of shaken

12  baby.  You need to understand there's two different aspects

13  here.  There's the underpinning science and then there's the

14  layering on top of something like radiology or ophthalmology.

15  So we would review the scientific papers on these things.

16  Q     My question is if you have offered assistance for profit

17  in the field, in the area of Shaken Baby Syndrome.

18  A     We have.  I need to clarify so that we're very clear on

19  what it is we offer an opinion about so that my evidence is

20  not misleading.

21  Q     But you have assisted in that, correct?

22  A     Correct.

23  Q     And the, you have -- have you offered expert testimony in

24  toxicology?

25  A     Yes.  And I do that myself, yes.

1   Q    And in drugs?

2   A    Not the analysis of drugs, no.

3   Q    Have you offered expert testimony when it comes to

4   narcotics cases?

5   A    Yes.

6   Q    Have you also offered expert testimony in handwriting

7   analysis?

8   A    Is this The Forensic Institute or me?

9   Q    You, sir.

10  A    No.

11  Q    And the institute, has it offered testimony in that

12  field?

13  A    Not that I can recollect.

14  Q    Have you testified as an expert in gunshot residue?

15  A    No.

16  Q    How about The Forensic Institute?

17  A    Not that I'm aware.

18  Q    Now, Dr. Jamieson, The Forensic Institute has, offers a

19  number, a laundry list of areas of possible expertise,

20  correct?

21  A    I think if you look at the current website, you'll see

22  there are four.

23  Q    And I'm not talking about the current website.

24       Prior versions of your website have offered expert

25  testimony in the fields this I've mentioned; isn't that

1  correct?

2  A    Yes, when we had experts to cover those areas, yes.

3  Q    Now, your focus in DNA is primarily in low copy or low

4  template DNA, correct?

5  A    Not really, no.  It's one of the areas that I have

6  expertise in and it's becoming more common to see cases

7  including that.

8  Q    But you have primarily testified in that area, correct?

9  A    No.

10  Q    Now, Dr. Jamieson, at what point were you retained as an

11  expert for this case?

12  A    I don't remember.  Was it months ago?  I don't remember.

13  Q    Was it after New Year's, January 1, 2024?

14  A    No.  Before that.

15  Q    Was it in December?

16  A    I don't know.

17  Q    Can you give us a sense of when that, when you were

18  retained?

19  A    I've probably got 30, 40 cases on the go any time and

20  running a business.  I don't know.

21  Q    And part of running a business is keeping records of what

22  you do for cases and what you do for defense attorneys that

23  retain you, correct?

24  A    And the reason we keep records is because I don't

25  necessarily keep it all in my memory.

 1          I'm sorry.  I don't understand when I was employed

 2   has anything to do.  I'm trying to answer your question

 3   honestly.

 4          THE COURT:  If you can't answer the question, just

 5   say you can't answer the question.

 6          THE WITNESS:  That's what I did say.

 7          THE COURT:  Well, don't argue with me.  Go ahead.

 8   Q    Now, Dr. Jamieson, were you retained before you reviewed

 9   reports from OCME?

10   A    Normally I would get an inquiry outlining the case, to

11   see if I could actually assist in any way, and then I would

12   say yes.  Then I would send an estimate and be engaged.

13   Q    And what was the information that you were provided?

14   A    I don't remember.

15   Q    So you don't remember when you were retained, you don't

16   remember the information that was given to you about this case

17   initially, correct?

18   A    No.

19   Q    Now, what materials did you eventually receive for

20   reviewing?

21   A    All the reports, the case files.  I mean, I can check my

22   records, if that would assist.

23   Q    When you say "All the reports," what does that mean?

24   A    OCME reports.

25   Q    But there's lots of OCME reports.

1   A    Yes, there are.

2   Q    So what reports did you receive?

3   A    I need to check my laptop to tell you all the reports.

4   My memory is that I've seen maybe eight, ten reports,

5   something like that.

6   Q    And you received the case file, correct?

7   A    Yes.

8   Q    And you received a number of suspect files, correct?

9   A    Yes.

10  Q    Okay.  And what did you review to come to your

11  conclusions that you've testified about today?

12  A    I looked at the results, the statistical results, and the

13  analysis that had been done, which is why I don't have any

14  problem with what's stated in the reports.

15  Q    So when you say you have no problem with what's stated in

16  the reports, are you saying that you agree with all of OCME's

17  conclusions in this case?

18  A    According to their standards, yes.

19  Q    So, in other words, you don't find, you don't take any

20  issue with the conclusions listed in the reports?

21  A    That's correct.

22  Q    So that would include the analysis of Cory Martin's DNA

23  as compared to the pillowcase in this case, items eight and

24  ten?

25  A    Yes.

1  Q    You agree that OCME properly developed his DNA profile,

2  correct?

3  A    Yes.

4  Q    And you agree that they identified his DNA as the sole

5  source, the single source of DNA on two of those stains on the

6  pillowcases, correct?

7  A    Yes.

8  Q    And you agree that when they conducted the Y testing,

9  they also identified Cory Martin's DNA as male donor A on

10 those two pillowcases, correct?

11 A    To clarify, they identified a profile that matched

12 Mr. Martin's but would also be expected to match other people.

13 So I don't want to get trapped into saying that it's

14 Mr. Martin's.  I know it wasn't.  I apologize.

15          But, to clarify, it was a profile that Mr. Martin

16 could be the source of.

17 Q    That's a fair point.  My question was whether they

18 conducted Y-DNA testing, which you agree they did properly,

19 correct?

20 A    Yes.

21 Q    And they identified a male donor A on the Y DNA testing,

22 correct?

23 A    Yes.

24 Q    Which matched Cory Martin's Y-DNA, correct?

25 A    Yes.

1  Q    And you agree with all of that?

2  A    Yes.

3  Q    And you agree that a plastic bag in this case, item two,

4  was tested in this case, correct?

5  A    Yes.

6  Q    And you agree that the majority, the vast majority of DNA

7  on that bag came from a female, correct?

8  A    Yes.

9  Q    And that the DNA matched the DNA of Brandy Odom, correct?

10 A    Yes.

11 Q    And you also agree that when they conducted the Y testing

12 on the sample of the plastic bag, they identified a male donor

13 A, correct?

14 A    Yes.

15 Q    And you agree that that male donor A also matches the

16 Y-DNA of Cory Martin, correct?

17 A    Yes.

18 Q    Which also matches the Y-DNA on the pillowcase, correct?

19 A    Yes.

20 Q    Now, you're obviously familiar with Y-DNA, correct?

21 A    Yes.

22 Q    You're institute doesn't do Y-DNA testing, correct?

23 A    Correct.

24 Q    But it does do familial analysis or paternity analysis,

25 correct?

1  A    Yes.

2  Q    Or you offer testimony in that field.

3  A    We do.  We have a lab that does the liquid part, and we

4  do the interpretation, yes.

5  Q    And Y-DNA is accurate and reliable in identifying

6  individuals as relatives, correct, on the paternal line?

7  A    Well, we use statistics again, yes.

8  Q    Now, you also agree here that the analysis is that Cory

9  Martin could have been a contributor to the DNA on that bag,

10  or a male relative, correct?

11  A    A male relative, again, it implies a close relative, but

12  it could be a distant person unaware.  Like, as I said,

13  there's 3,000 people in New York, 3,000 males with that

14  profile.  I don't think, but I'm speculating but I assume that

15  he doesn't know 3,000 people with the same Y-STR.

16            I just want to be careful of not misrepresenting the

17  issue.  If you ask the question again, I'll try again.

18  Q    I can ask the question again.  I'm happy to.

19            The conclusion was that Cory Martin or a male

20  relative of Cory Martin could be the source of the DNA on the

21  plastic bag?

22  A    Yes, with that qualification, yes.

23  Q    Okay.  And we're not talking about Cory Martin's great

24  great great great great grandfather, correct?

25  A    I'm assuming not, no.

1  Q    And if Cory Martin's father is dead, he could not be a
2  source of that DNA, correct?
3  A    No.  It's expected there will be 4,000 live people in
4  New York with that profile just now.
5  Q    But, again, it's on the paternal line, correct?
6  A    Yes.
7  Q    Cory Martin's paternal line is what we're talking about
8  here, you agree with that, correct?
9  A    Yes.
10 Q    So we're talking about Cory Martin's father, perhaps?
11 A    Yes.
12 Q    Cory Martin's grandfather?
13 A    Yes.
14 Q    Cory Martin's brothers?
15 A    Yes.
16 Q    Cory Martin's uncles?
17 A    On the paternal side, yes.
18 Q    On the paternal side.
19 A    Yes, yes.
20 Q    Okay.  Now, you can't offer any testimony about how or
21 when that DNA came to be on that bag, correct?
22 A    No they can't, no.
23 Q    You testified that one explanation for it can be transfer
24 DNA, correct?
25 A    Yes, direct or indirect.

1  Q    So one way for the DNA to get on that bag is direct

2  transfer of DNA, correct?

3  A    Yes.

4  Q    You're testifying that another possibility is indirect

5  transfer DNA, correct?

6  A    Yes.

7  Q    Dr. Jamieson, you testified that you, I think your words

8  were you primarily testify for the defense.

9  A    Yes.

10 Q    You only testify for the defense, correct?

11 A    Yes.

12 Q    And how much are you being paid for your testimony here

13 today?

14 A    I think it's $250 an hour.

15 Q    And how many hours have you worked on this case?

16 A    I don't know.  That's, again, a record kept in the

17 office.

18 Q    Can you estimate how much work you've put into this case?

19 A    Fifteen, twenty hours, maybe.

20 Q    And that's 15 to 20 hours over the last several months?

21 A    Yes.

22 Q    Now, you would agree with me that the OCME materials are

23 very voluminous in this case, correct?

24 A    Yes.

25 Q    It would be about 2800 pages of materials that OCME

1  produced in connection with this case, correct?

2  A    Yes.

3  Q    And did you review all of that?

4  A    I looked at all of this material given, but what we do is

5  then focus on the relevant material.  So, for example, when

6  materials tested and produced no results, there's a lot of

7  irrelevant material in there.

8        So the first task is to sort the material and then I

9  pull out, I was just given big, long PDFs.  So my first task

10 is to pull out, for example, those OCME reports.  So I

11 separate those individually.

12       Then I separate the statistical information, and

13 there's a software here called STRmix, which is used to do the

14 statistical calculation, and they produce reports.  Sometimes

15 seven pages but sometimes a lot longer.  And so it would

16 isolate those as a particular file and then study those files.

17       So the reality is it's the most cost-efficient way

18 of doing it.

19 Q    And you reviewed the materials pursuant to the STRmix

20 analysis, correct?

21 A    That and the EPGs I remember seeing, but the STRmix, and

22 then moved on; and at that point, I, it was obvious that I

23 agreed with the analysis, and therefore we were left with the

24 conclusions and the interpretation.

25       (Continued on the next page.)

1    CROSS-EXAMINATION

2    BY MR. PALACIO:  (Continuing)

3    Q    And you took no issue with OCME's statistical findings

4    with the STRmix software, correct?

5    A    No.  That's what the software produced.

6    Q    Again, you're not challenging the statistics that were

7    produced by OCME; correct?

8    A    They weren't relevant in the sense of they don't mean

9    anything, so there was no reason to.

10   Q    Okay.  So, Dr. Jamieson, just to be clear, you have no

11   objection to the analysis conducted by OCME; correct?

12   A    Correct.

13   Q    You have no objections to their conclusions; correct?

14   A    Correct.

15   Q    And you agree that Cory Martin's Y DNA matches the Y DNA

16   on the plastic bag, correct?

17   A    I believe that Cory Martin could be one of the -- could

18   be the contributor of that profile.

19   Q    And I thank you for that correction.

20        Cory Martin or a paternal relative; correct?

21   A    Yes.

22        MR. PALACIO:  Your Honor, I have nothing further.

23        THE COURT:  Any redirect?

24        MS. THIELE:  Briefly, Your Honor.

25        THE COURT:  Okay.

1   REDIRECT EXAMINATION

2   BY MS. THIELE:

3   Q    Dr. Jamieson, you were asked a few questions about your

4   appointment.

5            Were you appointed by the Court as an expert in this

6   case?

7            THE COURT:  Sustained.

8   Q    Dr. Jamieson, have you been invited to sign any amicus

9   briefs?

10  A    Yes.

11  Q    Dr. Jamieson, have you published any books?

12  A    Yes.

13  Q    How many, would you say?

14  A    Well, two -- two books, but one of them was five books

15  really because it's an encyclopedia.

16  Q    Can you tell us a little more about that encyclopedia?

17  A    So, the encyclopedia, it was Wiley's Encyclopedia of

18  Forensics Sciences, which is five volumes covering pretty much

19  all of the forensic disciplines, both chemistry, medicine,

20  behavioral sciences and forensic biology.  And I, along with

21  Andre Moenssens, who was a fingerprint expert in the United

22  States, and we were the editors-in-chief of that volume.

23           So, I had to review all of the contributions, so we

24  contracted the expert across the world.  I think there were

25  something like 200-odd experts that we contracted on behalf of

1  Wiley's, and then we had section editors.  But I would look at

2  all of, with the exception of the behavioral sciences, I

3  looked at all of those articles.

4         So that was the encyclopedia, and then Dr. Bader,

5  one of my colleagues from the institute, and I published the

6  book called an Introduction and a Guide to DNA — Forensic DNA

7  Profiling.

8  Q    And, Dr. Jamieson, just as far as the encyclopedia goes,

9  who's the intended customer of that sort of publication?

10 A    Well, anybody.  It does cost -- I think it's $2,000, so

11 that kind of restricts the market somewhat.  But academic

12 libraries and large legal institutions.

13        We tried to make it, forgive me for saying so, but

14 useful to lawyers.  Like it was written as well, but obviously

15 there were some very technical articles also.

16 Q    Have you also published articles related to forensic

17 biology in any journals?

18 A    Yes.  On -- well, the review on DNA transfer, I think we

19 published an article on OCME's software which they used prior

20 to STRmix.

21        And we've published with Australian colleagues on

22 the use of the likelihood ratio.

23        I don't remember them all, to be frank.

24 Q    That's all right.  Thank you.

25        Are these journal articles peer reviewed?

 1   A    Yes.

 2             MR. PALACIO:  Objection, Your Honor, to scope.

 3             THE COURT:  Overruled.

 4   Q    Dr. Jamieson, have you been a professor?

 5   A    Yes, I am a professor.

 6   Q    Have you lectured to groups on the forensic sciences?

 7   A    Yes.

 8   Q    Have you lectured to groups specifically on DNA analysis?

 9   A    Yes.

10   Q    And you have offered expert services for profit; correct?

11   A    Yes.

12   Q    Have you ever offered expert services whether for profit

13   or on a pro bono basis where you were not qualified to do so?

14   A    No.

15             MS. THIELE:  Nothing further.

16             THE COURT:  Any recross?

17             MR. PALACIO:  No, Your Honor.

18             THE COURT:  Thank you so much.  You can step down.

19             (Witness steps down.)

20             THE COURT:  I want to see the parties at the side

21   with the court reporter to see what's next.

22             (Continued on next page.)

23             (Sidebar conference.)

24

25

1      (The following occurred at sidebar.)

2      THE COURT:  So, are you going to rest now?

3      MR. CECUTTI:  Yes.

4      THE COURT:  We are still taking -- you want to --

5      MR. CECUTTI:  Reserve decision.

6      THE COURT:  Thank you.

7      On your motions after your case?

8      MR. CECUTTI:  Yes.

9      MR. PALACIO:  Your Honor, may we have a few minutes

10 to discuss Mr. Jamieson's testimony with Mr. Lim?

11     THE COURT:  Sure.  I forgot about that.  Then we've

12 got time.  Of course, you won't be very long.

13     But are you doing the summation tomorrow?

14     MS. HAJJAR:  Yes.

15     THE COURT:  Do you know how long it's going to be?

16     MS. HAJJAR:  I don't.  I hope it's going to be under

17 two hours.

18     THE COURT:  Do you have a sense?

19     MR. CECUTTI:  An hour-15, hour-and-a-half.

20     THE COURT:  Are you doing rebuttal?

21     MS. DEAN:  I am.

22     THE COURT:  All right.  We may be able to charge

23 tomorrow.  We will see.  I will give them ten minutes, and

24 then you will tell me what you want to do.

25     MR. PALACIO:  Thank you. (Continued on next page.)

1          (In open court; jury present.)

2          THE COURT:  All right.  I just need to speak with

3     the lawyers for a little bit.  Probably only about ten

4     minutes.  So I'm going to excuse you.

5          Please don't talk about the case.

6          When you come back, I will give you an idea of what

7     our schedule is, okay.

8          THE COURTROOM DEPUTY:  All rise.

9          (Jury exits the courtroom.)

10         THE COURT:  All right.  Everybody can sit.

11         All right.  Take a few minutes to speak to your

12    witness.

13         MS. DEAN:  Thank you, Your Honor.

14         (Recess taken.)

15         THE COURT:  So, are you going to call the -- I'm

16    sorry, is it Mr. Lim?

17         MR. PALACIO:  Just two or three questions, Your

18    Honor.

19         THE COURT:  All right.

20         MS. THIELE:  Your Honor.

21         THE COURT:  Yes.

22         MS. THIELE:  Just because Dr. Jamieson's testimony

23    generally accepted everything that was in the reports and he

24    provided brief, you know, other background explanations,

25    perhaps there's a way for the parties to confer about the

1   topics in case there's an issue about whether it is actually

2   rebuttal testimony from Mr. Lim.

3           THE COURT:  Well, my philosophy generally is to

4   trust lawyers when they say they are going to call rebuttal

5   witnesses.  If it's inappropriate rebuttal, I will sustain any

6   objection.

7           I will withhold opinions about whether I think it's

8   necessary or not, but I'm not trying the case.

9           So, why don't you make sure this is what you want to

10  do, and then we will get the jury.

11          (Pause.)

12          MR. PALACIO:  Your Honor, we withdraw that request.

13          THE COURT:  So, what I am going to do is bring the

14  jury in and just tell them what our plan is for tomorrow.

15          I was toying with the idea of having them come in at

16  9:00, but I think we will keep it at 9:30.  All right.

17          And I'm going to have you rest on the record.

18          MR. CECUTTI:  I was going to ask.  I assumed.

19          THE COURTROOM DEPUTY:  All rise.

20          (The jury enters the courtroom.)

21          THE COURTROOM DEPUTY:  You may be seated.

22          THE COURT:  All right.  Ladies and gentlemen, thank

23  you so much for your patience.

24          Mr. Cecutti, are you going to put on any more

25  evidence?

1           MR. CECUTTI:  No, Your Honor.  The defense rests.

2           THE COURT:  Any additional evidence from the

3    Government?

4           MS. DEAN:  No, Your Honor.

5           THE COURT:  All right.

6           So, ladies and gentlemen, what that means is we are

7    going to move on tomorrow to the next phase of the trial,

8    which will be the closing arguments of the parties and then my

9    charge on the law, and then I think we will have time for you

10   to begin your deliberations tomorrow.

11          It's going to be a full day.  We may take a little

12   bit shorter lunch.  I really do want to make the best use of

13   your time.

14          I will give you a few introductory instructions

15   tomorrow about summations and things like that, and then we

16   will get the show on the road.

17          So, have a good night.  Please don't look anything

18   up or talk to anybody about the case.

19          I will see you bright and early tomorrow morning.

20          Thanks so much.

21          THE COURTROOM DEPUTY:  All rise.

22          (Jury exits the courtroom.)

23          (Continued on next page.)

24

25

1          (Continuing.)

2          THE COURT:  Okay.  Everybody can sit down.

3          All right.  With any luck, you still have some fuel

4   in your tank to talk about the charge.  I did get the

5   Government's redline addition and I gave Mr. Cecutti a hard

6   copy of it.

7          Have you had a chance to look at it?

8          MR. CECUTTI:  I do.  I have thoughts and comments.

9          THE COURT:  Thoughts and comments and feelings, all

10  right.

11         So why don't we begin.  Let's say -- well, I don't

12  know.  I guess, Mr. Cecutti, I'll start with you.  Putting

13  aside the Government's changes, do you have -- I know that you

14  oppose the inclusion of the acting in concert.  But the case

15  law supports of inclusion of that.  The Government is not

16  required to charge it in the indictment.  And so I did include

17  that.

18         But you know, if you could identify by page number,

19  where you have issues.  And I guess you might as well

20  include -- what the heck, just do the whole thing, what the

21  Government proposed and let's just start from the beginning

22  and tell me if you have any objections.

23         MR. CECUTTI:  Your Honor, do you want me to go by

24  page --

25         THE COURT:  Page.

1      MR. CECUTTI:  Okay.  Okay.  I think our first

2  proposed edit is on Page 10.

3      THE COURT:  Okay.

4      MR. CECUTTI:  And it's with respect to the bullet

5  points.

6      THE COURT:  Yes.

7      MR. CECUTTI:  So the section reads, you may only

8  consider evidence of uncharged conduct.  And then I have no

9  objection to any of the bullets, except for one, which is, has

10  evidence of control that the defendant may have exercised over

11  his co-conspirator.  I think -- I take issue with that.  And I

12  expect Government is going to argue that.  We, as you may

13  gather, have a different view of that.

14      The other bullets are --

15      THE COURT:  Is there another way to phrase -- I

16  mean, I think that's a relevant concept.

17      MR. CECUTTI:  I think the other ones are.  For

18  example, relationships of mutual trust.  That's coming

19  directly from case law, background, corroboration.  But the

20  bullet point, as evidence of control, I feel crosses the line.

21  And I think that bullet number one captures the third bullet,

22  if that makes sense.

23      THE COURT:  Well, I take the point.  Does the

24  Government have a position on that?

25      I think we can say the same thing in the first

1  bullet, as evidence explaining the background, including the

2  background of the relationship between the parties -- between

3  the co-conspirators.

4          MS. HAJJAR:  Yes.  The background or nature of the

5  relationship or something like that.

6          MR. CECUTTI:  That's fine.

7          THE COURT:  Okay.  So let me just take that out.

8  And let me tell you what I'm going to say.

9          So for the first bullet, it'll be, as evidence

10  explaining the background and nature of the relationship

11  between -- I mean, is it okay to say the defendant and

12  Ms. Anderson?

13          There's nobody else, is there?

14          MR. CECUTTI:  That's fine.  That's fine.

15          THE COURT:  Okay.  Okay.  So we'll take that one

16  that you objected to out.  Okay.  And then after that, so just

17  to complete what the sentence will be:  As evidence explaining

18  the background and nature of the relationship between the

19  defendant and Ms. Anderson, the formation and development of

20  the illegal -- and the formation and the development of the

21  illegal relationship between them.

22          Is that fine?

23          MS. HAJJAR:  That seems fine to us.

24          MR. CECUTTI:  That's fine.

25          THE COURT:  Okay.  So what's next?

1       MR. CECUTTI:  So I don't know if it fits here, but

2   on the next page, there is the instruction on charts and

3   summaries.  And --

4       THE COURT:  Were there any?

5       MR. CECUTTI:  Yes.  There were charts that were

6   prepared by the paralegal who testified --

7       THE COURT:  Oh, oh, oh, right.  Sorry about that.

8   How could I forget?

9       MR. CECUTTI:  So this doesn't fit squarely, but I

10  think there should be an instruction regarding the compilation

11  video.  And specifically --

12      THE COURT:  Oh, we can include the charts, summary,

13  and video.

14      MR. CECUTTI:  Yeah, I think that makes sense.  And

15  specifically including language -- and Your Honor had done

16  this several times during that witness' testimony -- but

17  something along the lines of, you alone should make your own

18  interpretation of what it appears on the video.

19      THE COURT:  I think that's fair.

20      Do you have any objection to that, just that one

21  sentence at the end of that paragraph?  I mean, it happens to

22  be correct.

23      MR. CECUTTI:  I have another sentence too to add.

24  It's just two.

25      THE COURT:  All right.  What's that?

1          MR. CECUTTI:  The second sentence is, if you think

2     you saw something different than what you were told by

3     Detective Santiago, then what you saw controls.

4          MS. HAJJAR:  I think we can do something a little

5     more general.  I'm also not sure how we would frame it in this

6     paragraph because this really relates to --

7          THE COURT:  Let's do a separate paragraph, maybe,

8     that note the video compilation, and then, you also heard

9     testimony -- is it Detective Santiago?  Is that who it is?

10         You also heard and saw video compilation.  Okay.

11    Video compilation during Detective Santiago's testimony.

12         MS. HAJJAR:  Your Honor, I don't know if you have a

13    transcript instruction.  It just occurred to me.  It would be

14    something similar to me.  There were a couple of transcripts

15    that were provided as aids to the jury, and typically, we have

16    an instruction that says that it is your interpretation of the

17    underlying evidence that controls or something of that vein.

18    This seems sort of similar to that.  I don't know if there

19    are --

20         THE COURT:  I don't think have that transcript one

21    in there.

22         MR. CECUTTI:  It's not in there, but I think that

23    would also be appropriate because there were transcripts

24    provided related to the calls.  Maybe there's a transcript

25    video instruction.

1       THE COURT:  So let's -- I'll do a paragraph -- I

2   don't know if I'm going to put that exact language that you

3   put in.  But with the transcript and the video, it's the

4   jurors' interpretation that controls.  I think in that

5   transcript, there is, though, if you think you heard something

6   different, it's your interpretation that controls.  So I think

7   that's probably right.

8       So it would have your sentence in it, that with the

9   transcript and the video, if you think you heard or saw

10  something different than what the witness said or what the

11  transcript said, it's your interpretation that controls.

12      Are you writing this down?  I knew they were.

13      Okay.  So that's that.

14      MR. CECUTTI:  Okay.  Okay.  So a small typo on Page

15  13.

16      THE COURT:  Okay.

17      MR. CECUTTI:  Patricia Zippo.

18      THE COURT:  Oh, she didn't testify?

19      MR. CECUTTI:  Right.  Okay.  All right.

20      THE COURT:  And I guess just let's take a look at

21  these things.  So fingerprint analysis and Dr. Jamieson

22  testified.  Is that right, DNA analysis?  Is that fair?

23      MR. CECUTTI:  Yes.

24      THE COURT:  All right.

25      MR. CECUTTI:  Okay.  Page 14 and 15, which is the

1    instruction related to Alabi and Ms. Anderson.

2              THE COURT:  Right.

3              MR. CECUTTI:  So no issue on 14.

4              On 15, the sentence beginning with, however, needs

5    to be edited.

6              You should bear in mind that a witness --

7              THE COURT:  Oh, that a witness -- okay.  Let's see.

8              MR. CECUTTI:  And I think that --

9              THE COURT:  What did you mean to say there?  It's a

10   typo, I think.  That's the addition by Government.  Let's just

11   get what they meant.

12             MS. HAJJAR:  I'm sorry.  I'm trying to find it.

13             THE COURT:  It's in the section about testimony of

14   witnesses with agreements.  It's on Page 14.  But what it

15   reads right now is, however, you should bear in mind that way

16   witness or understanding has an -- I think what you mean to

17   say is, that a witness with agreements of these kinds has, or

18   something like that.

19             MR. CECUTTI:  I'm sorry, in the redline I just don't

20   see it.

21             THE COURT:  Do you see where, "however?"

22             MS. HAJJAR:  Oh, I see.  Yes.  I thought -- oh, yes.

23   That's a mistake.

24             You should bear in mind that a witness --

25             THE COURT:  -- with an agreement --

1    MS. HAJJAR:  I can look back at what I was looking

2  at, Your Honor.  I'm not sure.

3    THE COURT:  I think it should be, You should bear in

4  mind that a witness with -- I mean, I'm assuming we agree that

5  that Anderson and Alabi's interests are the same.  They're

6  actually kind of different, but I don't think for these

7  purposes it matters.

8    MR. CECUTTI:  One proposal, Your Honor, would be,

9  You should bear in mind that these witnesses have an interest

10  in this case that are different from an ordinarily witnesses.

11    THE COURT:  I think that's fine.

12    MS. HAJJAR:  It's just that their interest are quite

13  different.  And so I think what we need to -- I think the last

14  sentence is what's important is, that the jurors must

15  scrutinize their testimony with care.  But there is some

16  conflation about Alabi's agreement being a cooperation

17  agreement, and I don't want that to be confusing.

18    THE COURT:  Well, that's why I wonder if there

19  should be two separate paragraphs.

20    MS. HAJJAR:  That's fine with the Government.  It

21  may be duplicative because the part that is important to

22  include in both is the part about scrutinizing the testimony

23  with care.

24    MR. CECUTTI:  Yes.  But also, it's important that

25  the jury understand that they have interest that are different

1    from the 40 other people who testified in the case.

2          THE COURT:  I think that's true.  And that's why I'm

3    not sure that it matters that much.  Her interests are

4    obviously qualitatively different than his.  But I'm not sure

5    that we need to get into that because the critical point is

6    that they have to -- their interests are different than the

7    other witnesses.

8          MS. HAJJAR:  That's true.  I just don't want it to

9    seem -- my only objection to altering it to say that they have

10   an interest in the case different from an ordinary witness

11   just in the having combined those paragraph does make it seem

12   as though their interest are both the interest that a

13   cooperating witness would have which is quite different from

14   Alabi, the agreement that he entered into.

15         MR. CECUTTI:  Another proposal instead of the

16   plural, we keep it to the singular, each of them have

17   interests that are different from ordinary witness.

18         THE COURT:  Is that Ms. Thiele's idea?

19         MR. CECUTTI:  Yes, it was.

20         THE COURT:  That's a very good one.

21         MS. HAJJAR:  That's better.

22         THE COURT:  Ms. Thiele, what it is again?  I want

23   you to get the credit.

24         MS. THIELE:  Okay.  Thank you, Your Honor.

25         However, you should bear in mind that each of these

1  witnesses has an interest in this case different from an

2  ordinary witness.

3          THE COURT:  That's great.  Okay.

4          Okay.  What's next?

5          MR. CECUTTI:  Okay.

6          So Page 17, testimony of defendant is out.

7          THE COURT:  Right.

8          MR. CECUTTI:  Page 19.  Government has taken out

9  impeachment by prior inconsistent statement.  I think it

10 should remain --

11         THE COURT:  Why did you take that out?

12         MS. HAJJAR:  We took it out because I don't remember

13 there being impeachment with the publication of an

14 inconsistent statement.  What I recall seeing is counsel

15 cross-examining several witnesses about having made

16 inconsistent statements, and the witness either acknowledging

17 that that was the case or denying that they recalled it.  But

18 I didn't recall ever putting in -- ever admitting the actual

19 completing the impeachment with the inconsistent statement.

20 So that's the part I think that instruction is meant to cover

21 that instance where you have -- you put in the video where the

22 witness said something inconsistent and we -- the jurors are

23 to then conclude something about that.  But since the

24 cross-examination was never completed as to an impeachment,

25 that's what I'm not totally sure that that --

1    THE COURT:  Well, you know, that is a good point,

2  because it was mostly recollection refreshed, and witnesses

3  saying they either didn't remember.  And then the statement

4  doesn't come in.  And so --

5    MR. CECUTTI:  But, Your Honor, there were a series

6  of statements that were inconsistent.

7    For example, Adelle Anderson admitted on numerous

8  occasions that she said one thing during one interview and

9  then said something different compared to her testimony.  So I

10  don't think that the -- I think that the simple fact that she

11  acknowledged inconsistencies garners the inclusion of this

12  instruction.

13    THE COURT:  I will confess that I have never liked

14  this instruction because I think most regular people have no

15  idea what it means.  But I think we might as well leave it in.

16    MS. HAJJAR:  I just don't think that's quite right.

17  I do think that if a witness says, I lied during that

18  interview, it's actually not -- this is not impeachment with

19  an inconsistent statement.  I recall Ms. Anderson

20  acknowledging multiple times that, yes, I lied during that

21  and, yes, I lied during that.  The impeachment was never

22  completed because she frankly acknowledged the lie.  And so

23  that's why it's not inconsistent with her testimony today.

24    THE COURT:  My question is -- I don't know that

25  anybody's gone through the transcript.  But to the extent

1  there is one -- well, I guess -- I don't know the answer.  I

2  don't remember.

3          MS. HAJJAR:  I don't think there was one.  I could

4  be wrong, but I didn't see one.

5          THE COURT:  I'm always happy to leave things out.

6  But if it's not clear, I'm not going to leave it out.

7          MR. CECUTTI:  I honestly don't recall.  But I think

8  that --

9          THE COURT:  You know what I think might be a good

10 idea is to check to see if the impeachment was completed.  The

11 only reason is, I know this will shock you, but these jury

12 instructions can be a little dry, and if there's something

13 that doesn't need to be in there, then we shouldn't put it in.

14 But you know, we put it in in almost every case.

15         MR. CECUTTI:  Judge, we're talking about three

16 paragraphs that I think are important to include.

17         MS. HAJJAR:  I'm sorry, it says evidence of the

18 prior statements was admitted for the limited purpose, makes

19 it sound as though it actually was admitted.

20         THE COURT:  You should check to see if it happened.

21 Check to see if it happened and then I'll think about it.

22         All right.  What's next?

23         If we could leave out the evidence of the prior

24 statement was admitted because it really wasn't admitted.

25         MR. CECUTTI:  Right.

1          THE COURT:  So maybe just leave out that sentence.

2          MR. CECUTTI:  That's fine.

3          THE COURT:  You know, the evidence of the prior.

4          MS. HAJJAR:  I mean --

5          THE COURT:  It's so not a big deal.  I'm sorry, but

6     it isn't.

7          MS. HAJJAR:  I know.  It's just that it isn't quite

8     right.

9          THE COURT:  Well, you know, so if you find that the

10    witness made an earlier statement that conflicts with her

11    testimony, you can consider it.  They may not find any.

12         MS. HAJJAR:  But it's the evidence part that's --

13         THE COURT:  That's what I'm taking out.

14         MS. HAJJAR:  No, but the first -- the entire first

15    paragraph, because it says, you have heard evidence that

16    witnesses made statements on earlier occasions.

17         THE COURT:  So we could change that a little bit.

18         You could say, It may be that witnesses have made

19    statements that, whatever, something like that.

20         MS. HAJJAR:  Yeah, it's --

21         MR. CECUTTI:  That's fine.

22         MS. HAJJAR:  -- just the charge, Your Honor, just

23    goes to how the jurors are supposed to think about that

24    evidence and what it was admitted for, and when counsel is

25    saying you lied about X and you lied about Y, and the witness

1  says, I did, it just to me, doesn't make much sense in how to

2  assess that.

3          THE COURT:  Again, I just think -- I take your

4  point.  What I think might be a good idea is to do a check.

5          I think this would mostly be with Ms. Anderson,

6  right?

7          MR. CECUTTI:  I think so.

8          THE COURT:  All right.  I mean, the rest of the --

9  there were some witnesses who didn't remember.  I mean, there

10  was the one guy, the Turkish guy.  I mean, I don't think

11  you're talking about that guy?

12          MR. CECUTTI:  No.

13          THE COURT:  So I mean, it might be worth a look.  I

14  do like to be accurate about these things.

15          So just check to see if that happened.  All right.

16          What else?

17          MR. CECUTTI:  Page 20, uncalled witnesses equally

18  available to both sides.

19          I just don't agree with the instruction, Your Honor.

20          THE COURT:  Is there anybody that -- this is really

21  not a case where people talked a lot about other people,

22  though.

23          MS. HAJJAR:  I do think it's -- I think this is a

24  standard instruction.  I've actually never had a trial where

25  this instruction wasn't included.

1      THE COURT:  Same about that impeachment.

2      MS. HAJJAR:  I don't know, Your Honor.  I'm going to

3  look at our R. Kelly charge.  I don't think I saw it.

4      THE COURT:  Kelly?

5      MS. HAJJAR:  Oh, yeah, you did have it.

6      I don't know.  I haven't had a trial where that

7  wasn't mentioned and I think here there has been mention of

8  other individuals who were either solicited or had some

9  involvement in the case --

10     THE COURT:  Well, what if you just take, Each party

11 had the opportunity out.

12     MS. HAJJAR:  But -- I'm sorry?

13     THE COURT:  So if you just say, There are people

14 who's names you might have heard who didn't testify, just take

15 out that next sentence.

16     MS. HAJJAR:  But I think that's the part that the

17 Government thinks is important here.  Because the idea is that

18 that instruction guards against the suggestion that there was

19 some burden on the Government to call those particular

20 witnesses or to establish a particular fact.  And so, that's

21 the part I think the Government would be interested in

22 maintaining.

23     THE COURT:  I think the problem that some people

24 have -- and I'm sort of agnostic about it -- I can see one of

25 the problems being the suggestion, although it's ameliorated

1    in the last sentence, that the defense has some burden to put

2    on a case.  I have to say it always has struck me when I've

3    seen it.  I know it's been upheld.  I know all that.

4          I also just don't think it's a thing in this case.

5    It's not like -- I don't know.

6          MR. CECUTTI:  Judge, you did agree with us in the

7    James Albert case.

8          THE COURT:  Well, I was foolish in that case.

9          No, but that was a similar case.  It was a similar

10   case in terms of people who shouldn't have been called.

11         MS. HAJJAR:  Your Honor, just on that, I wonder if

12   it could be rectified by just reiterating that a defendant in

13   a criminal case does not have any burden to call witnesses and

14   produce evidence.  But the point is that I think in openings,

15   the defense said something to the effect of, you will be left

16   wondering why they didn't call certain witnesses.  I do think

17   an instruction is important to establish that the Government

18   does not need to call any particular witness to establish any

19   particular facts, and the defendant has the ability to call

20   witnesses themselves.  Since they opened on it, I think it's

21   appropriate.

22         MR. CECUTTI:  But that's reflected in another

23   instruction, the investigative technique instruction.  And

24   also, the concern here is, we did call a witness, and so

25   there's a greater danger of burden-shifting in light of this

1  instruction.  And --

2          THE COURT:  I'm not really concerned about that.

3  Let me think about it.

4          As I say, I don't remember Ms. Thiele saying that

5  about, you'll wonder if other witnesses --

6          MS. HAJJAR:  I'm reading from the opening, you will

7  be left wondering why they didn't call certain witnesses, and

8  then why they didn't pursue trails leading against Cory's

9  innocence.  Hold that against them.

10          THE COURT:  All right.  Well.

11          MR. CECUTTI:  We just go back to the title.  We

12  don't have the same ability as the Government to call certain

13  witnesses.

14          THE COURT:  Why don't we just say uncalled

15  witnesses.

16          Well, you would -- I mean, you could.  There's

17  subpoenas and all of those things.

18          MR. CECUTTI:  But we don't have the power to give

19  cooperation agreements, grant immunity to people.  We

20  fundamentally don't have that, and I think --

21          THE COURT:  I think we're going off into a

22  philosophical discussion that it is 10 to 6:00 that I don't

23  wish to have.  I am inclined to give the instruction and you

24  have an objection.

25          All right.  What else?    (Continued on next page.)

1           MR. CECUTTI:  We're on page 24.

2           We did object to the aiding and abetting.  I

3      understand the Court's ruling.

4           THE COURT:  Right, yes.

5           MR. CECUTTI:  No issue -- okay.  So page 29.

6           THE COURT:  Yes.

7           MR. CECUTTI:  The elements of murder for hire?

8           THE COURT:  Yes.

9           MR. CECUTTI:  So no issues with the additional

10     language by government.  I mean I've always interpreted it as

11     a fourth element, but if it's not deemed a fourth element,

12     that's fine.

13          THE COURT:  I think I got that from Judge Amon.

14          MR. CECUTTI:  Okay.

15          MS. HAJJAR:  You did, Your Honor, but we don't think

16     it's a fourth element.

17          THE COURT:  I don't think he's asking --

18          MR. CECUTTI:  I don't think it -- we don't care, put

19     it that way.

20          MS. HAJJAR:  Okay.

21          MR. CECUTTI:  One thing that we do care about though

22     is the lack of language concerning the consideration

23     requirement.

24          So in our proposed instructions, we included

25     language concerning the consideration requirement.  Government

1   did object and we think that there should be language

2   indicating that there must be a quid pro quo or a

3   bargained-for exchange, and we cited Second Circuit case law

4   to that effect.

5           THE COURT:  So the language that's there is that the

6   government has to prove that the defendant intended the murder

7   to be committed as consideration for the receipt of anything

8   of pecuniary value.  This element requires that before the

9   murder, there was a mutual agreement, understanding or promise

10  that something of value would be exchanged for committing the

11  murder.  And then it lists what the "anything of value" should

12  be.

13          Is there an additional requirement that I'm not

14  aware of?

15          MR. CECUTTI:  We think there should be language

16  explaining the consideration requirement and, again, we

17  included that in our proposed instructions and that there

18  should be language defining what that is, that there must

19  be -- I'm reading from our proposed instruction.

20          "There must be a quid pro quo or at least the

21  promise of such between the parties to the transaction.  The

22  federal murder-for-hire statute requires the government to

23  prove that the accused intended for a murder to be committed

24  as consideration for something of pecuniary value.  Moreover,

25  the mere fact that the consideration offered by, one, the

1   solicitor in exchange for another's, the murderer's agreement

2   to commit a murder could inure to the economic benefit of the

3   latter is insufficient.  There must be evidence to establish

4   that at the time the agreement was formed, the consideration

5   was something, the primary significance of which lay in its

6   economic advantage."

7           THE COURT:  I mean I don't, I don't think that that

8   additional "interpreted in the traditional sense of a

9   bargained-for exchange" -- well, I have the pecuniary value.

10  So I'm checking off what I have.

11          I think the language that you're proposing is more

12  in the line of a different sort of a contract murder.  The

13  language that you're proposing is language in, you know, sort

14  of the traditional hitman case which this case isn't.  I think

15  that's misleading.

16          MR. CECUTTI:  It's just coming out of the Second

17  Circuit murder-for-hire case law.

18          THE COURT:  And what was the case that they were

19  talking about?

20          MS. HAJJAR:  Just to clarify, it's actually,

21  quotations from out-of-Circuit cases.  It's just confusing and

22  it doesn't relate to the facts of this case.

23          THE COURT:  I just don't think it relates to the

24  facts of the case which is why I didn't include it in the

25  first place.

1      I mean the charge that's given here, as I said, it's

2 a charge that Judge Amon gave and I think it fits the

3 circumstances here because you're talking about the solicitor,

4 I mean this isn't that case.  It's not that the insurance

5 company was, you know, in on the, in on the plan.  So it just

6 doesn't fit.

7           Okay.  So you have an objection to that.

8           MR. CECUTTI:  One moment, Your Honor.

9           (Pause.)

10           MR. CECUTTI:  So page 41 where the government added

11 language from the <u>Dubin versus United States</u>.

12           THE COURT:  Right.

13           MR. CECUTTI:  No objection to that.

14           THE COURT:  Okay.

15           MR. CECUTTI:  Then on page 43, we do object to the

16 lengthy inclusion by the government.  We think that the

17 instruction without that addition --

18           THE COURT:  I think -- just if I could interrupt, I

19 don't think all that stuff at the bottom, I think they're just

20 explaining to me why I should put that in.  I think all

21 they've included is -- I think this comes from Judge Kuntz's

22 charge.  This is for this element the government -- just it

23 ends at "Count Three"  I did not take that long part to be

24 what they wanted me to put in.

25           Was I right about that?

1          MS. HAJJAR:  Yes.  Yes.  I just wanted to note that

2    this, this question is sort of an open question but all courts

3    that have considered it in this Circuit have concluded that

4    the consent of the person who had the identification is not a

5    defense of the charge and so without lawful authority, there's

6    no really great law on what that means but it just does not

7    mean that it's the owner of the information that gets to

8    decide what's lawful, lawful or unlawful use.

9          So if I take Ms. Dean's identification and commit a

10   crime with it, the fact that she consented to that is not a

11   legal defense to the charge.

12          THE COURT:  I mean I think that's a fair point.

13          MR. CECUTTI:  Again, I think the instruction that

14   was previously provided is sufficient and it's -- this is not,

15   this has not been settled by the Second Circuit.

16          MS. HAJJAR:  The only other thing I can propose, and

17   I can propose some language is to keep Your Honor's original

18   language but to say "without the authorization of the

19   individual or without the authorization of the," this is

20   what's confusing, "the issuing government entity," because

21   that's the thing.  Whatever it is you're using, without the

22   permission of the person's -- whatever entity that issued

23   that, the DOB or the SSN or whatever it is that you're using.

24          It's confusing.  I don't have a great solution here,

25   but I just don't think that the original charge is correct.

1    MR. CECUTTI:  I think it is correct and I think it

2  is sufficient.

3    THE COURT:  Well, I mean it's possible -- if we talk

4  about the facts of this case, it's possible that the victim

5  knew that the defendant had her identification, I don't think

6  this is a matter of common sense, she would have consented to

7  having him take an insurance policy out on her.  I don't think

8  that's your argument.

9    MR. CECUTTI:  No.

10    THE COURT:  I'll have to look at Judge Kuntz's --

11  that's a fairly recent trial, isn't it?

12    MS. HAJJAR:  It is, in 2021.

13    My only hesitation is that Dubin is the most recent

14  case that talked about this statute.  It was a little

15  limiting.  I don't know -- you know, obviously that postdates

16  Alder, but I still think, I still think the lawful authority

17  refers to the issuing entity, not to the victim whose

18  identification it was.

19    THE COURT:  Well, you could, I suppose, say the

20  third element is that the defendant acted without lawful

21  authority.  I think it does have to be a little bit clearer.

22    "Transferred or possessed or used the means of

23  identification of another person without lawful authority

24  during and in relation to the offense of the wire fraud

25  conspiracy."  That sentence is fine, I think, because it

1  clarifies that it's -- I think I'm going to have to look at --

2  I just got the cases so I haven't looked at them so I would

3  have to look at them again.

4         MR. CECUTTI:  Your Honor, we would not oppose the

5  two sentences beginning with "For this element" and ending

6  with "Count Three."

7         THE COURT:  You don't oppose those?

8         MR. CECUTTI:  No.

9         THE COURT:  Oh, swell.  We're good.

10        So what else?

11        MR. CECUTTI:  That's all we have.

12        THE COURT:  And I guess I have all of the

13 government's proposals, correct?

14        MS. HAJJAR:  Yes.  There was just a typo on page 45

15 and I think we've addressed everything else.

16        THE COURT:  Okay.  What did I say I was going to

17 decide?  Maybe I decided it already.

18        MR. CECUTTI:  What's that?

19        MS. HAJJAR:  We just resolved that.

20        THE COURT:  Oh, it was the impeachment business.

21 All right.  I don't think that's the key to the case but I do

22 kind of agree that you shouldn't have stuff in there that

23 doesn't belong there.  I just don't remember if what is

24 classic impeachment happened.  So I'm inclined to give it and

25 be criticized.

1      MS. HAJJAR:  Sorry.  Just to clarify, I think we've

2 resolved this, but the language on the statutory enhancement

3 about the causation, there's something that the Court added

4 about causation that the government revised.  I just wanted to

5 make sure there was no, that we were adopting that change.

6      THE COURT:  Yes.

7      MS. HAJJAR:  Okay.  Thank you.

8      THE COURT:  All right.  So we'll -- I am inclined to

9 give the impeachment one, just belt and suspenders, and I

10 don't think there's anything that we left open.

11      All right.  So I think that's all we have to do

12 today.  So I'll see everybody tomorrow.

13           (Matter adjourned to March 1, 2024 at 9:30 a.m.)

14

15

16

17

18

19

20

21

22

23

24

25

INDEX

WITNESSES:

MATTHEW WIEDEMER

    DIRECT EXAMINATION BY MS. DEAN        1499

    CROSS EXAMINATION BY MR. CECUTTI    1535

EUNGEE HWANG

    DIRECT EXAMINATION BY MR. PALACIO    1542

ALLAN JAMIESON

    DIRECT EXAMINATION BY MS. THIELE    1659

    CROSS-EXAMINATION BY MR. PALACIO    1672

    REDIRECT EXAMINATION BY MS. THIELE   1689

EXHIBITS:

Government Exhibits 962 through 987    1504
Government Exhibits 346 through 351A and  1514
351B
Government Exhibit 44    1518
Government Exhibits 42 and 43    1519
Government's Exhibit 1203    1541
Government's Exhibit 306    1545
Government's Exhibit 302    1545
Government's Exhibit 304    1545
Government's Exhibit 309    1547
Government's Exhibit 310    1551
Government's Exhibit 407    1552

*   *   *