1          UNITED STATES DISTRICT COURT
           EASTERN DISTRICT OF NEW YORK
2
   - - - - - - - - - - - - - - - - X
3
   UNITED STATES OF AMERICA,      : 20-CR-549(AMD)
4                                  :
                                   :
5                                  :
        -against-                  : United States Courthouse
6                                  : Brooklyn, New York
                                   :
7                                  :
                                   : Tuesday, February 20, 2024
8  CORY MARTIN,                    : 10:00 a.m.
                                   :
9          Defendant.              :
                                   :
10 - - - - - - - - - - - - - - - - X

11        TRANSCRIPT OF CRIMINAL CAUSE FOR JURY TRIAL
          BEFORE THE HONORABLE ANN M. DONNELLY
12             UNITED STATES DISTRICT JUDGE

13              A P P E A R A N C E S:

14 For the Government: BREON S. PEACE, ESQ.
                       United States Attorney
15                     Eastern District of New York
                       271 Cadman Plaza East
16                     Brooklyn, New York 11201
                   BY: EMILY J. DEAN, ESQ.
17                     TANYA HAJJAR, ESQ.
                       ANDRES PALACIO, ESQ.
18                     Assistant United States Attorneys

19
   For the Defendant:   THE LAW OFFICE OF ANTHONY CECUTTI
20                       217 Broadway
                         Suite 707
21                       New York, New York 10007
                     BY: ANTHONY CECUTTI, ESQ.
22

23 Court Reporter:  Nicole J. Sesta, RMR, CRR, RPR
                    Official Court Reporter
24                  E-mail:  NSestaRMR@gmail.com

25 Proceedings recorded by computerized stenography.  Transcript
   produced by Computer-aided Transcription.

1                    APPEARANCES - CONTINUED

2

3    For the Defendant:

4                    THE LAW OFFICE OF KESTINE M. THIELE
                     305 Broadway
5                    Suite 700
                     New York, New York 10007
6                    BY:  KESTINE M. THIELE, ESQ.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURTROOM DEPUTY:  This is criminal cause for

2    trial.  Docket number 20-cr-549, USA versus Cory Martin.

3          Counsel, state your appearance, government first.

4          MS. DEAN:  Good morning, Your Honor.

5          Emily Dean, Tanya Hajjar, Andy Palacio for the

6    government, with Paralegal Specialist Theodore Rader, and FBI

7    Special Agent Bridget Wendell.

8          THE COURT:  Good morning.

9          MR. CECUTTI:  Good morning, Your Honor.

10          Anthony Cecutti and Kestine Thiele for Cory Martin.

11   Also joined by paralegals, Preston Gover and Mayerlin Ulerio.

12          THE COURT:  Good morning.  Good morning, Mr. Martin.

13   All right.  A couple of things, we have lost already two

14   jurors.  One juror did not realize that he had dental

15   emergency, I don't know whatever necessary dental surgery for

16   this week.  He gave Donna a note.

17          The second juror called this morning, very, very

18   sick, also sent a doctor's note.  So off to a great start.

19   But we'll replace those jurors with alternates.  I want to say

20   that I don't appreciate the Monday filings of information that

21   should have been filed a long time ago.

22          I refer, specifically, to the defense expert

23   disclosure, such as they are.  We'll discuss them at the

24   break.  And the second thing has to do with the response to

25   the government's motion in limine.  We'll discuss that

1   briefly, because I understand that one of the witnesses is

2   going to testify.  I don't want that to happen again.  It was

3   late, and it should have been, at the very latest at least

4   with the motion in limine, last week; the expert material

5   should have been disclosed.  I think I gave a deadline of

6   February 5th and I did not realize it hadn't been done.

7            Has there been any other Rule 16 discovery supplied

8   to the prosecution?

9            MR. CECUTTI:  No, Your Honor.

10            THE COURT:  Is there any out there?

11            MR. CECUTTI:  No.

12            THE COURT:  Let's begin with the motion in limine.

13   I think the request with respect to CW-1 is to permit inquiry

14   into the fact that she, by her own admission, engaged in

15   shoplifting, sort of repeatedly.  I'm not sure of what the

16   time frame is.

17            And then the second application is that she lied to

18   her pretrial services officer, having to do with some

19   violations.  I take it the government doesn't object to the

20   line to the pretrial services officer, correct?

21            MS. DEAN:  With respect to the one time that she

22   lied regarding use of marijuana, no, we do believe that's

23   relevant.

24            THE COURT:  Okay.  So that's permissible.  The

25   shoplifting, what is the time period of this?

1          MS. DEAN:  The majority of the shoplifting took

2     place between 2005 to 2008.  That was when CW-1 was

3     shoplifting from retail stores and reselling merchandise.

4          In 2010, after her first child was born, she did

5     shoplift basic necessities, diapers, things such as that.  I

6     did, upon receipt of the defense response, inquire with CW-1

7     if there was any shoplifting closer in time to the charged

8     conduct.  She said that she still did, with the victim in this

9     case, steal snacks from a corner store, and that was in the

10    relevant time period.

11         THE COURT:  You're not seeking to inquire about the

12    some of it almost 20-year old conduct, are you, Mr. Cecutti?

13         MR. CECUTTI:  I think it's all related to qualities

14    concerning truthfulness and credibility of CW-1.

15         THE COURT:  So that she shoplifted from 2005 to

16    2008, you think that's relevant?

17         MR. CECUTTI:  Yes, because our view is that she

18    continued to do so well into the charged time period, and the

19    government has now confirmed that.

20         THE COURT:  Are you asking specific incidences or

21    are you just going to say did you shoplift?

22         MR. CECUTTI:  I would like to inquire based upon

23    what the government has indicated in their response, that she

24    shoplifted in 2005 to 2008 from stores, she was arrested four,

25    six times, she shoplifted twice a week, or twice a month for

1    four years.  That level of detail.

2            THE COURT:  I'll permit it.

3            MR. CECUTTI:  Thank you.

4            THE COURT:  And you're also going to ask about

5    shoplifting for baby clothes and things like that?

6            MR. CECUTTI:  For the period beyond 2008, and then I

7    also want to inquire about shoplifting during the charged time

8    period.

9            THE COURT:  I don't think the government objects to

10   that.

11           MS. DEAN:  No, Your Honor.

12           Just a clarifying question, with regards to the

13   cross-examination on the 2005 to 2008 conduct, we had moved to

14   preclude the sealed violation to disorderly conduct.

15           THE COURT:  There will be no testimony about arrests

16   because the arrests aren't probative of anything.  You're not

17   going to ask her about arrests.  You can ask her did she

18   shoplift.

19           MR. CECUTTI:  Yes.

20           THE COURT:  Yes.  No "were you arrested", no "did

21   you get a discon", which is not even a crime.  Was it a

22   violation?

23           MS. DEAN:  Yes, Your Honor.

24           THE COURT:  Don't ask her about any of the

25   dispositions because there are no convictions.

1          MR. CECUTTI:  Understood.

2          THE COURT:  All right.  Then with regard to witness

3   number one, are we going to get to witness number one today?

4          MS. DEAN:  We think so, Your Honor.  Before we get

5   to witness number one, can I just clarify something about

6   CW-1?

7          THE COURT:  If you could slow down.

8          MS. DEAN:  Thank you.  The defense did not move in

9   response to our motion with regards to her arrests for

10  fighting.  So I just want to make sure that I'm going to

11  instruct her that will not be coming up.

12         THE COURT:  No, it's not probative of credibility.

13         MR. CECUTTI:  Your Honor, I don't intend to get into

14  fighting.  But just back to CW-1 concerning her conduct while

15  on supervision, there's no disagreement about the lie

16  concerning marijuana use but there are other actions I wanted

17  to inquire her about.

18         THE COURT:  But had she violated supervised release?

19         MR. CECUTTI:  Yes.

20         THE COURT:  How are they probative of her

21  credibility?

22         MR. CECUTTI:  She lied to pretrial.

23         THE COURT:  You can ask her did she lie to pretrial.

24  How many times is she alleged to have lied to pretrial?

25         MS. DEAN:  One time, Your Honor.

1        MR. CECUTTI:  That's different than what pretrial is

2   saying.  Pretrial is saying that she violated curfew a number

3   of times, and her explanations for why she violated were not

4   plausible.

5        THE COURT:  You can ask her if she lied to pretrial,

6   and if you've got a basis for the inquiry you can ask her.

7   You say there's one.  Mr. Cecutti says there's more than one.

8        In the context of this case, I don't think it's the

9   key to the case, but you can ask her about did she lie to her

10  pretrial services officer.

11       Again, just with regard to the pending case with

12  witness one, I think the parties heard that the government

13  agrees that the witness can be cross-examined about the fact

14  that he has a pending case.

15       Is someone knocking on the door?

16       The witness is obviously going to take the Fifth,

17  assert his Fifth Amendment privilege, and I'm sure he'll have

18  counsel here.  So you can ask if he has a pending case.  You

19  can ask what the nature of the case is.  He'll invoke the

20  Fifth Amendment.

21       Questions by themselves are not answers, or are not

22  evidence, so I don't expect a litany of questions that have

23  what the facts of the case are since you know you're not going

24  to get an answer out of it.  But you can ask him does he have

25  a pending case.  The relevant factor is the extent to which

1   he's getting consideration, either from the Brooklyn District

2   Attorney's Office or from the United States Attorney's Office.

3           That's fair game.  Then, the government also agrees

4   that you can inquire into -- it's a little unclear to me

5   exactly what you want to ask him about his history of being

6   involved in shootings, but the government doesn't object to

7   it.  But the government does point out, as they have before,

8   that under those circumstances the evidence that the

9   defendant, I think he asked this witness for a gun himself.  I

10  mean, that's part of the testimony.

11          So that's permissible, too, for the reasons that the

12  government has outlined before.  Then there's this question of

13  in 2020 he had two felonies.  Was it aggravated unlicensed

14  driving?  What was it?

15          MS. HAJJAR:  Yes, Your Honor.  Aggravated -- I'm

16  sorry.  You're talking about the misdemeanor conviction, Your

17  Honor, for reckless endangerment?

18          THE COURT:  Right.  As I understand it, he was

19  arrested and charged with two felonies and they were reduced

20  to a misdemeanor.  That's the one I'm talking about.

21          Do I have that right?

22          MS. HAJJAR:  Yes, Your Honor.

23          THE COURT:  And, obviously, the details of those,

24  which I think are reckless endangerment because he ran a red

25  light and crashed into a car, that's not probative of

1  credibility.

2         As I understand it, the defense seeks to inquire

3  about this because of the possibility that the charges were

4  reduced as part of some deal with the Brooklyn District

5  Attorney's Office.

6         Was this in 2020?

7         MS. HAJJAR:  Yes.

8         THE COURT:  In 2020, the Brooklyn DA's office didn't

9  have anything to do with this case.

10        MR. CECUTTI:  Your Honor, I think this is the

11  argument.  He meets with NYPD on August 31, 2018.  He gives

12  them information concerning this murder.  He subsequently gets

13  arrested in a very serious case.

14         He gets pulled over, he speeds away, he goes through

15  a series of red lights, one way streets, crashes into cars,

16  and he ends up with a misdemeanor.  This is somebody who has

17  three prior --

18        THE COURT:  That happens so regularly in Brooklyn

19  criminal court.  I don't think it's unusual.  I think you

20  probably don't think it's that unusual either.

21        MR. CECUTTI:  I think it is.  If I'm representing

22  witness one, and I have this case, and I know that he met with

23  the Kings County DA's office and gave them information about

24  this particular murder, when I'm on the phone contacting

25  whatever ADA, I'm going to be emphasizing that fact in plea

1  negotiations.

2          THE COURT:  How long did it take to get reduced, do

3  you know?

4          MS. HAJJAR:  About two years, Your Honor.  But

5  there's no good faith basis to inquire about this, Your Honor.

6          THE COURT:  I'll tell you what I will permit.  You

7  can say did you get arrested in 2020 for felonies and did

8  those get reduced to misdemeanors, and did you have some kind

9  of a deal with the Brooklyn DA's office.  You can ask that

10  question and you're bound by the answer.

11          I'm going to deal with the expert business later,

12  except to say, just as a preview, it's woefully late, and such

13  as it is, it's unclear to me about what either witness would

14  have to say that was relevant.

15          We can discuss that later because we have a jury

16  waiting.  So before we bring in the jury, we have to seat the

17  alternates and then swear the jury in.

18          Anything else that cannot wait?

19          MS. DEAN:  Just very briefly, Your Honor.  With

20  regard to a witness who is going to testify this morning,

21  there's a large board that we would ask the Court permission,

22  as far as spatially, may we put it in front of the jury and

23  allow defense to reposition to see it?

24          THE COURT:  Sure.

25          MS. DEAN:  The only other thing is, there are three

1    minor children whose names will come up in this case.  We're

2    just requesting permission to refer to them as T, Z, and A,

3    and let our exhibits reflect those redactions.

4            THE COURT:  Okay.  And then I think -- I have to

5    grab something back in my chambers.  I think we should say

6    something about that in the opening instructions.  Give me

7    just a second.

8            (Pause.)

9            THE COURT:  I think we're ready for our jurors.

10           (Jury present.)

11           THE COURT:  Good morning, everybody.  I'm Judge

12   Donnelly.  I'm a United States District Judge.  I'll be

13   overseeing the trial.

14           I want to talk to you a little bit about what to

15   expect during the course of the trial, which we're about to

16   begin.

17           I'm going to give you some preliminary instructions.

18   But before I do that, we've already lost two jurors, so juror

19   number six and juror number nine were unavoidable.  So we'll

20   begin by replacing juror number six with alternate number one,

21   who is Mr. Lim.  So if you could just go down, I don't know

22   how you'll get there, but go to seat number six.

23           Then alternate number two, who is Mr. Lau, you're

24   going to sit in -- you'll become juror number nine.  So you'll

25   sit in --

1      THE COURTROOM DEPUTY:  Right here, behind number

2  one.

3      THE COURT:  I usually wait a couple of days to tell

4  you all to stay healthy but that will be my first instruction

5  to you.  Let's start by swearing the jurors in.

6      THE COURTROOM DEPUTY:  Please stand and raise your

7  right hand.

8      (Jury sworn.)

9      THE COURT:  All right, ladies and gentlemen.  The

10  first thing I want to do is thank you for your participation

11  in this very important process.  A trial by jury is one of the

12  foundations of our government.  It's one of the great rights

13  that we have as citizens of this country, and our system can't

14  function without good people like you who are willing to step

15  up and serve as jurors.  So I thank you for that.

16      Your job as jurors is to administer justice in this

17  case according to the law and according to the evidence.  You

18  must carry out your duties as jurors with complete fairness

19  and impartial at without bias, prejudice or sympathy for

20  either side, either for or against the government or for or

21  against the defendant.

22      I'm going to start by giving you a summary of what

23  the charges are.  Now these are just charges.  It's not

24  evidence.  In Count 1, Mr. Martin is charged with murder for

25  hire.  In or about and between March 2017 and April 2018, both

1    dates being approximate and inclusive, within the Eastern

2    District of New York and elsewhere, Cory Martin, together with

3    others, did knowingly and intentionally use and cause another

4    to use one or more facilities of interstate commerce, to wit:

5    One or more telephones and the internet with intent that a

6    murder be committed in violation of penal law Section 125.25,

7    to wit:  The murder of Brandy Odom as consideration for the

8    receipt of, and as consideration for a promise, an agreement

9    to pay something of pecuniary value and the death of Brandy

10   Odom did result.

11           Count 2 is murder for hire, conspiracy.  In or about

12   and between March 2017 and April of 2018, both dates being

13   approximate and inclusive, within the Eastern District of

14   New York and elsewhere, Cory Martin, together with others, did

15   knowingly and intentionally conspire to use and cause another

16   to use one or more facilities of interstate commerce, to wit:

17   One or more telephones and the internet with the intent that a

18   murder be committed in violation of New York penal law

19   Section 125.25, to wit:  The murder of Brandy Odom as

20   consideration for the receipt of and consideration for a

21   promise, an agreement to pay something of pecuniary value and

22   the death of Brandy Odom did result.

23           Count 3 charges wire fraud, conspiracy.  In or about

24   and between March 2017 and August 2018, both dates being

25   approximate and inclusive, within the Eastern District of

1   New York and elsewhere, Cory Martin together with others did

2   knowingly and intentionally conspire to devise a scheme and

3   artifice to defraud one or more life insurance companies, to

4   wit:  Globe Life and Accident Insurance Company and American

5   National Insurance Company, and to obtain money and property

6   from said life insurance companies by means of one or more

7   materially false and fraudulent pretenses, representations,

8   and promises, and for the purpose of executing such scheme and

9   artifice to transmit and cause to be transmitted by means of

10  wire communications, in interstate and foreign commerce one or

11  more writings, signs, signals, pictures, and sounds, to wit:

12  Telephone calls, monetary transfers, emails, and other

13  electronic communications.

14          Count four is aggravated identity theft.  In or

15  about and between March 2017 and August 2018, both dates being

16  approximate and inclusive within the Eastern District of New

17  York and elsewhere, Cory Martin, together with others during

18  in and in relation to the crime charged in count three, did

19  knowingly and intentionally transfer, possess, and use without

20  lawful authority one or more means of identification of

21  another person, to wit:  The name, date of birth, and social

22  security number of Brandy Odom, knowing that these means of

23  identification belonged to another person.

24          Count five is fraudulent use of identification,

25  Brandy Odom.  In or about and between March 2017 and August

1   2018, both dates being approximate and inclusive within the

2   Eastern District of New York and elsewhere, Cory Martin,

3   together with others, knowingly and intentionally transferred,

4   possessed, and used without lawful authority and in and

5   affecting interstate commerce one or more means of

6   identification belonging to another person, to wit:  The name,

7   date of birth, and social security number of Brandy Odom, with

8   the intent to commit and to aid and abet and in connection

9   with unlawful activities that constituted one or more

10  violations of federal law, to wit:  The crimes charged in

11  counts one, two, and three.

12          Cory Martin committed the offense charged in this

13  count in connection with a crime of violence, to wit:  The

14  murder of Brandy Odom.  Now as I said, these are just charges.

15  They are not evidence of anything.  It is the government's

16  burden to prove Mr. Martin's guilt beyond a reasonable doubt

17  with respect to each one of these charges.

18          The charges are in a document called the indictment,

19  and the indictment is the document that brings the case to

20  court but it's just an accusation.  It's not evidence of

21  anything.

22          As I said, the government has the burden of proving

23  each of the essential elements of the crimes charged beyond a

24  reasonable doubt, and it's the purpose of the trial to

25  determine whether or not the government has met this burden.

1          A defendant in a criminal case does not have to

2    prove innocence.  On the contrary, the defendant is presumed

3    to be innocent of the charges in the indictment.  One of your

4    jobs as jurors is going to be to determine what the facts are

5    based on the evidence.  You as jurors are the sole judges of

6    the facts.

7          You will then have to apply to those facts the law

8    as I will give it to you.  You must follow the law as I give

9    it to you, whether you agree with it or not.  Because I am the

10   judge of the law, I will make legal rulings including on

11   objections.  I also may direct the lawyers to move along at

12   various points so we can keep the trial moving along.  Don't

13   assume that because I make a ruling about the case, or a

14   ruling on any objection, you must not assume that I have any

15   opinion about the case or what your verdict should be.  I

16   don't have any such opinion.

17         Sometimes during the course of an examination I may

18   ask a question of a witness.  If I do that, there is nothing

19   special about it.  I'm either doing it because I don't

20   understand the question or because I think something needs to

21   be clarified for you.  Again, don't assume just because I ask

22   a question there is something of special importance to it.

23         Because you are the judges of the facts, you'll have

24   to listen to the evidence carefully.  The evidence consists of

25   testimony of witnesses on direct and cross-examination,

1   documents and other evidence that come into evidence, and any

2   facts on which the parties agree.  These agreements are called

3   stipulations.  There are other things that are not evidence

4   and you may not consider them.

5          What any lawyer says during the course of a trial,

6   whether it's in an opening statement or making an objection or

7   giving a closing argument is not evidence.  Now, lawyers

8   should make objections as part of their job if they think

9   there is a reason to object.  Don't hold it against lawyers

10  because they object.

11         If I sustain an objection, that means that I have

12  determined the question is not proper and you should ignore

13  the question.  If I overrule the objection, that means I have

14  determined that it is a proper question.  Now sometimes a

15  witness answers a question even if I've sustained the

16  objection.  If that happens, I'll simply direct you to

17  disregard the answer.

18         Anything that you have heard or seen outside of the

19  courtroom is not evidence.  You must decide this case only on

20  the evidence that is presented here during the trial.  It's

21  possible that there will be some press coverage of this case.

22  You must not read, watch, or listen to any coverage of this

23  case.

24         Now, during the course of the trial, there will be

25  reference made to some children.  They will be referred to by

1   initials.  That's very common in a case like this and you

2   shouldn't attach any special significance to it.

3           I do want to take just a minute to talk to you about

4   one of your tasks as jurors, which is to determine the

5   credibility of witnesses who testify.  It's part of your job

6   as the finders of the facts you will also determine whether or

7   not you believe what a particular witness is saying.  And so

8   whether you believe the witness is telling you the truth,

9   whether you believe the witness is lying, whether you think

10  the witness is being accurate, or whether the witness has made

11  an honest mistake, there is no magical formula for determining

12  whether a witness is telling you the truth.

13          You bring to this process all of your lifetime

14  experience and your common sense.  You make similar decisions

15  about people with regularity in your own lives when you're

16  trying to decide and to assess what someone is telling you.

17  I'm going to suggest to you some of the things you should

18  consider when you listen to a witness testify.  What is the

19  witness' demeanor, does the witness' testimony make sense,

20  does the witness have a reason or a motive to testify falsely,

21  is the witness' testimony consistent or inconsistent with

22  other evidence or other testimony, and if there are

23  inconsistencies, are they important and related to important

24  facts, or are they minor.

25          Has the witness said something contradictory at

1    another time.  These are just some of the tests that you use

2    to determine whether a witness is telling you the truth or

3    lying, whether the witness is mistaken or being accurate.

4           There are some basic rules that you must keep in

5    mind as jurors in this criminal case.  First, as I mentioned

6    before, Mr. Martin is presumed innocent unless and until the

7    government has proven him guilty beyond a reasonable doubt.

8    Second, the government has the burden to prove the defendant's

9    guilt beyond a reasonable doubt.  The defendant has no burden

10   to prove his innocence or present any evidence.  He has no

11   burden to put on a case or to testify.

12          If Mr. Martin decides not to testify or put on any

13   evidence, you may not hold those facts against him.  As I have

14   mentioned several times, the government must prove the

15   defendant's guilt beyond a reasonable doubt.

16          I will give you further instructions on this concept

17   in my final instructions, but that standard of proof, proof

18   beyond a reasonable doubt, is one of the things that makes a

19   criminal case different from a civil case.  Now, I want to say

20   a few words about your conduct as jurors.  As I mentioned

21   before, you must only decide the case based on the evidence

22   that you hear during the course of the trial.  And so that

23   means that you may not conduct any independent research on

24   anything having to do with anything about this case; not the

25   people involved, not about the law.  In other words, you

1  cannot look up anything on the internet, do not research the

2  lawyers or the witnesses or the parties.

3          Don't try to find out anything about this case from

4  any source outside of the courtroom.  I'm the last person to

5  be lecturing somebody about social media, because I don't know

6  that much about it, except to say don't go on social media

7  about this case at all.  Don't make comments, don't write a

8  blog about your experience as a juror, don't email anybody,

9  don't tweet or Instagram or any of the other ways that

10 somebody could communicate with other people.  I say this

11 because it has happened before in trials across the country

12 that a juror has decided to share his or her perceptions about

13 being a juror, and the whole case has to be started all over

14 again.

15         As tempting as it might be to try to find something

16 out about the people involved or about the case, do not look

17 anything up at all about the case, and that is something that

18 I'm going to be reminding you with regularity.

19         As a related matter, you are not permitted to

20 discuss the case with anyone during the trial.  Obviously, you

21 can talk to your families and your workplaces about your

22 schedule, but you can't talk about the case itself.  That also

23 means you can't talk to your fellow jurors about the case, and

24 I think that's probably a lot harder because this is the only

25 experience, as far as I know, that you all share.  So it must

1   be very tempting at the breaks to chat about something that

2   happened during the course of the trial, or comment on a

3   witness' testimony, but you can't do that.

4            If you were to start discussing amongst yourselves

5   what you think about the case, you would be deliberating

6   before you had heard all the evidence and our law doesn't

7   permit that.  So don't talk about the case.

8            I'm sure Judge Kuo told you this when you were

9   selected as jurors, but the lawyers are not permitted to speak

10  to you at all during the course of the trial, even to say

11  hello in the hallway.  They are not being rude.  They're just

12  not permitted to do it.  You must report directly to Ms.

13  Greene any effort by any person who approached you about this

14  case to influence you improperly or to influence another

15  juror.

16           And related to all of this is that you cannot form

17  an opinion about the case until all the evidence is in.

18  That's another reason for not discussing it ahead of time.

19  Keep an open mind until you begin your deliberations at the

20  end of the case.  Now, I think all of you have notepads.

21  You're welcome to take notes during the course of the trial.

22  If you do take notes, make sure that it does not interfere

23  with your ability to listen to the evidence.

24           We have, I think, the best court reporters in the

25  country.  They take down everything that every witness says.

1   If you need to refresh your recollection about a witness'

2   testimony, that testimony will be available to you during your

3   deliberations.  If you do take notes, don't discuss them with

4   anyone, they're only for your use.  You will not be permitted

5   to take them home with you.  They'll be collected at the end

6   of each day.  If you decide you don't want to take notes,

7   that's also fine but you can't rely on anybody else's notes.

8   As I said, the notes are for each individual juror.

9           During deliberations, as I mentioned, you will be

10  able to request portions of the trial transcript, if you need

11  to have your recollection refreshed.  A couple of other

12  things.  Please be on time.  We can't start until all of you

13  are here.  We will take a morning break, a lunch break, and an

14  afternoon break.  Sometimes I have to have conferences with

15  the lawyers.  Usually it's in an effort to try to speed things

16  along, but I'll try to let you know when those are going to

17  happen.  I have no control over the temperature in here.

18  Sometimes it's cold and sometimes it's hot.  Just prepare

19  accordingly.

20          I will say on Thursday we're going to stop at about

21  2:00, and then you'll have that afternoon free.  Now the last

22  thing I'm going to talk to you about is an overview of the

23  trial.  The government will make an opening statement, which

24  is really an outline of what the government expects the

25  evidence to prove.

1          Defense counsel may but does not have to make an

2     opening statement.  But opening statements are designed for

3     the parties to tell you what they expect the evidence will

4     show.  After opening statements, the government will then

5     present its witnesses.  Following the government's case, the

6     defendant may, but does not have to, present evidence or put

7     on a case.

8          After all of the evidence is in, the lawyers will

9     have the opportunity to address you in closing arguments.

10    After that I will instruct you on the law and then you will

11    retire to deliberate on your verdict.

12          I think we're ready to begin with the opening

13    statement by the government.

14          (Continued on next page.)

15

16

17

18

19

20

21

22

23

24

25

1  (Continuing.)

2         MR. PALACIO:  Thank you, Your Honor.

3         In early April 2018, this defendant strangled a

4  young woman to death inside a home they share in Queens.

5  After killing her, he opened the windows to let in the cold

6  spring air.  He dragged her naked body into a bathroom and

7  then into a bathtub.  He used multiple sharp objects,

8  including an electric saw, to dismember her body.  First her

9  arms, then her legs, and then her knees.

10        He stuffed her torso into a suitcase.  He threw

11 her severed limbs into garbage bags.  And then he made

12 multiple trips to Canarsie Park to dump her dismembered

13 corpse into a wooded field.  He killed Brandy Odom because

14 he had taken out two life insurance policies in her name.

15 The defendant murdered her to cash out on her death.

16        Brandy Odom and the defendant's girlfriend, Adelle

17 Anderson, worked for the defendant.  He was their pimp.

18 They lived and worked out of his house in Queens.  And

19 you'll hear that every dollar that they earned from sex work

20 went to line the defendant's pockets.  He demanded that they

21 call him "Daddy."  He controlled every aspect of their

22 lives, down to what they ate, and even when or if they could

23 even shower.

24        The defendant eventually transitioned Anderson

25 from doing her own sex work to managing Brandy's sex work at

1  a point in time after Anderson became pregnant with their

2  child.

3          Anderson managed Brandy's sex work.  She managed

4  online accounts, she communicated directly with clients, and

5  she scheduled Brandy for sexual services.  Everything that

6  they earned went back to the defendant.

7          But the money that the defendant made off their

8  bodies was not enough for him.  He wanted more, and he

9  determined that Brandy would be worth more dead than alive.

10 So he decided to take out life insurance policies without

11 Brandy's knowledge, and Anderson helped him carry out that

12 scheme.

13         Together they took out a policy worth $50,000 in

14 March 2017, an entire year before the defendant killed

15 Brandy.  They used her name, her date of birth, and her

16 social security number to secure those policies, and they

17 listed Anderson as the sole beneficiary of the policy, as

18 her sister, even though Anderson was not her sister.

19         And later that year, in December, and just four

20 months before the defendant killed Brandy, they took out a

21 second policy, this time worth $150,000, from a different

22 company, and again they listed Anderson as Brandy's sibling.

23         So by early April 2018, the defendant decided that

24 the time had come to kill Brandy.  On April 2, 2018, the

25 defendant took Anderson and their daughter to Anderson's

1   mother's house so that he could isolate Brandy.  And while

2   Anderson was away, the defendant stayed alone with Brandy

3   inside their house in Queens, and then he strangled her to

4   death inside her bedroom.  He left her body in that bedroom.

5          He went to pick up Anderson from her mother's, and

6   on the way back they stopped at Walmart to buy some cleaning

7   supplies, and over the next few days, the defendant

8   butchered Brandy's body.  He covered the bathroom from floor

9   to ceiling with plastic to avoid leaving traces of forensic

10  evidence.  He chopped away at her body.

11         But despite his efforts, he had trouble cutting

12  through her flesh and bone, so he used his phone to search

13  for a more powerful tool.  He went to Home Depot's website

14  to browse a reciprocating saw, which is a mechanical tool

15  that uses a blade to move back and forth and is generally

16  used in demolition and renovation projects.  He drove to

17  Home Depot, he purchased that saw, and he used it to tear

18  through the rest of Brandy's body.

19         And after completing that gruesome task, the

20  defendant and Anderson cleaned the house from top to bottom

21  to eliminate anything that could link them to the murder.

22  You'll even hear evidence that the defendant hired junk

23  removal companies to haul away bags of incriminating

24  evidence.

25         In the early morning hours of April 8th and

1   April 9th, the defendant and Anderson made two trips to

2   Canarsie Park to get rid of Brandy's body.  They drove to

3   the park with their baby in the back seat and Brandy's body

4   parts in the trunk.  The defendant threw out those garbage

5   bags into a wooded field; one containing Brandy's arms and

6   legs, and another containing chunks of her thighs.

7           He returned to the park the next day with that

8   suitcase, and he dumped Brandy's naked torso into a pile of

9   leaves and debris just off a foot path.  And you'll hear

10  that he did that on purpose, that he left her body in an

11  obvious location to be found by strangers, because for the

12  defendant to profit from Brandy's murder, she had to be

13  found and confirmed dead.  A disappearance alone would be

14  insufficient to secure that paycheck.

15          And on April 9th, a lady who was walking through

16  the park with her dog stumbled upon Brandy's body, her

17  torso, and called 911.  The next day, police found those

18  bags containing Brandy's severed limbs.

19          After throwing Brandy's body out like trash, the

20  defendant and Anderson made multiple unsuccessful attempts

21  to collect on those policies.  The defendant's depraved

22  scheme to make money at the cost of another human's life

23  ultimately failed.

24          And for his actions, the defendant is charged with

25  murdering and conspiring to murder Brandy Odom.  And because

1   he expected to make money from that killing, he is charged

2   with murder for hire and murder for hire conspiracy.  He is

3   charged with wire fraud conspiracy for defrauding two

4   insurance companies.  And he's charged with aggravated

5   identity theft and fraudulent use of Brandy Odom's details

6   to secure those policies.

7         Over the course of this trial, you will hear from

8   many witnesses, including the victim's mother, law

9   enforcement agents, and medical experts.

10        But you will hear from Adelle Anderson herself.

11  She will walk you through that conspiracy, that life

12  insurance scheme.  She will describe to you in detail what

13  the defendant did before, during, and after that murder.

14  She will also tell you that Brandy Odom was not the original

15  target of this life insurance scheme, that she was not the

16  first person that she and the defendant discussed killing.

17  You'll hear that it actually began much earlier, with

18  Anderson's ex and Anderson's children from prior

19  relationships, people that the defendant hated and wanted to

20  make money from killing.

21        You will also learn that Anderson has struggled to

22  come to terms with her own involvement in these life

23  insurance schemes, even during the course of her cooperation

24  with the Government.  Anderson has accepted responsibility.

25  She has pled to multiple federal crimes, including murder

1  for hire, and she will be testifying before you in the hopes

2  of receiving leniency at sentencing.  Examine her testimony

3  with care.  Compare her testimony to the other evidence in

4  this case, and you will see how that evidence supports

5  Anderson's testimony.

6       You will see for yourselves copies of those

7  fraudulent life insurance applications that the defendant

8  and Anderson submitted.  You'll hear recordings of Anderson

9  calling and pretending to be Brandy before the murder.  And

10  you'll hear recordings of Anderson after the murder calling

11  in as herself to collect on those policies.

12       You will see records of incriminating searches

13  from the defendant's own phone.  After he killed Brandy,

14  you'll see Craigslist searches on the defendant's phone for

15  junk removal companies.  And later that day, after he went

16  to Home Depot, purchased that saw and came home, you'll see

17  records of deleted YouTube searches for "how to insert blade

18  for reciprocating knife," and then followed by "using

19  reciprocating knife."

20       You will also watch surveillance video recovered

21  from the defendant's block, which captured his house and his

22  driveway for an entire week before Brandy's body was

23  discovered in that park.  And while the quality of the video

24  is grainy, you will be able to see everything that happened

25  outside of that house in the days surrounding Brandy's

1    murder.

2         You will witness the final time that Brandy walked

3    into that house while Anderson was away.  You'll see that

4    junk removal truck back up into the defendant's driveway.

5    And you'll see the defendant and Anderson leaving and

6    returning from the park in the wee hours of the morning on

7    two consecutive days.  But what you will never see is Brandy

8    leaving that house until the defendant removed her in

9    pieces.

10        You will also see cell phone location records for

11   the defendant and Anderson's phone at relevant times.  Those

12   records will place the defendant at the Home Depot after he

13   searched the website for the reciprocating saw.  But what

14   you will never see from those records is activity of the

15   defendant's phone on the nights that he traveled to the

16   park, because you will learn that he left his phone at home

17   so that he couldn't be traced.

18        You'll hear from the medical examiner in this case

19   who performed the autopsy on Brandy's body and concluded

20   that she had been killed by asphyxiation.  You'll also meet

21   the forensic anthropologists who put all of Brandy's bones

22   back together at the six locations where they had been cut,

23   and determined that they had been severed through a

24   combination of cutting, chopping, and the use of a

25   mechanically-powered blade.  You will even see for yourself

1   evidence of fracturing at some of those locations,

2   consistent with the defendant snapping Brandy's bones right

3   off her body to finish the job.

4            We will present all of that evidence to you, and

5   more, to prove the defendant's guilt beyond a reasonable

6   doubt.  At the conclusion of this trial, we will ask you to

7   hold the defendant accountable for murdering Brandy in cold

8   blood just to make money off her death.  We will ask you to

9   return the only verdict justified by the overwhelming

10  evidence:  Guilty on each and every count.

11           Thank you, ladies and gentlemen.

12           THE COURT:  Thank you, Mr. Palacio.

13           Mr. Cecutti?

14           MR. CECUTTI:  Ms. Thiele will be doing our opening

15  statement.

16           THE COURT:  Go ahead, Ms. Thiele.

17           MS. THIELE:  Good morning, everyone.

18           My name is Kestine Thiele.  I'm joined at defense

19  table by co-counsel Anthony Cecutti and paralegals Mayerlin

20  Ulerio and Preston Gover.  We are Cory Martin's

21  Court-appointed defense team, and it is our privilege to be

22  trying his case.

23           Each of you is now pivotal in this pursuit for

24  justice.  The search for truth.  Your responsibility today

25  and every day of this trial will be tremendous.  Serving on

1    this jury will be one of the most important things you do in

2    your life.  You are the only ones standing in between the

3    Government and the citizen.  Here, the citizen is Cory

4    Martin.  Our Constitution says that Mr. Martin is presumed

5    innocent until and only if the Government proves to each of

6    you his guilt beyond a reasonable doubt.  It is your duty to

7    protect this Constitutional right.

8            At the end of this trial, you will find that the

9    Government failed to meet its burden, and that will be

10   because of one simple reason:  Mr. Martin is not guilty.

11           This case involves a horrific crime.  Some of the

12   evidence will be hard to see and hear.  In April of 2018,

13   Ms. Odom was strangled, murdered, and dismembered, all for

14   the promise of a life insurance payout.  These facts are not

15   in dispute.  What is in dispute is what led to Ms. Odom's

16   murder, who was involved, and what followed.  The Government

17   believes that their evidence tells a convincing story of

18   Mr. Martin's guilt.  We disagree.

19           I'd like to ask you to keep a few things in mind

20   as we begin this morning.  As Judge Donnelly said, this

21   opening statement is simply that; a statement.  What we are

22   stating is not evidence.  You cannot have made up your mind

23   after the Government's opening statement, nor can you after

24   mine.  The fact that Mr. Martin was indicted does not mean

25   that he committed these crimes.  The fact that he's on trial

1    doesn't make it true either.  You will decide what the truth

2    is; not the Government, not the defense, not Judge Donnelly.

3    That responsibility is yours.

4         Mr. Martin is here today because the Government

5    has wrongfully accused him of fraudulently obtaining life

6    insurance policies in Ms. Odom's name and then murdering and

7    dismembering her to collect the proceeds.  In the course of

8    my remarks, I hope to give you a roadmap of what the

9    Government's evidence will show, and more importantly, what

10   it will not show.

11        There will be no credible evidence of Mr. Martin

12   taking out life insurance policies on Ms. Odom, paying the

13   premiums on those policies, stealing or misusing her

14   personal information, forging documents, or taking steps to

15   obtain the payout after the murder.  There will be no

16   credible evidence that Mr. Martin agreed with anyone to

17   murder Ms. Odom or that he had any motive to kill her.  And

18   there will be no forensic evidence that Mr. Martin, in fact,

19   killed her.

20        You will hear from dozens of witnesses over the

21   next few weeks that will include law enforcement experts,

22   civilians, and two criminals.  You will be shown documents,

23   text messages, expert reports, surveillance, physical

24   evidence.  And as the Government puts their witnesses up on

25   the stand, you will quickly find that the only direct

1    evidence the Government has against Mr. Martin of an

2    agreement to murder Ms. Odom for money is the sensational

3    testimony of a cooperator.

4         The Government left something important out of

5    their opening statement.  Their case rises and falls on the

6    testimony of one woman:  Adelle Anderson.  Without her, they

7    have no case and they know it.  At this trial, she will be

8    your only narrator of the offense.  She will provide the

9    color, she will provide the glue.  She will provide her

10   testimony, and the Government will provide her with her only

11   shot at serving a prison sentence of less than mandatory

12   life.

13        The evidence will show that Ms. Anderson pled

14   guilty to a cooperation agreement, a deal between her and

15   the Government.  Ms. Anderson has already admitted, in

16   court, to the crimes for which Mr. Martin is on trial today.

17   She had no choice.  The Government had her dead to rights.

18   She knew the consequences she'd face with this conviction,

19   so her only option was to tell the Government a story that

20   included lie after lie about Mr. Martin's involvement.

21        If Ms. Anderson didn't have a story of

22   Mr. Martin's guilt, she would have no value to them.  She'd

23   be behind bars for life.  Under Ms. Anderson's agreement

24   with the Government, if they decide she's told the truth,

25   they will write a letter to Judge Donnelly in advance of her

1   sentencing.  This letter is her golden ticket and she'll do

2   whatever she needs to get it.  Without it, she faces a

3   mandatory life sentence, with no opportunity for release.

4   Never being able to have a meal with friends or family,

5   never being able to celebrate another birthday or enjoy one

6   of life's intimate moments.  Every single day for the rest

7   of her life she would be separated from everything she knows

8   and wants.  Her life would effectively be over.

9           But with this golden ticket, Ms. Anderson has

10  another chance.  She could avoid prison altogether, despite

11  the fact that she has already admitted to participating in

12  the financially-motivated murder and dismemberment of

13  Ms. Odom, who she will tell you was like a sister to her.

14          You will learn that Ms. Anderson has an undeniable

15  motive to lie.  This is a woman who is deceptive and

16  manipulative.  Who has no regard for human life.  Who, to

17  get whatever she wants whenever she wants, will lie; lie to

18  her friends, lie to her partners, lie to life insurance

19  companies, lie to the NYPD, lie to these federal prosecutors

20  next to me, and lie to you.

21          This case is about putting someone on trial to get

22  a conviction where there has not been, and never will be,

23  credible or sufficient evidence against Mr. Martin.  That

24  much will be clear.

25          Allow me to take you back to 2016 through 2018,

1   the time period of the alleged crimes.  Here's what the

2   evidence will show.  Ms. Anderson and Ms. Odom had a close

3   personal relationship before Mr. Martin was in the picture.

4   They were in a dangerous line of work:  Prostitution.

5           Ms. Odom was estranged from her family, so she and

6   Ms. Anderson grew close.  They eventually moved in together.

7   Toward the end of 2016, as Mr. Martin and Ms. Anderson began

8   a romantic -- albeit toxic and sometimes physical --

9   relationship, Ms. Anderson brought Ms. Odom with her to live

10  at another residence:  Mr. Martin's home in Rosedale,

11  Queens.

12          Ms. Anderson showed Mr. Martin the ropes.  Taught

13  him about prostitution, all while maintaining close control

14  over Brandy Odom's sex work herself; by posting ads,

15  responding to johns, and setting up her dates.

16          In March of 2017, Ms. Anderson took out a life

17  insurance policy in Ms. Odom's name.  Ms. Odom knew about

18  this policy.  She listed Ms. Anderson, her trusted friend

19  and sister, as her beneficiary.  Ms. Anderson made sure that

20  the monthly premiums on that policy were paid and the

21  beneficiary information was up to date.

22          In December of 2017, another policy was taken out

23  in Ms. Odom's name.  Another policy with Ms. Anderson again

24  as the beneficiary.

25          In April of 2018 Ms. Odom was murdered, her body

1    parts found in bags in Canarsie Park.  And before Ms. Odom's

2    family could identify her body at the precinct, Ms. Anderson

3    called to offer her condolences.  Less than a month later,

4    Ms. Anderson told the NYPD that she had no idea who murdered

5    Ms. Odom.  In June of 2018, she began trying to cash out on

6    those policies, calling the life insurance companies and

7    collecting necessary documents to get paid.

8          Ms. Anderson will tell you that she did all of

9    this at Mr. Martin's direction.  She will tell you that

10   before he chose Ms. Odom as the victim, Mr. Martin wanted to

11   kill Ms. Anderson's ex, Alex Villard.  Then she'll tell you

12   that she intended to kill her very own children, and that

13   she took out these policies on her ex, her children, and

14   Ms. Odom because she was afraid of Mr. Martin.

15         But pay close attention to her testimony.  It will

16   not make sense.  The truth is this entire life insurance

17   murder scheme starts and ends with Ms. Anderson.

18         As the Government has said, you will see a YouTube

19   search into the most inopportune product Mr. Martin could

20   have looked up at the time:  Reciprocating saws.  You will

21   see a junk removal company was hired to come to the Rosedale

22   house the week of the murder.  You'll see surveillance of

23   early morning and late night activity in the driveway.  But

24   remember this:  These ordinary activities will only be made

25   to look nefarious through the testimony of Ms. Anderson.

1          The NYPD had the circumstantial evidence back in

2     2018 against Mr. Martin, yet they still struggled in their

3     investigation.  You'll hear testimony from NYPD officers

4     who, only a couple weeks after the murder, meticulously

5     searched the Rosedale house for evidence, collecting

6     pillowcases, cell phones, clothing, garbage bags, kitchen

7     knives, you name it.

8          You'll hear from the NYPD's Crime Scene Unit who

9     tested every inch of the residence, more than once, for

10    hours, checking for possible blood and swabbing for DNA and

11    fingerprints.

12         You will hear from experts at the New York City

13    Office of Chief Medical Examiner who prepared Ms. Odom's

14    autopsy report, examined the marks in her bones, and ran

15    countless DNA tests.

16         None of these law enforcement officers or experts

17    can tell you that the murder even occurred at the Rosedale

18    house.  None of them can tell you when the murder occurred

19    or what tools were used in the dismemberment.  None of them

20    can tell you who touched or was ever near the bags that

21    Ms. Odom's body was found in.

22         With no clues from the science, the NYPD continued

23    their investigation well into 2019 and 2020, interviewing

24    other suspects; failing to gather and test evidence that

25    they should have; failing to follow leads that they should

1  have.  You will be left wondering why they didn't call

2  certain witnesses; why they didn't test particular pieces of

3  evidence for DNA; and why they didn't pursue trails leading

4  towards Cory's innocence.  Hold that against them.

5        What does the Government do when they don't have

6  quality evidence to present?  They do what they will do at

7  this trial:  Overwhelm with quantity.  Dozens of witnesses,

8  hundreds of exhibits that cannot tell you that Mr. Martin

9  was, in fact, involved.

10        If you take one thing away from my opening

11  statement, let it be this:  They will try to distract you

12  from the fact that there will be no objective evidence, no

13  evidence that cannot lie corroborating Ms. Anderson's

14  testimony.  That is reasonable doubt.

15        The Government likes to say things like "we want

16  you to use your common sense."  But they want you to believe

17  that their case appeals to reason when, in fact, they're

18  inviting you to use prejudice to fill gaps in their proof.

19  It is your duty to scrutinize their evidence.  There is a

20  key difference between argument and fact.  Do what the

21  Government cannot; focus on the facts.

22        Please remember, Mr. Martin has no burden.  He

23  does not have to say or do anything at this trial.  We don't

24  have to cross-examine a single witness for you to find him

25  not guilty.  Our system demands that Mr. Martin be presumed

1    innocent until and only if proven otherwise.  You are the

2    first people in this case with giving him that presumption.

3           Each of you made promises during the course of

4    jury selection.  Both sides are pleased with the fact that

5    you agreed to serve, to give us your time, to leave your

6    lives.  That is a remarkable sacrifice, and we thank you.

7    We know it's hard to be away from work for weeks at a time,

8    and we know it's difficult to be away from family and

9    friends, but we need you.

10          Serving on a jury is not easy.  If done correctly,

11   it can be incredibly difficult, especially in a case like

12   this.  We've entrusted you with this duty to render a

13   verdict that truly reflects the evidence, devoid of sympathy

14   for or passion against Mr. Martin or any side in this case.

15   You are the conscience of this community.  Keep your minds

16   open and attentive until Judge Donnelly has instructed you

17   on the law.  Only after knowing the law applicable in this

18   case will you be able to do your job as jurors.

19          At the end of this trial, you will find that the

20   Government has failed to prove Mr. Martin's guilt beyond a

21   reasonable doubt.  Reasonable doubt is just that:  Doubt

22   based on reason.

23          In this case, we will give you many reasons to

24   doubt the Government's evidence.  They are asking you to

25   convict Mr. Martin on the testimony of one cooperator,

1   Adelle Anderson, despite a complete lack of corroborating

2   evidence.  On this shaky foundation, the Government expects

3   to convince you that it has met its burden.  Do not be

4   swayed.  A fair verdict for Cory Martin is one based on

5   reason, not passion.

6           We will ask that you return a verdict of not

7   guilty on all counts, because that is what the law requires.

8           Thank you.

9           THE COURT:  Thank you, Ms. Thiele.

10          Are you ready to call your first witness?

11          MS. DEAN:  Yes, Your Honor.

12          The Government calls Nicole Odom.

13          (Witness takes the stand.)

14          THE COURTROOM DEPUTY:  Please stand and raise your

15  right hand.

16          (Witness sworn.)

17          THE COURTROOM DEPUTY:  Please state your name for

18  the record.

19          THE WITNESS:  Nicole Odom.

20          THE COURT:  Ms. Odom, good morning.

21          THE WITNESS:  Good morning.

22          THE COURT:  I just want to give you a few pointers

23  before you begin.

24          I want to make sure you speak into the microphone

25  so that everybody and the jury can hear you and at both of

1   these tables.  Please speak slowly.  We have a court

2   reporter who takes down everything that you say.  And just

3   wait until whichever lawyer is questioning you finishes

4   talking before you start speaking, just so we're not talking

5   over each other and making the court reporter's job more

6   difficult.

7            If there's a question you don't understand and you

8   want to have repeated, just let me know and I'll have the

9   lawyer rephrase.  Okay?

10           THE WITNESS:  Okay.

11           THE COURT:  All right.  Go ahead.

12           MS. DEAN:  Thank you, Your Honor.

13           (Continued on next page.)

14

15

16

17

18

19

20

21

22

23

24

25

1    **NICOLE ODOM,**

2              called as a witness, having been first duly

3              sworn/affirmed, was examined and testified as

4              follows:

5    DIRECT EXAMINATION

6    BY MS. DEAN:

7    Q    Good morning, Ms. Odom.

8    A    Good morning.

9    Q    What do you do for work?

10   A    I'm assistant manager for Walgreens Company.

11   Q    And how old are you?

12   A    I'm 57.

13   Q    Do you have any children?

14   A    Yes.

15   Q    What are their names?

16   A    Aisha Odom, Brandy Odom, and Alicia Tucker.

17   Q    And did you just tell us that from oldest to youngest?

18   A    Yes.

19   Q    What was Brandy Odom's birthday?

20   A    January 8, 1992.

21   Q    Did she go by any nicknames?

22   A    Yes.

23   Q    What was her nickname?

24   A    Chocolate.

25   Q    And why was that her nickname?

1  A    Because when I had her, I wanted a dark-skinned baby

2  like me.  So when I had her, I named her Chocolate.

3  Q    I want to direct you now to April 11th of 2018.

4        On that day, did you go to the morgue at the

5  Medical Examiner's Office?

6  A    Yes.

7  Q    And what did you see there?

8  A    I seen a photograph of my daughter on the computer

9  screen.

10 Q    And which daughter?

11 A    Brandy Odom.

12 Q    How old was Brandy when she was killed?

13 A    She was 26.

14 Q    Can you describe what your relationship was like with

15 Brandy prior to her death?

16 A    It was a happy one, a joyful one.  She was my pride and

17 joy because she always just kept pushing.  She never

18 stopped, never stopped.  She always got back up and kept on

19 pushing.

20 Q    And did there come a time when the relationship became

21 more strained, when there was less contact between you two?

22 A    Yes, there did.

23 Q    How did that happen?

24 A    Well, she went and me moved away and came across just

25 the wrong people, and I just didn't want to accept that, so

1  I guess that made her just stray off a little bit more.

2  Q    Was there a time that you learned that Brandy was doing

3  sex work?

4  A    Yes.

5  Q    How did you find that out?

6  A    One of her ex-boyfriends had sent me a photograph while

7  I was at work one day of her on Backpage.  I didn't know

8  what the Backpage was at the time.

9  Q    Did you find out what that was?

10 A    Yes, I did.

11 Q    What is that?

12 A    It's some type or form of porn.

13 Q    I want to direct you now to approximately 2015 to 2016.

14       Did there come a time in that time range when

15 Brandy went to live with one of her sisters?

16 A    Yes.  After I found out about the incident, I moved her

17 in with my daughter, Aisha Odom.

18 Q    Where did Aisha live at the time?

19 A    She lived on Fulton in Rockaway.

20 Q    Did you visit Brandy and Aisha there?

21 A    Yes.

22 Q    Did you meet someone named Adelle Anderson?

23 A    Yes.

24 Q    How did you meet her?

25 A    I met her through my daughter 's building.  She lived

1   on the second floor inside my apartment building my daughter

2   Alicia lived in.

3   Q    Do you know if that's how Adelle Anderson and Aisha

4   met?

5   A    Yes.

6   Q    If you know, did Brandy and Ms. Anderson know each

7   other?

8   A    No.

9   Q    Did they meet?

10  A    They met from her moving into the building with my

11  daughter Aisha.

12  Q    That building on Fulton?

13  A    Yes.

14  Q    Did there come a time when Brandy moved out of Aisha's

15  apartment and in with someone else?

16  A    Yes.

17  Q    Who did she move in with?

18  A    She left with Adelle Anderson.

19  Q    And when you say "she left," did she actually leave the

20  building on Fulton Street at a certain point?

21  A    Yes.

22  Q    Do you know where Brandy and Ms. Anderson moved to?

23  A    No, I do not.

24  Q    Did you even know what borough they moved to in New

25  York City?

1   A    No, I did not.

2   Q    Did you know who they were living with at the time?

3   A    No, I did not.

4   Q    You testified that you learned that Brandy was doing

5   sex work.  Was there also a time when she worked a regular

6   job?

7   A    Yes.

8   Q    What did she do?

9   A    The last job she had, she was a JFC security guard.

10  Q    Was she also going to school?

11  A    Yes, for cosmetology.

12  Q    What was your contact like with Brandy after she moved

13  out of Aisha's and was living with Ms. Anderson?

14  A    Well, she used to call me from time to time on her cell

15  phone.  Various numbers; they always kept changing.  But I

16  was in contact with her.

17  Q    Through Brandy, did you end up meeting anyone in

18  Ms. Anderson's family?

19  A    I met her son, because Brandy used to always have

20  Adelle's son with her when she used to come and visit us.

21  Q    What was the approximate age of that child?

22  A    I believe at the time he probably was like five, six

23  years old.

24  Q    I want to talk to you now about April 10th of 2018.

25       What, if anything, did you see that day on the

1    news?

2    A    Well, my mom came and told me about a body they had

3    found in Canarsie Park.  So I was just going on regular

4    because we didn't have much detail about the person, so I

5    was just going to work and still just living my life, until

6    she told me that they identified a tattoo, a distinguished

7    tattoo on the person's body that said "Chocolate."

8    Q    Was that tattoo meaningful to you?

9    A    Yes, it was.

10   Q    Why?

11   A    Because I know that Brandy had the tattoo "Chocolate"

12   because that's the nickname that I gave her.

13   Q    Where was that tattooed on Brandy's body?

14   A    It was on the left side of her chest.

15   Q    What did you do when you received this information

16   about the chocolate tattoo?

17   A    I was in the kitchen cooking at the time, so I just

18   dropped everything and I was panicking.  My mom was asking

19   me what was going on, and I told her that I think that's my

20   daughter out there that they found in that park because of

21   the tattoo.  My mom didn't know about the tattoo.

22   Q    Did you reach out to detectives that day?

23   A    Yes, I did.

24   Q    And did you meet with them on April 10th?

25   A    Yes, I did.

1  Q    Did they show you something?

2  A    Yes.  They showed me a picture of my daughter wrapped

3  up.

4  Q    Did you provide the detectives with the last two phone

5  numbers that you had for Brandy before she was killed?

6  A    Yes, I did.

7  Q    Sitting here today, do you remember them from memory?

8  A    I don't remember them from memory because, like I said,

9  Brandy used to call me from different numbers, so I used to

10 just write down any number she called me from so I can just

11 remember, if she called me back again, this is one of the

12 numbers.

13 Q    Can I show you something that would refresh your memory

14 about the numbers you gave to the detectives?

15 A    Yes.

16      MS. DEAN:  If I can have for the witness only,

17 please, 3500-NO-27.

18 A    Yes, those are the numbers of her cell phone.

19 Q    Does that refresh your memory of the numbers?

20 A    Yes, those are some of the numbers she called me from.

21 Q    Can you tell us what two numbers you gave to the

22 detectives?

23 A    I need my glasses, I'm sorry.

24      MS. DEAN:  If you don't mind, Your Honor, may I

25 hand her her glasses?

1          THE COURT:  Fine.

2    A    Yes.  (518) 730-5202.

3    Q    And what was the second one?

4    A    (516) 309-7437.

5    Q    Did you have contact with Adelle Anderson after Brandy

6    was killed?

7    A    No, I did not -- oh, yes, I did.

8    Q    How?

9    A    She had called while I was in the precinct on a face

10   messenger call.

11   Q    And who did she call, you or someone else?

12   A    No, she called my daughter, Aisha Odom.  We were

13   sitting together inside the precinct.

14   Q    Did you know why she was calling?

15   A    She called to give us her condolences.

16   Q    At the time Ms. Anderson called to give you

17   condolences, had you identified Brandy's body yet?

18   A    No, I had not.

19   Q    Did you have a funeral for Brandy?

20   A    Yes, I did.

21   Q    Did Ms. Anderson attend?

22   A    No, she did not.

23   Q    Did there come a time when you received something in

24   the mail that was related to Brandy's death?

25   A    Yes, I did.

1  Q    What did you receive?

2  A    I received papers from a life insurance company.

3  Q    Do you remember what company?

4  A    It was Global Life.

5  Q    And what did you do when you received papers from a

6  life insurance company?

7  A    I called them to see what was the papers about.

8  Q    Did they have a name on them, the papers?

9  A    Yes, they did.  When I called, I wanted to know who was

10 the beneficiary on these policies.

11 Q    So if I can just back up a second.

12       Who was the insured on the policies that you

13 received, on the policy paperwork you received?

14 A    Adelle Anderson.

15 Q    I'm sorry.  Who were the policies for?

16 A    Oh, it was for Brandy Odom, it was for Brandy Odom.

17 Q    Did you have any life insurance policies taken out in

18 your daughter's name?

19 A    No, I did not.

20 Q    Now, you said something about Adelle Anderson.  Tell us

21 what happened when you called the life insurance policy

22 company.

23 A    I asked them, I would like to know about the policy

24 because my daughter's not here, and they sent me these

25 papers Federal Express through the mail.  So they was

1    telling me that they needed me to sign off on some

2    information so that the beneficiary can collect the money.

3    Q    And who did they tell you was the beneficiary?

4    A    Yeah, because I asked, and they told me it was Adelle

5    Anderson, her sister.

6    Q    Is Adelle Anderson Brandy's sister?

7    A    No, she is not.

8    Q    Is she any blood relative whatsoever?

9    A    No, she is not.

10   Q    Did you sign that paperwork that the life insurance

11   company was asking you to sign?

12   A    No, I did not.

13              (Continued on the following page.)

14

15

16

17

18

19

20

21

22

23

24

25

1    BY MS. DEAN:

2    Q    What did you do with the forms that you received in the

3    mail from the company?

4    A    I went down and took them to the District Attorney's

5    Office downtown Brooklyn.

6    Q    I'm going to ask the witness only now be shown Government

7    Exhibit 54 for identification.

8              Is there anything in front of you, Ms. Odom?

9    A    No, it's not.  Yes, those are the papers I received.

10   Q    You said those are the papers you received from the life

11   insurance company?

12   A    The life insurance company, yes.

13   Q    I'm going to ask that Government Exhibit 54 -- I'll just

14   note, other than the redaction of your address under your

15   name, is that the same paperwork that you received in the

16   mail?

17   A    Yes, it is.

18             MS. DEAN:  I ask that Government Exhibit 54 be

19   received in evidence.

20             THE COURT:  Any objection.

21             MS. THIELE:  No.

22             THE COURT:  That's in evidence.

23             (Government's Exhibit 54 was received in evidence.)

24             THE COURT:  Ladies and gentlemen, let me tell you,

25   any items that you see in evidence will be available to you

1  during your deliberations so you don't have to commit

2  everything to memory.

3  BY MS. DEAN:

4  Q    I now ask that the witness only be shown Government's

5  Exhibit 1.  Do you recognize the person in Government's

6  Exhibit 1?

7  A    Yes.

8  Q    Who is that?

9  A    That's Brandy Odom, my chocolate.

10  Q    Does that fairly and accurately show us the way she

11  looked before she was killed, Ms. Odom?

12  A    Yes, that's the way she looked.

13          MS. DEAN:  I ask that Government's Exhibit 1 be

14  received in evidence and published.

15          THE COURT:  Any objection?

16          MS. THIELE:  No objection.

17          THE COURT:  Number 1 will be in evidence.

18          (Government's Exhibit 1 was received in evidence.)

19  Q    If you could show us on Government's Exhibit 1 where the

20  chocolate tattoo is?

21  A    Right here, the left side of her chest.

22  Q    Is that tattoo you just showed us how you first

23  identified your daughter?

24  A    Yes.

25          MS. DEAN:  I have nothing further.  Thank you.

1      THE COURT:  Cross-examination.

2      MS. THIELE:  Briefly, your Honor.

3  CROSS-EXAMINATION

4  BY MS. THIELE:

5  Q    Good morning, Ms. Odom.

6  A    Good morning.

7  Q    I only have a few questions for you.  So you testified on

8  direct that at one point Brandy was living with Aisha at a

9  Fulton apartment; is that correct?

10 A    Yes.

11 Q    And you eventually met Adelle because Brandy and Aisha

12 were living in that apartment?

13 A    Yes.

14 Q    Would you say that you knew Adelle Anderson for a few

15 months while she lived in the same building as Aisha and

16 Brandy?

17 A    No, I don't know Adelle.

18 Q    Ms. Odom, do you remember meeting Ms. Anderson at that

19 Fulton address?

20 A    Yes, I met her there but I don't know her.

21 Q    Okay.  You didn't know Ms. Anderson personally?

22 A    No, I didn't.

23 Q    But you knew that she had a relationship with Ms. Odom?

24 A    I knew that she had known my daughter from meeting in the

25 building.

Q    Okay.  At one point you also met Ms. Anderson's partner,
the father to one of her children?

A    I met him after the fact, I didn't know him either.

Q    Okay.  You had suspicions at the time that both of them
were at the Fulton address that they were working in the sex
work industry?

A    At the Fulton address, no, I didn't know that.  I found
out from her with a Backpage before, so that's why I moved her
over there with my daughter to take her from out of the
situation that she was already in.  So I didn't know nothing
about Adelle and her having anything going on.  I put her over
there for safety reasons.  I didn't know nothing that took
place after she came across Adelle.

Q    Okay.  And the advertisement on Backpage that you did
see, was before she ever moved in to the Fulton apartment?

A    Yes.

Q    Okay.  You say that when Brandy and Adelle moved out of
the Fulton apartment, you don't know where they moved to?

A    No, my daughter wouldn't tell me where they was at.  She
just used to call me.  She never gave me an address or
location where her and Adelle was at.

Q    You had no information about whether anyone else was
living at this new residence with Brandy and Adelle?

A    No, I just knew she left with Adelle.

Q    Okay.  For approximately a year before Brandy's murder,

1    you did not see her in person, correct?

2    A    That's not correct.

3    Q    Do you remember telling the Government in this case that

4    you did not see Ms. Odom in person approximately a year before

5    her murder?

6    A    No, I did not.  I don't remember that, no.

7    Q    Mr. Glover, would you mind pulling up 3500NO3 just for

8    the witness.

9            Ms. Odom, can you see what is in front of you?

10           THE COURT:  I think there is something going on with

11   the -- hold on for a second.

12           Do you have a paper document to show her?

13   BY MS. THIELE:

14   Q    I'm going to walk up and hand a piece of paper to you.

15   Just review it to yourself, do not read aloud.

16   A    Okay.

17           (Witness reviewing document.)

18           MS. THIELE:  Let me know when you finish.

19           THE COURT:  Have you finished it?

20           THE WITNESS:  Yes, I finished it.

21           THE COURT:  She'll put another question to you.

22   BY MS. THIELE:

23   Q    Ms. Odom, does this document refresh your recollection as

24   to whether you told detectives in this case that you had not

25   seen Ms. Odom in approximately a year before her murder?

1   A    No, I did not.  Because I told the detectives

2   approximately two to three weeks before this happened we was

3   in contact with Brandy, because she just received a letter

4   from School Safety saying they accepted her application, she

5   was about to work for School Safety.

6   Q    Ms. Odom, is it true that you were estranged from

7   Ms. Odom around the time that she and Adelle were living

8   together?

9   A    Like I said, I talked to Brandy on the phone, so I was in

10  contact with her while she was with Adelle.  I just didn't

11  know the location where she was at.

12  Q    Isn't it true that you cut off your relationship with

13  Ms. Odom because she was engaged in prostitution?

14  A    That is incorrect.  Why would I save her and cut her off?

15  I went and saved her from the life she was out there trying to

16  live, that's not the life I raised her up to do; so no.

17  Q    The life you're referring to was a life prior to when she

18  moved in with Adelle --

19           THE COURT:  Let her finish the question.  That's

20  okay.

21           Did you finish your question?

22           MS. THIELE:  Yes.

23           THE WITNESS:  Can repeat the question since I

24  interrupted.

25  Q    Ms. Odom, the life that you tried to save Ms. Odom from,

1   that occurrence you're referring to, was from before Adelle

2   and Brandy moved in together; is that correct?

3   A    Yes.

4   Q    Isn't it true that you told the detectives in this case

5   that you cut off your relationship with Ms. Odom after she had

6   moved in with Adelle because of her prostitution?

7            MS. DEAN:  Objection.

8            THE COURT:  Overruled.

9            Did you tell her that?

10  A    No, I did not tell them that.  I told the detectives that

11  I took her from one situation for her to end up in another

12  situation.  It doesn't matter what your child does, that's my

13  child.  I'm going to love her regardless.  I will never cut

14  her off.  I will always try to steer her right.  She just came

15  across the wrong people at the wrong time.

16           A mother can only do but so much.  I feel that I did

17  my part when I took her from one situation and then she end up

18  in another one.  I just feel bad because I couldn't save her

19  from the second situation, that's the only thing that make me

20  feel bad.  But I do not feel bad as a mother; I raised her

21  right.

22  Q    During the 2016 through 2018 period when she moved out of

23  the Fulton address and in with Adelle, you did not know where

24  she was living?

25  A    No, I did not.

1  Q    You did not know much about what was going on in her life

2  at the time?

3  A    No, I did not.

4          MS. THIELE:  Okay.  Nothing further, your Honor?

5          THE COURT:  Any redirect?

6          MS. DEAN:  No.

7          THE COURT:  Ms. Odom, you can step down.  Thank you

8  so much.

9          (Whereupon, the witness was excused.)

10          THE COURT:  Are you ready to call your next witness?

11          MR. PALACIO:  Before we call the next witness may I

12  set up an easel?

13          THE COURT:  Sure.

14          MR. PALACIO:  The Government calls Robert Clouden.

15          (Continued on next page.)

16

17

18

19

20

21

22

23

24

25

1          (Witness takes the witness stand.)

2   **ROBERT CLOUDEN**,

3          called as a witness by the Government, having been first

4          duly sworn/affirmed by the Courtroom Deputy, was examined

5          and testified as follows:

6          THE COURTROOM DEPUTY:  State your name for the

7   record.

8          THE WITNESS:  Robert Clouden.

9          THE COURT:  Mr. Clouden, I have a couple of pointers

10  for you before you start.  Make sure that you're speaking into

11  the microphone.  I want to make sure the jury can hear you and

12  both sides can you hear you too.  It's also important that you

13  not speak too fast.  Our court reporter takes down everything

14  that you say and we don't want to make her job too difficult.

15  For the same reason, try not to talk over which ever lawyer is

16  asking you questions, it makes it hard are for court reporter.

17         THE WITNESS:  Understood.

18         THE COURT:  If you want a question repeated or you

19  don't understand, tell me and I'll have the lawyer rephrase.

20         THE WITNESS:  Okay.

21         MR. PALACIO:  Thank you, your Honor.

22  DIRECT EXAMINATION

23  BY MR. PALACIO:

24  Q    Can you give us your complete name?

25  A    Robert Kenwin Clouden, K-E-N-W-I-N.

1    Q    Mr. Clouden, how old are you?

2    A    Fifty-nine.

3    Q    Are you married?

4    A    Yes.

5    Q    Do you have any children?

6    A    Yes.

7    Q    How many kids do you have?

8    A    Two -- three.

9    Q    Without giving us an address, can you tell us where you

10   live?

11   A    Canarsie, Brooklyn.

12   Q    How long have you lived in Canarsie, Brooklyn?

13   A    Approximately 25 years.

14   Q    Can you tell us what you do for a living?

15   A    Retired.

16   Q    How long have you been retired?

17   A    Since 2019.

18   Q    What are you retired from?

19   A    MTA.

20   Q    What did you do at the MTA?

21   A    Bus operator and union representative.

22   Q    How long did you work at the MTA before retirement?

23   A    31 and-a-half years.

24   Q    Mr. Clouden, are you familiar with Canarsie Park in

25   Brooklyn?

1  A    Yes, I am.

2  Q    How are you familiar with that park?

3  A    I walk my dog there every day.

4  Q    Mr. Clouden, I'm going to direct your attention to the

5  morning of April 9, 2018 at approximately 8:00 a.m.  Do you

6  remember that day?

7  A    Yes, I do.

8  Q    Can you tell the jury what happened that day, what

9  happened that morning?

10 A    I was walking my pet through the park.  I took a

11 different route because my co-worker was supposed to pick me

12 up.  He called and indicated he would be running late.  So I

13 decided to give my pet a longer walk, so I deviated from the

14 normal path and took a different route.  On that route I

15 looked to my left and I saw what I thought appeared to be a

16 doll with no limbs.

17 Q    When you say your pet, is that a dog or a cat?

18 A    A dog.

19 Q    As you were walking you saw what appeared to be a doll.

20 Can you describe that a little more for us?  Describe what you

21 saw?

22 A    Okay.  I saw what appeared, I thought, was a doll.  Years

23 ago they had these dolls 4-foot, 5-foot, arms were detached,

24 you can detach the arms and legs.  And I noticed that it was

25 laying down, face down, the buttocks up.  I passed it, I was

1   on my phone, emailing and I stepped back and I stood there for

2   maybe a minute or so just looking at it trying to deceiver if

3   it was actually a doll.  And I came to that conclusion and I

4   just continued on.

5   Q    Did you get anywhere near what you believed to be a doll

6   at that time?

7   A    Repeat?

8   Q    Did you come close or come near what you believed to be

9   at that point in time to be a doll.

10  A    I didn't get any closer off the path that I was walking.

11            MR. PALACIO:  With the Court's permission, if we can

12  show the witness Government Exhibit 12 for the witness only.

13  Q    Mr. Clouden, do you recognize what is in front of you as

14  Government Exhibit 12?

15  A    Yes, I do.

16  Q    Can you tell us what that is?

17  A    That's the picture of the aerial of Canarsie Park.

18  Q    Is it a map?

19  A    Yes.

20  Q    Does it fairly and accurately represent what Canarsie

21  Park looked like, it's surrounding area on April 9, 2018?

22  A    It does.

23            MR. PALACIO:  With the Court's permission, if I may

24  show the witness Government Exhibit 12A?

25            THE COURT:  Sure.

1   Q     Can you tell us what this is?

2   A     That's the map of Canarsie Park.

3   Q     Is this a larger version of Government Exhibit 12?

4   A     Yes, it is.

5          MR. PALACIO:  With the Court's permission offering

6   into evidence Government Exhibit 12 and 12A.

7          THE COURT:  Any objection?

8          MR. CECUTTI:  I haven't seen it yet.  Can I take a

9   look?

10         THE COURT:  Sure.

11         MR. CECUTTI:  That's fine, no objection.

12         MR. PALACIO:  May I post this?

13         THE COURT:  Yes.

14         (Government's Exhibits 12 and 12A were received in

15  evidence.)

16         MR. PALACIO:  With the Court's permission, may we

17  have Mr. Clouden step down to the map?

18         THE COURT:  Sure.  I want to make sure everyone can

19  hear you.  Can we move the microphone so he can talk into it

20  while at the map, or give him a hand-held?

21         Go ahead and step down.  We'll give you a microphone

22  to use.

23  BY MR. PALACIO:

24  Q     Zoom in toward the center of the map where there is an X.

25         Mr. Clouden, can you show the jury the path that you

1  normally took in Canarsie Park to walk your dog?

2  A    Okay.  So around here would be the entrance East 85

3  Street.

4         THE COURT:  Mr. Cecutti, if you want to move, go

5  ahead.

6         MR. CECUTTI:  Thank you.

7  BY MR. PALACIO:

8  A    Normally I would enter from East 85 Street and Seaview

9  and turn right and walk the inner circle of the park and go,

10 what we would call, past by what we call the stage.  In the

11 summertime they have bands and so forth and that would be

12 considered the stage.  I would continue on and go up towards

13 the bathrooms and come back around to East 85 Street and exit

14 the park.

15 Q    Mr. Clouden, just so the other jurors can see the

16 overhead.  The area that you pointed at, is it fair to say you

17 were indicating that sort of inner loop of the park off of

18 Seaview Avenue?

19 A    That's correct.

20 Q    Can you tell us what path you took that morning when you

21 saw what you believed to be a doll?

22 A    So when I got the phone call that my partner would be

23 running late, I decided to give my dog an extra long walk.  So

24 when I reached by the stage I turned right.  And a few feet in

25 on my left, that's where I observed what I thought was a doll.

 1    Q    Do you see on that map the approximate location where you
 2    saw what you believed to be a doll?
 3    A    Yes, X, where the X is.
 4    Q    The area that you referred to as the stage is that the
 5    area in front of the X?
 6    A    Yes, it is.
 7    Q    The semi-circle?
 8    A    Yes.
 9    Q    You can take a seat.  Did there come a point later that
10    evening that you returned to the park?
11    A    Yes.
12    Q    Can you tell us what you noticed when you returned to the
13    park?
14    A    So I was giving my dog his evening walk.  I noticed
15    police activity in the same area where I noticed what I
16    thought was the doll.
17    Q    When you say police activity, what do you mean?
18    A    Police ambulance, the area was roped off, photographers,
19    that sort of thing.
20    Q    Did there come a point later on when you spoke with
21    police about what you had seen earlier that morning?
22    A    I didn't speak to the police.  I walked over to the
23    stage, the stage area was taped off, you couldn't go any
24    further.  I said:  Is that a body that they found?  And
25    someone said yes.  I said:  My God, I saw that this morning.

 1   At that moment a reporter came over to me and started

 2   questioning me, asked me for my name.

 3   Q    Did you later speak with police about what you saw?

 4   A    Yes, I did.

 5            MR. PALACIO:  Thank you, your Honor.  Nothing

 6   further.

 7            THE COURT:  Any cross-examination?

 8            MR. CECUTTI:  I don't have any questions for

 9   Mr. Clouden.

10            THE COURT:  Thank you so much.

11            Mr. Clouden, you can step down.  Thank you so much.

12            (Whereupon, the witness was excused.)

13            MS. HAJJAR:  The Government calls Patricia Smith.

14            (Continued on next page.)

15

16

17

18

19

20

21

22

23

24

25

1              (Witness takes the witness stand.)

2    **PATRICIA SMITH**,

3         called as a witness by the Government, having been first

4         duly sworn/affirmed by the Courtroom Deputy, was examined

5         and testified as follows:

6              THE COURTROOM DEPUTY:  State your name for the

7    record.

8              THE WITNESS:  My name is Patricia Smith.

9              THE COURT:  Ms. Smith, I want to give you a couple

10   of pointers.  The first thing is that chair doesn't move,

11   sometimes people think they can scoot it up, but you can't.  I

12   want to make sure everybody hears you.  Pull the microphone a

13   little bit closer and down.  Speak into the microphone.  Don't

14   speak too quickly because our court reporter takes down

15   everything that you say, I want to make sure they can hear

16   you.  If there is a question that isn't clear and you want to

17   have it repeated, just tell me.  Okay?

18              THE WITNESS:  Yes, ma'am.

19              THE COURT:  Go ahead.

20   DIRECT EXAMINATION

21   BY MS. HAJJAR:

22   Q    Good morning, Ms. Smith.

23   A    Good morning.

24   Q    Where do you live?

25   A    Brooklyn.

1   Q    What do you do for a living?

2   A    I'm a social worker.

3   Q    Directing your attention to April 9, 2018, at

4   approximately 6:00 p.m. what were you doing?

5   A    Walking my dog.

6   Q    Where you were walking your dog?

7   A    Canarsie Park.

8   Q    Do you typically walk your dog in Canarsie Park.

9   A    Yes.

10  Q    Can you describe to the jury where you were in Canarsie

11  Park?

12  A    I enter in Seaview Avenue.  There is two paths I can

13  take.  I can go straight down or to the left, and on this day

14  we went to the left.

15  Q    Is that a typical route you take in the park.

16  A    Yes.

17  Q    What happened?

18  A    I went to the left.  And the left ventured into a right

19  turn.  As I went on the path I looked to my left I saw

20  something dark on the ground and I wondered to myself why is

21  there a black garbage bag in that spot.

22  Q    What do you do next?

23  A    I kept on walking with my dog.  As I went by, my dog got

24  curious and looked closer, it was a body.

25  Q    What did you see, Ms. Smith?

1  A    I saw really dark body, legs were separated, arms were

2  separated, and she was laying face down.  I saw red spots

3  where the legs were separated.  It was a body.  I grabbed my

4  dog and went out of the park.

5  Q    What happened after you saw the body?

6  A    I grabbed my dog.  Ran out of the park.  And as I'm

7  running I'm making a call to my family, let them know, to let

8  them know I think what I saw.  I went home, they encouraged me

9  to call 911.

10  Q    Did you call 911?

11  A    I did.

12  Q    Have you heard the 911 call that you placed on April 9,

13  2018?

14  A    I have.

15        MS. HAJJAR:  May I approach the witness with

16  Government Exhibit 327?

17        THE COURT:  Yes.

18  BY MS. HAJJAR:

19  Q    Do you recognize this exhibit?

20  A    Yes, I do.

21  Q    Did you initial it to indicate that you had reviewed it?

22  A    Yes, I did.

23  Q    What is on that disk?

24  A    The call that I made to 911.

25        MS. HAJJAR:  Your Honor, the Government offers

 1   Government Exhibit 327.

 2           THE COURT:  Any objection?

 3           MR. CECUTTI:  Objection, your Honor.

 4           THE COURT:  You're objecting?

 5           MR. CECUTTI:  Yes.

 6           THE COURT:  Overruled.

 7           (Government's Exhibit 327 was received in evidence.)

 8           MS. HAJJAR:  May I publish the exhibit?

 9           THE COURT:  Yes.

10           MS. HAJJAR:  If you can play Government Exhibit 327

11   please.

12           (Audio played.)

13   BY MS. HAJJAR:

14   Q    Ms. Smith, was that the call placed to 911 on April 9?

15   A    Yes.

16   Q    Did you subsequently speak to law enforcement about what

17   you had found?

18   A    Yes.

19           MS. HAJJAR:  Thank you.  No further questions, your

20   Honor.

21           THE COURT:  Cross-examination?

22           MR. CECUTTI:  I don't have any questions for

23   Ms. Smith.

24           THE COURT:  Thank you so much, Ms. Smith.  You can

25   step down.

1          (Whereupon, the witness was excused.)

2          THE COURT:  Are you ready to call your next witness?

3          MS. HAJJAR:  Yes.  The Government calls Lieutenant

4  Juan Cruz.

5          (Continued on next page.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1            (Witness takes the witness stand.)

2    **JUAN CRUZ**,

3         called as a witness by the Government, having been first

4         duly sworn/affirmed by the Courtroom Deputy, was examined

5         and testified as follows:

6            THE COURTROOM DEPUTY:  State and spell your full

7    name.

8            THE WITNESS:  Lieutenant Juan Cruz.

9            THE COURT:  Lieutenant Cruz, just a couple of things

10   before you begin.  I want to make sure the jury can you hear

11   you, you've got the microphone in a good spot.  The chair

12   doesn't move.  Please don't speak too quickly so the court

13   reporter is able to take everything down.  If there is a

14   question that you don't understand or you want to have

15   repeated, let me know that.  Just the other thing is, don't

16   talk over which ever lawyer is asking you questions, just

17   makes it harder for the court reporter.  Go ahead.

18           MS. HAJJAR:  Thank you, your Honor.

19   DIRECT EXAMINATION

20   BY MS. HAJJAR:

21   Q    Good morning, Lieutenant Cruz.

22   A    Good morning.

23   Q    Where do you work?

24   A    For the New York City Police Department.

25   Q    How long have you worked for the New York City Police

 1   Department?

 2   A    Approximately 15 years.

 3   Q    Can you tell the jury where you worked in NYPD?

 4   A    I worked in the 67 precinct in East Flatbush, in the 68

 5   in Bay Ridge, in the 69 in Canarsie.  I currently work at

 6   chief of department in Manhattan.

 7   Q    What were the years in the 69 precinct?

 8   A    Approximately 2016 to about 2022.

 9   Q    Can you describe what areas that covers?

10   A    The 69?

11   Q    Yes.

12   A    It covers Canarsie, Brooklyn, New York.

13   Q    When you were working in the 69 precinct, what were your

14   duties and responsibilities?

15   A    From about 2016 to 2018 I was regular routine patrol.

16   Q    Afterwards?

17   A    2018 to about 2022 I was a domestic violence sergeant.

18   Q    What were your duties and responsibilities as, when you

19   say, you were on patrol?

20   A    Just routine patrol, answering radio calls, 911 calls,

21   stuff like that.

22   Q    Were you supervisor at that time.

23   A    Yes.

24   Q    Directing your attention to April 9, 2018, were you

25   working in the 69 precinct that day?

1  A    Yes.

2  Q    What were your hours that day?

3  A    My hours that day were 1450 which is 2:50 p.m. to about

4  2347 which is about 11:47 p.m.

5  Q    Were you working alone or with a partner?

6  A    That day I was a driving myself, I was alone.

7  Q    Were you in uniform or in plain clothes?

8  A    Uniform.

9  Q    Were you in a vehicle or on foot?

10  A    I was in a marked vehicle.

11  Q    Did you receive a radio run that day?

12  A    Yes.

13  Q    Can you explain to the members of the jury what a radio

14  run is?

15  A    A radio run is basically a 911 call, someone calls for

16  numerous reasons.

17        THE COURT:  When you say -- you're not talking to

18  the actual 911 caller?

19        THE WITNESS:  Sometimes I do.

20        THE COURT:  Go ahead.

21  BY MS. HAJJAR:

22  Q    What was the radio run in this case?

23  A    In this case this was a 1010 investigate, which is kind

24  of a general 911 call.  I don't know much until I get to the

25  scene.

1    Q    Did you end up speaking with the 911 caller in this case?

2    A    Yes.

3    Q    Who was that?

4    A    Unknown female I never met.

5    Q    Did the caller direct you to a specific location?

6    A    Yes.

7    Q    Where?

8    A    She directed me inside the Canarsie Park, it's kind of

9    hard to describe unless I'm driving or I show you.

10   Q    I'd ask that Government Exhibit 12, which is in evidence,

11   be shown to the witness or be published.  Can you see that,

12   Lieutenant Cruz?

13   A    Yes.

14   Q    Can you describe to the jurors with reference to this

15   map, the area you responded to?

16   A    So this is Canarsie Park, again the radio run came over

17   as 1010 investigate inside Canarsie Park.

18   Q    You were on the phone with the caller when you came to

19   the park?

20   A    Once I entered the park I did speak to the caller

21   directly.

22   Q    It may being difficult to show on the map, but can you

23   just describe to the jurors or even point out what route you

24   took to the park?

25   A    So Canarsie Park, this main road that's next to Canarsie

1   is Seaview Avenue.  I entered the park.  There is a main

2   entrance where vehicles can exit and enter, like 87 Street and

3   Seaview Avenue.

4               THE COURT:  You can touch it.

5               THE WITNESS:  It's the second pink square.

6               THE COURT:  If you touch the bottom corner it will

7   erase it.

8               THE WITNESS:  I see it.

9   BY MS. HAJJAR:

10  Q    Can you zoom in where Lieutenant Cruz has indicated?

11       Is that more helpful?

12  A    Yes.

13  Q    Show the jurors what street is that on Seaview that you

14  entered?

15  A    About 88 Street, it's normally like an entrance where

16  usually the Parks Department will come in and enter so they

17  can empty out the garbage, stuff like that, emergency vehicles

18  will go in if there is some type of event inside the park.

19  Approximately 88 Street and Seaview is an entrance where

20  vehicles can enter and exit.

21  Q    Is that where you entered the park in this case?

22  A    Yes.

23  Q    Were you still on the phone with the caller at this time?

24  A    Yes, I was.

25  Q    Where did she direct you after that?

1   A    So that little white roof top is where the bathrooms

2   were.  I took that route in front of the bathroom.  If you can

3   zoom out.  There is basically a path from where I entered all

4   the way to approximately where the red marker is.

5   Q    Is that the looping path that goes down?

6   A    Yes.

7   Q    Did you take that path in your vehicle?

8   A    Yes.

9   Q    Are you familiar with Canarsie Park, Lieutenant Cruz?

10  A    Yes, for the most part.

11  Q    Is it also called Seaview Park?

12  A    Yes.

13  Q    Can you describe generally the layout of the park to

14  members of the jury?

15  A    It's pretty just a bunch of walking paths, a couple of

16  baseball fields.  I mean it's just -- further down is a

17  playground area, a couple of people do picnics and stuff.

18  Q    You testified that you entered the park on this entrance

19  on Seaview Avenue; is that right?

20  A    Yes.

21  Q    Are there multiple entrances on Seaview?

22  A    There are, but not entrances where vehicles can enter.

23  Some them are locked off or they are gated.  There is multiple

24  pedestrian entrances.

25  Q    If we can zoom out.  Is there another entrance on the

1   right-hand side of this map where Skidmore Avenue is?

2   A    Yes, there is.  But to my knowledge, that entrance is

3   always closed.

4   Q    Is it open to pedestrians?

5   A    Open to pedestrians, yes.

6   Q    But not to vehicles.

7   A    But not to vehicles.

8   Q    Returning now to the entrance on Seaview Avenue.  Did you

9   take the route down to the looping path that you described,

10  Lieutenant Cruz?

11  A    Yes.  On Seaview and 88 I entered and followed that path

12  all the way down to where the red mark is.

13  Q    At any point did you get out of your vehicle?

14  A    I did.

15  Q    What happened after you followed the route the caller

16  directed you to?

17  A    Once I exited my vehicle, I looked to my left-hand side

18  and I observed what seemed to be a torso.

19  Q    Were you on foot at that time?

20  A    Yes.

21  Q    I'd like to show the witness something marked for

22  identification, Ms. Greene, I'd like to show what is marked

23  Government Exhibit 852.

24       Do you recognize this exhibit?

25  A    Yes.

 1   Q     What does it depict?

 2   A     So basically that path --

 3   Q     Just generally, Lieutenant Cruz.

 4   A     Depicts the crime scene.

 5              MS. HAJJAR:  I offer Government Exhibit 852 and ask

 6   for it to be published?

 7              MR. CECUTTI:  No objection.

 8              THE COURT:  That's in evidence.

 9              (Government's Exhibit 852 was received in evidence.)

10   Q     Can you describe what this area depicts, Lieutenant Cruz?

11   A     This concrete area is kind of like a stage area where

12   they would do some performances, stuff like that.  That

13   walkway straight ahead is the walkway I took to observe the

14   torso.

15   Q     I'd like to show what you is marked for identification

16   only Government Exhibit 860.  Do you recognize this

17   photograph?

18   A     Yes.

19   Q     What is it?

20   A     That is the torso of the female.

21              MS. HAJJAR:  I offer Government Exhibit 852 and ask

22   it to be published.

23              MR. CECUTTI:  Objection, based upon our previous

24   application.

25              THE COURT:  Overruled.

1          (Government's Exhibit 852 was received in evidence.)

2     Q    Can you describe what this photograph depicts, Lieutenant

3     Cruz?

4     A    It's a female, black, missing her legs and arms, covered

5     in debris, leaves and branches.

6     Q    Is that what the body looked like when you first saw it?

7     A    Yes.

8     Q    Now I'll show you what is marked for identification only

9     Government Exhibit 863.  Do you recognize this exhibit?

10    A    Yes.

11    Q    What is it?

12    A    It's a female, missing legs and arms, covered in branches

13    and leaves.

14         MS. HAJJAR:  I offer 863 and ask it to be published?

15         MR. CECUTTI:  Same objection.

16         THE COURT:  Overruled.

17         (Government's Exhibit 863 was received in evidence.)

18    Q    Lieutenant Cruz, do you recognize this photograph?

19    A    Yes.

20    Q    Can you describe what it depicts?

21    A    Female black, missing her legs and arms, covered in

22    leaves and branches.

23    Q    What did you do after you saw the body, Lieutenant Cruz?

24    A    Once I saw that, I basically just, I started the crime

25    scene and made my notifications to the detective squad.

1   That's pretty much it.

2   Q    Lieutenant Cruz, when you say you made notifications what

3   does that mean, explain that to the jury?

4   A    Basically I freeze the scene so nobody could come, enter

5   or exit the location.  Then I called the detective squad so

6   they can respond to the scene.

7   Q    Did they respond?

8   A    Yes.

9   Q    Was a large number of police personnel responding to the

10  scene?

11  A    Yes.

12  Q    Did you have any further involvement in this case?

13  A    No.

14           MS. HAJJAR:  Thank you.  No further questions.

15           THE COURT:  Any cross?

16           MR. CECUTTI:  No questions for Lieutenant Cruz.

17           THE COURT:  Thank you.  You can step down.

18           (Whereupon, the witness was excused.)

19           THE COURT:  Ready for the next witness?

20           MR. PALACIO:  Yes, your Honor.  The Government calls

21  Sergeant Matthew Noftsier.

22           (Continued on next page.)

23

24

25

1    (Continuing.)

2    **MATTHEW NOFTSIER**,

3            called as a witness by the Government, having been first

4            duly sworn/affirmed by the Courtroom Deputy, was examined

5            and testified as follows:

6                    THE COURTROOM DEPUTY:  Please state your name for

7    the record.

8                    THE WITNESS:  Sergeant Matthew Noftsier.

9                    THE COURT:  Just a couple of things, the chair

10   doesn't move.  We always like to warn everyone.  But the

11   microphone does, and I do want to make sure everyone can hear

12   you.  So just adjust it so we can put it to good use.  Just

13   don't speak too quickly, because we have a court reporter that

14   is taking down everything you say.  If you need a question

15   clarified or repeated, I'll have the lawyer rephrase.  Go

16   ahead.

17                   MR. PALACIO:  Thank you, Your Honor.

18   DIRECT EXAMINATION

19   BY MR. PALACIO:

20   Q    Detective, can you give us your complete name?

21   A    Matthew Noftsier.

22   Q    By whom are you employed?

23   A    NYPD.

24   Q    How long you have been employed by NYPD?

25   A    Approximately, 16 years.

1   Q     In what capacity?

2   A     I'm the supervisor now in the crime scene unit.

3   Q     Can you tell us about your career following graduation

4   from the academy?

5   A     Yes.  Following graduation I worked patrol in the 30th

6   Precinct in Manhattan North.  From there, I went to the 33rd

7   Precinct and I did patrol there, also.  From the 33rd Precinct

8   I went to Manhattan North, evidence collection team.

9          From the evidence collection team, I went to crime

10  scene, got promoted to detective, worked there for a couple of

11  years, and then I got promoted to sergeant, went back to

12  patrol in the Sixth Precinct.  From the Sixth Precinct I went

13  to the lab as a supervisor.  Then from the lab, I went to

14  latent prints as a supervisor.  From there, I went to

15  supervise the crime scene unit.

16  Q     You mentioned a couple of units, the evidence collection

17  team, or ECT, and the crime scene unit, CSU.  Can you explain

18  for the jury the difference between the two?

19  A     Yes.  Evidence collection team is borough wide and crime

20  scene is citywide.  ECT, which is evidence collection, we

21  handle the robberies, the burglaries, non-fatal shootings.

22  That is considered like low level crime.

23          In crime scene we handle the major scenes, the major

24  incidents, homicides, rapes, terrorism, bombings, stuff like

25  that, where there are actually victims involved that are

1    deceased.

2    Q    And you're currently a supervisor in CSU; is that

3    correct?

4    A    Yes.

5    Q    Can you tell the jury what some of your duties and

6    responsibilities are as a crime scene investigator?

7    A    As a crime scene investigator we're in charge of

8    responding to the scene, and we process the forensic aspects

9    of that scene.  We document, collect, and preserve the

10   evidence that's on the scene, at the scenes.

11   Q    And can you tell us about the training required to become

12   a crime scene investigator?

13   A    Yes.  We go through rigorous training.  We approximately

14   get 600 hours of training, in classroom training, which is

15   about three months.  Then we have another 12 to 14 months of

16   investigative in the field with a seasoned detective working

17   with us.

18   Q    What does the training include?

19   A    The training includes photography, recognizing the DNA,

20   how to package it, present it, photography, nighttime

21   photography, injuries on victims, and also like on

22   fingerprints, processing, stuff like that.

23   Q    Approximately, how many crime scenes have you

24   investigated throughout the course of your career?

25   A    Hundreds of crime scenes.

1    Q    When you're assigned a process or investigate a crime

2    scene, do you go alone or with a partner?

3    A    We actually work with a partner.

4    Q    I'm directing your attention to April 9th, 2018.  Were

5    you working that day?

6    A    Yes, I was.

7    Q    What hours were you working?

8    A    2:00 p.m. to 10:00 p.m.

9    Q    Did you have a partner?

10   A    Yes, I did.

11   Q    Who was your partner?

12   A    Detective Jason Eddy.

13   Q    Did you become involved in the investigation into a

14   homicide of a dismembered female in Canarsie Park in Brooklyn?

15   A    Yes, I did.

16   Q    Can you tell the jury what a crime scene run number is?

17   A    It's an individualized number that's assigned to each

18   scene, so in the future we can pull it up and we can know

19   which scene relates to which number.

20   Q    Can you describe how the number is formatted, what the

21   number looks like?

22   A    Yes.  It always starts with a year, 2023, 2024, then with

23   a sequential number start with number one all the way up to

24   the end of the year.

25   Q    And what happens if crime scene responds to additional

1  crime scenes that are part of the same investigation?

2  A    It uses the same numeric system but with letters attached

3  to it.  If a crime happened in 2023, one, there would be

4  2023-01, 2023-01A.

5  Q    Were you the lead investigator for this run on April 9th,

6  2018?

7  A    No, I was not.

8  Q    Who was that?

9  A    Detective Jason Eddy.

10 Q    Where is Detective Eddy now?

11 A    Retired.

12 Q    Can you tell us, specifically, where you responded to

13 that day?

14 A    Canarsie Park in Brooklyn.

15 Q    Can you tell us what streets surround Canarsie Park in

16 Brooklyn?

17 A    Seaview Avenue and the Belt Parkway.

18 Q    At approximately what time did you get to Canarsie Park?

19 A    Approximately, 8:30 at night.

20 Q    What were the weather conditions like that day?

21 A    It was rainy and dark.

22 Q    What was the ambient temperature that day?

23 A    Approximately 43 degrees.

24 Q    Was there a police presence at the park when you got

25 there?

1    A    Yes, there was.

2    Q    And after getting to the scene, can you tell us what you

3    did first?

4    A    Yes.  When we got to the scene, we did a walkthrough with

5    one of the case investigators from the precinct to show us

6    kind of the layout of the scene.

7    Q    What is a walkthrough?

8    A    It's when you walk through the scene with a detective and

9    he explains what's on the scene, what he has that's of

10   interest for evidence.

11   Q    And when you did that walk through, can you tell the jury

12   what you saw?

13   A    Yes.  We saw a white sheet over a torso.

14   Q    Now, after conferring with the detective and doing that

15   walkthrough, can you tell the jury what you did next?

16   A    Yes.  We actually documented the scene in our

17   photographs.

18   Q    When you say document the scene, what does that mean?

19   A    Take photographs of the scene exactly how it looks when

20   we got there.

21          MR. PALACIO:  Your Honor, with the Court's

22   permission if we could show the witness what's in evidence as

23   Government's Exhibit 12.

24          THE COURT:  Sure.

25          MR. PALACIO:  Mr. Rader, if we could focus on sort

1   of the center of that map.

2   Q    Sergeant Noftsier, do you see the area where you saw that

3   white sheet covering a torso?

4   A    Yes, I do.

5   Q    Can you tell us where that was?

6   A    In this photograph it's near the X.

7               MR. PALACIO:  Your Honor, indicating towards --

8               THE COURT:  Where the X is.

9               MR. PALACIO:  Where the X is.

10              THE WITNESS:  Yes.

11  Q    Sergeant Noftsier, you told us that you took pictures of

12  the crime scene.  Can you describe for the jury what the

13  protocol is when it comes to photographing a crime scene?

14  A    Yes.  So we take the photographs exactly how it is when

15  we get there, that's overall photographs.  Then we proceed to

16  mid view angles, which is closer ups showing the relationships

17  with different aspects within that scene.

18              Then we proceed to our close ups.  Once we do the

19  close ups, we put our yellow markers down, or other

20  identification markers, like orange cones, or something that

21  shows the relationship of evidence on that scene.

22              MR. PALACIO:  Your Honor, with the Court's

23  permission if we could show for the witness only Government's

24  Exhibits 849 to 851, 853 to 859, 861 to 862, and 864 to 880.

25              Your Honor, if it's helpful, I have physical copies

1   for the witness.

2            THE COURT:  I think that's easier.  If you want to

3   show the copy.  I take it the defense has seen these; is that

4   right?

5            MR. CECUTTI:  We've been provided them, yes.

6            THE COURT:  You have the numbers and everything?

7            MR. CECUTTI:  Yes.

8            MR. PALACIO:  Your Honor, may I approach the

9   witness?

10           THE COURT:  Yes.

11  BY MR. PALACIO:

12  Q    Sergeant Noftsier, if you could take a minute to look at

13  that and when you're finished let us know.

14           THE COURT:  Is it easier for you if we put it on the

15  screen, too?

16           THE WITNESS:  It is.

17           THE COURT:  For the witness only, if you could put

18  those up, as well.

19  A    I've reviewed the photos.

20           MR. CECUTTI:  Your Honor, I can quickly look through

21  them.

22           THE COURT:  That's fine, too.

23           MR. CECUTTI:  That would be easier.

24           THE COURT:  Can you take the photos from the

25  witness?

1    MR. PALACIO:  Yes.

2    MR. CECUTTI:  Your Honor, no objection, other than

3    Government Exhibit 861, 862, and 864 for the same reasons I

4    previously made.

5    THE COURT:  The objection is overruled.  Those

6    exhibits are in evidence.

7    (Government's Exhibits 849 through 851, 853 through

8    859, 861 through 862, and 864 through 880 were received in

9    evidence.)

10   Q    Sergeant Noftsier, I just want to come back to your

11   initial response to the park.  When you got to the park, had a

12   crime scene already been established?

13   A    Yes, it has.

14   Q    What did you see?

15   A    The crime scene was established with multiple uniformed

16   officers on scene, and also with yellow crime scene tape and

17   orange tape that was marked off the area where nobody could

18   enter.

19   Q    Was it daylight when you responded to the park?

20   A    It was nighttime.

21   Q    Was the crime scene illuminated in any way to assist your

22   processing of the scene?

23   A    Yes.  So there's actually pathway lights in the park

24   itself, but we also brought in ESU truck lights that were

25   mobile lights that flooded the area with lighting.

1        MR. PALACIO:  Mr. Rader, if we could begin with

2   Government's Exhibit 849.

3   Q    Sergeant Noftsier, can you tell us what we're looking at

4   here?  This is Government's Exhibit 849.

5   A    This is Canarsie Park, the north end of the park facing

6   east.

7   Q    I'd like to show you Government's Exhibit 850.  What are

8   we looking at here?

9   A    This is another angle of the same thing, but then you see

10  the path and the right, by the orange tape, that's one of the

11  paths.

12  Q    The path that you said that took you to where the white

13  sheet was, do you see that, where that would be on this

14  photograph?

15  A    It would be -- yes, it's to the right of this.

16  Q    I believe you can touch the screen and show us that.

17  A    That's the path right there.

18  Q    And where one would turn off to where the location of the

19  torso is, do you see that here?

20  A    Yes, right there.

21  Q    And you're indicating to the right-hand side of the

22  photograph; is that correct?

23  A    Yes.

24  Q    I'm showing you Government's Exhibit 851.  I think

25  there's a button to clear the bottom.

1          THE COURT:  It says clear at the bottom.  I think

2     it's to the left, the bottom of the screen.

3     Q    Sergeant, could you draw a circle around the area where

4     that path is that would lead -- that led you to the torso?

5          And you're indicating the center of the photograph;

6     is that correct?

7     A    Yes.

8     Q    If we could show you Government's Exhibit 852.  What are

9     we looking at here, Sergeant?

10    A    This is -- we're looking south in the park, and in the

11    middle right here is the pathway where the torso was found.

12    Q    And if you're walking down that path toward that light,

13    was the torso to your left or to your right?

14    A    To the left.

15    Q    I'd like to show you Government's Exhibit 854.  Can you

16    tell us what we're looking at here?

17    A    Yes.  So now we're on that same path looking down.

18    There's going to be an orange cone in the middle of the

19    roadway, and to the left, in the circle you're going to see a

20    white sheet.  That's actually where the torso was found.

21    Q    You indicated to the left of the path, sort of in the

22    center of the photograph; is that correct?

23    A    Yes.

24    Q    The cone that we see in the photograph, was that already

25    there when you responded?

1  A     Yes.

2  Q     And the mobile light, is that what we see in the

3  foreground of the photo?

4  A     Yes.  That's the ESU truck lighting that we were talking

5  about.

6  Q     I'd like to show you Government's Exhibit 855.  Can you

7  tell us what we see here?

8  A     That's going to be the same path, the orange cone with a

9  braid of hair.

10  Q     I'd like to show you Government's Exhibit 856.  Can you

11  tell us what we see in this picture?

12  A     Yes.  This is the path, and you see the sheet with the

13  torso underneath it.

14  Q     How close was that torso to the walkway?

15  A     Approximately 14 feet, 15 feet.

16  Q     Did you later uncover that sheet?

17  A     Yes.

18  Q     I'd like to show you Government's Exhibit 858.  Can you

19  tell us what we see here?

20  A     This is going to be the opposite view.  So we were

21  standing inside the woods facing the pathway and the sheet

22  with the torso underneath it.

23  Q     I'm showing you Government's Exhibit 860.  Can you tell

24  us what we see here?

25  A     This is the torso with the stick and debris and dirt on

1  top of her.

2  Q    Is this what the torso looked like once you took the

3  sheet off of her?

4  A    Yes.

5  Q    Can you describe what we see on top of her?

6  A    This is debris, like leaves, sticks, dirt, sand.

7  Q    You said she.  I assume -- is it fair to say you later

8  determined that it was a female?

9  A    Yes, later on.

10 Q    I'd like to show you Government's Exhibit 861.  Can you

11 tell us what we see here in the appearance of the female?

12 A    So the female is facing down, and then this is another

13 top view of her with the sticks, the sand, and debris on top

14 of her.

15 Q    And this is fairly obvious, but does she have any limbs?

16 Were her limbs missing?

17 A    No.  All limbs were cut off.

18 Q    I'd like to show you Government's Exhibit 862.  Can you

19 describe the view that we see here?

20 A    This is going to be the left view of the body.

21 Q    Sergeant Noftsier, I would like to show you Government's

22 Exhibit 863.  Can you describe for us what we see here?

23 A    Yes.  This is the photo that we take from the feet to the

24 head showing the bottom half of the body.

25 Q    Sergeant Noftsier, did anyone from the medical examiner's

1  office respond to the crime scene?

2  A    Yes.

3  Q    Who responded?

4  A    Can I refer to the notes to get the name?

5         MR. PALACIO:  With the Court's permission.

6         THE COURT:  Sure.

7  A    I'm referring to Government's Exhibit 3500 NN-3, the

8  person's report.  So it's going to be the medical legal

9  examiner, Vaival.

10 Q    Can you tell us what a medical legal examiner is and what

11 they do?

12 A    Yes.  A medical legal examiner comes up to the scene to

13 give her or his medical expertise in documenting the body and

14 see what injuries the person endured.

15 Q    Did the medical legal examiner take the victim's

16 temperature?

17 A    Yes.

18 Q    What was her temperature?

19 A    50 degrees.

20 Q    Was the victim's body eventually removed from the park?

21 A    Yes.

22 Q    By whom?

23 A    The medical legal examiner.

24 Q    Sergeant Noftsier I would like to talk about some of the

25 evidence that you recovered around the victim's body.  I'd

1   like to show you Government's Exhibit 864.  Can you tell us

2   what we're looking at here?

3   A    Yes.  This is the torso underneath one of the left leg,

4   and in the circle you're going to see a black piece of

5   plastic.

6   Q    And you're indicating that black item under what would be

7   the left hip of the victim; is that fair to say?

8   A    Yes, fair to say.

9   Q    I'd like to show you Government's Exhibit 865.  On this

10  photograph, do you see the location where the body was before

11  it was removed?

12  A    Yes.  So this is a photograph we took after the body was

13  removed, and the dark spot in the middle of the photograph is

14  where the body was laying.

15  Q    And the branch that we see on the right-hand side of the

16  photograph, was that recovered on your run?

17  A    No, it was not.

18  Q    Was that the branch that was on top of the victim?

19  A    Yes, it was.

20        THE COURT:  When you say it wasn't recovered, you

21  mean that nobody took it and processed it?

22        THE WITNESS:  It was not recovered on my run.

23  Q    I'd like to show you Government's Exhibit 866.  And

24  actually, are you aware if that branch was later recovered by

25  another crime scene team?

1    A    Yes, the subsequent crime scene run.

2    Q    Can you tell us what we see in Government's Exhibit 866?

3    A    Yes.  This is us taking a photograph from inside the

4    woods towards the path showing evidence markers one, two, and

5    three.

6    Q    We'll talk about those markers in a second.  Is this

7    around the area where the torso was?

8    A    Yes.

9    Q    I'd like to show you Government's Exhibit 867.  Can you

10   tell us what we see here?

11   A    Yes.  This is us standing from the path into the woods

12   showing overall photograph of markers one, two, and three.

13   Q    And on Government's Exhibit 868, can you tell us what we

14   see?

15   A    This is going to be us standing in the path taking a

16   photograph through the fence showing evidence markers one,

17   two, and three.

18   Q    I'm showing you Government's Exhibit 870.  Can you tell

19   us what we see here?

20   A    Yes.  This is going to be a closer view of evidence

21   markers one, two, and three.

22   Q    Do you see a marker in the back of the photograph?

23   A    Yes.

24   Q    What number is that?

25   A    Five.

1   Q     What does that indicate?

2   A     The piece of hair that was indicated before, with the

3   orange cone.

4   Q     I'm showing you Government's Exhibit 871.  Can you tell

5   us what that is?

6   A     Yes.  This is going to be our evidence piece number one,

7   with a yellow piece of fabric.

8   Q     Where was that found in relation to the victim's body?

9   A     That was actually right underneath the body, as you can

10  see the wet mark in the dirt.

11  Q     The wet mark, where are you --

12  A     The lower right-hand side of the photo.

13  Q     I'm showing you Government's Exhibit 872.  Can you tell

14  us what that is?

15  A     This is a piece of braided hair that was found in the

16  path, with evidence marker number five.

17  Q     Were you ever able to tell if that hair braid was

18  consistent with the hair of the victim?

19  A     Not on scene, no.

20  Q     Did you ever find that out?

21  A     No.

22  Q     I'm showing you Government's Exhibit 874.

23        Can you tell us what that is?

24  A     Yes.  This is going to be evidence number two, the black

25  piece of plastic that was found next to her hip.

1  Q    I'm showing you Government's Exhibit 875.  What does this

2  indicate?

3  A    Number three should be a soil sample of the soil that was

4  found underneath the body.

5  Q    Why is that done?

6  A    We always take the soil sample from a body that was on

7  scene just in case anything oozed out of the body into the

8  ground for collection purposes.

9  Q    I'm showing you Government's Exhibit 876.  What is that?

10 A    That is our evidence marker number four with a blue cloth

11 inside the woods.

12 Q    Where was that cloth in relation to the victim's body?

13 A    It was further inside the woods, away from the body.

14 Q    I'm showing you Government's Exhibit 877.  Can you tell

15 us what we're looking at here?

16 A    This is a close up photograph of that same blue cloth,

17 evidence marker number four.

18 Q    I want to show you Government's Exhibit 878.  Can you

19 tell us what we're looking at here?

20 A    This is evidence marker number six.

21 Q    Can you tell us what evidence marker number six is?

22 A    Yes.  It was a piece of rubber that was found underneath

23 the body.

24 Q    Now looking at 879, can you tell us what that is?

25 A    That's the piece of rubber, right there.  That was marker

1  number six.

2  Q     You're indicating just blow the number six; is that

3  correct?

4  A     Yes.

5  Q     Now the black piece of plastic that we saw earlier under

6  marker number two, was that piece of evidence vouchered?

7  A     Yes, it was.

8  Q     Can you explain to the jury what it means to voucher

9  evidence?

10 A     Yes.  So we take the evidence and then we voucher it,

11 which means we give it a unique identification number so we

12 can recall it at a later time.  It's kind of like a social

13 security number that we have as humans.  Each number gets

14 their own number, unique identification.

15 Q     Can you tell us what the voucher number was for that

16 black piece of plastic under the victim's left hip?

17 A     3,000, 951, 600.

18 Q     Sergeant Noftsier, did crime scene perform a more

19 expansive search of the park to look for more possible items

20 of evidence later that evening?

21 A     Yes.

22 Q     Was any other evidence recovered from the park?

23 A     Yes.

24 Q     Can you tell us what was recovered?

25 A     A jacket.

1  Q    I would like to show you Government's Exhibit 880.  Can

2  you tell us what that is?

3  A    Yes.  That's a jacket, the red jacket, next to the post

4  with evidence marker number seven.

5  Q    Where was that in relation to the body?

6  A    This is southern of the park, way, way from the body,

7  like a far distance.

8  Q    At approximately what time did you leave the crime scene?

9  A    3:30 in the morning the next day.

10  Q    On April 10th?

11  A    April 10th, yes.

12  Q    And did you have any further involvement in this

13  investigation?

14  A    No, I did not.

15          MR. PALACIO:  Nothing further, Your Honor.

16          THE COURT:  Do you have a lot?

17          MR. CECUTTI:  No.

18          THE COURT:  Okay.  Cross-examination.

19  CROSS-EXAMINATION

20  BY MR. CECUTTI:

21  Q    Good afternoon, Sergeant.  I have just a few questions

22  for you.  April 9th, 2018, you were with your partner,

23  Detective Eddy?

24  A    Yes.

25  Q    And both of you went to Canarsie Park?

1    A      Yes.

2    Q      And he was the lead detective?

3    A      Yes.

4    Q      And you and the lead detective joined other members of

5    the NYPD at the crime scene, correct?

6    A      Yes.

7    Q      To investigate the crime scene?

8    A      Yes.

9    Q      And you were there for hours, right?

10   A      Correct.

11   Q      And fair to say that you, Detective Eddy, and the other

12   members of the NYPD functioned as a team?

13   A      Yes, pretty much.

14   Q      A team to do a search of the crime scene, right?

15   A      Yes.

16   Q      And you and the team conducted searches of the crime

17   scene, correct?

18   A      Yes.

19   Q      And all of the searches that were done were thorough?

20   A      The ones that we did on our scene, yes.

21   Q      I'm talking about those.  They were thorough?

22   A      Yes.

23   Q      They were systematic?

24   A      Yes.

25   Q      They were methodical?

1  A     Yes.

2  Q     Those searches were thorough and systematic and

3  methodical in an effort to recover and collect all physical

4  evidence, correct?

5  A     Correct.

6  Q     Those searches were thorough and systematic and

7  methodical in an effort to recover and collect all forensic

8  evidence, correct?

9  A     Correct.

10            MR. CECUTTI:  I have nothing further.

11            THE COURT:  Any redirect?

12            MR. PALACIO:  No, Your Honor.

13            THE COURT:  All right.  Thank you so much, Sergeant.

14  You can step down.

15            (Whereupon, the witness was excused.)

16            THE COURT:  Ladies and gentlemen, we're going to

17  break for lunch.  We'll begin again at 2:15.  Don't talk about

18  the case at all.

19            Don't look anything up, but do have a good lunch.

20  The only thing I forgot to tell you, which it goes without

21  saying, is you should really do whatever Ms. Greene tells you

22  to.  She's the expert.  So we'll see you back here at 2:15.

23  Thank you so much.

24            (Jury not present.)

25            THE COURT:  Anything before we break?

1          MS. DEAN:  Nothing from the government.

2          THE COURT:  All right.  How many witnesses do you

3    think we'll get to this afternoon?

4          MS. DEAN:  I think we have two more law enforcement

5    right after lunch, and then we have two civilian witnesses.  I

6    think it's possible we'll get through three and start the

7    fourth.

8          THE COURT:  As long as we're filling the day.

9    Anything from defense?

10          MR. CECUTTI:  It would be helpful to know who the

11   law enforcement witnesses are and the civilian witness.

12          THE COURT:  I'm sure you can confer and get that

13   information.

14          MS. DEAN:  Your Honor, we provided our entire week

15   schedule, but I'm happy to remind Mr. Cecutti.

16          THE COURT:  Thank you so much.

17          (Recess taken.)

18          (Continued on next page.)

19

20

21

22

23

24

25

1                    (Afternoon session.)

2              THE COURTROOM DEPUTY:  All rise.

3              THE COURT:  Everyone can have a seat.

4              Are we ready for the jurors?

5              MS. DEAN:  Yes, your Honor.  One brief thing.  We

6    have two law enforcement witnesses and then we just ask for a

7    brief break because we have an incarcerated witness.

8              THE COURT:  Anything from the defense?

9              MR. CECUTTI:  No, your Honor.

10             (Jury enters the courtroom.)

11             THE COURT:  All right, ladies and gentlemen, we're

12   ready to get started.  I apologize for the delay.  We had a

13   little bit of technical problems with all these computers in

14   here.  That's been fixed and we're ready to proceed go ahead.

15             MS. DEAN:  The Government calls Police Officer

16   Stephen Deluzio.

17             (Continued on next page.)

18

19

20

21

22

23

24

25

1                (Witness takes the witness stand.)

2    **STEPHEN DELUZIO**,

3         called as a witness by the Government, having been first

4         duly sworn/affirmed by the Courtroom Deputy, was examined

5         and testified as follows:

6              THE COURTROOM DEPUTY:  State your name for the

7    record.

8              THE WITNESS:  Officer Deluzio, Stephen Deluzio.

9              THE COURT:  Officer Deluzio, a couple of things.

10   The chair doesn't move, you can't scoot it up.  The microphone

11   does, so just put it in a place where it makes it easy for you

12   to speak.  I want to make sure that all our jurors hear you

13   and the parties at both tables hear you too.  I am going to

14   ask not to speak too quickly, it makes it hard for the court

15   reporter.  If there is a question that you don't understand,

16   let me know I'll have the lawyer rephrase it.  Okay?

17             THE WITNESS:  Okay.

18             THE COURT:  Go ahead.

19             MS. DEAN:  Thank you.

20   DIRECT EXAMINATION

21   BY MS. DEAN:

22   Q    Good afternoon, Officer.

23   A    Good afternoon.

24   Q    Who do you work for?

25   A    NYPD.

1        THE COURT:  That's too fast, slow down.

2   Q    How long have you worked for the NYPD?

3   A    Since July 9, 2014.

4   Q    Can you tell us briefly about your career there?

5   A    I started at the 72 precinct.  Then in December 2017 I

6   went to SRG, which stands for Strategic Response Group, been

7   there ever since.

8   Q    What are your duties and responsibilities with the

9   Strategic Response Group?

10  A    Active shooters, protests, high crime areas.  And we do

11  searches, look for missings.

12  Q    On April 10, 2018, were you with that group?

13  A    Yes.

14  Q    I want to talk to you about that day.  Did you work on

15  April 10, 2018?

16  A    Yes, I did.

17  Q    What were your hours?

18  A    5:30 a.m. to 6:05 time p.m.

19  Q    What was your assignment?

20  A    Pretour overtime.

21       THE COURT:  What is that?

22       THE WITNESS:  Four hours pretour --

23       THE COURT:  You started earlier.

24       THE WITNESS:  Earlier.

25       THE COURT:  So you get overtime for that period.

1        THE WITNESS:  They send us to areas, either transit,
2   that day we had evidence search.
3        THE COURT:  Go ahead.
4   BY MS. DEAN:
5   Q    Where were you assigned to do an evidence search that
6   day?
7   A    In the Canarsie Park compounds of the 69 precinct.
8   Q    What borough?
9   A    Brooklyn.
10  Q    Did you have a partner that day?
11  A    Yes, I did.
12  Q    Who was that?
13  A    Officer Craig Lupardo.
14  Q    Were you on foot during the evidence search or in a
15  vehicle?
16  A    On foot.
17  Q    Can you tell us approximately what time you responded to
18  Canarsie Park in Brooklyn?
19  A    We got to the park approximately 8:00 a.m.
20  Q    What was going on at the park when arrived?
21  A    Part of the park was taped off, there was a big police
22  presence.  And we were told we were there for evidence search.
23  Q    Can you explain to the members of the jury what you were
24  searching for?
25  A    Searching for any evidence dealing with the crime and

1  body parts of a black female.

2  Q    Had some body parts already been found by the time you

3  were doing your search?

4  A    Yes.

5  Q    What other information, if any, were you given?

6  A    We told we were looking for limbs.

7  Q    Who were you searching with?

8  A    With approximately another 20 members of SRG, my partner,

9  and detective bureau.

10 Q    Where did you go to begin your search?

11 A    We began where the torso was found in that area.  We did

12 a grid search, which is a slow methodical search looking for

13 any evidence and body parts.

14 Q    Did there come a time that you went to an area of the

15 park that was further away from where the torso of the victim

16 was found?

17 A    Yes.

18 Q    Can you tell us about that?

19 A    After approximately, around 12:50 we were told to do a

20 perimeter search.  So basically we got back in the cars, they

21 said check any garbage pails around the park.  So me and my

22 partner, we headed towards the baseball field.

23 Q    Did you see any garbage pails over there?

24 A    Yes.

25 Q    What happened then?

1  A     My partner, Craig, he got out of the car, looked in the

2  garbage pail.  He noticed something that looked like hair.  I

3  got out also, I walked past the garbage pail up a little trail

4  where I noticed a garbage that was open.  It looked like a

5  limb of a black female sticking out.

6  Q     When you walked past the garbage pail up that trail, what

7  drew your attention to what you just described to us?

8  A     The bag was open, and I saw skin of a black female, and

9  it was like yellow flat and red blood in the middle.

10  Q     Did you see other garbage bags as well?

11  A     Yes.

12  Q     How many garbage bags in total do you recall seeing?

13  A     Two other, so three in total.

14  Q     Did you touch the bag with the body part in it or the

15  other bags at all?

16  A     No.

17  Q     Do you know how many of the bags contained body parts?

18  A     The only one I know of is the one I saw with the limb

19  sticking out.

20  Q     What did you do when you made this observation?

21  A     I called my partner over.  We called our boss, Lieutenant

22  Gary, he came to the scene.  We secured the scene until he

23  came.  He further called the detective bureau.

24  Q     Did members of the detective bureau arrive?

25  A     Yes.  Detective bureau crime scene, multiple other units

1  I'm not sure of.

2  Q    Can you describe to us what the volume of the law

3  enforcement response was like?

4  A    It was a large presence.

5  Q    Did law enforcement look inside the bags?

6  A    I'm not sure.

7  Q    Did medical personnel arrive?

8  A    I'm not 100 percent sure.

9  Q    What did do you at the scene?

10  A    We stepped back.  We secured the scene.  And we waited

11  for the Lieutenant to come.  And the detective came and he

12  interviewed me.

13              THE COURT:  The detective?

14              THE WITNESS:  The detective of the detective bureau.

15  Q    May I please have for the witness and the jury Government

16  Exhibit 12?

17              Do you recognized area shown on Government Exhibit

18  12?

19  A    Yes.

20  Q    What is that?

21  A    X is where the torso was found, and the letter Y where I

22  found the bag of legs.

23  Q    Using this map, can you draw on the screen in front of

24  you, can you put a circle around the area where you and your

25  partner found the bags?

1    A    (Indicating.)

2    Q    The witness has indicated by marking over the Y that's on

3    the map.

4         I'm now going to ask that the witness be shown for

5    the witness only, Government Exhibit 704 through 711.

6              MR. CECUTTI:  I've looked at the photos already.

7              MS. DEAN:  I can provide a hard copy as well.

8    Q    You can flip through these as well, Officer.  Take a look

9    please and tell us if you recognize those.

10   A    Yes, I do.

11   Q    What are 704 through 711?

12   A    The area where we discovered the bags.

13   Q    Does it fairly and accurately show the scene where you

14   first discovered the bags and found the body part that you

15   described to us?

16   A    Yes.

17             MS. DEAN:  I ask that Government Exhibit 704 to 711

18   be received into evidence.

19             THE COURT:  Any objection?

20             MR. CECUTTI:  No objection to 704 through 709 and

21   711.  The objection is to 710 for the same reasons previously

22   made.

23             THE COURT:  Okay.  Overruled.  Those will be in

24   evidence.

25             (Government's Exhibits 704 through 711 were received

1  in evidence.)

2          MS. DEAN:  May I publish 704 for the jury?

3  Q    Officer, what is Government Exhibit 704 show?

4  A    That's the baseball field where the legs were discovered

5  behind.

6  Q    If I can move to 705.  What is in this picture?

7  A    I'm standing to the left and a little further back is the

8  garbage pail up that trail where we discovered the bag of

9  legs.

10 Q    May I have 706, please.  What is this?

11 A    The garbage pail a little closer.  You have a better

12 sight of the trail.  I'm standing to the left.

13 Q    And 707, please.  What is in 707?

14 A    That's the inside of the garbage pail that my partner

15 discovered, what looked to be black hair.  That's what led us

16 down the trail.

17 Q    Officer, do you have any idea if the hair in this trash

18 can was related to this case at all?

19 A    I'm not sure.

20 Q    If we can turn to 708, please.  What is 708?

21 A    The trail where I discovered the three bags.

22 Q    Can we turn to 709.  What do we see in 709?

23 A    You see all three bags, a better view of the bags.

24 Q    Could you circle the bags for us?

25 A    Yes.  (Indicating.)

1    Q    Where is the third bag?  Are you able to see it in this?

2    A    It's a little blurry.

3    Q    Can you zoom in to the center of the picture by the tree

4    trunks?

5    A    It's right here.  (Indicating.)

6    Q    When you got closer, were you able to see this more

7    clearly?

8    A    Yes.

9    Q    If I can turn to Government Exhibit 710, what do we see?

10   A    That's the open bag that I saw with the leg sticking out.

11   It looks like a thigh of black skin, yellow flesh, and red

12   inside.

13   Q    Does this show exactly how you found the bag in the tree

14   trunks?

15   A    Yes.

16   Q    To be clear, when we were looking at 709, was that the

17   bag that you circled that was in the middle of the other two

18   bags?

19   A    Correct.

20   Q    If I could have 711, please.  What does this show?

21   A    It shows the different angle of the bags.

22   Q    Did there come a time that you left the crime scene?

23   A    Yes.

24   Q    Approximately when?

25   A    Approximately around 5:30 p.m.

1    Q    Did you have any other role in this investigation?

2    A    No.

3              MS. DEAN:  I have nothing further.

4              THE COURT:  Cross-examination?

5              MR. CECUTTI:  No, your Honor.  I have no questions

6    for Officer Deluzio.

7              THE COURT:  Okay.  Thank you so much.  You can step

8    down.

9              (Whereupon, the witness was excused.)

10             THE COURT:  Next witness.

11             MR. PALACIO:  The Government calls Ajuba Granville.

12             (Continued on next page.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Witness takes the witness stand.)

2     **AJUBA GRANVILLE**,

3          called as a witness by the Government, having been first

4          duly sworn/affirmed by the Courtroom Deputy, was examined

5          and testified as follows:

6               THE COURTROOM DEPUTY:  State your name for the

7     record.

8               THE WITNESS:  Ajuba Granville.

9               THE COURT:  Detective, I'm going to give you a

10    couple of preliminary instructions.  Just so you know, that

11    chair doesn't move so you won't be able to scoot it up.  If

12    you need to adjust the microphone, that's fine.  Don't speak

13    too fast so the court reporter doesn't have too much trouble.

14    And if there is a question that you don't understand, let me

15    know and we'll have the lawyer rephrase it all right?

16               THE WITNESS:  Thank you, your Honor.

17               THE COURT:  Go ahead.

18               MR. PALACIO:  Thank you, your Honor.

19    DIRECT EXAMINATION

20    BY MR. PALACIO:

21    Q    Detective, can you tell us by whom you're employed?

22    A    The New York City Police Department.

23    Q    How long have you been employed by NYPD?

24    A    Twenty-two years.

25    Q    In what capacity?

1    A    As a police officer then a detective.

2    Q    How long have you been a detective?

3    A    Since 2016.

4    Q    Can you tell the jury about your career following

5    graduation from the academy?

6    A    I went to the 75 precinct in East New York.  From there I

7    was in the 81 precinct in Bedford Stuyvesant.  Then I went to

8    the patrol bureau Brooklyn north evidence collection team.

9    From there I was in the crime scene unit.  And from the crime

10   scene unit I was in the Office of the Police Commissioner

11   Keychant Sewell.  And then I went to the intelligence

12   division.  And now I'm in the office of the First Deputy

13   Commissioner Tanya Kinsella.

14   Q    Can you tell us what you do in your current role?

15   A    I provide protection.  I'm one of the detectives that is

16   assigned to Commissioner Deputy Commissioner Kinsella.  We

17   provide protection to her wherever she goes.

18   Q    How long were you in the crime scene unit?

19   A    Seven years.

20   Q    Can you tell us what some of your duties and

21   responsibilities were as a crime scene investigator in CSU?

22   A    Some the duties and responsibilities included responding

23   to crime scenes such as homicides, high profile cases, sex

24   crimes, anything that they felt needed crime scene to go to

25   process.

1  Q    Can you tell us about your training to become a crime

2  scene investigator?

3  A    It was 400 hours of classroom training.  And then after

4  that I was assigned to a seasoned detective crime scene

5  investigator and I shadowed that individual on all crime

6  scenes.

7  Q    Approximately how many crime scenes have you investigated

8  over the course of your career?

9  A    Hundreds.

10 Q    Detective Granville, I'd like to direct your attention to

11 April 10, 2018.  Were you working that day?

12 A    Yes.

13 Q    What hours were you working?

14 A    The 7:00 a.m. to 3:00 p.m. tour.

15 Q    Did you have a partner that day?

16 A    Yes.

17 Q    Who was your partner?

18 A    Samuel Gilford.

19 Q    Did there come a point that you responded to Canarsie

20 Park in Brooklyn in connection with the investigation of a

21 dismembered female?

22 A    Yes.

23 Q    Was a crime scene run number assigned to your job?

24 A    Yes.

25 Q    What was the crime scene run number?

1   A    18-153A.

2   Q    Were you the lead investigator for that run?

3   A    No.

4   Q    Who was that?

5   A    Samuel Gilford.

6   Q    Do you know where Detective Gilford is now?

7   A    No.  Retired, that's what I know.

8   Q    Detective, can you tell us at what time you responded to

9   Canarsie Park?

10  A    It was approximately 8:58 a.m.

11  Q    What were the weather conditions like that morning?

12  A    It was pretty fair, maybe there was a little rain at one

13  point.

14  Q    Was there a police presence at the park when you got

15  there?

16  A    Yes.

17  Q    Did there come a point that you conferred with police

18  personnel on scene?

19  A    Yes.

20  Q    Can you tell us what you did?

21  A    We did what is called a walk through, where we literally

22  walk through the crime scene.  We were brought there to assist

23  with the daylight search, which included ECT, crime scene, and

24  SRG, members of SRG.

25  Q    Was there an initial item of evidence that you collected

1    after that walk through?

2    A    Yes.

3    Q    What was that?

4    A    A tree branch.

5    Q    After initially responding to the park to collect that

6    branch, did there come a point when you expanded the search

7    for other possible items of evidence in that park?

8    A    Yes.

9    Q    Can you tell us generally what was recovered over the

10   course of that search that day?

11   A    We recovered U.S. currency, a glove, a comb, hair, Dunkin

12   Donuts cup, water bottle, human remains, that's about it.

13   Q    You said that human remains were recovered.  How were

14   they found?

15   A    In black, plastic bags, garbage bags.

16   Q    Were crime scene photos taken of the evidence collected

17   from the run that day?

18   A    Yes.

19        MR. PALACIO:  With the Court's permission I'd like

20   to show the witness what is marked as Government Exhibit 934

21   to 961, previously shown to counsel.  I have hard copies for

22   the witness.

23        THE COURT:  Go ahead.

24   BY MR. PALACIO:

25   Q    Detective Granville, if you could take a minute to look

1   through that and once you're done look up I'll have some
2   questions for you.
3            (Witness reviewing document.)
4            Detective, do you recognize what is in front of you
5   as Government Exhibit 934 to 961 for identification?
6   A    Yes.
7   Q    What are they?
8   A    These are the photos that were taken on April 10.
9   Q    Are they photos that were taken at Canarsie Park of the
10  evidence that was collected over the course of your response
11  to the park?
12  A    Yes.
13  Q    Do those photographs fairly and accurately depict what
14  those items looked like, what the park looked like on
15  April 10, 2018?
16  A    Yes.
17           MR. PALACIO:  Offering Government Exhibit 934 four
18  to 961 into evidence.
19           MR. CECUTTI:  Your Honor, from that series 934 to
20  961, we are objecting to the following:  951, 952, 953, 954,
21  955, for reasons previously stated.
22           THE COURT:  The objection is overruled.
23           (Government Exhibit 934 - 961, were received in
24  evidence.)
25           MR. PALACIO:  May I approach?

1          THE COURT:  Yes.

2   BY MR. PALACIO:

3   Q    Detective, you told us earlier that the initial of item

4   of evidence that you recovered was a tree branch?

5   A    Yes.

6   Q    Do you know the significance of that tree branch?

7   A    We were told that the human remains was near the tree

8   branch.

9   Q    When you say human remains, do you know what part?

10  A    Torso.

11  Q    Do you know when that torso was recovered?

12  A    The day before, April 9.

13  Q    If we could pull up Government Exhibit 934.  Can you tell

14  us what we're looking at?

15  A    The tree branch that was collected.

16  Q    To the best of your knowledge that was near the location

17  of where the torso was found a day earlier; is that fair?

18  A    Yes.

19  Q    If we could show the witness Government Exhibit 935.

20  What is this?

21  A    That is another image of the tree branch with the number

22  one indicating the first piece of evidence that was collected.

23  Q    You told us also that the search was expanded from that

24  location; is that fair?

25  A    Yes.

 1  Q    I'd like to show you Government Exhibit 936.  Can you
 2  tell us what you see here?
 3  A    That's the number two, with a glove.
 4  Q    Where was this glove recovered?
 5  A    That was recovered near the lake.
 6  Q    I'd like to show you Government Exhibit 937.  What do we
 7  see here?
 8  A    A close-up of the glove with a number two.
 9  Q    You told us that was recovered by a lake in the park; is
10  that right?
11  A    Yes.
12  Q    Could we show the witness Government Exhibit 12, please.
13  And if we could zoom in on the lower half of that map.
14         Detective Granville, do you see the location of that
15  lake?
16  A    Yes.
17  Q    If you could use your finger and circle that location,
18  please?
19  A    (Indicating.)
20  Q    You've indicated the bottom portion of that map; is that
21  correct?
22  A    Yes.
23  Q    Can you show us the location of where that tree branch
24  was recovered from?
25  A    Do I circle?

1   Q    If you can circle as well.

2   A    (Indicating.)

3   Q    You circled around the X; is that fair?

4   A    Yes.

5   Q    There is a button on the bottom to clear the screen.

6        I'll show you Government Exhibit 938.  Can you tell

7   us what you see in the middle of the frame, and if we can

8   expand that area?

9   A    Evidence markers three and four.

10  Q    What type of evidence is indicated there?

11  A    It's currency.  One dollar bill at three and one dollar

12  bill at four.

13  Q    If we can show the witness Government Exhibit 939.  What

14  do we see here?

15  A    We see one d dollar bill by evidence marker three, and

16  one dollar bill by evidence marker four.

17  Q    I want to return to that map, Government Exhibit 12.  If

18  we could zoom in around the area of the X.  Detective

19  Granville, do you see where those two items of evidence were

20  recovered from?

21  A    Yes.

22  Q    If you could circle that general area as well?

23  A    (Indicating.)

24  Q    You've indicated to the right of the X; is that right?

25  A    Yes.

 1   Q     If you can clear that, please.

 2         Detective, you told us that you also found garbage

 3   bags with human remains; is that right?

 4   A     Yes.

 5   Q     I'll start with Government Exhibit 940.  What do we see

 6   here?

 7   A     That's the pathway in Canarsie Park.

 8   Q     Where does that lead to?

 9   A     That pathway leads towards -- the further end is the Belt

10   Parkway and the baseball fields and cricket fields.

11   Q     I'd like to show you Government Exhibit 941.  Do you see

12   the area where those bags were ultimately recovered from?

13   A     Yes.

14   Q     Could you circle that area?

15   A     (Indicating.)

16   Q     You've indicated with a circle just to the right of the

17   mid point of the photograph; is that correct?

18   A     Yes.

19   Q     I'd like to show you Government Exhibit 706.  Can you

20   tell us what we see here?

21   A     Another view of the previous photo from a different

22   angle.

23   Q     What is on the other side of that crime scene tape that

24   we see?

25   A     The body parts and a Dunkin Donuts cup and water bottle.

1  Q    I'd like to show you Government Exhibit 943.  Detective,
2  you said that there were several bags -- a couple of bags that
3  were recovered; is that correct?
4  A    Yes.
5  Q    Do you see on this photograph, maybe if we can zoom in
6  towards the center of the photograph, do you see some the bags
7  that were recovered?
8  A    Yes.
9  Q    Could you circle them, please?
10 A    (Indicating.)
11 Q    You've indicated with a circle to the left of a tree in
12 the middle of the photo, and just off to the right of the mid
13 point of the photograph another bag; is that correct?
14 A    Yes.
15 Q    I'd like to show you Government Exhibit 944.  If you
16 could clear that.
17        If we could zoom in, just to the right of the center
18 of the photograph.  Was there a third bag that was collected
19 that day.
20 A    Yes.
21 Q    Do you see that bag?
22 A    Yes.
23 Q    Could you circle that, please?
24 A    (Indicating.)
25 Q    You've drawn a circle towards the slightly to the right

 1  of the center of the photograph; is that fair?

 2  A    Yes.

 3            THE COURT:  To the right or to the left?

 4            MR. PALACIO:  On the larger picture to the right.

 5            THE COURT:  I see.

 6  BY MR. PALACIO:

 7  Q    If we could show Government Exhibit 944 and 946 together.

 8  We were just talking about that third bag.  Do you see that on

 9  the left-hand picture?

10  A    Yes.

11  Q    If you don't mind again just circling that.

12  A    (Indicating.)

13  Q    Can you tell us what we see on the right-hand side, which

14  is Government Exhibit 946?

15  A    A larger image photo of the one on the left.

16  Q    How is the garbage bag sealed, how is it closed?

17  A    A knot.

18  Q    If we can show the witness 947.  What do we see here?

19  A    A close-up image of the previous photographs.

20  Q    A moment ago you circled a bag that was next to the tree;

21  is that correct?

22  A    Yes.

23  Q    Could we show the witness Government Exhibit 710?  What

24  do we see here?

25  A    That is a limb inside a bag.

1  Q    Is that how that bag and that limb looked like when you

2  responded to the scene?

3  A    Yes.

4  Q    I'd like to show you Government Exhibit 950.  What do we

5  see here?

6  A    That is another bag.

7  Q    Where was that in relation to the bag that we just saw?

8  A    To the right.

9  Q    I'd like to show you Government Exhibit 949.  What do we

10 see here?

11 A    Number five is the Dunkin Donuts cup, and number six is a

12 water bottle.

13 Q    Is that the same location where the bag was that we just

14 saw a moment ago?

15 A    Yes.

16 Q    The bag that's been removed; is that fair to say?

17 A    Yes.

18 Q    Did there come a point when someone from the medical

19 examiners office responded to the park?

20 A    Yes.

21 Q    Who was that?  Without giving us the name, what type of

22 person?

23 A    The Medical Legal Investigator, MLI.

24 Q    What did the MLI do?

25 A    The MLI conducts the investigation for the office of the

1   chief medical examiner.  They take pictures.  They take

2   custody of the limbs, anything that they need to take to

3   examine, that's what they do.

4   Q    How many of those three bags that we saw, how many of

5   them contained human remains?

6   A    All three.

7   Q    Could you please review your notes?

8   A    Okay, for SG7, according to my notes, it says victims

9   limbs were recovered near bag.  And then the other two had

10  victims limbs were recovered inside the bag.

11  Q    Do you remember as you sit here today how many of those

12  bags contained human remains?

13  A    The first one I remember exactly, yes.

14  Q    When you say the first one, which one is that?

15  A    With the limbs exposed.

16  Q    Did there come a point when those bags were opened?

17  A    Yes.

18  Q    I'd like to show you Government Exhibit 951.  What do we

19  see here?

20  A    Those are thighs.

21  Q    Do you remember which bag that came from?

22  A    Number seven.

23  Q    When you say seven, is that the crime scene marker that

24  was assigned to it?

25  A    Yes, the crime scene marker number.

1  Q    Is this the bag that was next to the left of the tree

2  that we saw earlier?

3  A    Yes.

4  Q    I'd like to show you Government Exhibit 952.  What do we

5  see here?

6  A    Another picture of the limbs.

7  Q    I'd like to show you Government Exhibit 953.  What do we

8  see here?

9  A    We see legs, lower portion of legs, and the lower portion

10 of arms with hands attached.

11 Q    Do you have any recollection which bag these limbs came

12 from?

13 A    No.

14 Q    I'd like to show you Government Exhibit 954, can you tell

15 us what we see here?

16 A    Another picture of the lower limbs with feet attached,

17 and the lower arms with hands attached.

18 Q    Turning to Government Exhibit 955.  Can you tell us what

19 we see?

20 A    Another image of the legs, lower legs, and the lower arms

21 with feet and hands attached.

22 Q    Coming back to Government Exhibit 947.  How is this

23 knotted bag, how is it marked on the crime scene?

24 A    Evidence marker eight.

25 Q    Were the three bags that we talked about SG7 and SG8, the

1   third bag, how is that marked?

2   A   Number nine.

3   Q   Were those three bags vouchered?

4   A   Yes.

5   Q   Under what voucher number?

6   A   May I look at the paperwork?  Thank you.  The three bags

7   were vouchered under invoice number 300095-2042.

8              Thank you, your Honor.

9   Q   Were all three bags included under the same voucher

10  number?

11  A   Yes.

12  Q   Under different item numbers; fair to say?

13  A   Yes.

14  Q   Detective, did you also search the area around those

15  bags?

16  A   Yes.

17  Q   I'd like to show you what is in evidence as Government

18  Exhibit 956.  Can you tell us what we see here?

19  A   This is the garbage can that was outside of the

20  perimeter -- sorry.  What you see is this neutral colored box

21  is a crime scene -- our camera case.  So it was close to the

22  camera case.

23  Q   Were the contents of that trash can, were they emptied

24  out?

25  A   Yes.

1  Q    What does the number ten intended to indicate?

2  A    Hair.

3  Q    I want to show you briefly Government Exhibit 706.  Do

4  you see that trash can here?

5  A    Yes.

6  Q    If you don't mind circling that, please?

7  A    (Indicating.)

8  Q    You've indicated to the right of the center of the

9  photograph; is that fair.

10 A    Yes.

11 Q    You said that some hair was recovered from that bag; is

12 that right?

13 A    Yes.

14 Q    If we could show the witness Government Exhibit 957.

15 What do we see here?

16 A    Close-up view of the hair with evidence marker number

17 ten.

18 Q    Detective Granville, I want to come back to that map so

19 you can show the jury the location of where those human

20 remains were found.

21        If we could show the witness Government Exhibit 12.

22 If we could zoom in towards the bottom area of the map.

23        Detective Granville, do you see the location where

24 those bags were found that contain those human remains?

25 A    Yes.

 1   Q     Could you circle that area?

 2   A     (Indicating.)

 3   Q     Are you indicating the area near the Y on the map?

 4   A     Yes.

 5   Q     Is the Y the location, the approximate location, where

 6   the remains were found?

 7   A     Yes.

 8   Q     Later that day that you expanded the search for other

 9   possible items of evidence in different areas of the park?

10   A     Yes.

11   Q     I'd like to show you Government Exhibit 958.  What do we

12   see here?

13   A     That's an image of a garbage can right outside DiNapoli

14   playground, an area within Canarsie Park.

15                (Continued on next page.)

16

17

18

19

20

21

22

23

24

25

 1    (Continuing.)

 2            MR. PALACIO:  If we could just come back to

 3    Government's Exhibit 12.

 4            (Exhibit published.)

 5    Q    Can you circle where DiNapoli Park is?

 6            MR. PALACIO:  Actually, I think it's toward the

 7    top.

 8    A    (Witness complying.)

 9    Q    All right.  You've indicated from this blowout towards

10    the center of the photograph near some baseball fields; is

11    that correct?

12    A    Yes.

13    Q    I'd like to show you Government's Exhibit 959.

14            (Exhibit published.)

15    Q    What do we see here?

16    A    That is inside the garbage can that was outside of the

17    gate of DiNapoli Playground in Canarsie Park.

18    Q    And was anything from inside of that garbage can

19    recovered?

20    A    Yes.

21    Q    Can you tell us what that was?

22    A    One comb and hair, a braid.

23    Q    I'd like to show you Government's Exhibit 960.

24            (Exhibit published.)

25    Q    What is this?

1  A    That is a picture of a comb.

2  Q    And was that inside of that trash can?

3  A    Yes.

4  Q    And finally, Government's Exhibit 961.

5            (Exhibit published.)

6  Q    Can you tell us what this is?

7  A    That is hair with a braid.

8  Q    And do you have any idea if this hair had any relation

9  to this crime?

10  A    No.

11  Q    Detective Granville, can you tell us at about what time

12  you left the crime scene?

13  A    About 11:30 p.m.

14  Q    On April 10th?

15  A    Yes.

16  Q    And did you have any further involvement in this

17  investigation?

18  A    Other than going to the precinct?  No.

19            MR. PALACIO:  Nothing further, Your Honor.

20            THE COURT:  All right.

21            Any cross-examination.

22            MR. CECUTTI:  Your Honor, no questions for

23  Detective Granville.

24            THE COURT:  All right.  Detective, thank you so

25  much.  You can step down.

1    THE WITNESS:  Thank you.

2    (Witness excused.)

3    THE COURT:  All right.  I think it's a good time

4  for a break.  I think we have to set up for the next

5  witness.  So I'm going to excuse --

6    Am I right about that, by the way?

7    MS. DEAN:  Yes, Your Honor.

8    THE COURT:  Okay.  I'm going to excuse you jurors

9  for, it will probably take about 15 minutes, but please

10  don't talk about the case.  We'll see you in 15 minutes.

11    THE COURTROOM DEPUTY:  All rise.

12    (Jury exits.)

13    THE COURT:  Okay.  Everybody can have a seat.

14    All right.  So we'll be in recess for about

15  15 minutes.

16    (Recess was taken.)

17    (In open court; jury not present.)

18    THE COURTROOM DEPUTY:  All rise.

19    (Judge enters.)

20    THE COURT:  Everybody can have a seat.

21    All right.  Are we ready to bring in your next

22  witness?

23    MS. HAJJAR:  Yes, Your Honor.

24    THE COURT:  Okay.  And we'll just have him sitting

25  here when the jury gets here?

1          MS. HAJJAR:  Yes.

2          THE COURT:  And I see that his lawyer is here.

3          Counsel, do you want to stay where you're sitting?

4          MR. GUADAGNINO:  However Your Honor -- wherever

5   you would like me.

6          THE COURT:  If you're fine there, that's fine, if

7   that works for you.

8          MR. GUADAGNINO:  Yes, it does.

9          THE COURT:  Okay.  Mr. Guadagnino, it's

10  G-U-A-D-I-G-N-O --

11         MR. GUADAGNINO:  G-U-A-D-A-G-N-I-N-O.

12         THE COURT:  Right.  Okay, thanks.

13         (Witness takes the stand.)

14         THE COURT:  All right.  Are we ready for the jury?

15  Anything before we start?

16         MS. HAJJAR:  No, Your Honor.

17         THE COURT:  All right.  Let's get the jury.

18         (Pause in proceedings.)

19         THE COURTROOM DEPUTY:  All rise.

20         (Jury enters.)

21         THE COURT:  All right.  Before you call your next

22  witness, can I just ask the parties to come to the side with

23  the court reporter?

24         (Sidebar conference.)

25         (Continued on following page.)

1          (Sidebar conference held outside the presence of

2     the jury and audience.)

3          THE COURT:  I take it he's going to assert the

4     Fifth Amendment privilege with respect to the pending case.

5     I'm not going to give them any instruction about that,

6     unless you want me to.

7          MS. DEAN:  No.

8          THE COURT:  I just wanted to make sure.

9          Nothing from you, right?

10         MR. CECUTTI:  No.

11         THE COURT:  All right.

12         (Sidebar ends.)

13         (Continued on the following page.)

14

15

16

17

18

19

20

21

22

23

24

25

1          (In open court; jury present.)

2          MS. HAJJAR:  The Government calls Samson Alabi,

3    Your Honor.

4          THE COURTROOM DEPUTY:  Would the witness please

5    stand and raise your right hand.

6          (Witness sworn.)

7          THE COURTROOM DEPUTY:  Please state your name for

8    the record.

9          THE WITNESS:  Samson Alabi.

10         THE COURT:  All right.  A couple of things.

11         I want to make sure everybody hears you.  The

12   chair doesn't move, but the microphone does, so move it so

13   that you're a little closer so you're making the best use

14   out of it.  Make sure you speak into the microphone and you

15   don't speak too quickly.  Our court reporter is taking down

16   everything that you say, and if you speak too fast, it makes

17   her job harder.

18         THE WITNESS:  All right.

19         THE COURT:  And along those same lines, make sure

20   that you don't talk over whichever lawyer's asking you

21   questions.  It just makes it harder for the court reporter.

22   If there's a question that you don't understand or want to

23   have repeated, just let me know.

24         All right?

25         THE WITNESS:  All right.

1            THE COURT:  Go ahead.

2    **SAMSON ALABI**,

3              called as a witness, having been first duly

4              sworn/affirmed, was examined and testified as

5              follows:

6    DIRECT EXAMINATION

7    BY MS. HAJJAR:

8    Q    Good afternoon, Mr. Alabi.

9    A    Good afternoon.

10   Q    How old are you?

11   A    33.

12   Q    And do you know an individual named Cory?

13   A    Yes, ma'am.

14   Q    How do you know him?

15   A    From the neighborhood.

16   Q    Do you see Cory in the courtroom today?

17   A    Yes, ma'am.

18   Q    Can you identify him by an article of clothing or where

19   he's seated?

20   A    To the left of me, he has a suit on.

21           THE COURT:  There are a couple of people with

22   suits on at that table.

23           THE WITNESS:  He's got on a black suit and a white

24   shirt.

25           THE COURT:  Okay.  Any necktie?

1          THE WITNESS:  No, ma'am.

2          THE COURT:  All right.  Indicating the defendant.

3          MS. HAJJAR:  Thank you, Your Honor.

4   BY MS. HAJJAR:

5   Q    How long have you known the defendant?

6   A    A little over, give or take, seven, eight years.

7   Q    How did you first come to meet?

8   A    My cousin used to live on the same block that he used

9   to live on.

10  Q    And where was that block?

11  A    85th Street in Canarsie.

12  Q    Is that in Brooklyn?

13  A    Yes, ma'am.

14  Q    Where did the defendant live?

15  A    Across the street.

16  Q    From where you lived?

17  A    Yeah.

18  Q    And where did you live?

19  A    On 85th, between Avenue L and M.

20         THE COURT:  Avenue what?

21         THE WITNESS:  L and M.

22         THE COURT:  L and M, okay.

23  Q    Now, directing your attention to 2017, were you in jail

24  for any period of time?

25  A    Yeah.  I just came home 2017.

1   Q    And what had you been convicted of?

2   A    A violation of probation.

3   Q    Had you been convicted of anything prior to that?

4   A    Yes, ma'am.

5   Q    What was that?

6   A    Driving -- driving with suspended license.

7   Q    Okay.  Did you plead guilty to a crime?

8   A    Yes, ma'am.

9   Q    And was that to the unlicensed operation of a vehicle?

10          MR. CECUTTI:  Objection.  Leading.

11          THE COURT:  Overruled.

12  A    Yes, ma'am.

13  Q    And what did you do that made you guilty of that crime?

14  A    I was driving with a suspended license.

15  Q    And had you previously been convicted of the same crime

16  before?

17  A    Yes, ma'am.

18  Q    More than once?

19  A    Yes.

20  Q    Do you remember the approximate years?

21  A    After the first conviction?

22  Q    Well, when were the prior convictions prior to when you

23  got out of jail in 2017?

24  A    The next one was I think, if I'm not mistaken, 2020.

25          THE COURT:  I think the question is:  So you said

1    you were in jail because of the violation of probation; is

2    that right?  And that was because of the aggravated

3    unlicensed operation.

4              THE WITNESS:  Yes, ma'am.

5              THE COURT:  Did you have another conviction for

6    the same thing before that one?

7              THE WITNESS:  Oh, before that one?

8              THE COURT:  Yes.

9              THE WITNESS:  No.

10             THE COURT:  Okay.

11             THE WITNESS:  I had a possession of fraudulent

12   instruments.

13             THE COURT:  Possession of a?

14             THE WITNESS:  Fraudulent instrument.

15             THE COURT:  Fraudulent instrument?

16             THE WITNESS:  Yes, ma'am.

17             THE COURT:  Is that what you're asking about?

18             MS. HAJJAR:  Yes, Your Honor.

19             THE COURT:  Okay.  Go ahead.

20   BY MS. HAJJAR:

21   Q    Okay.  So that period of time, you said it was May 2017

22   when you got out of jail.

23   A    Yes, ma'am.

24   Q    Where did you live after you got out of jail?

25   A    I was staying in the Bronx with my girlfriend at the

1   time.

2   Q    And did you see the defendant after you got out of jail

3   in May 2017?

4   A    Yes, ma'am.

5   Q    Where did you see him?

6   A    In Canarsie, on 85th Street.

7   Q    Is that where you had previously known him?

8   A    Yeah.

9   Q    And what happened when you saw the defendant?

10  A    I happened to just came outside, and I seen people

11  across the street that I knew, and I went over there, and we

12  was just hanging out, catching up on old times.

13  Q    And you're familiar with that area, Mr. Alabi?

14  A    Yes, ma'am.

15  Q    How far away is that from Canarsie Park?

16  A    Two blocks.

17  Q    And what happened during the meeting with the

18  defendant?

19  A    We was just drinking and smoking and talking about old

20  days, just catching up that night.

21  Q    Did you and the defendant make any plans to meet again?

22  A    Yeah.  We had an exchange of numbers, and we said we

23  was gonna keep in contact with each other.

24  Q    Did you keep in contact with him?

25  A    Yes.

1   Q    And did you see him again?

2   A    Yes.

3   Q    Where?

4   A    Back on the same block, then a couple of time at his

5   house.

6   Q    How did you learn the defendant's address?

7   A    To his new residence?

8   Q    Uh-huh.

9   A    He had texted it to me.

10  Q    Okay.  And where did he live?

11  A    In Queens.

12  Q    Did you visit him more than once?

13  A    Yes, ma'am.

14  Q    Do you know approximately where in Queens he was

15  living?

16  A    I'm not sure.  I think somewhere in Rosedale, but I'm

17  not positive.

18  Q    And why did you visit the defendant?

19  A    The first time I actually visited him, I had a problem

20  with my girlfriend, and I needed a place to stay for the

21  night, and I asked him if it was okay if I spent the night.

22  Q    And did you, in fact, visit the defendant?

23  A    Yes, ma'am.

24  Q    When you visited the defendant in Queens, who, if

25  anyone else, was there?

1   A    It was him, his child's mother at the time, and there

2   was another young lady there.

3   Q    Did you see the child's mother?

4   A    Yeah.

5   Q    Can you explain what you mean?  Did you see her for a

6   long period of time?

7   A    No, not a long period of time.  I think she was injured

8   at the time, so she was upstairs in her room.

9   Q    She was injured?

10  A    Yeah.

11  Q    What kind of injury?

12  A    I think a foot injury from work or something.

13  Q    Did the defendant tell you anything about her injury?

14  A    No, not really.

15  Q    You testified that it was from work?

16  A    Yes.

17  Q    How did you come to learn that?

18  A    I was informed.  He told me.

19  Q    Okay.  And at some point did you see another woman in

20  the house?

21  A    Yes, ma'am.

22  Q    Do you remember any part of her name?

23  A    I can't really remember her name, but I know it started

24  with a B.

25  Q    What did she look like?

1    A    Dark skin, not too tall, you know, like, probably,

2    like, 5-  11, 5-10, somewhere around there.

3    Q    And what, if anything, did you understand about the

4    relationship between the defendant and this girl?

5    A    Not that I know -- he had informed me that he was -- he

6    was having her escort at the time frame.

7    Q    And what did you understand that to mean, having her

8    escort for him?

9    A    I guess, like, selling her body for money.

10   Q    Did he say anything else about that?

11   A    No.

12   Q    Can you describe what the house looked like in

13   Rosedale, Queens?

14   A    It was a family house.  You know, it has a basement, a

15   middle floor, and a top floor.

16   Q    And how did you enter the house when you visited?

17   A    If I'm not mistaken, the first time was through the

18   side, through the side by the drive-through, the driveway.

19   And then the other time was through the backyard.

20   Q    And do you know how many bedrooms were in the house?

21   A    I think three upstairs.

22   Q    Okay.  And did you have any understanding about who was

23   living in the house at the time?

24   A    Just him and his child's mother and the girl that was

25   staying there at the time.

1    Q    Was there a car at the house?

2    A    Yeah.

3    Q    What kind of car?

4    A    It was his car and I think his dad's car.

5    Q    Do you know the make or model?

6    A    He had a -- it was a Maxima, a Nissan Maxima, and then

7    a Toyota.

8              THE COURT:  Were there two cars?

9              THE WITNESS:  Yeah, it was two cars.

10             THE COURT:  Okay.

11   Q    Did there come a time when you asked the defendant

12   about making money?

13   A    Yeah, not too long.

14   Q    What do you mean "not too long"?

15   A    When I -- after I came home, I was basically just

16   asking around what he was up to, how he was making money,

17   because at the time I just came home from jail, and I was

18   trying to figure out how I was going to get my feet back on,

19   and I needed money at the time.

20   Q    And did you ask the defendant specifically about making

21   money?

22   A    Yeah.  I ran it across his mind; like, what he was up

23   to, what he was doing, if he had anything he could -- he

24   could put me on to.

25   Q    And what did you mean by that, anything that he could

1    put you on to?

2    A    Like, basically, if he could help me out to make money,

3    whatever he was doing, if he could let me know what it was

4    and if I could be a part of it.

5    Q    Okay.  Was there anything specific you were thinking of

6    when you asked him about making money?

7    A    No, not at the time.

8    Q    Were you having financial problems at the time?

9    A    Yeah.

10   Q    And did the defendant ever express anything to you

11   about any financial issues he was having?

12   A    Later on down the line.

13   Q    Okay.  And what did he tell you?

14   A    That it was rough all around for him, too, and he was

15   trying to figure out things himself.

16   Q    Did he give you any details about what he meant by

17   being -- by it being rough?

18   A    No.  Basically that he was -- he didn't really have

19   money, too.

20   Q    Did there come a time when the defendant made a

21   proposal to you?

22   A    Yeah.

23   Q    And where did that proposal take place?

24   A    At his residence.

25   Q    Was that in Rosedale, Queens?

1    A     Yes, ma'am.

2    Q     And what did he tell you?

3    A     We was just talking about the situation, that he said

4    he might have a play coming up, that he's going to keep me

5    informed, just to be on standby.

6    Q     What did you understand that to mean, that there was a

7    play coming up?

8    A     That he probably had a means of us making some money.

9    Q     Did you understand that to be, like, a legitimate form

10   of making money?

11   A     No.

12   Q     What did you understand it to mean?

13   A     Probably some scam or something.  I wasn't sure what it

14   was at the time.

15   Q     And had you ever discussed with the defendant scamming

16   before?

17   A     No, not really.  But he -- everybody around knew that's

18   what I was into, that I usually scam sometimes, so I just

19   figured out he probably has something in that line.

20   Q     Can you explain to the jury what you mean by scamming?

21   A     Credit cards.

22   Q     Okay.  So using credit cards information that didn't

23   belong to you?

24   A     Yes.

25   Q     Okay.

1          THE COURT:  Is that what you were doing?

2          THE WITNESS:  Yes.

3   Q    Now, did the defendant ever talk to you about a

4   specific proposal that he had?

5   A    No, not at the time.  He just told me that he's going

6   to let me know, he was trying to figure some things out,

7   that he had a play and he'll let me know when everything was

8   set.

9   Q    And at that time, did you text with the defendant about

10  this?

11  A    No.  The only text, he just told me was to let me know

12  that he was -- he was still working on it.  That was pretty

13  much it.

14  Q    At some time after that, did you come to learn what the

15  defendant was referring to?

16  A    Yes, ma'am.

17  Q    Okay.  Can you explain that to the jury, please?

18  A    I had went back to his house later on, and we was

19  talking about the -- well, he finally told me what was to

20  take place.  He said he had a -- he had a means that we

21  could make a quick money, and I asked him what it was about,

22  he said it was a -- he had life insurance that he was trying

23  to do.  He had a life insurance policy out on somebody that

24  he had filed for and to just give him some time, and then he

25  was gonna -- he wanted me -- he wanted me to kill the girl,

1   the female that was staying at the house at the time with

2   him so he could collect the funds.

3   Q    Okay.  I just want to break that down.

4        You say he had a life insurance out on somebody.

5   A    Yes.

6   Q    Did he explain what he meant by that?

7   A    The girl that was staying with him at the time, he just

8   explained to me that he had put a policy out for her, I

9   guess.  I don't really know how that works, but he said he

10  had put out a life insurance policy out on her and he was

11  just waiting for a period of -- I guess for the right time,

12  and he wanted me to shoot the girl and basically a robbery

13  gone wrong.

14  Q    Did he say anything about that period of time, what he

15  was doing during that period of time?

16  A    No.  He said he was just gonna let me know.

17  Q    Okay.  And did he say anything about the girl, which

18  girl it was?

19  A    It was the same girl that I had seen the first time I

20  came to his house.

21  Q    That lived in the house?

22  A    Yes, ma'am.

23  Q    What, if anything, did he say about how this plan was

24  going to work?

25  A    Basically, he was just explaining to me that it was

1    gonna be a robbery gone wrong.  He was gonna -- I should

2    come over one of the nights, he was gonna let me know when

3    everything was gonna go in play.  He's gonna text me to come

4    over to the house, the door was gonna be open, she was gonna

5    be in her room, just walk up, shoot her, make it seem like a

6    robbery gone wrong, and leave and let him know when it was

7    done.

8    Q    Did he say anything about why that girl specifically?

9    A    Pretty much like, I guess, at the time he said she

10   didn't have no family, nobody was -- nobody was gonna be

11   looking for her, things like that.

12   Q    Did the defendant offer you anything in this

13   conversation?

14   A    Yeah.  We was supposed to split some money.  I guess we

15   was gonna split the insurance money.

16   Q    And did he specify how much that was?

17   A    About $25,000.

18   Q    Was that going to be the full amount, or was that your

19   half?

20   A    I think that was my half.

21              THE COURT:  Can I just clarify, you said it was

22   the girl who was in the house.  Was it the girl who was

23   upstairs in the bed or the other one whose name began with a

24   B?

25              THE WITNESS:  The one that the name begins with a

1   B.

2           THE COURT:  Okay.  Thanks.

3           Sorry.  Go ahead.

4   Q    That was not the mother of his child, right?

5   A    No.

6   Q    How did you respond to the defendant's proposal?

7   A    I was shocked at the time when he told me about the

8   plan he had.

9   Q    Why?

10  A    Because I didn't expect that from him.

11  Q    And what did you say?

12  A    I denied it.

13  Q    What do you mean you denied it?  Can you explain that

14  to the jury?

15  A    Basically, I told him I couldn't go on with the plan,

16  that, you know, that's not something I do.  Like, I scam.

17  I'm not into killing people for money.

18  Q    What, if anything else, did he say about the girl, the

19  target of this plan?

20  A    He was just explaining to me how -- how he wanted --

21  how he wanted it done, that I guess he had a couple of other

22  documents and that's pretty much it.  It didn't really go on

23  after I had denied the proposal, so we didn't really get too

24  deep into the conversation.

25  Q    Can you explain to the jury what you mean by the

1  documents?

2  A    I think, if I'm not mistaken, a birth certificate or a

3  passport.  I'm not really -- I can't really remember which

4  one, but I know he had some other documents with him.

5  Q    What did the defendant say about the documents?

6  A    That he -- he had it.  I guess that's how he was

7  obtain -- that's how he was able to file the claim or

8  something.  I'm not really sure.

9  Q    The documents related to the girl that was the target

10 of this --

11 A    Yes, ma'am.

12 Q    Now, Mr. Alabi, in the past, have you committed any

13 crimes using a gun?

14 A    No.

15 Q    Have you committed any shootings?

16 A    Yes.

17 Q    Okay.  And was that when you were a minor or --

18 A    Yes, ma'am.

19 Q    Okay.  Are you aware if other people knew about your

20 involvement in shootings?

21 A    Probably people from the neighborhood.  You know, words

22 get around.

23 Q    Are you aware if the defendant knew?

24 A    Probably did --

25             MR. CECUTTI:  Objection.

1    THE COURT:  Did you object?

2    MR. CECUTTI:  Objection.

3    THE COURT:  Sustained.

4    Well, did you speak to him about it?

5    THE WITNESS:  No.

6    THE COURT:  All right.  Next question.

7  BY MS. HAJJAR:

8  Q    How many times did you visit the defendant at his

9  house?

10  A    Three to four times.

11  Q    And approximately how many times did you see the girl

12  whose name started with B at the Rosedale house?

13  A    It's about three times.

14  Q    Now, at any point after you got out of jail in May

15  2017, did you provide anything to the defendant?

16  A    It was -- there was a time I was in need of money, and

17  I had sold him a gun.  He had seen that I had a gun on me,

18  and I needed money and he liked it, so we just -- he wanted

19  to buy it and I sold it to him.

20    MR. CECUTTI:  Objection.

21    THE COURT:  Overruled.

22  Q    Did you ever contact the defendant about the gun?

23  A    Yeah, a couple of months later.

24  Q    What did you say?

25  A    I had got into a situation where I was staying at, and

1   I asked him if I could -- if he could lend me back the gun.

2   Q    And how did you communicate with the defendant about

3   the gun?

4   A    I had first texted him.  I text him on his phone.  I

5   told him, I said, I got into a little situation in the

6   Bronx, and I asked him if he could bring -- I was referring

7   to the gun as a girl, so I asked him if he could bring -- if

8   he could bring her back to me.

9   Q    Just to be clear, you're referring to the gun in code?

10  A    Yes, ma'am.

11  Q    And what was the code?

12  A    A girl, I called it a girl.

13  Q    Okay.  What happened after you contacted the defendant

14  about the gun in code?

15  A    He told me okay.  And it took a little while, but he

16  eventually showed up.

17  Q    Showed up where?

18  A    He came to the Bronx, to my resident at the time.

19  Q    Did he bring a firearm with him?

20  A    No, he didn't bring it.

21  Q    Can you explain what happened?

22  A    He thought I was talking about -- he actually thought I

23  was talking about the girl that was staying with him at the

24  time, so he showed up with her.  So when they got to my

25  house, I was able to explain it to him in person since we

1  wasn't on the phone no more, and he told me no problem.  He

2  says, oh, I'm sorry about that, that he's gonna go and get

3  it and come back.

4  Q    Was anyone else in the home with you at the time?

5  A    Yeah, it was my girlfriend at the time.

6  Q    And what happened after that?

7  A    We -- he stayed for a little bit, you know, he had

8  something to drink, we smoked, and he left.  He says to give

9  him like a hour and that he was gonna be back.

10  Q    Did the defendant ever return with the --

11  A    No.

12  Q    Did you ask for the firearm again after that?

13  A    Yeah, I text him and ask him if he was still coming

14  back, but it wasn't -- I didn't get no response that night.

15  Q    And what about after that?

16  A    Yeah, he told me that he still got me, that he was

17  gonna bring it, but I never -- he never came back.

18  Q    Okay.  Was that the last time you saw the defendant?

19  A    Yes, ma'am.

20  Q    Did there come a time, Mr. Alabi, when you heard about

21  a murder that had taken place?

22  A    Yes, ma'am.

23  Q    Can you explain what happened to the jury?

24  A    It was I guess a couple of months after I've seen him.

25  I was in the house, me and my girlfriend at the time.  I was

1    watching TV, she was sitting next to me on her phone, and I

2    heard her, like, oh, my god, scream.  That's what draw my

3    attention to her.  I asked her what was wrong, and she's

4    like, the girl that was just here had passed away.  And I

5    was like, what girl?  And then she showed me.  I guess it

6    was a article on Facebook at the time with her picture and

7    what had happened, and she had showed me and I was like, oh,

8    wow, she was just here.  And that's how I found out --

9         MR. CECUTTI:  Objection.

10   A    -- about it.

11        THE COURT:  Overruled.

12   Q    What did you do next?

13   A    I had called him.  I tried to get in contact with him.

14   Q    What happened?

15   A    He picked up, and I asked him if he was okay, if

16   everything was good, where he was at, and I wanted to talk

17   to him.

18   Q    What were you trying to communicate in asking those

19   questions?

20   A    At the time, I was just trying to find out if it was

21   true, if he did it or if he had anything to do with it.

22   Q    How did the defendant respond?

23   A    I didn't ask him.  I just -- I didn't ask him over the

24   phone.  I just asked him if he was good, that I wanted to

25   see him, but he was a little fidgety.  He was like a little

1  worried and stuff --

2          MR. CECUTTI:  Objection.

3          THE COURT:  Sustained.  Sustained as to that.

4          You said you spoke to him.

5          THE WITNESS:  Yes.

6          THE COURT:  But what exactly did you say to him

7  and what did he say to you?

8          THE WITNESS:  When he picked up, I asked him, I

9  said, are you okay?  He said yeah.  I said, the family good?

10 He said yeah.  I asked him where he was at.  He said he was

11 around.  I asked him, said I would like to talk to him, to

12 come back to the house so I could talk to him.  That was it.

13         THE COURT:  Okay.  Next question.

14 BY MS. HAJJAR:

15 Q    Now, without saying what you said, Mr. Alabi, did there

16 come a time when you were asked questions about a murder by

17 law enforcement?

18 A    Yeah.

19 Q    Okay.  And without saying what you said, did you

20 provide information to law enforcement at that time?

21 A    Yes, I did.

22 Q    And was that after an arrest in approximately August

23 2018?

24 A    Yes.

25 Q    And sometime after that, did you end up meeting with

1  the Government?

2  A    Yes, I did.

3  Q    Were you recently arrested, Mr. Alabi?

4  A    Yes, ma'am.

5  Q    And when was that?

6  A    2022.

7  Q    And was that after you had met with the Government in

8  this case?

9  A    Yes.

10  Q    And did the charges include attempted murder in the

11  second degree?

12  A    Yes, ma'am.

13  Q    And assault?

14  A    Yes, ma'am.

15  Q    Are those charges pending?

16  A    Yes, ma'am.

17  Q    Are they state or federal charges?

18  A    State.

19  Q    And are you currently incarcerated while those charges

20  are pending?

21  A    Yes, ma'am.

22  Q    Do you have any agreements with the Government, meaning

23  the federal government, regarding your testimony today?

24  A    Yeah.  It was a -- yeah, I have a agreement.

25  Q    Can you explain to the jury what your understanding is

1    of that agreement?

2    A    The agreement was pretty much stating that I was to

3    testify truly about what I know about the situation, and if

4    I felt like my life is in threaten or my family member, to

5    let the Government know that and then y'all do something,

6    and basically that y'all promised me no help with the state,

7    that y'all can't do nothing, but to just inform them of my

8    testifying, pretty much.

9    Q    And when you first met with the Government, did you

10   have any understanding that you would have such an agreement

11   if you testified?

12   A    No.

13               MS. HAJJAR:  One moment, Your Honor.

14               (Pause in proceedings.)

15   Q    I'm just going to go back for a moment, Mr. Alabi.

16               You testified that you visited the defendant and

17   met his child's mother and the woman whose name started with

18   B after you were released from prison in May 2017.

19   A    Yes, ma'am.

20   Q    And you testified that the child's mother had an

21   injury?

22   A    Yes, ma'am.

23   Q    Can you describe what the injury was?

24               MR. CECUTTI:  Objection.

25               THE COURT:  Did you see her?

1          THE WITNESS:  Yeah, I had seen her, like, one or

2    twice.

3          THE COURT:  But did you see her with the injury?

4          THE WITNESS:  She was limping.  It was like a

5    little leg injury.

6          THE COURT:  So you did see her?

7          THE WITNESS:  Yes.

8          THE COURT:  Okay.  And when you say "she was

9    limping," did you notice anything else about her?

10          THE WITNESS:  No.  Oh, she was pregnant at the

11    time.

12          THE COURT:  All right.  Next question.

13          MS. HAJJAR:  No further questions, Your Honor.

14          THE COURT:  Cross-examination?

15    CROSS-EXAMINATION

16    BY MR. CECUTTI:

17    Q    Good afternoon.

18    A    Good afternoon, sir.

19    Q    You're a criminal, correct?

20    A    Yes, sir.

21    Q    You're also a liar?

22    A    No.

23    Q    Fraudster?

24    A    In the past, yes.

25    Q    Scammer?

1    A    Yes.

2    Q    You draw a distinction between lying and scamming?

3    A    Can you repeat that?

4    Q    Do you think that lying and scamming are different?

5    A    I'm not really sure.

6    Q    What about lying and committing frauds, are they

7    different?

8    A    No.

9    Q    You've committed frauds?

10   A    Yes.

11   Q    You're a liar, then, correct?

12   A    Yes.

13   Q    You're also in jail right now, right?

14   A    Yes, I am.

15   Q    And you're facing a lot of prison time?

16   A    I don't know how much time I face --

17   Q    You have no idea, right?

18        THE COURT:  Can you let him finish what he's

19   saying and slow down a little bit, okay?

20        Just finish your answer.  What did you say before?

21        What was the question?

22   Q    You're facing a lot of prison time?

23   A    I'm not sure how many time I'm facing right now.

24   Q    You're charged with attempted murder?

25   A    Yes, sir.

1  Q    And intimidating a witness?

2  A    Intimidating a witness?

3  Q    Yes.

4  A    I'm not -- I wasn't aware of that.

5           MR. CECUTTI:  One moment, Your Honor.

6           THE COURT:  Sure.

7           (Pause in proceedings.)

8  BY MR. CECUTTI:

9  Q    Sir, you don't know if you -- you don't remember being

10 charged with tampering with a witness?

11 A    No.

12 Q    You know you've been charged with attempted murder,

13 right?

14 A    Yes.

15 Q    And assault?

16 A    Yes.

17 Q    Having a gun?

18 A    Yes.

19 Q    You've received an indictment in that case?

20 A    Yes.

21 Q    And you've reviewed it?

22 A    Yes, I have.

23 Q    But you don't remember if you've been charged with

24 tampering with a witness?

25 A    No.

1           MR. CECUTTI:  One moment.

2           THE COURT:  Okay.

3           (Pause in proceedings.)

4    BY MR. CECUTTI:

5    Q    Sir, I want you to take a look at the document on your

6    screen.  Please review it --

7           THE COURT:  For the witness only?

8           MR. CECUTTI:  Yes, for the witness only.

9    Q    And after you're done, please let me know.

10   A    All right.

11          THE COURT:  Do you have a paper document that you

12   could possibly use?

13          MR. CECUTTI:  I think we might.

14          THE COURT:  Okay.

15          MR. CECUTTI:  Your Honor, may I approach?

16          THE COURT:  Sure.

17          MR. CECUTTI:  I think we're going to abandon the

18   technology.

19   BY MR. CECUTTI:

20   Q    Sir, please take a look at that document.

21          THE COURT:  And I think we can take the document

22   that's on the screen off.

23          MR. CECUTTI:  Yes.

24   Q    Please take a look at that document, the page that I

25   showed you with respect to the charges that you're facing.

1   Please look at it carefully, and once you're done, let me
2   know.
3   A    Yes, I've looked at it.
4   Q    I'm sorry?
5   A    I looked at it.
6   Q    Do you now remember being charged with intimidating a
7   witness?
8   A    It says it here, but I don't remember it.
9   Q    Okay.  And you have no idea how much prison time you're
10  facing?
11  A    No, sir.
12  Q    For attempted murder, weapons possession, assault?
13  A    No, sir.
14  Q    You have no idea?
15  A    No.
16  Q    Again, you've committed credit card fraud?
17  A    Yes, sir.
18  Q    Bank fraud?
19  A    No.
20  Q    You've stolen people's identities?
21  A    No.
22  Q    You've committed scams, though?
23  A    Yes, I have.
24  Q    Credit card scams?
25  A    Yes, I have.

 1   Q     That's what you're into?

 2   A     Yeah.

 3   Q     And you've committed these scams so that you could

 4   benefit, correct?

 5   A     Yes.

 6   Q     Make some money?

 7   A     Yes.

 8   Q     And you've lied and you've deceived others in scamming

 9   so that you could get what you wanted, right?

10   A     Yes.

11   Q     Now, sir, you're also a shooter?

12   A     No, I'm not.

13   Q     You've committed shootings, right?

14   A     In the past.

15   Q     You committed shootings when you were young?

16   A     Yes, I have.

17   Q     And when you were an adult, too, correct?

18   A     No.

19   Q     In fact, in 2018, the time period that you testified

20   about, you were involved in several shootings, correct?

21   A     No, that's not correct.

22   Q     And those shootings made it hot for you in the

23   neighborhood, right?

24   A     No, that's not correct.

25   Q     Now, you testified that you have two prior convictions;

1   driving with a license suspended.

2   A    Uh-huh.

3   Q    Is that yes?

4   A    Yes.

5   Q    And a forged instrument, right?

6   A    Yes.

7   Q    But you have actually three felonies, correct?

8   A    No.

9   Q    You have a felony from 2014 when you were sentenced to

10  four months in jail, correct?

11  A    Yes, that was my driving.

12  Q    That's the first one.

13  A    Uh-huh.

14  Q    Right?

15  A    Yes.

16         THE COURT:  You have to say yes, just for the

17  court reporter.

18  A    Yes, sir.

19         THE COURT:  Okay.

20  Q    Then in 2015, you were convicted of the same thing and

21  you got five years probation, correct?

22  A    Yes.

23  Q    So that's a second felony, right?

24  A    Yes.

25  Q    And then you violated your probation, right?

1    A    Yes.

2    Q    And that happened in 2016, correct?

3    A    Yes.

4    Q    And you violated because you committed new crimes.

5    A    Driving.

6    Q    Aggravated unlicensed operation of a vehicle, right?

7    A    Yes, sir.

8    Q    Not just driving, right?

9    A    Yes, sir.

10   Q    Because driving's not a crime.

11   A    No.  I was -- I -- driving with a suspended license is

12   a crime.

13   Q    And having your license suspended ten or more times

14   makes it a felony, correct?

15   A    Yes.

16   Q    And that's what you were doing.

17   A    Yes.

18   Q    You were not just driving without a license, correct?

19   A    Yes.

20   Q    You were driving with over ten suspensions, correct?

21   A    Correct.

22   Q    And on one occasion, you also were driving when your

23   license was revoked, correct?

24   A    Correct.

25   Q    So you committed new crimes while you were on

1   probation, right?

2   A    Correct.

3   Q    And as a result, you were resentenced to one to three

4   years in prison, correct?

5   A    Correct.

6   Q    And these new crimes were possession of a forged

7   instrument and aggravated unlicensed operation, correct?

8   A    Correct.

9   Q    And you got a year in jail for each of those crimes,

10  correct?

11  A    Correct.

12  Q    So that's three felony convictions, right?

13  A    No, it was still under the same -- it fell under the

14  same first six of five split because I had violated my

15  probation.  So it was still under the same charge.

16  Q    Sir, you have the 2014 felony conviction, right?

17  A    Correct.

18  Q    You have a 2015 felony conviction, right?

19  A    Correct, for violating my probation.

20  Q    2015, you committed the crime of aggravated unlicensed

21  operation, correct?

22  A    Correct.

23  Q    And you got five years probation.

24  A    Correct.

25  Q    Then you committed more crimes, including aggravated

1  unlicensed operation.

2  A    Correct.

3  Q    You did that again, right?

4  A    Correct.

5  Q    So you have three felony convictions, right?

6  A    Correct.

7  Q    And you also have a conviction for possession of a

8  forged instrument, right?

9  A    Correct.

10  Q    So by 2018, let's just make sure that we've got it

11  correct, you had three felony convictions and a misdemeanor

12  conviction and a violation of probation, right?

13  A    Correct.

14  Q    And from 2014 to 2018, you had spent most of your time

15  in jail; that's correct, correct?

16  A    Correct.

17  Q    By the way, the crime of possession of a forged

18  instrument that you committed, what was the forged

19  instrument?

20  A    A credit card.

21  Q    Because that's what you're into, scamming with credit

22  cards, right?

23  A    At the time, correct.

24  Q    So it was a fake card?

25  A    Yes, it was.

1  Q   But you were trying to use it or present it in a real

2  way, right?

3  A   No.  That time it was just a old one that they had just

4  found in a car.  That's how I got charged with possession of

5  a fraud instrument.

6  Q   It wasn't in your name, correct?

7  A   Yes, it was in my name.

8  Q   It was your credit card?

9  A   No, it wasn't my credit card.

10 Q   Whose credit card was it?

11 A   I had got it from somebody.

12 Q   You bought it?

13 A   No, I didn't buy it.

14 Q   But you were going to use it to commit crimes, right?

15 A   Yeah.

16         THE COURT:  Can I just clarify?

17         So you said it had your name on it, right?

18         THE WITNESS:  Yes, ma'am.

19         THE COURT:  But somebody else's credit card

20 number?

21         THE WITNESS:  Yes.

22         THE COURT:  Okay.  Go ahead.

23 Q   But again, sir, you were going to use that credit card

24 to commit crimes, right?

25 A   No.  I was, but it wasn't good.  That's why I just

1    threw it in my car.

2    Q    But your intention, sir, was to commit crimes --

3    A    Was to use it.

4    Q    -- to defraud and deceive, right?

5    A    Correct.

6    Q    Now, on August 30, 2018 you were arrested, correct?

7    A    Correct.

8    Q    And once again, for aggravated unlicensed operation.

9    A    Correct.

10   Q    And you're facing prison again, right?

11   A    Correct.

12   Q    And you didn't want to go back to jail, correct?

13   A    Correct.

14   Q    And the next day after you were arrested, you met with

15   police and a prosecutor from the Brooklyn DA's office?

16   A    Correct.

17   Q    And you were interviewed by them?

18   A    Correct.

19   Q    And prior to being interviewed, you were placed under

20   oath?

21   A    Correct.

22   Q    And you raised your right hand and swore to tell the

23   truth?

24   A    Correct.

25   Q    Just like you did today, correct?

1  A    Correct.

2  Q    And you were asked questions by a prosecutor?

3  A    Correct.

4  Q    And you told the prosecutor how you and Cory met,

5  right?

6  A    Correct.

7  Q    And you told the prosecutor how you reconnected with

8  Cory after you got out of jail in 2017.

9  A    Correct.

10 Q    And you also told the prosecutor about criminal

11 activity about Cory, correct?

12 A    Correct.

13 Q    And you told them, you told the prosecutor that he had

14 this life insurance scam involving a woman who he lived

15 with, correct?

16 A    Correct.

17 Q    And you told them everything you knew about the scam,

18 right?

19 A    Correct.

20 Q    And you wanted to give the police as much information

21 as possible, right?

22 A    Correct.

23 Q    Now, your testimony today is that Cory tried to get you

24 to help him with the life insurance scam, correct?

25 A    Correct.

1   Q    And that he solicited you into this scam, correct?

2   A    No.  I don't know what that word means.

3   Q    Your testimony today is that Cory wanted you to help

4   him, correct?

5   A    Correct.

6   Q    He wasn't just telling you about the scam; he wanted

7   you in the scam with him, correct?

8   A    Correct.

9   Q    For a specific purpose.

10  A    Yeah, he asked me.

11  Q    Right.  That's your testimony today, correct?

12  A    Correct.

13  Q    And your testimony is that he offered you $25,000, or

14  half of the life insurance proceeds, correct?

15  A    Yeah, correct.

16            (Continued on the following page.)

17

18

19

20

21

22

23

24

25

1    (continuing.)

2    BY MR. CECUTTI:

3    Q    And your testimony is Cory told you the plan, correct?

4    A    Correct.

5    Q    A fairly detailed plan, correct?

6    A    Correct.

7    Q    A detailed plan involving entering the house, right?

8    A    Correct.

9    Q    And shooting and killing the woman, right?

10   A    Correct.

11   Q    And trying to make it out to be a robbery gone wrong?

12   A    Correct.

13   Q    Now during the interview on August 31, 2018, so about six

14   years ago, you did not tell the police and prosecutor that

15   Cory asked you to help him with the life insurance scam,

16   correct?

17   A    Correct.

18   Q    And you did not tell the prosecutor back in 2018 that

19   Cory offered you $25,000, right?

20   A    Correct.

21   Q    And you did not tell the prosecutor about this detailed

22   plan that you told all of us today that Cory had for you to

23   do, correct?

24   A    Correct.

25   Q    Sir, you would agree that what you told us today is

1    different than what you told the prosecutor from the Brooklyn

2    DA's office six years ago?

3    A    When I spoke with the prosecutor at the precinct at that

4    time, they just asked me if I knew him.  And at first I told

5    them no, that I didn't know him, and then they had pulled out

6    some text messages that showed that we had got in contact and

7    that's when I did tell them what I knew.

8    Q    Sir, what you told this jury today is different than what

9    you told the prosecutor back in 2018, correct?

10   A    No, it's not correct.

11   Q    They're the same things?

12   A    Yes.

13   Q    But you acknowledge that you left out all of these things

14   that I just went over with you, correct?

15   A    Back when I spoke with the federal prosecutor.

16   Q    I'm not talking about them.

17   A    Okay.

18   Q    I'm talking about 2018.

19   A    Correct.

20   Q    Remember when you had just been arrested?

21   A    Correct.

22   Q    For the fourth time for aggravated unlicensed operation?

23   A    Correct.

24   Q    And you did not want to go to prison?

25   A    Correct.

1   Q    And you were trying to give all this information you had

2   about Cory to the prosecutor, do you remember that?

3   A    Yeah.

4   Q    And you didn't mention, just to be clear, you never

5   mentioned that Cory asked you to help him in a life insurance

6   scam, correct?

7   A    They only asked me --

8   Q    Sir, it's a yes or no.

9        THE COURT:  You also have to stop interrupting him.

10  If you can, he wants you to answer yes or no.  Did you tell

11  him that?

12  A    Can you repeat the question again?

13  Q    In 2018 --

14  A    Yes.

15  Q    -- you did not tell the prosecutor in the interview, the

16  prosecutor from the Brooklyn DA's office, that Cory asked you

17  to help him in the life insurance scam?

18  A    Not correct.

19  Q    That is correct, right?

20  A    No, not correct.

21  Q    And you also didn't tell the prosecutor back in 2018 that

22  Cory offered you $25,000?

23  A    I told the prosecutor everything.

24  Q    Back in 2018?

25  A    Yes, sir.

1    Q    Your testimony a few minutes ago was that you did not say
2    these things.  Do you remember that?
3              THE COURT:  He's asking about the Brooklyn District
4    Attorney's office.
5              THE WITNESS:  When I was in the precinct?
6              THE COURT:  Yes.
7    A    Yes.  To my understanding I told them exactly what
8    happened.
9    Q    Do you remember not telling -- I want to be very clear
10   here.  Do you remember not telling the prosecutor from the
11   Brooklyn DA's office in 2018 that Cory asked you to help him?
12   A    I'm pretty sure I told her.
13   Q    I want to show you a document only for you.  I want you
14   to review the highlighted portion.
15             MS. HAJJAR:  Objection Your Honor.  Can we have a
16   sidebar?
17             THE COURT:  Sure.  You want to take that down for a
18   second.
19             (Sidebar; continued on next page.)
20
21
22
23
24
25

1        (Sidebar conference held on the record in the

2   presence of the Court and counsel, out of the hearing of the

3   jury.)

4              THE COURT:  Do you have a copy?  I don't know what

5   we're talking about.  What is the document?

6              MS. HAJJAR:  I think it's a write up, a write up by

7   the ADA that this witness has never seen.  The reason for my

8   objection, Your Honor, is that we intend to offer the prior

9   recorded statement as a prior consistent statement.

10             It may be easier to refer to the actual recorded

11  statement, which is fully recorded, as opposed to what the ADA

12  wrote up.

13             THE COURT:  There's a write up and then there's a

14  taped statement?

15             MS. HAJJAR:  There's a full recorded taped

16  statement, which we intend to put in in redirect.  I don't

17  know why we're looking at the summary.

18             THE COURT:  He can do his examination however he

19  wants.  I think that might be what's confusing the witness, if

20  you say you never told him this.  But not my circus, not my

21  clowns.  You do the examination how you want.  I was under the

22  impression there was only one statement.

23             MR. CECUTTI:  There is one statement from

24  August 31st.

25             THE COURT:  Right.

1          MR. CECUTTI:  And there's a recorded statement, and

2     then there's a report from that recorded statement.

3          THE COURT:  I'm confused.  He gets arrested, he's

4     interviewed by the Brooklyn District Attorney's Office.  Does

5     the interview get recorded from the get-go?

6          MS. DEAN:  No, Your Honor.

7          MS. HAJJAR:  Not from the get-go.

8          THE COURT:  Does somebody take notes of it first?

9          MS. DEAN:  No, Your Honor.  So first, the assistant

10    district attorney spoke to him, spoke to him about everything

11    that happened, and then they did a sworn audio statement.

12    That's the recording that Ms. Hajjar is talking about.

13         Then after that, the assistant DA wrote up a small

14    summary of the interview.  That's what Mr. Cecutti has just --

15         THE COURT:  You can bring it up on redirect.  I

16    mean, I can't tell him not to ask questions the way he wants.

17         MR. CECUTTI:  I don't want to play the recording at

18    this point.

19         THE COURT:  Well, maybe you don't, but you left the

20    impression that this is just the statement and I'm going to

21    permit them to clear that up.

22         MR. CECUTTI:  I understand.

23         THE COURT:  Okay.

24         (Sidebar concluded; continued on next page.)

25

1          THE COURT:  Go ahead.

2          MR. CECUTTI:  Thank you.

3    BY MR. CECUTTI:

4    Q    Now, sir, it's your testimony that you turned down this

5    offer from Cory, correct?

6    A    Correct.

7    Q    You didn't want to be involved, right?

8    A    Correct.

9    Q    Because that's not something that you do, shoot and kill

10   people, correct?

11   A    Correct.

12   Q    Now according to -- withdrawn.  After you apparently

13   learned of this scam from Cory, you didn't tell the police,

14   right?

15   A    Correct.

16   Q    You stayed in contact with him?

17   A    After?

18   Q    Yes.

19   A    Not really.

20   Q    You went to his house, right?

21   A    Correct.

22   Q    You went to his house I think three or four times is what

23   you testified to, right?

24   A    Correct.

25   Q    And you hung out with him?

1   A    Correct.

2   Q    And not only did you hangout with him, you also had sex

3   with the woman that was living upstairs, correct?

4   A    The who?

5   Q    The woman that was living upstairs.

6   A    That's not correct.

7   Q    The woman that you referred to as B?

8   A    That's not correct.

9   Q    Isn't it true that you did have sex with her multiple

10  times at the house?

11  A    That's not correct.

12  Q    Now, the woman that was living there, at no point did you

13  warn her about this scam, right?

14       THE COURT:  Are you talking about the woman whose

15  name begins with a B?

16       MR. CECUTTI:  Yes.

17       THE COURT:  Okay.

18  A    Correct.

19  Q    And -- withdrawn.  I want to go back to the interview

20  that you had with the NYPD, and the prosecutor from the DA's

21  office on August 31, 2018.  Okay?

22  A    Okay.

23  Q    Again, you had been charged with several crimes, right?

24  A    Correct.

25  Q    And after being interviewed, you were released?

1   A    Correct.

2   Q    And the Brooklyn DA's office did not prosecute you for

3   any of the crimes?

4   A    No, that's not correct.

5   Q    Following your arrest on August 31, 2018, were you

6   prosecuted by the Brooklyn DA's office for any crimes?

7   A    Correct.

8   Q    What were those crimes?

9   A    That I was charged with, the driving charges.

10  Q    What was your sentence?

11  A    City bullet, eight months.

12  Q    You got a year in jail?

13       THE COURT:  He said eight months.

14  A    Correct.

15  Q    Following your arrest on August 31, 2018?

16  A    Correct.

17  Q    Is that your testimony?

18  A    Correct.

19  Q    When did you get released?

20  A    Eight months after that.

21  Q    And you were at Riker's Island?

22  A    Correct.

23  Q    So you were at Riker's Island from -- again, this is your

24  testimony -- from August of 2018 up until June or so of 2019?

25  A    Actually, August -- no, no, I wasn't charged.  I didn't

1    do jail time at that time.  I think it was the thing, it was

2    after that I went to jail.  I didn't do jail time.

3    Q     In 2020 you went to jail?

4    A     Yes.  I didn't do jail time in 2018.

5    Q     Just to be clear, after you were arrested on August 31,

6    2018, you did not do jail time, correct?

7    A     I had got locked up in Connecticut.  I got released on R

8    and R, so I was still going back to Court for that case.

9    Q     That case, the case that you were arrested for in

10   Brooklyn, on August 31st --

11   A     Correct.

12   Q     -- that was dismissed, correct?

13   A     Correct.

14   Q     Now, you learned about the murder of the woman that you

15   referred to as B shortly after it happened, correct?

16   A     I'm not sure when the murder happened.  I'm only sure

17   when I got the news.  I don't know when she had passed.

18   Q     You got the news in April of 2018, correct?

19   A     I'm not sure.  I don't really remember the date.

20   Q     I'm just asking about the month.

21   A     I'm not sure, but when I -- I think it was still nice

22   outside when my girlfriend had showed me the -- probably

23   around summertime when she showed me the text message.

24   Q     Of 2018?

25   A     Uh-uhmm.

1  Q    When you learned about it, you didn't tell the police

2  about your supposed discussion with Cory about this life

3  insurance scam, correct?

4  A    Correct.

5  Q    And you didn't tell the police before the woman was

6  killed either, correct?

7  A    What you mean?

8         THE COURT:  He wants to know if you reported that

9  conversation that you had.

10         THE WITNESS:  Did I record that conversation?

11         THE COURT:  No, did you report it.  You said that he

12  wanted you to participate.

13         THE WITNESS:  I didn't report it.

14         THE COURT:  You didn't report it to the police,

15  correct?

16         THE WITNESS:  No, ma'am.

17  BY MR. CECUTTI:

18  Q    So you didn't tell the police in May of 2018, right?

19  A    About?

20  Q    About this --

21  A    Conversations we had?

22  Q    Correct.

23  A    No.

24  Q    And you didn't report it to the police in June of 2018?

25  A    No, I didn't report it.

1   Q      And you didn't report it in July either, right?

2   A      No.

3   Q      And you hadn't been arrested in May, June, or July,

4   correct?

5   A      I'm not -- I had got arrested in 2018, but I don't know

6   which month.

7   Q      You were still committing crimes in 2018, right?

8   A      Correct.

9   Q      Now, you know, though, you spoke with the police in

10  August of 2018?

11  A      Correct.

12  Q      And that's when you implicated Cory in the murder of this

13  woman that you referred to as B, right?

14  A      Correct.

15  Q      And you know at that time, in August, specifically

16  August 31st, you were in trouble, right?

17  A      Correct.

18  Q      And you didn't want to go to prison, right?

19  A      At the time, when I was questioned, it wasn't a matter if

20  I wanted to go to prison or not.  I was just trying to let the

21  detective at the time know I didn't have nothing to do with

22  it.

23  Q      You were a suspect?

24  A      They had an I-card out for questioning.  When I got

25  arrested for the drive, they informed me that I have an I-card

1  out for questioning.

2          THE COURT:  For questioning?

3          THE WITNESS:  Yes.

4  A    That detectives wanted to talk to me.  So when they came

5  to the precinct, they was telling me if I knew Cory.  They was

6  asking me questions about him.  I had denied it at first that

7  I didn't know who they was talking about.

8          Then they had showed me text messages that we had

9  about the whole situation.  That's when they told me was I

10  informed that a girl had passed away, and that's when I told

11  them what happened, what I knew about the situation.

12  Q    So your testimony is that you lied to law enforcement at

13  some point during that interview?

14  A    At first, that I didn't know him.

15  Q    And after you were interviewed, you were released from

16  the precinct, correct?

17  A    No.  I went to the central booking.  I was released from

18  the court.

19  Q    You were released from the court on August 31st?

20  A    I'm not really sure of the date.  I was released after I

21  seen the judge.

22  Q    And the case was eventually dismissed, correct?

23  A    Correct.

24  Q    And after the case was dismissed, you continued to commit

25  crimes, right?

1    A    Correct.

2    Q    Scams?

3    A    Correct.

4    Q    Frauds?

5    A    Correct.

6    Q    More lying and deceiving of people?

7    A    Correct.

8    Q    And then on October 24, 2020, you were arrested for two

9    more felonies.

10              Right?

11   A    Correct.

12   Q    Aggravated unlicensed operation, right?

13   A    Correct.

14   Q    And reckless endangerment, correct?

15   A    Correct.

16   Q    And you were prosecuted by the Brooklyn's DA's office?

17   A    Correct.

18   Q    And then two years later, in 2022, you pled guilty to one

19   misdemeanor offense?

20   A    Correct.

21   Q    And that was after plea negotiations between your lawyer

22   and the Brooklyn DA's office?

23   A    Correct.

24   Q    And, essentially, you made a deal with them for the

25   misdemeanor, right?

1   A   What do you mean by made a deal with them?

2   Q   You made a plea agreement, a plea bargain?

3   A   Correct.

4   Q   You made a deal, correct?

5   A   Correct.

6   Q   And after you got -- after that case was finished, you

7   continued to commit crimes?

8   A   No.  I've been in jail.

9           I was fighting a case.  I got re-arrested in 2022

10  for the same charge.

11  Q   For aggravated unlicensed operation?

12  A   I had to turn myself in to do the time.

13  Q   Another one?

14  A   No.  For what happened in 2020 I had to turn myself in

15  for that, to do the time for that.

16  Q   Now you were arrested on September 14, 2022, right?

17  A   Correct.

18  Q   For more felonies, correct?

19  A   Correct.

20  Q   One of them involved trying to shoot and kill somebody.

21          Correct?

22  A   Correct.

23  Q   And then threatening the victim at the hospital.

24          Correct?

25  A   I was -- no, that's not correct.

1  Q     You never went to the hospital?

2  A     No.  I was in jail.

3           THE COURT:  Can I see the parties at the side,

4  please?

5           (Sidebar; continued on next page.)

1    (Sidebar conference held on the record in the

2 presence of the Court and counsel, out of the hearing of the

3 jury.)

4    THE COURT:  So he has a Fifth Amendment right, and I

5 think his lawyer is trying to get him to assert it because

6 you're asking him questions about the events.  I think it

7 might be a good time to stop here.

8    I don't want him to unwittingly incriminate himself

9 when he hasn't had a chance to consult with his lawyer.  I can

10 ask the lawyer to come up, but it's almost 5:00.

11    MS. HAJJAR:  I think we'd rather finish.

12    THE COURT:  We can finish, but the man has rights

13 and I want to make sure.  I'll have the lawyer come up and

14 speak to him, then.

15    MR. CECUTTI:  I can't tell what's happening.

16    THE COURT:  I'm not suggesting you're doing it on

17 purpose, but I think it's the best way to do it.  Mr.

18 Guadagnino, can you come up?

19    MR. GUADAGNINO:  Yes, Your Honor.

20    THE COURT:  This is Peter Guadagnino.

21    Do you want to speak to him for a minute?

22    MR. GUADAGNINO:  Yes.

23    THE COURT:  What do you want to do?

24    MR. GUADAGNINO:  However you would like me to handle

25 it.  Do you want me to do it outside the presence of the jury?

1           THE COURT:  I think he's entitled to speak to his

2    attorney.  I think I'll send the jury out for five minutes and

3    you can consult with him here, wherever that can be.  Thanks.

4           (Sidebar concluded; continued on next page.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  Ladies and gentlemen, I have to send you

2   out just for five minutes.  I think we'll finish this witness

3   today, but I need to speak to the lawyers about something.

4   Please don't talk about the case.  It will be between 5 and

5   10 minutes.

6          (Jury not present.)

7          THE COURT:  I don't know what office you're from.

8   Are you from the marshals?

9          THE SPEAKER:  NYPD.

10          THE COURT:  I want to give the witness an

11   opportunity to consult with his lawyer.  I'm trying to figure

12   out the best place to do that.  Let's take the defendant back.

13   Do we have a place in the back?

14          THE MARSHAL:  Yes, Judge.

15          THE COURT:  Can you take Mr. Martin back there, too?

16          THE MARSHAL:  I'm going to take Mr. Martin first.

17          THE COURT:  Why don't you do that first, and then if

18   you can help us out with a place for him to speak to his

19   lawyer.  Counsel, if you want to come on up.

20          MR. GUADAGNINO:  Thank you, Judge.

21          (Continued on next page.)

22

23

24

25

1          THE COURT:  Let's get the jurors.

2          (Jury enters the courtroom.)

3          THE COURT:  Thank you so much for your patience.  We

4    are ready to resume.

5          Go ahead.

6          MR. CECUTTI:  Thank you.

7          THE COURTROOM DEPUTY:  The witness is reminded he's

8    still under oath.

9    BY MR. CECUTTI:

10   Q    Sir, I want to go back to talking with you about your

11   pending case, your case that is currently going on in Brooklyn

12   Supreme Court.  Okay?

13   A    Okay.

14   Q    You were arrested on September 14, 2022, right?

15   A    Correct.

16   Q    This was after you tried to shoot and kill someone on

17   August 23, 2022?

18   A    On behalf of my attorney, since the case is still

19   ongoing, I don't know if I can, I don't want to speak about

20   that.  I'd like to exercise my amendment.

21         THE COURT:  Fifth amendment?

22         THE WITNESS:  Yes.

23   BY MR. CECUTTI:

24   Q    Sir, you shot this person five times in the chest and

25   stomach and legs?

1          THE COURT:  He just said he wanted to assert his

2    Fifth Amendment privilege about that pending case, which he's

3    entitled to do.  Next question, please.

4    BY MR. CECUTTI:

5    Q     Sir, you're facing a lot of time in prison, correct?

6    A     I'm not sure how much time I'm facing in prison.

7    Q     Are you aware eight to 25 years for trying to shoot and

8    kill someone?

9    A     I'm not aware of that.

10   Q     And more prison time for the other charges in your

11   Indictment?

12   A     I'm not aware of that.

13   Q     Sir, you've met with the federal prosecutors in this

14   case, correct?

15   A     Correct.

16   Q     And how much times have you met with them?

17   A     Five, six times.

18   Q     When was the first time?

19   A     Oh, the first time was back in 2018 if I'm not mistaken.

20   Q     When was the next time?

21   A     Last month.

22   Q     January?

23   A     Yes.

24   Q     2024?

25   A     Correct.

1    Q     And then you met with them four or five more times?

2    A     Correct.

3    Q     Last month and this month?

4    A     The first time I seen them since 2018 was January.  And

5    then four to five times after that.

6    Q     So you've seen the federal prosecutors in this case four

7    to five times from January up until today; is that correct?

8    A     Correct.

9    Q     When you met with them, they asked you questions?

10   A     Correct.

11   Q     You gave information?

12   A     Correct.

13   Q     You reviewed documents?

14   A     Correct.

15   Q     And during those meetings someone was taking notes,

16   correct?

17   A     I think so, correct.

18              MR. CECUTTI:  Your Honor, may we have a sidebar?

19              THE COURT:  Sure.

20              (Sidebar; continued on next page.)

21

22

23

24

25

1      MR. CECUTTI:  The reason for the sidebar is that

2  this witness has said that he's met with the federal

3  prosecutors four to five times from January to February.  We

4  have notes from one interview, we do not have notes from any

5  other interview.  This witness has said that notes were taken,

6  we do not have them.

7      MS. HAJJAR:  The witness is mistaken about the time

8  of those meetings.  There has been maybe two meetings between

9  those two months and all the notes that have been taken during

10 the meetings have been turned over to Mr. Cecutti.

11     THE COURT:  Maybe he's mistaken.

12     (End of sidebar conference.)

13     (Continued on the next page.)

14

15

16

17

18

19

20

21

22

23

24

25

1          (In open court.)

2  BY MR. CECUTTI:

3  Q    Now, sir, after you finished your meetings -- withdrawn.

4  In the course of your meetings you entered into an agreement

5  with the federal prosecutors, correct?

6  A    What type of agreement?

7  Q    It's an agreement between you, your lawyer, and the

8  Government concerning cooperation in this case.  Do you

9  remember that agreement?

10 A    To state the truth of what I know about the situation,

11 yes.

12 Q    And if you, according to the agreement, if you tell the

13 truth then the Government will do certain things for you,

14 correct?

15 A    No, that's not correct.

16 Q    Why don't we take a look at the agreement.

17 A    Okay.

18 Q    By the way, you've reviewed the agreement, correct?

19 A    Correct.

20 Q    You don't remember if the Government will do anything on

21 your behalf?

22 A    Do anything as in?

23 Q    If you testify and cooperate with them.

24 A    You have to elaborate, like.

25 Q    You entered into an agreement?

1    A    I listened to that.  What do you mean "do something?"

2          THE COURT:  He wants to know if the Government

3    agreed to do anything for you if you abided by the agreement.

4          THE WITNESS:  I said earlier when he asked me.  If

5    my life feel threatened to let them know, they'll let the

6    state know that I testified.

7    Q    So I understand and we all understand and are on the same

8    page, if you tell the truth, according to the Government, then

9    the Government will contact the state and tell them about

10   that?

11   A    No, not the truth according to them; the truth according

12   to what I know.

13   Q    Who decides if you're being truthful, is it you?

14   A    I mean that's what everybody is here for I guess.  I'm

15   not -- I'm just here to say what I know about the situation

16   and leave the rest to you all.

17   Q    Sir, the agreement that you have of is that if you tell

18   the truth the federal prosecutors will do certain things for

19   you with your state case, correct?

20   A    No.

21   Q    No?

22   A    No.

23   Q    Let's look at the agreement.

24          THE COURT:  Is that in evidence?

25          MR. CECUTTI:  No.

1           MS. HAJJAR:  It's not, your Honor.

2           THE COURT:  Is anyone moving it in or are we going

3    to talk about it in the abstract?

4           MS. HAJJAR:  We're happy to move it in.

5           THE COURT:  Do you have a copy of it?

6           Do you need a hard copy?

7           MR. CECUTTI:  No, it's fine.

8           Judge, you have the hard copy I think.

9           THE COURT:  You want it?  You want me to give it to

10   him?

11          MR. CECUTTI:  Yes.

12   BY MR. CECUTTI:

13   Q    Sir, take a look at this document and after you're done

14   let me know.

15          (Witness reviewing document.)

16   A    I have.

17   Q    This is the cooperation agreement between you and the

18   Government?

19   A    Correct.

20   Q    It is signed by you, your lawyer, and the Government?

21   A    Correct.

22          MR. CECUTTI:  Your Honor, I offer it as Defense

23   Exhibit A.

24          THE COURT:  Any objection?

25          MS. HAJJAR:  No, your Honor.

 1              THE COURT:  That will be Defense Exhibit A.

 2              (Defense Exhibit A was received in evidence.)

 3              MR. CECUTTI:  May I publish, your Honor?

 4              THE COURT:  Sure.

 5    BY MR. CECUTTI:

 6    Q    Sir, I want to turn your attention to paragraph three.

 7    You can look at the hard copy or on your screen.

 8              THE COURT:  This is a different version.  You can't

 9    publish that one.  Put that one down.

10              MS. HAJJAR:  Could I ask him to publish a different

11    version of this?

12              THE COURT:  Yes.

13              MR. CECUTTI:  Thank you.

14    BY MR. CECUTTI:

15    Q    Why don't we do this.  Sir, I want to turn your attention

16    to paragraph one, please.  Can you read paragraph one for us?

17    A    The witness agrees to testify at the upcoming trial in

18    United States vs. Martin, 20-CR-549(AMD).  The witness agrees

19    to give complete truthful and accurate testimony.

20    Q    You're the witness, right?

21    A    Correct.

22    Q    You are required to tell the truth, correct?

23    A    Correct.

24    Q    It's the Government who decides if you've told the truth,

25    right?

1  A     Correct.

2  Q     It's not me, correct?

3  A     Correct.

4  Q     It's not Judge Donnelly?

5  A     Correct.

6  Q     It's the federal Government, correct?

7  A     And the jury.

8  Q     They get to decide if you have complied with the

9  agreement that you've entered into, right?

10  A     Can you repeat that last part?

11  Q     The Government determines if you have complied with the

12  terms of this agreement, correct?

13  A     I'm not sure.

14  Q     There is only two people to this agreement, you and them.

15  A     To this agreement?

16  Q     Yes.

17  A     Correct.

18         THE COURT:  When he says comply, he means you've

19  done what you've agreed to, do that's what he means.

20         THE WITNESS:  As telling the truth, I guess.

21         THE COURT:  Next question.

22  BY MR. CECUTTI:

23  Q     Go to paragraph three.  Can you read paragraph three for

24  us?

25  A     "If the office determines that the witness has complied

1  with the terms of this agreement, the office will advise the

2  Brooklyn District Attorney office and any sentencing Court of

3  the nature and extent of the witness's cooperation with law

4  enforcement and the witness testimony including its

5  prospective, value, truthfulness, completeness and accuracy."

6  Q    If the Government believes you've told the truth then the

7  Government will contact the Brooklyn DA's office and tell

8  them, right?

9  A    Correct.

10 Q    And the Government will also contact the sentencing Court

11 or the judge in your case, correct?

12 A    Correct.

13 Q    If you tell the truth and the Government doesn't believe

14 you, the Government won't contact the Brooklyn DA's office or

15 the judge in your case, correct?

16 A    Correct.

17 Q    And if you don't tell the truth but the Government

18 believes you, the Government will contact the Brooklyn DA's

19 office and your judge in your state case, correct?

20 A    Correct.

21 Q    I believe you testified earlier that you learned about

22 the woman's murder that you referred to as B from the news?

23 A    No, from my girlfriend at the time.

24 Q    Who was watching the news?

25 A    No, she seen the post on Facebook on her phone.

1  Q    And she told you?

2  A    Correct.

3  Q    Soon after that, you spoke with Cory, right?

4  A    I called him.

5  Q    And at the time you were close with him, right?

6  A    Correct.

7  Q    Fair to say you were friends?

8  A    Correct.

9  Q    And you wanted to confirm if he in fact killed this

10 woman?

11 A    I wanted to find out what was going on, correct.

12 Q    So you called him, right?

13 A    Correct.

14 Q    And I believe you also testified that you texted him,

15 right?

16 A    When?

17 Q    After you found out that the woman had been murdered at

18 some point?

19 A    Correct, to see if he was still coming.

20 Q    You also visited him at his home?

21 A    After?

22 Q    Yes.

23 A    No.

24 Q    But you were in communication with Cory?

25 A    No, that was the last time I heard from him.

1  Q    Let's back up a bit.

2  A    Okay.

3  Q    After she was murdered --

4  A    Correct.

5  Q    -- it you had a phone call with Cory?

6  A    Correct.

7  Q    And you also texted with Cory?

8  A    He didn't reply.

9  Q    But you texted him?

10 A    Correct.

11 Q    And at no point in your communications did Cory ever

12 admit to you tell you that he killed Brandy Odom?

13 A    No.

14       MR. CECUTTI:  No further questions.

15       THE COURT:  Redirect?

16       MS. HAJJAR:  Yes, your Honor.

17 REDIRECT EXAMINATION

18 BY MS. HAJJAR:

19 Q    Mr. Alabi, I'm going to turn your attention to the

20 agreement that we were looking at Defense Exhibit 1 (sic).

21 Could you scroll down to the next page.

22       Could you blow up paragraph four.

23       Mr. Alabi, could you read paragraph four?

24 A    "Nothing here shall be considered as agreement by the

25 office to enter into a cooperation agreement with the witness

1    or an agreement by the office not to prosecute the witness.

2    No promises, agreements, or conditions have been entered into

3    other than those set forth in this agreement and none will be

4    entered into unless set forth in a written signed by all

5    parties."

6    Q    So defense counsel asked you a couple of questions about

7    this agreement referring to it as a cooperation agreement.

8              To be clear, is this a cooperation agreement?

9    A    Not to my understanding, no.

10   Q    Does this agreement contain any promises about what the

11   Government will do regarding your state case?

12   A    No.

13   Q    Or about the outcome of your state case?

14   A    No, ma'am.

15   Q    What about the sentence you could receive as a result of

16   the state case?

17   A    No, ma'am.

18   Q    Defense counsel asked you questions about an interview

19   given to members of law enforcement and the Brooklyn DA's

20   office on August 31, 2018.

21             Do you remember those questions?

22   A    Correct.

23   Q    Was that statement recorded that you provided to law

24   enforcement?

25   A    It was.

1   Q     Have you reviewed that recording since you made it?

2   A     Yes.

3               MS. HAJJAR:  Your Honor, may I approach the witness?

4               THE COURT:  Yes.

5   BY MS. HAJJAR:

6   Q     I'm showing what you is marked Government Exhibit 328.

7   Have you reviewed what is on this exhibit?

8   A     Correct.

9   Q     What is on it?

10  A     It was the interview.

11  Q     The recorded interview?

12  A     Yes.

13              MS. HAJJAR:  Your Honor, the Government offers

14  Government Exhibit 328.

15              THE COURT:  Any objection?

16              MR. CECUTTI:  No objection.

17              THE COURT:  That will come into evidence.

18              (Government's Exhibit 328 was received in evidence.)

19              MS. HAJJAR:  Your Honor, may we publish?

20              If the Court could just turn up the volume slightly

21  on this recording.

22              (Audio played.)

23              THE COURT:  Can you pause it a minute?

24              Can I have the parties without the reporter at

25  sidebar?

1          You can continue playing, I'm just trying to get

2    some logistics.

3              (Audio played.)

4              (Continued on next page.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   (Continuing.)

2   BY MS. HAJJAR:

3   Q    Mr. Alabi, do you recall making that statement?

4   A    Yes, ma'am.

5   Q    To be clear, that was on August 31, 2018?

6   A    Yes, ma'am.

7   Q    Was that before your current case?

8   A    Yes, that was before.

9   Q    And did you testify in the grand jury in this case, as

10  well?

11  A    Yes, ma'am.

12  Q    And was that the first time that you met with the

13  Government in connection with that appearance?

14  A    Yes, ma'am.

15  Q    I'd like to show you what's marked for identification

16  as 3500-SA-8.

17            Ms. HAJJAR:  Just for the witness alone.

18  Q    Do you recognize this document, Mr. Alabi?

19  A    I can't really see it.

20  Q    Sorry.  Take a minute.

21            Do you recognize this document, Mr. Alabi?

22  A    Yes, ma'am.

23  Q    Okay.  What is this?

24  A    This was the grand jury, when I was speaking with the

25  grand jury.

1     MS. HAJJAR:  Your Honor, the Government offers

2  3500-SA-8 into evidence.

3     MR. CECUTTI:  No objection.

4     THE COURT:  All right.  That's in evidence.

5     (Government Exhibit 3500-SA-8 received in

6  evidence.)

7     MS. HAJJAR:  May I publish just this page, Your

8  Honor?

9     THE COURT:  Yes.

10 BY MS. HAJJAR:

11 Q   If you could focus on line 10 of that page.

12    MS. HAJJAR:  Sorry.  Scroll down a little bit.

13 Q   Do you see where the question reads:

14    Did Cory ask you to help him in any way?

15 A   Yes, I see it.

16 Q   And then the following question is:

17    Can you explain it to the grand jurors, please?

18    Could you read your response, please?

19 A   You want me to read it?

20 Q   Yes, please.

21 A   19 -- it says:  Did Cory ask you to help with --

22    THE COURT:  The page she wants you to read is 22.

23 A   22?

24 Q   Yes, please.

25 A   When I went there, when he told me about the situation,

1  he had basically told me, like, look, you said you needed

2  some money.  You can help me with this and we'll split the

3  money, and I basically told him, oh.

4  Q    And then in response to the next question, which is:

5           And when you said "help me with this," what did

6  you understand that to mean?

7  A    Like, I guess, to go through with the whole process

8  with him, I guess, with at the time doing whatever he was

9  going to do, you know, to do the thing, I guess to kill her

10  or whatever.

11  Q    And the next question is:

12           Did Cory offer you a specific amount of money in

13  connection with this offer?

14           Can you read your response?

15  A    Yeah, he was -- I guess he was telling me -- he told me

16  that he was going to get a check for 50,000 and we was going

17  to split it 25/25.

18  Q    Now, Mr. Alabi, defense counsel asked you a few

19  questions about whether you had any relationship with the

20  woman whose name started with B.

21  A    Yes, I remember.

22  Q    Okay.  And you testified that you did not have any sex

23  relationship with her.

24  A    No, I didn't.

25  Q    Was there another woman that you were interested in

1    related to the defendant?

2    A    It was a friend of his child's mother at the time.

3    Q    Okay.  But that wasn't the woman whose name started

4    with a B?

5    A    No.

6    Q    And you were also asked about a October 2020 arrest

7    that led to a guilty plea to a misdemeanor.  Do you recall

8    those questions?

9    A    Yes.

10   Q    Defense counsel asked you a question about whether

11   you'd made a deal in that case.

12   A    No.

13   Q    I think he asked you a question about whether there had

14   been plea negotiations in that case.

15   A    Oh, yes, he did.

16   Q    Did those plea negotiations have anything to do with

17   the statement you provided to state law enforcement

18   regarding this murder?

19   A    No, it didn't.

20            MR. CECUTTI:  Objection.

21            THE COURT:  Overruled.

22   Q    And with respect to your 2018 arrest and the resolution

23   of that case, did that have anything to do with the

24   statement you provided to law enforcement?

25   A    No, ma'am.

1          MR. CECUTTI:  Objection.

2          THE COURT:  Did you object?

3          MR. CECUTTI:  Objection.

4          THE COURT:  You have do it a little louder.

5          MR. CECUTTI:  Objection.

6          THE COURT:  Overruled.

7          MS. HAJJAR:  Just one moment, Your Honor.

8          (Pause in proceedings.)

9          MS. HAJJAR:  No further questions.  Thank you.

10         THE COURT:  Any recross?

11         MR. CECUTTI:  No, Your Honor.

12         THE COURT:  All right.  I think what we'll do is,

13  we'll excuse the jury now.

14         Thank you so much for your patience.  I don't

15  generally keep you past 5:30, but because we could finish

16  the witness, I think it will help move the case along.

17         So we're going to close for the night.

18         Please don't look anything up on the internet,

19  anything having to do with this case.  Don't talk to anybody

20  about it.  Don't talk to one another about it.

21         But have a good night, a good healthy night, and I

22  will see you tomorrow at 9:30.

23         Have a great night.

24         THE COURTROOM DEPUTY:  All rise.

25         (Jury exits.)

1          (In open court; jury not present.)

2          THE COURT:  Okay.  Everybody can sit down.

3          Mr. Alabi is free to go.

4          (Witness is excused.)

5          THE COURT:  Nice to see you, Mr. Guadagnino.

6          MR. GUADAGNINO:  You too, Judge.  Thank you.

7          THE COURT:  All right.  I don't think we have any

8  legal issues to discuss.  We got through a lot today, and I

9  don't know what the forecast is for tomorrow.

10          MS. DEAN:  CW-1, Your Honor.

11          THE COURT:  Okay.

12          MS. DEAN:  Will be here all day.

13          THE COURT:  Anything you want to add?

14          MR. CECUTTI:  No, Your Honor.

15          THE COURT:  All right.  I'll see everybody

16  tomorrow.  Thank you.

17          (Trial adjourned until Wednesday, February 21,

18  2024, at 9:30 a.m.)

19

20

21                    *    *    *

22

23

24

25

1 <u>I N D E X</u>

2

3 <u>WITNESS</u>                                           <u>PAGE</u>

4

5   NICOLE ODOM                                        44

6     DIRECT EXAMINATION BY MS. DEAN                   44

7     CROSS-EXAMINATION BY MS. THIELE                  56

8

9   ROBERT CLOUDEN

10    DIRECT EXAMINATION BY MR. PALACIO:               62

11

12  PATRICIA SMITH

13    DIRECT EXAMINATION BY MS. HAJJAR:                70

14

15  JUAN CRUZ

16    DIRECT EXAMINATION BY MS. HAJJAR:                75

17

18  MATTHEW NOFTSIER

19    DIRECT EXAMINATION BY MR. PALACIO:               85

20    CROSS-EXAMINATION BY MR. CECUTTI                 104

21

22  STEPHEN DELUZIO

23    DIRECT EXAMINATION BY MS. DEAN:                  109

24

25

221

I N D E X

WITNESS                                          PAGE

**AJUBA GRANVILLE**

  DIRECT EXAMINATION BY MR. PALACIO:              119


**SAMSON ALABI**                                  143

  DIRECT EXAMINATION BY MS. HAJJAR                143

  CROSS-EXAMINATION BY MR. CECUTTI                166

  REDIRECT EXAMINATION BY MS. HAJJAR:             210

1                       E X H I B I T S

2

3      Government's Exhibit 54                              54

4

5      Government's Exhibit 1                               55

6

7      Government's Exhibits 12 and 12A                     66

8

9      Government's Exhibit 327                             73

10

11     Government's Exhibit 852                             82

12

13     Government's Exhibit 852                             83

14

15     Government's Exhibit 863                             83

16

17     Government's Exhibits 849 through 851, 853

18     through 859, 861 through 862, and 864

19     through 880                                          93

20

21     Government's Exhibits 704 through 711                115

22

23     Defense Exhibit A                                    206

24

25     Government's Exhibit 328                             212

## E X H I B I T S

Government Exhibit 3500-SA-8                    215

Government Exhibit 3500-SA-8                    215