490

1              UNITED STATES DISTRICT COURT
               EASTERN DISTRICT OF NEW YORK
2
   - - - - - - - - - - - - - - - - - X
3
   UNITED STATES OF AMERICA,    : 20-CR-549(AMD)
4                           :
                           :
5                           :
      -against-          : United States Courthouse
6                           : Brooklyn, New York
                           :
7                           :
                           : Thursday, February 22, 2024
8   CORY MARTIN,             : 10:00 a.m.
                           :
9        Defendant.         :
10  - - - - - - - - - - - - - - - - - X

11      TRANSCRIPT OF CRIMINAL CAUSE FOR JURY TRIAL
        BEFORE THE HONORABLE ANN M. DONNELLY
12          UNITED STATES DISTRICT JUDGE

13          A P P E A R A N C E S:

14  For the Government: BREON S. PEACE, ESQ.
                 United States Attorney
15              Eastern District of New York
                271 Cadman Plaza East
16              Brooklyn, New York 11201
           BY:  EMILY J. DEAN, ESQ.
17              TANYA HAJJAR, ESQ.
              ANDRES PALACIO, ESQ.
18              Assistant United States Attorneys

19
  For the Defendant:   THE LAW OFFICE OF ANTHONY CECUTTI
20              217 Broadway
              Suite 707
21              New York, New York 10007
           BY: ANTHONY CECUTTI, ESQ.
22

23  Court Reporter:  Nicole J. Sesta, RMR, CRR, RPR
               Official Court Reporter
24           E-mail:  NSestaRMR@gmail.com

25  Proceedings recorded by computerized stenography.  Transcript
   produced by Computer-aided Transcription.

491

1                    APPEARANCES - CONTINUED

2

3    For the Defendant:

4                    THE LAW OFFICE OF KESTINE M. THIELE
                     305 Broadway
5                    Suite 700
                     New York, New York 10007
6                    BY:  KESTINE M. THIELE, ESQ.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Proceedings*                                                    492

1          THE COURTROOM DEPUTY:  All rise.

2          THE COURT:  Good morning.  Everybody can sit down.

3   We had a juror who was a little late.  We're all ready to go.

4          Anything before we get going?

5          MS. DEAN:  Nothing from the government.  Thank you.

6          MR. CECUTTI:  No, Your Honor.

7          THE COURT:  Let's get the witness back on the stand.

8          (Witness takes the stand.)

9          (Jury present.)

10          THE COURT:  Good morning, everybody.  We're ready to

11   continue with the cross-examination of Ms. Anderson.  Mr.

12   Cecutti, whenever you're ready.

13          MR. CECUTTI:  Thank you.

14          THE COURTROOM DEPUTY:  The witness is reminded she's

15   still under oath.

16          THE WITNESS:  Yes.

17          (Continued on the following page.)

18

19

20

21

22

23

24

25

1    **ADELLE ANDERSON**,

2         called as a witness by the Government, having been

3    previously duly sworn/affirmed by the Courtroom Deputy, was

4    examined and testified as follows:

5    CROSS-EXAMINATION

6    BY MR. CECUTTI:

7    Q    Good morning, Ms. Anderson.

8    A    Good morning.

9    Q    Yesterday you testified and gave a lot of details about

10   the murder of Brandy Odom, right?

11   A    Yes.

12   Q    A murder that was about collecting life insurance

13   proceeds from policies taken out on her name, correct?

14   A    Correct.

15   Q    I want to go back six years ago to 2018 and,

16   specifically, April of 2018.  Okay?

17   A    Okay.

18   Q    On April 10th, detectives came to the Rosedale house,

19   right?

20   A    Yes.

21   Q    And you spoke with them?

22   A    Yes.

23   Q    They interviewed you?

24   A    Yes.

25   Q    You gave them information about Brandy, right?

1   A    Yes.

2   Q    You told the detectives that she was a prostitute?

3   A    Yes.

4   Q    That she used drugs?

5   A    Yes.

6   Q    That she was a party girl?

7   A    Yes.

8   Q    And that she was always looking for money, right?

9   A    Yes.

10  Q    And you also told them about an ex-boyfriend named Ramel,

11  correct?

12  A    Correct.

13  Q    And that Ramel had been harassing Brandy, right?

14  A    Yes.

15  Q    Along with her family, correct?

16  A    No.

17  Q    You don't remember saying that?

18  A    No.

19          THE COURT:  Which part, the part about her family?

20          MR. CECUTTI:  Yes.

21          THE WITNESS:  Correct.

22          MR. CECUTTI:  Your Honor, may I approach?

23          THE COURT:  Yes.

24          MR. CECUTTI:  3500 AA-15.

25  Q    Ms. Anderson, I want to show you this document and refer

1    you to the highlighted portion here, and the part that I've

2    underlined.  Okay.  Please read that to yourself and let me

3    know when you're done.

4    A    Okay.

5    Q    Do you remember telling the detectives that Ramel had

6    been harassing Brandy and her relatives, or her family?

7    A    That's not the context in which I meant it.

8    Q    So you did say that, correct?

9    A    No.  I said that Ramel was harassing her, yes, but then I

10    also said that she didn't want to speak to her family is what

11    I said.

12    Q    That Brandy did not want to speak to her family?

13    A    Correct.

14    Q    I'll take that back.  During this interview, Ms.

15    Anderson, you told the detectives that Ramel would be the only

16    person who would want to hurt Brandy, correct?

17    A    Not correct.

18    Q    You don't remember saying that?

19    A    No.

20         MR. CECUTTI:  I spoke too soon.

21         Your Honor, may I approach again?

22         THE COURT:  Sure.

23         MR. CECUTTI:  Same document.

24    Q    Ms. Anderson, I want to show you the bottom portion

25    that's been highlighted, and then the bracketed part as well.

1  I want to direct your attention to that.  Please read it and

2  let me know when you're done.

3  A    I read it.

4  Q    Do you remember telling the detectives that Ramel would

5  be the only person who would want to hurt Brandy?

6  A    No.

7  Q    Do you remember that?

8  A    No, I don't.  And that was, again, taken out of context.

9  I said the only person that I could think of was Ramel because

10 I knew that she didn't want him to have any communications

11 with her.

12 Q    Ms. Anderson, to be clear, you remember telling the

13 detectives that Ramel was the only person who would want to

14 hurt Brandy, correct?

15 A    No.  That I could think of at that time is what I meant

16 and what I said.

17 Q    That's what I'm talking about.  I'm talking about that

18 interview on April 10, 2018, at the Rosedale house.

19 A    Correct.

20 Q    And in that interview you told the detectives that the

21 only person that you could think of who would want to hurt

22 Brandy was Ramel, right?

23 A    At that time, yes.

24 Q    And you also said to the detectives at the end of the

25 interview that you would do anything to assist in the

1   investigation, correct?

2   A    Correct.

3           MR. CECUTTI:   Your Honor, may I approach and take

4   the document?

5           THE COURT:   Yes.

6   Q    Ms. Anderson, I want to then talk about the next

7   interview you had only two days later on April 12, 2018.

8           Do you remember that?

9   A    No, I don't.

10  Q    You don't remember the detectives coming back to the

11  Rosedale house two days later to interview you again?

12  A    No.

13  Q    You don't remember in an interview on April 12, 2018, at

14  the Rosedale house with the detectives, that you told them

15  that you were best friends with Brandy?

16  A    I could have possibly told them that yes, because we were

17  close.

18  Q    And that Brandy was a prostitute?

19  A    I did, yes.

20  Q    And that she had only regular customers, right?

21  A    Possibly.

22  Q    And these customers were white men or Italian men or

23  Hispanic men, correct?

24  A    Correct.

25  Q    And that there were times in which she left the house and

*A. Anderson - Cross - Mr. Cecutti*                    498

1   she left the house with a tan bag; is that right?

2   A    I don't know.

3   Q    You don't remember saying that?

4   A    I don't.

5          MR. CECUTTI:  Your Honor, may I approach?

6          THE COURT:  Yes.

7   Q    Ms. Anderson, please read the highlighted portion and let

8   me know when you're done.

9   A    Okay.

10  Q    Do you remember telling the detectives in that interview,

11  on April 12th, that there were times when Brandy would leave

12  the house with a tan bag?

13  A    Correct.

14         MR. CECUTTI:  Your Honor, may I approach?

15         THE COURT:  Yes.

16  Q    Ms. Anderson, you had another interview in April 2018

17  with the NYPD, right?

18  A    Correct.

19  Q    And this time it wasn't at the Rosedale house, correct?

20  A    Correct.

21  Q    It was at a precinct, right?

22  A    Correct.

23  Q    And you were interviewed by two detectives?

24  A    Yes.

25  Q    A white man and a black woman?

1    A    I don't know.  I can't remember.

2    Q    You don't remember what the two detectives looked like?

3    A    Correct.

4    Q    The interview was recorded?

5    A    Yes.

6    Q    It was recorded by video?

7    A    Yes.

8    Q    And the two detectives met with you to discuss Brandy's

9    murder, right?

10   A    Correct.

11   Q    And that interview was over an hour?

12   A    I don't know how long it was.

13   Q    It was quite long, correct?

14   A    I'm not sure.  I can't remember.

15   Q    Was it five minutes?

16   A    No.

17   Q    Was it more than 30 minutes?

18   A    I don't know.

19   Q    It felt like a long time, right?

20   A    Yes.

21   Q    And in that interview you told lies, right?

22   A    Yes, I did.

23   Q    Lie after lie about the circumstances of Brandy's murder?

24   A    I did.

25   Q    And you told those lies about the circumstances of

1   Brandy's murder while looking right in the eyes of these two

2   detectives, correct?

3   A     I did.

4   Q     You told them, I love her, I really did.  Do you remember

5   saying that?

6   A     I don't.

7   Q     I'm sorry?

8   A     I don't remember saying that.

9   Q     Do you remember saying, we were close, I thought she

10  would be with me forever?

11  A     I don't remember saying that.

12        MR. CECUTTI:  Your Honor, I would like to play the

13  portion of this video, obviously only to Ms. Anderson.  We do

14  have a laptop with headphones.

15        THE COURT:  Just logistically, let me see the

16  parties at the side with the court reporter for a minute.

17        (Sidebar; continued on next page.)

18

19

20

21

22

23

24

25

*Sidebar*                                                                   501

1           (Sidebar conference held on the record in the

2   presence of the Court and counsel, out of the hearing of the

3   jury.)

4           THE COURT:  Is there a transcript of the interview?

5           MR. CECUTTI:  No.

6           MS. DEAN:  We have a rough one.  It's nothing she's

7   ever seen and she hasn't reviewed that video.

8           THE COURT:  All right.  So, is it video and audio?

9           MR. CECUTTI:  Yes.

10          THE COURT:  So she'll listen to it and see it?

11          MR. CECUTTI:  Yes.

12          THE COURT:  Okay.  The unusual part of this is I

13  can't hear it, so I don't know what it is.  I'll read lips.

14  How long is it?

15          MR. CECUTTI:  This portion is ten seconds.

16          THE COURT:  All right.  Sounds good.

17          MR. CECUTTI:  We can provide her with a laptop with

18  the headphones.

19          THE COURT:  That's the only way to do it.

20          MR. CECUTTI:  That's the most efficient way to do

21  it.

22          THE COURT:  Do you want to keep it up there?  I take

23  it this might come up again.

24          MR. CECUTTI:  It might.  Let's take it a step at a

25  time.  (Sidebar concluded; continued on next page.)

1   BY MR. CECUTTI:

2   Q    Ms. Anderson, we're going to provide you with the

3   recorded portion of that interview.  It's AA-24, 11:52.

4        THE COURT:  He wants you to listen to something and

5   see if it refreshes your recollection about the statements you

6   made to the detectives.

7        (Recording played.)

8   A    Can you play it back again?  What was your question?

9   Q    Ms. Anderson, after reviewing the video portion, do you

10  remember telling the detectives, we were close, I thought

11  she'd be with me forever?

12  A    No.

13  Q    You don't remember -- after watching the video, you don't

14  remember saying that?

15  A    I didn't hear that in the video, correct.

16  Q    You didn't hear that in the video?

17  A    That I watched just now, no, I did not.

18  Q    You didn't actually love Brandy, right?

19  A    I loved her as my friend, I did, yes.

20  Q    And you told -- your friend had just been brutally

21  murdered and you said to the detectives in that interview that

22  you didn't know anything, right?

23  A    Correct.

24  Q    And that was a lie?

25  A    Correct.

1    Q    And you also denied being involved in this brutal murder,

2    correct?

3    A    I did.

4    Q    And that was also a lie, right?

5    A    Correct.

6    Q    Now, you not only talked about the circumstances of

7    Brandy's murder, you also talked about Cory, as well, correct?

8    A    I did.

9    Q    And you talked about the physical abuse by Cory?

10   A    I did.

11   Q    And you told the detectives that Cory had assaulted you

12   in the past but only one time, right?

13   A    Correct.

14   Q    And you also told the detectives that Cory was never

15   aggressive to Brandy, correct?

16   A    Correct.

17   Q    And you also told the detectives that in discussing the

18   household, you, Cory, Brandy, that you were the head of the

19   household because you were the female, right?

20   A    I don't recall that.

21   Q    We can play a portion for you.  It's AA-3500, 24:43:45.

22   So we're going to play this portion for you just like we did,

23   and let me know once you're done.

24              (Recording played.)

25   A    This is which interview?

1  Q    This is the April 28th, 2018, interview.  Have you

2  reviewed it?

3  A    I have.

4  Q    Does it refresh your memory that you told the detectives

5  that you were the head of the household; I am the female?

6  A    Yes, but not in the context that you're referring to.

7  Q    Did you say that?

8  A    Yes, but not in the context you're referring to.

9  Q    You remember saying those words, correct?

10 A    Yes, but not in the context you're referring to.

11 Q    I want to turn to the next interview that you had with

12 law enforcement, specifically the NYPD.  And that interview

13 happened on October 29, 2020.

14        Do you remember that one?

15 A    Yes.

16 Q    That interview was at another precinct, right?

17 A    Correct.

18 Q    And this time there were not two detectives, but four?

19 A    Yes.

20 Q    And that interview was also recorded by video, correct?

21 A    Yes.

22 Q    Now, yesterday you testified that in this interview you

23 underplayed your role in the life insurance scheme, correct?

24 A    I did.

25 Q    That's what you said yesterday, right?

1   A    Yes.

2   Q    You specifically used the word underplayed, right?

3   A    Yes, the day I walked in the precinct and I told what I

4   did.

5   Q    I'm just talking about what you said yesterday.

6   Yesterday you told us that in this interview you underplayed

7   your role.

8         You remember that?

9   A    I did.

10  Q    And at the start of this interview, when the four

11  detectives were there, there was one detective that was

12  sitting right next to you, correct?

13  A    Correct.

14  Q    He was a black detective, right?

15  A    Correct.

16  Q    And he was sitting to your right, correct?

17  A    I'm not sure where he was sitting in reference to me, but

18  he was there, yes.

19  Q    And you remember that you held hands with him for about

20  the first 20 minutes of that interview?

21  A    I do remember that because I was nervous and scared, yes.

22  Q    And you were holding the hand of this detective and you

23  told the NYPD that Cory killed Brandy, right?

24  A    Yes.

25  Q    And you also told the NYPD, all the detectives that were

1   in the room, that you didn't know why he killed her, right?

2   A    Correct.  And that was a lie.

3   Q    And you also told the NYPD that Brandy's murder was a

4   complete shock to you, correct?

5   A    Yes.  And that was a lie, too.

6   Q    And you also told the NYPD that you didn't have any guilt

7   whatsoever, correct?

8   A    Correct.  And that was a lie also.

9   Q    And you also told the NYPD some of the circumstances

10  related to the murder of Brandy and your dealings with her,

11  correct?

12  A    Possibly, yes.

13  Q    And you said that the dismemberment of Brandy wasn't too

14  loud, it was quiet, correct?

15  A    I don't remember.

16  Q    We can play a portion of the video to see if you can

17  remember.  It's 3500 AA-44, time 45:35.

18            (Recording played.)

19  Q    Ms. Anderson, have you listened to that portion?

20  A    I have.

21  Q    Do you now remember saying to the detectives that the

22  dismemberment of Brandy wasn't too loud, it was quiet?

23  A    I did not say that.

24  Q    You don't remember?

25  A    What I said was it was loud enough so I could hear, but

1  it wasn't that loud.

2  Q    And you also told the detectives that Cory used a Capital

3  One account and Brandy was okay with it, correct?

4  A    No, I don't recall saying that.

5  Q    Same video, 3500 AA-44, and we're going to play a portion

6  of it for you to see if you remember saying that.  Okay?

7  A    Okay.

8            (Recording played.)

9  Q    Ms. Anderson, have you listened to that portion?

10  A    I did.

11  Q    Do you remember telling the detectives that Cory used a

12  Capital One account and Brandy was okay with it?

13  A    I did not say that.

14  Q    You just watched the video, correct?

15  A    Yes, and I did not hear myself say that.

16  Q    You also told the detectives that you were the one that

17  was in control of the finances because you're better with

18  money and he, meaning Cory, is just a street N word.

19            Do you remember saying that?

20  A    I do not.

21  Q    Again we're going to go back to the same video, the video

22  of October 29, 2020, 3500 AA-44, and we'll show you the

23  relevant portion beginning at 57:50.

24            (Recording played.)

25  Q    Ms. Anderson, you finished watching that portion?

*A. Anderson - Cross - Mr. Cecutti*                                    508

1    A    Yes.

2    Q    Do you remember telling the detectives that you were the

3    one in control of the finances because you're better with

4    money, he, meaning Cory, is just a street N word?

5    A    Yes.  And that was a lie.

6    Q    And you also told the detectives that Brandy would make

7    $500 on a good day when she put herself forward.  Do you

8    remember that?

9    A    I don't remember that.

10   Q    We'll show you a relevant portion from the same video.

11            THE COURT:  Before we do that, could I see the

12   parties at the side for just a minute, please, with the court

13   reporter.

14            (Sidebar; continued on next page.)

15

16

17

18

19

20

21

22

23

24

25

1          (Sidebar conference held on the record in the

2    presence of the Court and counsel, out of the hearing of the

3    jury.)

4              THE COURT:  How long is the video?

5              MR. CECUTTI:  An hour-and-a-half.

6              THE COURT:  I feel like there has to be a better way

7    then all the stopping and starting.  When is the last time

8    she's seen it, do we know?

9              MS. DEAN:  Your Honor, she's watched portions of it

10   but she hasn't watched it in full.  The last question, her

11   words have been repeatedly mischaracterized.  So this is going

12   to be difficult.

13             THE COURT:  I don't know, again, because I can't see

14   or hear the video, which I'm not exactly wild about right now.

15   I'm not accusing you of mischaracterizing her words, but there

16   may be a difference.  I don't know what it is.  I guess we

17   have to keep doing this.  We're positive that your paralegal

18   is showing her the right parts?

19             MR. CECUTTI:  Yes.

20             THE COURT:  Maybe there's a difference in phrasing

21   that's getting lost.  I would make sure I'm saying exactly

22   what she's saying.

23             MR. CECUTTI:  I'm quoting her exact words.

24             THE COURT:  This is not an ideal situation, and I

25   think that in terms of time savings that we should anticipate

1    things like that either with a transcript or with some way of

2    doing it.  So if somebody comes up with a way to do it, I

3    would appreciate it but I guess we have to just go on like

4    this.

5            (Sidebar concluded; continued on next page.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  BY MR. CECUTTI:

2  Q    Ms. Anderson, we're going to show you a portion of the

3  same video you've been watching at 58:40.

4          (Recording played.)

5  Q    Ms. Anderson, have you finished watching that portion?

6  A    Correct.

7  Q    Do you remember telling the detectives that Brandy made

8  $500 on a good day when she put herself forward?

9  A    No, I did not say that in that video.

10          THE COURT:  Did you not say any of those words?

11          THE WITNESS:  They asked the question about profits

12  and money.  That's what they asked me in the video, and I gave

13  them a number that 500 is decent.  I didn't say a good day or

14  a bad day because we had to make quotas, so I gave a number.

15          THE COURT:  All right.  Let me see the parties at

16  the side, again, for just a minute.

17          (Sidebar; continued on next page.)

18

19

20

21

22

23

24

25

1              (Sidebar conference held on the record in the

2    presence of the Court and counsel, out of the hearing of the

3    jury.)

4              THE COURT:  Are you asking her, like say the

5    detective asked the question and she answers it yes or no, are

6    you doing that?  Are you quoting exactly the words out of her

7    mouth?

8              MR. CECUTTI:  For the last example, she uses the

9    phrase put herself forward.  That's exactly the words.

10             THE COURT:  What about the $500 on a good day?  Did

11   those words come out of her mouth?

12             MR. CECUTTI:  Yes, $500.

13             THE COURT:  She's saying something the detective is

14   asking.  All I'm trying to get at is if you're sort of

15   conflating the question and the answers so the substance comes

16   out, that might be why she's confused.

17             Again, I've said it a thousand times, I don't know

18   because I can't see it.  It wouldn't be unreasonable to say

19   the substance of what her statement is, but if you're using

20   part of the question and part of her answer, again, I don't

21   know.  I don't know if that's what you're doing.  It sounds to

22   me that that might be what's happening, unless you're saying

23   question and answer.  I think she's taking you very literally.

24             MR. CECUTTI:  I'm sorry?

25             THE COURT:  It sounds like she's taking you very

1   literally.

2          MR. CECUTTI:  The parts that I'm quoting

3   specifically that she's not remembering.  She's listening to

4   the video, and I'm quoting words directly that she said.

5          THE COURT:  She said she could make $500 on a good

6   day if she put herself out there?

7          MR. CECUTTI:  Put herself --

8          THE COURT:  You have to be a little more careful

9   about what you're asking her, because I think she's being very

10  literal.  I think you have to be more careful about what she

11  said and what the police said.  It sounds picky but I think

12  that's where the hang up is.

13          (Sidebar concluded; continued on next page.)

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  Do you want to rephrase the question?

2    BY MR. CECUTTI:

3    Q    Do you remember after watching that portion of the video

4    that Brandy made $500 when she put herself forward?

5          THE COURT:  Was that the substance of what you said?

6          THE WITNESS:  No, it's not.  I gave a price as far

7    as to indicate what they was asking me, and I didn't say

8    anything about putting her foot forward.

9          THE COURT:  Putting herself forward.

10         THE WITNESS:  What he just quoted, I didn't hear

11   myself saying that in that video.

12         THE COURT:  Do you want to try it one more time and

13   make sure we're at the right portion of the interview?

14         (Recording played.)

15   Q    Ms. Anderson, have you listened to that portion again?

16   A    I have.

17   Q    Do you remember saying when she put herself forward?

18   A    I did say that, but not in the context that you're

19   referring to.

20   Q    Now continuing in that interview, do you remember telling

21   the detectives that Brandy took out a policy after asking you

22   for help, named you as the beneficiary, and that you didn't

23   know if Cory was aware of the policy?

24   A    I don't know.

25   Q    We're going to play another portion of the same video,

1  one hour and eight minutes in.

2            THE COURT:  The question is, do you have any

3  recollection of saying anything like that?

4            THE WITNESS:  I do.  It was a lie.

5            THE COURT:  Right.  He's just asking you what you

6  said to the detectives on that date, and the question really

7  is whether you recall telling them that you didn't know if the

8  defendant was aware of the policy.

9            Do you remember telling them that?

10           THE WITNESS:  Yes.

11           THE COURT:  Okay.  Next question.

12 BY MR. CECUTTI:

13 Q    The detectives then proceeded to ask you a lot of

14 questions about the connection between the murder and the life

15 insurance policies.

16           Do you remember that?

17 A    Yes.

18 Q    And near the end of the interview, after being asked many

19 times, you told them there was no connection between the two,

20 correct?

21 A    Yes.  I told them that, and it was a lie.

22 Q    And you told them that in your heart the answer was no,

23 that there was no connection between the two, correct?

24 A    Correct, and that was a lie.

25 Q    And you told them that you knew for a fact that there was

1  no connection between the two, correct?

2  A    I'm not sure if I said that.  If I did, it was a lie.

3            THE COURT:  So you might have said that, right?

4            THE WITNESS:  Correct.

5            MS. DEAN:  Objection.  Mischaracterization.

6            THE COURT:  I mischaracterized?

7            MS. DEAN:  No, Your Honor.  The phrase "knew for a

8  fact".  The witness is being asked very specific questions and

9  trying her best to respond.

10           THE COURT:  I guess you'll have to show the portion

11 where she says what you said "knew for a fact".

12 Q    Same video.  Ms. Anderson, we're going to play this

13 portion for you beginning at 1 hour, 50 minutes, 55 seconds.

14           (Recording played.)

15 Q    Ms. Anderson, have you reviewed that portion?

16 A    Yes.  What was your question?

17 Q    Do you remember telling the detectives that in your heart

18 there was no connection between the murder and the life

19 insurance policies, and that you knew that for a fact?

20           Do you remember saying that in substance?

21           MS. DEAN:  Objection.

22           THE COURT:  No, not in substance.  You're asking her

23 if she said specific words.

24           MR. CECUTTI:  That is correct.

25           THE COURT:  Please use the words that are on the

1   tape.

2   Q    Do you remember saying that you knew for a fact, Ms.

3   Anderson, that there was no connection between the life

4   insurance policies and the murder of Brandy Odom?

5   A    Let me see that again.

6            (Recording played.)

7   A    Okay.  What was the question?

8   Q    You reviewed the portion?

9   A    Yes, correct.

10  Q    Do you remember telling the detectives that you knew for

11  a fact there was no connection between the murder of Brandy

12  Odom and the life insurance policies?

13  A    I didn't say that in the portion that I just viewed.

14           THE COURT:  What did you say in the portion that you

15  just reviewed?

16           THE WITNESS:  They were asking me questions about

17  Cory and his defense, if the things that I'm saying if his

18  defense was to ask me if he did it, what would his defense be.

19  This is what the question I was being asked in the video.  I'm

20  not understanding.  I didn't say that.

21           THE COURT:  The lawyer wants to know if you said

22  that you knew for a fact that the insurance policy had nothing

23  to do with the murder.

24           THE WITNESS:  I did not say that in the portion I

25  just viewed.

1          THE COURT:  Next question.

2     BY MR. CECUTTI:

3     Q     Ms. Anderson, you didn't discuss with the detectives that

4     you had agreed to take out life insurance policies on Alex

5     Villard, correct?

6     A     You said what?

7     Q     You did not discuss with the detectives in that interview

8     that you had agreed to take out life insurance policies --

9     policy, on Alex Villard, correct?

10    A     Correct.

11    Q     And you did not discuss with the detectives in that

12    interview that you had agreed to take out life insurance

13    policies on T and Z, correct?

14    A     Correct.

15    Q     Now I want to bring you forward to November 4, 2020.

16    That was when you were arrested, correct?

17    A     Yes.

18    Q     And you were interviewed by the FBI and NYPD?

19    A     I don't know who I was interviewed by, but yes, I was

20    arrested.

21    Q     And you were interviewed by law enforcement?

22    A     Correct.

23    Q     And that interview was recorded?

24    A     Yes.

25    Q     And at the start of the interview you were with an NYPD

1    detective?

2    A    I'm not sure who I was with.

3    Q    A member of law enforcement?

4    A    Correct.

5    Q    And that member of law enforcement, do you remember him

6    telling you that there was only one person in trouble and that

7    wasn't him or you, correct?

8    A    I don't recall that.

9    Q    And do you remember being told by that member of

10   law enforcement that the federal prosecutors were not going to

11   prosecute you?

12   A    I don't recall that.

13   Q    We'll play you a portion from that video.  It's AA-48,

14   video one, and the clip is from 8 minutes, 15 seconds to

15   10 minutes, 20 seconds.

16                (Recording played.)

17                (Continued on next page.)

18

19

20

21

22

23

24

25

*A. Anderson - Cross - Mr. Cecutti*                    520

 1   (Continuing.)

 2   BY MR. CECUTTI:

 3   A    What was your question?

 4   Q    Did you finish listening to that portion?

 5   A    I did.

 6        MR. CECUTTI:  Just, Mr. Gover, if you can play

 7   from 10:20 to 10:45, please.

 8        THE COURT:  I thought you had a question about the

 9   last --

10        MR. CECUTTI:  It wasn't complete, Your Honor.

11        THE COURT:  All right.

12        (Video played for the witness.)

13   Q    Okay.  Ms. Anderson, have you listened to that portion?

14   A    I have.

15   Q    And do you remember being told by the member of law

16   enforcement that only one person was in trouble and that

17   wasn't you or him, and that the federal prosecutors were not

18   going to prosecute you; do you remember being told that?

19   A    He did not say that in the video that I just watched.

20   What I listened to, I just didn't hear?

21   Q    Do you remember being told that you weren't in trouble?

22   A    I do not.

23   Q    Do you remember being told that you were not going to

24   be going to jail?

25   A    I do not.

1       MR. CECUTTI:  From the same video, we'll play a

2   portion beginning at 21 minutes.

3       (Video played for the witness.)

4   Q   Ms. Anderson, did you listen to that portion?

5   A   I have.

6   Q   And do you remember being told by a member of law

7   enforcement that you wouldn't be going to jail?

8   A   I do.

9   Q   Now, in that same meeting you talked about Brandy

10  having knowledge of the life insurance policies, correct?

11  A   You said do I have knowledge of that?

12  Q   Let me rephrase.

13      In that meeting on November 4, 2020 with law

14  enforcement, you told law enforcement that Brandy had

15  knowledge of the life insurance policies, correct?

16  A   I don't remember saying that unless you show me the

17  video again.

18  Q   Okay.  Same video, we'll play a portion for you

19  beginning at 46:20.

20      And my question is whether you told law

21  enforcement, in substance, that Brandy knew about the life

22  insurance policies.

23  A   Okay.

24      (Video played for the witness.)

25  Q   Ms. Anderson, have you listened to that portion?

*A. Anderson - Cross - Mr. Cecutti*                522

1    A    I have.

2    Q    Any do you remember telling, in substance, to law

3    enforcement that Brandy was aware of the life insurance

4    policies?

5    A    I did say that, but I was speaking on a different

6    situation, not what you're speaking on.

7    Q    Well, you were talking about a meeting between you,

8    Cory, and Brandy where there was a discussion about taking

9    out life insurance policies for the kids, correct?

10   A    No.  That's not true.

11   Q    You don't remember that?

12   A    I did not say that.

13   Q    You told law enforcement, though, in substance, that

14   Brandy was aware -- she wasn't in the dark about the life

15   insurance policies, correct?

16   A    Yes.  But when we were speaking on policies, it wasn't

17   about -- it wasn't for her.  It was for someone else that

18   Cory was trying to get rid of.  That's what I was referring

19   to in the video.

20   Q    So in this meeting between you, Brandy, and Cory, you

21   agree that there was a discussion about life insurance

22   policies, right?

23   A    Correct.

24   Q    There was a meeting between the three of you?

25   A    Correct.

*A. Anderson - Cross - Mr. Cecutti*                     523

1   Q    And there was a discussion about taking out policies

2   for the kids, right?

3   A    No, it was not.  It was about taking out a policy on

4   Darry.

5   Q    Are you aware of --

6            MR. CECUTTI:  And I'll ask that this portion later

7   be sealed.

8   Q    But are you aware of two children or young people named

9   B and D?

10  A    Who?

11  Q    B?  Do you know who B is?

12  A    Who?

13  Q    B.

14  A    I'm not sure.

15  Q    Do you know who D is?

16  A    I'm not sure.

17  Q    Those are two young children that Brandy was taking

18  care of.  Do you remember that?

19           MS. DEAN:  Objection.

20           THE COURT:  Sustained as to form.

21           Do you know if Brandy was taking care of any

22  children?

23           THE WITNESS:  She had a niece and a nephew.

24           THE COURT:  Do you know what their names are?

25           THE WITNESS:  I can't remember sitting here today.

*A. Anderson - Cross - Mr. Cecutti*                    524

1          THE COURT:  All right.  Next question.

2    BY MR. CECUTTI:

3    Q    In that meeting, there was a discussion about making

4    sure that they would be all right by taking out life

5    insurance policies where Brandy was the insured, correct?

6    A    Can you rephrase that question?

7    Q    In the meeting that you're discussing with law

8    enforcement, with yourself, Cory, and Brandy, there was a

9    discussion about Brandy's niece and nephew and making sure

10   that they would be okay financially if something happened to

11   her?

12          MS. DEAN:  Objection.

13          THE COURT:  On what basis?

14          MS. DEAN:  Is he asking about the discussion with

15   law enforcement or is he asking about whether this happened?

16          THE COURT:  I think we're talking about the

17   interview, correct?

18          MR. CECUTTI:  Yes.

19          THE COURT:  Okay.

20          So what he wants to know is:  During the course of

21   your interview with the detectives --

22          Is this in November?

23          MR. CECUTTI:  Yes.

24          THE COURT:  And whoever else was there, was there

25   a discussion about Brandy's niece and nephew?  Do you recall

*A. Anderson - Cross - Mr. Cecutti*                525

1   that discussion?

2            THE WITNESS:  I don't recall that.  I would have

3   to see it.

4            THE COURT:  All right.

5            MR. CECUTTI:  That's fine.  I'll move on.

6   BY MR. CECUTTI:

7   Q    Ms. Anderson, in that same interview on November 4,

8   2020, do you remember telling law enforcement that Brandy

9   was aware of the premiums or payments that were being made

10  on the policies?

11  A    I do not.  I don't recall saying that.

12  Q    And you don't recall saying that because she also knew

13  about the policies, right?

14  A    No, she didn't.

15  Q    So you don't remember saying those things?

16  A    I don't recall, no.

17  Q    Okay.

18           MR. CECUTTI:  Same 3500 material, AA-48, Video 2,

19  and we'll play the portion beginning at 14:45.

20  Q    And before you start, just so that you're aware, my

21  question is if you remember telling law enforcement, in

22  substance, that Brandy was aware of premiums or payments

23  being made on the policies because she knew about the

24  policies.  That's my question.

25           THE COURT:  So he's not asking you if those are

*A. Anderson - Cross - Mr. Cecutti*                526

1  the exact words.  He's asking you if that's the substance of

2  the conversation.

3          Do you understand?

4          THE WITNESS:  Yes.

5          THE COURT:  So listen to it and tell us what you

6  know.

7          THE WITNESS:  Okay.

8          (Video is played for the witness.)

9  A    Repeat the question again.

10 Q    Do you remember telling law enforcement, in substance,

11 that Brandy was aware of the premiums or payments being made

12 on the policies because she knew about the policies?

13 A    I didn't say it that way.  What I said was there's a

14 possibility because Cory told me that she might have known,

15 and he didn't give me any reason to not believe him.  So

16 that's my answer.

17 Q    So in that interview, it's fair to say that you told

18 law enforcement, in substance, that Brandy was aware of the

19 policies?

20         MS. DEAN:  Objection.

21 A    In substance, I did not.

22         THE COURT:  Well, sustained as to form.

23 A    No, I did not.

24 Q    You told them that Brandy was aware of premiums being

25 paid, correct?

*A. Anderson - Cross - Mr. Cecutti*                527

1          MS. DEAN:  Objection.

2          THE COURT:  Well, did you tell them that Brandy

3     was aware that premiums were being made on a policy?

4          THE WITNESS:  I don't recall that.  I didn't hear

5     that in the video just now.

6     Q    You didn't discuss with law enforcement that you had

7     agreed to take out life insurance policies on Alex Villard,

8     correct?

9     A    I did not tell them, no.

10    Q    And you didn't tell law enforcement that you had agreed

11    to take out life insurance policies on T or Z, correct?

12    A    I did not.

13    Q    Now, following your interview with law enforcement on

14    November 4, 2020, you appeared before a judge?

15    A    I did.

16    Q    And you were then released?

17    A    I was.

18    Q    You left the courthouse?

19    A    Yes.

20    Q    And you were placed on pretrial supervision?

21    A    I was.

22    Q    And one of the conditions of your release was that you

23    abide by a curfew, right?

24    A    Correct.

25    Q    And you also had some other conditions that you needed

A. Anderson - Cross - Mr. Cecutti                 528

1    to follow, right?

2    A    Correct.

3    Q    And if you broke the conditions, you could end up in

4    jail, correct?

5    A    Yes.

6    Q    And as part of your supervision, you were assigned a

7    pretrial officer?

8    A    I was.

9    Q    And that officer was supervising you?

10   A    He was.

11   Q    And continues to supervise you, right?

12   A    Correct.

13   Q    And in 2021 you were breaking your curfew, correct?

14   A    I was.

15   Q    And --

16        MS. DEAN:  Objection, Your Honor.

17        May we approach?

18        THE COURT:  No.

19   Q    And you were giving your officer excuses as to why you

20   were breaking curfew, correct?

21   A    It wasn't excuses, but yes, I gave him the reasons of

22   me being late; I did.

23   Q    You were lying to him, right?

24   A    I was not.

25   Q    These excuses didn't make sense, right?

*A. Anderson - Cross - Mr. Cecutti*                529

1   A    They did.

2   Q    You're aware that your pretrial officer believed they

3   didn't make sense, correct?

4            MS. DEAN:  Objection.

5            THE COURT:  Sustained.

6   Q    And you were breaking curfew, right?

7   A    Yes.

8   Q    And you were also not permitted to use marijuana while

9   you were on supervision, correct?

10  A    Correct.

11  Q    In 2021, you lied to your officer about your marijuana

12  usage, correct?

13  A    Correct, but then I later told him that I was.

14  Q    I'm just talking about 2021.

15  A    Yes, and in 2021 I lied at first, and in the same

16  conversation I told him that I was.

17  Q    Ms. Anderson, you violated your release conditions in

18  this case, correct?

19  A    Yes.

20  Q    And you still remain out on bail, correct?

21  A    Correct.

22  Q    And you're living at home with your kids?

23  A    Correct.

24  Q    Now, you have lived a life where you've committed

25  crimes, right?

1  A    Yes.

2  Q    And you've lived a life of dishonesty?

3  A    Yes.

4  Q    As a teenager, you were boosting?

5  A    I was.

6  Q    You were shoplifting from various stores?

7  A    I was.

8  Q    Macy's?

9  A    Correct.

10  Q    Target?

11  A    Yes.

12  Q    Walmart?

13  A    Yes.

14  Q    Barney's?

15  A    Possibly.

16  Q    And you would take items from those places and then

17  sell them, right?

18  A    Correct.

19  Q    And then you continued to shoplift, correct?

20  A    Yes.

21  Q    And you've been shoplifting for years, right?

22  A    Until it stopped, yes.

23  Q    You were shoplifting while you were living with Cory at

24  the Rosedale house, correct?

25  A    I was.

*A. Anderson - Cross - Mr. Cecutti*                531

1  Q    Now, you started sex work when you were about 17, 18

2  years old?

3  A    No.

4  Q    How old were you?

5  A    I was 22, 23.

6  Q    In your early 20s?

7  A    Correct.

8  Q    And you continued to engage in sex work for about

9  eight, ten years?

10  A    I don't know.

11  Q    Well, how long was it?

12  A    I don't know.

13  Q    You don't remember how long you did sex work?

14  A    I don't remember.

15  Q    Were you doing sex work in your mid 20s?

16  A    Yes.

17  Q    In your late 20s?

18  A    Yes.

19  Q    In your early 30s?

20  A    I don't know.

21  Q    So you started when you were about 22?

22  A    Yeah.

23  Q    And you think you may have been engaged in sex work in

24  your early 30s?

25  A    Possibly, because I stopped once I got with Cory.

1  Q    You stopped in 2017, right?

2  A    Correct.

3  Q    But when you moved in, you were still doing sex work.

4  A    I was.

5  Q    And before you moved in you were doing sex work?

6  A    I was.

7  Q    We'll talk about that later.

8         Now, you were previously married to a man named

9  Amjad?

10 A    That's not his name.  His name was Mohammed.  But yes.

11 Q    But his last name was Amjad?

12 A    Correct.

13 Q    Mr. Amjad.

14 A    Yes.

15 Q    And that was a fraudulent marriage, right?

16 A    Yes.

17 Q    You married him so he could remain in the United

18 States?

19 A    Yes.

20 Q    You were also in a relationship with a man named

21 Fernando?

22 A    Yes.

23 Q    That's Z's father, right?

24 A    No.

25 Q    I'm sorry?

*A. Anderson - Cross - Mr. Cecutti*                    533

1    A    That's not Z's father.

2    Q    T's father.

3    A    Correct.

4    Q    Any you were dishonest with him, correct?

5    A    Dishonest with who?

6    Q    With T's father, Fernando.

7    A    About what?

8    Q    About your faithfulness to him.

9    A    I wasn't lying to him, no.

10   Q    You were not cheating on him?

11   A    No, I was not.

12   Q    You were not having sex with other men while you were

13   in a relationship with Fernando?

14   A    I was not in a relationship with Fernando.  He's just

15   T's father.

16   Q    You were in a relationship with Alex Villard, right?

17   A    Yes.

18   Q    And you were cheating on him, correct?

19   A    Correct.

20   Q    And you were dishonest with him, right?

21   A    Yes.

22   Q    Is your testimony that you never lied a single time to

23   Fernando?

24   A    I may have, possibly.

25   Q    So you were dishonest with him, right?

*A. Anderson - Cross - Mr. Cecutti*                    534

1              MS. DEAN:  Objection.

2    A    Yes, but not in the context you're referring to because

3    I was never with him.

4    Q    I'm just asking if you ever told him a lie.  That's my

5    question.

6    A    Possibly, yes.

7    Q    And you have forged signatures on life insurance

8    applications, correct?

9    A    I forged a signature on Alex's, yes.

10   Q    And you've pled guilty to fraud offenses in this case,

11   correct?

12   A    I have.

13   Q    So you've committed frauds, right?  Yes?

14   A    Yes.

15   Q    You have boosted?

16   A    Yes.

17   Q    Shoplifted?

18   A    Yes.

19   Q    Committed forgeries?

20   A    Yes.

21   Q    You've lied to law enforcement?

22   A    I have.

23   Q    State and federal?

24   A    I have.

25   Q    Now, Ms. Anderson, you're about making money, right?

*A. Anderson - Cross - Mr. Cecutti*                535

1   A    Can you rephrase that?

2   Q    You're about making money, getting money.

3   A    I don't understand.

4   Q    In 2015, while you were living on Fulton Street, you

5   and Brandy started doing sex work together, correct?

6   A    Yes.

7   Q    And in 2016 you came up with the idea for you and

8   Brandy to do sex work out of Cory's house in Rosedale,

9   right?

10  A    No, I did not come up with that idea, but we were using

11  his place to do sex work.

12  Q    You made the proposal to him, correct?

13  A    Yes.

14  Q    And you wanted to make the sex work that you and Brandy

15  were doing more organized, right?

16  A    No.

17  Q    Like a business.

18  A    No.

19  Q    You wanted to make more money, though, right?

20  A    Correct.

21  Q    And so you presented the idea to Cory of using his

22  house to do in-calls, correct?

23  A    We both came up with that, yes.

24  Q    You and Brandy?

25  A    No, me and Cory.

1    Q    And he allowed you to use the house to make money,

2    right?

3    A    Correct.

4    Q    And while you were living on Fulton Street, you'd been

5    doing in-calls at Cory's house?

6    A    Correct.

7    Q    So before you moved in, you were doing in-calls at

8    Cory's house, right?

9    A    Yes.

10   Q    And then after you moved in, you continued to do

11   in-calls at Cory's house, right?

12   A    No.

13   Q    When you moved in in 2016, you were not doing in-calls?

14   A    I was at the beginning, and then it stopped.

15   Q    That's what I'm asking you; when you moved in.

16   A    Yes.

17   Q    You were doing in-calls.

18   A    Correct.

19   Q    And you were making money, correct?

20   A    Yes.

21   Q    When you moved in, Brandy moved in soon after that,

22   right?

23   A    Yes.

24   Q    And Cory wasn't charging you rent, right?

25   A    No.

*A. Anderson - Cross - Mr. Cecutti*                          537

1  Q    And he wasn't charging Brandy rent, right?

2  A    No.

3  Q    And while you were doing in-calls in 2016, you were

4  also making money as a home health aide attendant?

5  A    Correct.

6  Q    Now, you testified yesterday about several different

7  life insurance policies, right?

8  A    Yes.

9  Q    You testified about the two Brandy Odom policies?

10 A    I did.

11 Q    And you were the beneficiary on both, right?

12 A    I was.

13 Q    And you testified about the Alex Villard policy.

14 A    I did.

15 Q    And you were the beneficiary on that policy, correct?

16 A    Correct.

17 Q    And there was also a policy where Cory was the insured

18 or the policyholder, right?

19 A    Correct.

20 Q    And T was the beneficiary, correct?

21 A    Correct.

22 Q    So under those circumstances, if Cory died, you would

23 have effectively received the money as T's mother, correct?

24 A    Correct.  That's what it was made to look like.

25 Q    And so there were, in effect, by 2017, four policies

*A. Anderson - Cross - Mr. Cecutti*                    538

1   that you could cash in on, correct?

2   A    Correct.

3   Q    We had the two Brandy policies, right?

4   A    Correct.

5   Q    The Alex Villard policy?

6   A    Correct.

7   Q    And the Cory Martin policy.

8   A    Correct.

9   Q    So if Brandy died, you'd get money, right?

10  A    Correct.

11  Q    If Alex died, you'd get money, right?

12  A    Correct.

13  Q    And if Cory died, you'd get money, right?

14  A    Correct, that's what it would appear to be, yes.

15  Q    And all these policies were obtained after you moved in

16  with Cory, right?

17  A    I'm not sure when they were obtained.

18  Q    Well, let's talk a little bit about the Brandy Odom

19  policies.

20       Before she died, you called the life insurance

21  companies pretending to be Brandy, right?

22  A    You said before she what?

23  Q    Before she died.

24  A    Yes.

25  Q    You called the life insurance companies pretending to

*A. Anderson - Cross - Mr. Cecutti*                  539

1   be her, correct?

2   A    Correct.

3   Q    And after she died, you contacted the life insurance

4   companies pretending to be her sister, right?

5   A    Correct.

6   Q    And you did so to try to collect the life insurance

7   money on both policies, correct?

8   A    Correct.

9   Q    And you did that for several months, right?

10  A    I'm not sure how long I did it for.

11  Q    Well, it began in April of 2018, right?

12  A    Possibly, yes.

13  Q    After she died.  She died in April, right?

14  A    Correct.

15  Q    And so in April you began trying to collect, right?

16  A    I guess, yes.

17  Q    And that continued for several months?

18  A    I don't know.

19  Q    You made efforts to collect in May, correct?

20  A    I don't know.

21  Q    June?

22  A    I don't know.

23  Q    July?

24        THE COURT:  Do you just not know the months?

25        THE WITNESS:  I don't know the months.

*A. Anderson - Cross - Mr. Cecutti*                    540

1          THE COURT:  All right.  Did you make efforts to

2    collect, though?

3          THE WITNESS:  I did.

4          THE COURT:  Okay.

5    Q    In the months after she died.  Do you remember that?

6    A    I do.

7    Q    And you made phone calls to life insurance companies,

8    right?

9    A    I did.

10   Q    You sent faxes?

11   A    I did.

12   Q    You sent letters?

13   A    No.

14   Q    You sent forms?

15   A    Yes.

16   Q    You sent correspondence indicating that you were the

17   sole beneficiary of the policies related to Brandy Odom,

18   right?

19   A    I did.

20   Q    Now, you have a friend named Maggie Jones, correct?

21   A    I do.

22   Q    And in June, you gave her the American National Life

23   policy that was issued for Brandy, correct?

24   A    Correct.

25   Q    And that policy was $150,000, right?

*A. Anderson - Cross - Mr. Cecutti*          541

1   A    I'm not sure how much the policy was.

2   Q    You were the beneficiary.

3   A    Correct.

4   Q    And you asked Maggie to hold the policy for you.

5   A    I don't know.

6   Q    Do you remember asking Maggie to cash in the policy and

7   then destroy the paperwork?

8   A    I don't.

9        MR. CECUTTI:  Your Honor, may I approach?

10       THE COURT:  Yes.

11  Q    Ms. Anderson, I want to show you this page.  If you

12  could just read paragraph 24 of the highlighted portion and

13  then let me know when you're done.

14  A    Okay.

15  Q    After reviewing that page, do you remember in June of

16  2018 asking Maggie to hold the policy for you?

17  A    I do not.

18  Q    Do you remember in June of 2018 asking Maggie to cash

19  in the policy and then destroying the paperwork?

20  A    I do not.

21  Q    Now, I want to go -- sticking with the same time

22  period, the spring of 2018, Cory was living in Virginia,

23  correct?

24  A    When?

25  Q    In May of 2018.

*A. Anderson - Cross - Mr. Cecutti*                    542

1  A    I'm not sure where he was living then.

2  Q    Do you remember telling the Government that Cory moved

3  to Virginia in May for three months and stayed with his

4  cousin Whitney?

5  A    I don't remember.

6            MR. CECUTTI:  Your Honor, may I approach?

7            THE COURT:  Yes.

8  Q    Ms. Anderson, please take a look at this page, and just

9  read the highlighted portion and then the portion on the

10  back.

11  A    Okay.

12  Q    Do you remember telling the Government that Cory moved

13  to Virginia in May of 2018 for three months and stayed with

14  his cousin Whitney?

15  A    I do.

16  Q    And do you remember telling the Government that after

17  living in Virginia, he moved to Florida and stayed with his

18  friend John?

19  A    Correct.

20  Q    And then do you remember telling the Government that on

21  Labor Day of 2018, Cory moved to New Jersey?

22  A    I did.

23  Q    And when he moved to New Jersey, you picked him up from

24  the airport, right?

25  A    Correct.

1  Q    And you drove him to your home?

2  A    Where I was staying, correct.

3  Q    And you were staying with your kids?

4  A    Correct.

5  Q    And your cousin Duane, right?

6  A    Correct.

7  Q    So by September of 2018, you and Cory were living at

8  Duane's house with your kids, correct?

9  A    Correct.

10 Q    Now, yesterday you testified that Cory planned on using

11 the life insurance proceeds to move with you to El Paso,

12 Texas?

13 A    Correct.

14 Q    Now, isn't it true that you've never mentioned this

15 El Paso plan to the Government?

16 A    When?

17 Q    You've met with the Government many times over four

18 years, right?

19 A    Correct.

20 Q    And isn't it true that you've never mentioned this

21 El Paso plan to the Government?

22 A    Not true.

23 Q    Do you remember telling the Government, in a meeting on

24 January 13, 2021, that Cory never said exactly what he would

25 use the insurance payouts for?

*A. Anderson - Cross - Mr. Cecutti*          544

1   A    I don't remember that.

2            MR. CECUTTI:  Your Honor, may I approach?

3            THE COURT:  Yes.

4   Q    Ms. Anderson, I just want you to read this highlighted

5   portion here, and when you're done, let me know.

6   A    Okay.

7   Q    Do you remember telling the Government, in a meeting on

8   January 13, 2021, that Cory never said exactly what he would

9   use the insurance payouts for?

10  A    I did say that.

11           MR. CECUTTI:  Your Honor, may I approach again?

12           THE COURT:  Yes.

13  Q    Ms. Anderson, your testimony is that Cory Martin beat

14  and raped you while you were both in high school?

15  A    Yes.

16  Q    And you testified yesterday that because he would beat

17  and rape you, you had to run and hide from him?

18  A    Yes.

19  Q    Now, when you reconnected in 2010, you continued your

20  sexual relationship, correct?

21  A    Correct.

22  Q    And at that time period, your testimony is that he was

23  abusive both physically and sexually, correct?

24  A    When?

25  Q    In 2010.

1  A    He was always abusive, verbally, physically, throughout

2  my whole life.  So you're going to have to be more specific

3  because it happened often.

4  Q    2015, 2016, that time period, he was both physically

5  and sexually abusive to you, correct?

6  A    Yes, but it wasn't that bad.

7  Q    And in that time period -- we'll broaden it out another

8  year, 2017 -- so 2015 to 2017, your testimony is that he

9  wanted your kids, T and Z, to die, right?

10 A    Correct.

11 Q    And he also wanted Z's father, Alex, to die, correct?

12 A    Correct.

13 Q    And yet you moved into Cory's house in 2016, correct?

14 A    Correct.

15 Q    And shortly after you moved in, your testimony is that

16 Cory became your pimp, right?

17 A    Correct.

18 Q    And you sold Brandy on the idea of Cory being her pimp,

19 right?

20 A    Yes.

21 Q    And the reason that you gave us yesterday for Cory

22 becoming your pimp was because he was charming, right?

23 A    And we trusted him.

24 Q    And he made you feel safe, right?

25 A    Correct.

*A. Anderson - Cross - Mr. Cecutti*                    546

1  Q    Now, again, shortly after you moved in, so this is the

2  end of 2016, I believe you described an incident yesterday

3  where Cory assaulted you, assaulted T, and tried to throw Z

4  out the window of the house.  Do you remember that?

5  A    I do.

6  Q    And this was the first fight that you had after moving

7  in, correct?

8  A    It was not.  That was not the first fight.

9  Q    This is the first time that Cory was ever abusive to

10  your kids, correct?

11  A    Yes.

12  Q    And you didn't call the police, right?

13  A    I did not.

14  Q    You didn't leave the Rosedale house and take your kids

15  and go live with your mother and family, right?

16  A    I did not, but I took my kids outside the home that

17  night and left both of them with their fathers.

18              (Continued on the following page.)

19

20

21

22

23

24

25

A. Anderson - cross - Cecutti                547

1   BY MR. CECUTTI: (Continuing.)

2   Q    But you stayed at the Rosedale house?

3   A    I did.

4   Q    And he continued to beat you nearly every day; that's

5   your testimony, right?

6   A    Yes, but I loved Cory.

7   Q    And he continued to beat you even while you were

8   pregnant, right?

9   A    Correct, but I loved him.

10  Q    Now, February of 2017, you went to Jamaica Hospital,

11  right?

12  A    Correct.

13  Q    And that's after Cory punched you in the eye; that's

14  what you said yesterday?

15  A    Correct.

16  Q    And Cory is a strong guy, right?

17  A    Correct.

18  Q    I believe you testified yesterday he had boxing

19  equipment at the house?

20  A    He did.

21  Q    He was -- he was trained in boxing, right?

22  A    He was.

23  Q    And he punched you in the eye, right?

24  A    Yes.

25  Q    And after this apparently happened, you were examined

A. Anderson - cross - Cecutti                548

1  by a doctor?

2  A    I was.

3  Q    At Jamaica Hospital?

4  A    Correct.

5  Q    Now, you didn't tell the doctor that this trained boxer

6  punched you in the eye, right?

7  A    I did not.

8  Q    You told the doctor that you were at a party the night

9  before, right?

10  A    I don't know what I told them, but whatever I told them

11  was a lie.

12  Q    Do you remember telling them that you were at a party

13  the night before, two girls were fighting and you tried to

14  break up the fight and you were thrown against the wall?

15  A    Correct.

16  Q    And then you went home, correct?

17  A    Correct.

18  Q    And then you went to the ER, right?

19          THE COURT:  He is asking if that's what you told.

20          THE WITNESS:  Yeah.

21  Q    Ms. Anderson, you would agree with me that's a very

22  different story than the trained boxer punching you in the

23  eye, right?

24  A    Correct.

25  Q    Now, following this supposed incident with Cory, you

A. Anderson - cross - Cecutti                549

1   didn't call 911, right?

2   A    No.

3   Q    Or the police?

4   A    No.

5   Q    And after you left the hospital, you returned to live

6   with him at the Rosedale house, correct?

7   A    I did.

8   Q    You didn't end your relationship with him?

9   A    No, I was still trying.

10  Q    And you did not move into your mother's house?

11  A    No.

12  Q    Or either house that your sisters lived in, correct?

13  A    Correct.

14  Q    Now, in the summertime, July of 2017, you also went to

15  Jamaica Hospital, correct?

16  A    Correct.

17  Q    And that was after -- you testified yesterday -- that

18  Cory breaking your leg?

19  A    Correct.

20  Q    You were examined by a doctor?

21  A    Correct.

22  Q    And you told the doctor that you had some pain in your

23  right leg, right?

24  A    Yes.

25  Q    And you told him or her that's -- that you have pain in

1   your leg because a small ladder fell on it, right?

2   A    Correct.

3   Q    Five days earlier, correct?

4   A    Days earlier, yes, I don't know the number.

5   Q    On a Friday evening, a small ladder fell on your right

6   leg, right?

7   A    That's what I said, yes.

8   Q    That's very different than what you told the jury

9   yesterday in terms of how you fractured your leg, right?

10  A    Yes.

11  Q    Now, your testimony is that Cory broke your leg?

12  A    Yes.

13  Q    And you didn't call 911, right?

14  A    No.

15  Q    And you didn't call the police?

16  A    No.

17  Q    And after he supposedly broke your leg and you went to

18  the hospital, you returned to live with him at the Rosedale

19  house, right?

20  A    I did.

21  Q    You didn't end the relationship?

22  A    No.

23  Q    And you didn't move out of the Rosedale house into your

24  mother's house, right?

25  A    No.

A. Anderson - cross - Cecutti                551

1   Q    Or any of your sisters', correct?

2   A    Correct.

3   Q    Now, there was an incident that happened several months

4   later on January 27, 2018, when you did call 911.

5            Do you remember that?

6   A    Yes.

7   Q    And -- one moment.

8            And I believe you testified yesterday that

9   Cory punched you on both sides of your face, right?

10  A    I didn't say that.

11  Q    He choked you?

12  A    He did.

13  Q    He punched you?

14  A    He did.

15  Q    Grabbed a knife and threatened to kill you?

16  A    He did.

17  Q    And also threatened to kill T, right?

18           THE COURT:  Mr. Cecutti, T.

19           MR. CECUTTI:  I'm sorry.  T.

20  Q    He threatened to kill T, right?

21  A    Correct.

22  Q    And T wasn't living there, correct?

23  A    He was but he was outside the home at that moment, yes.

24  Q    And you also testified, I believe, that Cory threw you

25  against the wall?

A. Anderson - cross - Cecutti                552

1    A    Correct.

2    Q    And all this happened while you were pregnant?

3    A    Correct.

4    Q    The police came?

5    A    Correct.

6    Q    They interviewed you?

7    A    Yes.

8    Q    You told them what happened?

9    A    Yes.

10   Q    And you told them that Cory was capable of killing you,

11   right?

12   A    Yes.

13   Q    And killing your children?

14   A    Correct.

15   Q    And that Cory was violent and constantly jealous of

16   you, right?

17   A    Yes.

18   Q    And that there was increasing violence in the home

19   because of Cory, right?

20   A    Yes.

21   Q    And when you were being interviewed, police officers

22   took photos of you?

23   A    I don't remember but possibly, yes.

24   Q    You remember Cory being arrested?

25   A    I do.

A. Anderson - cross - Cecutti        553

1   Q    And he was released the next day?

2   A    Correct.

3   Q    Without any bail, correct?

4   A    Right.

5   Q    He returned home?

6   A    Yes.

7   Q    You were there?

8   A    Yes.

9   Q    Now, you never sought medical treatment, correct?

10  A    No.

11  Q    You didn't go to the hospital?

12  A    No.

13  Q    You didn't go to the hospital for yourself, right?

14  A    No.

15  Q    Or your baby?

16  A    No.

17  Q    And you didn't end the relationship with Cory, correct?

18  A    I couldn't, no.

19  Q    And you didn't move out either?

20  A    No.

21  Q    Now, you also claim that Cory threatened T with a gun,

22  right?

23  A    Correct.

24  Q    And Cory put a gun in T's mouth, correct?

25  A    Right.

A. Anderson - cross - Cecutti                554

1   Q    And that Cory said that he would blow T's brains out,
2   right?
3   A    Right.
4   Q    Now, whenever this happened, you never called the
5   police, correct?
6   A    No.
7   Q    You never moved out either, right?
8   A    No.  I sent my son to go live outside the home.
9   Q    I'm asking what you did.
10  A    Yes, I sent T to go live with my sister.
11  Q    You didn't go move in with your sister, right?
12  A    No.
13  Q    Either one of them?
14  A    No.
15  Q    You didn't call 911?
16  A    No.
17  Q    Now, your testimony is that Cory sexually abused you
18  nearly every day, correct?
19  A    Yes.
20  Q    And, again, while you're living at the Rosedale House,
21  that's the time period, okay?
22  A    Yes.
23  Q    And that it's your testimony that Cory also raped you
24  nearly every day, right?
25  A    It happened often, it wasn't every day.

A. Anderson - cross - Cecutti                555

1   Q    Nearly every day, right?

2   A    It was often.

3   Q    And he sexually abused and raped you even when you were

4   pregnant?

5   A    Correct.

6   Q    And when he would sexually abuse or rape you, you

7   testified that he used objects?

8   A    He did.

9   Q    I believe you testified that he used a broomstick, a

10  hammer, liquor bottles, correct?

11  A    Correct.

12  Q    And you testified that you would be in pain and have

13  anal bleeding, correct?

14  A    Correct.

15  Q    And there was one occasion where he locked you in the

16  basement for three days and raped you repeatedly, right?

17  A    Correct.

18  Q    Now, in none of these incidents, you didn't call 911,

19  correct?

20  A    No.  I was scared of calling 911 on Cory.

21  Q    You never screamed and ran out of the house, correct?

22  A    Tried to but, yes, correct.

23  Q    You didn't call or text your mother?

24  A    No.  I didn't tell or call anybody.

25  Q    You didn't call or text your sisters?

A. Anderson - cross - Cecutti                556

1   A    I did not.

2   Q    Or any members of your family?

3   A    No.

4   Q    And you didn't go to the hospital either?

5   A    No.

6   Q    And you didn't leave Cory Martin, correct?

7   A    I did not.

8   Q    In fact, despite being raped and sexually abused as

9   frequently as you've described, you never once went to the

10  hospital, right?

11  A    No.

12           THE COURT:  Mr. Cecutti, I think this is probably

13  a good time for a break.

14           MR. CECUTTI:  Okay.

15           THE COURT:  So we'll pause for now.  I think it

16  will be about 15 minutes.

17           Please don't talk about the case at all, but just

18  take a little time to stretch your legs.

19           THE COURTROOM DEPUTY:  All rise.

20           (Jury exits the courtroom.)

21           THE COURT:  All right.  Everybody can have a seat.

22           Ms. Anderson, you can step down.

23           THE WITNESS:  Okay.

24           THE COURT:  Do you want to help Ms. Anderson down,

25  please.

1           (Witness steps down.)

2           THE COURT:  All right.  We'll be in recess until

3    just a little bit past noon.

4           (Brief recess taken.)

5           (In open court; jury not present.)

6           THE COURTROOM DEPUTY:  All rise.

7           THE COURT:  Everybody can sit.

8           We're going to have the witness take the stand.

9           (Witness resumes the witness stand.)

10          THE COURTROOM DEPUTY:  All rise.

11          (Jury enters the courtroom.)

12          THE COURTROOM DEPUTY:  You may be seated.  The

13   witness is reminded she is still under oath.

14          THE COURT:  All right.  We're ready to proceed,

15   everybody.

16          Mr. Cecutti, go ahead.

17          MR. CECUTTI:  Thank you.

18   BY MR. CECUTTI:

19   Q    Ms. Anderson, while you, Cory, and Brandy were living

20   together at the Rosedale house in 2017 and 2018, you texted

21   with Cory, right?

22   A    I did.

23   Q    And I want to go through -- I have some questions for

24   you regarding those text messages.  Do you remember sending

25   Cory a text on November 25, 2017 stating:  "You are the love

A. Anderson - cross - Cecutti                558

1   of my life"?

2   A    I don't recall that but that sounds like me because I

3   did love him.

4   Q    But you don't remember sending it, right?

5   A    No.

6   Q    So I want to show you what's been marked as

7   Government Exhibit 405, it's not in evidence, line 294, just

8   for the witness.

9           And, Ms. Anderson, please look at your screen,

10  at the highlighted portion, and let me know when you're

11  done.

12           Can you see that?

13       THE COURT:  I think it's got to be moved over.

14       Do you see the portion that's highlighted in

15  green?

16       THE WITNESS:  I do.

17  BY MR. CECUTTI:

18  Q    And, Ms. Anderson, do you remember texting Cory on

19  November 25, 2017:  "You're the love of my life"?

20  A    Yeah.

21  Q    Do you remember texting him the next day on

22  November 26, 2017 stating:  "Get fat so you can fuck me good

23  when you reach daddy"?

24  A    I don't recall that.  Can you show it to me?

25  Q    Yes.  I'll show you what's been marked as

A. Anderson - cross - Cecutti          559

1    Government Exhibit 405, again, it's not in evidence, line

2    463.

3    A    Yes, I do.

4    Q    You remember sending that text?

5    A    I don't remember but I see it, yes.

6    Q    And do you remember, on the same day, sending Cory a

7    text stating:  "I went to bed smiling with a pajama full of

8    prissy juice thinking good shit"?

9    A    Yes, I see it.

10   Q    Do you remember sending that to Cory?

11   A    I don't, but I see it.

12   Q    You texted him that, correct?

13   A    Yes.

14   Q    And do you remember sending him a text on that same

15   day, November 26, 2017, stating:  "I love that you're

16   sharing this pregnancy with me, daddy, LOL, you fatty"?

17   A    I don't see that here.

18   Q    I want to show you the same --

19            THE COURT:  Did you say you didn't see it?

20            THE WITNESS:  I don't see --

21            THE COURT:  It's not on the screen.

22            MR. CECUTTI:  Can you see it now?

23            THE COURT:  It's got the 490 before it.

24            THE WITNESS:  Okay.  I see that.

25            Yes, I see it.

A. Anderson - cross - Cecutti                 560

1   BY MR. CECUTTI:

2   Q    And you sent the text to Cory:  "I love that you're

3   sharing this pregnancy with me daddy, LOL, you fatty"?

4   A    I see it, yes.

5   Q    And that was on November 26, 2017, right?

6   A    Correct.

7   Q    Now, do you remember sending him texts the next day on

8   November 27, 2017 stating:  "I know ya dick hard for me

9   right now.  Licking my lips"?

10  A    I don't see that in front of me.

11                    Correct, I see it.

12  Q    You sent those text messages to him?

13  A    Yes.  I see it.

14  Q    And do you remember sending him texts on

15  November 26, 2017:  "I'm in love with the greatest man in

16  the world"?

17  A    I don't see that here in front of me.

18  Q    Can you see it on your screen now?

19  A    Yes.

20  Q    And you sent Cory that text, right?

21  A    Correct.

22  Q    Now, on December 3rd, 2017, do you remember sending him

23  texts:  "Let's just keep planning our future.  I love you.

24  I'm so in love with this little girl and she not here yet

25  because I'm so madly in love with her daddy"?

A. Anderson - cross - Cecutti                561

1                    Do you remember sending that?

2    A    Can you show me?

3    Q    Yes.  Directing you to 818 and 819.

4    A    Yes, I say it because he made me feel special.  Yes,

5    this is when things were good.

6    Q    And this is -- you sent these text messages to Cory

7    after nearly a year living at the Rosedale house, correct?

8    A    Correct.

9    Q    And nearly a year of being beaten and raped nearly

10   every day, correct?

11   A    Correct.

12   Q    Now, do you remember sending him text messages on

13   January 21st, 2018?

14   A    Can you show me?

15   Q    Yes.  Stating:  "I want to be the best and only woman

16   for you.  You make me feel young and beautiful every time

17   you look at me and I can't wait to grow old with ya handsome

18   ass"?

19   A    Yes, I see it.

20   Q    And you sent that text message to him?

21   A    Yes.

22   Q    And do you remember sending him a text message on

23   February 3rd, 2018 stating:  "I could never imagine losing

24   you"?

25   A    Can you scroll down to that?

A. Anderson - cross - Cecutti                562

1              I see it.

2   Q    You sent that text message, correct?

3   A    Correct.

4   Q    And do you remember sending him a text message on

5   February 13, 2018, stating:  "Don't worry, I'mma feed you

6   good and let you fuck me just as good when I get home"?

7              Do you remember sending that text?

8   A    Can you show me?

9   Q    Can you see that, line 2830?

10  A    Yes, I see it.

11  Q    You sent that text to Cory on February 13, 2018?

12  A    Yes.

13  Q    And you sent this text and the other texts after having

14  been, according to you, sexually assaulted over and over by

15  Cory with broomsticks, bottles, and hammers?

16  A    He would apologize, yes, but I would still take him

17  back.  Yes, I would.

18  Q    So the answer is yes, correct?

19  A    Correct.

20  Q    And do you remember sending him a text message on

21  March 1st, 2018, stating:  "Don't let nothing fuck up our

22  joy"?

23  A    Can you show me?

24  Q    Yes.  Directing you to 3421.

25              Can you see that, Ms. Anderson?

A. Anderson - cross - Cecutti                563

1   A    Yes, I see it.

2   Q    And you sent that message to Cory on March 1st, 2018,

3   correct?

4   A    I said that to him, yes, because he was pissed off that

5   he had to leave the birth of our daughter to go to court for

6   our DV situation.

7   Q    Now, I want to --

8        MR. CECUTTI:  Thank you, Mr. Gover.

9   Q    Yesterday, you testified that soon after moving into

10  the Rosedale house, Cory established rules that you needed

11  to follow, right?

12  A    Correct.

13  Q    And when he told you this, you didn't leave the

14  Rosedale house, correct?

15  A    No.

16  Q    You didn't go live with your mother, correct?

17  A    No.

18  Q    Or your sisters, right?

19  A    No.

20  Q    One of the rules, according to you, is that you had to

21  be naked in the house?

22  A    Correct.

23  Q    And another rule is you had to call Cory daddy,

24  correct?

25  A    Correct.

A. Anderson - cross - Cecutti                    564

1    Q    And you previously told the Government that this made

2    you very uncomfortable, right?

3    A    No, I did not say that.

4         MR. CECUTTI:  Your Honor, may I approach?

5         THE COURT:  Yes.

6    Q    Ms. Anderson, please take a look at this, just the

7    highlighted portion, and let me know when you're done.

8    A    Okay.

9    Q    Do you remember telling the Government that you were

10   required to call Cory daddy and that made you uncomfortable?

11   A    I see that here, yes.

12   Q    You remember saying that?

13   A    I don't remember saying that.

14   Q    Now, another rule was that Cory controlled what you

15   ate, right?

16   A    Yes.

17   Q    He monitored the food?

18   A    Yes.

19   Q    Now, do you remember sending him a text message on

20   February 16, 2017, asking him if he defrosted the meat and

21   telling him to season it?

22   A    Can you show me?

23   Q    Yes.  I'll show you what's been marked as

24   Government Exhibit 402, which is not in evidence, page 147.

25        MR. CECUTTI:  And maybe, Mr. Gover, if you could

A. Anderson - cross - Cecutti          565

1  highlight the relevant messages.

2  Q    Okay.  Ms. Anderson, can you see those highlighted

3  messages that are in green?

4  A    Yes.

5  Q    Can you read them to yourself?

6  A    Okay.

7  Q    And after looking at those highlighted green messages,

8  do you remember asking Cory on February 16, 2017, if he

9  defrosted the meat and telling him to season it?

10 A    Yes, because we were speaking about dinner.  Yes.

11 Q    Now, do you remember sending him a text message on

12 December 2nd, 2017, telling Cory to season the meat heavy

13 and to also add onions?

14 A    Can you show me?

15 Q    Yes.  It's the same exhibit, Government Exhibit 402,

16 again not in evidence -- I'm sorry, Government Exhibit 405,

17 lines 751 to 758.

18          Ms. Anderson, can you see the highlighted

19 green text?

20 A    I do.

21 Q    Please take a look at it and let me know when you're

22 finished.

23 A    Okay.

24 Q    Do you remember sending a text on December 2nd, 2017 to

25 Cory telling him to season the meat heavy and to also add

A. Anderson - cross - Cecutti                    566

1   onions?

2   A    I do, and this is when things were still good between

3   us.

4   Q    Now, do you remember sending him a text message on

5   December 30, 2017, telling Cory to soak the red beans for

6   you?

7   A    Can you show me?

8   Q    Yes.  I'm going to show you what's been marked as

9   Government Exhibit 405, it's not in evidence, line 1872.

10                  Can you see that on your screen, Ms. Anderson?

11  A    Yes.

12  Q    Can you read it to yourself, please.

13  A    Yes.

14  Q    And do you remember sending this text message to Cory

15  on December 30, 2017, asking him to soak the red beans?

16  A    Yes, I see it.

17  Q    You sent that text, correct?

18  A    I did.

19  Q    Now, do you remember sending him a text message on

20  February 9, 2018 telling Cory that you were at Henrica's

21  getting some lo mein and that you and him could eat that

22  with the fish?

23  A    Can you show me?

24  Q    Yes.  It's the same exhibit, directing you to 2791 and

25  92, can you read that highlighted green text to yourself,

A. Anderson - cross - Cecutti                567

1  please.

2  A    Okay.

3  Q    And do you remember sending that -- those text messages

4  on February 9, 2018, to Cory telling him that you were at

5  Henrica's getting some lo mein and that you and him could

6  eat that with the fish?

7  A    I said we.  I was talking about the whole house, but,

8  yes, I see it.  I didn't say me and Cory.  I said we.

9  Q    So you, Brandy, and Cory?

10 A    Correct.

11        MR. CECUTTI:  Thank you, Mr. Gover.

12 Q    I want to switch topics and discuss your MCU account,

13 okay?

14 A    Okay.

15 Q    Now, you testified yesterday about a claim that you

16 reported to the NYPD about money being stolen from your MCU

17 account?

18 A    It wasn't a claim to the NYPD.  It was a claim to the

19 bank.

20        THE COURT:  I'm sorry.  I didn't hear what you

21 said.  A claim to what?

22        THE WITNESS:  It was a claim to the bank, not law

23 enforcement.

24 Q    You never -- you never made a claim or a report to the

25 NYPD about stolen money from your FMCU account?

A. Anderson - cross - Cecutti                568

1  A    I don't recall.  No, I don't remember unless you show
2  me.
3          MR. CECUTTI:  Your Honor, may I approach?
4          THE COURT:  Yes.
5  Q    Ms. Anderson, please take a look at this document
6  focusing on the highlighted portion.
7  A    Okay.
8  Q    Do you remember making --
9          MR. CECUTTI:  Your Honor, may I approach?
10          THE COURT:  Yes.
11          MR. CECUTTI:  Do you still need it?
12          THE WITNESS:  If you want to ask more questions.
13          MR. CECUTTI:  I'll leave it here.
14  BY MR. CECUTTI:
15  Q    Ms. Anderson, do you remember making a claim to the
16  NYPD about money being stolen from your MCU account?
17  A    I do not remember making the claim, but I do see the
18  document.
19  Q    You don't remember filing a complaint that money was
20  stolen from your account?
21  A    I do, but to the bank is what I remember.
22  Q    That was a false claim, correct?
23  A    Yes, because that's what Cory wanted me to do.
24  Q    You lied to the bank?
25  A    I did.

A. Anderson - cross - Cecutti                    569

1    Q    And what did you tell the bank?

2    A    I told them that I had lost my car.

3    Q    And that was not true, correct?

4    A    I don't know.  I think I did lose my car at that time.

5    Q    What else did you tell them?

6    A    I don't know.

7    Q    You don't remember talking to the bank?

8    A    I do, but I don't exactly remember the conversation.

9              THE COURT:  Do you remember the substance of it?

10             THE WITNESS:  Yes.

11             THE COURT:  Why don't you tell us sort of

12   generally what you remember.

13             THE WITNESS:  That I wanted to put in a claim.

14   Q    For stolen money?

15   A    Correct.

16   Q    And so, you were claiming to be -- and -- withdrawn.

17   Money that was purportedly stolen from your account?

18   A    Correct.

19   Q    So you were claiming to be a victim of a crime, right?

20   A    Correct.

21   Q    When, in fact, you were not?

22   A    Correct.

23             MR. CECUTTI:  Your Honor, may I approach?

24             THE COURT:  Yes.

25   Q    Now, I want to direct your attention to your MCU bank

A. Anderson - cross - Cecutti          570

1  statement from about a year later on April 5, 2018.

2        MR. CECUTTI:  And, Mr. Gover, if you could pull up

3  Government Exhibit 132, page four, which is in evidence.

4        Okay.  If we could highlight the transactions on

5  April 5th, please.  Can we enlarge them, as well, please.

6  Q    Okay.  Ms. Anderson, do you see those two transactions?

7  A    I do.

8  Q    And they are from April 5, 2018, right?

9  A    Correct.

10 Q    And you talked about one of them yesterday, the Walmart

11 transaction?

12 A    Correct.

13 Q    And that Walmart transaction was for purchases that

14 totaled $140.13?

15 A    Correct.

16 Q    And this happened supposedly after Cory picked you up

17 after he killed Brandy you went to Walmart?

18 A    Correct.

19 Q    And this was also after you got your biscuits and other

20 food that you really wanted from Red Lobster, correct?

21 A    Correct.

22 Q    And you bought cleaning supplies, eggs, food, and a

23 Shark vacuum, right?

24 A    Correct.

25 Q    And you bought these things to clean the house and get

A. Anderson - cross - Cecutti                    571

1   rid of evidence, correct?

2   A    Correct.

3   Q    Now, before this Walmart purchase, you made another

4   purchase, correct?

5   A    Correct.

6   Q    And that was a purchase at Gucci?

7   A    Correct.

8   Q    You made that purchase?

9   A    I did.

10  Q    And that was for $348.40?

11  A    Correct.

12       MR. CECUTTI:  You can take that down.  Thank you.

13  Q    Now, your testimony is that Cory Martin cleaned the

14  Rosedale house to get rid of evidence of Brandy Odom's

15  murder, right?

16  A    We both did, yes.

17  Q    And your testimony is that Cory opened the window of

18  Brandy's room to throw off the time of death?

19  A    Correct.

20  Q    And he got the Nissan detailed to remove DNA from the

21  trunk?

22  A    Correct.

23  Q    And you both took extra showers?

24  A    Correct.

25  Q    And you vacuumed carpets, correct?

A. Anderson - cross - Cecutti                572

1    A    Right.

2    Q    Now, you've known Cory since high school, correct?

3    A    I have.

4    Q    He didn't graduate high school, correct?

5    A    No.

6    Q    And he didn't go to college, correct?

7    A    No.

8    Q    He doesn't have any degrees in biology?

9    A    No.

10   Q    Chemistry?

11   A    No.

12   Q    Masters degrees in those subjects?

13   A    No.

14   Q    He doesn't have, to your knowledge, any specialized

15   training from the NYPD on crime scene investigations?

16   A    No.

17   Q    Or forensics, right?

18   A    Right.

19   Q    Your testimony is that he watched some T.V. shows, The

20   First 48 and Dexter, and he learned about police tactics?

21   A    Yes.

22   Q    And he learned about looking for blood?

23   A    These were one -- some of the things that he watched it

24   for.

25   Q    And he watched these shows to be able to clean up the

A. Anderson - cross - Cecutti                573

1   Rosedale house and the Nissan and not leave any evidence?

2   A    It was more so for prepping and training me.  It was

3   less for him and more for me.

4   Q    So all of the knowledge that you and him gained about

5   cleaning up the entire Rosedale house and leaving no

6   forensic evidence came from a couple of T.V. shows, right?

7   A    No, it did not all come from a couple of T.V. shows.

8   Q    Did you read medical books?

9   A    No.

10  Q    Did you go to any classes?

11  A    No.

12  Q    Watch any YouTube videos on biology or chemistry or

13  DNA?

14  A    No.

15  Q    The only thing that you and Cory did was watch a couple

16  of T.V. shows, right?

17  A    No.

18  Q    What else did you do?

19  A    We talked.

20  Q    You talked?

21  A    Yes.

22  Q    And shared your -- your cumulative knowledge about

23  forensic evidence?

24  A    No.  He was prepping me on what to say and the alibi

25  and things to say and to not say.

A. Anderson - cross - Cecutti                    574

1   Q    And the only source of that came from two T.V. shows,

2   right?

3   A    No.

4   Q    No medical books, right?

5   A    No.

6   Q    No medical classes, correct?

7   A    No.

8   Q    No forensic classes?

9   A    No.

10  Q    Nothing but Dexter and First 48, right?

11  A    No.

12  Q    Now, after Cory supposedly killed Brandy, according to

13  your story, some time passed before he started dismembering

14  her, correct?

15  A    Correct.

16                 (Continued on the following page.)

17

18

19

20

21

22

23

24

25

575

1  BY MR. CECUTTI:   (Continuing)

2  Q    He waited a few days before he started to cut up Brandy's

3  body, according to you?

4  A    Yes.

5  Q    Now, in meeting with the government, you also told the

6  government that Brandy's body was in the house for 3 to 5 days

7  before Cory started to dismember it.

8         Do you remember that?

9  A    I don't remember that.  Can you show me?

10 Q    Sure.  Ms. Anderson, please take a look at that, the

11 highlighted portion.  Please let me know when you're finished.

12 A    Okay.

13 Q    Do you remember telling the government on August 8, 2023,

14 that Brandy's body was in the house for 3 to 5 days before

15 Cory started to dismember it?

16 A    Yes.  And I said that in the context of from I knew the

17 minute he had killed her, when he told me that to when I came

18 back to the house.

19        MR. CECUTTI:  Your Honor, may I approach?

20        THE COURT:  Yes.

21        MR. CECUTTI:  I'm sorry I didn't ask the last time.

22        THE COURT:  That's all right.

23 Q    Ms. Anderson, I want to talk to you about your

24 cooperation agreement with the government.

25 A    Okay.

576

1  Q    On September 30, 2021 you pled guilty to crimes involving
2  fraud?
3  A    I did.
4  Q    And you also pled guilty to murder for hire?
5  A    I did.
6  Q    And you pled guilty to these crimes as part of your
7  cooperation agreement with the government, right?
8  A    I did.
9  Q    And you're facing 20 years in prison for one of the fraud
10 offenses?
11 A    Yes.
12 Q    And 20 years on the other fraud offense, right?
13 A    Correct.
14 Q    And you're facing mandatory life in prison for the murder
15 for hire offense, right?
16 A    Correct.
17 Q    And that means spending every single day in prison for
18 the rest of your life, correct?
19 A    Correct.
20 Q    It means dying in prison, right?
21 A    Possibly, correct.
22 Q    And by getting a cooperation agreement with the
23 government you may be able to avoid a life sentence, right?
24 A    Correct.
25 Q    Now, to get a cooperation agreement you need to provide

577

1    what's called substantial assistance, right?

2    A    No.  I need to tell the truth and have accurate

3    information.

4    Q    You need to tell the truth on Cory, correct?

5    A    No.  Tell the truth about everything.

6    Q    And you haven't told the truth to the government about

7    everything, all the time, right?

8    A    I have not.

9    Q    And if you didn't tell the truth you wouldn't be able to

10   get a cooperation agreement, correct?

11   A    Correct.

12        THE COURT:  Do you mean a 5K letter or cooperation

13   agreement?

14        MR. CECUTTI:  Cooperation agreement.

15   Q    Ms. Anderson, you don't want to go to prison for the rest

16   of your life, correct?

17   A    Correct.

18   Q    And be away from your kids forever?

19   A    Correct.

20   Q    And lose your freedom forever?

21   A    Correct.

22   Q    And you're willing to do anything to get the 5K letter,

23   correct?

24   A    No.

25   Q    Now, you get the 5K letter from the government?

578

1    A    Correct.

2    Q    Not from anyone else but the government, correct?

3    A    Correct.

4    Q    And the government decides if you get the 5K letter?

5    A    Yes.

6    Q    And to get the 5K letter you need to tell the truth,

7    right?

8    A    Correct.

9    Q    And it's the government who decides if you've told the

10   truth, right?

11   A    No.  It was the government that decides if they write the

12   5K letter.

13   Q    And to get the 5K letter you need to tell the truth?

14   A    Correct.

15   Q    And the government decides if you've told the truth,

16   right?

17   A    Yes.

18   Q    So if the government believes what you've said, you get a

19   5K letter, correct?

20   A    No.

21   Q    If they believe what you say?

22   A    No.

23   Q    If you tell the truth -- withdrawn.  If you tell the

24   truth, Ms. Anderson, but the government doesn't believe you,

25   you don't get a 5K letter, correct?

579

1   A    It has nothing to do with whether they believe me, but if

2   I'm being honest, truthful, and accurate.

3   Q    If you're truthful and accurate but they don't believe

4   you, you don't get a 5K letter, right?

5   A    I don't know.

6   Q    If you lie to them, if you lie, but they believe you, if

7   you convince them, then you get a 5K letter, right?

8   A    No.  No.

9   Q    If you tell the truth but they don't believe you, you

10  don't get a 5K letter?

11          MS. DEAN:  Objection.

12  A    Say that again.

13          THE COURT:  Overruled.

14  Q    If you tell the truth, Ms. Anderson, but they don't

15  believe you, you don't get a 5K letter, right?

16  A    I don't know.

17  Q    Who gives you the 5K letter?

18  A    The government.

19  Q    So we got that point established.  The government gives

20  you the 5K letter.

21          Now, if you don't tell the truth but they believe

22  you, you can get a 5K letter, right?

23  A    I don't understand what you're saying.

24  Q    You agree with me that they're the ones that give you the

25  5K letter, correct?

580

1    A    Correct.

2    Q    Now, if you tell the truth and they believe you, you get

3    a 5K letter, right?

4    A    It's not based on if they believe me or not.

5    Q    Don't they decide if you've told the truth or not?

6    A    They don't decide.

7    Q    How do you get the 5K letter?

8    A    It's based off of me being honest and accurate.

9    Q    To who?

10   A    To the government about my involvement in this case.

11   Q    And if you don't tell the truth, what happens?

12   A    I don't get a 5K letter.

13   Q    And if you lie to them what happens?

14   A    I don't get a 5K letter.

15   Q    And if you tell the truth you get a 5K letter?

16   A    Correct.

17   Q    Now, if you don't tell the truth but they believe you're

18   telling the truth, you can still get a 5K letter, right?

19   A    No.

20   Q    Now, you have to tell the truth in order to get a 5K

21   letter, correct?

22   A    Correct.

23   Q    And you have to be truthful and accurate and honest in

24   all of your meetings, correct?

25   A    Yes.

581

1    Q     And lying to the government is also a crime?

2    A     It is.

3    Q     And if you lie to the government, then they can rip up

4    your cooperation agreement, correct?

5    A     Yes.

6    Q     And then you would be stuck with your guilty plea, right?

7    A     Correct.

8    Q     And that would mean spending the rest of your life in

9    prison, correct?

10   A     Correct.

11   Q     Now, you had a recent meeting with the government in

12   early February, right, of this year?

13   A     Yes.

14   Q     And they confronted you, correct?

15   A     Correct.

16   Q     And when they confronted you it was revealed that you had

17   been lying to them, correct?

18   A     Correct.

19   Q     You told them in that meeting, in early February, that

20   you agreed with Cory to kill your ex, Alex Villard, the father

21   of your son, correct?

22   A     Yes.

23   Q     And you also told the government that you took out life

24   insurance policies on your own children, correct?

25   A     No.

582

1    Q    You never told them that?

2    A    No.

3    Q    You've never told the government that you agreed to take

4    out life insurance policies on your own children?

5    A    No.  On one, yes.  But not my children.

6    Q    On Z?

7    A    Yes, because I was forced to.  Yes, I did.

8    Q    But you hadn't told them that until very recently,

9    correct?

10   A    I had not, because it was too painful.

11   Q    But it wasn't too painful to tell them about Brandy,

12   right?

13   A    Right.

14   Q    You were hoping to withhold some information from the

15   government, correct?

16   A    No.

17   Q    You were hoping to be able to get through this process

18   without telling them about the life insurance policy related

19   to Z or Alex?

20   A    Correct.

21   Q    You wanted to keep that information to yourself, correct?

22   A    I don't know.

23   Q    But the government confronted you?

24   A    Yes.

25   Q    Now, you agree that you were not fully truthful with the

583

1  government, correct?

2  A    Correct.

3  Q    You lied, right?

4  A    I did.

5  Q    Now, based upon the terms of your agreement, doesn't that

6  mean it's over, the cooperation agreement gets ripped up and

7  you're stuck with your guilty plea?

8  A    Correct.

9  Q    But that didn't happen here, right?

10  A    No.

11  Q    So instead of the government ripping up your agreement,

12  they gave you a new one, right?

13  A    Correct.

14  Q    And you just continued your cooperation, correct?

15  A    I had to plead guilty to conspiracy for murder for hire.

16  Q    Another crime you had to plead guilty to?

17  A    Yes.

18  Q    And you pled guilty pursuant to this new agreement with

19  the government on February 9th of this year, right?

20  A    Correct.

21  Q    And you mentioned that this new agreement contains this

22  new crime where you admitted to agreeing with Cory to kill

23  your ex, Alex Villard, right?

24  A    Yes.

25  Q    And you're now facing instead of life plus 40 years,

584

1   you're facing life plus 50 years, right?

2   A    Correct.

3   Q    And as part of this new cooperation agreement, you needed

4   to waive statute of limitations, right?

5   A    Correct.

6   Q    And that's because you actually can't be prosecuted for

7   that crime today as too much has passed, right?

8   A    Right.

9   Q    So you pled guilty to a new crime that you actually can't

10  be prosecuted for?

11              MS. DEAN:  Objection.

12              THE COURT:  Sustained.

13  A    Correct.

14              THE COURT:  You don't have to answer it.  The answer

15  is stricken.  The objection is sustained.

16  Q    Now your agreement with the government requires you to

17  not tell anyone about your cooperation, correct?

18  A    Correct.

19  Q    You need the government's consent before you tell a

20  single person, right?

21  A    Correct.

22  Q    And you violated that provision of this agreement,

23  correct?

24  A    I did.

25  Q    You had a meeting with the government on July 6, 2021,

585

1    correct?

2    A    I don't know.

3    Q    Do you remember a meeting in 2021, in the summer, where

4    the government confronted you about your disclosure of your

5    cooperation to other people?

6    A    I do not know.  Can you show me?

7    Q    Sure.

8            MR. CECUTTI:  Your Honor, may I approach?

9            THE COURT:  Yes.

10   Q    Ms. Anderson, please take a look at the document and

11   focus on the highlighted portion, please.

12   A    Okay.

13   Q    Have you finished looking at it?

14   A    I have.

15   Q    Do you remember meeting with the government, July, summer

16   of 2021, about your disclosure of your cooperation to others?

17   A    No.

18   Q    You don't remember telling Maggie, your friend, about

19   your cooperation?

20   A    Not in this meeting, no.  That was not this meeting.

21   Q    But the purpose of that meeting was to talk about your

22   disclosure of your cooperation, correct?

23   A    That was not the purpose of this meeting.

24   Q    You don't disagree with me that you've disclosed your

25   cooperation to other people in violation of your agreement,

586

1    correct?

2    A    Maggie, yes, a person.  Yes, I have to her.

3              THE COURT:  His question was, did you tell other

4    people?  Did you tell anyone besides Maggie?

5              THE WITNESS:  No.

6    Q    And the government confronted you when they learned that

7    you had disclosed your cooperation to Maggie, right?

8    A    You said what?

9    Q    The government confronted you when they learned that you

10   had disclosed your cooperation to Maggie, right?

11   A    Yes.

12   Q    And, again, that was in violation of your agreement,

13   correct?

14   A    It was.

15   Q    And, Ms. Anderson, you violated your cooperation

16   agreement multiple times, right?

17   A    Twice, yes.

18   Q    And the government hasn't ripped up your agreement,

19   right?

20   A    No.

21   Q    They've just given you another one, correct?

22   A    Yes.  I had to plead to more charges, yes.

23   Q    And you're still hoping that the government writes a 5K

24   letter for you, correct?

25   A    Correct.

587

1    Q    So that you can avoid a life sentence, right?

2    A    Correct.

3    Q    And actually not go to jail at all, right?

4    A    Correct.

5    Q    For being involved in the brutal killing of your close

6    friend, someone you loved and cared for and considered as a

7    sister, right?

8    A    Yes.

9    Q    And continuing to, as you put it yesterday, feel free and

10   be your own woman, right?

11   A    Repeat that.

12   Q    My question to you was, you're hoping to not go to jail

13   so that you, as you put it yesterday, could continue to be,

14   continue to feel free and be your own woman, right?

15   A    Yes.  I do not want to go to jail and I do feel free now

16   that I'm not with Cory.

17   Q    I want to talk to you about your friend, Maggie Jones.

18   Okay?

19   A    Okay.

20   Q    Are you still friends?

21   A    No.

22   Q    You're not, right?

23   A    No.

24   Q    There's problems and a conflict between the two of you,

25   correct?

588

1    A    Not necessarily, but we don't speak.

2    Q    You don't speak because you've committed crimes against

3    her recently, right?

4    A    I have not.

5    Q    You've committed crimes since you started cooperating

6    with the government, right?

7    A    No.

8    Q    You committed crimes last year in 2023, right?

9    A    No.

10   Q    Now you and Maggie used to work together, correct?

11   A    Refer to -- can you define working together?

12   Q    As home health aids.

13   A    Correct.

14   Q    And in mid December of last year, you had an argument

15   with her, correct?

16   A    Correct.

17   Q    And you threatened her, right?

18   A    I did not.

19   Q    You told her that she's going to die and that you will

20   run her down and hurt her, right?

21   A    No.

22   Q    And a complaint was filed against you with the NYPD,

23   right?

24   A    I don't know.

25   Q    Did you tell the government about that?

589

1   A    I did.

2   Q    That a complaint was filed against you by a Maggie Jones

3   for threatening her?

4   A    I told them about the dispute me and Maggie was going

5   through, yes, I did tell them that.

6   Q    You tell them that the NYPD has a complaint against you?

7   A    I don't know.

8   Q    You don't know if you told them that?

9   A    I don't know.

10          THE COURT:  I think the question is, do you know

11   that there's a NYPD complaint against you?

12          THE WITNESS:  I don't know.

13   Q    And you told Maggie Jones that she's going to die and

14   that you will run her down and hurt her, right?

15   A    I did not.

16   Q    Now, you live in public housing?

17   A    No.

18   Q    Do you live with your stepfather?

19          MS. DEAN:  Objection.

20          THE COURT:  I'm not sure what the relevance of

21   public housing is, but next question.

22   Q    You live with your stepfather?

23   A    I do not.

24   Q    Not currently?

25   A    No.

590

1    Q     Did you once live with your stepfather?

2    A     He once lived with me.

3    Q     And did you live in public housing at that time?

4          MS. DEAN:  Objection.

5          THE COURT:  Sustained.

6    A     I did not.

7          THE COURT:  You don't have to answer.

8    Q     Isn't it true, Ms. Anderson, that you told your son, T,

9    to falsely accuse a teacher at his school of choking him?

10   A     I did not.

11   Q     And that was so that you could file a lawsuit against the

12   teacher and the school and make money?

13         MS. DEAN:  Objection.

14         THE COURT:  Overruled.  Did that happen?

15         THE WITNESS:  No.  My son was assaulted by a dean at

16   the school, yes, and I filed a complaint against the school.

17   Q     Now, you've beaten T, right?

18   A     I have.

19   Q     And you beat him last year with a broomstick in his head?

20   A     I have not.

21   Q     You've beaten him though, correct?

22   A     I have.

23   Q     Have you told the government about that?

24   A     I don't know.

25   Q     You don't know if you told the government about whether

591

1   or not you've beaten your son?

2   A    Yes, when I was with Cory, yes.

3   Q    I'm talking about since your cooperation agreement.

4   A    No.

5   Q    You've also tried to commit car accident fraud by staging

6   accidents?

7   A    No.

8   Q    And last year you stole Maggie's laptop, right?

9   A    No.

10  Q    And her personal information was on that laptop, correct?

11  A    It was not.

12  Q    With that information you opened a Navy Federal Credit

13  Union account in Maggie's name without her knowledge, correct?

14  A    No.

15  Q    Now, you have said that Brandy Odom was your close

16  friend, right?

17  A    Correct.

18  Q    But in reality you didn't really like her, correct?

19  A    Not true.

20  Q    Now, Brandy was having sex with Alex Villard, correct?

21  A    I don't know.

22  Q    She was having sex with Alex in 2016?

23  A    I don't know.

24  Q    While you were pregnant with Z, correct?

25  A    I don't know.

592

```
 1            THE COURT:  Mr. Cecutti, you have to pay more
 2    attention to that.
 3    Q    When Brandy moved into the house with Cory, she began
 4    having sex with him, correct?
 5    A    No.
 6    Q    Do you remember an incident where your son, T, observed
 7    Brandy on her knees giving him oral sex?
 8    A    I do, and I did not believe my son.
 9    Q    And T told you, correct, what he had seen?
10    A    Yes, and I did not believe him.
11    Q    When Brandy was living with you at Cory's house, you had
12    fights with her, right?
13    A    Yes.
14    Q    On an ongoing basis?
15    A    No.
16    Q    And those fights that happened, Cory would break them up,
17    correct?
18    A    Sometimes.
19    Q    You've had a long history with Cory, right?
20    A    I have.
21    Q    Dated him in high school?
22    A    I have.
23    Q    Dated -- I'm sorry.  You stayed in contact with him
24    after?
25    A    Yes.
```

593

1   Q    Maintained a sexual relationship with him?

2   A    Yes.

3   Q    Even when you had other relationships, right?

4   A    Yes.

5   Q    Such as your relationship with Alex Villard?

6   A    Yes.

7   Q    And you left Alex Villard for Cory, right?

8   A    I did not.

9   Q    And when you moved into Cory's house at the end of 2016,

10  he proposed to you, correct?

11  A    He did.

12  Q    And you were excited when he did that, right?

13  A    I was.

14  Q    You were excited to build a life with him, right?

15  A    I was.

16  Q    But isn't it true that Brandy, after you learned that she

17  was having sex with him, wrecked it all?

18            MS. DEAN:  Objection.

19            THE COURT:  Overruled.  Is that true?

20            THE WITNESS:  No, it's not true.

21  Q    Now, in October of 2020 you and Cory were living in

22  New Jersey, right?

23  A    You said when?

24  Q    October of 2020.

25  A    Yes.

594

1    Q    You and Cory were living in New Jersey?

2    A    Yes.

3    Q    And just to go back a little bit in time, when you picked

4    him up at the airport in 2018, you paid for his plane ticket

5    to come home, right?

6    A    I don't know.

7            THE COURT:  I feel like you went over this already.

8            MR. CECUTTI:  Not that question.

9            THE COURT:  Okay.

10   Q    You don't remember paying for the plane ticket?

11   A    I'm not sure how he got back, but he got back.

12   Q    You've had a couple of residences with Cory from 2018 to

13   2020 in New Jersey, right?

14   A    Correct.

15   Q    And you put down the down payment for those apartments?

16   A    Yes.

17   Q    Now, in October of 2020, while you and Cory were living

18   in New Jersey, you were having problems in your relationship,

19   right?

20   A    We always had problems, and even after Brandy's murder it

21   never stopped.

22   Q    I'm just focusing on October of 2020.

23   A    We still had problems.

24   Q    And you would leave the house to go and work?

25   A    Say that again.

595

1    Q    You would leave the house for work?

2    A    Yes.

3    Q    And you would also leave the house at times to have sex

4    with other men, correct?

5    A    No.

6    Q    Now, during this time period you were talking with Maggie

7    Jones, right?

8    A    Correct.

9    Q    And you were talking with her about your problems with

10   Cory?

11   A    Yes.

12   Q    And your birthday, you went out on October 25, 2020,

13   right?

14   A    I don't know.

15   Q    You don't remember going out for your birthday?

16   A    I don't.

17   Q    In 2020?

18   A    I don't.

19   Q    You were with your friends, Patrica and Maggie and

20   others?

21   A    I was not.

22   Q    And that time period you didn't want to be in a

23   relationship with Cory, right?

24   A    I did not.

25   Q    And Maggie introduced you to a man named Demlin Campbell,

596

1    correct?

2    A    Correct.

3    Q    Around the time of your birthday, on October 25, 2020,

4    right?

5    A    Correct.

6    Q    And you met up with Demlin, correct?

7    A    Correct.

8    Q    You went to a hotel with him?

9    A    I did.

10    Q    You had sex with him throughout the day?

11    A    No.

12    Q    Didn't you testify yesterday that you had sex with Demlin

13    Campbell at a hotel?

14    A    Yes, but it wasn't throughout the day that you're

15    referring to.

16    Q    But you had sex with him, correct?

17    A    I did.

18    Q    And you connected with him, correct?

19    A    I did.

20    Q    And you told him about your problems with Cory?

21    A    I did not.

22    Q    You confessed to participating in Brandy's murder with

23    him, correct?

24    A    I did not.

25    Q    And you also asked him to kill Cory, correct?

597

1    A    I did not.

2    Q    Now after your time with Demlin at the hotel, you met up

3    with Maggie, correct?

4    A    No.

5    Q    You didn't meet up with Maggie and Detective Simmons?

6    A    I was at the hotel with D and they came, yes.

7    Q    So you're at the hotel with D; you had just had sex with

8    him, right?

9    A    Yes.

10   Q    And the next step was meeting up with Maggie and

11   Detective Simmons, correct?

12   A    I don't know what the next step was.

13   Q    The next thing that you did.

14   A    I met Detective Simmons.

15   Q    They came to the hotel?

16   A    Yes.

17   Q    And you left with them?

18   A    Yes.

19   Q    And you went immediately to the precinct, correct?

20   A    Correct.

21   Q    And this was about a week before your federal arrest?

22   A    Yes.

23   Q    And you were going to tell on Cory that he killed Brandy,

24   right?

25   A    Yes.

598

1  Q    And before doing that, you said to Detective Simmons and

2  the other detectives that you wanted reward money first,

3  right?

4  A    No.

5  Q    Didn't you say, Ms. Anderson, I'll talk with you about

6  that murder, but you got to pay me the reward money first?

7  A    Never said that.

8            (Continued on next page.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    (Continuing.)

2    BY MR. CECUTTI:

3    Q    At the start of the interview on October 29, 2020, you

4    said to the detectives, all four of them in the room, I want

5    to get out of this toxic relationship with Cory, right?

6    A    I don't know.  Can you show me?

7    Q    You don't remember saying that at all?

8    A    I don't.

9    Q    But at that time period, Ms. Anderson, you wanted to

10   get out of this toxic relationship with Cory, right?

11   A    I did.

12   Q    You wanted to move on in a different relationship,

13   right?

14   A    No.

15   Q    You wanted to --

16   A    I just didn't want to be with him.

17   Q    You wanted to move on potentially with Demlin Campbell,

18   correct?

19   A    No.

20   Q    Now, your testimony, Ms. Anderson, is that Cory

21   murdered Brandy, right?

22   A    Correct.

23   Q    About a few days before this happened, you left the

24   Rosedale house, correct?

25   A    I left the house.  I don't know how long in proximity.

A. Anderson - Cross - Mr. Cecutti                    600

1    I don't know how long.

2    Q    A couple of days?

3    A    I don't know.

4    Q    But you left the house and Cory and Brandy remained.

5    That's your testimony?

6    A    Yes, it is.

7    Q    And you went to your mother's house.

8    A    I did.

9    Q    And you stayed with her.

10   A    I did.

11   Q    And your other family, right?

12   A    Yes.

13   Q    And you wanted to enjoy the week or the few days with

14   your family, right?

15   A    Correct.

16   Q    They were meeting the baby.

17   A    Yes.

18   Q    And you were enjoying this time knowing that Brandy's

19   life was going to come to an end, correct?

20   A    Correct.

21   Q    And not once, Ms. Anderson, did you ever call or text

22   Brandy to warn her, right?

23   A    No.

24   Q    You never called the police, right?

25   A    No.

*A. Anderson - Cross - Mr. Cecutti*                        601

1   Q    Never called 911, right?

2   A    No.

3   Q    That your close friend, according to your story, was

4   about to get killed, right?

5   A    Correct.

6   Q    Instead, you wanted to enter an enjoyable week with

7   your family, right?

8   A    Yes.

9   Q    And this was your close friend, Ms. Anderson, who cared

10  for your son T, right?

11  A    Correct.

12  Q    This close friend that you loved, right?

13  A    Correct.

14  Q    And you never warned her in any way, correct?

15  A    I did.

16  Q    You left your close friend, according to your story, at

17  the Rosedale house to be murdered, right?

18  A    Yes.

19  Q    And your testimony is that you saw Brandy's body lying

20  on the floor of her bedroom when you got back to the house,

21  correct?

22  A    Correct.

23  Q    And you didn't run out of the house, correct?

24  A    No.

25  Q    Like you did on January 27, 2018.  You didn't run out

*A. Anderson - Cross - Mr. Cecutti*                602

1    of that house, right?

2    A    Correct.

3    Q    You didn't run out of the house screaming, correct?

4    A    No.

5    Q    You didn't call 911, right?

6    A    No.

7    Q    You didn't call the police either, right?

8    A    No.

9    Q    And then your testimony is that Cory dismembered Brandy

10   in the bathroom, right?

11   A    Correct.

12   Q    And this was days after he supposedly murdered her,

13   correct?

14   A    Correct.

15   Q    And your testimony is that you saw him mutilating her

16   body in the bathtub, right?

17   A    No.

18   Q    But you knew what was going on in that bathroom, right?

19   A    Not until I heard the saw.

20   Q    But you knew at that point, right, what was happening?

21   A    As far as what?

22   Q    According to your testimony, Ms. Anderson, you knew

23   that Cory was dismembering Brandy Odom.  That's your

24   testimony, right?

25   A    When?

1    Q    At the time it was happening.

2    A    What do you mean?

3    Q    Your testimony is that Cory Martin dismembered Brandy

4    Odom in the bathtub, right?

5    A    Yes.

6    Q    And at the time this was supposedly happening, you knew

7    it was happening, right?

8    A    No, not until I heard the noise in the bathroom.

9    Q    Okay.  And when you heard the noise in the bathroom,

10   you knew it was happening, correct?

11   A    When I walked in there and seen it, yes, that's when I

12   knew what was happening.

13   Q    Okay.  So according to your testimony, you knew it was

14   happening, right?

15   A    When I walked in, yes.

16   Q    And when you left the bathroom, you didn't call 911,

17   right?

18   A    No.

19   Q    You didn't call the police?

20   A    No.

21   Q    You didn't call Brandy's family, right?

22   A    No.

23   Q    You didn't do any of those things.

24   A    No.

25   Q    Instead, you sent a message on Facebook to Brandy's

*A. Anderson - Cross - Mr. Cecutti*                    604

1   actual sister, Aisha, right?

2   A     No.

3   Q     You don't remember sending a message to her?

4   A     I do, but it wasn't the day you're referring to.

5   Q     You sent a message on April 10, 2018, right?

6   A     I don't know when I sent it, but it's not the same day

7   that you're speaking of.

8   Q     A few days after, you sent this message to Aisha,

9   right?

10  A     Yes.

11              MS. DEAN:  Objection.

12              THE COURT:  At some point you sent a message, is

13  that right, on Facebook?

14              THE WITNESS:  Yes.

15  Q     Now, after Brandy's body was found, you continued to

16  live with Cory, correct?

17  A     I did.

18  Q     And you called clients of Brandy's after the murder?

19  A     No.

20  Q     Not once?

21  A     I don't know.

22  Q     Yesterday you testified about a public Facebook post

23  that you made, correct?

24  A     Correct.

25  Q     And that was after Brandy's murder, correct?

*A. Anderson - Cross - Mr. Cecutti*          605

1  A    Yes.  But that was Cory sitting me right next to me

2  telling me what to say and making me do it.  I did not want

3  to do it.

4          MR. CECUTTI:  Your Honor, may I approach?

5          THE COURT:  Yes.

6  Q    Ms. Anderson, do you recognize that?

7  A    I do.

8  Q    What is it?

9  A    It's the post that you're referring to.

10 Q    Did you write it?

11 A    Yes.

12 Q    And you wrote it on -- in April of 2018?

13 A    I don't know when it's written.

14 Q    You wrote it after Brandy's murder, correct?

15 A    Yes.

16         MR. CECUTTI:  Your Honor, I offer it as Defense

17 Exhibit B.

18         THE COURT:  Any objection?

19         MS. DEAN:  No objection.

20         THE COURT:  All right.

21         (Defense Exhibit B received in evidence.)

22         MR. CECUTTI:  May I publish, Your Honor?

23         THE COURT:  Yes.

24         (Exhibit published.)

25 Q    Ms. Anderson, this is the post, correct?

*A. Anderson - Cross - Mr. Cecutti*                 606

1   A    Correct.

2   Q    And in the post, you write:  "Sleep in peace, Brandy.

3   I loved you like a sister.  We had a bond from day one."

4        Right?

5   A    Correct.

6   Q    That wasn't true, correct?

7   A    It was true.

8   Q    You didn't have a bond with Brandy Odom, right?

9   A    I did.

10  Q    You also wrote in the post:  "I still can't believe

11  this happened to you."

12       Do you see that?

13  A    Correct.

14  Q    That was a lie, correct?

15  A    That was a lie.

16  Q    That wasn't true, right?

17  A    No, it wasn't true.

18  Q    And you said:  "I told you to be careful.  I begged you

19  to watch your surroundings and now you are gone, but you

20  will never be forgotten, sis."

21       And that was a lie too, right?

22  A    Correct.  And that was exactly mouthed -- said to me

23  from Cory.

24  Q    And you said:  "I will always help look for whoever did

25  this to you because I know you didn't deserve this."

1          And that was a lie, as well, right?

2   A    Yes, because I couldn't implicate him or myself.

3          MR. CECUTTI:  I have nothing further.

4          THE COURT:  All right.

5          Any redirect?

6          MS. DEAN:  Yes.  Thank you, Your Honor.

7   REDIRECT EXAMINATION

8   BY MS. DEAN:

9   Q    Ms. Anderson, did you lie to the police a lot during

10  the early stages of this investigation?

11  A    I did.

12  Q    When detectives came to your house on those dates in

13  April that defense counsel asked you about, were you trying

14  to help the investigation?

15  A    No.

16  Q    Were you trying to conceal your own role and the

17  defendant's role?

18  A    I was.

19  Q    When you told the detectives about Ramel, what was the

20  purpose of that?

21  A    To lead them out of our direction.

22  Q    When you told the detectives about clients of Brandy's,

23  what was the purpose of that?

24  A    To lead them on and make them look elsewhere.

25  Q    When you told the detectives that Brandy didn't want to

1    speak to her own family, what was the purpose of that?

2    A    Because she knew that her family was still in

3    communication with Ramel, and she didn't want them to know

4    anything about her.

5    Q    Do you remember, sitting here today, every lie you told

6    the police to lead them in other directions?

7    A    I do not.

8    Q    Why did you go to the precinct in October of 2020?

9    A    I knew -- I always wanted to leave Cory, but I knew I

10   couldn't leave him knowing this, because I was next.

11   Q    What do you mean you were next?

12   A    He was gonna kill me too.

13   Q    Why did you believe that he was going to kill you too?

14   A    He was waiting for me to collect the money so he can

15   kill me.

16   Q    Is that your belief?

17   A    Yes.

18   Q    Did you think if you successfully collected the money

19   from the life insurance policies, that you would survive

20   this?

21   A    No.

22   Q    When you met with the detectives in April of 2018, why

23   did you lie to them about the abuse that you were suffering

24   from the defendant?

25   A    I always lied about the abuse.

1   Q    Why?

2   A    Because I loved him.  I didn't want anybody to look at

3   him the way I did.

4   Q    You were asked about a number of different text

5   messages that you sent to the defendant that were loving,

6   right?

7   A    Yeah, because he was very loving and he was very

8   charming, and he always apologized and made me feel special

9   and told me it would never happen again.

10  Q    And then did it?

11  A    It did.

12  Q    Could that turn on a dime day to day?

13  A    Yes, based on the situation that we were arguing about

14  and things that I did.

15  Q    So when you said to the defense attorney who was asking

16  you questions a moment ago, this was when we were having

17  good times, could that be different the next day?

18  A    Yes.

19  Q    And was it different from day to day?

20  A    Yes.

21  Q    Why would you go back to Cory Martin when you were

22  enduring the physical abuse and the rapes that you've

23  described to us here?

24  A    Because I was always dealing with him, and I felt like

25  I had to give it a try this time.  I always cheated on

*A. Anderson - Redirect - Ms. Dean*                610

1  everybody with him.  So I felt like this was the time to at

2  least try and be together and have a blended family.

3  Q    You also described him at one point as someone who made

4  you feel safe.

5         Can you explain to us how someone who abused you

6  like that also could make you feel safe?

7  A    He did.  He knew the things to say and how to deal with

8  me.  He had a certain level of control over me.  He knew --

9  he knew everything about me, good and bad, what made me have

10 certain reactions.  He knew everything of how to make me

11 feel.

12 Q    Were there times that you wanted to have sex with him

13 and consented to sex?

14 A    Yes.

15 Q    Were there times that you desired sex with him?

16 A    Yes.  I loved him.

17 Q    Were there times that he forced you to have sex against

18 your will?

19 A    Yes.

20 Q    Were there times that he violently raped you?

21 A    Yes.

22 Q    You were asked some questions about whether Brandy Odom

23 knew about the policies that you and the defendant took out

24 in her name.

25         Did Brandy Odom know about those life insurance

A. Anderson - Redirect - Ms. Dean                611

1   policies?

2   A    No.

3   Q    When you were asked by the police if Brandy Odom was

4   aware that the defendant was paying premiums on the policies

5   with her credit card, did you, in fact, tell the police that

6   she was not aware?

7   A    I don't know, but she was not aware.

8   Q    You were asked about whether you were told that the

9   federal government would not prosecute you for this crime.

10       Do you remember those questions?

11  A    Yes.

12  Q    Did the federal government prosecute you?

13  A    Yes.

14  Q    Did you, in the course of that prosecution, plead

15  guilty to murder for hire and all of the charges that you've

16  been explaining to this jury about?

17  A    Yes, because I am guilty of those crimes.

18  Q    And in pleading guilty to those crimes, are you facing

19  life in jail?

20  A    I am.

21  Q    Now, the defense counsel asked you about what you hope

22  will happen in this case.

23       Do you remember those questions?

24  A    Yes.

25  Q    And do you want to go to jail, Ms. Anderson?

*A. Anderson - Redirect - Ms. Dean*                612

1    A    No.

2    Q    Is it very possible that you will go to jail?

3    A    Very possible.

4    Q    Do you have any idea how much time you could serve in

5    jail?

6    A    I don't know, but it can be up to life.

7    Q    Even though you're cooperating here today, it could be

8    up to life?

9    A    Yes.

10   Q    Who decides that?

11   A    The judge.

12   Q    You were asked some questions about the various

13   policies that you and the defendant had taken out by mid

14   2017.

15        Do you remember those questions?

16   A    Yes.

17   Q    I want to go back to those policies.

18        You remember the policy on Alex Villard, right?

19   A    I do.

20   Q    You remember the policy on Brandy Odom, right?

21   A    I do.

22   Q    And you remember the policy in Cory Martin's name,

23   right?

24   A    I do.

25   Q    You remember the second policy on Brandy Odom, correct?

1    A    Yes.

2    Q    In 2017, do you have any idea if the Alex Villard

3    policy was still being paid on?

4    A    I don't know.

5    Q    Do you know if that was in effect such that you could

6    make any claim on it?

7    A    I don't know.

8    Q    Do you know if the Cory Martin policy, where T was a

9    beneficiary, was in effect?

10   A    I don't know.

11   Q    Do you know if there was any ability, ever, to cash out

12   on that policy and get paid?

13   A    I don't know.

14   Q    The two policies on Brandy Odom, did you and the

15   defendant make sure those were paid?

16   A    Yes.

17   Q    Were you able to try to cash out on those policies?

18   A    What do you mean?

19   Q    Were those policies in effect when the defendant killed

20   Brandy?

21   A    Yes, they were.

22   Q    And, in fact, did you try to cash out on them?

23   A    I did.

24   Q    You were asked about whether you asked Maggie Jones for

25   help with something related to the Brandy Odom life

*A. Anderson - Redirect - Ms. Dean*                614

1    insurance policy.

2          Do you remember those questions?

3    A    Yes.

4    Q    Sitting here today, are you able to remember exactly

5    what you asked for her help with?

6    A    I don't.

7    Q    But you did ask her for help with something related to

8    the policy?

9    A    Correct.

10   Q    Had you previously described the defendant's plan to

11   get the life insurance money and move to El Paso to the

12   Government before?

13   A    Yes.

14   Q    What did he talk to you about about what he wanted to

15   do with the life insurance money?

16   A    He wanted to buy real estate and move to El Paso with

17   Hakeem.

18   Q    Was Hakeem someone you knew from growing up?

19   A    Yes.  That was his best friend, and he was also his

20   neighbor when he was growing up.

21   Q    You were asked some questions about your trips to the

22   hospital as a result of the defendant's violence in 2017.

23         Why didn't you tell the hospital staff the truth

24   about how you got your injuries?

25   A    Because I was scared.

1  Q    Why didn't you call 911 all of those different times

2  that Mr. Cecutti asked you about, on Cory Martin?

3  A    I was not going to.  I was not going to have one more

4  thing he blamed me for that I did to him.

5  Q    The time that you did call 911, what was it that pushed

6  you to call 911 that night?

7  A    We were just -- we just kept fighting; kept arguing,

8  kept fighting.  I got tired of it.  And then I also knew

9  that Brandy was going to die, and I felt like I needed some

10 kind of paper trail to say what was going on in this house.

11 We couldn't talk about what went on in that house.  When my

12 son would talk about it to my family, he would get his ass

13 beat.

14 Q    Were you afraid for your life that night?

15 A    Yes.  And I was still scared when I called them.  I

16 didn't -- I didn't want him to get in trouble.

17 Q    And, in fact, the next day did you take him back?

18 A    I did.

19 Q    Why?

20 A    Because I love him.  What was I gonna do, not take him

21 back and then keep running and playing back and forth?  I

22 was tired of doing back and forth with Cory.  I wanted to --

23 when I left him, I left for good.  He wasn't gonna come look

24 for me, find me, do anything to my family.  I just wanted to

25 leave him on a clean slate, and the only way I could have

A. Anderson - Redirect - Ms. Dean                616

1    did that was walking into the precinct.

2    Q    So let's talk about when you walked into the precinct.

3         Mr. Cecutti asked you if you confessed to your own

4    participation in Brandy's murder to D in that hotel.

5    A    I did not.

6    Q    What did you tell D about Brandy's murder?

7    A    I didn't tell him anything.  I told him that I couldn't

8    talk to him about it.  He kind of felt what I was saying,

9    and he called Maggie and said she wants to talk, and Maggie

10   came with Simmons.

11   Q    And that's the day you went to the precinct?

12   A    Correct.

13        MS. DEAN:  Just one moment, Your Honor, please.

14        THE COURT:  Sure.

15        (Pause in proceedings.)

16   BY MS. DEAN:

17   Q    Has anyone from the Government told you what the facts

18   are in this case?

19   A    No.

20   Q    Has anyone from the Government or law enforcement told

21   you about any other evidence in this case other than the

22   exhibits that we looked at together in court?

23   A    No.

24   Q    Do you know what other evidence or exhibits will be

25   used at any point in this trial other than what we looked at

*A. Anderson - Redirect - Ms. Dean*                      617

1  together?

2  A    I don't.

3  Q    Has anyone told you what other witnesses will testify

4  about?

5  A    No.

6  Q    Has anyone told you who the other witnesses are?

7  A    No.

8  Q    Has anyone from the Government told you about what

9  evidence it wanted as part of this case?

10  A    No.

11  Q    When you told the Government about your role and the

12  defendant's role in Brandy's murder, was that from memory or

13  from something else?

14  A    That was just from memory.

15  Q    Have you ever seen any kind of video compilation

16  related to this case?

17  A    No.

18  Q    Have you ever seen any phone records related to this

19  case before today when Mr. Cecutti showed you texts?

20  A    No.

21  Q    Have you ever seen any crime scene photos related to

22  this case?

23  A    No.

24  Q    Did you listen to any phone calls in this case other

25  than the 911 call you made that we listened to yesterday in

*A. Anderson - Redirect - Ms. Dean*                618

1  court and the three calls that we listened to at the end of

2  your direct examination where you said you recognized Cory

3  Martin's voice?

4  A    No, I haven't heard any other recordings.

5  Q    Before Mr. Cecutti showed you the reports that he put

6  in front of you today by law enforcement, had you ever seen

7  any law enforcement reports in this case?

8  A    No.

9  Q    At some of the meetings you attended, was there an

10 agent taking notes sometimes?

11 A    Yes.

12 Q    Were you ever given the opportunity to review those

13 notes?

14 A    No.

15 Q    Were you ever asked to check any notes for accuracy or

16 completeness?

17 A    No.

18 Q    Did you tell detectives about the prior abuse that your

19 sons and you suffered at the hands of the defendant?

20 A    I did.

21         MS. DEAN:  Just one moment, Your Honor.

22         THE COURT:  Sure.

23         (Pause in proceedings.)

24         MS. DEAN:  I have no further questions.

25         THE COURT:  Any recross?

*A. Anderson - Redirect - Ms. Dean*                    619

1              MR. CECUTTI:  No, Your Honor.

2              THE COURT:  All right.

3              Let me just see the parties at the side for just a

4    second.

5              Ms. Anderson can step down.

6              (Witness is excused.)

7

8              (Sidebar conference.)

9              (Continued on the following page.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Sidebar*                                                              620

1              (Sidebar conference held outside the presence of

2      the jury and audience.)

3              THE COURT:  I don't think it makes a whole lot of

4      sense to start anybody else today.  Do you?

5              MS. DEAN:  No, Your Honor.

6              And if you wanted to spend -- if there is extra

7      time, we would like to publish some of the certified records

8      we moved in throughout the course of direct examination.

9              THE COURT:  That's totally fine.

10             And then tomorrow we'll have the cell site guy?

11             MS. DEAN:  Yes.

12             THE COURT:  You think that will take most of the

13     day?

14             MS. DEAN:  I think it will take a lot of the day.

15     We'll probably try to have a couple of short witnesses, such

16     as Officer Saeed, who vouchered some property, and Officer

17     Raymondo, who responded to the January 27th domestic

18     violence incident.

19             THE COURT:  I don't know if it would move things

20     along a little bit, but are there pieces of evidence that

21     you all can agree on without laying the foundation and all

22     of that with the cell site stuff?  I just sometimes think if

23     we can dispense with the laying a foundation, it saves a

24     little time.  But it's been going very smoothly, so I don't

25     have a opinion about it one way or the other.

*Sidebar*                                                          621

1          MS. DEAN:  The phone records that we intend to

2     admit are all certified, so I don't think that there's an

3     objection.

4          THE COURT:  Okay.

5          MS. DEAN:  They're all certified.

6          THE COURT:  Then let's do some of those, whatever

7     you wanted to do, and then we'll break for the day.

8          MS. DEAN:  Thank you.

9          (Sidebar ends.)

10          (Continued on the following page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Proceedings                                                 622

1    (Continuing.)

2            THE COURT:  I think at this point you're just

3    going to ask to publish a couple of exhibits?

4            MS. DEAN:  Yes, Your Honor.  The Government has

5    moved in a number of certified exhibits since yesterday.  We

6    would like to publish them and read short portions as we

7    display them for the jurors.

8            THE COURT:  Sure.

9            MS. DEAN:  And if we can start, please, with

10   Government's 45.  If we can display that for everyone,

11   please.  Okay.

12           Mr. Rader, could you zoom in first on the top

13   portion, the highlights.  Yes.  Thank you.

14           At a term of the Criminal Court, County of Queens,

15   at the courthouse of Kew Gardens, State of New York, order

16   of protection, order number 2018A03828, People of the State

17   of New York against Cory Martin, docket number

18   CR-003828-18QN, date of birth 6/18/1987.

19           Mr. Rader, if you could move down to the next

20   highlighted portion.

21           Temporary order of protection.  And below that, it

22   reads:  It is hereby ordered that the above-named defendant

23   observe the following conditions of behavior:  Stay away

24   from Adelle Anderson, home of Adelle Anderson, school of

25   Adelle Anderson, business of Adelle Anderson, place of

Proceedings                                    623

1    employment of Adelle Anderson, do not go within 100 yards of

2    the above-named person.  You will be in violation of this

3    order even if you are invited back into the home.

4           No third party contact except for contact

5    communication or access by a subsequent order issued by a

6    family or supreme court in a custody, visitation, or child

7    abuse or neglect proceeding.  Refrain from communication or

8    any other contact by mail, telephone, email, voice mail or

9    electronic or any other means with protected person Anderson

10   Adelle except for contact communication or access permitted

11   by a subsequent order issued by a family or supreme court in

12   a custody, visitation, or child abuse or neglect proceeding.

13          Refrain from assault, stalking, harassment,

14   aggravated harassment, menacing, reckless endangerment,

15   disorderly conduct, criminal mischief, sexual abuse, sexual

16   misconduct, forcible touching, intimidation, threats, or any

17   criminal offense against Anderson Adelle.

18          Mr. Rader, if you could go to the bottom

19   highlighted portion.

20          Dated 01/27/2018.  Defendant advised in court of

21   issuance contents of order.  Order personally served on

22   defendant in court.  And to the right of that is a

23   signature.

24          If we may now publish Government's 46 in evidence.

25          (Exhibit published.)

Proceedings                    624

1          MS. DEAN:  And, again, may I have the top portion.

2          At a term of the Queens Criminal Court, County of

3   Queens at the courthouse at 125-01 Queens Boulevard,

4   Kew Gardens, New York 11415, State of New York, order number

5   2018-013687, People of the State of New York against

6   Cory Martin, DOB 6/18/1987.  Defendant present in court.

7          If I can have the lower -- the middle section,

8   please.  Thank you.

9          Temporary order of protection.  It is hereby

10  ordered that the above-named defendant Cory Martin, DOB

11  6/18/1987, observe the following conditions of behavior:

12  Stay away from Adelle Anderson.

13         And to the right of the section marked O2 in

14  brackets, it also reads:  Adelle Anderson, DOB 10/25/1988.

15         If I can have the bottom portion.  Thank you.  Can

16  you highlight the date, please, if it's easy.  Otherwise,

17  I'll just say it.

18         Dated 04/09/2018.  Defendant advised in court of

19  issuance and contents of order.  Order personally served on

20  defendant in court.  And to the right above Defendant's

21  signature says, "Def left court."

22         If we can now, please, have Government's 47 in

23  evidence.

24         Page one is the certificate of authenticity of

25  domestic records pursuant to Federal Rules of Evidence

Proceedings                                          625

1    902(11) and 902(13) from the New York City Department of

2    Health and Mental Hygiene.  The attached records consist of

3    two purchase orders for Brandy Odom's death certificate by

4    applicant Adelle Anderson as follows:  One, order number

5    2018-0707807 dated July 9, 2018, and two, order number

6    2018-0732224 dated July 31, 2018.

7            If we can turn to page three, please.

8            Certificate of death, decedent's legal name,

9    Brandy Keshawwn Odom.

10           If we can turn to page five, please.

11           Order number 2018-0707807, applicant

12   Adelle Anderson, shipped to Adelle Anderson 349

13   Massachusetts Ave 2, Trenton, New Jersey 08629, order

14   received date 7/9/2018, payment type, money order, under

15   delivery is the words pick up.

16           And if I can have page six, please.

17           Order number 2018-0732224, applicant

18   Adelle Anderson, shipped to Adelle Anderson, order received

19   date 7/31/2018, payment type, money order, under delivery

20   reads pick up.

21           If we can now have Government's 53.

22           (Exhibit published.)

23           Page one, Jamaica Hospital Medical Center records

24   certification, Adelle D. Anderson.

25           Page two, please.  Arrival date slash time,

Proceedings                                626

1   7/04/2017 09:18, discharge date slash time, 7/04/2017 16:44.

2   At the bottom of the page, arrival complaint, ladder fell on

3   my right leg on Friday.

4              If I can have page four, please.

5              Patient is a 28-year-old female presenting with

6   leg pain.  Location, leg, time since incident, five days,

7   injury, yes, mechanism of injury comment S slash P crush

8   injury five days ago, she stated a ladder fell on her R

9   lower leg, progression, worsening.

10             If I can have page six, please.

11             Number of diagnoses or management options, closed

12  fracture of proximal end of right fibula, unspecified

13  fracture morphology, initial encounter, new and requires

14  workup.

15             Page 16, please.

16             Impression, 28-year-old female presenting with

17  non-displaced right proximal fibula fracture, moderate

18  sprain and likely calf hematoma slash contusion, discussed

19  the nature of the injury and follow-up care, all questions

20  answered, weightbearing is tolerated, compression wrap,

21  crutches to aid with ambulation.

22             If I can have page 22, please.

23             X-ray, tibia, fibula, right AP, and lateral, there

24  is a questionable non-displaced fracture within the proximal

25  fibula shaft, there is a mild periosteal reaction within the

Proceedings                                            627

1   lateral portion of the mid fibula shaft which is nonspecific

2   but may be secondary to previous injury.

3          If I can now have Government's 55, please.

4          (Exhibit published.)

5          MS. DEAN:  And can we, please, Mr. Rader, first,

6   the bottom of the page -- actually the certification, the

7   very bottom.

8          This is to certify that this document is a true

9   and complete copy of an electronic record on file in the New

10  York State Department of Motor Vehicles, Albany, New York.

11         And if I can have the highlighted portion at the

12  top, please.

13         VIN number 1N, as in Nancy, 4BA41E85C86774605

14  Nissan black 4D SD.

15         In the middle of the page:  Prior owners,

16  Anderson Adelle D., plate HLC7182, 249-45 148th Road,

17  Rosedale, NY, batch date 01/11/17, original document issued

18  01/23/17.

19         Below that, Martin Cory W., plate HDM6678,

20  249-45 148th Road, batch date 06/13.16, original document

21  issued 06/24/16.

22         If I can, please, have now Government's 63.

23         THE COURT:  Could I just see the lawyers at the

24  side for just a quick second?  We don't need the court

25  reporter.

Proceedings                                    628

1          (Sidebar conference held off the record.)

2          MS. DEAN:  Okay.  Government's 63.

3          (Exhibit published.)

4          MS. DEAN:  Jamaica Hospital Medical Center,

5    Adelle D. Anderson.

6          If I can have page five, please.

7          2/19 -- 2/19/2017.  Patient was at a party last

8    night and two girls were fighting.  She tried to break up

9    the fight and was thrown against a wall.  Plaintiff

10   sustained las of L eyebrow at about 12mn.  She went home and

11   presents to ED today.

12         If I can have page 14, please.  Procedures,

13   laceration repair; location, face; face location, L eyebrow,

14   skin repair; repair method, sutures; number of sutures,

15   five.  That concludes the certified exhibit presentation.

16         THE COURT:  Okay.  All right.

17         Well, we're almost exactly when I said we were

18   going to finish.  So we're done for today.  So, you're

19   probably starving and free to go have lunch.  We'll meet

20   tomorrow at 9:30.

21         Please don't talk about the case at all, don't

22   look anything up on the Internet about anything, don't do

23   any research, anything like that, but do have a good

24   relaxing rest of your day, and I'll see you tomorrow

25   morning.  Thank you so much.

Proceedings                                          629

1          THE COURTROOM DEPUTY:  All rise.

2          (Jury exits the courtroom.)

3          THE COURT:  All right.  Everybody have a seat.

4          I think we already discussed at the side what the

5     schedule was for tomorrow.  You may have a few witnesses

6     whose testimony is shorter, right?

7          MS. DEAN:  Yes, Your Honor.

8          THE COURT:  And then you've got the cell-site

9     person.  Is that the person who can't come back next week?

10         MS. DEAN:  It is.  He wouldn't be available again

11    until March 4th.

12         THE COURT:  All right.  Again, not my telling you

13    how to do your job, but should we start with him to make

14    sure that he's done?

15         MS. DEAN:  Yes.

16         THE COURT:  Just throwing out a suggestion there.

17         MS. DEAN:  Thank you.

18         THE COURT:  All right.  Anything else that we need

19    to address before we break for the day?

20         MS. DEAN:  Nothing from the Government.  Thank

21    you, Your Honor.

22         MR. CECUTTI:  No, Your Honor.

23         THE COURT:  All right.  Thanks so much, everybody.

24         (Proceedings adjourned at 1:43 p.m. to resume on

25    February 23, 2024 at 9:30 a.m.)

630

1                         I N D E X

2

3    WITNESS                                        PAGE

4

5      ADELLE ANDERSON

6        CROSS-EXAMINATION BY MR. CECUTTI          493

7        REDIRECT EXAMINATION BY MS. DEAN          607

8

9

10

11                        E X H I B I T S

12

13    Defense Exhibit B                            605

14

15

16

17

18

19

20

21

22

23

24

25