UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------- X
                                                                  :
**UNITED STATES OF AMERICA**,                                     :
                                                                  :
            – against –    : **MEMORANDUM DECISION AND ORDER**
                                                                  :
**CORY MARTIN**,                                                  : 20-CR-549 (AMD)
                                                                  :
                   Defendant. :
----------------------------------------------------------------- X

**ANN M. DONNELLY**, United States District Judge:

      The defendant was convicted after a jury trial of murder-for-hire and conspiracy to commit murder-for-hire, in violation of 18 U.S.C. § 1958 (Counts One and Two); conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349 (Count Three); aggravated identity theft, in violation of 18 U.S.C. §1028A (Count Four); and fraudulent use of identification, in violation of 18 U.S.C. § 1028(a)(7) (Count Five). Over the course of a nine-day jury trial, the government called 30 witnesses and introduced hundreds of exhibits, including telephone records and cell site information, records of the defendant's internet searches, and video and photographic evidence. The evidence, described more fully below, established that the defendant and Adelle Anderson plotted to murder Brandy Odom to collect on insurance policies that they took out in her name. The defendant and Anderson paid the premiums on the policies for about a year. In April 2018 the defendant strangled Ms. Odom, dismembered her and, with Anderson's assistance, discarded her body parts in a Brooklyn park.

      Before the Court is the defendant's motion for a judgment of acquittal. For the reasons explained below, the motion is denied.

## BACKGROUND

**I.     Evidence at Trial**

    **a.     The Government's Case**

In 2016, Brandy Odom moved into the defendant's Queens, New York home, which he shared with his girlfriend Adelle Anderson.[1] (*See* Trial Transcript ("T. Tr.") 230–31, 301.) Ms. Odom and Anderson were sex workers, and the defendant was their pimp; Anderson eventually also managed Ms. Odom. (T. Tr. 231, 303.)

In late 2016, the defendant had serious financial problems; his house was in foreclosure, and he was unable to pay the utility bills. (T. Tr. 351–52.) He talked about taking out insurance policies in the names of different people, including Anderson's ex-husband and young children, and then murdering them to collect the proceeds. (T. Tr. 275–78, 280–82, 293.) The defendant planned to use the money to buy real estate and move to Texas. (*See* T. Tr. 343–44.) Eventually, he targeted Ms. Odom, because she was the "easiest to access," "nothing but a whore," and "nobody loved her." (T. Tr. 318, 333–34.) In 2017, he and Anderson took out two life insurance policies in Ms. Odom's name without her knowledge; they filled out the applications, and Anderson posed as Ms. Odom in calls with the companies. (T. Tr. 320–24, 328, 334–40, 342–43.)

In March 2017, the defendant and Anderson mailed Globe Life Insurance Company of New York an application for a $50,000 life insurance policy in Ms. Odom's name, listing Anderson as Ms. Odom's sister. (*See* GX 128C; *see also* T. Tr. 320–24.) Anderson signed Ms.

---

[1] Anderson testified pursuant to a cooperation agreement in which she agreed to plead guilty to wire fraud conspiracy, fraudulent use of identification, and murder-for-hire, and to provide "truthful, complete and accurate information" to the government. (GX 57 at 1–4.) In exchange for her cooperation, the government agreed to file a motion pursuant to U.S.S.G. ¶ 5K1.1 and 18 U.S.C. § 3553(e) outlining the extent of her cooperation with the Court during sentencing. (*Id.* at 5–6.)

Odom's name on the application. (*See* T. Tr. 320–21, 323.) She also posed as Ms. Odom in a call to Globe customer service and gave Ms. Odom's name, date of birth, and address. (*See* T. Tr. 328; GX 116E.) The defendant and Anderson employed the same scheme in a second policy application to American National Life Insurance Company of New York in December 2017, this time for $150,000. (*See* T. Tr. 320, 334–35, 339–40, 342–43.) Both companies approved the policies, and the defendant and Anderson paid the premiums, without Ms. Odom's knowledge, using her Capital One bank account, over which the defendant and Anderson had control. (*See* T. Tr. 341–342, 346–348.)

The defendant told Samson Alabi about the life insurance murder plot. (*See* T. Tr. 154–156.)[2] He offered to split the proceeds with Alabi if Alabi killed Ms. Odom. (*Id.*)[3] The defendant proposed that Alabi shoot Ms. Odom in her bedroom, and make it look like a "robbery gone wrong." (*Id.*) Alabi refused to help the defendant. (*See* T. Tr. 157.)[4]

On April 2, 2018, the defendant drove Anderson and their newborn baby to Anderson's mother's house in Queens; Anderson knew that the defendant planned to kill Ms. Odom while Anderson was away. (*See* T. Tr. 302, 367, 369–370; *see also* GX 26.) In a text message a few days later, the defendant told Anderson that he "got the pair of black UGGs," which she knew was a coded statement that the defendant had killed Ms. Odom. (*See* T. Tr. 373–75.)[5]

---

[2] Alabi testified pursuant to an agreement with the government, in which he agreed to "testify truly about what [he] kn[e]w about" the case. (T. Tr. 164–65.) The government agreed to inform the prosecutor and the judge in Alabi's pending state court prosecution about the fact of his cooperation. (T. Tr. 165, 208.)

[3] The defendant also discussed his plan with a friend named Ross (T. Tr. 324–25) and another friend named John. (T. Tr. 327–28).

[4] Alabi learned months later through social media that Ms. Odom had been murdered and dismembered. (*See* T. Tr. 161–62.)

[5] The previous Christmas, the defendant told Anderson to give Ms. Odom one of her pairs of black UGG boots and promised that Anderson would "get [them] back" one day. (*See* T. Tr. 373–74.)

The defendant picked up Anderson and their baby on April 5, 2018. (*See* T. Tr. 375–76.) They stopped at Walmart and bought cleaning supplies and a vacuum, and then went to the house on 249-45 148th Road. (*See* T. Tr. 231, 375–76, 378; *see also* GX 132.) The defendant and Anderson went to Ms. Odom's bedroom, where Ms. Odom was lying on the floor; she was naked and there was blood coming from her nose. (T. Tr. 379.) The defendant admitted that he choked Ms. Odom until she stopped breathing; he said that this was "the first time . . . he'[d] experienced seeing and feeling the life leave someone's body." (T. Tr. 380–81.)

In the days that followed, the defendant took steps to get rid of Odom's body. He did internet searches for "junk removal" companies, and searched Home Depot's website for "reciprocating saws." (*See* GX 405). The defendant also did a YouTube search for "how to insert blade for reciprocating saw" and "using reciprocating saw." (*See* GX 405.) On April 6, 2018, two junk removal companies hauled away Ms. Odom's bed and her belongings, as well as multiple large black garbage bags. (*See* T. Tr. 409–12, 1028–30, 1033.) Later that day, the defendant bought bleach, rubber gloves, heavy-duty black garbage bags and a reciprocating saw at the Home Depot in Long Island. (*See* T. Tr. 384–85; GX 26, 56, 405.)[6]

Next, the defendant and Anderson taped heavy-duty garbage bags over every surface, including the bathtub, in the upstairs bathroom. (T. Tr. 382–83.) Over the next two days, the defendant dismembered Ms. Odom's body with a manual saw and the reciprocating saw. (*See* T. Tr. 382–87.) The defendant put her arms and legs in black garbage bags, and he and Anderson took steps to remove any evidence of the murder, including shampooing the carpets, vacuuming, and showering multiple times a day. (*See* T. Tr. 394–95, 405–06.)

---

[6] Cell site records showed that the defendant went to a Long Island Home Depot on April 6, 2018 at 6:00 P.M. (T. Tr. 703; GX 26.) A receipt from Home Depot generated at around the same time showed a purchase for a reciprocating saw and a large box of black garbage bags. (*See* GX 56.)

4

The defendant told Anderson that they had to leave Ms. Odom's body someplace where it would be found so that they could collect on the insurance policies. (*See* T. Tr. 233, 391.) Accordingly, the defendant and Anderson took two trips to Canarsie Park in Brooklyn, New York, and left Ms. Odom's body parts in different parts of the park. (*See* T. Tr. 391–402.) At about 6:00 a.m. on April 8, 2018, the defendant put the garbage bags containing Ms. Odom's arms and legs in the trunk of their car, and Anderson drove the defendant to one of the park's entrances. (T. Tr. 391–95; GX 112.)[7] The defendant put the bag in a shopping cart and discarded it in the park. (*See* T. Tr. 394–395.) Close to midnight that same day, the defendant stuffed Ms. Odom's torso into a suitcase, and put it in the trunk of the car. (*See* T. Tr. 399; GX 112.) Anderson drove the defendant to a different entrance to the park. (*See* T. Tr. 397–99.) The defendant discarded Ms. Odom's torso in the park and returned to the car with the empty suitcase. (*See* T. Tr. 400–01.)

On the evening of April 9, 2018, Patricia Smith was walking her dog when she saw Ms. Odom's torso near the walkway. (T. Tr. 71–72.) She called 911, and police officers arrived at the park. (*See* T. Tr. 71–72.) Ms. Odom's arms had been severed at the elbow and her legs were severed at the hips. (*See* GX 860–64; *see also* T. Tr. 1311–13.) The next day, officers found Ms. Odom's severed arms and legs in another part of the park. (*See* GX 710, 946–48, 951–55; *see also* T. Tr. 110–15, 132–33.)

Dr. Shana Straub of the Office of Chief Medical Examiner ("OCME") performed the autopsy on Ms. Odom. (T. Tr. 1289.) Dr. Straub concluded that she died from "homicidal

---

[7] The government introduced surveillance video from the defendant's street that captured the defendant's and Anderson's movements in and out of the defendant's home in the days before and after the murder. (*See, e.g.*, GX 102–104, 111.) In addition, the government introduced footage from multiple sources showing the defendant's and Anderson's movements in the area of Canarsie Park. (*See, e.g.*, GX 105–10.)

5

asphyxia," an "unnatural" "disruption in the oxygen" to the body "and a buildup of carbon dioxide" that can be caused by "external compression of the neck or the airway" including "manual strangulation." (*See* GX 200; T. Tr. 1307–08, 1317.)  There was also evidence of hemorrhaging and burst blood vessels in Ms. Odom's eyes, which was consistent with neck compression. (*See* T. Tr. 1300.)  Dr. Angela Soler, a forensic anthropologist from OCME, examined Ms. Odom's bones. (T. Tr. 1448.)  She concluded that many of the cuts were "indicative of a blade used in a reciprocating" or "back and forth" motion that could have been made by a "mechanically powered blade." (T. Tr. 1466–67, 1472–75.)

DNA testing established that one of the garbage bags had male DNA consistent with the defendant's DNA profile or with one of his male relatives on his father's side. (T. Tr. 1396, 1402, 1419, 1422, 1444.)

From April 26 through August 28, 2018, at the defendant's direction, Anderson called Globe and American multiple times in an effort to collect on the life insurance policies she and the defendant had taken out on Ms. Odom's life. (*See* T. Tr. 328, 342, 435, 895–98; *see also* GX 116D–116P (recorded calls with Globe), 122A–122B (recorded calls with American).)  During those calls, she claimed that she was Ms. Odom's sister. (T. Tr. 328, 342.)

From April 28 to 29, 2018, police executed a search warrant on the defendant's home and car. (T. Tr. 907.)  They recovered, among other things, Ms. Odom's New York state driver's license and social security card from the dresser in the bedroom that the defendant and Anderson shared. (T. Tr. 909–10.)

In the fall of 2018, the defendant and Anderson moved to New Jersey, where they continued to try and collect on the life insurance policies. (T. Tr. 434–35.)  On November 4,

2020, the defendant and Anderson were arrested at their apartment in New Jersey. (T. Tr. 499–552.)

At the conclusion of the government's case, the defendant asked the Court to reserve decision on a motion for judgment of acquittal, submit the case to the jury, and to decide the motion if the jury returned a verdict of guilty on any of the counts. (*See* T. Tr. 1654–55.)

### b. The Defendant's Case

The defendant called Allan Jamieson, who claimed to be an expert in forensic biology. (T. Tr. 1659–61.) According to him, the fact the defendant was "one of the possible number of contributors" of the male DNA on one of the garbage bags did not prove that the defendant ever touched the bag, because DNA can be transferred indirectly through other people or other objects. (*See* T. Tr. 1663–64, 1671–72.)[8]

## II. Post-Trial Motion

On March 4, 2024, the jury convicted the defendant of murder-for-hire and conspiracy to commit murder-for-hire, in violation of 18 U.S.C. § 1958 (Counts One and Two); conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349 (Count Three); aggravated identity theft, in violation of 18 U.S.C. §1028A (Count Four); and fraudulent use of identification, in violation of 18 U.S.C. § 1028(a)(7) (Count Five). (ECF No. 131.)

The Court set a briefing schedule for the defendant's motions. In an April 8, 2024 letter, the defendant "request[ed] that the Court decide [his] motion for a judgment of acquittal as to all counts" "[s]ince the jury returned a verdict of guilty on all counts." (ECF No. 144.) The government opposes. (ECF No. 146.)

---

[8] After counsel rested, he renewed his request that the Court reserve decision on a motion for judgment of acquittal. (*See* T. Tr. 1692.)

**LEGAL STANDARD**

Rule 29 provides that "[i]f the jury has returned a guilty verdict, the court may set aside the verdict and enter an acquittal." Fed. R. Crim. P. 29(c)(1). A court evaluating a Rule 29(c) motion views "the evidence in the light most favorable to the prosecution," and will uphold the jury's verdict if it determines that "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Facen*, 812 F.3d 280, 286 (2d Cir. 2016) (citation omitted). Viewing the evidence in the light most favorable to the prosecution means "drawing all inferences in the government's favor and deferring to the jury's assessments of the witnesses' credibility." *United States v. Aguiar*, 737 F.3d 251, 264 (2d Cir. 2013) (citation omitted). A court "must consider the Government's case in its totality rather than in its parts," and the sufficiency of the evidence test "may be satisfied by circumstantial evidence alone." *United States v. Wexler*, 522 F.3d 194, 207 (2d Cir. 2008) (citations omitted). A defendant challenging the sufficiency of the evidence "bears a heavy burden." *United States v. Hawkins*, 547 F.3d 66, 70 (2d Cir. 2008) (citation omitted).

**DISCUSSION**

In seeking relief under Rule 29, the defendant does not cite any shortcoming in the evidence that would justify setting the verdict aside. (*See* ECF No. 144.) Nor can the Court identify any basis to disturb the jury's verdict. Indeed, the evidence of the defendant's guilt was compelling, and amply supported the jury's verdict that the defendant was guilty of murder-for-hire, murder-for-hire conspiracy, wire fraud conspiracy, aggravated identity theft, and fraudulent use of identification. *See United States v. Babilonia*, 854 F.3d 163, 174 (2d Cir. 2017) (elements to prove murder-for-hire); (ECF No. 130 at 25–27 (jury instructions) (same)); *United States v. Zemlyansky*, 908 F.3d 1, 10 (2d Cir. 2018) (elements to prove conspiracy); (ECF No. 130 at 28–29 (jury instructions) (same)); *United States v. Binday*, 804 F.3d 558, 569 (2d Cir. 2015)

(elements to prove wire fraud), *abrogated on other grounds by Ciminelli v. United States*, 598 U.S. 306 (2023); (ECF No. 130 at 32–33 (jury instructions) (same)); *United States v. Tureseo*, 566 F.3d 77, 82–83 (2d Cir. 2009) (elements to prove aggravated identity theft); (*see* ECF No. 130 at 37–39 (jury instructions) (same)); 18 U.S.C. § 1028(a)(7) (fraudulent use of identification); (*see* ECF No. 130 at 39–41 (jury instructions) (same).)

The jury was entitled to find that the defendant and Anderson conspired to murder Brandy Odom for pecuniary gain, that they used the internet, telephone, and mail to accomplish the scheme, as well as Ms. Odom's identification, and that the defendant murdered Ms. Odom as part of the scheme. (*See* T. Tr. 231–34, 320, 328, 341–44, 346–48, 435, 895–98, 1348, 1350; GX 116D–116P, 120, 122A–122B.) The jury heard that the defendant was in dire financial straits — that the bank was foreclosing on his house, and that he could not pay the utility bills. (T. Tr. 351–52.) Anderson testified that the defendant talked extensively about killing someone — including Anderson's young children — to collect on insurance policies before he finally settled on Ms. Odom. (T. Tr. 275–78, 280–82, 293.) He and Anderson completed applications, using Ms. Odom's identification without her permission or knowledge, and sent the applications to the insurance companies by email and regular mail. (T. Tr. 320–24, 328, 334–40, 342–43.) Anderson posed as Ms. Odom in telephone calls with the insurance companies. (*See* T. Tr. 319–20, 328; GX 116E, 122A.) The defendant also tried to recruit Samson Alabi and offered him a share of the insurance proceeds if he killed Ms. Odom. (*See* T. Tr. 154–57.) The jury saw evidence of the defendant's internet searches, as well as the proof that he purchased cleaning supplies and a reciprocating saw and hired two junk removal companies to remove Ms. Odom's bed, her belongings, and multiple large black garbage bags from the house. (*See* T. Tr. 384–85, 409–12, 1028–30; GX 26, 56, 405.) Anderson saw Ms. Odom's body, and the defendant

described how he strangled her. (*See* T. Tr. 379–81.) After the murder, the defendant and Anderson made repeated attempts to collect on the policies. (*See* T. Tr. 233–34, 328, 342, 435, 895–98; *see also* GX 116D–116P (recorded calls with Globe), 122A–122B (recorded calls with American).)

*     *     *

The Court has "examine[d] the entire case, take[n] into account all facts and circumstances, and [made] an objective evaluation." *Aguiar*, 737 F.3d at 264 (quoting *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001)). "[V]iewing the evidence in the light most favorable to the prosecution," "deferring to the jury's assessment of the witnesses' credibility," and considering the evidence "in its totality, not in isolation," the Court finds that the defendant has not sustained his "heavy burden" to show that he is entitled to relief under Rule 29. *Id.* (citations omitted). A rational jury could conclude from all the evidence that the defendant and Anderson conspired to murder Brandy Odom to collect on insurance policies which they obtained fraudulently by using Ms. Odom's identification, and that the defendant murdered her as part of that plan. For these reasons, the defendant's motion for an acquittal is denied.

## CONCLUSION

For these reasons, the defendant's motion for acquittal is denied.

**SO ORDERED.**

                                                                 s/Ann M. Donnelly
                                                                 ANN M. DONNELLY
                                                                 United States District Judge

Dated: Brooklyn, New York
         October 23, 2024